# Exhibit A

1

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3

 4      BIODELIVERY SCIENCES         :   CIVIL ACTION
        INTERNATIONAL, INC. And      :
        ARIUS TWO, INC.,             :
 5                                   :
                   Plaintiffs,       :
 6                                   :
            vs.                      :
 7                                   :
        ALVOGEN PB RESEARCH &        :
 8      DEVELOPMENT LLC, ALVOGEN     :
        MALTA OPERATIONS LTD.,       :
 9      ALVOGEN PINE BROOK LLC,      :
        ALVOGEN, INC., and ALVOGEN   :
10      GROUP, INC.,                 :
                                     :
11                 Defendants.       :   NO. 18-1395 (CFC) (CJB)
        ---------------------------  :
12      BIODELIVERY SCIENCES         :   CIVIL ACTION
        INTERNATIONAL, INC. and      :
13      ARIUS TWO, INC.,             :
                                     :
14                 Plaintiffs,       :
                                     :
15          vs.                      :
                                     :
16      CHEMO RESEARCH S.L., INSUD   :
        PHARMA S.L., INTELGENX       :
17      CORP., and INTELGENX         :
        TECHNOLOGIES CORP.,          :
18                                   :
                                     :
19                 Defendants.       :   NO. 19-444 (CFC)(CJB)

20                               - - -

21                          Wilmington, Delaware
                            Friday, December 20, 2019
22                          9:00 o'clock, a.m.

23                               - - -

24      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

25                                  Valerie J. Gunning
                                    Official Court Reporter
```

**APPEARANCES:**

MORRIS NICHOLS, ARSHT & TUNNELL, P.A.
BY:  JEREMY A. TIGAN, ESQ.

-and-

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
BY:  JENNIFER S. SWAN, ESQ.
(Palo Alto, California)

-and-

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
BY:  HOWARD W. LEVINE, ESQ. and
DANIEL G. CHUNG, ESQ.
(Washington, D.C.)

Counsel for Plaintiffs

HEYMAN ENERIO GATTUSO & HIRZEL LLP
BY:  DOMINICK T. GATTUSO, ESQ.

-and-

LEYDIG VOIT & MAYER
BY:  STEVEN H. SKLAR, ESQ. and
GREGORY C. BAYS, ESQ.
(Chicago, Illinois)

Counsel or Defendants
Alvogen PB Reserach & Development LLC,
Alvogen Malta Operations Ltd., Alvogen
Pine Brook LLC, Alvogen, Inc., and Alvogen
Group, Inc.

---

**APPEARANCES (Continued):**

YOUNG CONAWAY STARGATT & TAYLOR LLP
BY:  SAMANTHA WILSON, ESQ. and
ANNE SHEA GAZA, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX
BY:  DENNIES VARUGHESE, ESQ.,
ADAM LaROCK, ESQ. and
SASHA RAO, ESQ.

Counsel for Defendants
Chemo Research and Insud Pharma

- - -

---

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 9:00 a.m.)

THE COURT:  Good morning, everyone.  Please be seated.

All right.  Mr. Tigan?

MR. TIGAN:  Good morning, Your Honor.  Jeremy Tigan with Morris Nichols on behalf of the plaintiffs in both of these cases.  I'm joined here at counsel table by Howard Levine, Jennifer Swan, and Daniel Chung, all with the Finnegan firm.

With your permission, Mr. Levine will give the bulk of our presentation, and Mr. Chung, one term, time permitting.

Finally, in the row behind us, Jim Collins, general counsel at BDSI, is here.

THE COURT:  Thank you.  All right.

Mr. Gattuso?  I'm just going in order.

MR. GATTUSO:  Good morning, Your Honor.  Dominick Gattuso with Heyman Enerio Gattuso & Hirzel on behalf of defendant Alvogen.

I have with me at counsel table Steven Sklar and Gregory Bays, and I believe Mr. Sklar is going to argue on behalf of Alvogen today.

THE COURT:  All right.  And Ms. Wilson?

MS. WILSON:  Good morning, Your Honor.  Samantha Wilson from Young Conaway on behalf of the defendants in the 19-444 action.

With me today is Dennies Varughese, Adam LaRock and Sasha Rao from Sterne Kessler Goldstein & Fox.  They represent the Chemo and Insud defendants in our action but will be arguing today on behalf of all defendants.

Also with us today is Tommy Kenney, the director of IP and legal affairs from Intel Genex as well as my colleague, Anne Gaza, from Young Conaway.  Ms. Gaza does have another proceeding later today, so will need to step out at some point.

THE COURT:  That's fine.  Good morning, Ms. Gaza.  All right.

So a couple of things up front.  I got the letter this morning that you all filed, somebody filed at 9:00 o'clock last night, so I appreciate it on one hand, but I wanted to ask counsel just as a general matter, are you all familiar with Judge Noreika's latest practice of sending out a requirement of a meet and confer?  No?

MR. LEVINE:  No, Your Honor.

THE COURT:  So I'm particularly interested in Delaware counsel's views on this.  Judge Noreika started a

18

1    THE COURT:  Okay.

2    MR. VARUGHESE:  Your Honor, if it's helpful to

3    you and to Mr. Levine, the way I've grouped my presentation

4    is all the layer terms or the solid terms we grouped

5    together, because I think the arguments really rise and fall

6    together.  We have not distinguished between the layer

7    terms.

8    THE COURT:  Right.  That's my sense.  Do you

9    agree, Mr. Levine?

10   MR. LEVINE:  Yes.

11   THE COURT:  Okay.  All right.  So let's do that.

12   Now, you're doing like a tutorial essentially a little bit

13   at the beginning, I take it?

14   MR. LEVINE:  Yes, Your Honor.

15   THE COURT:  All right.  Are you?

16   MR. VARUGHESE:  I'm not, Your Honor.

17   THE COURT:  Okay.  All right.  Sounds good.

18   MR. LEVINE:  May it please the Court, Howard

19   Levine from Finnegan representing BDSI.

20   I just want to start off with just a little bit

21   of background as to the device or the film and it's Belbuca,

22   which is a buprenorphine buccal film.  It's indicated for

23   the    long-term treatment of chronic main.  That's the

24   indication.  And that's what it is.  It's a very small,

25   extremely thing film, and it has two layers.  And you'll see

19

1    this, and I'm sure you've seen this throughout the briefing

2    and throughout the patent.

3    The one layer is the backing layer that helps

4    facilitate one-way flow of medication.  It's also called

5    unidirectional delivery.  You'll see that term in the

6    patent, in the briefing.  And what that means is that the

7    backing layer prevents the buprenorphine from going back

8    into the mouth.  It's like a physical barrier and keeps it

9    going towards the cheek or into the mucosa.  The backing

10   layer also prevents the buprenorphine from mixing with the

11   saliva in the mouth because that is sort of the enemy of the

12   way this film works, is contact with saliva, because when

13   the buprenorphine is swallowed, it gets into the digestive

14   system.  It's not bioavailable when it's in the digestive

15   system, and it also causes really bad side effects.

16   And before I continue, Your Honor, may I

17   approach with the slides?

18   THE COURT:  Sure.  Please.

19   MR. LEVINE:  Sorry about that.

20   (Mr. Levine handed slides to the Court.)

21   MR. LEVINE:  So that's the backing layer.

22   The other layer is what's called the

23   mucoadhesive layer.  Mucoadhesive means it adheres to the

24   mucosa of the cheek, and that is where the buprenorphine is

25   in, it's in the mucosal layer.  It's a very thin layer, only

20

1    50 microns thin, extremely thin, and that is the part of the

2    layer that adheres to the cheek.

3    The other thing we will see throughout the

4    discussion for patent is something called a polymeric

5    infusion environment, which is really a mouthful.

6    THE COURT:  That's a very good pun.

7    MR. LEVINE:  Yes.

8    THE COURT:  I do agree, it says polymeric.

9    MR. LEVINE:  So when it says polymeric infusion

10   environment, it means polymers, which are just polymer

11   compounds that are in that mucosa layer that enables the

12   buprenorphine -- it creates an environment so that the

13   buprenorphine mixes with those polymers and can diffuse

14   across the mucosa.  That's what a polymeric infusion

15   environment is.  It's the polymers that contain the

16   buprenorphine that allow it to diffuse across the mucosa in

17   through the cheek.

18   And that's just a picture of the Bema film

19   inside the cheek.  That's where it goes.  That's a closeup

20   of the two layers, and you can see --

21   THE COURT:  Incidentally, who puts it in the

22   mouth?  Do you let the patient?

23   MR. LEVINE:  The patient, yes.

24   THE COURT:  They take that risk, because if you

25   put it in backwards --

21

1    MR. LEVINE:  That's right.  That's why the word

2    Belbuca is printed on the mucosa side, so that the patient

3    knows, that's the side that goes into the cheek and you do

4    not want to put this on backwards.  I'm not even sure if it

5    will stick if you put it in backwards because the mucosa is

6    designed for that to adhere to the cheek.

7    So that's the mucosal layer and that's the

8    backing layer, and because of that, the buprenorphine, when

9    it contacts the inside of the cheek, the buprenorphine flows

10   through the mucosa layer, diffuses into the circulatory

11   system and throughout the body.

12   The other important feature of this invention is

13   the pH, and we talked about it before with about.  pH of the

14   mucosa layer is important.  We found -- we argued quite

15   unexpectedly, because buprenorphine is a very basic compound

16   and the prior art would have taught that for a basic

17   compound, you wanted a high pH to get it across the mucosa.

18   We found that when you drop the pH, you had huge increases

19   in bioavailability and that's why part of the limitations of

20   the claim are a pH between four and six, a lower pH than you

21   would have expected.

22   And those are the three patents-in-suit, the

23   '866, the '843 and the '539.  The '866 and the '843, same

24   specification.  Essentially, basically, the same written

25   description.  The claims are slightly different.  They

1  expire at the same time.
2          The '539 patent comes a little bit later in time
3  and it has some clinical data.  Also it has -- the claims
4  have some pharmacokinetic parameters.  It also talks about
5  side effects.  That's a little bit later in time.
6          The '539 patent also claims the pH of the
7  backing layer and these two were just the pH of the mucosa
8  layer.  It turned out unexpectedly that the pH of the
9  backing layer also helped drive buprenorphine into the
10  mucosa and so that innovation is claimed in the '539 patent
11  as well.
12          And just so, tied to the patent, in the '866
13  patent under the detailed description of the invention,
14  these are the terms, phrases that I talked about --
15  polymeric diffusion environment, mucosal surface, pH being
16  important, barrier environment, which is the backing layer,
17  which creates the unidirectional gradient, going across.
18  Those are the main features of the invention.
19          So the first term is a bioerodable mucoadhesive
20  layer, and our position was that those words don't need to
21  be construed.  There's no ambiguity.  And I'm not sure from
22  reading their briefs that defendants have alleged there's
23  any ambiguity with regard to those terms.  Bioerodable means
24  it erodes as we discussed, within 20 to 30 minutes.  It
25  dissolves.  Mucoadhesive means it adheres to the mucosa of

23

1  the cheek, and layer implies a certain degree of thickness,
2  clearly not a liquid, but it's a layer.  And we thought
3  those words really mean what they say and don't need to be
4  construed.
5          Now, defendants want to add the word solid to
6  the beginning of that phrase and we object to that.  The
7  word solid is not recited in the claim.  The written
8  description does not refer to a solid bioerodable mucosal
9  layer pretty much because it dissolves.  It goes away.  It's
10  not there after 20 to 30 minutes, and the inventors and the
11  Patent Office, when they engaged in their discussion in
12  trying to find the fence, the borders of the property,
13  right, they are allowed to choose their own words to define
14  the invention and they chose to call it bioerodable and they
15  didn't include the word solid.
16          THE COURT:  So what's going on?  Okay.  This is
17  what I can't figure out.  I don't get to see the whole
18  picture you guys do.
19          There's a solid.  That is, the word solid is
20  used multiple times in the written description.  Right?
21          MR. LEVINE:  Not -- not referring to the layer.
22  It's actually -- I don't think it's ever referred to as the
23  layer in the solid.  I think there's one --
24          THE COURT:  Well, you agree it's a solid
25  solution, or at least you think one prior reference is

1  called in a solid solution.  Is that fair?
2          MR. LEVINE:  That is correct, that technically,
3  it's a solid solution and that it's a mixture of solids at
4  the molecular level.
5          THE COURT:  So let's say it's a solid solution,
6  so, again, now, kind of like the about thing.  So why
7  does it really matter?  What's really going on, because it
8  sounds like we could call it a solid and your expert would
9  come in and say, well, solid solution, here's why we have
10  infringement, and then their expert comes in and says,
11  there's no infringement.  I'm trying to understand is there
12  really, if it really makes a difference here.
13          MR. LEVINE:  Well, we chose to call --
14          THE COURT:  Because your expert is going to be
15  crossed and he or she is going to have to say, yes, it's a
16  solid solution.  Right?  That's what's going to happen on
17  the stand?
18          MR. LEVINE:  They would say that layer is a
19  solid solution, that's correct.
20          THE COURT:  Okay.  So then why am I spending all
21  of this time because we're going to have that come out at
22  the trial?
23          MR. LEVINE:  Because, again, and we have some
24  cases that talk about that.  Even if it was a solid, which,
25  again, within 20 minutes, it's not a solid anymore.  It's

25

1  gone.
2          THE COURT:  But you're going to admit on the
3  stand, your expert is, it's a solid solution.
4          MR. LEVINE:  That the layer is a mixture of
5  solid solution, correct.  But the question is --
6          THE COURT:  When they are asked yes or no, is it
7  a solid solution?
8          MR. LEVINE:  They're going to say --
9          THE COURT:  They're going to say yes.
10          MR. LEVINE:  They're going to say yes.
11          THE COURT:  Okay.  So let's talk about then, why
12  is it necessary to construe this?
13          MR. LEVINE:  Well, that's our position.  We
14  don't think that --
15          THE COURT:  Okay.  Fair enough.  So why does it
16  matter if we just call it solid?
17          MR. LEVINE:  I think the defendants are trying
18  to argue, as I understand their position, that the pH of the
19  layer is measured while it's in solution in the patent,
20  which is a perfectly appropriate way of doing that, and I
21  think they are trying to get the word solid in there to
22  argue that, well, if the word solid is in there, then you
23  can't measure the pH while it's in its liquid form.  It
24  bolsters their nonenablement position and also I think one
25  of the defendants has a noninfringement position as well

26

1  saying, well, because it's a solid and you don't measure our
2  pH of our product while it's in a liquid form, therefore, we
3  can't infringe.
4          And our point is, we didn't choose to call it a
5  solid.  That's not how it's defined in the written
6  description.  It's not how it's defined in the claims.  The
7  inventors chose a bioerodable layer and there's no reason to
8  read in terms into the claim because there's no purpose, and
9  that's simply our position.  I mean, there's no --
10          THE COURT: I get your position.
11          MR. LEVINE: Yes.
12          THE COURT: And, frankly, get ready.  I think
13  they have a better position.  All right?  I mean, we
14  generally go with the claims.  We don't read a limiting
15  definition into a claim unless there's lexicography.  I
16  don't think we have lexicography here.  So I generally
17  agree, but I'm also trying to figure out, does it really
18  matter?  Now, you alluded to some invalidity theory.
19          MR. LEVINE: Yes.
20          THE COURT: Maybe that's where it comes in,
21  because I'm thinking infringement, it's just not going to
22  matter, because I can't believe you would have a credible
23  expert who doesn't just point blank answer the question, is
24  it a solid solution?  Yes.
25          MR. LEVINE: Yes.  That's -- so the infringement

27

1  issue, I think, is they're going to try to say that our pH
2  of our layer is not approximately between four and six,
3  because the claim requires you to do it as a solid and you
4  can't take the pH of a solid, and therefore you can't prove
5  infringement.
6          THE COURT: All right.
7          MR. LEVINE: I think that's where they're going.
8  And the word layer, it's not a -- layer means it's not a
9  liquid, so any argument they want to make, they can make
10  with layer.
11          THE COURT: All right.
12          MR. LEVINE: Our position is you just don't need
13  to put in solid.
14          THE COURT: Yes.  Okay.
15          MR. LEVINE: So, again, and my presentation is
16  very case law heavy because, as you noted, Your Honor noted,
17  there are a lot of cases that deal with this specific issue.
18  It is improper for a Court to add extraneous limitations to
19  a claim, that is, limitations added wholly apart from any
20  need to interpret what the patentee meant by particular
21  words.  Here, none of those words need interpretation.
22          The Source case actually we think is very
23  important because there, Source made a similar argument.
24  They said, looking at the whole context of the patent and
25  the claims, and they said there was no bar to proposing a

28

1  claim construction that only adds words to the claim being
2  construed, and the Federal Circuit said, no, that's not
3  right.  Instead of looking to the words themselves, Source
4  added language without support from the specification or
5  prosecution history, altering otherwise unambiguous claim
6  language, a practice this Court has repeatedly rejected.
7          The Nichia case from this Court as well, they
8  wanted to interpret transparent material as unitary
9  transparent based on language in the written description.
10  The Court said, the written description doesn't refer to it
11  as unitary transfer material, the same way the written
12  description doesn't refer to it as a solid bioerodable
13  mucosal adhesive layer.
14          And then as I understand it, their too many
15  arguments are, well, you have to interpret solid because the
16  specification, that's a quote, the specification discloses
17  features unique to solids and therefore that word has to be
18  interpreted.  They argue an implement meaning from the
19  specification's context is equally definitive as explicit
20  disclosures.  We disagree with both of those points.
21          There's no requirement, even if the written
22  description called it a solid, there's no requirement that
23  every feature has to be added to the claims.  The Ventana
24  case --
25          THE COURT: Look, I will tell you why.  I think

29

1  it's overwhelming for you.  Maybe we should hear from them.
2          MR. LEVINE: Okay.
3          THE COURT: I'm not sure anything is really
4  overwhelming in Federal Circuit case law, but this one seems
5  pretty close.
6          MR. VARUGHESE: Good morning once again, Your
7  Honor.  If it pleases the Court, Dennies Varughese on behalf
8  of defendants from Sterne Kessler.
9          Your Honor, I have some demonstratives and hard
10  copies of the patents.  If I may approach?
11          (Mr. Varughese handed slides to the Court.)
12          MR. VARUGHESE: Your Honor, I do have a prepared
13  presentation, but in light of your discussion with
14  Mr. Levine, I thought I would jump around and maybe address
15  what I think Your Honor is going to ask me.
16          If we could go to slide 12.
17          So first to address the no ambiguity point,
18  initially, you know, we tend to agree there was no
19  ambiguity, but during the negotiation process to try to
20  figure out which terms the parties were on the same page
21  about, which terms we agreed in terms of the scope of the
22  claims, it was BDSI who refused to acknowledge that the
23  claims are limited to a solid.  You know, the commercial
24  embodiment of Belbuca is a solid, but for whatever reason,
25  they refused to agree with us that the claims were limited

1  to a solid, and I think that's what precipitated this
2  dispute.
3           While, yes, we are asking the Court to construe
4  the layer terms as a solid, I disagree strongly that we're
5  trying to import any limitation.  It's clear looking at the
6  specification and the claims, and I'm going to go to that
7  in about ten seconds, that the claims are limited to a
8  solid.
9           But this --
10          THE COURT:  The layer is disintegrating.  Right?
11          MR. VARUGHESE:  Yes.
12          THE COURT:  All right.  So it's disintegrating.
13  What's it turning into?
14          MR. VARUGHESE:  So it actually completely
15  erodes.
16          THE COURT:  It's disappearing.  So when it
17  disappears, what is it?
18          MR. VARUGHESE:  It's gone.
19          THE COURT:  So what is it?
20          MR. VARUGHESE:  So if I --
21          THE COURT:  It's in transition.  Right?  I mean,
22  this is the inability of language to perfectly capture all
23  nuances of an invention.  Right?  I mean, you've got to do
24  your best.
25          MR. VARUGHESE:  So I think the point that you

1  measure it, that I could see has validity implication
2  perhaps.  Right?
3           MR. VARUGHESE:  Yes, Your Honor.
4           THE COURT:  But I do think you're trying to read
5  a limitation into the claim.  I mean, isn't this really an
6  argument about, I guess it's enablement or something?  You
7  know, that's where the argument is.
8           MR. VARUGHESE:  I think it goes to all of that.
9  I mean, I think the problem that we're having is, I think
10  BDSI wants to have wiggle room to say the claims covered
11  more than what they actually claimed.
12          THE COURT:  Well, they do clearly.  I mean, yes
13  I guess is the answer to that, but they didn't limit
14  themselves in the claims, and the case law is you can't
15  import limitation from the written description unless you've
16  got lexicography or a disclaimer.  Right?  I mean, that's
17  the case law.
18          MR. VARUGHESE:  That is the case law, but, you
19  know, I submit to Your Honor respectfully, we're not adding
20  a limitation.  We're trying to clarify the scope of the
21  claims so we understand what the claims cover.  So we
22  focused just on the claims.  They say essentially, to
23  paraphrase, they're saying the thing that's administered to
24  the patient is a solid.  They admit that.
25          THE COURT:  Wait.  Let's just step back.  Let's

31

33

1  are making is what Mr. Levine said, that because it's
2  bioerodable, somehow it's not a solid.  I think that's
3  tantamount to arguing that a Tic-Tac or a breath minute is
4  not a solid because it dissolves in a person's mouth when it
5  is in contact with saliva.  It doesn't change the fact that
6  it's a solid when you first administered it.
7  <mark>Here's what BDSI says at page 10 of their brief.</mark>
8  <mark>While the mucoadhesive layer is in solid form, as opposed to</mark>
9  <mark>a liquid or a gas, at stages during the administration to a</mark>
10 <mark>patient, they say there's no reason why this particular</mark>
11 <mark>feature needs to be added to the claim.</mark>  We're not adding.
12  If Mr. Levine and BDSI in open court on the record says,
13  yes, the claims are limited to a solid, we can go home.
14          THE COURT:  This is the problem, is what are you
15  going to do with that?  Right?  And it really does boil down
16  to, at least one of the things looks like it boils down to,
17  when do you measure the pH.  Right?
18          MR. VARUGHESE:  I think that is one issue, Your
19  Honor, and also in terms of developing the invalidity
20  positions and developing prior art positions.
21          The parties need to understand, what is the
22  scope of the claim?
23          THE COURT:  So that also, that makes sense to
24  me, that if this particular piece of matter needs to be
25  measured with respect to pH and it's not clear when you

1  work through the practical implications.  Let's say I go
2  with them.  All right?  Now, don't you have a better
3  enablement argument?
4           MR. VARUGHESE:  I think we do.
5           THE COURT:  So then practically, why do you want
6  solid, because it makes it a lot harder for you.  I guess
7  you say we don't infringe.
8           MR. VARUGHESE:  When you say go with that, I'm
9  not really sure where they are going.  They don't like the
10  fact that we're calling it a solid.
11          THE COURT:  Right.  If I were them, I wouldn't
12  like the fact that you call it a solid.
13          MR. VARUGHESE:  But I think we need to have
14  clarity.  Is it a solid, is it a liquid, is it a gas?  I
15  think all of that has enablement, written description issue,
16  the other prior art issue --
17          THE COURT:  But really, I want to make sure I'm
18  not oversimplifying this, and it implicates both
19  infringement and potentially validity or invalidity.  What
20  it really boils down to is, when do you measure the pH?  Is
21  that right?
22          MR. VARUGHESE:  That is definitely one issue,
23  Your Honor.
24          THE COURT:  What is the other one?
25          MR. VARUGHESE:  The other issue is if this is

34

1 not a solid, then do we need to provide prior art references
2 that disclose the thing that Belbuca is in some type of
3 liquid form or gel form or gas form?  I know it's kind of
4 ridiculous, but that's what we're trying to focus on.
5        THE COURT:  Well, no, because I thought that
6 would help you, that it is not a solid and it was disclosed
7 in liquid form.  That I would think help you.
8        MR. VARUGHESE:  I think that would help us.
9        THE COURT:  So then why do you need to have this
10 solid put in?  You would be better off, wouldn't you?
11 Again, I could be asking really stupid questions here or
12 making stupid assumptions, but aren't you better off if it's
13 not solid, because now you've got a lot wider universe of
14 prior art references to look at to say, it was disclosed as
15 a liquid.
16        MR. VARUGHESE:  So, first of all, these are
17 really good questions.  I'm sweating through my suit.
18 That's neither here nor there.
19        I think the problem is, eight months later I
20 guess as the case shapes up more, perhaps BDSI is going to
21 take the position, yes, it was a solid all along because
22 they want to avoid those problems.  We're trying to get
23 clarity on --
24        THE COURT:  A, then you come back.  A, if they
25 are going to argue that, I think they would be so hard

35

1 pressed to do it given the representations that have been
2 made here today and that's what's in their briefing.
3        And then the second thing is, I guess they have
4 to demonstrate good cause.  I'm just having a hard time
5 figuring out how that would really happen.  I just don't
6 know how they could make a straight face say, oh, we changed
7 our mind.  We just realized that it really was a solid all
8 along.  I wouldn't want to make that argument if I were
9 them.
10        MR. VARUGHESE:  I understand, and I think given
11 where --
12        THE COURT:  So then let's go back to what's
13 practical here.  I'm really trying to understand why you
14 need this.
15        MR. VARUGHESE:  So, Your Honor, let me just make
16 this one point.  I think where you're headed, I don't want
17 to belabor the point and waste too much time.
18        THE COURT:  No, you're not wasting my time.  I
19 am going to let you make all the arguments.
20        MR. VARUGHESE:  Sure.
21        THE COURT:  Basically, it seems to me, so I
22 understand it, you've acknowledged that you would have a
23 better chance of establishing an obviousness defense or
24 anticipation.  I guess it would be obviousness if, in fact,
25 it's not solid.

36

1        MR. VARUGHESE:  112, indefiniteness.
2        ==THE COURT:  And you definitely have a better==
3 ==chance with enablement or indefiniteness.  So why do you==
4 ==want to press this argument?==
5        MR. VARUGHESE:  I understand that.  I might just
6 sit down.
7        THE COURT:  Just tell me why, tell me why.
8        MR. VARUGHESE:  One is, from an infringement
9 standpoint, on this slide, you know, BDSI uses this thing
10 called casting solution.  That's like a slurry during the
11 manufacturing process that has been hardened into the film,
12 into a solid.
13        I can't put myself in Mr. Levine's head.  I
14 don't know what their trial strategy is going to be.  I
15 think they want to leave themselves open to testing during
16 the manufacturing process if it turns out that testing
17 the pH is not beneficial for them on the film, and in our
18 view, it seemed to impermissibly expand the scope of the
19 claims.
20        THE COURT:  Have you propounded an interrogatory
21 that tells them, that requires them to tell you when you
22 measure the pH?
23        MR. VARUGHESE:  We have.  We've not gotten a
24 response to that.
25        THE COURT:  When is that response due?

37

1        MR. VARUGHESE:  I think there was an ongoing
2 dispute about that.  We have some letters we submitted to
3 Magistrate Judge Burke, or soon we will in terms of
4 discovery disputes.
5        And we're going to --
6        THE COURT:  Let me ask him:  When do you measure
7 the pH?
8        MR. LEVINE:  The way the patent describes it,
9 Your Honor, is it's during the manufacturing process, and,
10 in fact most of the prior art that they cite, that's the way
11 you do it for films.  You measure it during, when it's in a
12 liquid phase and then dry it.  That's a perfectly
13 appropriate way to do it.
14        You could probably also do it by taking a
15 finished film and then dissolving it's and measuring the pH
16 that way also.
17        So I just want to make clear.  The word said
18 layer.  A layer is not a liquid.  It's a layer, and we think
19 layer --
20        THE COURT:  Well, then you should just go with
21 solid, but you're fighting on it.  Again, this is the way
22 patent stuff works.  You all have a hidden agenda.  I don't
23 know where it goes.  Nobody wants to disclose stuff here
24 because I'm sitting here thinking, I don't know why we're
25 fighting this battle.  You just said, it's a layer, Judge.

38

1   It's a solid.  Go with solid.  Can't do that.  It's not
2   clear, both of you.  I mean, this seems to me, it's kind of
3   actually entertaining.
4            MR. LEVINE:  That's why we think we should go
5   with the words on the claim, a bioerodable that
6   disintegrates at the end.
7            THE COURT:  I know, but you just stood up and
8   you said, Judge, it's a layer.  It has to be a solid.  All
9   right.
10           MR. LEVINE:  I said it's not a liquid, it's not
11  a gas.  A bioerodable 50-micron layer that goes away.  Is it
12  porous if it's a solid?
13           THE COURT:  You are just repeating.  You're not
14  hitting head-on.
15           MR. VARUGHESE:  So, Your Honor, you know a layer
16  is not a stable matter.  If it's not a liquid, if it's not a
17  gas, it is surely not --
18           THE COURT:  Well, first of all, right, I've
19  mixed salad dressing.  We've got liquid layers.  I know
20  enough about that.  Right?
21           MR. VARUGHESE:  I would like to highlight one
22  other point for Your Honor.  The solid solution argument,
23  here's the definition of solid solution.  This is from the
24  BDSI witness.  It's a solid mixture containing a minor
25  component and a major component.  It's a mixture of two

39

1   crystalline solids that co-exist as a new crystalline solid.
2            I think BDSI is trying to seize on this word
3   solution and trying to suggest that in a traditional sense,
4   it's some kind of liquid or syrup the way we think of
5   solution.  No.  Solid solution means two solids.  You have
6   one major foundational component with a minor component
7   dispersed.  In no way is it a solid the way we think of a
8   sheet or a film.
9            With that, Your Honor, unless Your Honor would
10  like to hear more argument, I think we'll rest on the papers
11  and I understand some of the comments Your Honor made.  You
12  know, I just wanted to highlight those points.  I do not
13  need to go through this presentation unless Your Honor would
14  like me to.
15           THE COURT:  What is the expression, hoisted by
16  your own petard?
17           MR. VARUGHESE:  Not familiar with that
18  expression, Your Honor.
19           THE COURT:  Is that the expression?
20           MR. LEVINE:  That is the expression, Your Honor.
21           THE COURT:  Yes.  I think the plaintiff was
22  hoisted by his own petard.  I'm going to adopt the
23  plaintiffs' construction.  I'm not going to add the word
24  solid as a limitation because I don't think there has been
25  sufficient lexicography or certainly a clear, unequivocal

40

1   lexicography or disclaimer, but I think they're setting
2   themselves up for some invalidity issues.  And if I were
3   you, I would quote the transcript today when we get to that
4   stage.
5            So I'm going to adopt the plaintiffs'
6   construction and not add what I think is a limitation of the
7   word solid.  All right?
8            MR. VARUGHESE:  Thank you, Your Honor.  We
9   accept that.
10           THE COURT:  All right.  Let's go.  What's next?
11           MR. LEVINE:  And we just want to make --
12           THE COURT:  There's no need to argue that,
13  Mr. Levine.
14           MR. LEVINE:  Okay.
15           THE COURT:  You are where you are.  You had your
16  chance.  Your client had its chance.  Let's go.
17           MR. LEVINE:  Okay.  The next term is --
18           THE COURT:  I thought we got rid of this term.
19           MR. LEVINE:  Well, we received the letter last
20  night as well and we're not sure exactly what they meant by
21  that.  We had argued that there was no construction
22  necessary for a buffered environment because it was a term
23  that was defined in the patent and that is how we briefed
24  it.  If they agree with us on that, then we're done, but I'm
25  not sure that is what they are saying in the letter.  I

41

1   really don't -- didn't understand their letter exactly.
2            THE COURT:  I thought that's what they were
3   saying.
4            MR. VARUGHESE:  That is what we're saying, Your
5   Honor.
6            THE COURT:  All right.
7            MR. LEVINE:  Okay.  Is that easy enough?
8            THE COURT:  That's great.  Just so the Federal
9   Circuit knows what we're talking about, we had a screen shot
10  of slide 23 of the presentation referencing the quote, "is a
11  buffered environment" term, limitation, and the sides have
12  agreed that there's no need to construe that term.  No
13  construction is the necessary.  All right.
14           MR. LEVINE:  The next one was about, which we
15  dealt with already.  Fast-forward, please.
16           I think the only other term, I think there are
17  only two more terms left to be discussed and one of them is
18  transmucosal.
19           THE COURT:  All right.  I'm glad you got to this
20  one.
21           MR. LEVINE:  Okay.
22           THE COURT:  Here I am again.  I'm trying to
23  figure out why we're arguing about this, okay, because there
24  is lexicography.
25           MR. LEVINE:  There is.

# Exhibit B

| From: | Chung, Daniel |
|---|---|
| To: | Charles Wysocki; Sullivan, Thomas; Levine, Howard; Swan, Jennifer; Galgano, Michael; Katz, Seth; EXT-JTigan@mnat.com; "Sklar, Steven"; "Bays, Gregory"; "Szelag, Ashlee"; "Gattuso, D" |
| Cc: | Adam LaRock; Chemo Buprenorphine Film; EXT- meiklejohn.pau; "godfrey.geoff@dorsey.com"; "tseng.david@dorsey.com"; "Gaza, Anne Shea"; "Wilson, Samantha"; Fletcher Price, Bonnie |
| Subject: | RE: BDSI v. Chemo/IGX/Alvogen // Identification of Claim Terms for Construction |
| Date: | Tuesday, August 27, 2019 5:13:36 PM |
| Attachments: | image004.png |
| | image005.png |
| | image006.jpg |
| | image007.png |
| | Parties" Claim Terms and Proposed Constructions.docx |

Charles,

We attach a chart providing plaintiffs' proposed constructions to the claim terms identified by defendants.

We further disagree with the characterizations in your e-mail.  Plaintiffs have in no way been "unwilling to cooperate in the claim construction process."  Defendants initially identified a total of 36 claim terms and proposed constructions.  A number of the claim terms were identified as allegedly "indefinite," despite the Court's previous ruling that indefiniteness challenges would not be addressed at the claim construction stage.  In an effort to streamline the issues between the parties and before the Court, plaintiffs requested confirmation from defendants that the Markman briefing and hearing will only concern the disputed claim terms, and not the terms identified as "indefinite."  Defendants did not provide this confirmation until Thursday evening, and plaintiffs have diligently worked to address the remaining 23 claim terms and proposed constructions.

We propose that the parties exchange the identification of intrinsic evidence upon which the parties will rely by Thursday at 5 p.m. EST.

Please let us know if you believe it is necessary for the parties to meet and confer and your availability.

Regards,
Dan

**Daniel G. Chung**
**Attorney at Law**
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4355 | fax: 202.408.4400 | daniel.chung@finnegan.com | www.finnegan.com | Bio



**From:** Charles Wysocki <CWYSOCKI@sternekessler.com>
**Sent:** Monday, August 26, 2019 11:58 AM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Katz, Seth <seth.katz@finnegan.com>; EXT-JTigan@mnat.com

<JTigan@mnat.com>; 'Sklar, Steven' <ssklar@leydig.com>; 'Bays, Gregory' <gbays@leydig.com>; 'Szelag, Ashlee' <aszelag@leydig.com>; 'Gattuso, D' <dgattuso@hegh.law>
**Cc:** Adam LaRock <ALAROCK@sternekessler.com>; Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; EXT- meiklejohn.pau <meiklejohn.paul@dorsey.com>; 'godfrey.geoff@dorsey.com' <godfrey.geoff@dorsey.com>; 'tseng.david@dorsey.com' <tseng.david@dorsey.com>; 'Gaza, Anne Shea' <agaza@ycst.com>; 'Wilson, Samantha' <SWilson@ycst.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>
**Subject:** BDSI v. Chemo/IGX/Alvogen // Request for Meet and Confer re: BDSI Failure to Cooperate in Claim Construction

**EXTERNAL Email:**

Counsel:

I write on behalf of all Defendants. Defendants provided their identification of claim terms and proposed constructions on August 16. We have not received a response from you regarding our numerous requests for a date-certain by which Plaintiffs will propose competing constructions or agree that Defendants' construction is proper. The deadline for the parties to submit a joint claim construction chart—including citations to the intrinsic record that support a party's construction or rebut the opposing party's construction—is this Friday, August 30. BDSI's unwillingness to cooperate in the claim construction process is improper. Defendants need ample time to consider Plaintiffs' proposed constructions and identify rebuttal intrinsic evidence for Plaintiffs' proposed constructions.

Given Plaintiffs' silence on this issue, we understand that Plaintiffs accept Defendants' constructions for terms where Defendants have proposed a construction. As per my August 22 email, the parties will reserve briefing on indefiniteness for expert discovery. *See* email from C. Wysocki to T. Sullivan dated August 22.

If Defendants' understanding is incorrect, please explain why Plaintiffs have been unwilling to cooperate in the claim construction process by: (i) providing a proposed construction for the disputed terms; provided a date certain for the exchange of identifications of intrinsic evidence supporting the proposed construction, and (iii) providing a date certain by which the parties would exchange identifications of rebuttal intrinsic evidence. Given the limited time allotted for these exchanges, only two weeks after the parties identified claim terms for construction, Plaintiffs should have been prepared to take the appropriate steps to advance the case.

To the extent necessary, we are available for a meet and confer after 1 PM EST on Wednesday, August 28, about these issues.

Regards,
Charles

**Charles Wysocki**

Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933

**Administrative Assistant:** Renee Moore
**Direct:** 202.772.8820   **Main:** 202.371.2600

---

**From:** Charles Wysocki
**Sent:** Thursday, August 22, 2019 6:36 PM
**To:** 'Sullivan, Thomas'; Levine, Howard; Swan, Jennifer; Galgano, Michael; Katz, Seth; EXT-JTigan@mnat.com; 'Sklar, Steven'; 'Bays, Gregory'; 'Szelag, Ashlee'; 'Gattuso, D'
**Cc:** Adam LaRock; Chemo Buprenorphine Film; EXT- meiklejohn.pau; 'godfrey.geoff@dorsey.com'; 'tseng.david@dorsey.com'; 'Gaza, Anne Shea'; 'Wilson, Samantha'; Chung, Daniel; Fletcher Price, Bonnie
**Subject:** RE: BDSI v. Chemo et al (19-cv-444-CFC) // Identification of Claim Terms for Construction

Tom,

We write on behalf of all Defendants concerning your inquiry below. To narrow disputes presented before the Court, the Chemo and Alvogen defendants agree that the parties will brief only those terms with competing constructions. This is in no way a waiver of Chemo or Alvogen's rights to raise indefiniteness during expert discovery or at trial, nor an indication that the terms are not indefinite.

Relatedly, the deadline to submit the joint claim construction chart is next Friday, August 30. When will Plaintiffs provide a draft of the chart and their proposed constructions for Defendants' consideration?

Regards,
Charles

**Charles Wysocki**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933

**Administrative Assistant:** Renee Moore
**Direct:** 202.772.8820   **Main:** 202.371.2600

---

**From:** Sullivan, Thomas [mailto:Thomas.Sullivan@finnegan.com]
**Sent:** Tuesday, August 20, 2019 2:37 PM
**To:** Charles Wysocki; Levine, Howard; Swan, Jennifer; Galgano, Michael; Katz, Seth; EXT-JTigan@mnat.com; 'Sklar, Steven'; 'Bays, Gregory'; 'Szelag, Ashlee'; 'Gattuso, D'
**Cc:** Adam LaRock; Chemo Buprenorphine Film; EXT- meiklejohn.pau; 'godfrey.geoff@dorsey.com'; 'tseng.david@dorsey.com'; 'Gaza, Anne Shea'; 'Wilson, Samantha'; Chung, Daniel; Fletcher Price, Bonnie
**Subject:** RE: BDSI v. Chemo et al (19-cv-444-CFC) // Identification of Claim Terms for Construction

Counsel, both the Chemo and Alvogen Defendants have identified numerous claim terms as "indefinite," without providing proposed constructions.  At the July 18th hearing, however, BDSI's counsel raised the issue of the consideration of indefiniteness at the Markman hearing.  (July 18 Transcript at 14:3-11.)  In response, the Court ruled that it was "not going to consider indefiniteness

at the Markman hearing." (*Id.* at 14:12-13.) The Alvogen Defendants then stated: "We have identified, I believe it as roughly a dozen, of which maybe half of those were indefiniteness, like counsel for plaintiffs just mentioned, which we're perfectly amenable to resolving those at trial." (*Id.* at 15:14-17.) Accordingly, please confirm that the Defendants agree that the Markman briefing and hearing will only concern the claim terms that the parties have offered competing constructions, and not the terms identified as "indefinite" by the Alvogen and Chemo Defendants.

Best,
Tom

**Thomas J. Sullivan**
**Attorney at Law**
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4005 | fax: 202.408.4400| thomas.sullivan@finnegan.com | www.finnegan.com



**From:** Charles Wysocki <CWYSOCKI@sternekessler.com>
**Sent:** Tuesday, August 20, 2019 10:07 AM
**To:** Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Katz, Seth <seth.katz@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; 'Sklar, Steven' <ssklar@leydig.com>; 'Bays, Gregory' <gbays@leydig.com>; 'Szelag, Ashlee' <aszelag@leydig.com>; 'Gattuso, D' <dgattuso@hegh.law>
**Cc:** Adam LaRock <ALAROCK@sternekessler.com>; Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; EXT- meiklejohn.pau <meiklejohn.paul@dorsey.com>; 'godfrey.geoff@dorsey.com' <godfrey.geoff@dorsey.com>; 'tseng.david@dorsey.com' <tseng.david@dorsey.com>; 'Gaza, Anne Shea' <agaza@ycst.com>; 'Wilson, Samantha' <SWilson@ycst.com>
**Subject:** RE: BDSI v. Chemo et al (19-cv-444-CFC) // Identification of Claim Terms for Construction

**EXTERNAL Email:**

Counsel—

On review of Chemo's identification of claim terms for construction and their proposed construction, we noticed a typo on page 5 of the document. The proposed construction for the term "a pH of between about 4.0 and about 4.8" in claim 1 of the '539 patent should read: "a pH of between about 4.0 and about **4.8**, permitting nominal measurement error."

Separately, the deadline to submit the Joint Claim Construction Chart is August 30. Please let us know when we can expect to receive a draft of the chart, including Plaintiffs' proposed constructions of the terms, so that we may schedule a meet and confer as required by Paragraph 15 of the Scheduling Order (D.I. 39).

Regards,
Charles


**Charles Wysocki**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933

**Administrative Assistant:** Renee Moore
**Direct:** 202.772.8820   **Main:** 202.371.2600

---

**From:** Charles Wysocki
**Sent:** Friday, August 16, 2019 6:00 PM
**To:** Levine, Howard; Swan, Jennifer; Galgano, Michael; Katz, Seth; EXT-JTigan@mnat.com; 'Sullivan, Thomas'; Sklar, Steven; Bays, Gregory; 'Szelag, Ashlee'; Gattuso, D
**Cc:** Adam LaRock; Chemo Buprenorphine Film; EXT- meiklejohn.pau; 'godfrey.geoff@dorsey.com'; 'tseng.david@dorsey.com'; 'Gaza, Anne Shea'; 'Wilson, Samantha'
**Subject:** BDSI v. Chemo et al (19-cv-444-CFC) // Identification of Claim Terms for Construction

Counsel:

Please find Defendants' identification of claim terms for construction and proposed constructions enclosed.

Regards,
Charles

**Charles Wysocki**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1100 New York Avenue, NW, Washington, DC 20005

**Email:** cwysocki@sternekessler.com
**Direct:** 202.772.8933
**Administrative Assistant:** Renee Moore
**Main:** 202.371.2600   **Direct:** 202.772.8820

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit B.B

| Claim(s) | Term/Phrase | **U.S. Patent No. 8,147,866** | |
|---|---|---|---|
| | | **Defendants' Construction** | **Plaintiffs' Construction** |
| 1-12 | "a bioerodable mucoadhesive layer" | a solid bioerodable mucoadhesive layer | No construction necessary; "a bioerodable mucoadhesive layer" |
| 1-12 | "a barrier layer" | a solid barrier layer | No construction necessary; "a barrier layer" |
| 1-12 | "direct transmucosal" | mucosal administration via the oral mucosa, *e.g.*, buccal and/or sublingual | mucosal administration via the oral mucosa, *e.g.*, buccal and/or sublingual |
| 1-12 | "is a buffered environment" | is an environment containing a buffer | No construction necessary; "is a buffered environment" |
| 1-12 | "a pH of between about 4 and about 6" | a pH of between 4 and 6, permitting nominal measurement error | a pH of between approximately 4 and approximately 6 |

1

| | | U.S. Patent No. 9,655,843 | |
|---|---|---|---|
| Claim(s) | Term/Phrase | Defendants' Construction | Plaintiffs' Construction |
| 1-25 | "a bioerodable mucoadhesive layer" | a solid bioerodable mucoadhesive layer | No construction necessary; "a bioerodable mucoadhesive layer" |
| 1-25 | "a polymeric barrier environment" | a solid barrier layer | No construction necessary; "a polymeric barrier environment" |
| 1-12 | "transmucosal" | any route of administration via a mucosal membrane, including, but not limited to, buccal, sublingual, nasal, vaginal, and rectal | In the context of claims 1-12, "transmucosal" means administration via the buccal mucosa membrane |
| 6, 12, 18, 24 | "third layer or coating" | a layer or coating that is disposed adjacent to the mucoadhesive polymeric diffusion environment and facilitates unidirectional delivery of the medicament to the mucosa | No construction necessary; "third layer or coating" |
| 1-24 | "a pH of between about 4 and about 7.5" | a pH of between 4 and 7.5, permitting nominal measurement error | a pH of between approximately 4 and approximately 7.5 |
| 7, 9-12, 19-24 | "has a pH buffered to between about 4 and about [6/7.5]" | has a pH adjusted or maintained using a buffer between [6/7.5], permitting nominal measurement error | has a pH buffered to between approximately 4 and approximately [6/7.5]; no construction necessary for "buffered" |

2

| Claim(s) | Term/Phrase | U.S. Patent No. 9,901,539 | |
|---|---|---|---|
| | | Defendants' Construction | Plaintiffs' Construction |
| 1-22 | "a bioerodable mucoadhesive layer" | a solid bioerodable mucoadhesive layer | No construction necessary; "a bioerodable mucoadhesive layer" |
| 8 | "a barrier layer" | a solid barrier layer | No construction necessary; "a barrier layer" |
| 9 | "a backing layer" | a solid backing layer | No construction necessary; "a backing layer" |
| 1-8, 10-22 | "steady-state $C_{max}$ of plasma buprenorphine concentration" | the state wherein the post dose maximum plasma concentration of buprenorphine does not differ from one dose to another | the state wherein the post dose maximum plasma concentration of buprenorphine does not differ from one dose to another |
| 1-22 | "an opioid-experienced subject" | a subject currently receiving opioid therapy | one or more subjects currently receiving opioid therapy |
| 9 | "oral mucosal" | buccal and/or sublingual | buccal and/or sublingual |
| 14 | "steady-state $T_{max}$ of buprenorphine" | time to reach the steady-state $C_{max}$ of plasma buprenorphine concentration | time to reach the steady-state $C_{max}$ of plasma buprenorphine concentration |
| 15 | "$C_{min}$ of buprenorphine" | the state wherein the post dose minimum plasma concentration of buprenorphine does not differ from one dose to another | the state wherein the post dose minimum plasma concentration of buprenorphine does not differ from one dose to another |

3

| | U.S. Patent No. 9,901,539 | | |
|---|---|---|---|
| Claim(s) | Term/Phrase | Defendants' Construction | Plaintiffs' Construction |
| 16 | "steady-state AUC$_{last}$ of buprenorphine" | area under the concentration-time curve from time-zero to the time of the last quantifiable concentration at steady state | area under the concentration-time curve from time-zero to the time of the last quantifiable concentration |
| 1-22 | "buffered to a pH" | adjusted or maintained to a pH using a buffer | No construction necessary; "buffered to a pH" |
| 1-8, 10-22 | "a pH of between about 4.0 and about 6.0" | a pH of between 4.0 and 6.0, permitting nominal measurement error | a pH of between approximately 4.0 and approximately 6.0 |
| 1-8, 10-22 | "a pH of between about 4.0 and about 4.8" | a pH of between 4.0 and 4.8, permitting nominal measurement error | a pH of between approximately 4.0 and approximately 4.8 |

4

# Exhibit C

| | |
|---|---|
| **From:** | Gaza, Anne Shea |
| **To:** | "Tigan, Jeremy A."; Lyons, Jeffrey J. |
| **Subject:** | RE: BDSI v. Chemo: amending contentions |
| **Attachments:** | image001.png |

Jeremy and Jeffrey,

Given the lack of response to our proposal from last Thursday regarding a stipulation for defendants to serve amended contentions, it is defendants' intention to seek leave of the Court to amend their contentions. Please let me know your availability for a meet and confer Thursday, January 2, 2020. If plaintiffs' counsel refuses to meet and confer as requested, then defendants will unfortunately have no choice but to file their motion and advise the court accordingly.

Thanks and happy new year,

Anne

---

**From:** Gaza, Anne Shea
**Sent:** Monday, December 30, 2019 2:34 PM
**To:** Tigan, Jeremy A.; Lyons, Jeffrey J.
**Subject:** RE: BDSI v. Chemo: amending contentions

Hi Jeremy – any update on this?

---

**From:** Tigan, Jeremy A. [mailto:JTigan@MNAT.com]
**Sent:** Thursday, December 26, 2019 3:59 PM
**To:** Gaza, Anne Shea; Lyons, Jeffrey J.
**Subject:** RE: BDSI v. Chemo: amending contentions

Received – checking with Finnegan. Hope you're having a good holiday.

---

**From:** Gaza, Anne Shea [mailto:agaza@ycst.com]
**Sent:** Thursday, December 26, 2019 12:07 PM
**To:** Tigan, Jeremy A.; Lyons, Jeffrey J.
**Subject:** [EXT] BDSI v. Chemo: amending contentions

Jeremy and Jeffrey,

Please let me know whether BDSI will stipulate to Defendants' amending their contentions in light of the claim construction hearing. We appreciate your response by Friday COB. If BDSI does not so agree to stipulate, please let me know your availability for a meet and confer on Monday, January 30.

Thanks, Anne



**Anne Shea Gaza, Partner**
Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
P 302.571.6727 F 302.576.3439
agaza@ycst.com | www.youngconaway.com | vCard

This message may contain confidential attorney-client communications or other protected information. If you believe you are not an intended recipient (even if this message was sent to your e-mail address), you may not use, copy, or retransmit it. If you believe you received this message by mistake, please notify us by return e-mail, and then delete this message. Thank you for your cooperation.

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CHEMO RESEARCH, S.L., INSUD PHARMA, S.L.U, INTELGENX CORP. and INTELGENX TECHNOLOGIES CORP.**<br><br>**Defendant.** | **C.A. No. 19-444 (CFC)**<br><br>~~Confidential~~ |

**DEFENDANTS' ~~INITIAL~~FIRST AMENDED INVALIDITY CONTENTIONS**

Pursuant to Paragraph 4(d) of the Court's Default Standard of Discovery and Paragraph 5 of the Scheduling Order entered in the above-captioned action (D.I. 39), Defendants Chemo Research, S.L., Insud Pharma, S.L.U, IntelGenx Corp. and IntelGenx Technologies Corp. (collectively "Defendants"), through their undersigned counsel, hereby provides the following ~~Initial~~First Amended Invalidity Contentions to Plaintiffs BioDelivery Sciences International, Inc. ("BDSI") and Arius Two, Inc. (collectively, "BDSI" or "Plaintiffs"). As set forth in Plaintiffs' infringement contentions dated July 24, 2019, Plaintiffs assert infringement under 35 U.S.C. § 271(e)(2)(A) of claims 1-5 and 8-10 of U.S. Patent No. 8,147,866 ("the '866 patent"), claims 1-4, 6-10, 12-16, 18-22, 24, and 25 of U.S. Patent No. 9,655,843 ("the '843 patent"), and claims 1-7 and 9-22 of U.S. Patent No. 9,901,539 ("the '539 patent") against Defendants. Defendants contend that all of the asserted claims are invalid under at least 35 U.S.C. §§ 102, 103, and/or

1

112, as described herein. ~~Defendants reserve the right to supplement these Initial~~These Amended Invalidity Contentions reflect the Court's claim construction ruling at the December 20, 2019 Markman Hearing, but Defendants explicitly reserve the right to assert additional claim constructions should that issue present itself through fact discovery, expert discovery, or at any time prior to or during trial. Defendants also reserve the right to further supplement these Amended Invalidity Contentions pursuant to the Federal Rules of Civil Procedure, the Local Rules, the Default Standard, and/or the Court's Orders.

## I.   GENERAL STATEMENTS

### A.   RESERVATION OF RIGHTS AND OBJECTIONS

These contentions are based on information reasonably available to Defendants at this time, are necessarily preliminary, and may require subsequent amendment, alteration or supplementation. Accordingly, Defendants reserve the right to amend, alter, or supplement these contentions based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any further claim construction from the Court, as a result of Plaintiffs' asserted claims and contentions, or as necessary and appropriate and as provided under the Local Rules of the United States District Court for the District of Delaware or any other applicable Rules or order of the Court, including, but not limited to, if Plaintiffs assert/attempt to assert claim constructions that are different from any assumptions that were compelled to be made herein; if Plaintiffs assert/attempt to assert additional or different infringement allegations or claims at a later date; as provided under or in accordance with the Default Standard; if Plaintiffs assert an interpretation of the prior art different from that used herein; in light of any response Plaintiffs make to these contentions or any written discovery propounded by Defendant; based upon information produced in another action involving the patents at issue in this litigation;

2

based on any discovery materials that have not yet been produced or provided to Defendants (whether by Plaintiffs or a third party to this action); based upon any other proceedings concerning the asserted patents or any related patent in any other forum or the United States Patent and Trademark Office ("USPTO"); and based upon further investigation. These contentions do not constitute any concession by Defendants for purposes of claim construction or infringement. *See* Fed. R. Civ. P. 8(d). By including prior art and arguments in ~~the Initial~~these Invalidity Contentions, Defendants are not admitting to the accuracy of any particular claim construction, unless explicitly stated.

Furthermore, these contentions are provided without prejudice to Defendants' right to introduce at trial any subsequently discovered evidence or expert opinions relating to currently known facts and to produce and introduce at trial all evidence, whenever discovered, relating to the proof of subsequently-discovered facts. Moreover, facts, documents, and things now known may be imperfectly understood and, accordingly, such facts, documents, and things may not be included in the following contentions. Defendants reserve the right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert opinion testimony, documents, and things, notwithstanding the written statements herein. Defendants further reserve their right to refer to, conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, documents, and things that are not currently recalled but might be recalled at some time in the future.

These ~~Initial~~Amended Invalidity Contentions are made subject to Federal Rule of Evidence 502. Defendants object to the disclosure of information that is protected by the attorney-client privilege, the attorney work-product immunity, the common-interest privilege, or any other applicable privilege or immunity. To the extent that Defendants inadvertently disclose

3

information that may be protected from discovery under the attorney-client privilege, the attorney work-product immunity, the common-interest privilege, or any other applicable privilege or immunity, such inadvertent disclosure does not constitute a waiver of any such privilege or immunity.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevance, materiality or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided below at any time. Defendants also reserve the right to amend these contentions based on expert or fact discovery, any ~~future~~further claim construction, further investigation, or any other subsequent clarification or development with respect to the meaning of any term used in the asserted claims or any information or findings relating to the priority dates for the asserted claims.

Further, to the extent Plaintiffs' ~~Initial~~Amended Infringement Claim Charts lack proper and complete disclosure concerning Defendants' accused products, Defendants reserve the right to supplement these ~~Initial~~Amended Invalidity Contentions, including the prior art disclosed and the stated grounds of invalidity. Defendants' ~~Initial~~Amended Invalidity Contentions are set forth in the alternative and do not constitute any concession by Defendants for purposes of determining infringement or any other issue in this case. *See* Fed. R. Civ. P. 8(d).

The contentions of each dependent claim incorporate the contentions of each claim from which the dependent claim depends. This includes all prior art and non-prior art defenses,

including all defenses available under 35 U.S.C. §§ 101, 102, 103, and 112.[1] Additionally, Defendants reserve the right to raise any invalidity issue identified at any point in these contentions, whether they be raised in the charts, the narratives for each patent or the description of the prior art or cited in any portion of the prior-art references discussed or listed herein or in the attached appendices or within the general knowledge and skill of the person of ordinary skill in the art.

Prior art not included in these contentions, whether known or unknown to Defendants, may become relevant to the extent that Plaintiffs will contend that any of the limitations of the asserted claims are not disclosed in the prior art identified herein. Accordingly, Defendants reserve the right to identify any additional prior art that may relate to the allegedly missing limitations. Additionally, Defendants reserve the right to assert invalidity under 35 U.S.C. § 102(g) to the extent that Plaintiffs seek to antedate any 102(a) or 102(e) reference identified herein.

Defendants reserve the right to amend and supplement these contentions in accordance with the Federal Rules of Civil Procedure and the rules and orders of this Court. Defendants further reserve the right to defend against Plaintiffs' infringement allegations on bases other than those required to be disclosed under the Default Standard and/or Scheduling Order (D.I. 39). In addition to the defenses set forth herein, Defendants expressly reserve all rights to assert any and all defenses relating to invalidity, unenforceability, and non-infringement of the asserted claims, including but not limited to invalidity due to double-patenting, invalidity due to improper

---

[1] All references to sections of Title 35 of the United States Code are to the pre-America Invents Act version of the statute unless otherwise indicated.  However, to the extent a certain claim is not entitled to a filing date before March 16, 2013, the relevant section(s) of the America Invents Act Title 35 of the United States Code are applicable.

inventorship, or unenforceability due to inequitable conduct, based upon, *inter alia*, facts revealed during or through fact or expert discovery.

### B. INCORPORATION BY REFERENCE

In addition to the prior art identified below, Defendants incorporate by reference the prosecution file history of the patents-in-suit or any related applications, including any arguments, cited prior art, or claim rejections made by the USPTO set forth in such prosecution histories.

In accordance with 21 U.S.C. § 355(j)(2)(B), Defendants provided confidential notice (the "Notice Letter") to Plaintiffs that they intended to market a drug product under their Abbreviated New Drug Applications before the expiration of the patents-in-suit. The Notice Letter included, among other things, a detailed statement of the factual and legal bases, known by Defendants at the time of service of the Notice Letter, that the asserted claims of the patents-in-suit were invalid. Defendants hereby incorporate by reference their own confidential Notice Letter and accompanying attachments as if fully set forth in these ~~Initial~~Amended Invalidity Contentions.

Defendants also incorporate by reference the Invalidity Contentions provided by the Defendants in the actions captioned *BioDelivery Sciences International, Inc. et al v. Alvogen PB Research and Development LLC et al*, Civil Action No. 18-cv-1395 (DED); *BioDelivery Sciences International, Inc. et al v. Teva Pharmaceuticals USA, Inc. et al*, 17-cv-282 (DED); *BioDelivery Sciences International, Inc. et al v. Teva Pharmaceuticals USA, Inc. et al*, 17-cv-118 (DED); *BioDelivery Sciences International, Inc. et al v. Teva Pharmaceuticals USA, Inc. et al*, 16-cv-1303 (DED); *BioDelivery Sciences International, Inc. et al v. Actavis Laboratories UT, Inc.*, 16-cv-175 (DED).

6

### C.    COMMON SENSE AND GENERAL KNOWLEDGE OF A PERSON OF ORDINARY SKILL IN THE ART

In connection with the contentions set forth herein, Defendants may rely on common sense and/or the general knowledge of a person of ordinary skill in the art ("POSA") at the time of the alleged inventions, including to provide background in connection with presenting their ~~Initial~~Amended Invalidity Contentions.

### D.    IDENTIFICATION OF ASSERTED CLAIMS

On July 24, 2019, Plaintiffs provided their Initial Claim Charts on Infringement pursuant to Paragraph 4(c) of the Default Standard for Discovery, and this Court's Scheduling Order (D.I. 39). In their Initial Claim Charts on Infringement, Plaintiffs asserted that the product described in Defendants' Abbreviated New Drug Application will infringe claims 1-5 and 8-10 of the '866 patent, claims 1-4, 6-10, 12-16, 18-22, and 24-25 of the '843 patent, and claims 1-7 and 9-22 of the '539 patent. In view of Plaintiffs' Initial Claim Charts on Infringement, the following invalidity contentions address the asserted claims of the patents-in-suit.

### E.    ONGOING DISCOVERY AND DISCLOSURES

Discovery in this case is in its early stages and Defendants' investigation is ongoing. Defendants, therefore, reserve the right to further supplement or alter the positions taken and information disclosed in these ~~Initial~~Amended Invalidity Contentions including, without limitation, the prior art and grounds of invalidity set forth herein, to take into account information or defenses that may come to light as a result of these continuing efforts. Moreover, because expert discovery has not started, Defendants reserve the right to amend these ~~Initial~~Amended Invalidity Contentions as a result of new information disclosed through the

7

parties' experts. Therefore, Defendants reserve all rights to further supplement or amend these ~~Initial~~Amended Invalidity Contentions if and when further information becomes available.

## F.     PRIOR ART IDENTIFICATION AND CITATION

It should be recognized that a POSA would generally read a prior-art reference as a whole and in the context of other publications, literature, and general knowledge in the field. To understand and interpret any specific statement or disclosure in a prior-art reference, a POSA would rely upon other information including other publications and general scientific or medical knowledge. Defendants, therefore, reserve the right to rely upon other unidentified portions of the prior-art references and on other publications and expert testimony to provide context and to aid understanding and interpretation of any identified portions. Defendants also reserve the right to rely upon other portions of the prior-art references, other publications, and the testimony of experts to establish that the alleged inventions were inherently disclosed in the prior art, and/or would have been obvious to a POSA, including on the basis of modifying or combining certain cited references. Defendants also reserve the right to rely upon any prior art or admissions relating to prior art in the patents-in-suit and/or their respective prosecution histories. In addition, Defendants reserve the right to rely on all prior art produced by Plaintiffs or any other party in any other proceeding including re-examinations, oppositions, and *inter partes* review involving the patents-in-suit.

## G.     RESERVATION OF RIGHTS

Defendants reserve all rights to further supplement or modify these ~~Initial~~Amended Invalidity Contentions, including the prior art disclosed and the stated grounds of invalidity. In addition, Defendants reserve the right to prove the invalidity of the asserted claims of the

patents-in-suit on bases other than those disclosed in this disclosure and contentions and/or amend these contentions at a later date.

### H.   INITIAL IDENTIFICATION OF PRIOR ART

Relevant prior art includes, without limitation, the following, as understood in the context of what was known as of the priority date of the '866, '843 and '539 patents[2]:

- U.S. Patent Application No. 11/069,089 ("Tapolsky I")

- European Patent Application No. EP0069600A2 ("Todd")

- Bullingham, R.E.S., et al., "Sublingual Buprenorphine Used Postoperatively: Clinical Observation and Preliminary Pharmacokinetic Analysis," Br. J Clin. Pharmac. (1981), 12, 117-122 ("Bullingham I")

- U.S. Patent No. 4,292,299 ("Suzuki")

- Bullingham, R.E.S. et al., "Sublingual Buprenorphine Used Postoperatively: Ten Hour Plasma Drug Concentration Analysis," Br. J. Clin. Pharmac. 13:655-673 (1982)
- ("Bullingham II")

- Garrett, Edward R., et. al., "Pharmacokinetics of Morphine and its Surrogates VI: bioanalysis, Solvolysis Kinetics, Solubility, pKa Values, and Protein Binding of Buprenorphine," Journal of Pharmaceutical Sciences, 74:4, 515-524 (May 1985) ("Garrett")

- United Kingdom Patent No. 2108841 ("Kissel")

- U.S. Patent No. 4,552,751 ("Inaba")

- U.S. Patent No. 4,594,240 ("Kawata")

- Japanese Patent Application Publication No. S62-56420 ("Teijin")

- U.S. Patent No. 4,713,239 ("Babaian")

- European Patent Application Publication EP 0 262 422 ("Konishi")

---

[2] All prior art references listed herein have been produced as CHEMO_BEL-0034312-CHEMO_BEL0038526.

9

- U.S. Patent No. 4,764,378 ("Keith")

- U.S. Patent No. 4,765,983 ("Takayanagi")

- U.S. Patent No. 4,876,092 ("Mizobuchi")

- U.S. Patent No. 5,069,909 ("Sharma")

- Cassidy, J.P., et al., "Controlled Buccal Delivery of Buprenorphine," Journal of Controlled Release, 25:21-29 (1993) ("Cassidy")

- European Patent Application Publication EP 0 551 626 ("Kramaric")

- European Patent EP 0 250 187 ("Schiraldi")

- Roy, Samir D., et al., "Transdermal Delivery of Buprenorphine through Cadaver Skin," Journal of Pharmaceutical Sciences, 83: 2, 126-130 (February 1994) ("Roy")

- U.S. Patent No. 5,298,256 ("Flockhart")

- U.S. Patent No. 5,346,701 ("Heiber")

- McQuinn, R.L., et al., "Sustained oral mucosal delivery in human volunteers of buprenorphine from a thin non-eroding mucoadhesive polymeric disk," Journal of Controlled Release 34 (1995) 243-250 ("McQuinn")

- Wilding, I.R., et al., "Pharmacokinetic Evaluation of Transdermal Buprenorphine in Man," Int. J. Pharm. 132:81-87 (1996) ("Wilding")

- U.S. Patent No. 5,552,406 ("Mendelson")

- U.S. Patent No. 5,599,554 ("Majeti")

- U.S. Patent No. 5,603,947 ("Wong")

- U.S. Patent No. 5,700,478 ("Biegajski")

- Fine, Perry G., et al., "A Review of Oral Transmucosal Fentanyl Citrate: Potent, Rapid and Noninvasive Opioid Analgesia," Journal of Palliative Medicine, 1:1, 55-63 (1998) ("Fine")

- Shojaei, Amir H., "Buccal Mucosas as a Route for Systemic Drug Delivery: A Review," Journal of Pharmacy and Pharmaceutical Sciences, 1:1, 15-30 (1998) ("Shojaei")

- Volker et al., "Oral Buprenorphine is Anti-Inflammatory and Modulates the Pathogenesis of Streptococcal Cell Wall Polymer-Induced Arthritis in the Lew/SSN Rat," Laboratory Animals, 34:423-429 (2000) ("Volker")

- International Patent Application Publication WO 00/19987 ("Matson")

- International Patent Application Publication WO 2000/42992 ("Chen")

- International Patent Application Publication WO 00/62764 ("Yates")

- U.S. Patent No. 6,159,498 ("Tapolsky II")

- U.S. Patent No. 6,231,886 ("Reder")

- U.S. Patent No. 6,264,981 ("Zhang")

- International Patent Application Publication WO 01/58447 ("Oshlack")

- U.S. Patent No. 6,375,963 ("Repka")

- U.S. Patent Application No. 2002/0142036 ("Rupprecht")

- Prescribing information for Suboxone® sublingual tablets published on October 8, 2002 ("Suboxone Label")

- Suboxone® Tablet Clinical Pharmacology and Biopharmaceutics Review ("Suboxone® FDA Review")

- Chiang, et al., "Pharmacokinetics of the combination tablet of buprenorphine and naloxone," Drug and Alcohol Dependence, 70, S39-S47 (2003) ("Chiang")

- International Patent Application Publication WO 03/013525 ("Breder")

- U.S. Patent Application Publication 2003/004446 ("Moro")

- International Patent Application Publication WO 03/080021 ("Birch I")

- U.S. Patent Application No. 2003/0194420 ("Holl I")

- Das et al., "Development of Mucoadhesive Dosage Forms of Buprenorphine for Sublingual Drug Delivery," Drug Delivery, 11, 89-95 (2004) ("Das")

- U.S. Patent Application Publication No. 2004/0024003 ("Asmussen")

- International Patent Application Publication WO 2004/017941 ("Shevchuk")

- U.S. Patent Application Publication No. 2004/0077540 A1 ("Quay")

- U.S. Patent Application Publication No. 2004/0151774 ("Pauletti")

- U.S. Patent Application Publication No. 2004/0180080 ("Furusawa")

11

- U.S. Patent Application No. 2004/0191301 ("Van Duren")

- U.S. Patent Application No. 2004/0219195 ("Hart")

- European Patent EP 1 201 233 ("Leslie")

- U.S. Patent Application Publication No. 2004/0253307 ("Hague")

- U.S. Patent Application Publication 2005/0037055 ("Yang")

- International Patent Publication No. WO 2005/016321 ("Holl II")

- U.S. Patent Application Publication No. 2005/0042173 ("Besse")

- U.S. Patent Application Publication 2005/0048102 ("Tapolsky III")

- U.S. Patent Publication 2005/0085440 ("Birch II")

- International Patent Application Publication WO 2005/044243 ("Gale")

- Canadian Patent No. 2274910 ("Cremer")

- U.S. Patent Application Publication No. 2005/0163838 ("Moe")

- International Patent Application Publication No. WO 2005/081825 A2 ("Reidenberg")

- European Patent Application Publication EP 1 642 579 ("Ihara")

- U.S. Patent Application Publication 2006/0073189 ("Pinney")

- U.S. Patent Application Publication No. 2006/0182786 ("Rademacher")

- U.S. Patent Application Publication No. 2007/0148097 ("Finn")

- U.S. Patent Application Publication No. 2007/0149731 ("Myers")

- International Patent Application Publication WO 2008/025791 ("Oksche")

- International Patent Application Publication WO 2008/040534 ("Leichs")

- International Patent Publication No. WO 2008/047163 ("Booles")

- U.S. Patent Application Publication No. 2008/0160068 ("Hille")

- International Patent Application Publication WO 2008/100434 ("Yum")

- International Patent Application Publication WO 2008/011194 ("Vasisht I")

12

- U.S. Patent Application Publication No. 2009/0246256 A1 ("Al-Ghananeem")

- U.S. Patent Application Publication 2009/0264385 ("Crowley")

- International Patent Application Publication WO 2010/008863 ("Vasisht II")

- U.S. Patent Application Publication No. 2010/0247586 ("Hugerth")

- International Patent Application Publication WO 2011/017484 ("Myers II")

- International Patent Publication No. WO 2003/015748 ("Moro II")

- U.S. Patent No. 5,800,832 ("Tapolsky IV")

- International Patent Publication No. WO 2001/89476 ("Pinney II")

- International Patent Publication No. WO 2002/47688 ("Coleman")

- International Patent Publication No. WO 2006/026922 ("Chow")

- U.S. Patent Application No. 10/646,990 ("Singh")

- International Patent Publication No. WO 2011/017484 ("Myers")

- Benyamin, Ramsin et al., "Opioid Complications and Side Effects," Pain Physician (2008); 11:S105-S120 ("Benyamin")

- JPH059723A (1993)

- JPH01226823A (1989)

- JPH03246220A (1991)

- JPH059723A (1993)

- JPS60116630A (1985)

- JPS6222713 (1987)

- JPS62135417A (1987)

- JPS63310818A (1988)

- JPS6490121 (A) (1989)

- Meschia, M. et al., "Effect of Hormone Replacement Therapy and Calcitonin on Bone Mass in Postmenopausal Women," European Journal of Obstetrics & Gynecology and Reproductive Biology, 47 (1992): 53-57 ("Meschia")

13

- European Patent Application No. 0551626A1 ("Resman")

- U.S. Patent No. 6,552,024

- U.S. Patent No. 5,866,164

- International Patent Application Publication No. WO 1995/05416

- U.S. Patent No. 4,713,243

- U.S. Patent No. 4,784,858

- U.S. Patent No. 5,780,047

- U.S. Patent No. 5,679,714

- U.S. Patent Application Publication No. 2010/0015183 A1

- Japanese Patent Application KOKAI No. JPS 56100714

- U.S. Patent No. 4,720,387

- U.S. Patent No. 4,990,339

- International Patent Application Publication No. WO 2007/070632 A2

- U.S. Patent Application Publication No. 2004/0213828 A1

- International Patent Application Publication No. WO 03/070191 A1

- International Patent Application Publication No. WO 03/013538 A1

- U.S. Patent Application Publication No. 2004/0219196 A1

- International Patent Application Publication No. 02/092060 A1

- U.S. Patent Application Publication No. 11/0033542

Defendants intend to rely upon each reference in its entirety to the extent relevant and/or appropriate, including references cited in, referenced within, or incorporated by reference in, the references identified above. Defendants also incorporate, in full, all prior-art references cited in the patents-in-suit and their prosecution histories. Defendants reserve the right to amend this list as more prior-art references are revealed during discovery.

14

Defendants expressly reserve the right to modify and/or supplement the prior art discussed herein.[3] In addition to the art summarized herein, Defendants reserve the right to rely on art identified during prosecution of the '866, '843, and/or '539 patents, as well as any other art that would have provided useful background information to the POSA.

Descriptions of the above exemplary prior art references are below:

### (a) Tapolsky I

Tapolsky I is a published U.S. patent application entitled "Pharmaceutical carrier device suitable for delivery of pharmaceutical compounds to mucosal surfaces." Tapolsky I was publicly available at least as of July 7, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Tapolsky I discloses a pharmaceutical delivery device comprising an adhesive layer and a backing layer for application to mucosal surfaces. (Tapolsky I at Abstract.) Tapolsky I teaches that "[t]he pharmaceutical component may be included in either layer, although preferably, it is included in the adhesive layer, which is closest to the treatment site and which will have a slower

---

[3] To the extent that the patentee or inventors attempt to swear behind or otherwise remove as prior art any of the prior art below, Defendants reserve its right to add additional prior art to the list. Furthermore, to the extent that the patentee argues that any of the cited references are not prior art under 35 U.S.C. § 102, many of the referenced patents and/or patent applications have foreign or U.S. equivalents that also qualify as prior art. Such foreign and U.S. equivalents are incorporated herein, and Defendants reserve the right to rely upon them. Additionally, as previously noted, Defendants reserve the right to supplement or amend its list of prior art references based upon, *inter alia*, the patentee's disclosure of its alleged infringement proofs; the patentee's response to any of Defendants' defenses, including, but not limited to, the patentee's interpretation of the prior art; fact or expert discovery; and/or further investigation. Moreover, Defendants do not admit, or otherwise concede, that the claims of the '866, '843, or '539 patents are entitled to an effective filing date earlier than the patent's filing date, and therefore reserves the right to, *inter alia*, challenge the effective filing date of the patent and to assert additional prior art references and/or products based on any such challenge. Nevertheless, as discussed herein, each claim of the patent is invalid even if the '866, '843, and/or '539 patents have proper claim of priority to an earlier-filed application.

erosion time, given that the backing layer protects the interior, adhesive layer and will typically erode first." (*Id.* at [0030].) Such a bioerodible mucoadhesive system "allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities, would have advantages." (*Id.* at [0059].)

Tapolsky I discloses that "[t]he adhesive layer may comprise at least one film-forming water-erodable polymer (the 'film-forming polymer') and at least one pharmacologically acceptable polymer known for its bioadhesive capabilities (the 'bioadhesive polymer'). (*Id.* at [0031].) The film-forming polymer may comprise, e.g., hydroxyethyl cellulose, and the bioadhesive polymer may comprise, e.g., polyacrylic acid and sodium carboxymethyl cellulose. (*Id.*) Tapolsky I discloses that the backing layer comprises a water-erodible, film-forming polymer such as hydroxyethyl cellulose and hydroxypropylmethyl cellulose. (*Id.* at [0035].)

Tapolsky I further discloses that various drugs can be incorporated into the mucoadhesive layer and/or the backing layer. (*Id.* at [0046]-[0053].) Additionally, Tapolsky I discloses applying the drug delivery devices to the buccal mucosa of dogs. (*Id.* at [0128]; Example 40. )

### (b)     Todd

Todd is a published European patent application entitled "Pharmaceutical compositions." Todd was publicly available at least as of January 1983, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Todd discloses pharmaceutical compositions for the sublingual administration of buprenorphine. (Todd at Abstract.) Todd discloses that "[b]uprenorphine is a potent antagonist analgesic with good bioavailability following sublingual administration, useful in the relief of moderate to severe pain and also in the treatment of narcotic addiction." (*Id.*) Todd also discloses

that the therapeutic range of buprenorphine for sublingual administration is 0.2 to 0.4 mg. (*Id.* at 1:12-14).

Todd additionally discloses a sublingual buprenorphine formulation having a pH in the range of between 4.5 to 5.5. (*Id.* at 2:21-3:4; claim 1.) Todd further discloses that compositions having a pH of 5 or 6 provide a higher degree of absorption compared to a composition having a pH of 4. Todd states

> We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400 µg/0.5 ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's.

(*Id.* at 2:11-17.)

### (c)     Bullingham I

Bullingham, R.E.S. *et al.*, "Sublingual Buprenorphine Used Postoperatively: Clinical Observations and Preliminary Pharmacokinetic Analysis," *Br. J. Clin. Pharmac.* 12:117-122 (1981) ("Bullingham I") published in 1981, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Bullingham I describes a study designed to measure plasma levels of buprenorphine given to patients sublingually after hip replacement surgery. An initial dose of 0.3 mg buprenorphine was given intravenously during the surgery, and then 3 hours later, sublingual buprenorphine was administered as tablets (two 0.2 mg tablets) that dissolved under the tongue. (Bullingham I at p. 118.) The residual plasma buprenorphine from the intravenous dose was determined, and that value was subtracted from blood levels in patients who received sublingual buprenorphine, to determine the blood level due to sublingual dosing only. (*Id.*) Bullingham I reports that "sublingual administration of buprenorphine results in a gradual rise in plasma level, producing values similar to those following intravenous and intramuscular

17

administration at the 80 min sampling time." (*Id.* at p. 119; Figure 1.) Table 2 sets out plasma buprenorphine levels after sublingual administration, as follows:

**Table 2**  Plasma buprenorphine levels after sublingual administration

| Time (min) | Plasma buprenorphine (ng/ml) |
|---|---|
| 0 | 0 |
| 5 | 0 |
| 10 | 0 |
| 15 | 0 |
| 20 | $0.07 \pm 0.12$ |
| 40 | $0.10 \pm 0.12$ |
| 60 | $0.28 \pm 0.15$ |
| 80 | $0.41 \pm 0.17$ |
| 120 | $0.51 \pm 0.13$ |
| 150 | $0.74 \pm 0.16$ |
| 180 | $0.71 \pm 0.14$ |

Measured plasma levels minus computed contribution from the first (i.v.) dose. Results are mean ± s.e.mean, from the ten patients.

Bullingham I also reports that "[f]ollowing the sublingual dose, the onset of analgesia, estimated by the observer, occurred between 15 and 45 min." (Bullingham I at p. 119.)  In addition, "[t]he median estimate of duration of action was 534 minutes from the time the sublingual dose was given." (*Id.*) More specifically:

> The averaged kinetic data presented here for sublingual buprenorphine shows both delay in absorption and large intersubject variation in the buprenorphine plasma levels. These two observations would lead to the prediction of slow onset and variable efficacy.
>
> In contrast, the analgesic onset time, duration and individual variation was not measurably different from that found after parenteral postoperative buprenorphine doses. Other analgesic measures have also shown sublingual buprenorphine to be effective in postoperative pain. The surprising analgesic efficacy, despite low plasma levels, of the sublingual route may be explained by a general consideration of the dose-plasma level-response relation with respect to the sublingual route, and by specific features of buprenorphine.

(*Id.* at pp. 120-121.) (citations omitted).

18

Moreover Bullingham I discloses:

> Thus the sublingual route may be particularly appropriate for buprenorphine, where the slow absorption rate combines with its associative properties with the opiate receptor to provide analgesia of long duration. An additional benefit may be that side-effects related to plasma level may differ by the sublingual route from those found with parenteral use. An indication of this was found here, where there was less sedation with sublingual buprenorphine. A similar effect has been noted for sublingual etorphine.

(*Id.*)

### (d)    Suzuki

U.S. Patent No. 4,292,299 ("Suzuki") issued on September 29, 1981, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Suzuki discloses "a slow-releasing preparation which is administered by adhering to the wet mucous surface [that] consists of two layers, an adhesive layer and a nonadhesive layer." (Suzuki at 2:6-9.) The preparation can be in the shape of a disk. (*Id.* at Example 7.) "The adhesive layer comprises a polymer, which displays adhesiveness towards the wet mucous surface and has a property to swell when moistened, to work as an adhesive component." (*Id.* at 2:16-19.) The adhesive layer can contain a medicament and other excipients, "provided that the layer maintains said adhesiveness to the wet mucous surface." (*Id.* at 3:3-5.) The backing layer is water soluble and water disintegrable (*Id.* at 3:9-10.) Suzuki states that the non-adhesive layer can be made from "lactose, glucose, sucrose, starch, crystalline cellulose, dextrin, cyclodextrin, silicic acid anhydride, aluminum silicate, talc, calcium stearate, magnesium stearate, beeswax, polyethylene glycol, polyphosphate, etc. may be mentioned." (*Id.* at 3:16-22.) Suzuki teaches that the "nonadhesive layer and the adhesive layer cooperate together to increase each other's efficiency." (*Id.* at 4:29-31.) Upon application to a mucosal surface, the backing layer dissolves and the adhesive layer swells, which releases the medicament. (*Id.* at 3:29-37.)

**(e)     Bullingham II**

Bullingham, R.E.S. *et al.*, "Sublingual Buprenorphine Used Postoperatively: Ten Hour Plasma Drug Concentration Analysis," *Br. J. Clin. Pharmac.* 13:655-673 (1982) ("Bullingham II") published in 1982, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Bullingham II is an expanded study of Bullingham I, in which plasma drug concentrations were measured for 10 hours after a single sublingual dose of either 0.4 or 0.8 mg. (Bullingham II at p. 665.) The mean buprenorphine plasma drug concentrations at each sample time following the sublingual dose, and less the initial intravenous dose, are shown in Table 6, as follows:

**Table 6** Mean buprenorphine plasma levels (ng/ml $\pm$ s.e. mean) in patients following the second dose of buprenorphine (individual data stripped of first dose contribution)

| Dose | 0.4 mg sublingually (n = 5) | 0.8 mg sublingually (n = 5) | Ratio |
|---|---|---|---|
| *Time (min after sublingual dose)* | | | |
| 0 | 0 | 0 | — |
| 15 | $-0.03 \pm 0.01$ | $-0.02 \pm 0.04$ | — |
| 30 | $0.00 \pm 0.01$ | $-0.01 \pm 0.02$ | — |
| 60 | $0.16 \pm 0.10$ | $0.33 \pm 0.11$ | 2.06 |
| 90 | $0.26 \pm 0.07$ | $0.59 \pm 0.16$ | 2.27 |
| 120 | $0.36 \pm 0.08$ | $0.85 \pm 0.32$ | 2.36 |
| 150 | $0.35 \pm 0.07$ | $0.73 \pm 0.19$ | 2.09 |
| 180 | $0.43 \pm 0.06$ | $0.71 \pm 0.20$ | 1.65 |
| 210 | $0.42 \pm 0.07$ | $0.63 \pm 0.19$ | 1.50 |
| 240 | $0.36 \pm 0.06$ | $0.74 \pm 0.22$ | 2.05 |
| 270 | $0.37 \pm 0.09^*$ | $0.81 \pm 0.20$ | 2.19 |
| 300 | $0.31 \pm 0.06^*$ | $0.74 \pm 0.23$ | 2.39 |
| 330 | $0.33 \pm 0.04$ | $0.68 \pm 0.19$ | 2.06 |
| 360 | $0.31 \pm 0.05^*$ | $0.61 \pm 0.14$ | 1.97 |
| 390 | $0.33 \pm 0.05$ | $0.51 \pm 0.14$ | 1.55 |
| 420 | $0.28 \pm 0.06$ | $0.55 \pm 0.13$ | 1.96 |
| 450 | $0.24 \pm 0.03$ | $0.54 \pm 0.15$ | 2.25 |
| 480 | $0.28 \pm 0.03$ | $0.44 \pm 0.10$ | 1.57 |
| 510 | $0.26 \pm 0.04$ | $0.37 \pm 0.10$ | 1.42 |
| 540 | $0.26 \pm 0.05$ | $0.39 \pm 0.06$ | 1.50 |
| 570 | $0.26 \pm 0.02$ | $0.35 \pm 0.07^*$ | 1.35 |
| 600 | $0.23 \pm 0.03^*$ | $0.37 \pm 0.06^*$ | 1.61 |
| | | | Mean $1.89 \pm 0.08$ (n = 19) |

$^*n = 4$

Bullingham II concludes as follows:

> For both doses, significant increases in plasma drug concentration were seen at times beyond 30 min. This correlates with the time of onset of analgesia when sublingual buprenorphine was administered after a preceding intravenous dose of buprenorphine, reported as 15 to 45 min (Bullingham et al., 1981). Plasma drug concentrations of buprenorphine after sublingual administration changed relatively slowly; typically highest drug concentrations were not reached until 3 h after administration. This suggests that plasma drug concentrations as low as 0.4 to 0.6 ng/ml are associated with appreciable analgesic effect.

(Bullingham II at p. 669.)

#### (f)    Garrett

Garrett, Edward R., *et. al.*, "Pharmacokinetics of Morphine and its Surrogates VI: Bioanalysis, Solvolysis Kinetics, Solubility, pKa Values, and Protein Binding of Buprenorphine," Journal of Pharmaceutical Sciences, 74:5, 515-524 (May 1985) ("Garrett") published in May 1985 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Garrett states that "[n]eutral buprenorphine is highly lipophilic and readily extractable into benzene." (Garrett at p. 518.) Garrett reports that "[t]he apparent benzene-buffer partition coefficients for buprenorphine at room temperature were 0.2, 0.65, 5.2, 44, and 120 at pH values of 2, 3, 4, 5, and 6, respectively." (*Id.*) "No significant amounts of buprenorphine . . . remained in the aqueous phase after extraction of pH 9 buffer containing 1 µg/mL of buprenorphine with an equal volume of benzene." (*Id.*)

#### (g)    Kissel

United Kingdom Patent No. 2108841 ("Kissel") issued on September 11, 1985, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Kissel teaches "sustained release pharmaceutical compositions, especially for buccal use." (Kissel at 1:2-3.) The compositions comprise "a non-adhesive polymer film layer, which is

21

porous on contact with . . . oral mucous," "an adhesive layer capable of adhering to the inside of the mouth," and "a medicament dissolved or dispersed in at least one of said layers." (*Id.* at 2:62-3:1.) Kissel discloses that the non-adhesive layer can be made from a cellulose derivative that allows the formation of porous films. (*Id.* at 2:7-8.) Examples of such derivatives include methylcellulose, ethylcellulose, and hydroxypropylcellulose. (*Id.* at 2:8-10.) The non-adhesive layer can be formed on top of the adhesive layer (*Id.* at 3:4-5) and dissolves slowly (*Id.* at 3:7-9.) A suitable adhesive for the adhesive layer is "an appropriate water-soluble cellulose gum, e.g., sodium carboxymethycellulose." (*Id.* at 2:21-22.) Medicaments suitable for the composition include analgesics. (*Id.* at 2:36-37.)

### (h)   Inaba

U.S. Patent No. 4,552,751 ("Inaba") issued on November 12, 1985, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Inaba relates to "multi-layered film preparations which comprise one or more water soluble polymer bases, one or more water insoluble polymer bases, one or more plasticizers and one or more prostaglandins." (Inaba at Abstract.) Water soluble polymers suitable for the film include cellulose derivatives such as hydroxypropyl cellulose, polyvinylpyrrolidone, and hydroxypropyl methyl cellulose (*Id.* at 2:12-16.) Water insoluble polymers suitable for the film include cellulose acetate and vinyl acetate resin. (*Id.* at 2:18-21.) The film allows for transmucosal delivery of prostaglandin via application to a mucosal surface. (*Id.* at 1:45-50.)

The film of Inaba has at least three layers: two drug release controlling layers and one drug storing layer. (*See id.* at Abstract.) The drug storing layer contains the medicament prostaglandin, water soluble polymers, and plasticizers. (*Id.* at 3:30-35.) The drug release controlling layers are comprised of water-soluble and water-insoluble compounds as well as

plasticizers. (*Id.* at 2:61-64.) "[O]n administration to the mucosal tissue in the vital body, they are swollen and dissolved or decomposed with the body liquid. By this [process], the body liquid permeates into the drug storing layer or layers, and the drug contained therein is leached out." (*Id.* at 2:64-68.)

### (i) Kawata

U.S. Patent No. 4,594,240 ("Kawata") issued on June 10, 1986, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Kawata relates to "[a] sheet-shape adhesive preparation for promoting tooth-movement in orthodontics comprising a layer of a pharmaceutical composition containing as the active ingredient a prostaglandin." (Kawata at Abstract.) Kawata states that preparation comprises, *inter alia*, a layer with prostaglandin, a water-soluble, high molecular weight compound consisting of "sodium polyacrylate, ammonium polyacrylate, hydroxyethyl cellulose, sodium carboxymethyl cellulose, sodium alginate, starch, polyvinyl alcohol and polyvinylpyrrolidone," and a water-insoluble high molecular weight compound consisting of "vinyl acetate resin, ethyl cellulose, propyl cellulose, ethylmethyl cellulose and cellulose acetate phthalate." (*Id.* at claim 1.) Kawata discloses that polyacrylic acid salts, polyvinylpyrolidone and cellulose derivatives such as hydroxyethyl cellulose and sodium carboxymethyl cellulose have high dissolution rates in water. (*Id.* at 2:47-49.)

### (j) Teijin

Japanese Patent Application Publication No. S62-56420 ("Teijin") published on March 12, 1987 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Teijin discloses a film-form oral mucoadhesive drug formulation with two layers. (Teijin at p. 3.) The first film layer includes a hydroxypropyl cellulose, polyacrylic acid, a plasticizer, and the drug to be delivered. (*Id.* at pp. 3, 4.) The second layer consists of "low-viscosity hydroxypropyl cellulose." (*Id.* at p. 3.) The first layer adheres to the mucous membrane while the second layer is non-adhesive. (*Id.*) The second layer also prevents the drug in the first layer from migrating into the second layer. (*Id.* at p. 5.) Analgesic anti-inflammatory drugs are suitable for use in the film. (*Id.* at p. 4.)

### (k)   Babaian

U.S. Patent No. 4,713,239 ("Babaian") issued on December 15, 1987, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Babaian relates to an antianginal film that contains a "biologically soluble and resolvable carrier" and an antianginal active ingredient. (*See, e.g.,* Babaian at Abstract.) The antianginal film includes a "homopolymer of acrylamide or vinyl pyrrolidone, or copolymer therof with acrylate" and the antianginal active agent. (*Id.* at 2:31-47.)

The film can be applied to the mouth mucosa.  Babaian discloses that "[t]he main advantage of the proposed method of treating ischemic heart disease is that the active principle is delivered directly into the systemic blood flow." (*Id.* at 3:27-29.) In fact, "[a]n important advantage to the proposed medicinal film . . . is its high adhesion in the swollen state to the mouth mucosa, which makes it possible to attach it to a chosen site of the mucosa where it remains fixed until fully resolved to ensure uniform delivery of the active substance directly into the mucosa and further into the blood circulation system bypassing the gastrointestinal tract to rule out uncontrolled partial inactivation of the active principle." (*Id.* at 14:48-56.) Babian

24

states that with the administration of its film, "a reliable and pronounced hemodynamic effect is attained with markedly lower doses of the active substance." (*Id.* at 10:58-60.)

### (l)    Konishi

European Patent Application Publication EP 0 262 422 A1 ("Konishi") published on April 6, 1988, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Konishi teaches "a multi-layer sustained release dosage form for use in conjunction with, in one embodiment, the mucous membrane found in the oral cavity." (Konishi at 2:3-4.) The dosage form comprises a drug reservoir (which includes a medicament), a drug release controlling layer, and an adhesive layer that sticks to the oral mucosal membrane. (*Id.* at 2:4-12.) The reservoir can include, for example, polyacrylic acid resin and hydroxypropyl methylcellulose in polymer films that easily absorb drugs. (*Id.* at 3:15-20.) The adhesive layer comprises water soluble polymers along with a plasticizer and a water insoluble polymer. (*Id.* at 3:32-34.) Konishi discloses that "the layer shows adhesiveness upon gradual dissolution…with saliva." (*Id.* at 3:34-35.) Optionally, "a drug impermeable layer can be positioned between the adhesive layer and the drug reservoir." (*Id.* at 2:55-56.) The drug impermeable layer can contain "ethylcellulose, cellulose acetate, and other cellulose derivatives, dimethylaminoethyl methacrylate-methyl methacrylate copolymer (Eudragit E), and other acrylic copolymers, or other synthetic polymers." (*Id.* at 3:29-31.) The device in Konishi provides for the mucosal absorption of the medicament. (*Id.* at 2:10-13.)

### (m)    Keith

U.S. Patent No. 4,764,378 ("Keith") issued on August 16, 1988, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Keith describes "buccal dosage forms having a polymeric matrix for controlled release of a drug." (Keith at 1:7-9.) The dosage form adheres to the oral mucosa for transmucosal administration of the drug. (*Id.* at 2:32-36; 2:46-47.) The polymeric matrix contains polyethylene glycol and the drug. (*Id.* at 2:23-29; 2:19-23.) The matrix is erodible in saliva. (*Id.* at 2:43-45; 3:24-27.) Analgesics can be incorporated into the dosage form. (*Id.* at 5:12-13.)

### (n)     Takayanagi

U.S. Patent No. 4,765,983 ("Takayanagi") issued on August 23, 1988, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Takayanagi relates to a multi-layered adhesive medical tape for the oral mucosa that includes a medicament-containing layer. (Takayanagi at 1:6-9.) "More particularly, the invention relates to an adhesive medical tape for oral mucosa comprising a support layer composed of an intestine-soluble polymer and a medicament-containing layer composed of a water-soluble polymer containing at least one kind of a steroid or nonsteroid antiphlogistic and analgesic medicament." (*Id.* at 1:9-15.) The medicament-containing layer is made of water-soluble polymers such as polyvinylpyrrolidone, methylcellulose, and hydroxypropyl cellulose. (*Id.* at 2:58-67.)

Figure 1 of Takayanagi provides a representation of the medical tape:



FIG. 1



Takayanagi discloses that "FIG. 1 shows an embodiment of the adhesive medical tape of this invention having one medicament-containing layer composed of support layer 1 and a medicament-containing layer 2. In addition, numeral 3 shows adhesive surface." (*Id.* at 5:64-68).

### (o)    Mizobuchi

U.S. Patent No. 4,876,092 ("Mizobuchi") issued on October 24, 1989, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Mizobuchi relates to a "sheet-shaped adhesive preparation" with "an adhesive layer containing . . . a pharmaceutically active agent" and a "water-impermeable and water-insoluble carrier layer." (Mizobuchi at abstract.).  The adhesive preparation is applied to the mucous membrane in the oral cavity and allows for sustained release of the active agent through the mucosa. (*Id.* at 1:46-51.) The adhesive layer contains a carboxyvinyl polymer, such as polyacrylic acid. (*Id.* at 2:55-57; 3:3-5.) The carrier layer can be made from a "water-insoluble, film-forming high molecular weight compound" such as cellulose derivatives. (*Id.* at 3:11-18.)

### (p)    Sharma

U.S. Patent No. 5,069,909 ("Sharma") issued on December 3, 1991, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Sharma is directed to the transdermal administration of buprenorphine. (*See, e.g.*, Sharma at 1:7-10.) More specifically:

> It has now been found that one can actually achieve noninvasive sustained administration of buprenorphine at therapeutically effective dose levels by continuously delivering it transdermally from a laminated composite patch affixed to the patient's skin.

(*Id.* at 2:21-25.)

Sharma teaches that the composite patch includes a backing layer, a buprenorphine reservoir layer, and a release liner layer. (*See, e.g.*, *id.* at 3:42-47.)  The backing layer "provides a

27

protective covering for the composite," and may be made from an elastomeric polymer. (*Id.* at 3:48-53.) The reservoir layer includes buprenorphine and a pressure-sensitive adhesive, which is isobutylene, a silicone, or an acrylate adhesive (*Id.* at 3:64-4:1), and "provides the means by which the composite is affixed to the skin." (*Id.* at 5:12-16.)

Sharma also includes an example that determines the permeation of buprenorphine base as a function of aqueous pH at 32° C. The results are set forth in Table 4, as follows:

## TABLE 4

| | Permeation of buprenorphine base as a function aqueous pH | | | |
|---|---|---|---|---|
| Equilibrium pH | $C_s$ (mg/ml) | n | $J_{skin}$ ($\mu g/cm^2/h$) | $P^1$ (cm/h) |
| 5.0 | 0.692 | 3 | $0.59 \pm 0.13$ | $8.7 \times 10^{-4}$ |
| 6.0 | 0.082 | 3 | $0.48 \pm 0.02$ | $5.9 \times 10^{-3}$ |
| 7.0 | 0.006 | 3 | $0.14 \pm 0.01$ | $2.3 \times 10^{-2}$ |
| 7.9 | 0.0006 | 3 | $0.05 \pm 0.02$ | $8.3 \times 10^{-2}$ |
| 8.7 | 0.00014 | 3 | $0.03 \pm 0.01$ | $2.1 \times 10^{-1}$ |

$^1 P = J/C_s$

In view of these results, Sharma concludes as follows:

> Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. <u>These results indicate that the completely ionized form (pKa=8.4) of drug (pH=5.0) has higher skin flux than the partially un-ionized form</u>; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports.

(*Id.* at 8:20-24 (emphasis added.)

### (q)  Cassidy

Cassidy, J.P., *et al.*, "Controlled Buccal Delivery of Buprenorphine," Journal of Controlled Release, 25:21-29 (1993) ("Cassidy") published in 1993, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

28

Cassidy states that buprenorphine is a potent opiate agonist-antagonist used for the treatment of pain, but points out that it has low oral bioavailability due to presystemic metabolism in the wall of the gastrointestinal tract and extensive first pass metabolism. (Cassidy at p. 21; Abstract.) According to Cassidy, however, "[b]uccal delivery offers advantages in terms of accessibility, avoidance of first pass metabolism and the ability to provide controlled delivery for extended periods of time." (*Id.*) More specifically:

> The buccal route offers several advantages for controlled drug delivery for extended periods of time. The mucosa is well supplied with both vascular and lymphatic drainage and first-pass metabolism in the liver and pre-systemic metabolism in the GI tract are avoided. The area is obviously very accessible for placement and removal of a delivery device. Polymeric systems with an impermeable backing could deliver drug in a unidirectional fashion to the mucosa and avoid loss due to swallowing. The ultimate aim would be to develop a small, thin, flexible device that would adhere to the mucosa during normal activities, including eating and drinking. Buccal delivery also offers the advantage of rapid absorption, which would obviously be necessary in the control of pain, and buprenorphine is known to be efficacious as a sublingual tablet. The use of a device that provides rapid, long-lasting and adequate pain control by noninvasive means could offer considerable advantages in pain management.

(*Id.* at pp. 21-22.)

Cassidy also studied buccal absorption of buprenorphine by measuring buprenorphine solubility at different pH values. (*Id.* at p. 22.)  Cassidy concluded that the solubility of buprenorphine is influenced by pH. (*Id.* at pp. 27-28.) Cassidy also noted that buprenorphine's behavior "in solution was similar to that reported for fentanyl and sufentanil, which are also weakly basic narcotic analgesics." (*Id.* at p. 28.) Cassidy concludes:

> Steady-state plasma levels of buprenorphine were obtained in the dog using two different prototype systems, one non-woven and the other a hydrogel. The lag times were less than 1 h in both cases which would therefore provide rapid delivery of this analgesic. Good analgesic effect was obtained in man with sublingual

> buprenorphine following a similar delay in absorption. The dog has been reported to be a good model for man and extrapolation of these results to man suggests that the buccal route of delivery of buprenorphine would be feasible and would offer an excellent treatment modality for pain relief.

(*Id.* at pp. 28-29.)

### (r)    Kramaric

European Patent Application Publication EP 0 551 626 ("Kramaric") published on July 21, 1993, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Kramaric is directed to a thermoreversible gel as a liquid pharmaceutical carrier for a galenic formulation. (*See, e.g.*, Kramaric at Abstract.). Kramaric discloses numerous active substances that can be included in the pharmaceutical carrier, including the following:

> Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid.

(*Id.* at 8:47-49.) Thus, Kramaric identifies buprenorphine as an "anti-inflammatory and analgesic agent."

### (s)    Schiraldi

European Patent EP 0250187 B1 ("Schiraldi") issued on September 29, 1993, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Schiraldi discloses a "pharmaceutically acceptable controlled-releasing medicament-containing extruded single or multi-layered thin film, capable of adhering to a wet mucous surface, comprising a water soluble or swellable polymer matrix bioadhesive layer which can adhere to a wet mucous surface and which bioadhesive layer consists essentially of 22.4-68.3% by weight of hydroxypropyl cellulose of molecular weight above 100,000 23.75-60%

30

of a homopolymer of ethylene oxide of molecular weight above 100,000, 0-12.5%, of a water-insoluble polymer selected from ethyl cellulose, propyl cellulose, carboxy methyl cellulose free acid, polyethylene and polypropylene, and 2.85-5% of a plasticizer." (Schiraldi at 3:12-18.) Medicaments such as analgesics can be incorporated in the bioadhesive layer of the film. (*Id.* at 3:25-27, 56-57.)

Schiraldi also describes a two-layered film containing a bioadhesive layer and an outer protective barrier membrane layer. ( *Id.* at 9:51-55.) The barrier layer contains hydroxypropyl cellulose, ethyl cellulose, and polyethylene glycol 400. (*Id.* at 10:30-45.)

### (t)     Roy

Roy, Samir D., *et al.*, "Transdermal Delivery of Buprenorphine through Cadaver Skin," Journal of Pharmaceutical Sciences, 83: 2, 126-130 (February 1994) ("Roy") published in February 1994 and is prior art to the asserted patents under 35 U.S.C. S 102(b) or 35 U.S.C. § 102(a)(AIA).

Roy states that the buprenorphine is a weak base with a pKa of 8.24 and that the solubility of buprenorphine in aqueous solution decreases when pH increases from 5.0 to 8.7. (Roy at p. 128.) In comparing buprenorphine HCL to the basic form of buprenorphine, Roy reports that the "aqueous solubility of buprenorphine free base was considerably lower than that of the HCL salt, which suggests that the free base is extremely lipophilic." (*Id.* at p. 127.)  Still, buprenorphine HCL has "inherent high aqueous and high lipid solubility properties," which makes it a suitable drug for transdermal administration. (*Id.* at p. 128.)

### (u)     Flockhart

U.S. Patent No. 5,298,256 ("Flockhart") issued on March 29, 1994, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Flockhart relates to buccal patches for the transmucosal administration of desmopressin. (*See, e.g.*, ~~Flockart~~Flockhart at Abstract.) The matrix for the buccal patch includes, *inter alia*, the drug to be delivered, polyvinylpyrrolidone and low and high molecular weight polyethylene glycols. (*Id.* at 4:3-25.) The matrix is dissolvable and the patch "adhere[s] firmly to the mouth mucosa as to disperse . . . desmopressin through transmucosal absorption into the bloodstream." (*Id.* at claim 1.) Additionally, "[the] matrix absorbs fluid from saliva and dissolves within about 20-30 minutes." (*Id.*)

### (v)   Heiber

U.S. Patent No. 5,346,701 ("Heiber") issued on September 13, 1994, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Heiber discloses a transmucosal drug delivery device that adheres to the mucosal surface (including the buccal surface) and "comprises an inert outer or backing layer or membrane and an inner drug/enhancer/polymer layer." (~~Heibert~~Heiber at Abstract; 1:6-12; 7:48-50.) The device can be a patch. Particularly, Heiber explains:

> In a patch, the outer layer is a film or membrane and is preferably a permselective membrane having a molecular weight cutoff which prevents the outflow of macromolecular drug or bile salt but allows the inflow of water or other smaller molecules into the lower layer. This membrane layer can be either insoluble or of a selected solubility to dissolve after the delivery of the drug and enhancer.

(*Id.* at 5:41-48.) Each layer of the device comprises polymers. Materials suitable for the perm-selective membrane include film forming polymers, crosslinked polymers, gels, and various starches. (*Id.* at 10:8-12.) The inner layer contains the drug as well as polymers such as hydroxypropyl cellulose. (*Id.* at 11:65-68.) The inner layer adheres to the mucosa surface. (*Id.* at Abstract; 9:26-29.)  Heiber teaches that hydroxypropyl cellulose is hydrophilic and "can be either water soluble or swellable." (*Id.* at 7:20-47.)

32

(w)   **McQuinn**

McQuinn, R.L., *et al.* "Sustained oral mucosal delivery in human volunteers of buprenorphine from a thin non-eroding mucoadhesive polymeric disk," Journal of Controlled Release 34 (1995) ("McQuinn") published in 1995, and is prior art to asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

McQuinn discloses the use of a transmucosal delivery device (e.g., patch) containing buprenorphine. (McQuinn at Abstract.) McQuinn states that "mucoadhesive, oral mucosal patches are capable of reasonably rapid and sustained delivery of therapeutically useful amounts of buprenorphine." (*Id.* at p. 250.) Additionally, McQuinn states that "a buprenorphine formulation delivering sustained controlled levels of drug by a nonparenteral route would enhance the therapeutic effectiveness of buprenorphine." (*Id.* at p. 244.)

The patch in McQuinn contains a mixture of buprenorphine free base, Carbopol 934, polyisobutylene and polyisoprene. (*Id.* at p. 244.) McQuinn teaches that the mixture was then compressed, and a "membrane backing (ethylcellulose) was applied to one side of the compressed material." (*Id.* at p. 245.) The disclosed purpose of the backing layer is "to retard drug release from one side of the disk and prohibit adhesion to opposing side tissues." (*Id.*)

McQuinn describes a study in which the transmucosal patch was applied to seven human males. (*Id.* at p. 245.) The patch was applied to the upper gum during one period and the upper lip area during another period. McQuinn reports the pharmacokinetic results of the study as follows:

Table 1
Pharmacokinetic parameters in subjects after application to the gum or upper lip of a single mucoadhesive patch containing 2.9 mg buprenorphine free base

| Parameter | Subject Number | | | | | | | Mean ± SD |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2[a] | 3 | 4 | 5 | 6 | 7 | |
| **Gum treatment** | | | | | | | | |
| $C_{max}$ (pg/ml) | 413 | 779 | 428 | 694 | 468 | 266 | 419 | 495 ± 178 |
| $T_{max}$ (h) | 8 | 10 | 10 | 4 | 12 | 12 | 12 | 10 ± 3 |
| AUC (pg·h/ml) | 4622 | 7377 | 5509 | 7032 | 4769 | 3456 | 6392 | 5594 ± 1419 |
| **Lip treatment** | | | | | | | | |
| $C_{max}$ (pg/ml) | 355 | – | 328 | 410[b] | 288 | 393 | – | 355 ± 49 |
| $T_{max}$ (h) | 12 | – | 8 | 5 | 12 | 12 | – | 10 ± 3 |
| AUC (pg·h/ml) | 4736 | – | 4144 | 3977 | 2657 | 4257 | – | 3958 ± 780 |

(*Id.* at p. 245.) McQuinn states:

> [S]erum buprenorphine levels as low as 200-400 pg/ml are often observed in patients who report effective pain control with this opiate. For subjects who received the gum application, serum levels of this magnitude were generally achieved by 2-4 h post-dose and generally maintained at this level or higher through the 12- or 16-h sampling time intervals; modestly lower serum concentrations were achieved with the lip application of the patch.

(*Id.* at p. 249.)

McQuinn reports that "[m]ost subjects reported at least one adverse event" and that those experiences "ranged from mild to moderate in severity and were characteristic of those normally associated with the administration of an opiate." (*Id.* at p. 246.) Examples of such adverse events include nausea, pallor, and dizziness. (*Id.*)

### (x)   Wilding

Wilding, I.R., *et al.*, "Pharmacokinetic Evaluation of Transdermal Buprenorphine in Man," Int. J. Pharm. 132:81-87 (1996) ("Wilding") published in 1996 and is prior art the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Wilding studies the transdermal delivery of buprenorphine in healthy volunteers following administration of a short intravenous infusion and the application of aqueous-based and ethanol-based fillable transdermal therapeutic systems (FTTS), containing 8 mg of buprenorphine and

34

37.5 mg buprenorphine, respectively. (Wilding at Abstract.) Wilding reports a lag time of 1 hour to 20 hours after application of the aqueous-based FTTS before measurable levels of buprenorphine were detected (*id.* at p. 84), and a lag time of 1 hour to 6 hours after application of the ethanol-based FTTS (*id.* at p. 85). Thus, "the delay in appearance of measurable drug levels was shorter for the FTTS with the ethanol-based reservoir as compared to the FTTS with the aqueous reservoir." (*Id.*)

According to Wilding:

> The results of the feasibility investigation demonstrated that transdermal delivery of buprenorphine produced sustained plasma levels of drug within the range observed after intravenous dosing and that an ethanolic formulation produced approximately a four-fold increase in transdermal flux. The in vivo investigation suggests that transdermal delivery could provide appropriate plasma levels of buprenorphine for sustained analgesic effect.

(*Id.* at Abstract.)

Figure 1 illustrates the mean plasma concentration of buprenorphine following a single application of ethanol and aqueous FTTS, as follows:



Fig. 1. Mean plasma concentration of buprenorphine follow-ing single application of ethanol and aqueous FTTS to a group of 12 healthy male volunteers (coefficient of variation at 24 h post-application was 43 and 48% for the ethanol and aqueous FTTS, respectively).

Wilding concludes that "[i]t will be important to tailor carefully the pharmaceutical properties of the transdermal system with the clinically required plasma levels for sustained analgesic therapy." (*Id.* at p. 86.)

### (y)   Mendelson

U.S. Patent No. 5,552,406 ("Mendelson") issued on September 3, 1996, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Mendelson is directed to a method for treating pain and brain perfusion abnormalities using mixed opiate agonist/antagonists (*see, e.g.*, Mendelson at Abstract), especially buprenorphine. (*Id.* at 6:31-36.) More specifically:

> The present invention comprises a method for treating any animal, including humans, which requires analgesia and will benefit from the treatment or prevention of brain perfusion abnormalities.

(*Id.* at 7:40-43.)

36

Mendelson states that "[m]ethods of treatment involve the administration of selected pharmacotherapies in a sufficient dosage to decrease or eliminate the pain while improving brain perfusion," but also cautions that "the dosage should not be so high to produce any undesirable side effects, such as nausea, vomiting, dizziness, headaches, respiratory depression, etc." (*Id.* at 7:25-30.)

According to Mendelson:

> While the mixed opioid agonists-antagonists may be administered as a single agent, it may also be combined with other suitable components to provide a formulation for administration. In this regard, the particular compound may be dissolved in an alcohol or other appropriate solution. Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation.

(*Id.* at 7:48-55.)

Mendelson states that sublingual administration of buprenorphine is known to be effective. ( *Id.* at 6:46-51.) More specifically:

> As noted, buprenorphine is recognized as a particularly effective mixed opioid agonist-antagonist. For use in the present invention, buprenorphine can be administered by any appropriate route, for example, the sublingual, subcutaneous, transdermal, nasal, or intramuscular routes. Generally, buprenorphine doses are more potent when delivered sublingually.

> For sublingual administration, buprenorphine is prepared in an appropriate aqueous solution, usually an aqueous ethanol or alcohol solution as provided by Bicket et al., J. Pharm. Exp. Ther. 247:47-53 (1988), and Kosten et al., Life Sci. 42:635-641 (1988). Additional components, as discussed above, may be included. A sample preparation involves, for example, about 12 mg of buprenorphine dissolved in one ml of a mixture of 95% alcohol (30%) and a titrate phosphate buffer (70%, pH 5). This solution may be prepared and stored for about 2 to 3 weeks in opaque sealed containers.

> The prepared solution is administered sublingually in a constant volume of about 1 ml. During administration, the subject is

> required to hold the solution under his/her tongue for a period of
> time from about 5 to 20 min, usually about 8 to 12 min.

(*Id.* at 7:56-8:11.)

### (z)    Majeti

U.S. Patent No. 5,599,554 ("Majeti") issued on February 4, 1997, and is prior art to the

asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Majeti relates to a "transdermally or transmucosally administrable composition for the

treatment of nicotine craving and/or smoking withdrawal symptoms." (Majeti at 1:66-2:1.)  The

composition contains nicotine and/or caffeine that is delivered to the patient. (*Id.* at 2:18-21.) The

transmucosal composition of Majeti can be a single layer or multi-layer system. (*Id.* at 4:31-32.)

Majeti teaches that a multi-layered system contains at least an adhesive layer and a reservoir

layer. (*Id.* at 4:37-40.)

"The adhesive layer may be mucoadhesive, bioadhesive, pressure sensitive or require

moisture for adhesion." (*Id.* at 4:35-37.) Majeti states that appropriate polymers for the adhesive

layer "include hydroxypropyl cellulose, polyethylene oxide homopolymers, alkyl or polyvinyl

ethermaleic maleic acid copolymers, polyacrylic acid, [and] polyvinylpyrrolidone." (*Id.* at 4:61-

64.) Majeti further discloses an "exemplary adhesive layer [that] adheres to wet mucosal

surfaces." (*Id.* at 4:64-5:2.)

Nicotine and caffeine reside in the reservoir layer.( *Id.* at 7:10-23.) The reservoir is

produced from "materials capable of forming film walls or matrixes which allow the nicotine and

caffeine or caffeine equivalent to pass by diffusion." (*Id.* at 5:7-9.) Such materials include

"poly(hydroxyethylacrylate), poly(hydroxyethymethacrylate), polyvinylalcohol, polyvinylacetate,

plasticized polyvinylchloride, [and] polyvinylpyrrolidone." (*Id.* at 5:10-17.) Majeti further

teaches a backing component "to prevent the passage of the drug through surface of the delivery

vehicle opposite the skin or oral mucosa." (*Id.* at 5:18-20.)  The backing component can contain cellulose polymers like ethyl cellulose. ( *Id.* at 5:20-28.) The compositions of Majeti can also contain pH adjusters. (*Id.* at 6:22-25.)

### (aa)   Wong

U.S. Patent No. 5,603,947 ("Wong") issued on February 18, 1997, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Wong relates to a "skin or buccal patch for providing nicotine replacement therapy which comprises a matrix type laminated composite in which the matrix is composed of a mixture of nicotine in a polymer wherein the amount of nicotine in the matrix." (Wong at Abstract.)  The patch disclosed in Wong has a polymeric matrix layer containing nicotine and a backing layer that is impermeable to nicotine. (*Id.* at 2:10-31.) The patch is also characterized by "a diffusional pathway for nicotine to migrate from the matrix layer into the skin or mucosa." (*Id.* at 5:48-50.)

### (bb)   Biegajski

U.S. Patent No. 5,700,478 ("Biegajski") issued on December 23, 1997, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Biegajski discloses "a layered composite mucoadhesive device for delivery of an active substance into the oral cavity, having an active- containing layer that includes the active substance dispersed or dissolved in a water soluble polymer, and a water soluble adhesive layer" (Biegajski at 11:10-15.) The active containing layer is "water soluble" (*id.* at 11:16) and can contain hydroxypropyl cellulose (*Id.* at 21:46-50.)

### (cc)   Fine

Fine, Perry G., *et al*., "A Review of Oral Transmucosal Fentanyl Citrate: Potent, Rapid ~~andNoninvasive~~and Noninvasive Opioid Analgesia," *J. of Palliative Medicine*, 1:1, 55-63 (1998)

39

("Fine") published in 1998, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Fine discloses that "sublingual mucosa allows the greatest absorption, followed by the buccal and gingival mucosal" and that "drugs that pass through the oral mucosa appear in the systemic circulation quickly." (Fine at p. 56.) Fine discloses that as an opioid agonist, fentanyl citrate can be used to treat pain without severe adverse events. In a study of ten cancer patients, Fine reports that the onset of pain relief occurred within 9.5 minutes after the transmucosal administration of fentanyl, with no significant adverse events.

Fine also reports that "clinically significant" plasma concentration of fentanyl citrate occurs "within minutes" after dissolution of a transmucosal device containing the drug. (*Id.*) Fine discloses a plasma concentration over time as follows:



FIG. 1.  Plasma concentrations of fentanyl after administration in eight subjects via the oral transmucosal (buccal) route or after swallowing an equivalent dose.

(*Id.* at p. 57.)

Additionally, Fine describes a study with "[c]ancer patients with baseline pain controlled with either transdermal fentanyl or regularly scheduled opioid formulation who were

experiencing a few episodes of breakthrough pain," who were enrolled in a study. (*Id.* at p. 59.) The patients were treated with oral transmucosal fentanyl citrate. The most common side-effects were "somnolence (18%), nausea (11%), and dizziness (10%)." (*Id.*)

### (dd)    Shojaei

Shojaei, Amir H., "Buccal Mucosas as a Route for Systemic Drug Delivery: A Review," Journal of Pharmacy and Pharmaceutical Sciences, 1(1):15-30 (1998) ("Shojaei") published in 1998, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Shojaei provides a "review [of] buccal drug delivery by discussing the structure and environment of the oral mucosa and the experimental methods used in assessing buccal drug permeation/absorption," including bioadhesive polymeric based delivery systems. (Shojaei at p. 15.) More specifically, Shojaei discloses that bioadhesive polymers, which adhere to the mucosal tissue, play an important role in buccal drug delivery systems. Such polymers include polyacrylic acid and hydroxypropylmethylcellulose.

According to Shojaei:

> Saliva is an aqueous fluid with 1% organic and inorganic materials. The major determinant of the salivary composition is the flow rate which in turn depends upon three factors: the time of day, the type of stimulus, and the degree of stimulation. The salivary pH ranges from 5.5 to 7 depending on the flow rate. At high flow rates, the sodium and bicarbonate concentrations increase leading to an increase in the pH. The daily salivary volume is between 0.5 to 2 liters and it is this amount of fluid that is available to hydrate oral mucosal dosage forms. A main reason behind the selection of hydrophilic polymeric matrices as vehicles for oral transmucosal drug delivery systems is this water rich environment of the oral cavity.

(*Id.* at p. 17.)

41

Shojaei states that "[t]he cells of the oral epithelia are surrounded by an intercellular ground substance, mucus, the principle components of which are complexes made up of proteins and carbohydrates." (*Id.*) Shojaei teaches that "the mucus is also believed to play a role in bioadhesion of mucoadhesive drug delivery systems." ( *Id.*) More specifically:

> At physiological pH the mucus network carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer.

(*Id.*) Thus, Shojaei teaches that pH can affect the strength of the bioadhesive polymer. To that end, Shojaei reports a study that was conducted to determine "[t]he effect of pH on the bioadhesion of poly(acrylic acid) crosslinked with divinyl glycol," which determined that "the polymer showed maximum adhesion at pH 5 and 6 and a minimum at pH 7." (*Id.* at 25.)

Shojaei further describes that transmucosal drug delivery devices can be in the form of multi-layered patches. For example, Shojaei describes "a unidirectional buccal patch which consisted of three layers: an impermeable backing layer, a rate limiting center membrane containing the drug, and a mucoadhesive layer containing bioadhesive polymer polycarbophil." (*Id.*) Shojaei also describes a "bilayer patch" with "a backing layer of teflon and a mucoadhesive layer of protirelin dispersed in hydroxylethylcellulose." (*Id.*) Shojaei also reports the development of a buccal mucoadhesive device for controlled release of buprenorphine, using copolymeric hydrogel discs of HEMA (monomer) and Polymeg (macromere).

### (ee)    Volker

Volker *et al*., "Oral Buprenorphine is Anti-Inflammatory and Modulates the Pathogenesis of Streptococcal Cell Wall Polymer-Induced Arthritis in the Lew/SSN Rat," Laboratory Animals

34:423-429 (2000) ("Volker") published in 2000, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Volker describes a study that was conducted to determine an effective regimen for pain management for arthritis in rats. (*See* Volker at summary.) In particular, sublingual buprenorphine tablets were incorporated into jelly disks that were given to the rats as part of their diet to alleviate the pain of acute arthritis. (*Id.*) Volker concludes as follows:

> [O]ral administration of buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti-inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis.

(*Id.*) Thus, Volker teaches that buprenorphine has "significant anti-inflammatory effect."

### (ff)    Matson

International Patent Application Publication WO 00/19987 ("Matson") published on April 13, 2000, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Matson teaches a method for administrating a pharmacological agent to an animal, comprising applying a transmucosal drug delivery device to a mucous membrane of the animal, wherein the device comprises (i) an adhesive suitable for adhering the device to the mucous membrane; and (ii) the pharmacological agent. (*See* Matson at claim 1.) The device of Matson can be a patch that has an impermeable backing layer and outer polymer ring. (*Id.* at 30:14-25.) A drug is disposed within a polymer matrix that includes Carbopol. (*Id.* at 7:16-24; Table 1.) The device allows for unidirectional delivery of the drug into the mucosa. (*Id.* at 5:24-26.) The drug can be a centrally or peripherally acting analgesic. (*Id.* at 15:28-29.)

### (gg)   Chen

International Patent Application Publication WO 2000/42992 ("Chen") published on July 27, 2000 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Chen discloses films containing a water-soluble hydrocolloid, mucosal surface-coat-forming film, include an effective dose of an active agent. (Chen at 3:30-33.) The films of Chen are suitable "for local and systemic delivery of pharmaceutical agents to a mucosal surface in a subject." (*Id.* at 8:3-4.) Chen teaches applying the films "to any mucosal surface as deemed appropriate for the systemic or local delivery of an active agent including vaginal, rectal, and ocular surfaces." (*Id.* at 8:6-8.)  Chen also teaches that "[f]or purposes of oral delivery, the films may be applied on lingual, sub-lingual, buccal, gingival, and palatal surfaces (Figure 1)." (*Id.* at 8:8-10.)

Chen teaches that the disclosed films are suitable for delivering "a wide range of active agents" including "a small molecule, a protein, a nucleic acid including antisense molecules or other biological or synthetic molecules." (*Id.* at 7:22-24.) Chen specifically teaches using an opioid analgesic, e.g., hydromorphone, as an active agent. (*Id.* at 4:8-9.)

Chen teaches including a buffering agent in the disclosed films. (*Id.* at 4:5, 29;5:3.)  Chen teaches that the buffering agent can include "acidulants and alkalizing agents exemplified by citric acid, fumaric acid, lactic acid, tartaric acid, malic acid, as well as sodium citrate, sodium bicarbonate and carbonate, sodium or potassium phosphate and magnesium oxide." (*Id.* at 11:17-19.) Chen teaches including 0.1-10% of the buffering agent in the disclosed films. (*Id.* at 15:12.) Chen also teaches using citric acid as a stabilizer. (*Id.* at 11:26.) Chen teaches measuring the pH of the film-forming dispersion. (*Id.* at 17:12-13.)  Chen also teaches conducting a release

study to assess "the percentage of active agents released from the film as a function of time in a suitable dissolution vessel and medium under specified conditions of temperature and pH." (*Id.* at 12:10-12.) Chen provides working examples of exemplary films. The films described in Examples 1, 2, and 4-8 contain citric acid, a known buffering agent. (*Id.* at pp. 18-21).

### (hh)    Yates

International Patent Application Publication WO 00/62764 ("Yates") published on October 26, 2000, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Yates relates to methods of transmucosal delivery of a medicament for the treatment of systemic diseases. (Yates at 1:13-14.) Yates discloses oral mucosal delivery, and recognizes that "oral transmucosal delivery forms and devices are known to the art." (*Id.* at 2:32.) Examples include multi- layered tablets and patches. (*Id.* at 3:10-24, 37-38.) Yates also teaches that "absorption [of a medicament through the oral mucosa] is affected by . . . pH." (*Id.* at 2:24-25.)

Yates discloses a transmucosal device in the form of a gum pad, which is insertable between the gums and the buccal mucosa. (*Id.* at 5:9-11.)  The pad contains a reservoir layer, a backing layer, and a semi-permeable outer layer. (*Id.* at 4:38-5:5.)  The reservoir layer contains the medicament dispersed within a water soluble support matrix that can be made from cellulose polymers such as hydroxypropyl cellulose. (*Id.* at 8:22-38; 9:11-14.) The backing layer comprises cellulose polymers like hydroxyalkyl cellulose or alkyl cellulose polymers, adheres to the gums, and "prevents the migration of the medication" toward the gums. (*Id.* at 7:29-33; 7:38-8:1.)  The backing layer also "maintains the structure integrity of the Gum Pad and acts to protect against excessive swelling." (*Id.* at 7:32-33.)

45

Yates further states that "[a]gents that target the central nervous system (CNS) can be employed with the Gum Pad," including analgesics and opioid agonists. (*Id.* at 18:19-21.)

### (ii)    Tapolsky II

U.S. Patent No. 6,159,498 ("Tapolsky II") issued on December 12, 2000, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Claim 1 of Tapolsky II recites:

> A biodegradable, water-soluble pharmaceutical carrier device comprising a layered flexible film having a first water-soluble adhesive layer to be placed in contact with the mucosal surface and a second, water-soluble non-adhesive backing layer, and a pharmaceutical or combination of pharmaceuticals incorporated with said first or second layer, wherein said first water-soluble adhesive layer comprises hydroxyethyl cellulose, polyacrylic acid, and sodium carboxymethyl cellulose; and said second water-soluble non-adhesive backing layer comprises hydroxyethyl cellulose.

Tapolsky II teaches that the disclosed device, "by its solid form and its instantaneous adhesion to the mucosal surface, allows a lasting contact, a consequence of the entanglement of polymer chains and glycoproteins of the mucosal tissue which assures adhesion." (Tapolsky II at 4:24-28.) Tapolsky II also teaches that "the pharmaceutical device of the present invention minimizes the discomfort associated with application of a foreign substance for a period of time sufficient to provide effective drug delivery to the treatment site." (*Id.* at 4:35-38.) Tabolsky II teaches that "the device of the present invention offers the advantages of an effective residence time with minimal discomfort and ease of use, and is an appropriate vehicle for the local as well as systemic delivery of pharmaceutical, given its thinner, flexible form." (*Id.* at 4:48-52.)

Tapolsky II teaches that "[u]pon application, the pharmaceutical delivery device adheres to the mucosal surface and holds in place." (*Id.* at 5:16-17.) Tapolsky II teaches that the device can have a residence time of from about 30 minutes to about 4 hours. (*Id.* at 5:23-25.)

46

The devices of Tapolsky II include "a film disk having two layers–an adhesive layer and a non-adhesive backing layer–which are both water soluble." (*Id.* at 5:31-33.) Tapolsky II teaches including a pharmacological agent in either layer, although Tapolsky II teaches that the pharmaceutical agent is preferably in the adhesive layer, "which is closest to the treatment site and which will have a slower dissolution time, given that the backing layer protects the interior, adhesive layer and will dissolve first." (*Id.* at 5:37-39.) The pharmaceutical agents disclosed by Tapolsky II include, e.g., anti-inflammatory analgesic agents, and others. (*Id.* at 7:13-22.)

Tapolsky II teaches that "[t]he adhesive layer may comprise at least one film-forming, water-soluble polymer (the 'film-forming polymer') and at least one pharmacologically acceptable polymer known for its bioadhesive capabilities (the 'bioadhesive polymer')." (*Id.* at 5:40-44.)  The film-forming, water-soluble polymer can include, e.g., hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, and hydroxyethylmethyl cellulose. (*Id.* at 5:44-47.) Furthermore, "[t]he film-forming polymer may be crosslinked or plasticized in order to alter its dissolution kinetics." (*Id.* at 5:56-57.) The bioadhesive polymer can include, e.g., "polyacrylic acid (PAA), which may or may not be partially crosslinked, sodium carboxymethyl cellulose (NaCMC), and polyvinylpyrrolidone (PVP), or combinations thereof." (*Id.* at 5:59-63.)

Tapolsky II further teaches that the non-adhesive backing layer can include a water-soluble, film forming, pharmaceutically acceptable polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose, polyvinylalcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, and others. (*Id.* at 6:38-44.) In Example 20 of Tapolsky II, an adhesive layer was coated on top of the backing layer, forming a bilayer disk. (*Id.* at 13:5-6.)

### (jj)    Reder

U.S. Patent No. 6,231,886 ("Reder") issued on May 15, 2001 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

An objective of Reder is "to provide reduced plasma concentrations of buprenorphine over a prolonged time period than possible according to prior art methods, while still providing effective pain managemen.t" (Reder at 2:63-68.)  Another objective of Reder is "to provide a method for treating patients in pain with buprenorphine which achieves prolonged and effective pain management, while at the same time provides the opportunity to reduce side effects, dependence and tolerance which the patients may experience when subjected to prolonged treatment with a narcotic such as buprenorphine." (*Id.* at 3:1-7.) Reder further describes:

> [A] transdermal delivery system containing buprenorphine as the active ingredient onto the skin of patients which provide a release rate of buprenorphine over about a 72 hour dosing interval such that a maximum plasma concentration from about 20 pg/ml to about 850 pg/ml is attained (depending upon the dosage levels needed to maintain analgesia in the particular patients), and then maintaining the transdermal delivery systems on the skin of the patients for at least an additional 24 hour interval during which the plasma concentrations of buprenorphine in the patients are maintained above minimum effective concentrations of the drug and the patients continue to experience effective pain management during this additional dosing interval.

(*Id.* at 3:66-4:13.)

Reder discloses the results of a clinical study in which human subjects were administered low doses of buprenorphine transdermally, and pharmacokinetic properties were assessed. (*Id.* at 24:1-36:63.)  The dosing regimen of Reder provided an average buprenorphine $C_{max}$ of 184.80 pg/mL, i.e., 0.185 ng/mL. (*Id.* at 26:10-17; Table 2.) The study also assessed the incidence of common opioid adverse events, including headaches, dizziness, nausea, constipation, and vomiting. (*Id.* at 26:37-54; Table 3.)

Reder observed that "there was only one incident of a moderate adverse event, and no incidents of severe adverse events reported by the test subjects during the application interval." (*Id.* at 26:56-59.)  Reder also observed that "the level of dizziness, nausea and sleepiness significantly decreased after day 3 of the dosage interval" and that "[o]ther side effects such as headache, vomiting and constipation were also low in occurrence." (*Id.* at 26:60-64.) Reder accordingly states that "[t]he present invention, by maintaining a lower blood level of drug over the 7 day dosing period while maintaining effective pain management, has a lower incidence of side effects." (*Id.* at 23:44-47.)

### (kk)   Zhang

U.S. Patent No. 6,264,981 ("Zhang") issued on July 24, 2001, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Zhang discloses devices for the transmucosal delivery of drugs affecting the central nervous system. (Zhang at 9:32-53.)  Zhang teaches that the disclosed devices may be formulated as a "buccal or mucosal patch." (*Id.* at 5:48-52.) Zhang teaches that the disclosed devices "may easily be utilized in the administration of opioid agonists (such as fentanyl, alfentanil, sufentanil, lofentanil, and carfentanil)." (*Id.* at 9:38-43.) Zhang also teaches that "other drugs may also be utilized within the scope of the present invention either singly or in combination." (*Id.* at 9:51-53.)

Zhang recognized that "the dissolution rate, solubility, stability and permeability of an ionizable drug are greatly influenced by the pH of the system. In general, an ionized form of a drug has a higher dissolution rate and solubility, better stability, but lower permeability than does the unionized form." (*Id.* at 7:65-8:3.) Zhang accordingly recognized that "the ionized [salt] forms will almost always have lower partition coefficients than the unionized forms, and

therefore are less well absorbed by the oral mucosal tissue.  Thus, converting the weak acid or base to an ionized form in order to increase solubility compromises absorption." (*Id.* at 4:58-63.)

Zhang teaches that "[a] common method of controlling the pH of the formulation is to use a buffer system.  A buffer system consists of hydrogen ion donor(s) (acid) and conjugate hydrogen ion receiver(s) (base). An appropriate buffer system stabilizes the pH." (*Id.* at 4:64-5:1.)

### (ll)     Oshlack

International Patent Application Publication WO 01/58447 ("Oshlack") published on August 16, 2001, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Oshlack discloses transmucosal delivery systems designed to deliver buprenorphine to patients. (Oshlack at 1:31-32; 17:15-24.) One such delivery system is an oral mucosal patch (in the form of a circular disk) with a membrane backing layer made from polymers such as an alkylcellulose. (*Id.* at 18:10-14.) The backing layer of this system helps to "retard drug release from one side of the disk and to prohibit adhesion to opposing side tissues." (*Id.* at 17:25-27.)  The transmucosal delivery device in Oshlack can be used to treat pain. (*Id.* at 2:10-14.)

Oshlack also discloses a transdermal delivery device for the administration of an opioid agonist and/or an opioid antagonist to patients. (*Id.* at 15:5-8.)  In some embodiments, the device is a "transdermal patch comprising a backing layer which is impermeable to the active substance, a pressure-sensitive adhesive reservoir layer, and optionally a removable protective layer, the reservoir layer by weight comprising 20 to 90% of a polymeric matrix, 0.1 to 30% of a softening agent, 0.1 to 20% of said opioid agonist and opioid antagonist and 0.1 to 30% of a solvent of a solvent for the opioid agonist and opioid antagonist." (*Id.* at 15:36-16:7.) The transdermal device can further contain an "adhesive which allows the transdermal device to adhere to the skin,

allowing the passage of the active agent from the transdermal device through the skin of the patient." (*Id.* at 12:36-38.) The transdermal device can deliver buprenorphine as the active agent. (*Id.* at 14:15.) The device can be used to treat pain. (*Id.* at 2:10-14.)

### (mm)   Repka

U.S. Patent No. 6,375,963 ("Repka") published on April 23, 2002, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Repka discloses a "bioadhesive hot-melt extruded film for topical and mucosal adhesion applications." (Repka at title.)  The film provides a "convenient topical or intra-cavity drug delivery system" (*id.* at 2:63-64) for, e.g., buccal or oral application (*id.* at 3:2-3). Repka reports that the "film formulations of the invention will adhere to mucosal surfaces (oral, rectal, vaginal, etc.) and/or skin surfaces when wet. (*Id.* at 3:45-47.)

In an aspect, the films of Repka are formed from a composition comprising: about 30-95% wt. of one or more water-soluble or water-swellable thermoplastic polymers, about 1-25% wt., or up to 25% wt., of polycarbophil, about 1-60% wt., or up to 60% wt., of poly(ethylene oxide), about 0.1-10% wt., or up to 10% wt., of an organic acid, about 0.01-10% wt., or up to 10% wt., of an antioxidant, and about 0-50% wt., or up to 50% wt., of a therapeutic agent. (*Id.* at 3:48-57.)

Repka discloses that:

> The hot-melt extruded film can also comprise one or more pH-adjusting agents to improve drug stability and solubility. Also the pH modifying agents can control drug release and enhance bioadhesion. These additives may be dispersed in the powder blend, and the pH adjusted from 2.0 to 10.0, or more optimally from 4.0 to 8.5. The pH-adjusting agent is generally present in an amount of about 0.1-10% wt., while 2-6% is most desirable. A pH-adjusting agent can include, by way of example and without limitation, an organic acid or base, an alpha-hydroxy acid, a beta-hydroxy acid. Suitable agents include tartaric acid, citric acid, fumaric acid, succinic acid and others known to those of ordinary skill in the art.

51

(*Id.* at 5:45-57.)

Further, Repka discloses that the bioadhesive films can also include pH buffering agents to, *inter alia*, "resist change in pH upon dilution or addition of acid or alkali." (*Id.* at 6:61-7:2.) The buffering agents include such agents as "potassium metaphosphate, potassium phosphate, monobasic sodium acetate and sodium citrate anhydrous and dihydrate, salts of inorganic or organic acids, salts of inorganic or organic bases" and the like. (*Id.* at 7:3-8.)

### (nn)   Rupprecht

U.S. Patent Application No. 2002/0142036 ("Rupprecht") published on October 3, 2002, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Rupprecht teaches a transmucosal drug delivery device in the embodiment of a multi-layered film. (Rupprecht at [0002], [0048].) The film includes a cover layer, an active substance-containing layer, and an adherent layer that secures the film to the "site at which the active substance is to be released." (*Id.* at [0003].)

Rupprecht reports that "[t]he cover layer serves to mechanically stabilize the multi-layer film, to protect the active substance incorporated in the active substance-containing layer, and also as a barrier to prevent diffusion of the active substance, so that a unidirectional release of the active substance takes place through the adherent layer to the site where the multi-layer film is attached." (*Id.* at [0010].) The cover layer can be made from "any known suitable film-forming water- soluble polymer(s)," including "cellulose ethers, preferably hydroxyethylcellulose and/or methylcellulose." (*Id.* at [0011], [0012].)

Similarly, Rupprecht describes that the active-substance containing layer (also known as the "active substance matrix") "may be produced from a suitable film-forming, water-soluble polymer," which includes "cellulose ethers, preferably hydroxyethylcellulose and/or

52

methylcellulose." (*Id.* at [0018] - [0020].) Buprenorphine can be disposed within this layer as the medicament for the transmucosal device. (*Id.* at [0029].)

Rupprecht also states that "[t]he adherent layer … is applied directly to the active substance-containing layers." (*Id.* at [0047].) "[T]he adherent layer may consist essentially of non-crosslinked, preferably mucoadhesive, polymers," such as polycarcylic acid and methylcellulose. (*Id.* at [0047].)

Rupprecht further discloses that "the administration of medicaments via transmucosal application by means of a multi-layer film has proved very effective both for local therapy as well as systemic therapy." (*Id.* at [0004].)  Suitable medicaments include buprenorphine. (*Id.* at [0029].)

### (oo)   Suboxone Label

Suboxone® sublingual tablets were approved by the FDA on October 8, 2002, and the prescribing information for Suboxone sublingual tablets published on October 8, 2002 ("Suboxone Label"). Suboxone sublingual tablets and the prescribing information for Suboxone sublingual tablets are prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Suboxone tablets contain buprenorphine hydrochloride and naloxone hydrochloride dihydrate in a free base ratio of 4:1 buprenorphine: naloxone. (Suboxone Label at 23. ) Suboxone Label describes at least two dosage strengths, i.e., one containing 2 mg buprenorphine hydrochloride and 0.5 mg naloxone hydrochloride dihydrate (corresponding to free base), and another containing 8 mg buprenorphine hydrochloride and 2 mg naloxone hydrochloride dihydrate (corresponding to free base). (*Id.*) Suboxone tablets are buffered with a

mixture of citric acid and sodium citrate, administered sublingually, and indicated for the treatment of opioid dependence. (*Id.* at 8, 13.)

Suboxone Label notes that buprenorphine is a partial agonist and partial antagonist, while naloxone is an antagonist. (*Id.* at 23.) More specifically, the prescribing information for Suboxone states that "[c]omparisons of buprenorphine to full opioid agonists such as methadone and hydromorphone suggest that sublingual buprenorphine produces typical opioid agonist effects which are limited by a ceiling effect." (*Id.*) Naloxone, on the other hand, "had no clinically significant effect when administered by the sublingual route, although blood levels of the drug were measureable." (*Id.* at 24.) Thus, while "[b]oth $C_{max}$ and AUC of buprenorphine increased in a linear fashion with [an] increase in dose (in the range of 4 to 16 mg)," "[t]he levels of naloxone were too low to assess dose-proportionality." (*Id.* at 10.) "Mean peak naloxone levels ranged from 0.11 to 0.28 ng/ml in the dose range of 1-4 mg." (*Id.*)

The prescribing information for Suboxone tablets also includes the following pharmacokinetic data for buprenorphine after administration of 4 mg, 8 mg, and 16 mg Suboxone doses, shown as mean (%CV):

| Pharmacokinetic Parameter | Suboxone 4 mg | Suboxone 8 mg | Suboxone 16 mg |
|---|---|---|---|
| $C_{max}$ (ng/ml) buprenorphine | 1.84 (39) | 3.0 (51) | 5.95 (38) |
| AUC0-48, hour*ng/ml buprenorphine | 12.52 (35) | 20.22 (43) | 34.89 (33) |

(*Id.*)

### (pp)    Suboxone® FDA Review

Reckitt & Colman Pharmaceuticals Inc. developed Subutex® and Suboxone® and sought FDA approvals by filing NDA Nos. 20-732 and 20-733, respectively. (*See* Suboxone FDA

Review at 4.) Because Subutex and Suboxone "are closely related products (from the viewpoint of formulation and proposed indications) and share similar Clinical Pharmacology and Biopharmaceutics issues and concerns, Subutex [is] discussed along with Suboxone" in the Clinical Pharmacology and Biopharmaceutics Review, which published as part of the Suboxone Drug Approval Package and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA). (*Id.*)

Suboxone FDA Review describes certain physicochemical properties of buprenorphine:

### 2.0   PHYSICOCHEMICAL PROPERTIES

Buprenorphine is a weak base with a pKa of 8.4. As such, pH of the saliva will play a role in the amount of buprenorphine absorbed from the oral mucosa. The solubility of buprenorphine is ⁓ at pH 6 but only ⁓ at pH 7, a 10-fold decrease. It is highly lipid soluble (log partition coefficient of octanol/pH 6.6 is 3.37).

(*Id.* at 5.)

Suboxone FDA Review describes studies to evaluate dose proportionality of Suboxone® tablets. (*Id.* at 7.) In one study–CR95/001–4 mg, 8 mg, and 16 mg doses of Suboxone® tablets and a 16 mg dose of Subutex® tablets were administered to patients and the following buprenorphine and naloxone $C_{max}$ and AUC values were measured:

**Table 2**.   Pharmacokinetic parameters of buprenorphine after the administration of 4 mg, 8mg, and 16 mg Suboxone® doses and 16mg Subutex® dose (mean (%CV)).

| Pharmacokinetic Parameter | Suboxone® 4 mg | Suboxone® 8 mg | Suboxone® 16 mg | Subutex® 16 mg | 90% Confidence Intervals for Suboxone®/Subutex® |
|---|---|---|---|---|---|
| $C_{max}$, ng/mL | 1.84 (39) | 3.0 (51) | 5.95 (38) | 5.47 (23) | 84-129 |
| $AUC_{0-48}$*, hour*ng/mL | 12.52 (35) | 20.22 (43) | 34.89 (33) | 32.63 (25) | 88-123 |

* $AUC_{0-36}$ in two out of 24 doses.

**Table 3.**     Pharmacokinetic parameters of naloxone after the administration of 4 mg, 8mg, and 16 mg doses of Suboxone® (mean (%CV)).

| Pharmacokinetic Parameter | Suboxone® 4 mg (Naloxone 1 mg) | Suboxone® 8 mg (Naloxone 2 mg) | Suboxone® 16 mg (Naloxone 4 mg) |
|---|---|---|---|
| $C_{max}$, ng/mL | 0.107 (25) | 0.178 (57) | 0.279 (68) |
| $AUC_{0-48}$, hour*ng/mL | 0.103[#] | 0.148 (33) | 0.259 (45) |

[#] one subject

(*Id.* at 8, 20-23.)

Suboxone FDA Review explains that "[a]lthough Suboxone® is a combination product of buprenorphine and naloxone (in the ratio of 4:1), the primary purpose of naloxone is to prevent the intravenous misuse of buprenorphine (concept originally used in currently marketed pentazocine product, Talwin® NX). This could be done because naloxone has poor oral bioavailability." (*Id.* at 4.) Thus, "for practical purposes naloxone can be deemed to be an inactive ingredient in [Suboxone tablets]." (*Id.*) Ultimately, Suboxone FDA Review concludes that naloxone in the Suboxone formulation–up to at least concentrations of 4 mg–does not affect the pharmacokinetics of buprenorphine. (*Id.* at 14.)

### (qq)   Chiang

Chiang, *et al.*, "Pharmacokinetics of the combination tablet of buprenorphine and naloxone," *Drug and Alcohol Dependence*, *70*, S39-S47 (2003) ("Chiang") published in 2003 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Chiang discloses a sublingual combination tablet, which contains buprenorphine and naloxone. Chiang teaches that the "addition of naloxone does not affect the efficacy of buprenorphine" because "naloxone is poorly absorbed sublingually relative to buprenorphine" and "the half-life for buprenorphine is much longer than for naloxone." (Chiang at Abstract.)

56

Chiang also teaches that the addition of naloxone "is intended to reduce the abuse potential of buprenorphine." (*Id.* at S39.)

Chiang compares the pharmacokinetics of sublingual buprenorphine from the tablet formulation with that of buprenorphine from sublingual solution formulations, as reported in three different studies in the literature. Chiang reports that buprenorphine is rapidly absorbed and that "[t]here is no apparent difference in the time ($T_{max}$ of 1 h) to reach the peak concentration between the solution formulations and the tablet formulation." (*Id.* at S43, references omitted.) Further, Chiang reports that the bioavailability of buprenorphine from three sublingual solutions varied between 30 and 51% of the intravenous bioavailability. (*Id.* at S43; Table 2.) Chiang also disclosed that bioavailability estimates from multi-dose studies reaching steady state may be higher than from single-dose studies in part because subjects learn to better hold the dosages, i.e., tablets, under their tongues. (*Id.* at S43.) Chiang concludes that "[t]he steady-state data probably provides a better estimate of the relative bioavailability ($\sim$ 70% tablet to solution) in the actual clinical situation." (*Id.* at S43-S44.)

### (rr)   Breder

International Patent Application Publication WO 03/013525 ("Breder") published on February 20, 2003, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Breder relates to "an oral dosage form of an opioid agonist that is useful for decreasing the potential for abuse." (Breder at 2:12-13.) Breder discloses that the matrix of the dosage form can contain both the opioid agonist and opioid antagonist. (*Id.* at 37:31-36.) The matrix can be released in a pH-dependent fashion. (*Id.* at 37:31-36.) Materials suitable to produce the matrix include alkylcelluloses and acrylic polymers. (*Id.* at 38:24-35.)

57

### (ss)     Moro

U.S. Patent Application Publication 2003/0044446 ("Moro") published on March 6, 2003, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Moro discloses layered pharmaceutical delivery devices. (*See* Moro at Abstract.) The devices of Moro include a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer, and one or more pharmaceuticals, if desired, in either or both layers. (*Id.*)  Moro teaches that the disclosed devices adhere to a mucosal surface and that the residence time can be easily regulated by modification of the backing layer. (*Id.*)

As noted above, the devices of Moro can include a pharmaceutical agent in the adhesive and/or backing layer. For example, Moro teaches:

> In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable. In another embodiment, the pharmaceutical delivery device comprises a multi-layered film having an adhesive layer and a coated backing layer containing a pharmaceutical or other active compound in either or both layers.

(*Id.* at [0010].) Moro teaches that the pharmaceutical agent in the disclosed device can include an analgesic narcotic such as buprenorphine. (*Id.* at [0031]; [0064].)

Moro teaches using film-forming and bioadhesive polymers in the adhesive layer. For instance, Moro teaches:

> The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination.

(*Id.* at [0010].) With regard to the non-adhesive backing layer, Moro teaches:

> The non-adhesive backing layer is a precast film alone or in combination with other layers. The precast film is comprised of hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxyethylmethyl cellulose, hydroxypropylmethyl cellulose, polyvinyl alcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide copolymers, or other water soluble film-forming polymer, alone or in combination thereof. The precast film may also include plasticizers or other excipients required to enhance the film forming properties of the polymer. The non-adhesive backing layer is further modified to render it water erodible instead of water soluble.

(*Id.* at [0010].) Moro also teaches including "a third layer that regulates the residence time of the device." (*Id.* at [0071].)

Moro further teaches that "[t]he device causes minimum discomfort, is easy to use and provides an effective residence time that can be tailored to deliver therapeutics over different time intervals." (*Id.* at [0010].) Moro also teaches that the disclosed device "will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." (*Id.* at [0046].) Moro further teaches that "[t]he residence time is easily tailored to provide a range from minutes to hours, dependent upon the type of drug used and therapeutic indication." (*Id.* at [0036].)

### (tt)     Birch

International Patent Application Publication WO 03/080021 ("Birch") published on October 2, 2003, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Birch teaches "buprenorphine formulations for nasal administration" that result in "[r]apid uptake of the buprenorphine across the nasal mucosa into the plasma" and "fast onset of analgesia." (Birch at p. 3.) Particularly, Birch discloses a nasal spray solution in which a

selected concentration of buprenorphine (i.e., 0.1 to 10 mg/mL) is dissolved within "5 to 40 mg/ml of a pectin having a low degree of esterification." (*Id.* at pp. 7, 9.)  Pectin is a "polysaccharide substance present in the cell walls of all plant tissues." (*Id.* at p. 8.) Birch teaches a variety of pH ranges for the buprenorphine-pectin solution, including a pH of from 3 to 4.2 and a pH of from 3 to 4.8. (*Id.* at pp. 9, 14, 38-40.)  The spray solution can contain buffers or no buffers. (*Id.* at p. 14.)  A chitosan can also be added to the solution to provide mucoadhesive properties. (*Id.* at p. 11.)

Dosages of buprenorphine suitable for the formulation in Birch range "from 0.02 to 1.2 mg, such as from 50 to 600 μg or from 100 to 400 μg." (*Id.* at p. 16.) Birch teaches that for low dosages of buprenorphine, the $C_{max}$ can be "from 1 to 5 ng/mL," "1 to 4 ngl/ml," "1.5 to 3 ng/mL" or "1 to 2 ng/mL." (*Id.* at p. 17.) The $T_{max}$ "is typically 10 to 40 minutes after administration, for example 10 to 30 minutes or 15 to 24 minutes such as 15 to 20 minutes." (*Id.* at p. 17.) The nasal solution can provide "a therapeutic plasma concentration $C_{ther}$ of 0.2 ng/mL or greater which is maintained for a duration $T_{maint}$ of at least 2 hours." (*Id.* at p. 18.)

### (uu)    Holl I

U.S. Patent Application No. 2003/0194420 ("Holl I") published on October 16, 2003, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Holl I discloses a bioerodible, water- soluble mucoadhesive film with a bioadhesive layer and a non-bioadhesive backing layer. (Holl I at [0046]; claim 1.) The bioadhesive layer of the film is water-soluble, containing at least one film-forming polymer and one bioadhesive polymer. (*Id.* at [0046]-[0047].) The film-forming polymer can be a cellulose derivative such as hydroxypropyl methyl cellulose. (*Id.* at [0048].) The bioadhesive polymer can be, *inter alia*,

polyacrylic acid, sodium carboxylmethyl cellulose or polyvinylpyrrolidone. (*Id.* at [0049].) The bioadhesive layer adheres to the mucosal surface of a mammal. (*See id.* at claim 3.)

The backing layer comprises a water-soluble, film-forming pharmaceutically acceptable polymer such as (but not limited to) cellulose derivatives (paragraph [0051]). Holl I teaches that "[t]he backing layer protects the interior, bioadhesive layer and will dissolve first. Dissolution of the backing layer primarily controls the residence time of the film disc after application to the mucosal surface." (*Id.* at [0046].)

A pharmaceutical composition is generally placed on "the surface of the bioadhesive layer, which is closest to the application site" (i.e., the mucosa). (*Id.* at [0046].) This composition can include buprenorphine. (*Id.* at [0062].)

### (vv)   Das

Das *et al.*, "Development of Mucoadhesive Dosage Forms of Buprenorphine for Sublingual Drug Delivery," Drug Delivery, 11: 89-95 (2004) ("Das") published in 2004 and is as prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Das discloses a study of drug delivery devices, including mucoadhesive sublingual films containing buprenorphine. Das "hypothesize[s] that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of drug, leading to better therapeutic efficacy and reproducibility." (Das at p. 90.) Das also teaches that a commercial matrix-type transdermal patch containing buprenorphine was "recently introduced in the European market for the management of stable cancer and noncancer pain," and that "early clinical efficacy reports are fairly promising." (*Id.* at p. 89.)

61

#### (ww)   Asmussen

U.S. Patent Application Publication No. 2004/0024003 ("Asmussen") published on February 5, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Asmussen discloses a "flat pharmaceutical preparation for transmucosal administration of oxycodone or a pharmacologically comparable active ingredient in the region of the oral cavity," and "the use of such a pharmaceutical preparation in pain therapy." (Asmussen at [0001].)  The preparation can be in a dosage form with a bilayer structure (*id.* at [0018]) and can disintegrate in aqueous media (*id.* at claim 1). One layer can be mucoadhesive while the other layer is not. (*Id.* at [0018].) "Examples of such mucoadhesive substances are polyacrylic acid, carboxymethylcellulose, hydroxymethylcellulose, methylcellulose, tragacanth, alginic acid, gelatin and gum Arabic." (*Id.* at [0017].) "In embodiments which contain non-mucoadhesive layers in addition to mucoadhesive ones, the former are preferably designed so that their permeability for the active ingredient is lower than that of the bioadhesive or mucoadhesive layer. This makes it possibl[e] to avoid [the] active ingredient being released in the saliva in the oral cavity." (*Id.* at [0019].) The dosage form can be brought in contact to a patient's oral surface for the delivery of the medicament. (*Id.* at [0017]; [0163].)

#### (xx)   Shevchuk

International Patent Application Publication WO 2004/017941 ("Shevchuk") published on March 4, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Shevchuk discloses that transdermal drug delivery devices are well-known in the art. (Shevchuk at 12:1-5.)  One such device "comprises a reservoir . . . located between an

62

impermeable backing film and a rate-controlling membrane that is covered with a pressure-sensitive adhesive skin-contacting layer." (*Id.* at 9:6-8.) The reservoir can have a polymer-matrix wherein an opioid and an opioid antagonist are dispersed. (*Id.* at 10: 6-9.)  Once the matrix contacts the skin, the opioid diffuses and penetrates the skin. (*Id.* at 10:16-17.) "A peripheral ring of adhesive [is] located around the edge" of the device to ensure adhesion to the skin. (*Id.* at 10:10-12.)  The backing film (or layer) "can be any suitable material that is impermeable to the contents of the reservoir compartment [or] the polymer matrix." (*Id.* at 12:26-27.) Buprenorphine is suitable as the drug for the device. (*Id.* at 18:18.) Shevchuk teaches that the device can be used to treat pain. (*Id.* at 22:18-25.)

### (yy)    Quay

U.S. Patent Application Publication No. 2004/0077540 ("Quay"), published on April 22, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Quay relates to "compositions and methods . . . that include a biologically active agent and a permeabilizing agent effective to enhance mucosal delivery of the biologically active agent in a mammalian subject" such as a human. (Quay at Abstract; [0495].) The biologically active agent can be an opioid. (*Id.* at [0050].) The permeabilizing agent is generally a protein. (*Id.* at [0047].)

According to Quay, transmucosal delivery of active agents has many advantages, one of which is the speed of delivery. (*Id.* at [0005].) Quay states that its methods and compositions can produce "enhanced bioavailability of the therapeutic compound" while "providing enhanced speed [and] duration" of transmucosal administration. (*Id.* at [0076]; [0149].)  As an example,

Quay discloses that its compositions can yield a $T_{max}$ (i.e., the time to reach the maximum plasma concentration of an active agent) of "between about 0.1 to 1.0 hours." (*Id.* at [0078].)

The transmucosal compositions in Quay can be formulated into sprays, gels, and films. (*Id.* at [0481]; [0485].) When the composition is a gel or a film, the biologically active agent can be disposed within a polymeric environment. (*Id.* at [0359]; [0485].) The polymers can be biodegradable and/or erodible "by mechanical, enzymatic and/or ciliary action." (*Id.* at [0393]; [0485].) Suitable polymers for these compositions include polyvinylpyrrolidone, cellulose derivatives, and mucoadhesive polymers. (*Id.* at [0395]; [0485].) The amount of the biologically active agent in the composition ranges "between about 10 μg and 5.0 mg." (*Id.* at [0499].) Quay states that the dosage regimen "may be adjusted to provide an optimum prophylactic or therapeutic response." (*Id.* at [0499].)

Quay suggests that the pH of the composition may also be important. In compositions that contain polymers, the pH ranges "from about 3 to 9" in order to provide stability. (*Id.* at [0363].) Buffers can also be used in the drug composition. (*Id.* at [0488].) For a spray formulation, Quay discloses a buffered pH of 4-6. (*Id.* at [0481].)

According to Quay, the transmucosal delivery of a biologically active agent is affected by several factors such as its "molecular size, lipid solubility, and ionization." (*Id.* at [0006].) For instance:

> Small molecules, less than about 300-1,000 daltons, are often capable of penetrating mucosal barriers, however, as molecular size increases, permeability decreases rapidly. Lipid-soluble compounds are generally more permeable through mucosal surfaces than are non-lipid-soluble molecules. Peptides and proteins are poorly lipid soluble, and hence exhibit poor absorption characteristics across mucosal surfaces.

(*Id.*)

64

The ionization of the active agent, which also influences transmucosal administration, "is dependent on the pKa of the molecule and the pH of the mucosal membrane surface." (*Id.* at [0261].) Quay instructs that the "mucosal delivery of charged macromolecular species . . . is substantially improved when the active agent is delivered to the mucosal surface in a substantially un-ionized, or natural, electrical charge state." (*Id.* at [0263].) Indeed, "[p]ermeation . . . of biologically active agents . . . may be facilitated by charge alteration or charge spreading of the active agent . . . which is achieved, for example, by . . . modifying the pH of the delivery vehicle or solution in which the active agent is delivered." (*Id.* at [261].)

### (zz)   Pauletti

U.S. Patent Application Publication No. 2004/0151774 ("Pauletti") published August 5, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Pauletti relates to "[p]olymer foams and films for delivery of therapeutic agents to and through nasal, oral or vaginal mucosa." (Pauletti at Abstract.) Pauletti states that the "[t]he foam or film of the invention has a controllable rate of gelling, swelling and degradation." (*Id.* at [0056].) A preferred site of delivery is the buccal mucosa, as the buccal mucosa "is rich in blood vessels facilitating access to systemic circulation," drug administration is "non-invasive" and "hepatic first-pass metabolism" is avoided. (*Id.* at [0288].) Opioid analgesics like buprenorphine can be delivered through the films or foams disclosed in Pauletti. (*Id.* at [0183].)

Pauletti teaches films with more than one layer, such as two-layered and three-layered films. (*Id.* at [0104]-[0105].) The layers of these multi-layered films generally have different functions. (*Id.* at [0104].) "For example, for buccal applications, a drug-eluting layer is most desirable against the mucous membrane. On the opposite side, however, a second barrier film

layer may be useful to prevent loss of the drug into the saliva and the digestive system." (*Id.* at

[0104].) As an example, Pauletti describes:

> As a functional example of a multi-layer film, a multi-layer film would consist of a barrier film as described above, a middle layer which serves as the primary reservoir for the drug, and a third layer comprising mucoadhesives and/or release modifiers, which contacts the body and controls the adhesion of the film to the tissue and the rate at which the drug is released from the reservoir layer.

(*Id.* at [105].)

Polymers that are hydrophilic, hydrophobic, and/or mucoadhesive can be used to make

these films. (*Id.* at [0111]-[0112]; [0122]-[0123].) Examples of suitable polymers include

hydroxypropyl methylcellulose, carboxymethylcellulose, polyacrylic acid, and polyethylene

glycol. (*Id.* at [0112]; [0123].) Buffering agents can also be employed to enhance drug

delivery. (*Id.* at [0151].) Pauletti encourages buccal administration of drugs. (*Id.* at [0285]-

[0288].)

### (aaa)   Furusawa

U.S. Patent Application Publication No. 2004/0180080 ("Furusawa") published on

September 16, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35

U.S.C. § 102(a)(AIA).

Furusawa relates to "a film-type edible oral mucosal patch" comprising fentanyl, and

including certain polymers, a polyhydric alcohol, and a pH-adjusting agent (abstract).  The

patches in Furusawa can be single-layered, or multi-layered such that there is at least one support

layer and at least one drug layer containing fentanyl. (Furusawa at [0037]; [0040]; [0041];

[0043].) The drug layer of the patch adheres to the oral mucosa. (*Id.* at [0040].) Furusawa

66

disceloses an embodiment with a drug layer sandwiched between disintegrating support layers. (*Id.* at [0043].)

Furusawa teaches that the drug layer has disintegrating features, i.e., it dissolves in the oral cavity, while the support layer may be disintegrating or non-disintegrating. ( *Id.* at [0037]; [0039]; [0041].) Any layer that is disintegrating dissolves "within the range from about 10 seconds to 24 hours [and] more preferably 10 seconds to 12 hours." (*Id.* at [0091]; [0100].)

In the embodiment where only the drug layer is disintegrating, the drug layer comprises "a semi-synthetic water-soluble polymer," "a synthetic-water soluble polymer," "a water-soluble polyhydric alcohol," and "a pH-adjusting agent" while the support layer contains "a semi-synthetic water insoluble polymer," "a synthetic-water soluble polymer," and "a water-soluble polyhydric alcohol." (*Id.* at [0063].) When both the drug and the support layers of the patch are disintegrating, the drug layer comprises "a semi-synthetic water-soluble polymer," "a synthetic-water soluble polymer," and "a water-soluble polyhydric alcohol" while the support layer has "a semi-synthetic water-insoluble polymer," "a synthetic-water soluble polymer," "a water-soluble polyhydric alcohol" and "a pH adjusting agent." (*Id.* at [0064].)

Furusawa teaches that ethyl cellulose and hydroxypropylmethyl cellulose phathalate can be the semi-synthetic water-insoluble polymers in the support layer. (*Id.* at [0068].) Furusawa also teaches that hydroxypropyl cellulose, hydroxypropylmethyl cellulose, methyl cellulose, and sodium carboxymethyl cellulose are suitable as the semi-synthetic-water soluble polymer for the drug layer. (*Id.* at [0070].) Additionally, Furusawa discloses polyvinyl pyrrolidone and sodium polyacrylate as the synthetic-water-soluble polymer that is present in both the drug and support layers. (*Id.* at [0072].)

67

Furusawa also teaches that the patch comprises a pH-adjusting agent. (*See, e.g.*, *id.* at [0033]-[0034]; [0037]; [0041]; [0051].) Furusawa teaches that the pH-adjusting agent plays an important role in the stability and transmucosal absorption of the active agent, as follows:

> By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased.

( *Id.* at [0063].) And:

> By containing an appropriate amount of a pH-adjusting agent in the disintegrating support layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased and the stability of the fentanyl compound in the edible oral mucosal patch can be greatly improved.

( *Id.* at [0064].)

With respect to pH, Furusawa teaches as follows:

> When the content of the pH-adjusting agent is adjusted so as to provide pH of an aqueous solution, which is prepared by mixing 2 parts by weight of the oral mucosal patch with 98 parts by weight of water and in which at least the drug layer is dissolved, within the range of <u>4.0 to 8.0, more preferably, 5.0 to 7.0, a fentanyl compound can be absorbed particularly preferably</u>.

(*Id.* at [0065] (emphasis added).) Furusawa explains that the pH of the aqueous solution in the case of a single-layer film, is that of the aqueous solution obtained after the entire preparation is dissolved; in the case of a film with a non-disintegrating support layer and a disintegrating drug layer, is that of the aqueous solution obtained after the drug layer is dissolved; and in the case of a film with a disintegrating support layer and a disintegrating drug layer, is that of the aqueous solution obtained after the drug layer is dissolved. (*Id.* at [0065].)

Furusawa teaches as follows with respect to pH:

> When the pH of the aqueous solution is 4.0 or less, the absorption of a fentanyl compound decreases and a sufficient flux to reach an

68

efficient concentration in blood is not obtained. On the other hand, a pH of 8.0 or higher is not preferable since the oral mucosa may be badly affected and irritated.

(*Id.* at [0065].)

In addition:

[I]t is not only necessary for a pH-adjusting agent added to the support layer to control the pH in the oral cavity so as to absorb a drug easily, in order for the edible oral mucosal patch formed of the disintegrating support layer and the disintegrating drug layer to exhibit its performance more satisfactorily, but also necessary to release the drug by dissolving the drug layer before the drug-absorbable condition created by the pH-adjusting agent is destroyed by secretion of saliva.

(*Id.* at [0100] (emphasis added).)

Thus, when the patch contains a disintegrating support layer, Furusawa teaches that the stability of the active ingredient can be greatly improved by adding a pH-adjusting agent to the support layer, without decreasing the transmucosal efficiency of the active ingredient.

(*Id.* at [0202]; [0207]; [0216].)

### (bbb)  Van Duren

U.S. Patent Application No. 2004/0191301 ("Van Duren") published on September 30, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Van Duren relates to a transdermal drug delivery device comprising a backing layer, a drug reservoir layer adjacent to the backing layer, a phase change material, and an adhesive layer next to the reservoir layer but opposite to the backing layer. (*See* Van Duren at claim 1; [0017].) Comprising of polymers, the backing layer prevents the medicament in the reservoir from being released or transported through the top or sides of the device, as it is substantially impermeable to the medicament. (*Id.* at [0019].) "The materials of which the backing layer 12 can be made

69

include polymers such as polyethylene, polypropylene, polyvinylchloride, polyurethane, polyesters such as poly (ethylene phthalate), coated flexible fabrics such as paper or cloth, and foils such as laminates of polymer films with metallic foils such as aluminum foil." (*Id.* at [0019].)

### (ccc)   Hart

U.S. Patent Application No. 2004/0219195 ("Hart") published on November 4, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Hart discloses a transdermal delivery device comprising an active agent component and a barrier. (Hart at [0026].) The active agent component contains a drug disposed within a skin-contacting polymeric material. (*Id.* at [0026]; [0032].) Hart teaches that "the skin-contacting polymeric material may comprise a pressure-sensitive adhesive." ( *Id.* at [0034].) "The barrier is permeable to and/or at least partially soluble in a solvent selected from the group consisting of water, ethanol, ether, and mixtures thereof, and . . . is substantially impermeable to diffusion of active agent and adverse agent in the absence of said solvent." (*Id.* at [0074].)

### (ddd)   Leslie

European Patent EP 1201233 ("Leslie") published on December 8, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Leslie discloses adhesive transdermal patches with a matrix layer and an impermeable backing layer. (Leslie at [0017].)  Comprised of polymers, the matrix layer can contain an opioid analgesic such as buprenorphine. (*Id.* at [0014]; [0015]; [0017].)

(eee)   **Hague**

U.S. Patent Application Publication No. 2004/0253307 ("Hague") published on December 16, 2004, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Hague discloses devices for the transmucosal delivery of drugs, which may be formulated as patches for oral administration. (Hague at [0001]; [0028].) Hague teaches that the disclosed devices "may easily be utilized in the administration of opioid agonists (such as fentanyl, alfentanil, sufentanil, lofentanil, and carfentanil)," and that "other drugs may also be utilized within the scope of the present invention either singly or in combination." (*Id.* at [0042].)

Hague teaches that, for ionizable drugs, "the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane." (*Id.* at [0052].) In particular, "[i]onizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." (*Id.*) Hague also cautions as follows:

> It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects; state of ionization and aqueous solubility.

(*Id.* at [0058].)

71

Hague teaches the use of a buffer to control pH. For instance, Hague teaches:

> Changes in pH . . . can preferably be accomplished by incorporating particular buffer systems within the sugar-free composition, in an amount sufficient to maintain a portion of the pharmaceutical agent, upon dissolution of the oral transmucosal solid dosage form, in an ionized state. In this way, the solid dosage form can, to a certain extent, overcome the influence of conditions of the surrounding environment, such as rate of saliva secretion, pH of the saliva, and other factors. Suitable buffer systems may comprise any physiologically acceptable organic and inorganic acids and bases that may be combined in different proportions to produce a buffer having the desired buffering capacity and pH range.

(*Id.* at [0057].) Hague discloses a list of suitable buffer systems, which include the following:

## TABLE 5

| BUFFER INGREDIENTS | pH RANGE |
|---|---|
| citric acid - sodium hydroxide | 2.5–6.5 |
| citric acid - di-sodium hydrogen phosphate | 2.5–7 |
| citric acid - sodium citrate | 3–6.5 |
| sodium acetate - acetic acid | 3.5–5.5 |
| succinic acid - sodium hydroxide | 3.5–6 |

## TABLE 5-continued

| BUFFER INGREDIENTS | pH RANGE |
|---|---|
| potassium dihydrogen phosphate - di-sodium hydrogen phosphate | 5–8 |
| maleic acid disodium salt - hydrochloric acid | 5.5–6.7 |
| potassium dihydrogen phosphate - sodium hydroxide | 5.8–8 |
| sodium dihydrogen phosphate - di-sodium hydrogen phosphate | 5.8–8 |
| imidazole-hydrochloric acid | 6.5–7.5 |
| tris acid maleate - sodium hydroxide | 5–9 |

(*Id.* at [0057]; Table 5.)

### (fff)   Yang

U.S. Patent Application Publication 2005/0037055 ("Yang") published on February 17, 2005 and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Yang discloses thin films that include a polymer component, which contains polyethylene oxide optionally blended with hydrophilic cellulosic polymers. (*See* Yang at Abstract.) In some embodiments, the films of Yang "are designed to adhere to the buccal cavity and tongue, where they controllably dissolve." (*Id.* at [0125].) Yang teaches incorporating active agents in the disclosed films. (*Id.* at [0126]-[0139].) The films of Yang "provide a controlled release of the active are particularly useful for buccal, gingival, sublingual and vaginal applications." (*Id.* at [0124].)  Exemplary active agents for the films include "opiates and opiate derivatives, such as oxycodone (available as Oxycontin®)." (*Id.* at [0133].) Yang teaches that the disclosed films advantageously "may not be crushed in the manner of controlled release tablets which is a problem leading to abuse of drugs such as Oxycontin." (*Id.* at [0125].)

Yang teaches using the films for oral mucoadhesive administration. (*Id.* at [0210].) Yang also teaches including a support layer, which may be removed prior to use. (*Id.*) Yang generally teaches incorporating additives, which include buffering agents and buffers, in the disclosed films. (*Id.* at [0161].)

### (ggg)   Holl II

International Patent Application Publication WO 2005/016321 ("Holl II") published on February 24, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Holl II teaches "bioerodible, water-soluble systems for transmucosal delivery of pharmaceutical agents for either systemic or local therapy." (Holl II at 1:7-9.) Specifically, Holl II discloses "[a] mucoadhesive delivery system" that includes "an at least partially water-soluble bioadhesive layer comprising at least one bioadhesive polymer or a combination of at least one bioadhesive polymer and at least one first film-forming, water-soluble polymer" and "an at least partially water-soluble non-adhesive backing layer comprising at least one second water-soluble, film-forming polymer." (*See id.* at claim 1.) This delivery system further contains a penetration enhancing agent that "enables rapid transport of the pharmaceutical agent across the mucosal surface." (*Id.* at 2:33-35.) The system in Holl II is bioerodible, water-soluble, and biodegradable. (*Id.* at 3:20-21.)

The bioadhesive layer in Holl II is water-soluble and "can adhere to the mucosal surface of any mucosal membrane of a mammal." (*Id.* at 9:7-8.) Indeed, Holl II teaches that its system "can be placed on any mucosal surface including buccal . . . surfaces." (*Id.* at 3:3-5.) The bioadhesive polymer of this layer "can be any water soluble substituted cellulosic polymer or substituted olefinic polymer." (*Id.* at 9:21-22.) Examples of such polymers include polyacrylic acid, hydroxypropyl methyl cellulose, hydroxyethylmethyl cellulose, and polyvinylpyrrolidone. (*Id.* at 9:29-32.) Holl II also discloses that the "film-forming water- soluble polymer(s) of the bioadhesive layer can be hydroxyl cellulose derivatives" such as hydroxyethylmethyl cellulose and hydroxylproplymethyl cellulose. (*Id.* at 9:14-20.) These polymers can be crosslinked or plasticized. (*Id.* at 10:22-25.) The medicament to be delivered can be disposed within the bioadhesive layer. (*Id.* at 3:14-16.) Buprenorphine is a suitable medicament. (*Id.* at 34:28-33.)

The backing layer, which is non-adhesive, "is also water soluble and includes a second water-soluble, film-forming polymer(s)." (*Id.* at 10:26-27.) "[P]olyethers and polyalcohols as

well as hydrogen bonding cellulosic polymers" such as hydroxypropyl methyl cellulose and hydroxyethylmethyl cellulose are examples of film-forming polymers that can be used in the backing layer. (*Id.* at 11:6-14.) The polymers can be cross-linked. (*Id.* at 11:14-15.) Holl II states that the "backing layer protects the water-soluble bioadhesive layer." (*Id.* at 10:31-32.) Particularly, the "[d]issolution of the water-soluble non-adhesive backing layer primarily controls the residence time of the mucoadhesive system of the present invention after application to the mucosa and promotes unidirectional delivery across the target membrane." (*Id.* at 10:32-11:3.)

Holl II states that the "[t]he system layers can be prepared independently and then laminated together or can be prepared as systems, one sequentially coated on the top of the other." (*Id.* at 24:22-24.) As an example, Holl II describes that "bioadhesive with the drug can be coated over the dried backer system." (*Id.* at 42:5-7.)

### (hhh)  Besse

U.S. Patent Application Publication No. 2005/0042173 ("Besse") published February 24, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Besse discloses "micronized film-forming powder" including a drug and a bioadhesive agent. (Besse at Abstract.) The powder can produce "a cohesive continuous film when it is contacted with a hydrated or moist support, for example, with mucous membranes or the previously hydrated skin." (*Id.* at [0018].) Besse teaches that the film provides "sustained prolonged release of the active substance" (*id.* at [0003]) and that "the film erodes with time so as to leave no residue" (*id.* at [0004]). Besse discloses the use of adhesive agents in the powder. (*Id.* at [0016].) Examples of such agents suitable for the powder include "ethyl cellulose, methyl cellulose, carboxymethyl cellulose, carboxymethyl cellulose sodium, hydroxyethyl cellulose,

hydroxypropyl cellulose, hydroxypropyl methyl cellulose sodium, polyvinylpyrrolidone, [and]
polyvinyl alcohols." (*Id.* at [0065].) Besse also discloses pH-controlling agents to maintain the
pH of the film between 2.0 and 9.0. (*Id.* at [0075].)

### (iii)   Tapolsky III

U.S. Patent Application Publication 2005/0048102 ("Tapolsky III") published on March
3, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C.
§ 102(a)(AIA).

Tapolsky III discloses transmucosal drug delivery devices. (*See* Tapolsky III at
Abstract.) Tapolsky III teaches that the disclosed device, "by its solid form and its instantaneous
adhesion to the mucosal surface, allows a lasting contact, a consequence of the entanglement of
polymer chains and glycoproteins of the mucosal tissue which assures adhesion." (*Id.* at [0025].)
Tapolsky III also teaches that "the pharmaceutical device of the present invention minimizes the
discomfort associated with application of a foreign substance for a period of time sufficient to
provide effective drug delivery to the treatment site." (*Id.* at [0026].) Tapolsky III teaches that
"the device of the present invention offers the advantages of an effective residence time with
minimal discomfort and ease of use, and is an appropriate vehicle for the local, as well as
systemic, delivery of pharmaceutical, given its thinner, flexible form." (*Id.* at [0026].)

Tapolsky III teaches that "[u]pon application, the pharmaceutical delivery device adheres
to the mucosal surface and is held in place." (*Id.* at [0029].)  Tapolsky III teaches that the device
can have a residence time of from about 30 minutes to about 24 hours. (*Id.* at [0029].)  Tapolsky
III teaches that "a bioerodible mucoadhesive system allowing a transmucosal unidirectional
delivery and protecting the drug being delivered from enzymes present, for instance, in the
oral or vaginal cavities would have advantages." (*Id.* at [0059].)

The devices of Tapolsky III include "a film disc having an adhesive layer and a non-adhesive backing layer which can be comprised of components having a similar or different hydrophilicity." (*Id.* at [0030].) Tapolsky III teaches including a pharmacological agent in either layer, although Tapolsky III teaches that the pharmaceutical agent is preferably in the adhesive layer "which is closest to the treatment site and which will have a slower erosion time, given that the backing layer protects the interior, adhesive layer and will typically erode first." (*Id.* at [0030].) The pharmaceutical agents disclosed by Tapolsky III include, e.g., non-steroidal anti-inflammatory analgesic agents. (*Id.* at [0046].) Tapolsky III also teaches incorporating a third layer in the disclosed device. (*Id.* at [0014].)

Tapolsky III teaches that "[t]he adhesive layer may comprise at least one film-forming water-erodable polymer (the 'film-forming polymer') and at least one pharmacologically acceptable polymer known for its bioadhesive capabilities (the 'bioadhesive polymer')." (*Id.* at [0031].) Tapolsky III teaches that the film-forming, water-erodable polymer can include, e.g., hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose, polyvinyl alcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, and others. (*Id.* at [0031].)

Tapolsky III teaches that bioadhesive polymer can include, e.g., "polyacrylic acid (PAA), which may or may not be partially crosslinked, sodium carboxymethyl cellulose (NaCMC), and polyvinylpyrrolidone (PVP), or combinations thereof." (*Id.* at [0032].)

Tapolsky III teaches that the non-adhesive backing layer can include a water-erodable, film-forming, pharmaceutically acceptable polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose,

polyvinylalcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, and others. (*Id.* at [0035].)

The devices of Tapolsky III provide unidirectional delivery of the pharmaceutical agent directly to the oral mucosa to minimize release of the drug through the sides and back of the device, thereby minimizing release of the drug into the oral cavity. (*Id.* at [0021]; [0058]-[0062]; Fig. 2.) Tapolsky III states that "localized delivery of a pharmaceutical may be accomplished in a unidirectional manner toward the mucosal layer." (*Id.* at [0014].)

Tapolsky III additionally teaches including excipients in the disclosed devices, which excipients include, e.g., citrate, benzoate, and phosphate, to adjust the kinetics of erodability of the devices. (*Id.* at [0040].) Tapolsky III teaches that the amount of such excipients added "will vary depending upon how much the erosion kinetics are to be altered as well as the amount and nature of the other components in the device." (*Id.* at [0040].) Tapolsky III also teaches using, e.g., sodium citrate, as a permeation enhancer in the device, typically in the layer containing the drug, "to improve absorption of the drug." (*Id.* at [0056].)

Examples 38 and 39 of Tapolsky III disclose multilayer films containing albuterol sulfate and testosterone, respectively. Example 40 describes a clinical study in dogs in which the films of Examples 38 and 39 were applied to the inside of the mouth on the buccal mucosa, and systemic blood levels were measured over time. (*See also id.* at Tables 5, 6.) Based on the clinical studies, Tapolsky III concluded that "the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." (*Id.* at [0131].)

### (jjj) Birch

U.S. Patent Application Publication No. 2005/0085440 ("Birch") published on April 21, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Birch is directed to aqueous buprenorphine formulations for intranasal administration. (*See, e.g.*, Birch at Abstract.) Noting that buprenorphine has previously been administered via intravenous, intramuscular, and sublingual routes (*id.* at [0008]), Birch states that "[i]mproved buprenorphine formulations for nasal administration have now been devised," which allow "[r]apid uptake of the buprenorphine across the nasal mucosa into the plasma," resulting in "fast onset of analgesia" (*id.* at [0010]). In particular, Birch teaches nasal solutions containing buprenorphine in three different formulations (a) buprenorphine with pectin (*id.* at Examples 1 and 2); (b) buprenorphine with chitosan and the polymer HPMC (hydroxypropylmethylcellulose) (*id.* at Examples 3 and 4) and (c) buprenorphine with chitosan and the polymer poloxamer (*id.* at Examples 5 and 6). Overall, the Birch formulations include polymers, sugars, buffers, and active pharmaceutical ingredients.

Birch states that buprenorphine hydrochloride is preferred for use in the solutions of the invention, at a preferred concentration between 1 mg/ml and 4 mg/ml. (*Id.* at [0040]-[0041].) The solutions also contain pectin as a gelling agent (*see, e.g.*, *id.* at [0043]-[0047]), and have a pH between 3 and 4.2 (*id.* at [0048]). Birch teaches that "[a]ny pH within this range may be employed provided the buprenorphine or buprenorphine salt or esteremains [*sic*] dissolved in the solution." (*Id.* at [0048].) A particularly preferred pH, according to Birch, is from 3.6 to 3.8. (*Id.* at [0048].) "The pH may be adjusted to an appropriate value by addition of a physiologically acceptable acid and/or physiologically acceptable buffer." (*Id.* at [0048].) Birch analyzed the

effect of pH on solubility of buprenorphine in the formulations. (*Id.* at [0174]-[0184].)  Like Cassidy, Birch noted that buprenorphine solubility decreased as the pH increased. (*Id.* at [0181]-[0182].)

Birch describes the results of a clinical study of the intranasal buprenorphine formulations of Examples 1, 3 and 5, which had pH values of 3.6, 3.4, and 3.4, respectively. (*Id.* at [0139]; [0145]; [0152]; [0206].) Birch collected pharmacokinetic results for each formulation, and concluded that all three "showed similar pharmacokinetic profiles," and "gave high bioavailability." (*Id.* at [0210].) In particular, the formulations exhibited bioavailability between 72% and 81%. (*Id.* at Table 11.)

Birch explains that it may be desirable to "optimize" a buprenorphine delivery profile to avoid high $C_{max}$ values in order to "lead to an improved therapeutic index." (*Id.* at [0083].) Birch's formulations provide buprenorphine $C_{max}$ values from 1 to 5 ng/ml. (*Id.* at [0084].)

### (kkk)   Gale

International Patent Application Publication WO 2005/044243 ("Gale") published on May 19, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Gale relates to a transdermal drug delivery device with analgesic reservoir containing an analgesic.  (Gale at [0007].)  The reservoir can be made from hydrophobic/lipophilic polymeric materials and pressure sensitive adhesives such as polyacrylates. (*Id.* at [0077]-[0078].)

### (lll)   Cremer

Canadian Patent No. 2274910 ("Cremer") issued on July 5, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Cremer discloses "a buccal pharmaceutical preparation for treating acute conditions of pain or for addiction therapy, comprising as active substance buprenorphine." (Cremer at p. 4.) The preparation has "a wafer-shaped administration form, disintegratable in the aqueous medium of the oral cavity." (*Id.*) The wafer "has a mucoadhesive, active substance containing layer based on water-soluble, film-forming polymers of small thickness, for rapid active substance transfer through short diffusion paths, while having a large surface appropriate to the effective dose." (*Id.*).  The wafer is applied to the oral mucosa for transmucosal delivery of buprenorphine. (*Id.* at p. 6.)

### (mmm)   Moe

U.S. Patent Application Publication No. 2005/0163838 ("Moe") published on July 28, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Moe discloses "orally disintegrable/dissolvable effervescent dosage form[s], which comprise[] an effervescent couple, a pH adjusting substance and specific disintegrants, the dosage form being designed for the administration of an opiate . . . through the oral cavity such as through buccal, gingival or sublingual administration routes." (Moe at [0012].) Embodiments of the dosage form include "orally disintegrable and/or dissolvable tablets, capsules, caplets, gels, creams, films, and the like." (*Id.* at [0011].) Generally, the dosage form comprises "between about 20 to about 200,000 micrograms" of the opiate to be delivered. (*Id.* at [0012].) Moe states that its pharmaceutical compositions could be used to treat pain, "including but not limited to: back pain, lower back pain, joint pain, any form of arthritic pain . . . neuropathic pain . . . cancer pain, and in particular breakthrough pain as a result of cancers." (*Id.* at [0014].)

81

The pH adjusting substance in the dosage facilitates the transmucosal delivery of the opiate. (*Id.* at [0201].) The appropriate pH adjusting substance "depends[] on the drug to be administered and in particular to the pH at which it is ionized or unionized." (*Id.* at [0202].) Moe states:

> "pH adjusting substances in accordance with the present invention can include, without limitation, any substance capable of adjusting the localized pH to promote transport across the membranes in the oral cavity in amounts which will result in pH's generally ranging from between about 3 to 10 and more preferably about 3 to about 9 in the microenvironment at the surface contact area of the oral mucosa and the dosage for or any portion thereof."

(*Id.* at [0202].) Moe further teaches that "an effective amount of a pH adjusting substance is an amount which is sufficient to change the pH in the localized microenvironment . . . when dissolved in the mouth to a pH at which effervescence can enhance the penetration across the mucosal membrane in the oral cavity." (*Id.* at [0204].) The change in the local pH should be at least 0.5 pH units. (*Id.*)

Moe also provides pharmacokinetic studies involving, *inter alia*, OraVescent® Fentanyl Citrate Tablets with a dosage of 270 mcg of fentanyl. (*Id.* at [0021]-[0110].) In one study, subjects placed effervescent tablets "between the upper gum and cheek above a molar tooth," and allowed the tablets to "disintegrate for 10 minutes." (*Id.* at [0058].) Those subjects exhibited an AUC(0 to t) (which corresponds to the "area under the fentanyl concentration curve calculated using linear trapezoidal summation from time zero to time t, where t is the time of the last measurable concentration") of 4333.5 pg*hr/mL and a $C_{max}$ of 797.9 pg/mL (see Treatment E below). (*Id.* at [0067]; [0096].)

82

Summary of the Pharmacokinetic Parameters of Serum Fentanyl for Treatments C, D, and E

| Pharmacokinetic Parameters | Serum Fentanyl | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Treatment C | | | Treatment D | | | Treatment E | | |
| | N | Arithmetic Mean | SD | N | Arithmetic Mean | SD | N | Arithmetic Mean | SD |
| Cmax(pg/mL) | 12 | 2791.4 | 874.3 | 13 | 2646.9 | 778.7 | 14 | 797.9 | 312.9 |
| AUC(0–tmax) (pg*hr/mL) | 12 | 4008.3 | 1259.1 | 13 | 3694.8 | 971.89 | 14 | 1095.6 | 433.92 |
| AUC(0–t) (pg*hr/mL) | 12 | 18921 | 6470.2 | 13 | 15339 | 4260.4 | 14 | 4333.5 | 1597.9 |
| AUC(0–inf) (pg*hr/mL) | 12 | 21033 | 7346.3 | 13 | 16831 | 4449.8 | 9 | 4221.9 | 1747.8 |
| T½(Hr) | 12 | 13.2 | 7.67 | 13 | 11.7 | 4.66 | 9 | 6.62 | 3.17 |
| Kel(1/hr) | 12 | 0.0687 | 0.0354 | 13 | 0.0703 | 0.0352 | 9 | 0.126 | 0.0538 |
| AUCR | 12 | 0.907 | 0.0683 | 13 | 0.909 | 0.0376 | 9 | 0.865 | 0.0381 |

Treatment C = 1 × 1300 mcg OraVescent Fentanyl Citrate Tablet
Treatment D = 1 × 810 mcg OraVescent Fentanyl Citrate Tablet
Treatment E = 1 × 270 mcg OraVescent Fentanyl Citrate Tablet
AUCR is ratio of $AUC_{o-t}/AUC_{o-infinity}$

Another similar study was also done with 200 mcg OraVescent® tablets. (*Id.* at [0136].) Subjects who allowed these tablets to disintegrate for ten minutes within the area "between the upper gum and cheek, above a molar tooth" exhibited an AUC(0 to t) of 2876.3 pg*hr/mL, a Cmax of 617.8 pg/mL, and a Tmax of 0.76 hr (*see* Treatment A below). (*Id.* at [0136]; [0180].)

Summary of the Phamacokinetic Parameters of Serum Fentanyl
SERUM FENTANYL

| Pharmacokinetic Parameters | N | Arithmetic Mean | SD | N | Arithmetic Mean | SD |
|---|---|---|---|---|---|---|
| | | Treatment A | | | Treatment B | |
| $C_{max}$ (pg/mL) | 25 | 617.8 | 236.7 | 26 | 1546.2 | 621.4 |
| *$T_{max}$ (hr) | 25 | 0.76 | 0.33–4.0 | 26 | 0.75 | 0.33–4.0 |
| AUC(0–t) (pg*hr/mL) | 25 | 2876.3 | 1107.7 | 26 | 8501.2 | 3346.2 |
| AUC(0–inf) (pg*hr/mL) | 24 | 3543.9 | 1304.5 | 26 | 9701.9 | 2651.5 |
| T½(hr) | 24 | 6.48 | 3.69 | 26 | 12.0 | 8.18 |
| Kel(1/hr) | 24 | 0.143 | 0.0802 | 26 | 0.0746 | 0.0377 |
| AUCR | 24 | 0.843 | 0.0604 | 26 | 0.875 | 0.0929 |
| $C_{max}$/dose (pg/mL/mcg) | 25 | 3.09 | 1.18 | 26 | 3.09 | 1.24 |
| AUC(0–t) (pg*hr/mL/mcg) | 25 | 14.4 | 5.54 | 26 | 17.0 | 6.69 |
| AUC(0–inf) (pg*hr/mL/mcg) | 24 | 17.7 | 6.52 | 26 | 19.4 | 7.30 |
| ln($C_{max}$/dose) | 25 | 1.06 | 0.383 | 26 | 1.05 | 0.426 |
| ln[AUC(0–t)/dose] | 25 | 2.59 | 0.424 | 26 | 2.75 | 0.441 |
| ln[AUC(0–inf)/dose] | 24 | 2.81 | 0.369 | 26 | 2.89 | 0.413 |
| | | Treatment C | | | Treatment D | |
| $C_{max}$ (pg/mL) | 27 | 2280.1 | 968.9 | 27 | 2682.3 | 1106.0 |
| *$T_{max}$ (hr) | 27 | 0.99 | 0.33–4.0 | 27 | 0.75 | 0.33–4.0 |
| AUC(0–t) (pg*hr/mL) | 27 | 13301 | 4069.1 | 27 | 16813 | 5232.2 |
| AUC(0–inf) (pg*hr/mL) | 27 | 14962 | 4709.6 | 27 | 18664 | 6266.0 |
| T½(hr) | 27 | 12.8 | 4.08 | 27 | 11.4 | 4.34 |
| Kel(1/hr) | 27 | 0.0592 | 0.0167 | 27 | 0.0679 | 0.0216 |
| AUCR | 27 | 0.893 | 0.0589 | 27 | 0.909 | 0.0602 |
| $C_{max}$/dose (pg/mL/mcg) | 27 | 2.81 | 1.20 | 27 | 2.48 | 1.02 |
| AUC(0–t) (pg*hr/mL/mcg) | 27 | 16.4 | 5.02 | 27 | 15.6 | 4.84 |
| AUC(0–inf) (pg*hr/mL/mcg) | 27 | 18.5 | 5.81 | 27 | 17.3 | 5.80 |
| ln($C_{max}$/dose) | 27 | 0.945 | 0.439 | 27 | 0.836 | 0.386 |
| ln[AUC(0–t)/dose] | 27 | 2.75 | 0.324 | 27 | 2.69 | 0.356 |
| ln[AUC(0–inf)/dose] | 27 | 2.87 | 0.329 | 27 | 2.79 | 0.372 |

*Median and min-max are reported for Tmax.
Treatment A = 1 × 200 mcg OraVescent Fentanyl Citrate Tablet
Treatment B = 1 × 500 mcg OraVescent Fentanyl Citrate Tablet
Treatment C = 1 × 810 mcg OraVescent Fentanyl Citrate Tablet
Treatment D = 1 × 1080 mcg OraVescent Fentanyl Citrate Tablet

**(nnn)  Reidenberg**

International Patent Application Publication No. WO 2005/081825 ("Reidenberg"),

published on September 9, 2005, and is prior art to the asserted patents under 35 U.S.C. § 102(b)

or 35 U.S.C. § 102(a)(AIA).

84

Reidenberg relates to "abuse-resistant transdermal delivery devices containing an opioid agonist intended for analgesic purposes in pain patients." (Reidenberg at Abstract.) The device can be a patch containing an opioid agonist such as buprenorphine (*id.* at [0079]; [0083]) as well as an opioid antagonist (*id.* at [0014]).

Reidenberg teaches that the device has polymeric matrix where the opioid agonist is disposed. (*Id.* at [0084].) Suitable polymers for the matrix include cellulose derivatives. (*Id.*) Reidenberg explains that the release of the agonist is controlled by the erosion of this matrix. (*Id.*). Preferably, there is a backing layer that "serves as a protective cover for the opioid agonist and may also provide a support function" for the device. (*Id.* at [0089].) The backing layer comprises of polymer films. (*Id.*) "Films of high and low density polyethylene, polypropylene, polyvinylchloride, [and] polyurethane" are suitable for the backing layer. (*Id.*) The device in Reidenberg also contains "an adhesive layer to affix the delivery device to the skin of a patient for a desired period of administration." (*Id.* at [0091].) The adhesive layer can be made from polyacrylic adhesive polymers. (*Id.* at [0092].)

### (ooo)   Ihara

European Patent Application Publication EP 1 642 579 ("Ihara") published on April 5, 2006, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Ihara discloses "a patch containing fentanyl for [the] mucous membrane of the oral cavity." (Ihara at [0009].) The patch contains a drug layer and a support layer. (*Id*) The drug layer includes, *inter alia*, fentanyl and softening agents such as N-methyl-2-pyrrolidone. (*Id.* at [0015]; [0023].) The drug layer adheres to the mucosal surface. (*Id.* at [0017]-[0018].) "[T]he support layer which is insoluble or hardly soluble in water is laminated on the drug layer in order

to prevent to release the drug in other parts of the oral cavity except the applied region." (*Id.* at [0025].) The support layer can contain cellulose polymers. (*Id.* at [0025]-[0026].)

### (ppp)  Pinney

U.S. Patent Application Publication 2006/0073189 ("Pinney") published on April 6, 2006, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Pinney relates to "compositions that contain orally administered medications and dietary supplements that are released in the oral cavity." (Pinney at [0002].)  Pinney discloses the inclusion of a buffer within a transmucosal delivery system in order to affect the pH of the oral cavity to optimize delivery. (*Id.* at [0009]; [0017]; [0018].)  For instance, Pinney states that "[m]edicants and dietary supplements that contain acidic moieties in their structure may demonstrate a pKa in the range of 3 to 11.  Under acidic pH conditions in the mouth (pH 6.0 to pH 7.0), many of the useful compounds would be highly ionized and would not be efficiently absorbed into the bloodstream." (*Id.* at [0018].)

### (qqq)  Rademacher

U.S. Patent Application Publication No. 2006/0182786 ("Rademacher") published on August 17, 2006, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Rademacher teaches "film-shaped administration forms for transmucosal administration of active substances to the human or animal body." (Rademacher at Abstract.)  In particular, the film is mucoadhesive and disintegrable in aqueous media such as body fluids. (*Id.* at [0026]; [0028].) The film also has "a polymer matrix that serves as an active substance reservoir." (*Id.* at [0026].) The polymer matrix has "polymers that are water-soluble and/or capable of swelling in aqueous

media." (*Id.* at [0027].) Rademacher discloses that "[b]y selecting such polymers it is possible to influence the mucoadhesive properties and the release behavior." (*Id.*)

Rademacher also teaches that the pH of the polymer mass of the matrix should be adjusted to correspond to the "physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." (*Id.* at [0015].) Rademacher teaches that this lessens irritation of the site where the device is applied. (*Id.* at [0012].) Rademacher discloses that the pH of the oral mucosa of humans would be "approximately between 5.5 and 6.5." (*Id.* at [0022].) The pH of the polymer mass can be adjusted to the intended pH with the aid of a physiological buffer system, such as a phosphate buffer. (*Id.* at [0024].)

The film in Rademacher also can be multi-layered. In such a film, "at least one of the layers contains an active substance and at least one of the layers or at least one of the surfaces of the administration form possesses mucoadhesive properties." (*Id.* at [0026].) Buprenorphine is a suitable active substance for the device. (*Id.* at [0037].)

### (rrr)   Finn

U.S. Patent Application Publication No. 2007/0148097 ("Finn") published on June 28, 2007, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Finn discloses "a bioerodable transmucosal delivery device that includes an abusable drug and an antagonist to the abusable drug associated with an abuse-resistant matrix." (Finn at Abstract.) The device of Finn can be "a mucoadhesive drug delivery device [and/or] a buccal delivery device." (*Id.* at [0012].)  The device can have a mucoadhesive layer and a non-adhesive

backing layer, as well as an optional third layer. (*Id.* at [0014].) The antagonist to the abusable drug (e.g., naloxone) can be disposed in any layer. (*Id.* at [0017]; [0050].)

The mucoadhesive layer, which is bioerodible, contains the abusable drug (e.g., buprenorphine). (*Id.* at [0053]; [0016].) To administer the drug, the mucoadhesive layer of the device is applied to the treatment site (i.e., the mucosal surface). (*Id.* at [0021].) Finn teaches that "the placement of the abusable drug in the mucoadhesive layer allows the abusable pharmaceutically active substance to unidirectionally diffuse through the buccal mucosa of the mouth and into the systemic circulation, while avoiding first pass metabolism by the liver." (*Id.* at [0052].) Water-soluble polymers such as "hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose, [and] polyacrylic acid" form the mucoadhesive layer. (*Id.* at [0053].)

The backing layer, which is also bioerodible, contains "water-soluble, film-forming pharmaceutically acceptable polymers." (*Id.* at [0054].) "[H]ydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose, [and] polyvinylalcohol" are examples of suitable polymers. (*Id.*) Finn teaches that "the backing layer protects the mucoadhesive layer from contact with saliva or other fluid resulting in slower dissolution of the mucoadhesive layer and longer contact of the mucoadhesive layer and drug with the treatment site." (*Id.* at [0053].) The backing layer can be formed on top of the mucoadhesive layer. (*Id.* at [0088].)

### (sss)   Myers

U.S. Patent Application Publication No. 2007/0149731 ("Myers") published on June 28, 2007, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

88

Myers discloses that particle self-aggregation and non-uniformity (i.e., synerisis) are problems "inherent in conventional film forming techniques." (Myers at [0008]; [0015].) To solve this problem of synerisis, Myers teaches the production of films with "one component having a non-neutral pH when combined with water; and a pH modulated polymer system selected to reduce or prevent synerisis when combined with the non-natural component in combination with water." (*Id.* at [0021].) The film in Myers can be applied to the mucosal areas of the body. (*Id.* at [0019].) The non-neutral component of the film can be a drug, acid component, basic component, or a buffer. (*Id.* at [0021].) Buprenorphine is a suitable drug. (*Id.* at [0132].)

The pH modulated polymer system in Myers "include[s] at least one water soluble polymer." (*Id.* at [0090].) Myer also states:

> The polymers that are chosen for the films of the present invention may also be chosen to allow for controlled disintegration of the active. This may be achieved by providing a substantially water insoluble film that incorporates an active that will be released from the film over time. This may be accomplished by incorporating a variety of different soluble or insoluble polymers and may also include biodegradable polymers in combination. Alternatively, coated controlled release active particles may be incorporated into a readily soluble film matrix to achieve the controlled release property of the active.

(*Id.* at [0117].)

Myers further discloses the use of a system with two films. (*Id.* at [0045].) The films of this system can contain the same or different polymers. Table 1 illustrates one- and two-film embodiments, such that the two films can have different buffer and ion compositions. Myers states that "the pH modulated film may enhanced the delivery of a drug contained in either the pH modulated film or a separate film used in conjunction with the pH modulated film." (*Id.* at [0020].)

89

Myers also disclose the use of buffers to maintain the pH of the polymer system. (*Id.* at [0044].) In particular, Myers explains:

> A neutral pH may be advantageous in certain instances because it substantially prevents drugs, which are mostly chemically weak acids or weak bases, from ionizing. The ionized form has an electric charge, and in this form, it typically cannot cross lipid membranes. Thus, by providing a substantially neutral pH environment, the drug is in an unionized form, which is lipid soluble and can cross membranes easily. However, at other times, a lower or higher pH may be necessary and require the use of a buffer to maintain a given pH. In some embodiments, a pH modulated film according to the present invention may be used to form a drug delivery system that yields a higher blood level of the drug relative to in the absence of the pH modulated film.

(*Id.*) Any drug within the polymer system is released upon contact with a mucosal surface at a desired pH. (*Id.*)

### (ttt)   Oksche

International Patent Application Publication WO 2008/025791 ("Oksche") published on March 6, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Oksche describes "oral pharmaceutical dosage forms comprising buprenorphine with the dosage form releasing buprenorphine instantly upon oral, preferably sublingual, application of the dosage form." (Oksche at Abstract.) The oral dosage form can be a film (*id.* at p. 7) that "disintegrate[s] within e.g., one second to three minutes or within five seconds to one minute or five seconds to thirty seconds" (*id.* at p. 19). Oksche teaches that the films comprise soluble polymers such as cellulose with buprenorphine incorporated into the film matrix. (*Id.* at pp. 11-12.) The matrix can be "a cellulosic material, a gum, a protein, a starch, a glycan, or any combinations thereof." (*Id.* at p. 13.) The film can also include an adhesive material to promote

90

adhesion to the mucosa. (*Id.* at pp. 18-19.) Oksche discloses that its films are suitable for the treatment of pain. (*Id.* at p. 4.)

### (uuu)   Leichs

International Patent Application Publication WO 2008/040534 ("Leichs") published on April 10, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Leichs relates to "non-mucoadhesive orally disintegrating film" (claim 1) and is absorbed in the GI tract. (Leichs at p. 3.) Leichs discloses "film dosage forms" that disintegrate when contacted to the saliva of the buccal cavity. (*Id.*) The film in Leichs comprises an active agent, water soluble binders, and hydrophilic polymers such as "starches, celluloses, and gelatins." (*Id.* at p. 13.)

Leichs also teaches that pH can affect mucosal absorption of drugs. To slow down the rate of mucosal absorption, Leichs discloses the use of pH adjusting agents that "function by ionizing the active agent to a less permeable state. For an acidic active agent, one would adjust the pH of the solution to above the pKa of the active agent to give a neutral species; for a basic active ingredient, one would adjust the pH of the solution to below the pKa of the conjugate acid." (*Id.* at p. 13.)

### (vvv)   Booles

International Patent Application Publication WO 2008/047163 ("Booles") published on April 24, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Booles is directed to a buprenorphine spray solution suitable for transmucosal administration (Booles at p. 1.) Booles teaches that "the application of carefully chosen

medicaments to mucosa . . . offers a route of administration which is capable of resulting in very rapid transmission of medicament to the bloodstream with consequent fast onset of effect." (*Id.* at p. 2.) The "mucosa to which medicaments may be administered include . . . buccal mucosa." (*Id.*) The spray compositions can "include mucoadherents (in order to increase residency time on the mucosa) for example carboxyvinyl polymers, chitosans, polyacrylic acid, gelatin, polyvinyl pyrrolidone." (*Id.* at p. 7.) Booles discloses that the pH of the spray solution may "typically be between around 4 and 9.5," with some embodiments having pH ranges between 4 and 6, between around 4.5 and 6, or between around 4 and 5. (*Id.* at p. 5.)

### (www) Hille

U.S. Patent Application Publication No. 2008/0160068 ("Hille") published on July 3, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Hille describes a method of treatment using a transdermal device and a transmucosal device. (Hille at [0023]; [0025].) The transmucosal device can be shaped as a wafer, which contains a medicament (such as buprenorphine), which is released when the wafer is applied to an oral mucosal surface. (*Id.* at [0025]; [0027]; [0040]; [0041].) Hille teaches that "the release of active substance starts immediately after the wafer has been introduced in the oral cavity. Due to the transmucosal absorption, a therapeutically effective plasma level is achieved within a few minutes (approximately 5 to 15 minutes) following the oral administration of a wafer. This enables a rapid onset of action." (*Id.* at [0025].) Additionally, the wafers of Hille are preferably "mucoadhesive or/and are disintegratable in aqueous medium." (*Id.* at [0025].)

Hille states:

> The wafer used in accordance with the invention may, without limiting the invention, be a sheet-like object for oral administration of active substances. In this case, the active substance is present dissolved in a polymer or polymer mixture or dispersed in a

92

polymer matrix. The polymers used for manufacturing the wafer should preferably be water-soluble so that the wafer, as intended, can dissolve quickly, ideally within seconds (e.g., maximally 5 to 30 seconds) in the saliva of the oral cavity.

(*Id.* at [0058].) The devices in Hille are suitable for the treatment of pain, such as breakthrough pain. (*Id.* at [0035].)

### (xxx)   Yum

International Patent Application Publication WO 2008/100434 ("Yum") published on August 21, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Yum discloses "a transoral dosage form comprising sufentanil." (Yum at 3:5-6.) Yum defines "transoral" as "administration across surfaces of a subject's oral cavity, including across buccal surfaces, sub-lingual surfaces, and lingual surfaces." (*Id.* at 13:29-30.) Yum states that sufentanil can be effectively absorbed in a transmucosal manner at a mean pH range of about 3.5 to about 5.5 even when ionization of the drug occurs. (*Id.* at 8:9-25.) Yum explains that sufficient unionized sufentanil "may exist in equilibrium with ionized sufentanil to be absorbed across the oral mucosa" at this mean pH range. (*Id.* at 8:9-11.)

### (yyy)   Vasisht I

International Patent Application Publication WO 2008/011194 ("Vasisht I") published on January 24, 2008, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Vasisht I states that "[t]he present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same." (Vasisht I at [0004].) Vasisht I teaches including buprenorphine as the active ingredient in the disclosed device and administering it to a subject. (*See id.* at Abstract.) In one embodiment, Vasisht I teaches direct

93

transmucosal delivery of buprenorphine to a subject by "administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject." (*Id.* at [0010].)

Vasisht I states that "'polymeric diffusion environment' refers to an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion of the polymeric diffusion environment to a mucosal surface." (*Id.* at [0032].) Vasisht I also states that "'transmucosal' … refers to any route of administration via a mucosal membrane. Examples include, but are not limited to, buccal, sublingual, nasal, vaginal, and rectal." (*Id.* at [0037].) Vasisht I further states that "'direct transmucosal' refers to mucosal administration via the oral mucosa, e.g., buccal and/or sublingual." (*Id.*) Vasisht I teaches that the mucoadhesive polymeric diffusion environment of the disclosed device is bioerodable. (*Id.* at [0071].) Vasisht I teaches formulating the mucoadhesive polymeric diffusion environment as a "bioerodable mucoadhesive layer." (*Id.* at [0072].)  According to Vasisht I, "[t]he devices of the present invention adhere to the mucosal surface in less than about five seconds, and naturally erode in about twenty to thirty minutes, without any need to hold the device in place." (*Id.* at [0094].)

Vasisht I teaches administering the disclosed device with buprenorphine as the active ingredient to treat chronic pain, acute pain, and breakthrough pain. (*Id.* at [0011].) According to Vasisht I, chronic pain may be caused by "arthritis, cancer, Reflex Sympathetic Dystrophy Syndrome (RSDS), repetitive stress injuries, shingles, headaches, fibromyalgia, and diabetic neuropathy." (*Id.* at [0028].)  Vasisht I also teaches that breakthrough pain may be "characterized

by frequent and intense flares of moderate to severe pain which occur over chronic pain" and may occur "in patients with lower back pain, neck and shoulder pain, moderate to severe osteoarthritis, and patients with severe migraine." (*Id.* at [0029].)

Vasisht I teaches administering the disclosed device multiple times per day if needed. For example, Vasisht I teaches that "several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation." (*Id.* at [0036].) Vasisht I further explains, "[f]or example, a device may be a square sheet, perforated into quarters, where each quarter comprises a 200 µg dose. Accordingly, a subject can use the entire device for an 800 µg dose, or detach any portion thereof for a 200 µg, 400 µg or 600 µg dose." (*Id.* at [0092].)

Vasisht I teaches including a therapeutically effective amount of buprenorphine within the bioerodable mucoadhesive layer of the disclosed device. For instance, Vasisht I teaches including "about 800 µg of buprenorphine" or "about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 µg of buprenorphine" in the disclosed device. (*Id.* at [0052].)  Vasisht I further teaches including "about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 µg of any of the medicaments described herein" including buprenorphine in the disclosed device. (*Id.*)

Vasisht I teaches that the pH of the mucoadhesive environment directly affects the transmucosal delivery of buprenorphine. For instance, Vasisht I teaches that "[t]he flux of a transported medicament is proportionally related to the diffusivity of the environment which can be manipulated by, e.g., the pH, taking into account the  ionic nature of the medicament and/or the ionic nature polymer or polymers included in the environment." (*Id.* at [0032].) Vasisht I also teaches that for weakly basic drugs, the pH of the disclosed device directly affects the ability of

95

the drug to migrate from the device to the mucosa as well as the extent of drug absorption. For

instance, Vasisht I teaches:

> Without wishing to be bound by any particular theory, it is believed that delivery of the medicament is particularly effective because the mucoadhesive polymeric diffusion environment (e.g., the pH and the ionic nature of the polymers) is such that the medicament (e.g., a weakly basic drug such as fentanyl or buprenorphine) can rapidly move through the mucoadhesive polymeric diffusion environment to the mucosa, while also allowing efficient absorption by the mucosa. For example, in some embodiments, the pH is low enough to allow movement of the medicament, while high enough for absorption.

(*Id.* at [0047].) Vasisht I teaches buffering the disclosed device to stabilize the pH within

the mucosal environment following administration as follows:

> In some embodiments, the mucoadhesive polymeric diffusion environment is a layer with a buffered pH such that a desired pH is maintained at the mucosal administration site. Accordingly, the effect of any variation in pH encountered in a subject or between subjects (e.g., due to foods or beverages recently consumed), including any effect on uptake, is reduced or eliminated.

(*Id.* at [0048]; *see also* at [0049].) In addition:

> The pH of the mucoadhesive polymeric diffusion environment can be adjusted and/or maintained by methods including, but not limited to, the use of buffering agents, or by adjusting the composition of the device of the present invention. For example, adjustment of the components of the device of the present invention that influence pH, e.g., the amount of anti-oxidant, such as citric acid, contained in the device will adjust the pH of the device.

(*Id.* at [0061].)

Vasisht I also teaches buffering the disclosed device to a desired pH to optimize

the transmucosal uptake of buprenorphine. For example, Vasisht I teaches:

> In one embodiment, the mucoadhesive polymeric diffusion environment of the device will have a buffered environment, i.e., a stabilized pH, for the transmucosal administration of a medicament. The buffered environment of the device allows for

96

the optimal administration of the medicament to a subject. For example, the buffered environment can provide a desired pH at the mucosa when in use, regardless of the circumstances of the mucosa prior to administration.

Accordingly, in various embodiments, the devices include a mucoadhesive polymeric diffusion environment having a buffered environment that reduces or eliminates pH variability at the site of administration due to, for example, medications, foods and/or beverages consumed by the subject prior to or during administration. Thus, pH variation encountered at the site of administration in a subject from one administration to the next may have minimal or no effect on the absorption of the medicament. Further, pH variation at the administration site between different patients will have little or no effect on the absorption of the medicament. Thus, the buffered environment allows for reduced inter- and intra-subject variability during transmucosal administration of the medicament. In another embodiment, the present invention is directed to methods for enhancing uptake of a medicament that include administering to a subject a device including a medicament disposed in a mucoadhesive polymeric diffusion environment having a buffered environment for the transmucosal administration. In yet another embodiment, the present invention is directed to methods of delivering a therapeutically effective amount of a medicament to a subject that include administering a device including a medicament disposed in a mucoadhesive polymeric diffusion environment having a buffered environment for the transmucosal administration.

(*Id.* at [0063]-[0064].)

Vasisht I teaches that suitable buffers include "phosphates, such as sodium phosphate; phosphates monobasic, such as sodium dihydrogen phosphate and potassium dihydrogen phosphate; phosphates dibasic, such as disodium hydrogen phosphate and dipotassium hydrogen phosphate; citrates, such as sodium citrate (anhydrous or dehydrate); [and] bicarbonates, such as sodium bicarbonate and potassium bicarbonate." (*Id.* at [0062].) For example, the buffer may include, e.g., "citric acid, sodium benzoate or mixtures thereof." (*Id.* at [0018].)

Vasisht I teaches that "when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment . . . is between about 4.0 and about 7.5." (*Id.* at

[0060].) Exemplary pHs and pH ranges that may be used in the disclosed device include "about 6.0," "about 5.5 to about 6.5," "between about 7.0 and 7.5," and "between about 7.25 and 7.5." (*Id.*) Vasisht I also states that the pH can be "about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof." (*Id.*)

Example 1 of Vasisht I describes the preparation of devices in which the mucoadhesive layer contained fentanyl and "the polymer mixture [hydroxypropyl cellulose (Klucel EF, about 0.6% total formulation, by weight), hydroxyethyl cellulose (Natrosol 250L, about 1.9% total formulation, by weight), polycarbophil (Noveon AA1 (about 0.6% total formulation, by weight), and carboxy methyl cellulose (Aqualon 7LF, about 5.124% total formulation, by weight)]." (*Id.* at [0100].)  The mucoadhesive layer also contained, *inter alia*, "sodium benzoate (about 0.06% total formulation, by weight) . . . citric acid (about 0.06% total formulation, by weight) . . . and monobasic sodium phosphate (about 0.04% total formulation, by weight)." (*Id.*) According to Example 1, batches of the drug layer were made "having pHs of about 6, 7.25, and 8.5." (*Id.*) Example 3 of Vasisht I describes devices "produced using the same method as described in Example 1, except that buprenorphine was added to the mucoadhesive polymeric diffusion environment, rather than fentanyl citrate." (*Id.* at [0120].)

Vasisht I teaches that formulating the device at pH 6 maximizes the transmucosal uptake of buprenorphine. (*Id.* at [0121].) At pH 6, the device provided a $C_{max}$ of 1.05 ng/mL in human subjects, whereas at pH 7.25, the device provided a $C_{max}$ of 0.86 ng/mL in human subjects. (*Id.*) According to Vasisht I, "the delivery devices of the present invention at pH 6 appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." (*Id*).  Vasisht I also teaches that the exemplified devices at pH 6 and 7.25

provided a C$_{first}$ of 0.0521 and 0.0845 ng/mL, respectively, and that both devices provided a T$_{max}$ of 3 hr.

Vasisht I teaches that maximizing the transmucosal uptake of buprenorphine is advantageous.  For instance, Vasisht I states that "because the devices of the present invention more efficiently deliver the medicament, e.g., fentanyl or buprenorphine, than conventional devices, less medicament can be included than must be included in conventional devices to deliver the same amount of medicament." (*Id.* at [0055].) Vasisht I also states that "the devices of the present invention are less subject to abuse than conventional devices because less medicament, e.g., fentanyl or buprenorphine, is required in the device, i.e., there is less medicament to be extracted by an abuser for injection into the bloodstream." (*Id.* at [0056].)

Vasisht I teaches that the "'barrier environment' refers to an environment in the form of, e.g., a layer or coating, capable of slowing or stopping flux of a medicament in its direction." (*Id.* at [0033].)  The barrier environment can be a backing layer. (*Id.* at [0074].)  Vasisht I teaches buffering the backing layer, e.g., with a combination of citric acid (about 0.1 wt.%) and sodium benzoate (about 0.1 wt.%). (*Id.* at [0099].)  The buffered backing layer of Vasisht I does not contain an opioid antagonist. (*Id.*)  Vasisht I teaches using the buffered backing layer on a device containing buprenorphine in the mucoadhesive layer. (*Id.* at [0120].)

Vasisht I also teaches administering the disclosed devices to opioid-experienced subjects. (*Id.* at [0043].) Vasisht I further teaches that any adverse events associated with the disclosed devices are mild or moderate.  For example, Vasisht I states that "[n]o subject experienced mucosal irritation with any of the three exemplary devices of the present invention. All reported adverse events were mild or moderate in nature." (*Id.* at [0118].)  Vasisht I further states that "the devices of the present invention cause little or no constipation." (*Id.* at [0055].)

99

### (zzz)    Al-Ghananeem

U.S. Patent Application Publication No. 2009/0246256 ("Al-Ghananeem"), published on October 1, 2009, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Al-Gahananeem relates to "compositions and methods for accelerating the rate of delivery of lofexidine to the systemic circulation by transmucosal administration through the nasal, sublingual, or buccal routes to provide rapid response in the treatment of opiate addicts, migraine, neuropathic pain and other therapeutic indications." (Al-Ghananeem at Abstract.) Lofexidine is a "receptor agonist analogue of clodinine" that "suppress[es] opiate withdrawal symptoms." (*Id.* at [0003].) Al- Gahananeem teaches the use of dosage formulations such as patches, sprays, gels, and films comprising lofexidine for the transmucosal (e.g., buccal) delivery of the drug to human subjects. (*Id.* at [0084]; [0086]; [0101]; [0108].) Some of these formulations can contain buprenorphine as a second drug for delivery. (*Id.* at [0080]-[0081].)

Al-Gahananeem also teaches that the pH of its compositions should be "maintained from about 2.0 to about 10.0" and preferably "from about 3.0 to about 7.0" in order to correspond closely to the "physiologic pH of the mucosal membranes." (*Id.* at [0040]; [0099].) Other suitable pH values and ranges for the compositions include a pH of 4.4 and a pH range of 4-6. (*Id.* at [0107]-[0108].) A pH value that falls outside the disclosed range (*i.e.*, "a pH of less than 2.0 or greater than about 10.0") "can increase the risk of irritating the mucosal membranes in the nasal, sublingual, and buccal region of a recipient." (*Id.* at [0099].) Al-Gahananeem states that buffers can be used to control pH. (*Id.* at [0046].)

According to Al-Gahananeem, "oral transmucosal delivery through buccal and/or sublingual mucosa . . . are particularly advantageous delivery routes." (*Id.* at [0077].) In

particular, transmucosal delivery "has much shorter onset time, i.e., the time from administration to therapeutic effect, than the oral delivery. A drug absorbed via the buccal, nasal, and sublingual mucosa will also avoid first pass metabolism, in which the drug is metabolized in the gastrointestinal tract and liver." (*Id.* at [0078].)

### (aaaa) Crowley

U.S. Patent Application Publication 2009/0264385 ("Crowley") published on October 22, 2009, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Crowley discloses pharmaceutical dosage forms for transmucosal, e.g., buccal, administration of alkaline labile drugs. (Crowley at [0060]; [0067].)  The dosage form can include "two or more thermoplastic and water swellable, water soluble, or water erodible polymers." (*Id.* at claims 62, 64.)  Crowley teaches configuring the dosage form as a multi-layered film or laminate, which "will comprise at least two layers: a bioadhesive drug reservoir layer and a backing layer." (*Id.* at [0021].)

Crowley teaches that "[a]n alkaline labile active agent is one that degrades under alkaline conditions during processing and/or storage" where "[a]lkaline is defined as a pH of greater than 7." (*Id.* at [0170].)  Crowley teaches that alkaline labile drugs can include opioids such as morphine, fentanyl, and naltrexone.  (*Id.* at [0171].) Crowley teaches formulating the bioadhesive drug reservoir layer composition by, e.g., combining an excipient mixture containing an alkaline thermoplastic polymer, a bioadhesive polymer, and an acidic component "with an alkaline labile drug to form a bioadhesive thermoplastic hydrophilic first composition." (*Id.* at [0023]-[0024]; [0028]-[0029]; [0035]-[0036].) The composition of the bioadhesive thermoplastic hydrophilic composition can include a "water swellable or water soluble alkaline

101

thermoplastic polymer" that is also a "bioadhesive polymer." (*Id.* at [0048].) Crowley teaches

formulating the "excipient" mixture (used in the drug layer) at a pH "of about 7 or less or less

than the pH where the alkaline labile drug degrades." (*Id.* at [0023]; [0028]; [0035].)

Crowley teaches formulating the backing layer composition by, e.g., "providing a

thermoplastic hydrophobic second composition comprising at least one hydrophobic polymer, a

plasticizer, optionally one or more hydrophilic polymers, and optionally at least one acidic

component." (*Id.* at [0025]; [0030]; [0038].) Crowley teaches that "the backing layer is typically

inert, meaning it does not contain a therapeutically active agent. However, the backing layer can

optionally include a therapeutically active agent, and its active agent can be the same as or different

than the one in the reservoir layer." (*Id.* at [0128].)

According to Crowley, the disclosed bi-layered laminates may be prepared by, e.g., "either

hot-melt extruding the second composition onto the reservoir layer to form a bioadhesive bi-

layered laminate; hot-melt extruding the second composition to form a hydrophobic low

permeability backing layer and subsequently laminating the reservoir layer and the backing layer

together to form a bioadhesive bi-layered laminate; or casting the second composition onto the

reservoir layer to form a bioadhesive bi-layered laminate." (*Id.* at [0038]-[0040].) Crowley also

contemplates "tri-layered" and "multi-layered" laminates. (*Id.* at [0090].)

Crowley teaches adding an acidic component to both the drug and backing layer

compositions to promote stability of the alkaline labile drug residing within the drug layer. (*Id.* at

[0021]; [0101].) Crowley states that "[t]he acidic component can be an acidic polymer (such as a

bioadhesive polymer), inorganic acid, mineral acid or an organic acid or mixtures thereof." (*Id.*

at [0046].) Crowley further states:

> As used herein, the term "acidic component" or "acidifying agent"
> means one or more acidic polymers (e.g., Carbopol(R),

102

Polycarbophil, polyacrylic acid), one or more inorganic acids (e.g., a mineral acid, (phosphoric acid, boric acid, hydrochloric acid, nitric acid, Sulfuric acid, hydrobromic acid), one or more organic acids (non-polymeric carboxylic acid such as acetic acid, citric acid, tartaric acid, turmeric acid, Succinic acid, amino acid, alpha-hydroxylacid, ascorbic or adipic acid), or a combination thereof. An acidic component also includes the salt form or buffer of an acid, wherein the salt has solution pH of less than 7 or less than 6 when dissolved in water. The above-listed acidic components are merely illustrative and non-limiting. Any acidic component having a pKa of less than 7 or less than 6 would be suitable for use in the present invention. Specific embodiments include those wherein the acidic component is selected from the group consisting of hydrochloric acid, phosphoric acid, citric acid and a combination thereof. An acidic component can be a combination of an acidic polymer and an organic acid, an acidic polymer and an inorganic acid, or an inorganic acid and an organic acid. An acidic component may also be a combination or two or more acidic polymers, two or more inorganic acids, or two or more organic acids.

(*Id.* at [0112]-[0113].)  Example 5 of Crowley describes the preparation of an exemplary backing layer formulation that contains 1.0 wt.% citric acid as an acidic component. (*Id.* at [0259]-[0261].)

Crowley states that "[s]ince the backing layer can be intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer." (*Id.* at [0134]). Crowley also states that "[s]tudies to investigate the pH … of the backing layer were conducted to eliminate the potential for drug degradation at the interface between the backing layer and the reservoir layer." (*Id.*) As part of the study, backing layer compositions were acidified to pH 4.6 and pH 3.4 by adding citric acid to the backing layer suspensions. (*Id.*) According to Crowley, "[t]he results indicate decreased degradation of drug in the reservoir layer when the backing layer included an acidic component in an amount sufficient to render the solution pH of the backing film less than about 7 or less than the pH at which the alkaline labile drug degrades" (*Id.*)

103

**(bbbb) Vasisht II**

International Patent Application Publication WO 2010/008863 ("Vasisht II") published on January 21, 2010, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Vasisht II relates to transmucosal administration (e.g., buccal administration) of a pharmaceutical agent via a drug delivery device with two mucoadhesive layers. (Vashisht II at [003]; [0036].) Coated on top of each other, the mucoadhesive layers can contain "at least one film- forming water erodible polymer . . . and at least one pharmacologically acceptable polymer known for its bioadhesive capabilities." (*Id.* at [0066]; [0037].) Vasisht II discloses that suitable film-forming polymers include cellulose derivatives like hydroxyethyl cellulose and hydroxypropylmethyl cellulose. (*Id.*) The mucoadhesive layers can also be bioerodable. (*Id.*)

For a multi-layered device, Vasisht II teaches that at least one mucoadhesive layer contains a pharmaceutical agent. (*Id.* at [0039].) One such agent is buprenorphine, which can be used to treat pain. (*Id.* at [0018]; [0073].) Vasisht II discloses that the mucoadhesive layers containing buprenorphine can have pH ranges of 4.5 to 5.5 or 5.0 to 6.0. (*Id.* at [0080].) The devices in Vasisht II can deliver "an effective amount of the active agent" in less than about 45 minutes with a Tmax of less than about 100 minutes, about 80 minutes, about 50 minutes, about 30 minutes or 20 minutes. (*Id.* at [0012]; [0018].)

**(cccc) Hugerth**

U.S. Patent Application Publication No. 2010/0247586 ("Hugerth") published on September 30, 2010, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

104

Hugerth relates to a "multi portion intra-oral dosage form comprising at least one pharmaceutically active or health promoting agent" and another portion that contains "a component creating a noticeable organoleptic sensation." (Hugerth at [0001].) The dosage form can be a film that facilitates the transmucosal administration of a medicament such as buprenorphine. (*Id.* at [0043]; [0048]; [0054].)

Hugerth also teaches the transmucosal administration of nicotine through oral mucosa with the aid of buffering agents. (*Id.* at [0072].) Hugerth explains:

> Absorption of nicotine form the oral cavity to the systemic circulation is dependent on the pH of the saliva, pH of the blood plasma, and the pKa of nicotine, which is about 7.8. Thus, the level and type of buffering agent/s or combination thereof will affect the pH of the saliva and hence the absorption of nicotine in a free base form, which is the form predominantly absorbed through the mucosa. The buffering is designed so as to achieve a transient buffering of the saliva of a subject during melting . . . or dissolution of the oral formulation.

(*Id.*) Particularly, the buffer can "transiently change[] the pH of the saliva of the subject by 0.1-3 pH units, preferably by 0.2-3.5 pH units, most preferably by 0.5-3.0." (*Id.* at [0124].)

### (dddd) Myers II

International Patent Application Publication WO 2011/017484 ("Myers II") published on February 10, 2011, and is prior art to the asserted patents under 35 U.S.C. § 102(b) or 35 U.S.C. § 102(a)(AIA).

Myers II discloses transmucosal film dosage compositions with two regions, each with a polymeric carrier matrix. (Myers II at 4:8-16; 10:32-11:2; claim 29.) The films in Myers II are bioadhesive and are "preferably moderate-dissolving in the oral cavity and particularly suitable for delivery of actives." (*Id.* at 8:20-24.) The polymers in each matrix "may be water-soluble,

water-swellable, water-insoluble, or a combination" thereof. (*Id.* at 9:9-11.) Examples of suitable water-soluble polymers include hydroxypropylmethyl cellulose, hydroxyethyl cellulose, hydroxyl propyl cellulose, polyvinyl pyrrolidone, carboxymethycellulose, polyethylene glycol, and polyacrylic acids. (*Id.* at 9:12-18.) Examples of suitable water-insoluble polymers include ethyl cellulose and hydroxypropyl ethyl cellulose. (*Id.* at 9:17-18.)

The first region of the film includes an agonist and a second region of the film contains an antagonist. (*Id.* at 4:8-16). Buprenorphine can be the agonist and naloxone can be the antagonist. (*Id.* at 20:15-16; 19:20-28.) Buprenorphine has a pKa of 8.42 and naloxone has a pKa of 7.94. (*Id.* at 19:21, 30.) Myers II states that the purpose of its films is to "maximize[] the release and/or oral absorption of the agonist while simultaneously minimizing the release and/or oral absorption of the antagonist." (*Id.* at 19:6-10.)

To meet this goal, Myers II teaches the use of pH buffers. (*Id.* at 25:19-31.) Myers II explains that the "absorption of an active depends on the available unionized form the active.  Thus, as the local pH of the surrounding environment is lowered, basic actives will be more ionized and less will be available for absorption." (*Id.* at 20:3-5.) For Myers II's two-region films, the local pH of the region containing the agonist can be between "about 3 to about 4 or from about 4 to about 9, and more specifically from about 6 to about 9." (*Id.* at 25:27.) The local pH of the region containing the antagonist can be "from about 2 to about 4, and more specifically about 2 to about 3." (*Id.* at pp. 25-27.) For a film with both buprenorphine and naloxone, the pH of the agonist region is preferably "from about 3 to about 4 or from about 5.5 to about 6.5" while the local pH of the antagonist region is "about 2.0 to about 3.0." (*Id.* at 25:27-31.)  The two regions, thus, "work in cooperation to provide a desired absorption profile."

Myers II states that by promoting and maintaining ionization of the antagonist, the buffers "serve[] to limit the absorption of the antagonist, and thus provide the desired control of the antagonist.  While the ionization of the antagonist is limited, the ionization of the agonist may not be so limited. As such, the resulting dosage form provides absorption of the antagonist to the user, while sufficiently reducing and/or preventing the absorption of the antagonist." (*Id.* at 22:33-23:4.)

The films in Myers II can generate a $C_{max}$ of "about 6.4 ng/ml or less," of "less than about 5.2 ng/ml, of "less than about 3.8 ng/ml," of "less than about 1.9 ng/ml," or "of less than about 1.1 ng/ml." (*Id.* at 23:22-26.) The films in Myers II can also be used to treat pain. (*Id.* at 1:29-31; 8:1-17; 27:24-26.)

## II.    LEVEL OF ORDINARY SKILL IN THE ART

For purposes of these contentions, a person of ordinary skill in the art ("POSA") would have been a person skilled in oral film formulation and manufacturing technologies. The POSA would have included someone with a bachelor's degree in pharmaceutical sciences, chemistry, or a related field, plus three to five years of relevant experience in developing drug formulations, including transmucosal dosage forms.  Alternatively, the POSA would have included a person with a Ph.D. and less practical experience.

## III.    THE '866 PATENT

### A.    Asserted Claims of the '866 Patent

The '866 patent contains 12 claims, of which claims 1-5 and 8-10 are asserted. The asserted claims read as follows:

> 1. A method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine, the method comprising: administering buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to

107

an oral mucosal surface of the subject, the device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6; and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment upon application to the mucosal surface.

2. The method of claim 1, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5.

3. The method of claim 1, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.

4. The method of claim 1, wherein a first quantifiable plasma concentration of buprenorphine is observed at about 45 minutes.

5. The method of claim 1, wherein an effective plasma concentration of buprenorphine is maintained for at least 4 hours.

8. A mucoadhesive bioerodable drug delivery device suitable for direct transmucosal administration of buprenorphine to a subject, the mucoadhesive bioerodable drug delivery device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH between about 4 and about 6; and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment.

9. The device of claim 8, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5.

10. The device of claim 8, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.

**B.    OBVIOUSNESS**

      **1.    Earliest Possible Priority Date of the '866 Patent**

The '866 patent issued on April 3, 2012, from U.S. Patent Application No. 13/184,306 ("the '306 application"), filed on July 15, 2011, is a continuation of U.S. Patent Application No. 11/817,915 ("the '915 application"), filed on October 6, 2009, which is the national stage entry of International Patent Application No. PCT/US2007/016634, filed on July 23, 2007. The '866 patent further claims the benefit of U.S. Provisional Patent Application Nos. 60/839,504 ("the '504 provisional application"), filed on August 23, 2006, 60/832,725 ("the '725 provisional application"), filed on July 21, 2006, and 60/832,726 ("the '726 provisional application"), filed on July 21, 2006.

Asserted claims 1-5 and 8-10 of the '866 patent each require a drug delivery device comprising a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment having a pH of "between about 4 and about 6." Claims 2, 3, 9, and 10 further require that the pH of the polymeric diffusion environment is between about 4.5 and about 5.5 (claims 2 and 9), or between about 4.5 and about 5 (claims 3 and 10). None of the pH ranges claimed in claims 1, 2-3, 8, and 9-10 is identified in the '915 application. Instead, the '915 application teaches as follows:

> In one embodiment, e.g., when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5. In other embodiments, the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention.

(The '915 application at [0063] (emphasis added).)

Thus, the '915 application describes a broad range of suitable pH values for the polymeric diffusion environment, without anything pointing to the specific – and lower – claimed range of about 4 to about 6. The '915 application also states that "the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof." ('855 patent at 12:5-7 (emphasis added).) The "device" is not the same as the polymeric diffusion environment. (*See, e.g.*, *id.* at 6:16-24; 7:24-40; 17:28-18:67.) On the contrary, the "device" comprises at least the polymeric diffusion environment and a barrier environment (*see, e.g.*, *id.* at 1:59-67; 2:14-19, 56-62), and optionally comprises an additional layer (*see, e.g.*, *id.* at 2:44-48; 14:54-15:2), and/or other ingredients (*id.* at 15:58-17:27). As a result, a POSA would consider the description of pH of the device to be separate and distinct from the description of the pH of the polymeric diffusion environment in particular. Nonetheless, nothing in the description of the pH of "the device" defines or discloses the range of about 4 to about 6. Nothing in the '915 application identifies that the top end of the pH range should be 6, 5.5, or 5. Nothing in the '915 application identifies that the bottom end of the pH range should be 4.5.

The '866 patent also claims the benefit of the '504, '725, and '726 provisional applications.  As discussed in detail below, there is no disclosure in any of the provisional applications of the pH ranges required by the claims of the '866 patent. In particular, the '504 provisional application discloses as follows:

> In one embodiment, the pH of the mucoadhesive layer in the devices of the present invention is between about 6.5 and about 8. In another embodiment, the pH of the mucoadhesive layer is about 7.25. In another embodiment, the pH is between about 7.0 and about 7.5, or between about 7.25 and about 7.5. In other embodiments, the pH is about 6.5, 7.0, 7.5, 8.0 or 8.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention.

('504 provisional application at [0021]; *see also* claims 6-8.)

110

The '504 provisional application also states that the pH of a mucoadhesive layer including fentanyl is between about 6 and about 8.5. (*Id.* at [0081]; [0054]; [0066]; [0081]; *see also* claims 1, 2, 5.) Example 1 describes the preparation of mucoadhesive layer batches including fentanyl citrate and having pHs of about 6, 7.25, and 8.5. (*Id.* at [0062]; *see also* [0066]; [0070]; [0075]-[0081]; Table 2.) Nothing in the '504 provisional application describes a pH range at about 4 to about 6 for the polymeric diffusion environment. On the contrary, the '504 provisional application points to much higher pH values to the mucoadhesive layer by emphasizing pH values greater than 6.5.

The '725 provisional application discloses as follows:

> In one embodiment, the pH <u>of the device</u> of the present invention is between about 6.5 and about 8. In another embodiment, the pH <u>of the device</u> is about 7.25. In another embodiment, the pH is between about 7.0 and about 7.5, or between about 7.25 and 7.5. In other embodiments, the pH <u>of the device</u> may be about 6.5, 7.0, 7.5, 8.0 or 8.5, or any incremental value thereof.

(*Id.* at [0020]; *see also* claims 6-8 (emphasis added).) The '725 provisional application also states that the pH of a mucoadhesive layer including fentanyl is between about 6 and about 8.5 (*Id.* at [0018]; [0054]-[0055]; [0066]; [0081]; *see also* claims 1, 2, 5.) Example 1 describes the preparation of mucoadhesive layer batches including fentanyl citrate and having pHs of about 6, 7.25, and 8.5. (*Id.* at [0062]; *see also* [0066]; [0070]; [0075]-[0081]; Table 2.)

For the reasons discussed above, a POSA would consider the description of the pH of the *device* to be separate and distinct from the description of the pH of the *mucoadhesive* layer, in particular. (*See, e.g.*, *id.* at [0034]-[0036], [0047], [0050].) Nonetheless, nothing in the description of the pH of "the device" defines or discloses the range of about 4 to about 6. The '725 provisional application does not include any teaching with respect to the pH of a

111

polymeric diffusion environment including buprenorphine, as required by the claims of the '866 patent. Nothing in the '725 provisional application describes a pH range of about 4 to about 6 for the polymeric diffusion environment. On the contrary, the '725 provisional application points to higher pH values for the mucoadhesive layer, by emphasizing pH values greater than 6.5.

The '726 provisional application discloses that the device comprises a mucoadhesive layer comprising buprenorphine and having a pH between about 4 and about 7.5. (*Id.* at [0018]; *see also* [0054]-[0055]; claims 1, 2, 5, 7-9.) The '726 provisional application also discloses as follows:

> In one embodiment, the pH <u>of the device</u> of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH <u>of the device</u> is about 6.0. In one embodiment, the pH <u>of the device</u> is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH <u>of the device</u> is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5. In other embodiments, the pH <u>of the device</u> may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention.

(*Id.* at [0020] (emphasis added).)  For the reasons discussed above, a POSA would consider the description of the pH of the device to be separate and distinct from the description of the pH of the mucoadhesive layer in particular. (*See, e.g.*, *id.* at [0034]-[0036]; [0047]; [0050].) Nonetheless, nothing in the description of the pH of "the device" defines or discloses the range of about 4 to about 6.

Nothing in the '504 provisional application, the '725 provisional application, or the '726 provisional application identifies that the top end of the pH range should be 6, 5.5 or 5. Nothing

112

in the '504 provisional application, the '725 provisional application, or the '726 provisional application identifies that the bottom end of the pH range should be 4.5.

Thus, the pH ranges recited in the asserted claims of the '866 patent are not sufficiently described as part of the invention in the priority documents and, therefore, are not entitled to the filing date of the '915 application, or any of the provisional applications listed on the face of the '866 patent. While Applicants broadly disclosed a generic pH range of about 4.0 to about 7.5, nothing in the '915 application or any of the provisional applications describes a pH range of about 4 to about 6, about 4.5 to about 5.5, or about 4.5 to about 5.  As a result, the asserted claims of the '866 patent are entitled to a priority date of no earlier than July 15, 2011.

Therefore, for at least this reason, the asserted claims are not entitled to the filing date of the '504 provisional application, the '725 provisional application, or the '726 provisional application.

The asserted claims of the '866 patent are not enabled and/or lack written description by the '866 patent specification for the additional reasons discussed below. For at least the same reasons as discussed below, the claims of the '866 patent specification are not enabled and/or described by the '504 provisional application, the '725 provisional application, or the '726 provisional application. Therefore, for this additional reason, the asserted claims of the '866 patent are not entitled to the filing date of the '504 provisional application, the '725 provisional application, or the '726 provisional application.

      **2.**      **The Asserted Claims of the '866 Patent Are Anticipated by Vasisht I**

As discussed above, the claims of the '866 patent are entitled to a filing date of no earlier than July 15, 2011, Vasisht I is prior art to the asserted claims of the '866 patent under 35

U.S.C. § 102(b). For the reasons described below, Vasisht I anticipates the subject matter of the asserted claims of the '866 patent.

(a)    **Claim 1**

(i)    **"A method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine, the method comprising"**

Vasisht I "provides transmucosal devices for enhanced uptake of a medicament and methods of using the same" (Vasisht I at [0004].) More specifically:

> In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject.

(*Id.* at [0010].)

Thus, Vasisht I discloses "a method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine," as required by the preamble of claim 1.

(ii)    **"administering buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising"**

As noted above, Vasisht I discloses a method of administering a bioerodable drug delivery device to an oral mucosal surface of a subject, wherein the device includes buprenorphine disposed in a mucoadhesive polymeric diffusion environment. (*Id.*)

Thus, Vasisht I describes "administering buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject," as required by claim 1.

  **(iii) "a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment"**

The method of Vasisht I generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment, such that the effective amount of the buprenorphine is delivered in less than about 30 minutes. (*Id.* at [0011].) In particular:

> [T]he present invention provides a flexible, bioerodable mucoadhesive delivery device suitable for direct transmucosal administration of an effective amount of a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative to a subject. The mucoadhesive device includes a mucoadhesive layer comprising a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative disposed in a polymeric diffusion environment [having a certain pH].

(*Id.* at [0019].)

Thus, Vasisht I discloses "a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment," as required by claim 1.

  **(iv) "wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6"**

Vasisht I states that the mucoadhesive layer of the mucoadhesive device comprises buprenorphine or a buprenorphine derivative disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of

between about 4.0 and 7.5, about 5.5 and 6.5, or about 6.0 and 6.5 for the buprenorphine or buprenorphine derivative. (*Id.* at [0060].) According to Vasisht I:

> In some embodiments, the mucoadhesive polymeric diffusion environment is a layer with a buffered pH such that a desired pH is maintained at the mucosal administration site. Accordingly, the effect of any variation in pH encountered in a subject or between subjects (e.g., due to foods or beverages recently consumed), including any effect on uptake, is reduced or eliminated.

> Accordingly, one advantage of the present invention is that variability in the properties of the device (e.g., due to changes in the pH of the ingredients) between devices, and from lot to lot is reduced or eliminated. Without wishing to be bound by any particular theory, it is believed that the polymeric diffusion environment of the present invention reduces variation, e.g., by maintaining a buffered pH. Yet another advantage is pH variability at the administration site (e.g., due to what food or drink or other medications was recently consumed) is reduced or eliminated, such that, e.g., the variability of the devices is reduced or eliminated.

(*Id.* at [0048]-[0049].)

Thus, Vasisht I discloses a mucoadhesive device comprising a polymeric diffusion environment that is "a buffered environment having a pH of between about 4 and about 6," as required by claim 1.

> **(v)** **"and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer"**

Vasisht I also describes that the mucoadhesive device includes a backing layer comprising a barrier environment which is disposed adjacent to and coterminous with the mucoadhesive layer. (*Id.* at [0074].) Thus, Vasisht I discloses "a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer," as required by claim 1.

> **(vi)** **"to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient**

116

**delivers buprenorphine across the buffered polymeric diffusion environment upon application to the mucosal surface"**

Vasisht I teaches that the barrier environment of its bioerodable drug delivery device is disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject. (*Id.* at [0012].) More specifically:

> [I]t is believed that delivery of the medicament is particularly effective because the mucoadhesive polymeric diffusion environment (e.g., the pH and the ionic nature of the polymers) is such that the medicament (e.g., a weakly basic drug such as fentanyl or buprenorphine) can rapidly move through the mucoadhesive polymeric diffusion environment to the mucosa, while also allowing efficient absorption by the mucosa.

(*Id.* at [0047].)

Vasisht I defines the "unidirectional gradient" as follows:

> [T]he term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (e.g., fentanyl or buprenorphine) through the device, e.g., through a polymeric diffusion environment, in substantially one direction, e.g., to the mucosa of a subject. For example, the polymeric diffusion environment may be a mucoadhesive polymeric diffusion environment in the form of a layer or film disposed adjacent to a backing layer or film. Upon mucoadministration, a gradient is created between the mucoadhesive polymeric diffusion environment and the mucosa, and the medicament flows from the mucoadhesive polymeric diffusion environment, substantially in one direction towards the mucosa.

(*Id.* at [0034].)

Thus, Vasisht I discloses a device that provides "a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment upon application to the mucosal surface," as required by claim 1.

117

Accordingly, claim 1 of the '866 patent is invalid under 35 U.S.C. § 102(b).

### (b)      Claims 2 and 3

Claims 2 and 3 depend from claim 1, and further require that the pH of the polymeric diffusion environment is between about 4.5 and about 5.5 (claim 2) and about 4.5 and 5 (claim 3). Vasisht I describes that, when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment ranges from about 4.0 to 7.5 or about 5.5 to about 6.5. (Vasisht I at [0060].) Thus, Vasisht I discloses a mucoadhesive polymeric diffusion environment having a pH that encompasses the pH ranges required by claims 2 and 3.

Accordingly, claims 2 and 3 of the '866 patent are invalid under 35 U.S.C. § 102(b).

### (c)      Claim 4

Claim 4 depends from claim 1 and further requires that the first quantifiable plasma concentration of buprenorphine is observed at about 45 minutes. Example 4 of Vasisht I describes a study of buprenorphine uptake in humans, "in exemplary devices of the present invention (at pH 6 and 7.25)." (*Id.* at [0121].) Vasisht I states that "[a]s demonstrated in Table 4, the delivery devices of the present invention at pH 6 appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." (*Id.*) Table 4 sets forth "pharmacokinetic data for buprenorphine," including a $t_{first}$ at 0.75 hours, i.e., 45 minutes. Vasisht I defines $t_{first}$ as the time to the first quantifiable concentration (*see id.* at [0112]), and Table 4 associates $t_{first}$ with $C_{first}$, i.e., the first quantifiable concentration. As a result, Vasisht I discloses a first quantifiable plasma concentration of buprenorphine that is observed at about 45 minutes, as required by claim 4.

Accordingly, claim 4 of the '866 patent is invalid under 35 U.S.C. § 102(b).

### (d)      Claim 5

118

Claim 5 depends from claim 1 and requires that the effective plasma concentration of buprenorphine is maintained for at least 4 hours.  As noted above, Example 4 of Vasisht I describes a study of buprenorphine uptake in humans, "in exemplary devices of the present invention (at pH 6 and 7.25)." (Vasisht I at [0121].) Example 4 states that "results from this study are summarized in the graph in FIG. 3," which illustrates that a plasma concentration of buprenorphine is measured for approximately 16 hours. (*Id.*) Table 4 indicates that a $C_{max}$ of 1.05 ng/mL occurred at 3 hours, and at 4 hours, Figure 3 illustrates that the plasma buprenorphine concentration is slightly below 1.0 ng/mL for the "pH 6.0 mean device." (*Id.*) Thus,  Vasisht I discloses  the  maintenance  of  an effective  plasma  concentration  of buprenorphine for at least 4 hours, as required by claim 5.

Accordingly, claim 5 of the '866 patent is invalid under 35 U.S.C. § 102(b).

### (e)        Claim 8

The mucoadhesive bioerodable drug delivery device of claim 8 is encompassed by claim 1. For at least the same reasons as claim 1, Vasisht I discloses each and every limitation of claim 8.

Accordingly, claim 8 of the '866 patent is invalid under 35 U.S.C. § 102(b).

### (f)        Claims 9 and 10

Claims 9 and 10 depend from claim 8, and further require that the pH of the polymeric diffusion environment is between about 4.5 and about 5.5 (claim 9) and about 4.5 and 5 (claim 10).  For the same reasons as claims 2, 3, and 8 of the '866 patent, claims 9 and 10 are anticipated by Vasisht I.

Accordingly, claims 9 and 10 of the '866 patent are invalid under 35 U.S.C. § 102(b).

119

3. **The Asserted Claims of the '866 Patent Would Have Been Obvious Over Tapolsky I and/or Moro in Combination with Todd, in Further Combination With One or More of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang**

(a) **Claim 1**

(i) **"A method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine, the method comprising"**

Tapolsky I teaches a method of direct transmucosal drug delivery by using a bioerodable device that delivers a drug upon application to a mucosal surface of a subject. (Tapolsky I at [0024].) The device of Tapolsky I "yields fast onset of activity, excellent bioavailability, and sustained drug delivery," which leads to enhanced drug uptake. (*Id.* at [0131].) Drugs suitable for use in the method of Tapolsky I include anti-inflammatory analgesics. (*Id.* at [0046].) Buprenorphine is a known anti-inflammatory analgesic. (*See, e.g.*, Kramaric at 8:47-49; Volker at summary.) As a result, it would have been obvious to a POSA to use buprenorphine in the delivery device of Tapolsky I.

Similarly, Moro discloses a method of transmucosal drug delivery by using a mucoadhesive bioerodable drug delivery device for direct transmucosal administration of a drug. (Moro at Abstract; [0071].) The device in Moro has "an effective residence time that can be tailored to deliver therapeutics over different time intervals," which provides for enhanced uptake of a drug. (*Id.* at [0031].) Moro expressly teaches incorporating an effective amount of buprenorphine in the bioerodable mucoadhesive layer of its device. (*Id.* at [0031]; [0064].)

Thus, each of Tapolsky I and Moro discloses the enhanced uptake of buprenorphine to a subject by direct transmucosal delivery.

Indeed, a POSA would have been aware that the prior art in general teaches direct transmucosal delivery to provide enhanced uptake of drugs such as buprenorphine, in particular.

120

Das teaches the use of mucoadhesive films to provide direct transmucosal administration of buprenorphine, and "hypothesize[s] that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility," i.e., enhanced uptake (Das at p. 90) (*see also* Chen at 1:26-28; 3:25-28; 5:8-12; 6:19-29; 10:28; Yang at [0002]; [0013]; [0014]; [0133]; [0209]-[0211]; and Chiang at Abstract; S45).

Todd describes buprenorphine as a "potent antagonist analgesic with good bioavailability following sublingual administration." (Todd at Abstract). More specifically, Todd teaches the use of a buffered environment at a pH of 4-6, including at a pH of 5 or 6, in particular, to optimize transmucosal uptake of buprenorphine, i.e., to enhance uptake of buprenorphine by direct transmucosal delivery.

In view of the teachings of the prior art, a POSA would have been motivated to use direct transmucosal delivery to provide enhanced uptake of buprenorphine to a subject, and would have had a reasonable expectation of successfully doing so with the drug delivery devices of Tapolsky I and/or Moro.

> **(ii)** **"administering buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising"**

Tapolsky I teaches a bioerodable device that delivers a drug upon its application to mucosal surface of a subject, including a surface within the mouth. (Tapolsky at [0024]; [0128].) Drugs suitable for the device of Tapolsky I include anti-inflammatory analgesics (*id.* at [0046]), such as buprenorphine, which is a known anti-inflammatory analgesic (*see, e.g.*, Kramaric at 8:47-49; Volker at summary.) Moro also discloses a mucoadhesive, bioerodable drug delivery

device for the direct transmucosal administration of a drug, such as buprenorphine, to a subject by application to oral mucosa. (Moro at Abstract; [0010]; [0031]; [0071].)

The use of mucoadhesive bioerodable devices to deliver drugs, such as buprenorphine in particular, by application to the oral mucosa of a subject was well known to a POSA. (*See* Das at pp. 90, 91-92; Chen at 3:30-4:16, 6:19-29, 7:25-30; Yang at [0002]; [0014]; [0133]; [0209]-[0211].) A POSA would have had a reasonable expectation of successfully administering buprenorphine by the use of a mucoadhesive bioerodable drug delivery device. Tapolsky I, for example, describes that its device "minimizes the discomfort associated with application of a foreign substance for a period of time sufficient to provide effective drug delivery to the treatment site" (Tapolsky I at [0026]), and "offers the advantages of an effective residence time with minimal discomfort and ease of use, and is an appropriate vehicle for the local, as well as systemic, delivery of pharmaceutical, given its thinner, flexible form" (*id.*).

Moro similarly teaches that the device "causes minimum discomfort, is easy to use and provides an effective residence time that can be tailored to deliver therapeutics over different time intervals" (Moro at [0010]), and maximizes "the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids" (*id.* at [0046]).

In view of the teachings of the prior art, a POSA would have been motivated to administer buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, and would have had a reasonable expectation of successfully doing so with the drug delivery devices of Tapolsky I and/or Moro.

          **(iii)**      **"a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment"**

Tapolsky I discloses a device that contains a bioerodable mucoadhesive layer including at least one film-forming polymer and one bioadhesive polymer, such that the polymer chains of the mucoadhesive layer and glycoproteins of the mucosal tissue interact in a way as to assure adhesion. (Tapolsky I at [0002]; [0022]; [0024]-[0025]; [0027]; [0030]-[0031].) Thus, the mucoadhesive layer of Tapolsky I comprises a polymeric diffusion environment. Tapolsky I teaches that the drug, such as an anti-inflammatory analgesic like buprenorphine, preferably is placed within the polymeric diffusion environment of the device. (*See* Tapolsky I at [0030], [0045]; *see also* Kramaric at 8:47-49; Volker at summary.)

The device of Moro also contains a water-soluble, bioerodable mucoadhesive layer. (Moro at [0010]-[0011].) In addition, the mucoadhesive layer of Moro contains at least a film-forming polymer and a bioadhesive polymer, and comprises a polymeric diffusion environment. (*See id.* at [0010].) Moro teaches that an effective amount of buprenorphine can be disposed in the polymeric diffusion environment. (*Id.* at [0016]; [0031]; [0064].)

The use of a polymeric diffusion environment to contain an active agent such as buprenorphine, within a bioerodable mucoadhesive layer of a transmucosal delivery device, like that of Tapolsky I or Moro, was well known to a POSA. For example, Das discloses mucoadhesive polymer film formulations of buprenorphine for application to sublingual mucosa, which include polymers such as Carbopol to create an aqueous gel system, and which include plasticizers such as PEG, to improve the mucoadhesion properties of the polymers. (Das at pp. 90, 92.)

Each of Chen and Yang also discloses a mucoadhesive layer comprising an effective amount of a drug dispersed in a polymeric diffusion environment. (*See* Chen at 3:30-4:, 5:13-25, 6:19-29, 7:25-30, 8:19-9:18; Yang at [0002]; [0014]-[0017]; [0133]; [0209]-[0211].)

In view of the teachings of the prior art, discussed above, a POSA would have been motivated to develop a drug delivery device with a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, with a reasonable expectation of success.

> **(iv)** **"wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6"**

Tapolsky I teaches including a buffer, e.g., citrate, benzoate, and/or phosphate, in the bioerodable mucoadhesive layer of the device. (Tapolsky I at [0040].) Yang also teaches that mucoadhesive films can contain buffering agents. (Yang at [0161]; [0210].) Chen discloses that mucosal films containing opioid analgesics can include buffering agents such as citric acid. (*See, e.g.*, Chen at Examples 1, 2, and 4-8.) Thus, it was well-known to a POSA to include a buffering agent in transmucosal films.

A POSA would have known that a pH buffered to the range of 4 to 6 would optimize the transmucosal delivery of buprenorphine. In particular, Todd reports:

> We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400µg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's.

(Todd at 2:11-17.) Todd also discloses and claims buffering the buprenorphine composition "to between pH 4.5 to 5.5." (*Id.* at 2:21-3:2; claim 1.) (*See also* Birch at pp. 9, 14, 38-40; Quay at [0363], [00481]; Besse at [0075].)

124

Todd expressly states that buprenorphine migrates directly to the mucosa and into the blood at pH 4-6, and that "the degree of uptake of the drug was greater at the two higher pH's," i.e., at pH 5 and at pH 6. (Todd at 2:11-17 (emphasis added).) Chiang reports that the sublingual ~~bioavailbility~~bioavailability of buprenorphine from three different studies of sublingual solution formulations varied between 30% and 51% of the intravenous bioavailability. (Chiang at p. S43; Table 2.)  Additionally, Chiang reports that the bioavailability of buprenorphine from sublingual tablets is about 70% that from sublingual solutions. (*Id.* at S44.)

Todd would have motivated a POSA to incorporate buprenorphine in a buffered polymeric diffusion environment having a pH between about 4 and about 6, and especially at a pH of around 5, into a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky I and Moro. A POSA would have had a reasonable expectation of successfully doing so, considering the teaching of the prior art that buffers were routinely used to control the pH of transmucosal films.

> **(v)** **"and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer"**

Tapolsky I teaches a backing layer that serves as a barrier layer in its device by protecting the adhesive layer. (Tapolsky I at [0030].)  In particular, Tapolsky I teaches that the backing layer is adjacent to the mucoadhesive layer and includes "film-forming pharmaceutically acceptable polymer[s]" to provide a polymeric barrier environment. (*Id.* at [0030], [0035], [0065]; Figures 1 and 2.)

Moro also discloses a backing layer, which is adjacent to the mucoadhesive layer, and preferably "act[s] as a casing and support surface on which the adhesive layer is prepared." (Moro at [0010]-[0012].) Moro provides a polymeric barrier environment within the backing

125

layer, using polymers described as suitable for the backing layer of the '866 patent. (*See* Moro at [0010]; '866 patent at 15:28-41.)

It was well-known to a POSA to employ a polymeric barrier layer adjacent to the mucoadhesive layer of a transmucosal delivery device. (*See, e.g.*, Chen at 4:31-32; Yang at [0175].) Thus, a POSA would have had a reason, and a reasonable expectation of success, to include a backing layer in a mucoadhesive bioerodable drug delivery device, to protect the drug layer and facilitate delivery of the drug to the mucosa. (*See, e.g.*, Tapolsky I at [0030]; [0058].)

> **(vi)   "to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment upon application to the mucosal surface."**

Tapolsky I teaches that the thickness and surface area of the backing layer can be adjusted to facilitate a unidirectional gradient across the polymeric diffusion environment when the device is applied to a mucosal surface. (Tapolsky I at [0014]; [0021]; [0057]-[0062]; [0131]; Figure 2.) The device of Tapolsky I provides fast onset of activity, excellent bioavailability, and sustained delivery, i.e., "rapid and efficient" delivery of a drug, including an anti-inflammatory analgesic like buprenorphine in particular (*id.* at [0026], [0046], [0131]; *see also* Kramaric at 8:47-49; Volker at summary.)

The backing layer of Moro also creates a unidirectional gradient, which delivers the drug across the polymeric diffusion environment upon application of the delivery device to a mucosal surface. (Moro at [0046].) The residence time of the drug delivery device "is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the coating solution." (*Id.*)  Thus, the device of Moro provides "rapid and efficient" delivery of a drug, such as buprenorphine in particular. (*Id.* at [0031]; [0064].)

126

The use of a unidirectional gradient to provide efficient delivery of an active agent for transmucosal administration was well-known to a POSA, to facilitate the effective delivery of an active agent to a mucosal surface. In view of the results reported in the prior art, a POSA would have had a reasonable expectation of creating a unidirectional gradient to efficiently deliver an active agent, such as buprenorphine, to the mucosal surface. (*See, e.g.*, Tapolsky I at [0026], [0046], [0131]; Moro at [0031], [0064].)

In view of the foregoing, the subject matter of claim 1 of the '866 patent would have been *prima facie* obvious to a POSA.

### (b)      Claims 2 and 3

Claims 2 and 3 depend from claim 1, and recite that the pH of the polymeric diffusion environment is between about 4.5 and about 5.5 (claim 2), or between about 4.5 and about 5 (claim 3). Todd teaches the use of sublingual buprenorphine compositions buffered to a pH of 4.5 to 5.5. ('866 at Abstract; 2:21-3:2; Examples 1-13; and claim 1.) In view of the teachings of Todd regarding the beneficial sublingual uptake of buprenorphine at a pH buffered to between 4.5-5.5, it would have been obvious to a POSA to provide a polymeric diffusion environment having a pH between about 4.5 and 5.5, or between about 4.5 and 5, as required by claims 2 and 3.

Thus, the subject matter of claims 2 and 3 of the '866 patent would have been *prima facie* obvious to a POSA.

### (c)      Claim 4

Claim 4 depends from claim 1 and requires that "a first quantifiable plasma concentration of buprenorphine is observed at about 45 minutes." Tapolsky I discloses administering the device prepared in Example 38 to the buccal mucosa of dogs (see Example 40). Tapolsky I discloses the

plasma concentration of the drug (albuterol sulfate) over time in Table 5. The mean plasma albuterol sulfate concentration was first detected above background between 30 to 60 minutes. Tapolsky I, Table 5. Tapolsky I states that the drug delivery system provides fast onset and excellent bioavailability. (Tapolsky I at [0131].) In addition, Tapolsky I also discloses that the erosion kinetics of the mucoadhesive layer and/or the backing layer may be adjusted, e.g., by crosslinking or plasticizing the film-forming polymer, to modify the release profile of the drug(s) contained in the device. (*Id.* at [0038].)

Thus, a POSA, in view of Tapolsky I, would have prepared a drug delivery device comprising buprenorphine similar to the device of Example 38 to give a first quantifiable plasma concentration of buprenorphine between 30 to 60 minutes. The skilled artisan would have routinely adjusted the erosion kinetics of the mucoadhesive layer and/or the backing layer to provide a first quantifiable plasma concentration of buprenorphine of about 45 minutes.

Further, Bullingham I studies plasma levels of buprenorphine after sublingual administration, and reports that the onset of analgesia, i.e., associated with a first quantifiable plasma concentration of buprenorphine, occurred between 15 and 45 minutes. (Bullingham I at p. 119 and Table 2; *see also* Bullingham II at p. 669 and Table 6.) Thus, Bullingham I discloses a method of transmucosal delivery of buprenorphine providing a first quantifiable plasma concentration of buprenorphine at about 45 minutes. Bullingham I also concludes that "the sublingual route may be particularly appropriate for buprenorphine, where the slow absorption rate combines with its associative properties with the opiate receptor to provide analgesia of long duration." (Bullingham at p. 121.) In view of the results reported in Bullingham I, a POSA would have reasonably expected to provide a first quantifiable plasma concentration of buprenorphine at 45 minutes after direct transmucosal delivery from a device like that of Tapolsky I or Moro.

128

Wilding studies plasma levels of buprenorphine after transdermal administration, and finds minimal plasma concentration of buprenorphine in the first hour after administration of an aqueous-based system, as compared to an ethanol-based system. In view of the differences between the systems, Wilding concludes that "[i]t will be important to tailor carefully the pharmaceutical properties of the transdermal system with the clinically required plasma levels for sustained analgesic therapy." (Wilding at p. 86.) Nonetheless, Wilding states that "transdermal delivery of buprenorphine produced sustained plasma levels of drug within the range observed after intravenous dosing and … [t]he in vivo investigation suggests that transdermal delivery could provide appropriate plasma levels of buprenorphine for sustained analgesic effect." ('866 at Abstract.) The teachings of Wilding confirm that it would have been within the skill of a POSA to tailor the components and/or properties of a transmucosal delivery device to provide the desired first quantifiable plasma concentration of buprenorphine.

In view of the foregoing, the subject matter of claim 4 would have been *prima facie* obvious to a POSA.

### (d)    Claim 5

Claim 5 depends from claim 1 and further recites that "an effective plasma concentration of buprenorphine is maintained for at least 4 hours." Tapolsky I discloses applying the drug delivery device prepared in Example 38 to the buccal mucosa of dogs, and the plasma concentration of the drug (albuterol sulfate) over time. The plasma concentration of albuterol sulfate was maintained above background over 480 minutes, i.e., for at least 4 hours. Moreover, maintaining an effective plasma concentration of buprenorphine is beneficial as it can provide prolonged pain relief. Thus, a person of ordinary skill in the art, in view of Tapolsky I, would have been motivated, with a reasonable expectation of success, to prepare a drug delivery device

similar to the device of Example 38 of Tapolsky I to maintain an effective plasma concentration of buprenorphine for at least 4 hours.

Bullingham I reports a median estimate of duration of action of 534 minutes, which is almost 9 hours, i.e., an effective plasma concentration of buprenorphine for at least 4 hours. Thus, a POSA would have reasonably expected to maintain an effective plasma concentration of buprenorphine of at least 4 hours by the transmucosal delivery of buprenorphine from a device like that of Tapolsky I or Moro such that the subject matter of claim 5 would have been *prima facie* obvious to a POSA.

**(e)   Claim 8**

The mucoadhesive bioerodable drug delivery device of claim 8 is encompassed by claim 1. For at least the same reasons as claim 1, the subject matter of claim 8 would have been *prima facie* obvious to a POSA.

**(f)   Claims 9 and 10**

Claims 9 and 10 depend from claim 8, and further recite that "the pH of the polymeric diffusion environment is between about 4.5 and about 5.5" (claim 9), and that "the pH of the polymeric diffusion environment is between about 4.5 and about 5" (claim 10), respectively. For the same reasons as claims 2, 3, and 8, the subject matter of claims 9 and 10 of the '866 patent would have been *prima facie* obvious to a POSA.

**4.    The Asserted Claims of the '866 Patent Would Have Been Obvious Over Tapolsky I and/or Moro in Combination with One or More of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in Further View of One or More of Bullingham, Bullingham II, Wilding, Das, Chen, Yan and/or Chiang**

As described above, the asserted claims would have been obvious over Tapolsky I or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II,

130

Wilding, Das, Chen, Yang, and Chiang.  This alternative combination of Tapolsky or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and Chiang is similar to the combination described above. Accordingly, this section describes how the addition of one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson and Shojaei would have rendered obvious claim 1, limitation [C] and claim 8, limitation [B], i.e., "wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6," (claims 2 and 9), i.e., wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5, (claims 3 and 10), i.e., wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.

A POSA would have known that for an ionizable drug such as buprenorphine, both the ionization and solubility of the drug are pH dependent, and both impact the absorption of the drug. Hague, for example, teaches that "[i]onizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." (Hague at [0052].) However, "[w]hile increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions." (*Id.* at [0058].) As a result, the "actual bioavailability" of a drug at a given pH "depends on the combination of these two effects; state of ionization and aqueous solubility." (*Id.*) Furusawa also teaches that pH plays an important role in both the stability and transmucosal absorption of an active agent. (*See, e.g.*, Furusawa at [0063].) For a multi-layer transmucosal film including fentanyl, another opioid active agent, Furusawa teaches that a pH of 5-7 is preferable, to increase transmucosal absorption. (*See, e.g.*, *id.* at [0065].)

131

Cassidy teaches that buprenorphine's behavior "in solution was similar to that reported for fentanyl and sufentanil, which are also weakly basic narcotic analgesics." (Cassidy at p. 28.) In view of at least the teachings of Cassidy, a POSA would have reasonably expected that buprenorphine – like fentanyl as described in Furusawa – would absorb transmucosally at acidic pH values. Indeed, Cassidy teaches that buprenorphine absorbs through the buccal mucosa at acidic pH values. In particular, Cassidy teaches that the solubility of buprenorphine is "highly pH dependent," with the highest solubility seen at pH 4.2. According to Cassidy, solubility at neutral pH, i.e., 7.3, was significantly lower. Cassidy states two prototypes for buccal delivery of buprenorphine to dogs (which Cassidy describes as a good model for man) provided steady-state plasma levels of buprenorphine and rapid delivery of the drug. (*Id.* at pp. 28-29.)

Sharma also studies the permeation of buprenorphine specifically as a function of pH, and recognizes that "[s]olubility of the base decreases exponentially as the pH increases," and states that "[b]uprenorphine skin flux increased as the pH was decreased to 5," concluding that "the completely ionized form (pKa=8.4) of drug (pH=5.0) has higher skin flux than the partially unionized form." (Sharma at 8:20-24.) Mendelson also teaches that buffers and pH adjusting agents may be included in sublingual formulations of buprenorphine (Mendelson at 7:48-55), and teaches that buprenorphine is prepared in an aqueous solution for sublingual administration, in which the solution includes a titrate phosphate buffer at pH 5 (*id.* at 7:63-8:4.) Cassidy, Sharma, and Mendelson demonstrate that it would have been obvious to a POSA to use sufficient buffer to provide buprenorphine in a polymeric diffusion environment having a pH between about 4 and about 6, and especially at a pH of around 5.  A POSA would have had a reasonable expectation of successfully administering buprenorphine transmucosally at a pH between about 4

132

and 6, including at a  pH of  about 5, in particular, in view of at least the  teachings in Cassidy

that buccal administration at acidic pH values provides steady-state plasma levels of

buprenorphine and rapid delivery of the drug.

A POSA also would have known that pH can affect the strength of the bioadhesive polymer

used in delivery devices for oral mucosal delivery. Shojaei, for example, teaches that the oral

mucosa can "form a strongly cohesive gel structure" at physiological pH, i.e., from 5.5 to 7 for the

saliva, where it has a negative charge, improving mucoadhesion. As an example, Shojaei reports

that a bioadhesive polymer, poly(acrylic acid) crosslinked with divinyl glycol, showed a

maximum adhesion at pH 5 and 6, and a minimum at pH 7. Shojaei also describes a buccal

mucoadhesive device for controlled release of buprenorphine using bioadhesive polymers. As

illustrated by Shojaei, a POSA would have been motivated to provide a mucoadhesive layer

having a pH between 5-7, and especially a pH of 5 or 6, to improve mucoadhesion.

As demonstrated by the art discussed above, a POSA would have been aware of the

importance of pH in determining the bioavailability of buprenorphine in a polymeric diffusion

environment within a transmucosal delivery device, and it would have been a matter of routine

experimentation for a POSA to optimize the pH to balance extent of ionization and solubility of

buprenorphine, as well as mucoadhesion. A POSA would have reasonably expected (especially

in view of the teachings of Furusawa, Cassidy and Sharma) that buffering a polymeric diffusion

environment containing buprenorphine to a pH between about 4 and 6, including to a pH of about

5 in particular (as taught by Sharma and Mendelson), would have provided enhanced uptake of

buprenorphine.  A POSA also would have known that a pH of 5 is beneficial for the mucoadhesion

of polymers, as taught by Shojaei. Thus, it would have been obvious to a POSA to use sufficient

buffer to provide buprenorphine in a polymeric diffusion environment having a pH between about

4 and about 6, and especially at a pH of around 5, in a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky and Moro.

For these reasons and the reasons discussed above with respect to obviousness of the asserted claims of the '866 patent over Tapolsky and/or Moro in combination with Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, the subject matter of the asserted claims of the '866 patent would have been obvious to a POSA in view of Tapolsky and/or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham I, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang.

5.   **The Asserted Claims of the '866 Patent Would Have Been Obvious Over Tapolsky and/or Moro in Combination with One of More of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in Further View of One or More of Bullingham, Bullingham II, Wilding, Das, Chen, Yan and/or Chiang**

As described above, the asserted claims would have been obvious over (1) Tapolsky and/or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, and (2) Tapolsky and/or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang. This alternative combination of Tapolsky and/or Moro, in combination with one or more of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang is similar to the combination described above. Because the claims of the '866 patent are entitled to a filing date of no earlier than July 15, 2011, Rademacher is prior art to the asserted claims of the '866 patent under 35 U.S.C. § 102(b). For the reasons

described below, Rademacher, in combination with one or more of the other references listed above, renders obvious the subject matter of the asserted claims of the '866 patent.

Accordingly, this section describes how the addition of one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson and/or Shojaei would have rendered obvious the limitations "wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6," (claim 8) "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5," (claim 2) and "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5" (claim 3).

Rademacher teaches films for the transmucosal administration of active agents, such as buprenorphine in particular. (Rademacher at Abstract; [0037].) The film has "a polymer matrix that serves as an active substance reservoir," comprising water-soluble polymers or polymers that are capable of swelling in aqueous media. (*Id.* at [0026].) Rademacher teaches that "[b]y selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour" (*id.*), and teaches that the pH of the polymer matrix is important to those properties and to the release of the active agent. In particular, Rademacher teaches that the pH of the polymer matrix should be adjusted to correspond to the "physiological pH value of the mucous membrane to which the administration form is to be applied" (*id.* at [16]), such as to between about 5.5 and 6.5, which is the approximate pH of the oral mucosa of humans (*id.* at [0022]). As an example, Rademacher describes the use of a physiological buffer system like a phosphate buffer. (*Id.* at [0024].)

Thus, Rademacher confirms that a POSA would have been aware that the pH of the polymeric diffusion environment is important to bioadhesion of a transmucosal device, and that adhesion is stronger at or near the physiological pH of the mucus (*see also* Shojaei). The

teaching of Rademacher with respect to the optimal pH for a particular polymer system is consistent with the teachings of Shojaei, i.e., pH 5 or pH 6, and is consistent with the teachings of Mendelson, i.e., phosphate buffer having pH 5.

As a result, it would have been obvious to a POSA to use a buffer to provide buprenorphine in a polymeric diffusion environment having a pH between about 4 and about 6, and especially at a pH of around 5, in a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky and Moro.

For these reasons and the reasons discussed above with respect to the obviousness of the asserted claims over (1) Tapolsky and/or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, and (2) Tapolsky and/or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, the subject matter of the asserted claims of the '866 patent would have been obvious to a POSA in view of Tapolsky and/or Moro, in combination with one or more of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang.

### 6.    Secondary Indicia of Non-Obviousness

#### (a)    Plaintiffs Cannot Show That The '866 Patent is Non-Obvious Because of Secondary Indicia of Non-Obviousness

Defendants are unaware of any secondary indicia of non-obviousness that, when considered in light of the totality of the evidence, would lead to a conclusion that the claimed invention would not have been obvious to a POSA. For example, during prosecution of the

'306 application, Applicants submitted the Declaration of Dr. Andrew Finn Under 37 C.F.R. §

1.132, dated September 12, 2011 ("Finn Declaration"), stating as follows:

> The methods and devices of the present invention, which include a polymeric diffusion environment which is a buffered environment having a pH of between about 4 and about 6, exhibit unexpectedly superior bioavailability versus devices which do not include the buffered environment having a pH of between about 4 and about 6.

> In addition to the delivery devices tested at pH 6 and pH 7.25 (*see, e.g.*, Example 4 of the present invention), we also provide the final clinical trial results of exemplary inventive transmucosal delivery devices at pH 5.4, pH 4.9 and pH 4.75. Each of these devices was administered to a group of healthy patients for pharmacokinetic profiling and analyzed in accordance with FDA standards. The pharmacokinetic data of devices at pH 7.25, pH 6.0, pH 5.4, pH 4.9 and pH 4.75 (entries BEMA 1-7), as well as unbuffered Suboxone are presented below in Table 1. Declarant notes that the data presented in Table 4 of the specification was preliminary data, and the final clinical trial results are presented below as BEMA 1 and BEMA 2.

*TABLE 1: Pharmacokinetics of Various Transmucosal Buprenorphine Devices*

| DEVICE→<br>pH→<br>DOSE→ | Suboxone<br>N/A<br>2 mg | BEMA 1<br>7.25<br>2 mg | BEMA 2<br>6.0<br>2 mg | BEMA 3<br>5.4<br>1 mg | BEMA 4<br>4.9<br>1 mg | BEMA 5<br>4.75<br>0.2 mg | BEMA 6<br>4.75<br>0.5 mg | BEMA 7<br>4.75<br>1.5 mg |
|---|---|---|---|---|---|---|---|---|
| $T_{max}$ (hr) | 1.96 | 3.00 | 3.10 | 2.19 | 2.31 | 2.88 | 2.31 | 2.25 |
| $C_{max}$ (ng/mL) | 0.879 | 0.951 | 1.26 | 0.912 | 1.50 | 0.276 | 0.551 | 1.90 |
| $AUC_{inf}$ (hr*ng/mL) | 8.582 | 10.77 | 11.20 | 5.856 | 9.396 | 2.005 | 4.399 | 16.33 |
| Bioavail. (%) calc from $AUC_{inf}$ | 24.6 | 30.8 | 32.0 | 46.1 | 73.3 | 74.2 | 65.1 | 80.6 |

(Finn Declaration at ¶ 8.)

In view of the data, the Finn Declaration states that devices having the claimed polymeric diffusion environment "exhibit dramatically improved $C_{max}$ and/or bioavailability as compared to devices having a polymeric diffusion environment at a pH of 7.25 or those having no buffered environment." (Finn Declaration at ¶ 9.) The Finn Declaration concludes as follows:

137

> Such enhanced bioavailability in the bioerodable device described in the present invention was unexpected and could not have been predicted from a mere change in pH or adhesive capability.

(*Id.*)

Based on the prior art cited herein, no showing by the patentee has established unexpected results in comparison to the closest prior art. In particular, contrary to the conclusions of the Finn Declaration, and as the above discussion of the prior art demonstrates, a POSA would have known to buffer a polymeric diffusion environment for the transmucosal delivery of buprenorphine to a pH between 4 and 6, and specifically to a pH of 5, and would have reasonably expected improved bioavailability at acidic pH. For example:

- Todd discloses a composition for sublingual administration of buprenorphine buffered to a pH between 4.5 and 5.5 (Todd at 2:21-3:4), and teaches a desirable "degree of uptake" of buprenorphine at acidic pH values (*id.* at 2:9-17);

- Sharma teaches that "the completely ionized form" of buprenorphine, i.e., at acidic pH such as pH 5.0 in particular, "has higher skin flux than the partially un-ionized form," which would lead to improved bioavailability (Sharma at 8:20-24);

- Mendelson teaches the use of a buffer for the sublingual administration of buprenorphine, including the use of a titrate phosphate buffer having a pH of 5 in particular (Mendelson at 7:56-8:11);

- Furusawa teaches that fentanyl, a weakly-basic narcotic analgesic like buprenorphine, is transmucosally absorbed best at a pH between 4 and 8, and preferably at a pH between 5 and 7 (Furusawa at [0065]);

138

- Cassidy teaches that buprenorphine has the highest solubility at acidic pH, e.g., at pH 4.2, and has "considerably lower" solubility at neutral pH, e.g., at pH 7.3 (Cassidy at p. 24), and teaches that buprenorphine absorbs through the buccal mucosa at acidic pH values (*id.* at pp. 28-29); and

- Rademacher and Shojaei teach that adhesion of a transmucosal device is stronger when the polymeric diffusion environment has a pH at or near the physiological pH of the mucus (Rademacher at [0015]); Shojaei, e.g., by use of a physiological buffer system like a phosphate buffer, which has a pH around 5 (Rademacher at [0024]; Mendelson at 7:56-8:11).

Thus, the results described in the Finn Declaration were not unexpected. On the contrary, a POSA would have predicted that "change in pH," i.e., to an acidic pH between 4 and 6, would have increased the transmucosal bioavailability of buprenorphine.

During prosecution of the '306 application, Applicants also argued that commercial success supported the non-obviousness of the claims (*see* Notice of Allowability dated February 16, 2012, p. 2; Reasons for Allowance; Applicant-Initiated Interview Summary dated February 10, 2012). Even assuming – for the sake of argument only – that Belbuca® buccal films obtained significant sales and/or achieved "commercial success," Defendants are not aware of any nexus between those sales and the claims of the '866 patent, as opposed to marketing, endorsements, other patents or marketing exclusivities, or other factors unrelated to the claimed inventions. Moreover, in view of the minor differences between the prior art and the subject matter of the asserted claims of the '866 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to a POSA.

139

**(b)**     **A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is negated, or at least overwhelmed, by the existence of one or more blocking patents in the buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in *Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee

140

> of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

### 7.    Other Relevant References

One or more prior art references identified in Section I, *supra*, but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

### C.    LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS

1.    **The Asserted Claims of the '866 Patent are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled**

(a)    **Drug Delivery Device Having a Bioerodable Mucoadhesive Layer Comprising Buprenorphine in a Polymeric Diffusion Environment "Having a pH of Between About 4 and About 6"**

The asserted claims of the '866 patent require a mucoadhesive bioerodable drug delivery device comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH between about 4 and about 6 (*see* independent claims 1 and 8). The bioerodable mucoadhesive layer ~~is~~encompasses a solid layer (*see* Example 1 of the '866 patent). The patentee has not shown how to prepare a solid or solid suspension layer having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claim. Moreover, the '866 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment having a pH between about 4.0 and about 6.0.  As a result, the '866 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

142

The specification identifies a mucoadhesive bioerodable drug delivery device having at least two layers: a mucoadhesive layer comprising buprenorphine "and buffered to a pH of between about 4.0 and about 6.0," and a backing layer or barrier environment disposed relative to the polymeric diffusion environment. (*See, e.g.*, '866 patent at 2:52-62.) Example 1 of the '866 patent describes the preparation of the claimed drug delivery devices, including the preparation of the mucoadhesive and backing layers as separate blends. (*Id.* at 19:1-20:14). With respect to the mucoadhesive layer blend, Example 1 states that "[a]s the last addition step, tribasic sodium phosphate and sodium hydroxide were added to adjust the blend to a desired pH" (*id.* at 19:61-63), and "[b]atches were made having pHs of about 6, 7.25, and 8.5" (*id.* at 19:66-67). Thus, Example 1 describes the pH of the blend that is used to create the mucoadhesive layer, before the blend is mixed under vacuum, stored, and then cast onto the backing layer. (*Id.* at 19:67-20:14.) Therefore, the claimed pH range for the mucoadhesive layer is based on measurements taken of the blend composition used for producing the mucoadhesive layer, separately from the blend composition used for producing the backing layer, and before the layers are joined together to form a drug delivery device.

Claim 1 of the '866 patent, however, relates to a method of providing enhanced uptake of buprenorphine, comprising, *inter alia*, administering buprenorphine to a subject by application of a mucoadhesive bioerodable <u>drug delivery device</u>, the <u>device</u> comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of "between about 4 and about 6," and an adjacent barrier layer. Claim 8 similarly requires a mucoadhesive bioerodable drug delivery <u>device</u> comprising a bioerodable mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment that is a buffered environment

143

having a pH of "between about 4 and about 6," and a backing layer adjacent to the mucoadhesive layer. Thus, claims 1 and 8 of the '866 patent require a mucoadhesive layer, having a certain pH, and a backing layer having any pH, <u>as part of the drug delivery device</u>. A POSA would understand that the term "drug delivery device," as used in the claims, refers to the finished drug product, i.e., the device that is formed after the mucoadhesive and backing layers are joined. (*See, e.g.*, '866 patent at 2:53-62; 3:6-18; Example 1; 20:4-13.) Accordingly, the pH value recited in the claims corresponds to that of the mucoadhesive layer of the finished device.

However, nothing in the specification purports to measure or control the pH of the mucoadhesive layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together. A POSA would have been aware that, once the separate layers of the device are joined, the mucoadhesive layer can permeate into the backing layer, such that the pH of the mucoadhesive layer impacts the pH of the backing layer, and vice versa (*see, e.g.,* Furusawa at [0208], teaching that "the drug layer solution spread on the support layer permeates into the underlying support layer," such that the active agent "migrated into the support layer is affected by the pH- adjusting agent contained in the support layer," which degrades its stability; Crowley at [0134], teaching that "[s]ince the backing layer can be in intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer"). In other words, a POSA would have known that the pH of the backing layer (which is not limited by the asserted claims) can cause a change in the pH of the mucoadhesive layer. Because the pH of the backing layer is not described or limited, the backing layer can affect the pH of the mucoadhesive layer. That the pH of the backing layer can affect the pH of the mucoadhesive layer also is confirmed by the teaching in the art that an acidic backing layer can decrease degradation of the

144

active agent in the mucoadhesive layer, which occurs via pH reduction. (*See, e.g.*, Crowley at [0134]; Furusawa at [0064], [0100], [0208].)

Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, Applicants' description of the pH of the mucoadhesive layer – only before the layers are joined – would not demonstrate to a POSA that Applicants had possession of a drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 6.0. As a result, the specification fails to describe a <u>device</u> comprising a mucoadhesive layer having "a pH of between about 4.0 and about 6.0" (claim 8). There is nothing in the specification to convey to a POSA that the Applicant invented a drug delivery <u>device</u> comprising a mucoadhesive layer having a pH value within the ranges required by the '866 patent. As a result, for this additional reason, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Nor does the specification teach a POSA how to make or use a drug delivery device comprising a mucoadhesive layer having a pH value within the range required by the '866 patent, without undue experimentation. The specification provides no guidance with respect to how to measure or control the pH of the mucoadhesive layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together, nor does it provide any working examples of the characteristics of the mucoadhesive layer once it is joined with the backing layer to make the device. As discussed above, however, a POSA would have known that the pH of the backing layer (which is not limited by the asserted claims) can affect the pH of the mucoadhesive layer. Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, the description in the specification of the pH of the mucoadhesive layer – only before the layers are joined – would not enable a POSA to make a

145

drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 6.0, without undue experimentation.

As a result, for this additional reason, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 for lack of enablement.

Moreover, the asserted claims require "an effective amount of buprenorphine" disposed in a polymeric diffusion environment. The '866 patent specification explicitly defines "buprenorphine" as including "any pharmaceutically acceptable forms of buprenorphine, including, but not limited to, salts, esters, and prodrugs thereof." ('866 patent at 5:45-48.) But the '866 patent contains only two formulations containing buprenorphine free base. (*See id.* at Examples 3 & 4.) No formulations containing any pharmaceutically acceptable salts, esters, or prodrugs of buprenorphine are disclosed. Therefore, for at least this additional reason, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as lacking written description.

Additionally, because the salt, ester, or prodrug form of an active ingredient impacts the characteristics of a formulation, the '866 patent specification does not enable a POSA to practice the full scope of the invention, i.e., a buprenorphine formulation containing any pharmaceutically acceptable salt, ester, or prodrug thereof, without undue experimentation. Therefore, for at least this additional reason, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as not being enabled.

> **(b)     Polymeric Diffusion Environment Buffered to a pH of Between About 4 and About 6, About 4.5 and About 5.5, or Between About 4.5 and About 5**

The asserted claims of the '866 patent require a polymeric diffusion environment buffered to a pH of between about 4 and about 6 (*see* independent claims 1 and 8). Dependent

claims 2 and 3, which depend from claim 1, and dependent claims 9 and 10, which depend from

claim 8, further require that the pH of the polymeric diffusion environment is between about 4.5

and about 5.5 (claims 2 and 9) or between about 4.5 and about 5 (claims 3 and 10). To satisfy the

written description requirement of 35 U.S.C. § 112, the disclosure of the application must

reasonably convey to a POSA that the inventors had possession of the claimed subject matter as

of the filing date of the application.

　　　None of the pH ranges claimed in claims 1, 2-3, 8 and 9-10 is identified in the '866 patent.

Instead, the '866 patent teaches as follows:

> In one embodiment, e.g., when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5.

> In other embodiments, the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention.

('866 patent at 11:62-12:10 (emphasis added).)  Thus, the '866 patent describes a broad range of

suitable pH values for the polymeric diffusion environment, without anything pointing to the

specific – and lower – claimed range of about 4 to about 6.

　　　The '866 patent also states that "the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0,

6.5, 7.0, or 7.5, or any incremental value thereof." (*Id.* at 12:5-7 (emphasis added).) The "device"

is not the same as the polymeric diffusion environment. (*See, e.g.*, *id.* at 6:16-24; 7:24-40; 17:28-

18:67.) On the contrary, the "device" comprises at least the polymeric diffusion environment and

a barrier environment (*see, e.g.*, *id.* at 1:59-67; 2:14-19, 56-62), and optionally comprises an additional layer (*see, e.g.*, *id.* at 2:44-48; 14:54-15:2), and/or other ingredients (*id.* at 15:58-17:27). As a result, a POSA would consider the description of pH of the device to be separate and distinct from the description of the pH of the polymeric diffusion environment in particular. Nonetheless, nothing in the description of the pH of "the device" defines or discloses the range of about 4 to about 6. Nothing in the '866 patent identifies that the top end of the pH range should be 6, 5.5, or 5. Nothing in the '866 patent identifies that the bottom end of the pH range should be 4.5.

Although the '306 application contained original claims directed to, *inter alia*, a polymeric diffusion environment that is a buffered environment having a pH of between about 4 and about 6 (*see* original claims 1 and 8; *see also* original claims 2-3 and 9-10), original claim language does not necessarily satisfy the written description requirement. In the '866 patent, Applicants broadly disclosed a generic pH range of about 4.0 to about 7.5, but nothing in the '866 patent describes a pH range of about 4 to about 6. As a result, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 for failure to satisfy the written description requirement.

Additionally, the asserted claims of the '866 patent encompass any polymeric diffusion environment. The polymeric diffusion environment can have any composition, so long as it contains at least one polymer component. But the '866 patent provides only one formulation with a polymeric diffusion environment that purportedly falls within the broader asserted claims – a buprenorphine delivery device that has a mucoadhesive layer prepared using a blend buffered to a pH of 6 – and none within the narrower pH ranges. Because the asserted claims encompass innumerable buprenorphine delivery devices, undue experimentation would be required to

148

practice the full scope of the asserted claims. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this additional reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

### (c)   Barrier Layer Comprising a Polymeric Barrier Environment Disposed Adjacent to the Mucoadhesive Layer to Provide a Unidirectional Gradient Upon Application to a Mucosal Surface for the Rapid and Efficient Delivery of Buprenorphine

The asserted claims of the '866 patent encompass a barrier layer comprising any polymeric diffusion environment. The polymeric diffusion environment can have any composition, so long as it contains at least one polymer component. But the '866 patent provides only one formulation with a polymeric diffusion environment that purportedly falls within the asserted claims – a buprenorphine delivery device that has a mucoadhesive layer prepared using a blend buffered to a pH of 6. Because the asserted claims encompass innumerable buprenorphine delivery devices, undue experimentation would be required to practice the full scope of the asserted claims, especially to determine whether the particular device exhibits "rapid and efficient" delivery of buprenorphine. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

### (d)   Effective Plasma Concentration of Buprenorphine

Claim 5 of the '866 patent requires that "an effective plasma concentration of buprenorphine is maintained for at least 4 hours" by the method of providing enhanced uptake of buprenorphine that is set forth in claim 1. The requirement for the maintenance of an effective plasma concentration for "at least 4 hours" encompasses the maintenance of an effective plasma concentration for any time period that is greater than or equal to 4 hours, including, for example,

149

for 50 hours, for 100 hours, or even longer – without any maximum or other limitation.  To satisfy the enablement requirement, the specification of a patent must teach a POSA how to make and use the full scope of the claimed invention without "undue experimentation." The specification of the '866 patent does not enable a POSA to make or use a drug delivery device capable of providing an effective plasma concentration of buprenorphine for such extended time periods, such that claim 5 is invalid as not enabled.

 More specifically, the specification states as follows:

> In some embodiments of the above methods and devices, an effective amount is delivered transmucosally. In other embodiments, an effective amount is delivered transmucosally and by gastrointestinal absorption. In still other embodiments, an effective amount is delivered transmucosally, and delivery though the gastrointestinal absorption augments and/or maintains treatment, e.g., pain relief for a desired period of time, e.g., at least 1, 1.5, 2, 2.5, 3, 3.5, or 4 or more hours.

('866 patent at 7:64-8:5.)

 Figure 3 of the '866 patent (reproduced below) illustrates an upper limit of about 16 hours for the maintenance of a <u>detectable</u> plasma buprenorphine concentration, which (even assuming, for the sake of argument only, that a "detectable" concentration is an "effective" concentration), represents only a very small portion of the number of hours encompassed by claim 5.



Figure 3. Mean (SD) Buprenorphine Concentration Over Time Comparing an Exemplary Device According To The Present Invention and Conventional Buprenorphine Delivery

The specification does not describe a method that maintains an effective plasma concentration of buprenorphine for longer than 16 hours. Nor does the specification provide guidance to a POSA with respect to the maintenance of an effective buprenorphine concentration for time periods longer than 16 hours, let alone for the infinite number of longer time periods encompassed by claim 5. As a result, the specification of the '866 patent does not enable a POSA to practice the full scope of claim 5 without undue experimentation. Thus, claim 5 is invalid under 35 U.S.C. § 112 for lack of enablement.

Moreover, because the inventors did not "possess" a buprenorphine delivery device that maintains an effective buprenorphine concentration for time periods longer than 16 hours. Thus, claim 5 is invalid under 35 U.S.C. § 112 as lacking written description.

<span style="color:red">**(e)      The Claimed Layers Are Not Limited to Solid Layers**</span>

<span style="color:red">On December 20, 2019, the Court held that "layer" in the terms "a bioerodable mucoadhesive layer" and "a barrier layer" in claims 1-12 was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7. However, the '866 patent specification</span>

151

does not provide any descriptions of a device with non-solid mucoadhesive or barrier layers. Rather, the specification only describes solid layers for the mucoadhesive and barrier layers. *See, e.g.*, Example 1 (explaining how the mucoadhesive layer is cast, cured, and dried) and Figure 4 (showing the flux of medicament through the device in substantially one direction, but never passing into or through the barrier). The patentee has not shown how to prepare a non-solid bioerodable mucoadhesive layer or a non-solid barrier layer. Because the '866 patent does not reasonably convey to a POSA that the inventors had possession of the full scope of the claimed device, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Additionally, the patentee has not shown how to prepare or administer a device with a non-solid bioerodable mucoadhesive layer or a non-solid barrier layer. Because the '866 patent specification does not enable a POSA to practice the full scope of the invention without undue experimentation, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as not being enabled.

Under the Court's construction, the asserted claims further encompass a device—having non-solid mucoadhesive and barrier layers—that provides "enhanced uptake of buprenorphine" and "rapid and efficient delivery of buprenorphine." *See* independent claims 1 and 8. However, the '866 patent specification does not provide any descriptions of a device with non-solid mucoadhesive or barrier layers, let alone one that provides "enhanced uptake of buprenorphine" or "rapid and efficient delivery of buprenorphine." Because the '866 patent does not reasonably convey to a POSA that the inventors had possession of the full scope of the claimed device under the Court's claim construction, the asserted claims are invalid for lack of written description. The patentee has also not shown a POSA how to prepare or administer a device with non-solid layers

152

exciting the claimed "enhanced uptake of buprenorphine" and "rapid and efficient delivery of buprenorphine" and therefore has not enabled the full scope of the claim.

### 2. The Asserted Claims of the '866 Patent ~~are~~Are Invalid Under 35 U.S.C. § 112 as Indefinite

The asserted claims of the '866 patent require the administration of a mucoadhesive bioerodable drug delivery device to provide "rapid and efficient delivery of buprenorphine" (*see* independent claims 1 and 8). To comply with the definiteness requirement of 35 U.S.C. § 112, however, a claim, when read in light of the specification and the prosecution, must inform a POSA, "with reasonable certainty," about the scope of the invention. Because the term "rapid and efficient delivery" has no clear or accepted objective meaning, and is not objectively defined by the specification, the asserted claims of the '866 patent are invalid as indefinite.

More specifically, the specification does not provide a POSA with a standard to determine whether a device provides "rapid and efficient delivery of buprenorphine." While the specification describes that the claimed devices and methods provide a "rapid onset" (*see* '866 patent at 4:32-38; 8:59-63; 9:18-28), and "efficient delivery" of the drug (*id.* at 4:42-45; 9:18-28; 11:9-15), nothing in the specification defines "rapid" or "efficient."

The specification also provides pharmacokinetic data associated with the delivery of fentanyl, but this is not relevant to the claimed delivery of buprenorphine, nor does it objectively define "rapid and efficient delivery." (*See, e.g.*, *id.* at 8:6-20; Example 2; 20:15-25:43.) Table 4 of the '866 patent provides pharmacokinetic data, i.e., $t_{first}$, $t_{max}$, $C_{first}$, $C_{max}$, associated with the delivery of buprenorphine, and Figure 4 illustrates buprenorphine plasma concentration over time for four different delivery devices, as follows:

TABLE 4

Pharmacokinetic data for buprenorphine

| | pH | |
|---|---|---|
| | 6 | 7.25 |
| $t_{first}$ (hr) | 0.75 | 0.75 |
| $C_{first}$ (ng/mL) | 0.0521 | 0.0845 |
| $t_{max}$ (hr) | 3 | 3 |
| $C_{max}$ (ng/mL)[1] | 1.05 | 0.86 |

**Figure 3. Mean (SD) Buprenorphine Concentration Over Time Comparing an Exemplary Device According To The Present Invention and Conventional Buprenorphine Delivery**



However, nothing in the specification identifies the pharmacokinetic parameters or standards that are necessary for "rapid" buprenorphine delivery, or for "efficient" buprenorphine delivery. "Rapid" and "efficient" are terms of degree, yet the specification fails to provide a benchmark for determining whether a method or a drug delivery device meets these standards. Without a standard provided by the patent, the issue of whether a method or drug delivery device achieves "rapid and efficient" buprenorphine delivery is "purely subjective" and depends "on the unpredictable vagaries of any one person's opinion." The '866 patent does not provide

objective boundaries for a POSA to determine whether a particular method or drug delivery device provides "rapid and efficient" buprenorphine delivery. As a result, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as indefinite.

Additionally, the preamble of the asserted claims are directed to a "method for providing enhanced uptake of buprenorphine" (claim 1). "Enhanced uptake" requires a comparison between the claimed delivery device and a standard. However, the '866 patent does not provide a standard for comparison. Without a standard provided by the patent, the issue of whether a method of delivery device achieves an "enhanced uptake" is purely subjective and depends "on the unpredictable vagaries of any one person's opinion." The '866 patent does not provide objective boundaries for a POSA to determine whether a particular method or drug delivery device provides "rapid and efficient" buprenorphine delivery. As a result, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

Moreover, the asserted claims require a "a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6" (claim 1). The '866 patent explicitly defines "polymeric diffusion environment" as "an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion of the polymeric diffusion environment to a mucosal surface." ('866 patent at 6:16-19.) The '866 patent also indicates that the mucoadhesive polymeric diffusion environment was prepared as a blend having particular pH values and then cast onto the backing layer, cured in an oven, and dried, yielding a solid layer. (*Id.* at Example 1.) The '866 patent also discloses that "the mucoadhesive polymeric diffusion environment is a layer with a buffered pH such that a desired pH is maintained at the mucosal administration site." (*Id.* at 9:29-31.)

Therefore, the '866 patent indicates that the pH of the polymeric diffusion environment making up the bioerodable mucoadhesive layer can be measured under three different conditions – the solid mucoadhesive layer, the blend used to make the mucoadhesive layer, and at the mucosal administration site. Because the conditions at which the pH is determined can influence the measured pH, such as volume size, the '866 patent does not clarify as to how to determine the pH of the polymeric diffusion environment. As a result, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

As discussed above, on December 20, 2019, the Court held that "layer" in the term "a bioerodable mucoadhesive layer" in the asserted claims was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7. But patentees, during the Markman Hearing asserted that the "layer" is "not a liquid, it's not a gas." *Id.* at 38:10-11. Because it is unclear as to what "layer" means, the asserted claims of the '866 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

Dependent claim 4 recites that "a first quantifiable plasma concentration of buprenorphine is observed at about 45 minutes." However, the first quantifiable concentration, and thus the time of the first quantifiable concentration, varies depending, *inter alia,* upon the equipment used to measure drug concentration (with more sensitive equipment providing a lower first quantifiable concentration and thus a faster time of first quantifiable concentration, and *vice versa*) and, to some extent, the skill, judgment and whim of the analytical technician. As a result, claim 4 of the '866 patent is invalid under 35 U.S.C. § 112 as being indefinite.

Dependent claim 5 recites that "an effective plasma concentration of buprenorphine is maintained for at least 4 hours." An "effective plasma concentration" varies from subject to

subject and therefore is subjective. As a result, claim 5 of the '866 patent is invalid under 35 U.S.C. § 112 as being indefinite.

## IV.   **THE '843 PATENT**

### A.   ASSERTED CLAIMS OF THE '843 PATENT

The '843 patent contains 25 claims, of which claims 1-4, 6-10, 12-16, 18-22, and 24-25 are asserted. The asserted claims read as follows:

> 1. A method for delivering buprenorphine to a human comprising: administering a mucoadhesive biodegradable drug delivery device for transmucosal delivery, the device comprising: a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5, and a polymeric barrier environment disposed adjacent to the mucoadhesive layer, and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface.
>
> 2. The method of claim 1, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer.
>
> 3. The method of claim 1, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer.
>
> 4. The method of claim 1, wherein the polymeric diffusion environment has a pH of between about 4 to about 6.
>
> 6. The method of claim 1, wherein the biodegradable drug delivery device further comprises a third layer or coating.
>
> 7. The method of claim 1, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5.
>
> 8. The method of claim 1, wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6.
>
> 9. The method of claim 7, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer.

157

10. The method of claim 7, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer.

12. The method of claim 7, wherein the biodegradable drug delivery device further comprises a third layer or coating.

13. A device for delivering buprenorphine to a human, the device comprising: a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5; and a polymeric barrier environment disposed adjacent to the mucoadhesive layer, and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface of a human.

14. The device of claim 13, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer.

15. The device of claim 13, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer.

16. The device of claim 13, wherein the polymeric diffusion environment has a pH of between about 4 and about 6.

18. The device of claim 13, wherein the biodegradable drug delivery device further comprises a third layer or coating.

19. The device of claim 13, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5.

20. The device of claim 13, wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6.

21. The device of claim 19, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer.

22. The device of claim 19, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer.

24. The device of claim 19, wherein the biodegradable drug delivery device further comprises a third layer or coating.

158

25. A method for treating pain, the method comprising: adhering a mucoadhesive biodegradable drug delivery device to a buccal surface of a human, the device comprising: a bioerodible mucoadhesive layer comprising a therapeutically effective amount of buprenorphine for treating pain disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5; and a polymeric barrier environment disposed adjacent to the mucoadhesive layer wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to the buccal surface.

**B.    ANTICIPATION AND OBVIOUSNESS**

The following claim-by-claim analysis of the asserted claims of the '843 patent is exemplary only.  Providing this analysis in view of certain of the prior art cited in Exhibit A does not waive any future assertion of any art or any combination of art contained in Exhibit A or Exhibit B. The assertion of a combination here does not imply that there are no other combinations or that this is the only combination on which Defendants intend to rely.

**1.    Earliest Possible Priority Date of the '843 Patent**

U.S. Patent No. 9,655,843, entitled "Transmucosal Delivery Devices with Enhanced Uptake," issued on May 23, 2017, from U.S. Patent Application No. 15/212,912 ("the '912 application"), filed on July 18, 2016, which is a continuation of U.S. Patent Application No. 14/746,168 ("the '168 application"), filed on June 22, 2015, which is a continuation of U.S. Patent Application No. 13/413,112 ("the '112 application"), filed on March 6, 2012, which is a continuation of U.S. Patent Application No. 13/184,306 ("the '306 application"), filed on July 15, 2011, which is a continuation of U.S. Patent Application No. 11/817,915 ("the '915 application"), filed on October 6, 2009, which is the national stage entry of International Patent Application No. PCT/US2007/016634, filed on July 23, 2007. The '843 patent also claims the benefit of U.S. Provisional Patent Application Nos. 60/839,504 ("the '504

provisional application"), filed on August 23, 2006, 60/832,725 ("the '725 provisional application"), filed on July 21, 2006, and 60/832,726 ("the '726 provisional application"), filed on July 21, 2006.

Based on the face of the '843 patent, the earliest possible priority date and also the earliest possible effective filing date for the '843 patent is July 21, 2006. However, as discussed above for the '866 patent regarding the pH value of the bioerodable mucoadhesive layer limitation, the asserted claims are not entitled to the filing date of the '504 provisional application, the '725 provisional application, or the '726 provisional application.

The asserted claims of the '843 patent are not enabled and/or lack written description by the '843 patent specification for the additional reasons discussed below. For at least the same reasons as discussed below, the claims of the '843 patent specification are not enabled and/or described by the '168 application, the '112 application, the '306 application, the '915 application, the '504 provisional application, the '725 provisional application, or the '726 provisional application. Therefore, for this additional reason, the asserted claims of the '866 patent are not entitled to the filing date of the '168 application, the '112 application, the '306 application, the '915 application, the '504 provisional application, the '725 provisional application, or the '726 provisional application.

### 2. Claims 1, 4, 8, 16 and 20 Are Anticipated by Vasisht

Because claims 4, 8, 16, and 20 of the '843 patent are entitled to a filing date of no earlier than July 18, 2016, Vasisht is prior art to claims 4, 8, 16, and 20 of the '843 patent under 35 U.S.C. § 102(a) (AIA). For the reasons described below, Vasisht anticipates the subject matter of claims 1, 4, 8, 16, and 20 of the '843 patent.

### (a) Claim 1

160

(i) **"A method for delivering buprenorphine to a human comprising"**

Vasisht "provides transmucosal devices for enhanced uptake of a medicament and methods of using the same." (Vasisht at [0004].) More specifically:

> In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject.

(*Id.* at [0010].) The method described in Vasisht is for delivering buprenorphine to a human.

(*See, e.g.*, *Id.* at Figure 3; [0022].)

Thus, Vasisht provides the method required by the preamble of claim 1.

(ii) **"administering a mucoadhesive biodegradable drug delivery device for transmucosal delivery, the device comprising"**

Vasisht is directed to "methods for enhancing direct transmucosal delivery of buprenorphine to a subject," by "administering a bioerodable drug delivery device to an oral mucosal surface of the subject," where in the device includes buprenorphine disposed in a mucoadhesive polymeric diffusion environment, and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject. (Vasisht at [0010].)

To the extent that the description of a "bioerodible" device encompasses a "biodegradable" device, Vasisht teaches this requirement of claim 1.

161

        (iii)      **"a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment"**

The method of Vasisht generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment, such that the effective amount of the buprenorphine is delivered in less than about 30 minutes. (*Id.* at [0011].) In particular:

> [T]he present invention provides a flexible, bioerodable mucoadhesive delivery device suitable for direct transmucosal administration of an effective amount of a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative to a subject. The mucoadhesive device includes a mucoadhesive layer comprising a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative disposed in a polymeric diffusion environment [having a certain pH].

(*Id.* at [0019].)

Thus, Vasisht discloses "a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment," as required by claim 1.

        (iv)      **"wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5"**

Vasisht states that when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. (*Id.* at [0060].) Thus, Vasisht explicitly discloses this limitation of claim 1.

        (v)      **"and a polymeric barrier environment disposed adjacent to the mucoadhesive layer"**

Vasisht also describes that the mucoadhesive device includes a backing layer comprising a barrier environment which is disposed adjacent to and coterminous with the mucoadhesive layer. (*Id.* at [0074].) Thus, Vasisht explicitly discloses "a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer," as required by claim 1.

(vi)    **"and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface"**

Vasisht teaches that the barrier environment of its bioerodable drug delivery device is disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject. (*Id.* at [0012].) More specifically:

> [I]t is believed that delivery of the medicament is particularly effective because the mucoadhesive polymeric diffusion environment (e.g., the pH and the ionic nature of the polymers) is such that the medicament (e.g., a weakly basic drug such as fentanyl or buprenorphine) can rapidly move through the mucoadhesive polymeric diffusion environment to the mucosa, while also allowing efficient absorption by the mucosa.

(*Id.* at [0047].)

Vasisht defines the "unidirectional gradient" as follows:

> [T]he term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (e.g., fentanyl or buprenorphine) through the device, e.g., through a polymeric diffusion environment, in substantially one direction, e.g., to the mucosa of a subject. For example, the polymeric diffusion environment may be a mucoadhesive polymeric diffusion environment in the form of a layer or film disposed adjacent to a backing layer or film. Upon mucoadministration, a gradient is created between the mucoadhesive polymeric diffusion environment and the mucosa, and the medicament flows from the mucoadhesive polymeric diffusion environment, substantially in one direction towards the mucosa.

(*Id.* at [0034].)

The device of Vasisht may be administered to the buccal mucosa. (*See, e.g.*, *id.* at [0037].) Thus, Vasisht discloses the subject matter of claim 1.

(b)    **Claims 4 and 8**

163

Claim 4 depends from claim 1 and recites that the polymeric diffusion environment has a pH between about 4 to about 6, and claim 8 depends from claim 1 and requires that the polymeric diffusion environment has a pH buffered to between about 4 to about 6. Vasisht discloses:

> In one embodiment, e.g., when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5 . . . .
>
> The pH of the mucoadhesive polymeric diffusion environment can be adjusted and/or maintained by methods including, but not limited to, the use of buffering agents, or by adjusting the composition of the device of the present invention. For example, adjustment of the components of the device of the present invention that influence pH, e.g., the amount of anti-oxidant, such as citric acid, contained in the device will adjust the pH of the device.

(*Id.* at [0060]-[0061].)

Thus, Vasisht discloses each and every limitation of claims 4 and 8, such that claims 4 and 8 are both anticipated by Vasisht.

### (c)     Claims 13, 16 and 20

Claims 16 and 20 depend from claim 13. The device of claim 13 is encompassed by the method of claim 1. Thus, for at least the same reasons as claim 1, Vasisht also discloses the subject matter of claim 13.

Claim 16 further requires that the polymeric diffusion environment has a pH between about 4 to about 6, and claim 20 further requires that the polymeric diffusion environment has a pH buffered to between about 4 to about 6. Vasisht discloses:

> In one embodiment, e.g., when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about

7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5….

The pH of the mucoadhesive polymeric diffusion environment can be adjusted and/or maintained by methods including, but not limited to, the use of buffering agents, or by adjusting the composition of the device of the present invention. For example, adjustment of the components of the device of the present invention that influence pH, e.g., the amount of anti-oxidant, such as citric acid, contained in the device will adjust the pH of the device.

(*Id.* at [0060]-[0061].)

Thus, Vasisht discloses each and every limitation of claims 16 and 20, such that the subject matter of claims 16 and 20 is anticipated by Vasisht.

> **3.      The Asserted Claims of the '843 Patent Would Have Been Obvious Over Tapolsky I and/or Moro in Combination with Todd, in Further View of One or More of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang**
>
> > **(a)      Claim 1**
> >
> > > **(i)      "A method for delivering buprenorphine to a human comprising"**

Tapolsky I teaches a method of direct transmucosal drug delivery by using a bioerodable device that delivers a drug upon application to a mucosal surface of a subject. (Tapolsky I at [0024].) The device of Tapolsky I "yields fast onset of activity, excellent bioavailability, and sustained drug delivery." (*Id.* at [0131].) Drugs suitable for use in the method of Tapolsky I include anti- inflammatory analgesics. (*Id.* at [0046].) Buprenorphine is a known anti-inflammatory analgesic. (*See, e.g.*, Kramaric at 8:47-49; Volker at summary.) As a result, it would have been obvious to a POSA to use buprenorphine in the delivery device of Tapolsky I. The device and method of Tapolsky I relate to the delivery of buprenorphine to a human (*see, e.g.,* Tapolsky I at [0027]), stating "the user of the present invention does not have to remove the

165

device following treatment"; *Id.* at Example 20; [0100], noting that participants in the study "were asked to evaluate the disk's handling and numbing effect," "the time necessary for adhesion," and any "foreign body sensation," as well as "the overall effectiveness of the disk and their overall impression").

Similarly, Moro discloses a method of transmucosal drug delivery by using a mucoadhesive bioerodable drug delivery device for direct transmucosal administration of a drug to a subject. (Moro at Abstract; [0071].)  The device in Moro has "an effective residence time that can be tailored to deliver therapeutics over different time intervals." (*Id.* at [0010].) Moro expressly teaches incorporating an effective amount of buprenorphine in the bioerodable mucoadhesive layer of its device. (*Id.* at [0031]; [0064].) The device and method of Moro relate to the delivery of buprenorphine to a human (*see, e.g.*, *id.* at Example 10; [0092], ascertaining the in-vivo performance of drug delivery devices of the examples, including based on "[p]arameters such as initial tack, comfort and residence time").

Thus, each of Tapolsky I and Moro discloses a method for delivering buprenorphine to a human subject by direct transmucosal delivery. Indeed, a POSA would have been aware that the prior art in general teaches direct transmucosal delivery to deliver drugs such as buprenorphine in particular.  Das teaches the use of mucoadhesive films to provide direct transmucosal administration of buprenorphine. (Das at pp. 89- 90.) Das "hypothesize[s] that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." (*Id.* at p. 90.) (*See also* Chen at 1:26-28, 3:25-28, 5:8-12, 6:19-29, 10:28; Yang at [0002]; [0013]; [0014]; [0133]; [0209]-[0211]; Chiang at Abstract, S45.)

166

Todd describes buprenorphine as a "potent antagonist analgesic with good bioavailability following sublingual administration." (Todd at Abstract.) More specifically, Todd teaches the use of a buffered environment at a pH of 4-6, including at a pH of 5 or 6, in particular, to optimize transmucosal uptake of buprenorphine.

In view of the teachings of the prior art, a POSA would have been motivated to use direct transmucosal delivery to deliver buprenorphine to a human, and would have had a reasonable expectation of successfully doing so.

> (ii)   **"administering a mucoadhesive biodegradable drug delivery device for transmucosal delivery, the device comprising"**

Tapolsky I teaches a bioerodable device that delivers a drug upon its application to mucosal surface of a subject, including surface within the mouth. (Tapolsky I at [0024]; [0128].) To the extent that the description of a "bioerodible" device discloses a "biodegradable" device, Tapolsky I teaches this limitation of claim 1. Drugs suitable for the device of Tapolsky I include anti-inflammatory analgesics (*id.* at [0046]), such as buprenorphine, which is a known anti-inflammatory analgesic. (*See, e.g.*, Kramaric at 8:47-49; Volker at summary.)

Moro also discloses a mucoadhesive, bioerodable drug delivery device for the direct transmucosal administration of a drug, such as buprenorphine, to a subject by application to oral mucosa. (Moro at Abstract; [0010]; [0031]; [0071].) To the extent that the description of a "bioerodible" device discloses a "biodegradable" device, Moro teaches this limitation of claim 1.

The use of mucoadhesive bioerodable devices to deliver drugs, such as buprenorphine, in particular, by application to the oral mucosa was well known to a POSA. (*See* Das at pp. 90, 91-92; Chen at 3:30-4:16, 6:19-29, 7:25-30; Yang at [0002]; [0014]; [0133]; [0209]-[0211].) A POSA would have had a reasonable expectation of successfully administering buprenorphine by

the use of a mucoadhesive bioerodable drug delivery device. Tapolsky I, for example, describes that its device "minimizes the discomfort associated with application of a foreign substance for a period of time sufficient to provide effective drug delivery to the treatment site" (Tapolsky I at [0026]), and "offers the advantages of an effective residence time with minimal discomfort and ease of use, and is an appropriate vehicle for the local, as well as systemic, delivery of pharmaceutical, given its thinner, flexible form." (*Id.* at [0026].)

Moro, similarly, teaches that "[t]he device causes minimum discomfort, is easy to use and provides an effective residence time that can be tailored to deliver therapeutics over different time intervals" (Moro at [0010]), and maximizes "the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids" (*id.* at [0046]).

> (iii) **"a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment"**

Tapolsky I discloses a device that contains a bioerodable mucoadhesive layer including at least one film-forming polymer and one bioadhesive polymer, such that the polymer chains of the mucoadhesive layer and glycoproteins of the mucosal tissue interact in a way as to assure adhesion. (Tapolsky I at [0002]; [0022]; [0024]-[0025]; [0027]; [0030]-[0031].) Thus, the mucoadhesive layer of Tapolsky I provides a polymeric diffusion environment. Tapolsky I teaches that the drug, such as an anti-inflammatory analgesic like buprenorphine, preferably is placed within the polymeric diffusion environment of the device. (*See id.* at [0030], [0045]; *see also* Kramaric at 8:47-49; Volker at summary.)

The device of Moro contains a water-soluble, bioerodable mucoadhesive layer. (Moro at [0010]-[0011].) Also, the mucoadhesive layer of Moro contains at least a film-forming polymer

and a bioadhesive polymer, and provides a polymeric diffusion environment. (*See id.* at [0010].) Moro teaches that an effective amount of buprenorphine can be disposed in the polymeric diffusion environment. (*Id.* at [0016]; [0031]; [0064].)

The use of a polymeric diffusion environment to contain an active agent such as buprenorphine, within a bioerodable mucoadhesive layer of a transmucosal delivery device was well known to a POSA. For example, Das discloses mucoadhesive polymer film formulations of buprenorphine for application to sublingual mucosa, which include polymers such as Carbopol to create an aqueous gel system, and which include plasticizers such as PEG, to improve the mucoadhesion properties of the polymers. (Das at pp. 90, 92.)

Each Chen and Yang also discloses a mucoadhesive layer comprising an effective amount of a drug dispersed in a polymeric diffusion environment. (*See* Chen at 3:30-4:, 5:13-25, 6:19-29, 7:25-30, 8:19-9:18; Yang at [0002]; [0014]-[0017]; [0133]; [0209]-[0211].)

In view of the teachings of the prior art, discussed above, a POSA would have had a reasonable expectation of successfully disposing an effective amount of buprenorphine in a polymeric diffusion environment within a bioerodable mucoadhesive layer.

> **(iv)** **"wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5"**

A POSA would have known that a pH in the range of 4 to 7.5 would optimize the transmucosal delivery of buprenorphine. In particular, Todd reports:

> We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400μg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's.

169

(Todd at 2:11-17.) Todd also discloses and claims buffering the composition "to between pH 4.5 to 5.5." (*Id.* at 2:21-3:2; claim 1.) (*See also* Birch at pp. 9, 14, 38-40; Quay at [0363], [00481]; Besse at [0075].)

During prosecution of the '912 application, Applicant submitted a declaration by Dr. Niraj Vasisht stating that the buprenorphine in the compositions of Todd "may merely migrate into another aqueous solution, the saliva, while the solution is in the subject's mouth" (Declaration of Dr. Niraj Vasisht Under 37 CFR § 1.132, dated March 27, 2017, submitted during prosecution of U.S. Patent Application No. 15/212,912, at ¶ 8). Contrary to Applicant's speculative argument about what buprenorphine "may" do in the context of Todd, Todd expressly states that buprenorphine migrated directly to the mucosa and into the blood at pH 4-6, and that "the degree of uptake of the drug was greater at the two higher pH's," i.e., at pH 5 and at pH 6. (Todd at 2:11-17.) The "uptake of the drug" as a result of the administration of a sublingual solution of buprenorphine is not indicative of mere migration of buprenorphine into the saliva. Chiang, for example, reports that the sublingual bioavailability of buprenorphine from three different studies of sublingual solution formulations varied between 30% and 51% of the intravenous bioavailability. (Chiang at S43, Table 2.) Additionally, Chiang reports that the bioavailability of buprenorphine from sublingual tablets is about 70% that from sublingual solutions. (*Id.* at S44.) Todd is highly relevant to the subject matter claimed by the '866 patent.

Todd would have motivated a POSA to provide buprenorphine in a polymeric diffusion environment having a pH between about 4 and about 7.5, using a buffer as necessary, and especially at a pH of around 5, in a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky I and Moro.

170

A POSA would have had a reasonable expectation of successfully doing so, considering the recognition in the art of the importance of pH, and teaching of the prior art that buffers were routinely used to control the pH of transmucosal films. (*See, e.g.*, Tapolsky I at [0040]; Yang at [0161], [0210]; Chen at Examples 1, 2, and 4-8.)

> **(v)    "and a polymeric barrier environment disposed adjacent to the mucoadhesive layer"**

Tapolsky I teaches a backing layer that serves as a barrier layer in its device by protecting the adhesive layer. (Tapolsky I at [0030].)  In particular, Tapolsky I teaches that the backing layer is adjacent to the mucoadhesive layer and includes "film-forming pharmaceutically acceptable polymer[s]" to provide a polymeric barrier environment. (*Id.* at [0035], [0065]; Figure 1 and 2.)

Moro also discloses a backing layer, which is adjacent to the mucoadhesive layer, and preferably "act[s] as a casing and support surface on which the adhesive layer is prepared." (Moro at [0010]-[0012].) Moro provides a polymeric barrier environment within the backing layer, using polymers described as suitable for the backing layer of the '866 patent. (*Id.* at [0010]; '866 patent at 15:28-41.)

> It was well-known to a POSA to employ a polymeric barrier layer adjacent to the mucoadhesive layer of a transmucosal delivery device (*see, e.g.*, Chen at 4:31-32; Yang at [0175]). A POSA would have had a reason to include a backing layer in a mucoadhesive bioerodable drug delivery device, to protect the drug layer and facilitate delivery of the drug to the mucosa.

(*See, e.g.*, Tapolsky I at [0030]; [0058].)

> **(vi) "and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface"**

171

Tapolsky I teaches that the thickness and surface area of the backing layer can be adjusted to facilitate a unidirectional gradient across the polymeric diffusion environment when the device is applied to a mucosal surface, including the buccal mucosa in particular. (Tapolsky I at [0014]; [0021]; [0057]-[0062]; [0128]; [0131]; Figure 2.) The device of Tapolsky I provides fast onset of activity, excellent bioavailability, and sustained delivery, i.e., "rapid and efficient" delivery of a drug, including an anti-inflammatory analgesic like buprenorphine in particular. (*Id.* at [0026], [0046], [0131]; *see also* Kramaric at 8:47-49; Volker at summary.)

The backing layer of Moro also creates a unidirectional gradient, which delivers the drug across the polymeric diffusion environment upon application of the delivery device to a mucosal surface. (Moro at [0046].) The residence time of the drug delivery device "is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the coating solution." (*Id.* at [0046].) Therefore, the device of Moro provides "rapid and efficient" delivery of a drug, such as buprenorphine in particular. (*Id.* at [0031]; [0064].)

Thus, the use of a unidirectional gradient to provide efficient delivery of an active agent for transmucosal administration was well-known to a POSA, to facilitate the effective delivery of an active agent to a mucosal surface, such as the buccal mucosa in particular. (*See also* Chen at 8:8-10, stating "[f]or purposes of oral delivery, the films may be applied on lingual, sublingual, buccal, gingival, and palatal surfaces.") In view of the results reported in the prior art, a POSA would have had a reasonable expectation of creating a unidirectional gradient to efficiently deliver an active agent, such as buprenorphine, to the buccal surface. (*See, e.g.*, Tapolsky I at [0026], [0046], [0131]; Moro at [0031], [0064].) Tapolsky I, for example, reports that the results of buccal administration of its delivery device "illustrate that systemic delivery can be achieved

172

with the pharmaceutical carrier devices of the invention," which "yield fast onset of activity, excellent bioavailability, and sustained delivery." (Tapolsky I at [0131].)

In view of the foregoing, the subject matter of claim 1 of the '843 patent would have been *prima facie* obvious to a POSA.

### (b)   Claim 2

Claim 2 depends from claim 1 are requires that "the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer." It was well-known and routine to a POSA to include film-forming water-erodible adhesive polymers and bioadhesive polymers in the polymeric diffusion environment of a mucoadhesive drug delivery device. (*See, e.g.*, Tapolsky I at [0031]-[0032]; Moro at [0010].) The use of these types of polymers to create and maintain a polymeric diffusion environment within a mucoadhesive drug delivery device for transmucosal administration was well known to a person of ordinary skill in the art. Thus, the subject matter of claim 2 would have been *prima facie* obvious to a POSA.

### (c)   Claim 3

Claim 3 depends from claim 1, and further requires that the "polymeric barrier environment comprises at least one film-forming water-erodible polymer." It was well-known and routine to a POSA to include at least one film-forming water-erodible polymer in the barrier environment of a mucoadhesive drug delivery device. (*See, e.g.*, Tapolsky I at [0035]; Moro at [0010].) Thus, the subject matter of claim 3 would have been *prima facie* obvious to a POSA.

### (d)   Claim 4

Claim 4 depends from claim 1, and further requires that "the polymeric diffusion environment has a pH of between about 4 to about 6." Todd teaches the use of sublingual

173

buprenorphine compositions buffered to a pH of 4.5 to 5.5. (Todd at Abstract; 2:21-3:2; Examples 1-13, and claim 1.)  In view of the teachings of Todd regarding the beneficial sublingual uptake of buprenorphine at a pH value as low as 4, especially at a pH buffered to between 4.5-5.5, it would have been obvious to a POSA to provide a polymeric diffusion environment having a pH between about 4 and about 6. Thus, the subject matter of claim 4 would have been *prima facie* obvious to a POSA.

### (e)     Claim 6

Claim 6 depends from claim 1, and further requires that the device further comprises a third layer or coating. A POSA was aware that biodegradable drug delivery devices routinely include multiple layers, including three layers in particular. (*See, e.g.*, Tapolsky I at [0014]; Moro at [0071].) It would have been a matter of routine optimization for a POSA to include a third layer or coating in a mucoadhesive drug delivery device for transmucosal delivery, including in the devices of Tapolsky I and Moro. Thus, the subject matter of claim 6 would have been *prima facie* obvious to a POSA.

### (f)     Claims 7 and 8

Claims 7 and 8 depend from claim 1, and further require that the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5, and that the polymeric diffusion environment has a pH buffered to between about 4 to about 6, respectively.  The prior art teaches the importance of pH in transmucosal delivery devices, and teaches that buffers were routinely used to control the pH of transmucosal films in particular. (*See, e.g.*, Tapolsky I at [0040]; Yang at [0161], [0210]; Chen at Examples 1, 2 and 4-8.) Todd would have motivated a POSA to provide buprenorphine in a polymeric diffusion environment having a pH buffered to between about 4 and about 7.5, and especially at a pH of around 5. In view of the teachings of Todd

174

regarding the beneficial sublingual uptake of buprenorphine at a pH value as low as 4, a POSA would have had a reasonable expectation of successfully delivering buprenorphine to a human using the mucoadhesive bioerodable drug delivery device taught by Tapolsky I or Moro, buffered to a pH between 4 and 6. Thus, the subject matter of claims 7 and 8 would have been *prima facie* obvious to a POSA.

### (g)   Claim 9

Claim 9 depends from claim 7, and further requires that "the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer." For at least the same reasons as claims 1, 2, and 7, the subject matter of claim 9 would have been *prima facie* obvious to a POSA.

### (h)   Claim 10

Claim 10 depends from claim 7, and further requires that the "polymeric barrier environment comprises at least one film-forming water-erodible polymer."  For at least the same reasons as claims 1, 3, and 7, the subject matter of claim 10 would have been *prima facie* obvious to a POSA.

### (i)   Claim 12

Claim 12 depends from claim 7, and further requires that the device further comprises a third layer or coating. A POSA was aware that biodegradable drug delivery devices routinely include multiple layers, including three layers in particular. (*See, e.g.*, Tapolsky I at [0014]; Moro at [0071].) It would have been a matter of routine optimization for a POSA to include a third layer or coating in a mucoadhesive drug delivery device for transmucosal delivery, including in the devices of Tapolsky I and Moro. The subject matter of claim 12 would have been *prima facie* obvious to a POSA.

### (j)   Claim 13

175

The device of claim 13 is encompassed by the method of claim 1. Thus, for at least the same reasons as claim 1, the subject matter of claim 13 of the '843 patent would have been *prima facie* obvious to a POSA.

### (k)    Claim 14

Claim 14 depends from claim 13, and further requires that "the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer." It was well-known and routine to a POSA to include film-forming water-erodible adhesive polymers and bioadhesive polymers in the polymeric diffusion environment of a mucoadhesive drug delivery device. (*See, e.g.*, Tapolsky I at [0031]-[0032]; Moro at [0010].) The use of these types of polymers to create and maintain a polymeric diffusion environment within a mucoadhesive drug delivery device for transmucosal administration was well known to a person of ordinary skill in the art. Thus, the subject matter of claim 14 would have been obvious to a POSA.

### (l)    Claim 15

Claim 15 depends from claim 13, and further requires that the "polymeric barrier environment comprises at least one film-forming water-erodible polymer."  For at least the same reasons as claims 1, 3, and 13, the subject matter of claim 15 would have been *prima facie* obvious to a POSA.

### (m)    Claim 16

Claim 16 depends from claim 13, and further requires that "the polymeric diffusion environment has a pH of between about 4 to about 6." For at least the same reasons as claims 1, 4, and 13, the subject matter of claim 16 would have been *prima facie* obvious to a POSA.

### (n)    Claim 18

176

Claim 18 depends from claim 13, and further requires that the device further comprises a third layer or coating. For at least the same reasons as claims 1, 6, and 13, the subject matter of claim 16 would have been *prima facie* obvious to a POSA.

### (o)    Claims 19 and 20

Claims 19 and 20 depend from claim 13, and further require that the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5, and that the polymeric diffusion environment has a pH buffered to between about 4 to about 6, respectively. For at least the same reasons as claims 1, 7, 8, and 13, the subject matter of claims 17 and 18 would have been *prima facie* obvious to a POSA.

### (p)    Claim 21

Claim 21 depends from claim 19, and further requires that "the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer." For at least the same reasons as claims 1, 2, and 13, the subject matter of claim 21 would have been *prima facie* obvious to a POSA.

### (q)    Claim 22

Claim 22 depends from claim 19, and further requires that the "polymeric barrier environment comprises at least one film-forming water-erodible polymer."  For at least the same reasons as claims 1, 3, 13, and 19, the subject matter of claim 22 would have been *prima facie* obvious to a POSA.

### (r)    Claim 24

Claim 24 depends from claim 19, and further requires that the device further comprises a third layer or coating. For at least the same reasons as claims 1, 6, 13, and 19, the subject matter of claim 24 would have been *prima facie* obvious to a POSA.

### (s)    Claim 25

177

Claim 25 differs from claim 1 of the '543 patent only in that claim 25 is directed to a method of treating pain. The device recited in claim 25 is encompassed by the device of claim 1.

Tapolsky I teaches a method of direct transmucosal drug delivery by using a bioerodable device that delivers a drug upon application to a mucosal surface of a subject. (Tapolsky I at [0024].) The device of Tapolsky I "yield[s] fast onset of activity, excellent bioavailability, and sustained drug delivery" (*Id.* at [0131].) Drugs suitable for use in the method of Tapolsky I include anti-inflammatory analgesics. (*Id.* at [0046].)  Buprenorphine is a known anti-inflammatory analgesic, known to be effective in pain management. (*See, e.g.*, Volker at summary.) As a result, it would have been obvious to a POSA to use buprenorphine, in the delivery device of Tapolsky I, to treat pain.

 Similarly, Moro discloses a method of transmucosal drug delivery by using a mucoadhesive bioerodable drug delivery device for direct transmucosal administration of a drug to a subject. (Moro at Abstract; [0071].) The device in Moro has "an effective residence time that can be tailored to deliver therapeutics over different time intervals." (*Id.* at [0010].) Moro expressly teaches incorporating an effective amount of buprenorphine, which it describes as an "analgesic narcotic," in the bioerodable mucoadhesive layer of its device. (*Id.* at [0031]-[0064].) Analgesic narcotics were known to a POSA to be routinely used in methods for treating pain. (*See, e.g.*, Das at p. 89, recognizing that buprenorphine "has strong analgesic and narcotic antagonist activity and is 25-50 times more potent than morphine.")

Thus, each of Tapolsky I and Moro discloses a method for delivering buprenorphine to a subject by direct transmucosal delivery, and it would have been obvious to a POSA that the methods of Tapolsky I and Moro would effectively treat pain.

Indeed, a POSA would have been aware that the prior art in general teaches direct transmucosal delivery to effectively deliver drugs such as buprenorphine in particular. Das teaches the use of mucoadhesive films to provide direct transmucosal administration of buprenorphine. (Das at pp. 89-90.) Das "hypothesize[s] that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." (*Id.* at p. 90.) (*See also* Chen at 1:26-28, 3:25-28, 5:8-12, 6:19-29, 10:28; Yang at [0002]; [0013]; [0014]; [0133]; [0209]-[0211]; Chiang at Abstract, S45.)

Todd describes buprenorphine as a "potent antagonist analgesic with good bioavailability following sublingual administration." (Todd at Abstract.) More specifically, Todd teaches the use of a buffered environment at a pH of 4-6, including at a pH of 5 or 6, in particular, to optimize transmucosal uptake of buprenorphine.

In view of the teachings of the prior art, a POSA would have been motivated to use direct transmucosal delivery to deliver buprenorphine to a human, in a method to treat pain, and would have had a reasonable expectation of successfully doing so.

Accordingly, for at least the same reasons as claim 1 and those discussed above, the subject matter of claim 25 would have been *prima facie* obvious to a POSA.

### 4. The Asserted Claims of the '843 Patent Would Have Been Obvious Over Tapolsky and/or Moro in Combination with One or More of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in Further View of One or More of Bullingham, Bullingham II, Wilding, Todd, Das, Chen, Yan and/or Chiang

As described above, the asserted claims would have been obvious over Tapolsky and/or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang. This alternative combination of Tapolsky and/or

Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang is similar to the combination described above. Accordingly, this section describes how the addition of one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson and/or Shojaei would have rendered obvious the limitations of claim 1, claim 13, and claim 25, that recite "wherein the polymeric diffusion environment has a pH of between [or buffered to (in claim 25)] about 4 and about 7.5," claims 4 and 16, i.e., wherein the polymeric diffusion environment has a pH of between about 4 to about 6, claims 7 and 19, i.e., wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5, and claims 8 and 20, i.e., wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6.

A POSA would have known that for an ionizable drug such as buprenorphine, both the ionization and solubility of the drug are pH dependent, and both impact the absorption of the drug. Hague, for example, teaches that "[i]onizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." (Hague at [0052].) However, "[w]hile increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions." (*Id.* at [0058].) As a result, the "actual bioavailability" of a drug at a given pH "depends on the combination of these two effects; state of ionization and aqueous solubility." (*Id.*) Furusawa also teaches that pH plays an important role in both the stability and transmucosal absorption of an active agent. (*See, e.g.*, *id.* at [0063].) For a multi-layer transmucosal film

180

including fentanyl, another opioid active agent, Furusawa teaches that a pH of 5-7 is preferable, to increase transmucosal absorption. (*See, e.g.*, *id.* at [0065].)

Cassidy teaches that buprenorphine's behavior "in solution was similar to that reported for fentanyl and sufentanil, which are also weakly basic narcotic analgesics." (Cassidy at p. 28.) In view of at least the teachings of Cassidy, a POSA would have reasonably expected that buprenorphine – like fentanyl as described in Furusawa – would absorb transmucosally at acidic pH values. Indeed, Cassidy teaches that buprenorphine absorbs through the buccal mucosa at acidic pH values. In particular, Cassidy teaches that the solubility of buprenorphine is "highly pH dependent," with the highest solubility seen at pH 4.2. According to Cassidy, solubility at neutral pH, i.e., 7.3, was significantly lower. Cassidy states two prototypes for buccal delivery of buprenorphine to dogs (which Cassidy describes as a good model for man) provided steady-state plasma levels of buprenorphine and rapid delivery of the drug. (*Id.* at pp. 28-29.)

Sharma also studies the permeation of buprenorphine specifically as a function of pH, and recognizes that "[s]olubility of the base decreases exponentially as the pH increases," and states that "[b]uprenorphine skin flux increased as the pH was decreased to 5," concluding that "the completely ionized form (pKa=8.4) of drug (pH=5.0) has higher skin flux than the partially un ionized form." (Sharma at 8:20-24.) Mendelson also teaches that buffers and pH adjusting agents may be included in sublingual formulations of buprenorphine (Mendelson at 7:48-55), and teaches that buprenorphine is prepared in an aqueous solution for sublingual administration, which solution includes a titrate phosphate buffer at pH 5 (*id.* at 7:63-8:4). Cassidy, Sharma and Mendelson demonstrate that it would have been obvious to a POSA to use sufficient buffer to provide buprenorphine in a polymeric diffusion environment having a

181

pH between about 4 and about 6, and especially at a pH of around 5.  A POSA would have had a reasonable expectation of successfully administering buprenorphine transmucosally at a pH between about 4 and 6, including at a pH of about 5 in particular, in view of at least the teachings in Cassidy that buccal administration at acidic pH values provides steady-state plasma levels of buprenorphine and rapid delivery of the drug.

A POSA also would have known that pH can affect the strength of the bioadhesive polymer used in delivery devices for oral mucosal delivery. Shojaei, for example, teaches that the oral mucosa can "form a strongly cohesive gel structure" at physiological pH, i.e., from 5.5 to 7 for the saliva, where it has a negative charge, improving mucoadhesion. As an example, Shojaei reports that a bioadhesive polymer, poly(acrylic acid) crosslinked with divinyl glycol, showed a maximum adhesion at pH 5 and 6, and a minimum at pH 7. Shojaei also describes a buccal mucoadhesive device for controlled release of buprenorphine using bioadhesive polymers. As illustrated by Shojaei, a POSA would have been motivated to provide a mucoadhesive layer having a pH between 5-7, and especially a pH of 5 or 6, to improve mucoadhesion.

As demonstrated by the art discussed above, a POSA would have been aware of the importance of pH in determining the bioavailability of buprenorphine in a polymeric diffusion environment within a transmucosal delivery device, and it would have been a matter of routine experimentation for a POSA to optimize the pH to balance the extent of ionization and solubility of buprenorphine, as well as mucoadhesion. A POSA would have reasonably expected (especially in view of the teachings of Furusawa, Cassidy and Sharma) that buffering a polymeric diffusion environment containing buprenorphine to a pH between about 4 and 6, including to a pH of about 5 in particular (as taught by Sharma and Mendelson), would have provided enhanced uptake of buprenorphine.  A POSA also would have known that a pH of 5 is

182

beneficial for the mucoadhesion of polymers, as taught by Shojaei. Thus, it would have been obvious to a POSA to use sufficient buffer to provide buprenorphine in a polymeric diffusion environment having a pH between about 4 and about 6, and especially at a pH of around 5, in a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky and Moro.

For these reasons and the reasons discussed above with respect to obviousness of the asserted claims of the '843 patent over Tapolsky and/or Moro in combination with Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, the subject matter of the asserted claims of the '843 patent would have been obvious to a POSA in view of Tapolsky and/or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang.

### 5. Claims 4, 8, 16, and 20 of the '843 Patent Would Have Been Obvious Over Tapolsky and/or Moro in Combination with One of More of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in Further View of One or More of Bullingham, Bullingham II, Wilding, Das, Chen, Yan and/or Chiang

As described above, the asserted claims would have been obvious over (1) Tapolsky or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and Chiang, and (2) Tapolsky or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and Chiang.  This alternative combination of Tapolsky or Moro, in combination with one or more of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and Chiang is similar to the combination described above.  Accordingly, this section describes how the addition of one or more

183

of Hague, Furusawa, Sharma, Cassidy, Mendelson and Shojaei would have rendered obvious claims 4 and 16, i.e., wherein the polymeric diffusion environment has a pH of between about 4 to about 6, and claims 8 and 20, i.e., wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6.

Rademacher teaches films for the transmucosal administration of active agents, such as buprenorphine in particular. (Rademacher at Abstract; [0037].)  The film has "a polymer matrix that serves as an active substance reservoir," comprising water-soluble polymers or polymers that are capable of swelling in aqueous media. (*Id.* at [0026].)  Rademacher teaches that "[b]y selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour" (*id.* at [0027]), and teaches that the pH of polymer matrix is important to those properties and to the release of the active agent. In particular, Rademacher teaches that the pH of the polymer matrix should be adjusted to correspond to the "physiological pH value of the mucous membrane to which the administration form is to be applied" (*id.* at [0015]), such as between about 5.5 and 6.5, which is the approximate pH of the oral mucosa of humans (*id.* at [0022]). As an example, Rademacher describes the use of a physiological buffer system like a phosphate buffer. (*Id.* at [0024].)

Thus, Rademacher confirms that a POSA would have been aware that the pH of the polymeric diffusion environment is important to bioadhesion of a transmucosal device, and that adhesion is stronger at or near the physiological pH of the mucus (*see also* Shojaei). The teaching of Rademacher with respect to the optimal pH for a particular polymer system is consistent with the teachings of Shojaei, i.e., pH 5 or pH 6, and is consistent with the teachings of Mendelson, i.e., phosphate buffer having pH 5.

As a result, it would have been obvious to a POSA to use sufficient buffer to provide buprenorphine in a polymeric diffusion environment having a pH between about 4 to about 6, and especially at a pH of around 5, in a mucoadhesive bioerodable drug delivery device like that taught by Tapolsky and Moro.

For these reasons and the reasons discussed above with respect to the obviousness of the asserted claims over (1) Tapolsky and/or Moro in combination with Todd, in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, and (2) Tapolsky and/or Moro, in combination with one or more of Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang, the subject matter of asserted claims 4, 8, 16, and 20 of the '843 patent would have been obvious to a POSA in view of Tapolsky and/or Moro, in combination with one or more of Rademacher, Hague, Furusawa, Sharma, Cassidy, Mendelson, Shojaei and/or Todd, and in further view of one or more of Bullingham, Bullingham II, Wilding, Das, Chen, Yang, and/or Chiang.

### 6.     Secondary Indicia of Non-Obviousness

#### (a)     Plaintiffs Cannot Show That The '843 Patent is Non-Obvious Because of Secondary Indicia of Non-Obviousness

Defendants are unaware of any secondary indicia of non-obviousness that, when considered in light of the totality of the evidence, would lead to a conclusion that the claimed invention would not have been obvious to a POSA.

As discussed above with respect to the obviousness of the '866 patent, during prosecution of the '306 application that led to the '866 patent, Applicants submitted the Declaration of Dr. Andrew Finn Under 37 C.F.R. § 1.132, dated September 12, 2011 ("Finn Declaration"), stating

that "[t]he methods and devices of the present invention, which include a polymeric diffusion environment which is a buffered environment having a <u>pH of between about 4 and about 6</u>, exhibit unexpectedly superior bioavailability versus devices which do not include the buffered environment having a pH of between about 4 and about 6." (Finn Declaration at ¶ 8 (emphasis added).)

For the reasons discussed above with respect to the obviousness of the '866 patent, and in view of the teachings of the prior art discussed herein, the Finn Declaration does not establish unexpected results associated with the claims of the '866 patent.  However, even assuming, for the sake of argument only, that the Finn Declaration establishes "unexpected results" for a polymeric diffusion environment buffered to a pH between about 4 and about 6, these results are not commensurate in scope with asserted claims 1-3, 6-10, 12-15, 18-22, and 24-25 of the '843 patent, which encompass a polymeric diffusion environment having a pH between about 4 and <u>about 7.5</u>. As stated by the Finn Declaration itself:

> [T]he devices which include a polymeric diffusion environment which is a buffered environment having a pH of between about 4 and about 6 exhibit dramatically improved $C_{max}$ and/or bioavailability <u>as compared to devices having a polymeric diffusion environment at a pH of 7.25</u> or those having no buffered environment.

(Finn Declaration at ¶ 9 (emphasis added).)

Example 4, included in the specification of the '843 patent, compares buprenorphine uptake from "exemplary devices of the present invention (at pH 6 and 7.25)." ('843 patent at 26:13-15.) According to Example 4, "the delivery devices of the present invention <u>at pH 6</u> appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." (*Id.* at 26:17-21 (emphasis added).) Thus, the '843 patent itself characterizes that a polymeric diffusion environment having a pH of 7.25 – which is

186

encompassed by asserted claims 1-3, 6-7, 9-10, 12-15, 18-19, 21-22, and 24-25 of the '843

patent – does not provide "enhanced uptake" of buprenorphine.  In view of the Finn Declaration

and Example 4 of the '843 patent, any "unexpected results" associated with a polymeric

diffusion environment having a pH between about 4 and about 6 are not associated with a

polymeric diffusion environment having a pH of 7.25 (and, presumably, would not be

associated with a polymeric diffusion environment having a pH between 7.25 and about 7.5).

As a result, any "unexpected results" described by the Finn Declaration are not

commensurate in scope with claims 1-3, 6-7, 9-10, 12-15, 18-19, 21-22, and 24-25 of the '843

patent, and cannot establish the non-obviousness of these claims.

Moreover, in view of the minor differences between the prior art and the subject matter of

the asserted claims of the '843 patent, the prior art creates such a strong case of obviousness that,

even in light of evidence of secondary considerations of non-obviousness, the claimed subject

matter would have been obvious to a POSA.

> **(b)     A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is

negated, or at least overwhelmed, by the existence of one or more blocking patents in the

buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do

nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention

claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the

Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364

(Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled

that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in *Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for

BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

### 7. Other Relevant References

One or more prior art references identified in Section III, *supra*, or Exhibit A or Exhibit B but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

### C. LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS, AND IMPROPER DEPENDENCY

#### 1. The Asserted Claims of the '843 Patent are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled

##### (a) Drug Delivery Device Having a Bioerodable Mucoadhesive Layer Comprising Buprenorphine in a Polymeric Diffusion Environment Having a pH of Between About 4

189

The asserted claims of the '843 patent require a drug delivery device comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH between about 4 and about 7.25 (*see* independent claims 1, 13 and 25). The bioerodable mucoadhesive layer ~~is~~encompasses a solid layer (*see* Example 1 of the '843 patent). The patentee has not shown how to prepare a solid or solid solution layer having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claims. Moreover, the '843 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment having a pH between about 4.0 and about 7.5. As a result, the '843 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

The specification identifies a mucoadhesive bioerodable drug delivery device having at least two layers: a mucoadhesive layer comprising buprenorphine "and buffered to a pH of between about 4.0 and about 6.0," and a backing layer or barrier environment disposed relative to the polymeric diffusion environment. (*See, e.g.*, '843 ~~pateant~~patent at 2:60-3:60.) Example 1 of the '843 patent describes the preparation of the claimed drug delivery devices, including the preparation of the mucoadhesive and backing layers as separate blends. (*Id.* at 19:31-20:44.) With respect to the mucoadhesive layer blend, Example 1 states that "[a]s the last addition step, tribasic sodium phosphate and sodium hydroxide were added to adjust the blend to a desired pH" (*id.* at 20:25-28), and "batches were made having pHs of about 6, 7.25, and 8.5." (*Id.* at 20:30-

31.) Thus, Example 1 describes the pH of the blend that is used to create the mucoadhesive layer, before the blend is mixed under vacuum, stored, and then cast onto the backing layer. (*Id.* at 20:31-44.)  Therefore, the claimed pH range for the mucoadhesive layer is based on measurements taken of the blend composition used for producing the mucoadhesive layer, separately from the blend composition used for producing the backing layer, and before the layers are joined together to form a drug delivery device.

Claim 1 of the '843 patent, however, relates to a method for delivering buprenorphine, comprising, *inter alia*, administering a mucoadhesive bioerodable <u>drug delivery device</u>, the <u>device</u> comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having to a pH of "between about 4 and about 7.25," and an adjacent barrier layer. Claim 13 similarly requires a <u>device</u> comprising a bioerodable mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment having a pH of "between about 4 and about 7.25," and a barrier layer adjacent to the mucoadhesive layer. Claim 25 requires a method of treating pain with a mucoadhesive drug delivery device comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.25, and an adjacent barrier layer.

Thus, the claims of the '843 patent require a mucoadhesive layer, having a certain pH, and a backing layer having any pH, <u>as part of the drug delivery device</u>. A POSA would understand that the term "drug delivery device," as used in the claims, refers to the finished drug product, i.e., the device that is formed after the mucoadhesive and backing layers are joined. (*See, e.g.*, '843

patent at 2:60-3:3; 3:14-27; Example 1, 20:30-45.) Accordingly, the pH value recited in the claims corresponds to that of the mucoadhesive layer of the finished device.

However, nothing in the specification purports to measure or control the pH of the mucoadhesive layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together. A POSA would have been aware that, once the separate layers of the device are joined, the mucoadhesive layer can permeate into the backing layer, such that the pH of the mucoadhesive layer impacts the pH of the backing layer, and vice versa (*see, e.g.,* Furusawa at [0208], teaching that "the drug layer solution spread on the support layer permeates into the underlying support layer," such that the active agent "migrated into the support layer is affected by the pH-adjusting agent contained in the support layer," which degrades its stability; Crowley at [0134], teaching that "[s]ince the backing layer can be in intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer"). In other words, a POSA would have known that the pH of the backing layer (which is not limited by the asserted claims) can cause a change in the pH of the mucoadhesive layer. Because the pH of the backing layer is not described or limited, the backing layer can affect the pH of the mucoadhesive layer, depending upon the difference between the pH of the backing layer and the pH of the mucoadhesive layer. That the pH of the backing layer can affect the pH of the mucoadhesive layer also is confirmed by the teaching in the art that an acidic backing layer can decrease degradation of the active agent in the mucoadhesive layer, which occurs via pH reduction. (*See, e.g.*, Crowley at [0134]; Furusawa at [0064], [0100], [0208].)

Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, Applicants' description of the pH of the mucoadhesive layer – only before the layers are joined – would not demonstrate to a POSA that

192

Applicants had possession of a drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 6.0. As a result, for this additional reason, the specification fails to describe a <u>device</u> comprising a mucoadhesive layer having "a pH of between about 4.0 and about 6.0." There is nothing in the specification to convey to a POSA that the patentees invented a drug delivery <u>device</u> comprising a mucoadhesive layer having a pH value within the ranges required by the '843 patent. As a result, for this additional reason, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Nor does the specification teach a POSA how to make or use a drug delivery device comprising a mucoadhesive layer having a pH value within the range required by the '843 patent, without undue experimentation. The specification provides no guidance with respect to how to measure or control the pH of the mucoadhesive layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together, nor does it provide any working examples of the characteristics of the mucoadhesive layer once it is joined with the backing layer to make the device. *See, e.g., In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). As discussed above, however, a POSA would have known that the pH of the backing layer (which is not limited by the asserted claims) can affect the pH of the mucoadhesive layer. Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, the description in the specification of the pH of the mucoadhesive layer – only before the layers are joined – would not enable a POSA to make a drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 7.5, without undue experimentation. As a result, for this additional reason, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 for lack of enablement.

Moreover, the asserted claims require "an effective amount of buprenorphine" disposed in a polymeric diffusion environment. The '843 patent specification explicitly defines "buprenorphine" as including "any pharmaceutically acceptable forms of buprenorphine, including, but not limited to, salts, esters, and prodrugs thereof." ('843 patent at 5:60-63.) But the '843 patent contains only two formulations containing buprenorphine free base. (*See id.* at Examples 3 & 4.) No formulations containing any pharmaceutically acceptable salts, esters, or prodrugs of buprenorphine are disclosed. Therefore, for at least this additional reason, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 as lacking written description.

Additionally, because the salt, ester, or prodrug form of an active ingredient impacts the characteristics of a formulation, the '843 patent specification does not enable a POSA to practice the full scope of the invention, i.e., a buprenorphine formulation containing any pharmaceutically acceptable salt, ester, or prodrug thereof, without undue experimentation. Therefore, for at least this additional reason, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 as not being enabled.

### (b) Mucoadhesive Biodegradable Drug Delivery Device

Claims 1-4, 6-10, 12, 18, and 24-25 are directed to methods that require the administration of a "mucoadhesive biodegradable drug delivery device" (*see* independent claims 1 and 25). The specification does not disclose a *biodegradable* drug delivery device, but does disclose a *bioerodable* drug delivery device. (*See, e.g.*, '843 patent at 2:60-3:3.) Indeed, the term "biodegradable" does not appear anywhere in the specification of the '843 patent. To satisfy the written description requirement of 35 U.S.C. § 112, however, the disclosure of the application must reasonably convey to a POSA that the inventor had possession of the claimed subject

matter as of the filing date of the application. *See, e.g., Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citations omitted).  To the extent that the disclosure of a "bioerodible" device fails to describe a "biodegradable" device, there is nothing in the specification of the '843 patent to convey to a POSA that the patentees invented a "mucoadhesive biodegradable drug delivery device," and claims 1-4, 6-10, 12, 18 and 24-25 are invalid for lack of written description.

In addition, to the extent that the disclosure of a "bioerodible" device fails to describe a "biodegradable" device, the specification fails to teach a POSA how to make and use a "biodegradable drug delivery device" without undue experimentation. The specification provides no guidance whatsoever with respect to how to make a biodegradable device (to the extent it is distinct from a bioerodable device), or with respect to the properties or characteristics of such a device, nor does it provide any working examples of such a device. *See, e.g., In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). As a result, claims 1-4, 6-10, 12, 18, and 24-25 are invalid as not enabled.

The '843 patent fails to describe a mucoadhesive biodegradable drug delivery device, and fails to enable a POSA to make or use a mucoadhesive biodegradable drug delivery device without undue experimentation, to the extent that the disclosure of a "bioerodible" device fails to describe a "biodegradable" device. Claims 1-4, 6-10, 12, 18, and 24-25 are invalid under 35 U.S.C. § 112.

### (c) Polymeric Diffusion Environment Having a pH Between About 4 to About 7.5 or About 4 to About 6

The asserted claims of the '843 patent require a polymeric diffusion environment having a pH of between about 4 and about 7.5 (*see* independent claims 1, 13, and 25). Claims 4 and 16 depend from claims 1 and 13, respectively, and recite that the polymeric diffusion environment

195

has a pH of between about 4 to about 6. Claims 8 and 20 depend also depend from claims 1 and 13, respectively, and recite that the polymeric diffusion environment has a pH buffered to between about 4 to about 6.

The asserted claims of the '866 patent encompass any polymeric diffusion environment. The polymeric diffusion environment can have any composition, so long as it contains at least one polymer component. But the '843 patent provides only two formulations with a polymeric diffusion environment that purportedly falls within the broader asserted claims – a buprenorphine delivery device that has a mucoadhesive layer prepared using a blend buffered to a pH of 6 or 7.25 – and only one within the narrower pH ranges. Because the asserted claims encompass innumerable buprenorphine delivery devices, undue experimentation would be required to practice the full scope of the asserted claims. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

Additionally, each of asserted claims 4, 8, 16 and 20 requires a polymeric diffusion environment having a pH "between about 4 to about 6."  For the reasons discussed above with respect to the invalidity of the asserted claims of the '866 patent for failure to satisfy the written description requirement, none of the pH ranges claimed in claims 4, 8, 16 and 20 is identified in the '843 patent. Instead, the '843 patent teaches as follows:

> In one embodiment, e.g., when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5.

> In other embodiments, the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention.

('843 Patent at 12:18-33). Thus, the '843 patent describes a broad range of suitable pH values for the polymeric diffusion environment, without anything pointing to the specific – and lower – claimed range of about 4 to about 6.

The '843 patent also states that "the pH of the device may be about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof." (*Id.* at 12:29-33 (emphasis added).) The "device" is not the same as the polymeric diffusion environment. (*See, e.g.*, *id.* at 6:31-39; 7:39-53; 17:57-19:26.) On the contrary, the "device" comprises at least the polymeric diffusion environment and a barrier environment (*see, e.g.*, *id.* at 1:64- 2:5; 2:21-26; 2:64-3:3), and optionally comprises an additional layer (*see, e.g.*, *id.* at 2:52-55; 15:13-28), and/or other ingredients (*id.* at 16:17-17:56). As a result, a POSA would consider the description of pH of the device to be separate and distinct from the description of the pH of the polymeric diffusion environment in particular. Nonetheless, nothing in the description of the pH of "the device" defines or discloses the range of about 4 to about 6. Nothing in the '843 patent identifies that the top end of the pH range should be 6.

Although the '912 application that led to the '843 patent contained original claims that included the pH limitations of claims 4, 8, 16, and 20 (see original claims 4, 8, 16 and 20), original claim language does not necessarily satisfy the written description requirement. *Ariad Pharms., Inc. v. Eli Lilly and Co*., 598 F.3d 1336, 1349 (Fed. Cir. 2010). In the '843 patent, Applicants broadly disclosed a generic pH range of about 4.0 to about 7.5, but nothing in the '843 patent describes a pH range of about 4 to about 6. As a result, for at least this additional

197

reason, claims 4, 8, 16 and 20 of the '843 patent are invalid under 35 U.S.C. § 112 for failure to satisfy the written description requirement.

> **(d)    Polymeric Barrier Environment Disposed Adjacent to the Mucoadhesive Layer, and Wherein a Unidirectional Diffusion Gradient of Buprenorphine is Provided Upon Application to a Buccal Surface**

The asserted claims of the '843 patent encompass any polymeric diffusion environment adjacent to the mucoadhesive layer. The polymeric diffusion environment can have any composition, so long as it contains at least one polymer component. But the '843 patent provides only two formulations with a polymeric diffusion environment that purportedly falls within the asserted claims – a buprenorphine delivery device that has a mucoadhesive layer prepared using a blend buffered to a pH of 6 or 7.25. Because the asserted claims encompass innumerable buprenorphine delivery devices, undue experimentation would be required to practice the full scope of the asserted claims. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

> **(e)    A Method for Treating Pain**

Claim 25 is directed to "[a] method for treating pain." The '843 patent explicitly defines "treating" as "preventing, curing, healing, alleviating, relieving, altering, remedying, ameliorating, improving, stabilizing or affecting a disease or disorder, or a symptom of a disease or disorder (e.g., to alleviate pain)." ('843 patent at 6:65-7:3.). However, the '843 patent does not provide any disclosure on how the delivery device will perform each category of "treatment" e.g., "prevent" or "cure" pain. Therefore, for at least this additional reason, claim 25 is invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

### (f)     The Claimed Layers Are Not Limited to Solid Layers

On December 20, 2019, the Court held that "layer" in the term "a bioerodable mucoadhesive layer" in claims 1-25 was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7. However, the '843 patent specification does not provide any descriptions of a device with a non-solid mucoadhesive layer. Rather, the specification only describes a solid mucoadhesive layer. *See, e.g.*, Example 1 (explaining how the mucoadhesive layer is cast, cured, and dried). Because the patentee has not shown how to prepare a non-solid bioerodable mucoadhesive layer, the '843 patent does not reasonably convey to a POSA that the inventors had possession of the full scope of the claimed device. Therefore, for at least this additional reason, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Additionally, the patentee has not shown how to prepare or administer a device with a non-solid bioerodable mucoadhesive layer and/or a third layer. Because the '843 patent specification does not enable a POSA to practice the full scope of the invention without undue experimentation, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 as not being enabled.

### 2.     The Asserted Claims of the '843 Patent Are Invalid Under 35 U.S.C. § 112 as Indefinite

The asserted claims require a "a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5." The '843 patent explicitly defines "polymeric diffusion environment" as "an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion of the polymeric diffusion environment to a mucosal surface." (*Id.* at 6:31-34.) The '843 patent also indicates that

the mucoadhesive polymeric diffusion environment was prepared as a blend having particular pH values and then cast onto the backing layer, cured in an oven, and dried, yielding a solid layer. (*Id.* at Example 1.) The '843 patent also discloses that "the mucoadhesive polymeric diffusion environment is a layer with a buffered pH such that a desired pH is maintained at the mucosal administration site." (*Id.* at 9:47-50.) Therefore, the '843 patent indicates that the pH of the polymeric diffusion environment making up the bioerodable mucoadhesive layer can be measured under three different conditions – the solid mucoadhesive layer, the blend used to make the mucoadhesive layer, and at the mucosal administration site. Because the conditions at which the pH is determined can influence the measured pH, such as volume size, the '843 patent does not clarity as to how to determine the pH of the polymeric diffusion environment. As a result, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

~~Additionally~~Additionally, as discussed above, on December 20, 2019, the Court held that "layer" in the term "a bioerodable mucoadhesive layer" in the asserted claims was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7.  But patentees, during the Markman Hearing asserted that the "layer" is "not a liquid, it's not a gas."  *Id*. at 38:10-11.  Because it is unclear as to what "layer" means, the asserted claims of the '843 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

Moreover, claims 6, 12, 18, and 24 require the drug delivery device to further comprise "a third layer or coating." The '539 patent specification provides no disclosure as to what a third layer or coating is beyond "a layer or coating that is disposed or adjacent to the mucoadhesive polymeric diffusion environment and facilitates unidirectional delivery of the medicament to the

mucosa." Therefore, if the Court does not construe this limitation accordingly, then claims 6, 12, 18, and 24 are invalid under 35 U.S.C. § 112 as indefinite.

> **3.      Claims 18 and 24 of the '843 Patent Are Invalid Under 35 U.S.C. § 112 for Failing to Further Limit the Subject Matter of the Claims From Which They Depend**

Pursuant to 35 U.S.C. § 112, a dependent claim "shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." The Federal Circuit has held that non-compliance with 35 U.S.C. § 112, paragraph 4, renders a claim unpatentable just as non-compliance with other paragraphs of 35 U.S.C. § 112 would.

Claim 18 depends from claim 13, and claim 24 depends from 19, which also depends from claim 13. Each of claims 18 and 24 recites that "the biodegradable drug delivery device further comprises a third layer or coating." Claim 13, however, recites only a "device for delivering buprenorphine," with no mention of a biodegradable drug delivery device. Thus, claim 13 does not provide antecedent basis for the "biodegradable drug delivery device" limitations of claims 18 and 24. As a result, claims 18 and 24 are invalid under 35 U.S.C. § 112 for failing to further limit the subject matter of the claims from which they depend.

## V.      THE '539 PATENT

### A.      ASSERTED CLAIMS OF THE '539 PATENT

The '539 patent issued with 22 claims, of which claims 1-7 and 9-22, are asserted. The asserted claims read as follows:

> 1. A method of treating chronic pain, the method comprising: administering to a subject in need thereof a mucoadhesive bioerodable drug delivery device, wherein the device is administered once or twice daily, wherein the device comprises: a bioerodable mucoadhesive layer comprising about 100 g to about 0.9 mg buprenorphine and buffered to a pH of between about 4.0 and about 6.0; and a backing layer buffered to a pH of between about 4.0 and about 4.8 and that does not include an opioid

antagonist; wherein the device provides a steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.156 and about 0.364 ng/mL; wherein the subject is an opioid-experienced subject; and wherein the subject treated experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects.

2. The method according to claim 1, wherein the device is administered once daily.

3. The method according to claim 1, wherein the chronic pain is chronic low back pain.

4. The method according to claim 1, wherein the chronic pain is moderate to severe chronic low back pain.

5. The method according to claim 1, wherein the subject is treated without significant constipation.

6. The method according to claim 1, wherein the subject is treated without significant nausea.

7. The method according to claim 1, wherein the total daily dose of buprenorphine administered to the subject is selected from the group consisting of 200 µg, 220 µg, 240 µg, 280 µg, 300 µg, 320 µg, 350 µg, 360 µg, 400 µg, 450 µg, 480 µg, 500 µg, 550 µg, 600 µg, 620 µg, 650 µg, 700 µg, 720 µg, 750 µg, 800 µg, 860 µg, 900 µg, 960 µg, 1000 µg, 1100 µg, 1200 µg, 1250 µg, 1300 µg, 1400 µg, 1500 µg, 1600 µg, and 1800 µg of buprenorphine.

9. A method of treating a subject with moderate to severe chronic low back pain, comprising: administering to the subject twice daily a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a buffered polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6; and a backing layer buffered to a pH between about 4.0 and about 4.8 and that does not include an opioid antagonist; wherein the total daily dose of buprenorphine administered to the subject is effective for treating moderate to severe chronic low back pain; wherein the subject is an opioid-experienced subject; and wherein the subject treated experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects.

202

10. The method according to claim 1, wherein said chronic pain is neuropathic pain.

11. The method according to claim 1, wherein said chronic pain is osteoarthritic pain.

12. The method according to claim 1, wherein the device comprises a dose of buprenorphine selected from the group consisting of 100 µg, 110 µg, 120 µg, 140 µg, 150 µg, 160 µg, 175 µg, and 180 µg.

13. The method according to claim 1, wherein the total daily dose of buprenorphine administered to the subject ranges from 200 µg to about 1800 µg.

14. The method according to claim 1, wherein steady-state $T_{max}$ of buprenorphine is in a range between about 2.00 and about 2.90 h.

15. The method according to claim 1, wherein $C_{min}$ of buprenorphine is in a range between about 0.0157 and about 0.0862 ng/mL.

16. The method according to claim 1, wherein steady-state $AUC_{last}$ of buprenorphine is in a range between about 0.4085 and about 5.033 h*ng/mL.

17. The method according to claim 1, wherein between about 2.4-6.9% of subjects experience drug related mild or moderate headaches as a treatment emergent adverse event (TEAE).

18. The method according to claim 1, wherein between about 3-6.9% of subjects experience drug related mild or moderate dizziness as a TEAE.

19. The method according to claim 1, wherein between about 2.6-27.9% of subjects experience drug related mild or moderate nausea as a TEAE.

20. The method according to claim 1, wherein between about 1.5-8.5% of subjects experience drug related mild or moderate constipation as a TEAE.

21. The method according to claim 1, wherein between about 0.9-3% of subjects experience drug related mild or moderate vomiting as a TEAE.

203

22. The method according to claim 1, wherein between about 7.7-33.9% of subjects experience drug related mild or moderate TEAEs.

## B.   OBVIOUSNESS

The following claim-by-claim analysis of the asserted claims of the '866 patent is exemplary only.  Providing this analysis in view of certain of the prior art cited in Exhibit A does not waive any future assertion of any art or any combination of art contained in Exhibit A or Exhibit B. The assertion of a combination here does not imply that there are no other combinations or that this is the only combination on which Defendants intend to rely.

### 1.   Earliest Possible Priority Date

U.S. Patent No. 9,901,539, entitled "Transmucosal Delivery Devices for Use in Chronic Pain Relief," issued on February 27, 2018, from U.S. Patent Application No. 13/724,959 ("the '959 application"), filed on December 21, 2012, and claims the benefit of U.S. Provisional Patent Application No. 61/578,755 ("the '755 provisional application"), filed on December 21, 2011.

Based on the face of the '539 patent, the earliest possible priority date and also the earliest possible effective filing date for the '539 patent is December 21, 2011, although the asserted claims of the '539 patent cannot properly rely on this earliest date. As discussed above with respect to the '866 patent, in order to rely on the filing date of an earlier application, 35 U.S.C. § 120 requires that the earlier application include a disclosure that complies with 35 U.S.C. § 112, ¶ 1. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997).  Thus, claims can rely on the filing date of an earlier application if that earlier application includes "an equivalent description" of the claimed invention. *Id.* A demonstration that the claims would have been obvious variants of the earlier disclosure is insufficient.

A POSA would not understand the '755 provisional application to provide a sufficient written description of the claimed "pH of between about 4.0 and about 4.8" required for the

backing layer of the drug delivery device, or for the claimed bioerodable mucoadhesive layer "buffered to a pH of between about 4.0 and about 6.0," or for the claimed bioerodable mucoadhesive layer including a polymeric diffusion environment that is buffered to a "pH of between about 4 and about 6." More specifically, independent claims 1 and 9 of the '539 patent (and, therefore, all asserted dependent claims) require a backing layer buffered to "a pH of between about 4 and about 4.8," and a bioerodable mucoadhesive layer (or polymeric diffusion environment, in particular) buffered to a pH of between about 4.0 and about 6.0. However, with respect to the pH of the backing layer, the '755 provisional application only teaches as follows:

> In some embodiments, the backing layer may contain a second medicament intended for dissolution in the saliva. In such cases, the pH of the backing layer is adjusted, such that it impedes flux of the medicament toward the mucoadhesive layer where transmucosal absorption may occur.

('755 provisional application at 6:2-5.) Thus, the '755 provisional application teaches pH "adjustment" in the backing layer only when the backing layer contains a second medicament for dissolution in the saliva (the asserted claims of the '539 patent, on the other hand, require that the backing layer "does not include an opioid antagonist"), and does not teach any particular pH for the backing layer, let alone a pH of between about 4.0 and about 4.8. (*See also id.* at 10:29-11:14 and 12:17-28 regarding the backing layer and silent as to pH.)

The '755 provisional application does not define or disclose the range of about 4.0 to about 4.8 for the backing layer of the drug delivery device. Indeed, nothing in the '755 provisional application describes a suitable pH range for the backing layer whatsoever. Thus, the pH ranges for the backing layer recited in the asserted claims of the '539 patent are not sufficiently described

as part of the invention in the priority documents and, therefore, are not entitled to the filing date of the '755 provisional application listed on the face of the '866 patent.

As a result, the asserted claims of the '539 patent are entitled to a priority date of no earlier than December 21, 2012.

With respect to the mucoadhesive layer, the '755 provisional application teaches:

> The flux of a transported medicament is proportionally related to the diffusivity of the environment which can be manipulated by, e.g., adjusting the pH, taking into account the ionic nature of the medicament and/or the ionic nature of the polymer or polymers included in the environment.

('755 provisional application at 5:18-21.)  Although the '755 provisional application teaches "adjusting the pH" of the mucoadhesive layer or polymeric diffusion environment, it does not teach any particular pH range for the layer or environment, let alone a pH of between about 4 and about 6 (*see also* Example 1, describing the preparation of the mucoadhesive layer, and noting that tribasic sodium phosphate and sodium hydroxide were added "to adjust the blend to a desired pH" (*id.* at 12:13-15), but silent as to any particular pH).

Additionally, although original claims of the '755 provisional application were directed to a buffered polymeric diffusion environment having a pH of between about 4 and about 6 (*see id.* at claims 15, 17, 18, 19), original claim language does not necessarily satisfy the written description requirement. In the '755 provisional application, Applicants claim a generic pH range of about 4.0 to about 6.0, but nothing in the '755 application describes any pH range at all for the mucoadhesive layer, let alone a pH range of about 4 to about 6.  "One cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention.  In order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure." *Purdue Pharma L.P. v.*

206

*Faulding Inc.*, 230 F.3d 1320, 1326-27 (2000).  The '755 provisional application does not contain any "blaze marks" directing a POSA to a pH between 4 and 6 for the mucoadhesive layer.

Nor would a POSA understand the '755 provisional patent application to provide a sufficient written description of the claimed buprenorphine dose of "about 100 µg to about 0.9 mg" required by independent claim 1 (and dependent claims 2-7 and 10-22) of the '539 patent. Dependent claim 7 further specifies that the "total daily dose of buprenorphine administered to the subject is selected from the group consisting of 200 µg, 220 µg, 240 µg, 280 µg, 300 µg, 320 µg, 350 µg, 360 µg, 400 µg, 450 µg, 480 µg, 500 µg, 550 µg, 600 µg, 620 µg, 650 µg, 700 µg, 720 µg, 750 µg, 800 µg, 860 µg, 900 µg, 960 µg, 1000 µg, 1100 µg, 1200 µg, 1250 µg, 1300 µg, 1400 µg, 1500 µg, 1600 µg, and 1800 µg."  Dependent claim 12 requires that "the device comprises a dose of buprenorphine selected from the group consisting of 100 µg, 110 µg, 120 µg, 140 µg, 150 µg, 160 µg, 175 µg, and 180 µg," and dependent claim 13 requires that the "total daily dose of buprenorphine administered to the subject ranges from 200 µg  to about 1800 µg."  However, with respect to the total daily dose of buprenorphine, the '755 provisional application teaches as follows:

> In some embodiments, the total daily dose of buprenorphine administered is between 100 µg and 4000 µg, e.g., 100 µg, 120 µg, 150 µg, 180 µg, 200 µg, 220 µg, 240 µg, 280 µg, 300 µg, 320 µg, 350 µg, 360 µg, 400 µg, 450 µg, 480 µg, 500 µg, 550 µg, 600 µg, 620 µg, 650 µg, 700 µg, 720 µg, 750 µg, 800 µg, 860 µg, 900 µg, 960 µg, 1000 µg, 1100 µg, 1200 µg, 1250 µg, 1500 µg, 1800 µg, 2000 µg, 2400 µg, 3000 µg, and 4000 µg of buprenorphine.
>
> In some embodiments, the transmucosal drug delivery devices of the present invention comprise low doses of buprenorphine. In one embodiment, the low dose of buprenorphine is defined as the dose of less than 1500 of buprenorphine. In some embodiments, the low dose of buprenorphine comprises in the mucoadhesive device of the invention is 50 µg, 60 µg, 75 µg, 90 µg, 100 µg, 110 µg, 120 µg, 140 µg, 150 µg, 160 µg, 175 µg, 180 µg, 200 µg, 225 µg, 240 µg, 250 µg, 275 µg, 300 µg, 310 µg, 325 µg, 350 µg, 360 µg, 375

207

> μg, 400 μg, 430 μg, 450 μg, 480 μg, 500 μg, 550 μg, 600 μg, 625 μg, 750 μg, 900 μg, 1000 μg, 1200 μg, 1500 μg, and 2000 μg of buprenorphine.

('755 provisional application at 9:22-10:6; *see also* 10:25-28.) Thus, the '755 provisional application teaches that total daily dose of buprenorphine is between 100 μg and 4000 μg, and teaches several discrete values within that range, but – importantly – does not teach a range of 100 μg to about 0.9 mg buprenorphine, nor a range of about 200 μg to about 1800 μg, nor a mucoadhesive layer comprising 100 μg to about 0.9 mg buprenorphine. Nothing in the '755 provisional application identifies that the top end of the range should be 0.9 mg, as is required by claim 1, or that the top end of the range should be 1800 μg, as is required by claim 13. Nor does anything in the '755 provisional application teach discrete dose values of 1300 μg, 1400 μg, or 1600 μg, as required by claim 7.

The '755 provisional application does not define or disclose the claimed doses or dose ranges of buprenorphine. Thus, the claimed doses and dose ranges recited in the asserted claims of the '539 patent are not sufficiently described as part of the invention in the priority documents and, therefore, are not entitled to the filing date of the '755 provisional application listed on the face of the '539 patent. For this additional reason, asserted claims 1-7 and 10-22 of the '539 patent are entitled to a priority date of no earlier than December 21, 2012.

The asserted claims of the '539 patent are not enabled and/or lack written description by the '539 patent specification for the additional reasons discussed below. For at least the same reasons as discussed below, the claims of the '539 patent specification are not enabled and/or described by the '755 provisional application. Therefore, for this additional reason, the asserted claims of the '539 patent are not entitled to the filing date of the '725 provisional application.

208

The following claim-by-claim analysis of the asserted claims of the '539 patent is

exemplary only.  Providing this analysis in view of certain of the prior art cited in Exhibit A does

not waive any future assertion of any art or any combination of art contained in Exhibit A or

Exhibit B. The assertion of a combination here does not imply that there are no other

combinations or that this is the only combination on which the Defendants intend to rely.

> **2.  The Asserted Claims of the '539 patent Would Have Been Obvious
> Over Vasisht I in View of One or More of Zhang, Hague, Crowley,
> Reder, Furusawa, Cassidy, and McQuinn**

> **(a)  Claim 1**

> > **(i)  "A method of treating chronic pain, the method
> > comprising"**

Vasisht I discloses methods of treating chronic pain by the transmucosal administration

of an effective amount of an active agent such as buprenorphine. (Vasisht I at [0011], [0041].)

Indeed, methods to treat chronic pain by the transmucosal administration of a drug, including

buprenorphine in particular, were well-known to a POSA. (*See, e.g.*, Reder at 8:3-9, 23:13-40;

Furusawa at [0001], [0002], [0021].)

> > **(ii)  "administering to a subject in need thereof a
> > mucoadhesive bioerodable drug delivery device,
> > wherein the device is administered once or twice daily,
> > wherein the device comprises"**

Vasisht I teaches the administration of a bioerodable drug delivery device to the oral

mucosal surface of a subject, where the device comprises buprenorphine disposed in a

mucoadhesive polymeric diffusion environment. (Vasisht I at [0010].) Mucoadhesive drug

delivery devices for transmucosal drug delivery were well-known to a POSA. (*See, e.g.*,

Furusawa at [0037], [0040]-[0041], [0063]-[0064], [0093]-[0114]; Crowley at [0021], [0060].)

Vasisht I does not restrict the dosage regimen of the device.  Vasisht I discloses that the

device can be used to administer an effective amount of a medicament based on a subject's age,

209

sex, and weight, and that "dosage regimens can be adjusted to provide the optimum therapeutic response." (Vasisht I at [0036].) Vasisht I also teaches administering the disclosed device multiple times per day if needed. For example, Vasisht I teaches that "several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation." (*Id.*). Vasisht I further explains, "[f]or example, a device may be a square sheet, perforated into quarters, where each quarter comprises a 200 μg dose. Accordingly, a subject can use the entire device for an 800 μg dose, or detach any portion thereof for a 200 μg, 400 μg or 600 μg dose." (*Id.* at [0092].)

Thus, as recognized by Vasisht I, a POSA would have been capable of adjusting the dosing regimen as necessary, with a reasonable expectation of success. Accordingly, it would have been obvious to a POSA to administer the device of Vasisht I once or twice daily to deliver a drug such as buprenorphine to a subject in need, as required by claim 1.

### (iii)   "a bioerodable mucoadhesive layer comprising about 100 [μ]g to about 0.9 mg buprenorphine and buffered to a pH of between about 4.0 and about 6.0"

Vasisht I teaches a device with a bioerodable mucoadhesive layer. (*See, e.g.*, *id.* at [0072].) In particular:

> In some embodiments, the present invention provides a flexible, bioerodable mucoadhesive delivery device suitable for direct transmucosal administration of an effective amount of a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative to a subject. The mucoadhesive device includes a mucoadhesive layer comprising a fentanyl, fentanyl derivative, buprenorphine or buprenorphine derivative disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of about 7.25 for the fentanyl or fentanyl derivative or a pH of about 6 for the buprenorphine or buprenorphine derivative.

(*Id.* at [0019].)

Thus, Vasisht I teaches that buprenorphine is disposed within a mucoadhesive layer, and teaches that the mucoadhesive layer has a pH of about 6. (*See also id.* at [0012], [0060].) Indeed, a POSA would have been aware that buprenorphine absorbs transmucosally at acidic pH values. (*See, e.g.,* Crowley at [0023], [0028], [0035]; Cassidy at pp. 24, 28-29.) Vasisht I teaches as follows with respect to doses of buprenorphine:

> In another embodiment, the device comprises about 800 μg of buprenorphine. In another embodiment the device comprises about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 μg of buprenorphine. In another embodiment the device comprises about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 μg of any of the medicaments.

(Vasisht I at [0052].) Thus, Vasisht I teaches a bioerodable mucoadhesive layer, buffered to a pH of between about 4.0 and about 6.0, comprising about 100 μg to about 0.9 mg, i.e., 900 μg, buprenorphine.

The use of a bioerodable mucoadhesive layer to contain an effective amount of a drug such as buprenorphine, within a mucoadhesive bioerodable drug delivery device, was well known to a POSA. (*See, e.g.*, Furusawa at [0037], [0040]-[0041], [0063]-[0064], [0093]-[0114]; Crowley at [0021], [0060].) Thus, a POSA would have had a reasonable expectation of successfully disposing an effective amount of buprenorphine, including between about 100 μg and about 0.9 mg in particular, in a bioerodable mucoadhesive layer.

### (iv) "a backing layer buffered to a pH of between about 4.0 and about 4.8 and that does not include an opioid antagonist;"

As demonstrated by the teachings of the prior art discussed below, a POSA would have known that pH has a direct but competing effect on both drug solubility and transmucosal absorption, and that the pH of the backing layer in a transmucosal drug delivery device is important to drug stability and absorption. A POSA also would have been motivated to reduce plasma

concentrations of buprenorphine, to reduce side effects, and would have reasonably expected to provide effective pain management while doing so. To achieve this goal, a POSA would have been motivated to buffer the backing layer of a transmucosal drug delivery device, like that of Vasisht I, to a pH between about 4.0 and about 4.8 in particular. The drug delivery devices of Vasisht I include "a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment." (Vasisht I at [0014].) The backing layer can be devoid of an opioid antagonist (*Id.* at [0099]; *see also* [0015], [0055], [0058].) Vasisht I also teaches that "the device" can include a pH buffering agent. (*Id.* at [0013].) During prosecution of the '959 application, Applicant argued that the backing layer of Vasisht I did not literally meet the recited pH range of about 4 to 4.8 because the average pH of the backing layer of Vasisht I was 5.61. (*See* Amendment in Response to Final Office Action dated July 27, 2017, p. 8.) Applicant's arguments, however, do not support a determination that the pH required by claim 1 is non-obvious.

First, a POSA would have understood that the differences between the pH values of Vasisht I and the values of the '539 patent reflect the different objectives of the references. The goal of Vasisht I is to maximize systemic uptake, i.e., provide high doses, of buprenorphine via transmucosal administration. (*See, e.g., id.* at [0004].) Vasisht I teaches selecting a buffer system that "allows for the optimal administration of the medicament to a subject." (*Id.* at [0063].) For weakly basic drugs, such as buprenorphine, Vasisht I teaches that pH has a direct but competing effect on both the solubility and transmucosal absorption of the drug. (*Id.* at [0032], [0047].) Vasisht I therefore teaches selecting a pH that "is low enough to allow movement of the medicament, while high enough for absorption." (*Id.* at [0047].) Consistent with its objective,

212

Vasisht I teaches buffering the device to pH 6 to provide the highest systemic levels of buprenorphine with a Cmax of 1.05 ng/mL. (*Id.* at [00121]; Table 4.)

By contrast, the objective of the '539 patent is to deliver <u>low doses</u> of buprenorphine via transmucosal administration. (*See, e.g.*, '539 patent at Abstract; 2:12-15, 52-53.)  The '539 patent purports to accomplish that objective with a mucoadhesive bioerodable drug delivery device that is virtually identical to the device of Vasisht I, except with a backing layer buffered to a pH of "between about 4.0 and about 4.8," leading to the recited Cmax range of about 0.156 to about 0.364 ng/mL.  However, a POSA, with knowledge of Vasisht I and other prior art discussed below, would not have found these ranges to be unexpected.

Second, a POSA would have understood that nothing in the teachings of Vasisht I precludes selecting a pH below the preferred range. To the contrary, Vasisht I teaches using a wide range of different pH values, including those falling within the scope of limitation (iv) of claim 1. (Vasisht I at [0060].) Vasisht I also teaches that reducing the pH below the preferred level will reduce the dose of buprenorphine delivered by increasing the extent of drug ionization. (*Id.* at [0047], [0121].)  A POSA would recognize that the teaching in Vasisht I of buffering to pH 6 is simply a selection made to advance its objective of maximizing buprenorphine absorption while balancing other factors such as mobility/solubility, i.e., "the pH is low enough to allow movement of the medicament, while high enough for absorption." (*Id.* at [0047].).  A POSA would thus have interpreted Vasisht I as teaching a preferred pH to achieve a particular result, i.e., to maximize systemic uptake, and not as a *per se* teaching against using other pH values.

> **(v)     wherein the device provides a steady-state Cmax of plasma buprenorphine concentration in a range between about 0.156 and about 0.364 ng/mL**

At the time of the invention, it would have been obvious to a POSA to modify the device of Vasisht I by buffering the backing layer to pH of "between about 4.0 and about 4.8," to achieve a buprenorphine steady-state $C_{max}$ "between about 0.156 and about 0.364 ng/mL" as required by claim 1 of the '539 patent.

Like the '539 patent, Reder is directed to the "surprising result" that effective pain management is provided by a method for treating patients by providing a reduced plasma concentration of buprenorphine, thereby reducing side effects. (*See, e.g.*, Reder at Abstract; 2:63-3:7, 3:21-28; '539 patent at 1:58-60, 2:12-18, 60-67.)  Reder reports that, according to its method, buprenorphine can be administered by any of various methods, including transdermally, sublingually or buccally. (Reder at 3:56-59; *see also id.* at 23:13-40.) Reder discloses the results of a clinical study in which the dosing regimen provided an average buprenorphine $C_{max}$ of 184.80 pg/mL, i.e., 0.185 ng/mL (*id.* at 26:10-17; Table 2), which was effective to provide analgesia (*see, e.g.*, *id.* at 35:2-6). No incidence of severe common opioid adverse events occurred during the study (*Id.* at 26:37-59; Table 3; *see also id.* at 23:44-47).

Thus, a POSA, desiring to reduce side effects associated with the administration of an opioid such as buprenorphine, while still providing effective pain management, would have sought to reduce plasma concentrations of buprenorphine, as taught by Reder. A POSA would have known to use a buffer to manipulate the transmucosal uptake of buprenorphine from a transmucosal delivery device like that of Vasisht I. For example, Zhang teaches that "the physicochemical properties of a drug can be manipulated by changing the surrounding environment" (Zhang at 4:12-14), and states that "the ionized forms [of an ionizable drug] almost always have lower partition coefficients than the unionized forms, and therefore are less well absorbed by the oral mucosal tissue," such that "converting the weak acid or base to an ionized

214

form in order to increase solubility compromises absorption" (*Id.* at 4:58-63). Zhang also discloses that "[a] common method of controlling the pH of the formulation is to use a buffer system," and teaches that "[a]n appropriate buffer system stabilizes the pH." (*Id.* at 4:64-5:1.) The teachings of Zhang apply to the transmucosal delivery of common opioids such as fentanyl and others. (*Id.* at 9:39-42.)

Hague similarly recognizes the criticality of pH in oral transmucosal dosage forms, teaching that the "actual bioavailability" of a drug administered by a transmucosal delivery device "depends upon the combination" of both the "state of ionization and aqueous solubility" of the drug. (Hague at [0058].)  For basic drugs, Hague expressly states that "adding an ionizing agent that maintains a more acidic pH will increase the portion of a basic drug that is present in the ionized form, which may lead to a decrease in the oral transmucosal absorption, and hence, bioavailability." (*Id.* at [0053].)

To that end, Hague teaches the use of a buffer system to control pH in oral transmucosal dosage forms, to "overcome the influence of conditions of the surrounding environment, such as rate of saliva secretion, pH of the saliva, and other factors." (*Id.* at [0057].) Hague demonstrates that a POSA would have known to optimize pH for a particular active agent by balancing the extent of ionization and the solubility, as follows:

> It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH

> depends on the combination of these two effects; state of ionization and aqueous solubility.

(*Id.* at [0058].) Fentanyl and buprenorphine are both weakly basic narcotic analgesics, and are known to behave similarly in solution. (*See, e.g.*, Cassidy at pp. 27-28.) A POSA would have known that the solubility of buprenorphine – like that of fentanyl discussed in Hague – is highly pH dependent, with solubility generally increasing, and transmucosal absorption decreasing, as pH decreases. (*Id.*)

A POSA also would have known that the pH of the backing layer in particular is important to drug stability and transmucosal absorption, and that reducing the pH of the backing layer reduces the pH of the drug layer in transmucosal delivery devices like those of Vasisht I.

More specifically, Furusawa teaches a "film-type edible oral mucosal patch," which includes fentanyl, polymers, a polyhydric alcohol, and a pH-adjusting agent. (Furusawa at Abstract; [0033]-[0034]; [0037]; [0041]; [0051].) The patches in Furusawa can be single-layered, or multi- layered (e.g., two or three layers) such that there is at least one support layer and at least one drug layer containing fentanyl. (*Id.* at [0037]; [0040]; [0041].)  The drug layer of the patch adheres to the oral mucosa. (*Id.* at [0040].)  Furusawa teaches that the pH-adjusting agent of the support layer plays an important role in the stability and transmucosal absorption of the active agent, as follows:

> By containing an appropriate amount of a pH-adjusting agent in the disintegrating support layer, the <u>transmucosal absorption efficiency</u> of a main ingredient, a fentanyl compound, can be increased and the <u>stability</u> of the fentanyl compound in the edible oral mucosal patch can be greatly improved.

(*Id.* at [0064] (emphasis added).) In addition:

> [I]t is not only necessary for a pH-adjusting agent added to the support layer to <u>control the pH in the oral cavity so as to absorb a drug easily,</u> in order for the edible oral mucosal patch formed of

> the disintegrating support layer and the disintegrating drug layer to exhibit its performance more satisfactorily, but also necessary to <u>release the drug by dissolving the drug layer before the drug-absorbable condition created by the pH-adjusting agent is destroyed by secretion of saliva</u>.

(*Id.* at [0100] (emphasis added).)

Thus, a POSA would have known the pH of the backing layer to be important to both absorption and stability of an active compound contained within a transmucosal delivery device, and would have sought to optimize and control the pH of the backing layer by use of a pH-adjusting agent or buffer. More specifically:

> Since the drug layer solution is spread on the support layer which has been formed by coating process in Example 11, the <u>drug layer solution spread on the support layer permeates into the underlying support layer</u>. At that time, a fentanyl compound is migrated together with the solvent into the underlying support layer. The <u>fentanyl compound migrated into the support layer is affected by the pH-adjusting agent contained in the support layer</u>, degrading the stability of the fentanyl compound. Hence, the stability of a preparation can be more improved by physically laminating the support layer and the drug layer.

(*Id.* at [00208].)

Crowley confirms the teachings of Furusawa with respect to the importance of the pH of the backing layer. Crowley teaches methods of stabilizing a base labile drug in a bioadhesive transmucosal delivery device with a drug layer and a backing layer. (Crowley at [0013]-[0060].) The teaching of Crowley applies to opioids such as, e.g., morphine, fentanyl, and naltrexone (*Id.* at [0171].) Like Furusawa, Crowley states that "[s]ince the backing layer can be intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer." (*Id.* at [0134].). Crowley describes studies to assess the effect of backing layer pH on drug layer pH, and observed "decreased degradation of drug in the reservoir layer when the backing layer included an acidic component." (*Id.*) Crowley accordingly teaches reducing the backing layer

217

pH to stabilize a base labile drug residing exclusively within the drug layer. Because drug stabilization occurs via pH reduction, a POSA would recognize from the teachings of Crowley that reducing the backing layer pH also reduces the drug layer pH. In one embodiment, Crowley teaches acidifying the backing layer of a transmucosal drug delivery device by buffering with citric acid to a pH of 4.6. (*Id.*)  Thus, Crowley teaches buffering the backing layer of a mucoadhesive transmucosal drug delivery device to the same pH required by claim 1 of the '539 patent.

As a result, at the time of invention, a POSA, seeking to deliver low doses of buprenorphine to reduce side effects while maintaining effective pain management, would have understood from Vasisht I, Zhang and/or Hague that a decrease in pH of a transmucosal device would cause a decrease in buprenorphine uptake.  A POSA would have been motivated by Furusawa, Crowley and/or Hague to buffer the pH of the backing layer in the transmucosal delivery device of Vasisht I, to stabilize the buprenorphine in the mucoadhesive layer and reduce the dose of the drug. More specifically, Crowley would have motivated a POSA to buffer the backing layer of a mucoadhesive bioerodable drug delivery device to a pH of 4.6, i.e., to a pH between about 4.0 and about 4.8.  In view of the teachings of Vasisht I and Hague regarding the balancing of ionization and solubility for weakly basic narcotic analgesics like buprenorphine, a POSA would have had a reasonable expectation of successfully buffering the backing layer to a pH of 4.6, and thereby reducing the absorption of buprenorphine and its attendant side effects.

Moreover, A POSA would have known that the claimed $C_{max}$ range of "between about 0.156 and about 0.364 ng/mL" would have necessarily resulted from the selected buprenorphine dose and pH of the mucoadhesive and backing layers. For example, Reder provides "reduced plasma concentrations of buprenorphine over a prolonged time period," while

"still providing effective pain management" and reducing undesirable side effects. (Reder at 2:63-67, 3:1-7; '539 patent at 2:12-18.) The average $C_{max}$ of buprenorphine achieved in the clinical study reported by Reder was 0.185 ng/mL, with a standard deviation of 0.06884 (col. 26, lines 10-17 (Table 2)), i.e., between about 0.156 and about 0.364 ng/mL, as required by claim 1.

Here, the claimed pharmacokinetic effect, i.e., a steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.156 and about 0.364 ng/mL, is inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method.

Thus, the subject matter of limitation (v) of claim 1 would have been obvious to a POSA.

### (vi)    "wherein the subject is an opioid-experienced subject"

Vasisht I teaches applying its drug delivery device to individuals who are placed on chronic opioid therapy and individuals who are opioid tolerant. (Vasisht at [0043], [0045].) Since these individuals are currently receiving opioid therapy, they are "opioid-experienced" as required by claim 1. (*See* '539 patent at 6:44-45.)  Contrary to the argument made by applicants during prosecution of the '959 application that resulted in the '539 patent (*see* Amendment and Response to Non-Final Action Under 37 C.F.R. 1.111, dated December 30, 2013, p. 7; Amendment and Response to Final Office Action and Request for Continued Examination, dated November 19, 2014, p. 7), the opioid-experienced subjects of Vasisht I are not limited to those with experience with fentanyl or fentanyl derivatives. Paragraph 45 states:

> For example, the devices of the present invention can be used to treat breakthrough pain in a subject already on chronic opioid therapy.

Nothing in paragraph 45 limits the opioid therapy to fentanyl in particular. The pain management methods described by Reder also apply to opioid-experienced subjects. ('539 patent at 9:47-52.)

In view of the foregoing, a POSA would have reasonably expected to treat chronic pain in opioid-experienced subjects using a mucoadhesive bioerodable drug delivery device comprising buprenorphine, according to the method of Vasisht I or Reder.

> **(vii)** **"wherein the subject treated experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects"**

Vasisht I discloses that those treated by its method suffered moderate to mild adverse events or no adverse events. For example, Vasisht I states that "devices of the present invention are not irritating to the mucosal surface on which it attaches" and that "[i]n some embodiments, the devices of the present invention cause little or no constipation." (Vasisht I at [0055].) Moreover, Vasisht I reports that "[a]ll reported adverse events were mild or moderate in nature." (*Id.* at [0118].) Contrary to applicants' statements during prosecution of the application that resulted in the '539 patent, the teachings of Vasisht I with respect to side effects are not limited to subjects treated with fentanyl or fentanyl derivatives. Paragraph 55, for example, states as follows:

> Accordingly, another advantage of the devices and methods of the present invention is that because the devices of the present invention more efficiently deliver the medicament, e.g., fentanyl <u>or buprenorphine</u>, than do conventional devices, less medicament can be included than must be included in conventional devices to deliver the same amount of medicament. Accordingly, in some embodiments, the <u>devices of the present invention are not irritating to the mucosal surface on which it attaches</u>. In some embodiments, the <u>devices of the present invention cause little or no constipation</u>, even when the devices include an opioid antagonist such as naloxone.

Similarly, Reder discloses that its method causes only moderate to mild adverse events, or no adverse events. In particular, Reder reports "only one incident of a moderate adverse event, and no incidents of severe adverse events reported by the test subjects during the application

220

interval." (Reder at 26:56-59.) Further "dizziness, nausea and sleepiness significantly decreased after day 3 of the dosage interval" and "[o]ther side effects such as headache, vomiting and constipation were also low in occurrence." (*Id.* at 26:59-64.) In view of the teachings of Vasisht I and Reder, a POSA would have reasonably expected to administer a mucoadhesive bioerodable drug delivery device comprising buprenorphine to a subject, without causing more than mild or moderate common opioid adverse events, according to the method of Vasisht I or Reder.

The clinical effects claimed, i.e., mild or moderate common opioid adverse events, or no common opioid adverse effects, are inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method.

In view of the foregoing, the subject matter of claim 1 of the '539 patent would have been obvious to a POSA.

### (b)     Claim 2

Claim 2 depends from claim 1 and requires that "the device is administered once daily." As explained above, Vasisht I does not restrict the dosage regimen of the device. Vasisht I discloses that the device can be used to administer an effective amount of a medicament based on a subject's age, sex, and weight, and that "[d]osage regimens can be adjusted to provide the optimum therapeutic response." (Vasisht I at [0036].) Vasisht I teaches that "several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation." (*Id.*)  Vasisht I further explains, "[f]or example, a device may be a square sheet, perforated into quarters, where each quarter comprises a 200 µg dose. Accordingly, a subject can use the entire device for an 800 µg dose, or detach any portion thereof for a 200 µg, 400 µg or 600 µg dose." (*Id.*)

Thus, it would have been obvious to a POSA to administer the device of Vasisht I once daily to deliver a drug such as buprenorphine to a subject in need, and a POSA would have been able to determine the appropriate dosing schedule through the exercise of routine skill.  The subject matter of claim 2 would have been obvious to a POSA.

### (c)      Claims 3 and 4

Claim 3 depends from claim 1 and recites that the chronic pain is low back pain, and claim 4 depends from claim 1 and recites that the chronic pain is moderate to severe chronic low back pain. Vasisht I teaches using its mucoadhesive bioerodable drug delivery device to treat moderate to severe chronic pain, which includes lower back pain. (Vasisht I at [0011], [0028], [0029].)  It would have been obvious for a POSA to use the device and method of Vasisht I to treat chronic, moderate to severe low back pain, and a POSA would have had a reasonable expectation of success in doing so. (*See, e.g.,* Vasisht I at [0011].)

### (d)      Claim 5

Claim 5 depends from claim 1, and requires that "the subject is treated without significant constipation." As discussed above with respect to limitation (vii) of claim 1, Vasisht I teaches that all reported adverse events associated with administering the disclosed devices "were mild or moderate in nature." (Vasisht I at [0118].) Vasisht I also teaches that "the devices of the present invention cause little or no constipation." (*Id.* at [0055].)

Similarly, and as also discussed above with respect to claim 1, Reder discloses that its method causes only moderate to mild adverse events, or no adverse events. (*See, e.g.*, Reder at 26:56-64.) In view of the teachings of Vasisht I and Reder, a POSA would have reasonably expected to administer a mucoadhesive bioerodable drug delivery device comprising buprenorphine to a subject, without causing more than mild or moderate common opioid adverse

222

events, including without causing significant constipation, according to the method of Vasisht I or Reder.

In any event, the clinical effect claimed, i.e., treatment without significant constipation, is inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method.

Thus, the subject matter of claim 5 would have been obvious to a POSA.

### (e)    Claim 6

Claim 6 depends from claim 1 and requires that "the subject is treated without significant nausea." As discussed above with respect to limitation (vii) of claim 1, Vasisht I teaches that all reported adverse events associated with administering the disclosed devices "were mild or moderate in nature." (Vasisht I at [0118].)

Similarly, and as also discussed above with respect to claim 1, Reder discloses that its method causes only moderate to mild adverse events, or no adverse events. (*See, e.g.*, R e d e r at 26:56-64.) More specifically, Reder reports the results of a clinical study that assessed the incidence of common opioid adverse events, including nausea, and reports that 25% of subjects experienced mild nausea, while no subjects experienced moderate or severe nausea. (*Id.* at 26:37-54; Table 3.)  In view of the teachings of Vasisht I and Reder, a POSA would have reasonably expected to administer a mucoadhesive bioerodable drug delivery device comprising buprenorphine to a subject, without causing significant nausea, according to the method of Vasisht I or Reder.

In any event, the clinical effect claimed, i.e., treatment without significant nausea, is inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method.

Thus, the subject matter of claim 6 would have been obvious to a POSA.

### (f)    Claim 7

Claim 7 depends from claim 1 and requires that the total daily dose of buprenorphine administered to the subject "is selected from the group consisting of 200 [μ]g, 220 [μ]g, 240 [μ]g, 280 [μ]g, 300 [μ]g, 320 [μ]g, 350 [μ]g, 360 [μ]g, 400 [μ]g, 450 [μ]g, 480 [μ]g, 500 [μ]g, 550 [μ]g, 600 [μ]g, 620 [μ]g, 650 [μ]g, 700 [μ]g, 720 [μ]g, 750 [μ]g, 800 [μ]g, 860 [μ]g, 900 [μ]g, 960 [μ]g, 1000 [μ]g, 1100 [μ]g, 1200 [μ]g, 1250 [μ]g, 1300 [μ]g, 1400 [μ]g, 1500 [μ]g, 1600 [μ]g, and 1800 [μ]g of buprenorphine."

Vasisht I teaches as follows with respect to doses of buprenorphine:

> In another embodiment, the device comprises about 800 μg of buprenorphine. In another embodiment the device comprises about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 μg of buprenorphine. In another embodiment the device comprises about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 μg of any of the medicaments.

(Vasisht I at [0052].) Thus, Vasisht I teaches the administration of buprenorphine in amounts selected from the group set forth in claim 7.

Vasisht I does not restrict the dosage regimen of the device.  Vasisht I discloses that the device can be used to administer an effective amount of a medicament based on a subject's age, sex, and weight, and that "[d]osage regimens can be adjusted to provide the optimum therapeutic response." (*Id.* at [0036]; *see also id.* at [0053], [0092], [0104], [0121].)  Thus, it would have been obvious to a POSA to administer the device of Vasisht I to provide a total daily dose of buprenorphine as required by claim 7.  The subject matter of claim 7 would have been obvious to a POSA.

### (g)    Claim 9

Claim 9 differs from claim 1 in that claim 9 is directed to treating moderate to severe chronic low back pain, and claim 9 does not require a specific pK profile. Vasisht I discloses methods of treating chronic pain by the transmucosal administration of an effective amount of an active agent such as buprenorphine. (Vasisht I at [0011], [0041].) Vasisht I teaches that its methods can be used to treat breakthrough pain (*id.* at [0045]), which can occur in patients with lower back pain (*id.* at [0029]). Thus, a POSA would have understood that the methods of Vasisht I could be used to treat moderate to severe low back pain. Indeed, methods to treat chronic pain by the transmucosal administration of a drug, including buprenorphine in particular, were well-known to a POSA. (*See, e.g.*, Reder at 8:3-9, 23:13-40; Furusawa at [0001], [0002], [0021].)

For at least the reasons discussed above and for claim 1, the subject matter of claim 9 of the '539 patent would have been obvious to a POSA.

### (h)    Claim 10

Claim 10 depends from claim 1 and requires that the chronic pain is neuropathic pain. Vasisht I teaches administering the transmucosal drug delivery device to treat chronic pain, which may be caused by "arthritis, cancer, Reflex Sympathetic Dystrophy Syndrome (RSDS), repetitive stress injuries, shingles, headaches, fibromyalgia, and diabetic neuropathy." (Vasisht I at [0028].) Thus, Vasisht I teaches the treatment of chronic neuropathic pain, as required by claim 10. The subject matter of claim 10 would have been obvious to a POSA.

### (i)    Claim 11

Claim 11 depends from claim 1 and recites that the chronic pain is osteoarthritic pain. Vasisht I teaches administering the transmucosal drug delivery device to treat chronic pain, which may be caused by "arthritis, cancer, Reflex Sympathetic Dystrophy Syndrome (RSDS),

repetitive stress injuries, shingles, headaches, fibromyalgia, and diabetic neuropathy." (Vasisht I at [0028].) Vasisht I also teaches the treatment of breakthrough pain, which is "characterized by frequent and intense flares of moderate to severe pain which occur over chronic pain" and may occur "in patients with lower back pain, neck and shoulder pain, moderate to severe osteoarthritis, and patients with severe migraine." (*Id.* at [0029].) Thus, Vasisht I teaches the treatment of chronic osteoarthritic pain, as required by claim 11. The subject matter of claim 11 would have been obvious to a POSA.

### (j)     Claim 12

Claim 12 depends from claim 1 and requires administering a dose of buprenorphine "selected from the group consisting of 100 [μ]g, 110 [μ]g, 120 [μ]g, 140 [μ]g, 150 [μ]g, 160 [μ]g, 175 [μ]g, and 180 [μ]g."  Vasisht I teaches as follows with respect to doses of buprenorphine:

> In another embodiment, the device comprises about 800 μg of buprenorphine. In another embodiment the device comprises about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 μg of buprenorphine. In another embodiment the device comprises about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 μg of any of the medicaments.

(Vasisht I at [0052].) Thus, Vasisht I teaches a bioerodable mucoadhesive layer, buffered to a pH of between about 4.0 and about 6.0, comprising a buprenorphine dose as required by claim 12. Thus, the subject matter of claim 12 would have been obvious to a POSA.

### (k)     Claim 13

Claim 13 depends from claim 1 and requires that the total daily dose of buprenorphine administered to a subject ranges "from 200 [μ]g to about 1800 μg." Vasisht I teaches including "about 800 μg of buprenorphine" or "about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 μg of buprenorphine" in its transmucosal drug delivery device. (*Id.* at

[0052].)  Thus, Vasisht I teaches a bioerodable mucoadhesive layer, buffered to a pH of between about 4.0 and about 6.0, comprising a buprenorphine dose as required by claim 13. The subject matter of claim 13 would have been obvious to a POSA.

## (l)    Claims 14-16

Each of claims 14-16 depends from claim 1, and recite that a "steady-state $T_{max}$ of buprenorphine is in a range between about 2.00 and about 2.90 h" (claim 14), a "$C_{min}$ of buprenorphine is in a range between about 0.0157 and about 0.0862 ng/mL" (claim 15), and a "steady-state $AUC_{last}$ of buprenorphine is in a range between about 0.4085 and about 5.033 h*ng/mL" (claim 16). Vasisht I teaches that "buprenorphine in exemplary devices of the present invention (at pH 6 and 7.25)" provided a $T_{max}$ of 3 hours and a $C_{first}$ of 0.0521 and 0.0845 ng/mL, respectively (paragraph [0121], Table 4). Thus, Vasisht I explicitly or inherently discloses the limitation of claim 14.

In any event, and for the reasons discussed above with respect to claim 1, a POSA, seeking to deliver low doses of buprenorphine to reduce side effects while maintaining effective pain management, would have understood from Vasisht I, Zhang, and/or Hague that a decrease in pH of a transmucosal device would cause a decrease in buprenorphine uptake.  A POSA would have been motivated by Furusawa, Crowley and/or Hague to buffer the pH of the backing layer in the transmucosal delivery device of Vasisht I, to stabilize the buprenorphine in the mucoadhesive layer and reduce the dose of the drug.  More specifically, Crowley would have motivated a POSA to buffer the backing layer of a mucoadhesive bioerodable drug delivery device to a pH of 4.6, i.e., to a pH between about 4.0 and about 4.8. In view of the teachings of Vasisht I and Hague regarding the balancing of ionization and solubility for weakly basic narcotic analgesics like buprenorphine, a POSA would have had a reasonable expectation of successfully

227

buffering the backing layer to a pH of 4.6, and thereby reducing the absorption of buprenorphine and its attendant side effects. A POSA would have known that the claimed steady-state $T_{max}$ of buprenorphine, $C_{min}$ of buprenorphine, and steady-state $AUC_{last}$ of buprenorphine would have necessarily resulted from the selected buprenorphine dose and pH of the mucoadhesive and backing layers.

Moreover, "the discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). The Federal Circuit has held that properties inherent in a claimed invention, even if unappreciated by the prior art, will not render the claimed invention non-obvious. The claimed pharmacokinetic effects are inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method.

Moreover, McQuinn demonstrates that a "steady-state $AUC_{last}$ of buprenorphine . . . in a range between about 0.4085 and about 5.033 h*ng/mL," as required by claim 16, would have been obvious to a POSA. The '539 patent discloses that $AUC_{last}$ refers to the area under the concentration-time curve from time-zero to the time of last quantifiable concentration ('539 patent at 15, Table 16, last footnote). McQuinn discloses "mucoadhesive, oral mucosal patches [that] are capable of reasonably rapid and sustained delivery of therapeutically useful amounts of buprenorphine." (McQuinn at p. 250.) The patches of McQuinn are formed from a compressed mixture of buprenorphine free base, Carbopol 934, polyisobutylene and polyisoprene, backed by an ethylcellulose layer. McQuinn describes a study in which the transmucosal patch was applied to seven human males. The patch was applied to the upper gum during one period and the

228

upper lip area during another period.  The pharmacokinetic results of the study are given in Table 1, including values for AUC.  The definition for AUC used by McQuinn corresponds to the definition that the '539 patent uses for $AUC_{last}$: McQuinn states that "[t]he area under the serum buprenorphine versus time curve was calculated for time zero to the time of last measurable concentration (AUC) by the linear trapezoidal rule." (McQuinn at p. 245.) McQuinn reports that, after gum treatment, individuals 1, 5 and 6 had buprenorphine AUC values of 4622, 4769 and 3456 pg*h/mL, which correspond to values of 4.622, 4.769 and 3.456 ng*h/mL, respectively, which values are "between about 0.4085 and about 5.033 h*ng/mL," as required by claim 16. Similarly, the five reported buprenorphine AUC values for the lip treatment of individuals 1, 3, 4, 5 and 6 correspond to values of 4.736, 4.144, 3.977, 2.657 and 4.257 ng*h/mL, respectively, which values also are "between about 0.4085 and about 5.033 h*ng/mL," as required by claim 16. Thus, McQuinn discloses the $AUC_{last}$ required by claim 16.

For at least the reasons explained above, the subject matter of claims 14-16 would have been obvious to a POSA.

### (m)    Claims 17-22

Claims 17-22 depend from claim 1, and require that a certain percentage of "subjects" experience drug related mild or moderate adverse events, as follows:

- between about 2.4-6.9% of subjects experience drug related mild or moderate headaches as a treatment emergent adverse event (TEAE) (claim 17),

- between about 3-6.9% of subjects experience drug related mild or moderate dizziness as a TEAE (claim 18),

- between about 2.6-27.9% of subjects experience drug related mild or moderate nausea as a TEAE (claim 19),

- between about 1.5-8.5% of subjects experience drug related mild or moderate constipation as a TEAE (claim 20),

229

- between about 0.9-3% of subjects experience drug related mild or moderate vomiting as a TEAE (claim 21), and

- between about 7.7-33.9% of subjects experience drug related mild or moderate TEAEs (claim 22).

Vasisht I discloses that those treated by its method suffered moderate to mild adverse events or no adverse events. For example, Vasisht I states that "devices of the present invention are not irritating to the mucosal surface on which it attaches" and that "[i]n some embodiments, the devices of the present invention cause little or no constipation." (Vasisht I at [0055].) Moreover, Vasisht I reports that "[a]ll reported adverse events were mild or moderate in nature." (*Id.* at [0118].)

Similarly, Reder discloses that its method causes only moderate to mild adverse events, or no adverse events. In particular, Reder reports "only one incident of a moderate adverse event, and no incidents of severe adverse events reported by the test subjects during the application interval." (Reder at 26:56-59.) Further "dizziness, nausea and sleepiness significantly decreased after day 3 of the dosage interval" and "[o]ther side effects such as headache, vomiting and constipation were also low in occurrence." (*Id.* at 26:59-64.) In view of the teachings of Vasisht I and Reder, a POSA would have reasonably expected to administer a mucoadhesive bioerodable drug delivery device comprising buprenorphine to a subject, without causing more than mild or moderate common opioid adverse events, according to the method of Vasisht I or Reder.

In any event, the clinical effects claimed are inherent in the composition of the mucoadhesive bioerodable drug delivery device recited in claim 1 when used in accordance with the steps of the claimed method. Thus, achieving the results required by each of claims 17-22 would have been obvious to a POSA.

In view of the foregoing, the subject matter of claims 17-22 of the '539 patent would have been obvious to a POSA.

### 3. Secondary Indicia of Non-Obviousness

#### (a) Plaintiffs Cannot Show That The '843 Patent is Non-Obvious Because of Secondary Indicia of Non-Obviousness

Defendants are unaware of any secondary indicia of non-obviousness that, when considered in light of the totality of the evidence, would lead to a conclusion that the claimed invention would not have been obvious to a POSA.

As discussed above with respect to claims 1 and 9, during prosecution of the '959 application, Applicant argued that the claimed steady-state $C_{max}$ of about 0.156 to about 0.364 ng/mL was unexpected in view of the disclosure in Vasisht I of "pH dependent $C_{max}$ values of 1.05 and 0.86 ng/mL." (*See* Amendment in Response to Non-Final Office Action dated March 10, 2017, pp. 7-8.)

When assessing whether there are unexpected results, a court should consider "what properties were expected." Based on the prior art cited herein, no showing by the patentee has established unexpected results in comparison to the closest prior art.

In particular, contrary to Applicant's arguments during prosecution, and as the above discussion of the prior art demonstrates:

- A POSA would have been motivated to reduce the plasma concentration of buprenorphine provided by a mucoadhesive bioerodable drug delivery device, in order to reduce side effects associated with buprenorphine (*see* Reder at Abstract; 2:63-3:7; 3:21-28),

- A POSA would have expected to reduce buprenorphine plasma concentration by buffering the pH of backing layer of the device to a certain level (*see* Zhang at 4:12-14 and 58-63, 4:64-5:1; Hague at [0053], [0057]-[0058]; Furusawa at Abstract; [0033]-[0034], [0037], [0040]-[0041], [0051], [0064], [0100], [0208]), such as to pH 4.6 in particular (*see* Crowley at [0134]), which is within the claimed range, and

231

- A POSA would have reasonably expected to provide effective pain management, even at a reduced plasma buprenorphine concentration of 0.185 ng/mL (*see* Reder at 23:10-17; Table 2), which is within the claimed range.

Thus, the claimed $C_{max}$ (as well as all other claimed pharmacokinetic properties) were not unexpected. On the contrary, a POSA would have predicted that a reduction in backing layer pH as claimed would have reduced buprenorphine uptake, resulting in the claimed $C_{max}$.

Moreover, in view of the minor differences between the prior art and the subject matter of the asserted claims of the '539 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to a POSA.

> **(b)**  **A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is negated, or at least overwhelmed, by the existence of one or more blocking patents in the buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in

*Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic

233

pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

### 4.     Other Relevant References

One or more prior art references identified in Section III, *supra*, or Exhibit A or Exhibit B but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

### C.     LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS

#### 1.     The Asserted Claims of the '539 patent Are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled

##### (a)     A Drug Delivery Device Having a Mucoadhesive Layer With a pH "Between About 4.0 and About 6.0," and a Backing Layer With a pH "Between About 4.0 and About 4.8"

The asserted claims of the '539 patent require a mucoadhesive bioerodable drug delivery device comprising a mucoadhesive layer having a pH between about 4.0 and about 6.0, and a backing layer having a pH of between about 4.0 and about 4.8 (*see* independent claims 1 and 9). The bioerodable mucoadhesive layer and backing layers ~~are~~encompass solid layers (*see* Example 1 of the '539 patent). The patentee has not shown how to prepare a solid or solid solution layer

234

having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claim. Moreover, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer having a pH between about 4.0 and about 6.0, and a backing layer having a pH of between about 4.0 and about 4.8. As a result, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

The specification identifies a mucoadhesive bioerodable drug delivery device having at least two layers: a mucoadhesive layer comprising buprenorphine "and buffered to a pH of between about 4.0 and about 6.0," and a backing layer "buffered to a pH of between about 4.0 and about 4.8." (*See, e.g.*, '539 patent at 2:36-41.) Example 1 of the '539 patent describes the preparation of the claimed drug delivery devices, including the preparation of the mucoadhesive and backing layers as separate blends. (*Id.* at 9:30-10:38.)  With respect to the mucoadhesive layer blend, Example 1 states that "[as] the last addition step, tribasic sodium phosphate and sodium hydroxide are added to adjust the blend to a desired pH." (*Id.* at 10:4-6.) Thus, Example 1 describes the adjustment measurement and pH of the blend that is used to create the mucoadhesive layer, before the blend is mixed under vacuum, stored, and then cast onto the backing layer. (*Id.* at 10:6-8.) Similarly, during prosecution of the '959 application that led to the '539 patent, an inventor of the '539 patent submitted a declaration stating that "although we [the inventors] did not measure the pH of the backer layer in the 2008 Publication [i.e., in the context of International Patent Application Publication WO 2008/011194, which is a parent of the '866 patent], we did

235

recently remake the backer <u>formulation</u> from Example 1 of the 2008 Publication and measured the pH three times." (*See* Declaration of Niraj Vasisht I, Ph.D. Under 37 CFR § 1.132, dated July 26, 2017, ¶ 7 (emphasis added).)  In view of the description of the measurement of pH included in the '539 patent, and the statements made describing the measurement of pH during prosecution of the '959 application, a POSA would have understood that the claimed pH range for the backing layer is based on measurements taken of the blend composition used for producing the backing layer, separately from the blend composition used for producing the mucoadhesive layer, and before the layers are joined together to form a drug delivery device. Similarly, a POSA would have understood that the claimed pH range for the mucoadhesive layer is based on measurements taken of the blend composition used for producing the mucoadhesive layer, separately from the blend composition used for producing the backing layer, and before the layers are joined together to form a drug delivery device.

Claim 1 of the '539 patent, however, relates to a method of treating chronic pain comprising, *inter alia*, administering a mucoadhesive bioerodable <u>drug delivery device</u>, wherein the <u>device</u> comprises a mucoadhesive layer "buffered to a pH of between about 4.0 and about 6.0," and a backing layer "buffered to a pH of between about 4.0 and about 4.8." Claim 9 similarly requires a method of treating a subject with moderate to severe chronic low back pain comprising, *inter alia*, administering a mucoadhesive bioerodable drug delivery <u>device</u> comprising a bioerodable mucoadhesive layer comprising a buffered polymeric diffusion environment "having a pH of between about 4 and about 6," and a backing layer "buffered to a pH between about 4.0 and about 4.8."  Thus, claims 1 and 9 of the '539 patent require a mucoadhesive layer and a backing layer having pH values within particular ranges, <u>as part of the drug delivery device</u>. A POSA would understand that the term "drug delivery device," as used in the claims, refers to

the finished drug product, i.e., the device that is formed after the mucoadhesive and backing layers are joined. (*See, e.g.*, '539 patent at 2:12-41; Example 1; 9:30-10:38.) Accordingly, the pH values recited in the claims correspond to those of the layers of the finished device.

However, nothing in the specification purports to measure or control the pH of the mucoadhesive layer or the backing layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together. A POSA would have been aware that, once the separate layers of the device are joined, the mucoadhesive layer can permeate into the backing layer, such that the pH of the mucoadhesive layer impacts the pH of the backing layer, and vice versa (*see, e.g.,* Furusawa at [0208], teaching that "the drug layer solution spread on the support layer permeates into the underlying support layer," such that the active agent "migrated into the support layer is affected by the pH-adjusting agent contained in the support layer," which degrades its stability; Crowley at [0134], teaching that "[s]ince the backing layer can be in intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer". In other words, a POSA would have known that the lower pH of the backing layer can cause the higher pH of the mucoadhesive layer to drop, i.e., to become more acidic, while the higher pH of the mucoadhesive layer can cause the lower pH of the backing layer to increase, i.e., to become more basic. That the pH of the backing layer can affect the pH of the mucoadhesive layer also is confirmed by the teaching in the art that an acidic backing layer can decrease degradation of the active agent in the mucoadhesive layer, which occurs via pH reduction. (*See, e.g.*, Crowley at [0134]; Furusawa at [0064], [0100], [0208].) Indeed, this interaction between the layers, and resulting change in pH, may be the reason that the drug delivery device of the '539 patent provides a lower blood plasma concentration of buprenorphine, as compared to the drug delivery device of Vasisht I. More specifically, buprenorphine in the

237

mucoadhesive layer will become more ionized due to acid leaching from the (more acidic) backing layer into the mucoadhesive layer, which will ionize buprenorphine to a greater extent, and reduce its transmucosal absorption. (*See* Furusawa at [0064]; Crowley at [0134].)

Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, Applicants' description of the pH of the backing layer and mucoadhesive layer – only before the layers are joined – would not demonstrate to a POSA that Applicants had possession of a drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 6.0, and a backing layer buffered to a pH of between about 4.0 and about 4.8.  As a result, the specification fails to describe a <u>device</u> comprising a mucoadhesive layer having "a pH of between about 4.0 and about 6.0," and a backing layer having "a pH of between about 4.0 and about 4.8."  There is nothing in the specification to convey to a POSA that the patentees invented a drug delivery <u>device</u> comprising a mucoadhesive layer and a backing layer having pH values within the ranges required by the '539 patent. As a result, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Nor does the specification teach a POSA how to make or use a drug delivery device comprising a mucoadhesive layer and a backing layer having pH values within the ranges required by the '539 patent, without undue experimentation. The specification provides no guidance with respect to how to measure or control the pH of the mucoadhesive layer or the backing layer of the <u>device</u> itself as claimed, i.e., after the mucoadhesive and backing layers are joined together, nor does it provide any working examples of the characteristics of the layers once they are joined together to make the device. As discussed above, however, once the separate layers of the device are joined, the mucoadhesive layer can permeate into the backing layer, such that

238

the pH of the mucoadhesive layer impacts the pH of the backing layer, and vice versa. (*See, e.g.,* Furusawa at [0208]; Crowley at [0134].)  In other words, a POSA would have known that the lower pH of the backing layer can cause the higher pH of the mucoadhesive layer to drop, i.e., to become more acidic, while the higher pH of the mucoadhesive layer can cause the lower pH of the backing layer to increase, i.e., to become more basic. Because of the known pH interaction between the mucoadhesive and backing layers once they are joined to create the drug delivery device, the description in the specification of the pH of the backing layer and mucoadhesive layer – only before the layers are joined – would not enable a POSA to make a drug delivery device having a mucoadhesive layer buffered to a pH of between about 4.0 and about 6.0, and  a backing layer buffered to a pH of between about 4.0 and about 4.8, without undue experimentation. As a result, for this additional reason, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 for lack of enablement.

### (b)     A Backing Layer that "Does Not Include an Opioid Antagonist"

The asserted claims of the '539 patent require a mucoadhesive bioerodable drug delivery device comprising a backing layer that "does not include an opioid antagonist" (*see* independent claims 1 and 9). The specification, however, does not describe a device comprising a backing layer that does not include an opioid antagonist, but may include other medicaments. As a result, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed backing layer, and the asserted claims are invalid for lack of written description.

More specifically, the specification describes that "[i]n some embodiments, the backing layer <u>includes</u> an additional medicament, such as an <u>opioid antagonist</u>," e.g., naloxone, "to render the device of the invention abuse-resistant." ('539 patent at 9:8-10 (emphasis added).) In addition:

239

> In some embodiments, the backing layer may <u>contain</u> a second medicament <u>intended for dissolution in the saliva</u>. In such cases, the pH of the backing layer is adjusted, such that it impedes flux of the medicament toward the mucoadhesive layer where transmucosal absorption may occur.

(*Id.* at 5:16-20.) In the context of the '539 patent, a POSA would have understood an opioid antagonist to be the second medicament intended for dissolution in the saliva. (*See, e.g.*, *id.* at 1:44-49; 6:53-56; 9:8-20.)

Thus, the specification describes that the backing layer can include a specific second medicament, i.e., an <u>opioid antagonist</u> intended for dissolution in the saliva, but does not describe that the backing layer can include <u>any</u> second medicament. On the other hand, by excluding only the narrow category of opioid antagonists from the backing layer, the asserted claims encompass backing layers including any other medicament, such as an opioid agonist, for example. Importantly, however, the specification does not describe or suggest that the backing layer can include an opioid agonist, or any medicament other than an opioid antagonist intended for dissolution in the saliva.

There is nothing in the specification to convey to a POSA that the patentees invented a drug delivery device comprising a backing layer including any medicament other than an opioid antagonist. Because the claims of the '539 patent expressly state that the backing layer excludes opioid antagonists – the only type of second medicament the specification states that the backing layer <u>can</u> include – the claims cannot properly encompass any other second medicament. The asserted claims of the '539 patent, which encompass a backing layer including any medicament other than an opioid antagonist, are therefore invalid under 35 U.S.C. § 112 for lack of written description.

   **(c)**  **A Mucoadhesive Layer Having a pH Between About 4.0 and About 6.0**

240

The asserted claims of the '539 patent require a mucoadhesive bioerodable drug delivery device comprising a mucoadhesive layer buffered to a pH between about 4.0 and about 6.0 (*see* independent claims 1 and 9).  The specification, however, does not describe a mucoadhesive layer buffered to a pH between about 4.0 and about 6.0.  As a result, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed mucoadhesive layer, and the asserted claims are invalid for lack of written description.

With respect to the pH of the mucoadhesive layer, the specification discloses only as follows:

> In one embodiment, the buprenorphine delivery device comprises a bioerodable mucoadhesive layer comprising a therapeutically effective amount of buprenorphine disposed in a buffered polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6…. In still another embodiment, the device comprises a mucoadhesive layer comprising an effective amount of buprenorphine buffered to a pH of between about 4.0 and about 6.0, and a backing layer buffered to a pH between about 4.0 and about 4.8.

('539 patent at 2:23-41.)  Nothing else in the specification describes or suggests a mucoadhesive layer having a pH between about 4 and about 6.

The asserted claims of the '539 patent broadly claim a mucoadhesive layer having any pH between about 4 and about 6, but the specification does not describe any species within those boundaries. More specifically, although the specification states that "[t]he flux of a transported medicament is proportionally related to the diffusivity of the environment which can be manipulated by, e.g., adjusting the pH," the specification does not further describe or correlate any particular pH value (let alone a pH between about 4 and about 6) to flux of the medicament or diffusivity of the environment. (*See Id.* at 5:1-10.) Similarly, Example 1 describes the preparation of devices of the invention, including the preparation of the mucoadhesive layer from

a blend. Example 1 states that "[a]s the last addition step, tribasic sodium phosphate and sodium hydroxide are added to adjust the blend to a desired pH," but the specification does not identify any specific "desired pH," let alone a pH between about 4 and about 6. (*Id.* at 10:4-6.)

As a result, the disclosure of the patent as a whole does not "reasonably convey" to a POSA that the inventors had possession of the claimed subject matter – here, a mucoadhesive layer having a pH between about 4 and about 6 – as of the filing date of the '959 application that led to the '539 patent. The asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 for failure to satisfy the written description requirement.

Moreover, the asserted claims require the mucoadhesive layer comprise "about 100 [μ]g to about 0.9 mg buprenorphine." The '539 patent specification explicitly defines "buprenorphine" as including "any pharmaceutically acceptable form of buprenorphine, including, but not limited to, salts, esters, and prodrugs thereof." (*Id.* at 4:15-17.) But the '539 patent contains only a hypothetical formulation containing buprenorphine free base. (*See* the '539 patent at Example 1.) No formulations containing any pharmaceutically acceptable salts, esters, or prodrugs of buprenorphine are disclosed. Therefore, for at least this additional reason, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 as lacking written description.

Additionally, because the salt, ester, or prodrug form of an active ingredient impacts the characteristics of a formulation, the '539 patent specification does not enable a POSA to practice the full scope of the invention, i.e., a buprenorphine formulation containing any pharmaceutically acceptable salt, ester, or prodrug thereof, without undue experimentation. Therefore, for at least this additional reason, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 as not being enabled.

242

Also, the asserted claims of the '539 patent encompass any mucoadhesive layer. The mucoadhesive layer can have any composition, so long as it contains an amount of buprenorphine in an amount between 100 μg and 0.9 mg and a buffer sufficient to maintain the pH of the mucoadhesive layer between 4.0 and 6.0 or an effective amount of buprenorphine in a buffered polymeric diffusion environment. But the '539 patent provides only a hypothetical formulation. Because the asserted claims encompass innumerable buprenorphine delivery devices, undue experimentation would be required to practice the full scope of the asserted claims. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this additional reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

### (d)   A Backing Layer Having a pH Between About 4.0 and About 4.8

The asserted claims of the '539 patent require a mucoadhesive bioerodable drug delivery device comprising a backing layer buffered to a pH between about 4.0 and about 4.8 (*see* independent claims 1 and 9). The specification, however, does not describe a backing layer buffered to a pH between about 4.0 and about 4.8. As a result, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed backing layer, and the asserted claims are invalid for lack of written description.

With respect to the pH of the backing layer of the claimed drug delivery device, the specification discloses only as follows:

> In still another embodiment, the device comprises a mucoadhesive layer comprising an effective amount of buprenorphine buffered to a pH of between about 4.0 and about 6.0, and a backing layer buffered to a pH between about 4.0 and about 4.8.

('539 patent at 2:36-41.)  Nothing else in the specification describes or suggests a backing layer having a pH between about 4 and about 4.8.

The asserted claims of the '539 patent broadly claim a backing layer having any pH between about 4 and about 4.8, but the specification does not describe any species within those boundaries. More specifically, the specification states:

> In some embodiments, the backing layer may contain a second medicament intended for dissolution in the saliva. In such cases, the pH of the backing layer is adjusted, such that it impedes flux of the medicament toward the mucoadhesive layer where transmucosal absorption may occur.

(*Id.* at 5:16-20.) However, the specification does not further describe or correlate any particular pH value (let alone a pH between about 4 and about 4.8) to flux of the medicament toward the mucoadhesive layer. Similarly, Example 1 describes the preparation of devices of the invention, including the preparation of the backing layer from a blend. (*Id.* at 10:9-27.) Example 1, however, does not describe or suggest any pH adjustment or buffering of the backing layer, nor does it identify any desirable pH value – let alone a pH between about 4 and about 4.8 – for the backing layer.

As a result, the disclosure of the patent as a whole does not "reasonably convey" to a POSA that the inventors had possession of the claimed subject matter – here, a backing layer having a pH between about 4 and about 4.8 – as of the filing date of the '959 application that led to the '539 patent. The asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 for failure to satisfy the written description requirement.

Moreover, the asserted claims of the '539 patent encompass a barrier layer having any composition, so long as the barrier layer has a pH between about 4.0 and about 4.8. But the '539 patent provides only a hypothetical formulation. Because the asserted claims encompass

innumerable buprenorphine delivery devices, undue experimentation would be required to practice the full scope of the asserted claims. Also, the inventors did not possess the full scope of the asserted claims. Therefore, for at least this reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

**(e)** **A Method of Treating Chronic Pain or A Method of Treating a Subject with Moderate to Severe Chronic Low Back Pain**

The asserted claims are directed to "[a] method of treating chronic pain" or "[a] method of treating a subject with moderate to severe chronic low back pain." The '539 patent explicitly defines "treating" as "preventing, curing, healing, alleviating, relieving, altering, remedying, ameliorating, improving, stabilizing or affecting a disease or disorder, or a symptom of a disease or disorder (e.g., to alleviate pain)." ('539 patent at 5:34-39.) However, the '539 patent does not provide any disclosure on how the delivery device will perform each category of "treatment" e.g., "prevent" or "cure" pain. Therefore, for at least this additional reason, the asserted claims are invalid under 35 U.S.C. § 112 as not being enabled and/or for lacking written description.

**(f)** **Pharmacokinetic Limitations**

Claim 1 of the '539 patent requires that the mucoadhesive bioerodable drug delivery device "provides a steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.156 and about 0.365 ng/mL." Asserted claims 2-7 and 10-12 depend from claim 1 and, therefore, also include the steady-state $C_{max}$ requirement of claim 1. Each of claims 14-16, which depend from claim 1, recites an additional pharmacokinetic limitation for the claimed method: a steady state $T_{max}$ of buprenorphine in a range between about 2.00 and about 2.9 h (claim 14), a $C_{min}$ of buprenorphine in a range between 0.0157 and about 0.862 ng/mL (claim

245

15), and a steady- state $AUC_{last}$ of buprenorphine in a range between about 0.4085 and about 5.933 h*ng/mL (claim 16).

Example 3 and Table 16 of the specification disclose the only data relating to the pharmacokinetic properties required by claims 1-7 and 10-22. In particular:

> Pharmacokinetic parameters for the BEMA Buprenorphine doses used in the treatment of chronic pain were determined in a separate, multiple dose study. BEMA Buprenorphine contained buprenorphine doses of 2 x A µg, and 4 x A µg. Each dose was administered twice daily for 3 days with serial blood samples collected. Selected pharmacokinetic parameters are shown in the Table 16 below.

### TABLE 16

Selected Pharmacokinetic Parameters for BEMA Buprenorphine Buccal Films comprising 1xA µg, 2xA µg, 3xA µg and 4xA µg buprenorphine

| Pharmacokinetic Parameters (Mean values) | 1xA µg | 2xA µg | 3xA µg | 4xA µg |
|---|---|---|---|---|
| $T_{max}$ (hr) | 2.90 | 2.61 | 2.00 | 2.20 |
| $C_{max}$ (ng/mL) | 0.0766 | 0.156 | 0.216 | 0.364 |
| $C_{min}$ (ng/mL) | 0.0157 | 0.0371 | 0.0558 | 0.0862 |
| $C_{avg}$ (ng/mL) | 0.0409 | 0.0805 | 0.113 | 0.195 |
| $AUC_{0-\tau}$ (hr*ng/mL) | 0.4903 | 0.9658 | 1.358 | 2.343 |
| $AUC_{last}$ (hr*ng/mL) | 0.4085 | 0.7902 | 1.111 | 5.033 |

('539 patent at 15:35-67.) The specification provides no guidance on the selection or combination of particular values from Table 16.

Thus, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed pharmacokinetic properties at the time of the invention. Therefore, claims 1-7 and 10-22 are invalid under 35 U.S.C. § 112 for lack of written description.

In addition, because the specification does not teach a POSA, without undue experimentation, how to prepare a drug delivery device that provides any of these pharmacokinetic effects, or to practice a method of treating chronic pain that produces any of

246

these pharmacokinetic effects, asserted claims 1-7 and 10-22 are invalid under 35 U.S.C. § 112 for lack of enablement. The specification states that "[t]he devices comprise about 100 µg to 0.9 mg buprenorphine, and provide steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.1 and about 1.2 ng/mL, such that the subject is treated for chronic pain" (col. 2, lines 19-22). Thus, the specification teaches that a dose of buprenorphine between about 100 µg and 0.9 mg will provide a $C_{max}$ between about 0.1 and about 1.2 ng/mL. In addition:

> In one embodiment, the devices used in the present invention provide steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.1 and about 1.0 ng/mL. In another embodiment, the devices used in the present invention provide steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.1 and about 0.5 ng/mL.

('539 patent at 7:3-10.) The specification does not associate any particular buprenorphine dose or range of doses with these ranges for steady-state $C_{max}$.

The claimed steady-state $C_{max}$, i.e., between about 0.156 and about 0.364 ng/mL, is a significantly narrower range than the broader range described in the specification (e.g., about 0.1– about 1.2 ng/mL), but is not associated with any particular buprenorphine dose or range of doses. In particular, the minimum claimed steady-state $C_{max}$ results from the buprenorphine dose of "2 x A µg" described in Example 3, and the maximum claimed steady-state $C_{max}$ results from the buprenorphine dose of "4 x A µg" described in Example 3.  However, nothing in the specification identifies or correlates a dose of "A µg" (let alone 2 x A µg or 4 x A µg) with any actual dose.  As a result, the specification does not convey to a POSA what buprenorphine dose (or range of doses) will provide a steady-state $C_{max}$ within the specific range claimed. Moreover the $C_{max}$ results reported in Example 3 are "mean $C_{max}$" values, not an individual subject's $C_{max}$ as required by the claims. As a result, the specification does not enable a POSA to determine the buprenorphine dose or range of doses required to produce the claimed steady-state $C_{max}$ in an

individual subject without undue experimentation. Thus, asserted claims 1-7 and 9-22 are invalid under 35 U.S.C. § 112 as not enabled.

Other than the "mean" values provided in Table 16 of Example 3, nothing in the specification of the '539 patent discloses any particular values for steady state $T_{max}$, $C_{min}$, or steady-state $AUC_{last}$ for a particular subject, let alone the particular values claimed by dependent claims 14-16. For the reasons discussed above, and at least because the specification does not identify or correlate a dose of "A µg" (let alone 2 x A µg, 3 x A µg, or 4 x A µg) with any actual dose of buprenorphine, the specification does not convey to a POSA what buprenorphine dose (or range of doses) will provide a steady state $T_{max}$, $C_{min}$, or steady-state $AUC_{last}$ within the specific ranges claimed. As a result, the specification does not enable a POSA to determine the buprenorphine dose or range of doses required to produce the claimed pharmacokinetic parameters in an individual subject without undue experimentation. Claims 14-16 are, therefore, invalid under 35 U.S.C. § 112 for this additional reason.

Moreover, the pharmacokinetic parameters reported in Example 3 are for twice daily administration of the buprenorphine drug delivery device. However, asserted claims 1-7 and 10-22 encompass once daily administration of the buprenorphine drug delivery device. Therefore, asserted claims 1-7 and 10-22 are invalid under 35 U.S.C. § 112 for lack of enablement and/or written description for this additional reason.

### (g)  Mild or Moderate Treatment Emergent Adverse Events (TEAEs)

Claims 17-22 depend from claim 1 and further recite that certain percentages of subjects experience particular "Total Treatment Emergent Adverse Events," or TEAEs. (*See* '539 patent at Table 13.) In particular, the claims require that a very specific percentage range of "subjects" experience mild or moderate headaches (claim 17), mild or moderate dizziness (claim

248

18), mild or moderate nausea (claim 19), mild or moderate constipation (claim 20), mild or moderate vomiting (claim 21), and mild or moderate TEAEs (claim 22). To satisfy the written description requirement of 35 U.S.C. § 112 the disclosure of the application must reasonably convey to a POSA that the inventor had possession of the claimed subject matter as of the filing date of the application.

The specification generically states that treatment according to the '539 patent "does not result in substantial side effects associated with opioids, such as constipation and nausea." ('539 patent at 3:1-2.) The specification also defines "common opioid adverse effects" as including, among others, "headache, constipation, nausea or vomiting, pruritus, somnolence or cognitive impairment, dry mouth, tolerance or dependence and urinary retention." (*Id.* at 7:11-17.) More specifically, the specification states that "for example, less than 15% (preferably less than 10%, more preferably less than 5%) patients experience constipation (*id.* at 2:15-18; *see also id.* at 7:28-30, defining "significant constipation," and 7:31-35, defining "significant nausea"). Thus, the '539 patent generally teaches to reduce – or even eliminate – all TEAEs. Even in reporting the percentages for patients experimenting constipation, the'539 patent teaches that it is preferable to have less than 5% of patients experience this side effect, i.e., teaching that it is most preferable that 0% of patients experiencing a particular side effect.

Example 2 of the '539 patent provides the only additional disclosure of data regarding side effects. In particular, Example 2 describes a study to evaluate the efficacy of BEMA buprenorphine in subjects with moderate to severe chronic low back pain, and reports on the incidence of adverse events. ('539 patent at 10:40-54; 14:7-67; Tables 14-15.) In particular:

> Table 14 below shows the number and percent of subjects who experienced TEAEs during the open label titration period involving 330 subjects, with all TEAEs characterized by event intensity and relationship to the study drug. Table 15 below shows

249

analogous data for the double blind treatment period and buprenorphine treatment group involving 117 subjects. The maximum intensity ever recorded for each event and the drug relationship at that intensity were used to categorize adverse events. "Drug-related" category is listed as "R" and includes adverse events with investigator-assessed relation to drug of "probably" or "possibly." "Non drug-related" category is listed as "NR."

TABLE 14

TEAEs by Event Intensity and Drug Relationship During Open Label Titration Period.

| AE Profile | AE Intensity and Drug Relationship | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mild | | Moderate | | Severe | | Not Reported | | Overall | |
| | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) |
| No. of subject with ≥1 TEAE | 49 (14.8) | 52 (15.8) | 63 (19.1) | 34 (10.3) | 12 (3.6) | 10 (3.0) | 0 | 0 | 124 (37.6) | 96 (29.1) |
| Constipation | 23 (7.0) | 4 (1.2) | 5 (1.5) | 1 (0.3) | 3 (0.9) | 0 | 0 | 0 | 31 (9.4) | 5 (1.5) |
| Nausea | 50 (15.2) | 9 (2.7) | 42 (12.7) | 1 (0.3) | 5 (1.5) | 1 (0.3) | 0 | 0 | 97 (29.4) | 11 (3.3) |
| Vomiting | 3 (0.9) | 6 (1.8) | 7 (2.1) | 0 | 2 (0.6) | 1 (0.3) | 0 | 0 | 12 (3.6) | 7 (2.1) |
| Dizziness | 13 (3.9) | 3 (0.9) | 10 (3.0) | 1 (0.3) | 3 (0.9) | 0 | 0 | 0 | 26 (7.9) | 4 (1.2) |
| Headache | 15 (4.5) | 9 (2.7) | 8 (2.4) | 3 (0.9) | 3 (0.9) | 1 (0.3) | 0 | 0 | 26 (7.9) | 13 (3.9) |

TABLE 15

TEAEs by Event Intensity and Drug Relationship During Double Blind Treatment Period.

| AE Profile | AE Intensity and Drug Relationship | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mild | | Moderate | | Severe | | Not Reported | | Overall | |
| | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) | R n (%) | NR n (%) |
| No. of subject with ≥1 TEAE | 9 (7.7) | 24 (20.5) | 11 (9.94) | 23 (19.7) | 1 (0.9) | 5 (4.3) | 0 | 0 | 21 (17.9) | 52 (44.4) |
| Constipation | 3 (2.6) | 0 | 4 (3.4) | 0 | 0 | 0 | 0 | 0 | 7 (6.0) | 0 |
| Nausea | 5 (4.3) | 3 (2.6) | 3 (2.6) | 0 | 0 | 0 | 0 | 0 | 8 (6.8) | 3 (2.6) |
| Vomiting | 0 | 2 (1.7) | 2 (1.7) | 1 (0.9) | 1 (0.9) | 0 | 0 | 0 | 3 (2.6) | 3 (2.6) |
| Dizziness | 1 (0.9) | 0 | 2 (1.7) | 0 | 1 (0.9) | 0 | 0 | 0 | 4 (3.4) | 0 |
| Headache | 1 (0.9) | 7 (0.6) | 2 (1.7) | 1 (0.9) | 0 | 1 (0.9) | 0 | 0 | 3 (2.6) | 9 (7.7) |

('539 patent at 14:55-67; Tables 14 and 15.)

The claimed values are not apparent from looking at Table 14 and/or Table 15, and specification provides no guidance on the selection or combination of particular values.

The specification does not provide any teaching, or any "blaze marks" directing a POSA to the particular percentages of subjects experiencing the various claimed TEAS. On the

250

contrary, the specification emphasizes the desire for the significant reduction – or even elimination – of side effects all together.  Thus, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed percentages of subjects experiencing particular TEAEs. Thus, claims 17-22 are invalid under 35 U.S.C. § 112 for lack of written description.

### (h)  The Claimed Layers Are Not Limited to Solid Layers

On December 20, 2019, the Court held that "layer" in the terms "a bioerodable mucoadhesive layer," "a barrier layer," and "a backing layer" in claims 1-22 was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7. However, the '539 patent specification does not provide any descriptions of a device with non-solid mucoadhesive, barrier or backing layers. Rather, the specification only describes solid layers for the mucoadhesive, barrier, and backing layers. *See, e.g.*, Example 1 (explaining how the mucoadhesive and backing layers are each cast, cured, and dried) and Figure 4 (showing the flux of medicament through the device in substantially one direction, but never passing into or through the barrier). The patentee has not shown how to prepare a non-solid bioerodable mucoadhesive layer, a non-solid barrier layer, or a non-solid backing layer. Because the '539 patent does not reasonably convey to a POSA that the inventors had possession of the full scope of the claimed device, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 for lack of written description.

Additionally, the patentee has not shown how to prepare or administer a device with a non-solid bioerodable mucoadhesive layer, barrier layer, or backing layer, much less one having the recited characteristics (e.g., pharmacokinetic parameters). Because the '539 patent specification does not enable a POSA to practice the full scope of the invention without undue

experimentation, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 as not being enabled.

**2.     The Asserted Claims of the '539 patent Are Invalid Under 35 U.S.C. § 112 as Indefinite**

**(a)     Mild or Moderate Common Opioid Adverse Effects**

The asserted claims of the '539 patent require, *inter alia*, the administration of a mucoadhesive bioerodable drug delivery device to a subject, wherein the subject treated experiences "mild or moderate common opioid adverse effects" (*see* independent claims 1 and 9). Because the term "mild or moderate common opioid adverse effects" has no clear or accepted objective meaning, and is not objectively defined by the specification, the asserted claims are invalid as indefinite.

More specifically, the specification does not provide a POSA with a standard to determine whether an adverse effect is "mild or moderate."  The specification defines "mild common opioid adverse effects" as "adverse effects that do not require a special treatment and do not interfere with the subject's daily activities," and defines "moderate common opioid adverse effects" as "adverse effects that introduce a low level of inconvenience or concern to the subjects and could interfere with daily activities, but are usually ameliorated by simple therapeutic measures." ('539 patent at 7:18-24.) However, these definitions only introduce additional subjective standards into the claims, e.g., "special treatment," "interfere with the subject's daily activities," "low level of inconvenience or concern," "could interfere with daily activities," "usually ameliorated," and "simple therapeutic measures." Thus, the specification defines "mild or moderate common opioid adverse effects" in a purely subjective manner. "Mild or moderate common opioid adverse effects" is a term of degree, but the '539 patent does not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

252

Therefore, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 as indefinite.

### (b)      Bioerodable Mucoadhesive Layer

The asserted claims require a mucoadhesive bioerodable drug delivery device comprising "a bioerodable mucoadhesive layer."  As discussed above, on December 20, 2019, the Court held that "layer" in the term "a bioerodable mucoadhesive layer" in the asserted claims was not limited to solid layers. *See* December 20, 2019 Markman Hearing Tr. at 39:23-40:7.  But patentees, during the Markman Hearing asserted that the "layer" is "not a liquid, it's not a gas."  *Id.* at 38:10-11.  Because it is unclear as to what "layer" means, the asserted claims of the '539 patent are invalid under 35 U.S.C. § 112 as indefinite for this additional reason.

### (b)(c)   Chronic Low Back Pain

Claims 3 and 4 are directed to treatment of chronic low back pain. Although the specification defines "chronic pain" as "pain which persists beyond the usual recovery period for an injury or illness," ('539 patent at 3:41-43) this definition only introduces subject standards into the claims. Thus, the specification defines "chronic pain" in a purely subjective manner. The '539 patent does not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

Therefore, for at least this additional reason, claims 3 and 4 of the '539 patent are invalid under 35 U.S.C. § 112 as indefinite.

### (c)(d)   Moderate to Severe Chronic Low Back Pain

Claims 4 and 9 are directed to treatment of moderate to severe chronic low back pain. Although the specification defines "moderate to severe low chronic low back pain" as "chronic low back pain characterized, e.g., by pain intensity of ≥5 on an 11-point Numerical Rating Scale (NRS, wherein 0 represents no pain and 10 represents the worst pain imaginable)," ('539 patent

253

at 3:54-58) this definition only introduces subject standards into the claims. Thus, the specification defines "moderate to severe chronic low back pain" in a purely subjective manner. The '539 patent does not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

Therefore, for at least this additional reason, claims 4 and 9 of the '539 patent are invalid under 35 U.S.C. § 112 as indefinite.

### ~~(d)~~(e)   Significant Constipation

Claim 5 specifies that the treated subject is treated "without significant constipation." Although the specification defines "significant constipation" as "chronic or severe constipation associated with the continuous use of morphine or other opioids," ('539 patent at 7:28-30) this definition only introduces subject standards into the claims. Thus, the specification defines "significant constipation" in a purely subjective manner. The '539 patent does not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

Therefore, for at least this additional reason, claim 5 of the '539 patent is invalid under 35 U.S.C. § 112 as indefinite.

### ~~(e)~~(f)   Significant Nausea

Claim 6 specifies that the treated subject is treated "without significant nausea." Although the specification defines "significant nausea" as "a severe condition of nausea that is commonly known in the art. In some embodiments, the term 'significant nausea' is defined with a visual analog scale (VAS) score of greater than or equal to 25 mm on a 0 to 100 mm scale," ('539 patent at 7:31-35) this definition only introduces subject standards into the claims. Thus, the specification defines "significant nausea" in a purely subjective manner. The '539 patent does

not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

Therefore, for at least this additional reason, claim 6 of the '539 patent is invalid under 35 U.S.C. § 112 as indefinite.

### (f)(g)   Bioerodable Mucoadhesive Layer Comprising an Effective Amount of Buprenorphine Disposed in a Buffered Polymeric Diffusion Environment

Claim 9 requires that the drug delivery device comprise "a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a buffered polymeric diffusion environment." This language indicates that a bioerodable mucoadhesive layer is broader than a polymeric diffusion environment. However, the specification indicates that "mucoadhesive layer" and "polymeric diffusion environment" are interchangeable and both refer "to an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion to a mucosal surface." ('539 patent at 5:1-5.) Because the claim is inconsistent with the explicit definition in the specification for "mucoadhesive layer" and "polymeric diffusion environment," claim 9 is invalid under 35 U.S.C. § 112 as indefinite.

### (g)(h)   Mild or Moderate TEAEs

Claims 17-22 depend from claim 1 and further recite that certain percentages of subjects experience particular "Total Treatment Emergent Adverse Events," or TEAEs. (*See* '539 patent at Table 13.) In particular, the claims require mild or moderate headaches (claim 17), mild or moderate dizziness (claim 18), mild or moderate nausea (claim 19), mild or moderate constipation (claim 20), mild or moderate vomiting (claim 21), and mild or moderate TEAEs (claim 22). The term "mild or moderate" TEAEs has no clear or accepted objective meaning, nor is it objectively defined by the specification.  As a result, claims 17-22 are invalid as indefinite.

255

More specifically, the specification does not provide a POSA with a standard to determine whether a particular TEAE is "mild or moderate." The specification defines mild adverse events (AEs) as "transient, did not require a special treatment and did not interfere with the subject's daily activities," and moderate AEs as "AEs that introduced a low level of inconvenience or concern to the subject and could interfere with daily activities, but were usually ameliorated by simple therapeutic measures." ('539 patent at 14:42-49.)  However, these definitions only introduce additional subjective standards into the claims, e.g., "special treatment," "interfere with the subject's daily activities," "low level of inconvenience or concern," "could interfere with daily activities," "usually ameliorated," and "simple therapeutic measures." Thus, the specification defines "mild or moderate" TEAEs in a purely subjective manner. "Mild or moderate" TEAEs is a term of degree, but the '539 patent does not provide objective boundaries for a POSA to determine whether a subject experiences these effects.

Thus, claims 17-22 of the '539 patent are invalid under 35 U.S.C. § 112 as indefinite.

### (h)(i)  Subjects

As discussed above, claims 17-22 depend from claim 1 and further recite that certain percentages of "subjects" experience particular TEAEs, i.e., mild or moderate headaches (claim 17), mild or moderate dizziness (claim 18), mild or moderate nausea (claim 19), mild or moderate constipation (claim 20), mild or moderate vomiting (claim 21), and mild or moderate TEAEs (claim 22).

A claim is indefinite when it has words or phrases that are unclear, including as the result of a lack of antecedent basis in the claim. The term "subjects," as used in claims 17-22, indicates more than one subject. Claim 1, on the other hand, recites the administration of a transmucosal drug delivery device to "a subject," which indicates a singular subject. Nothing in claim 1

mentions "subjects" or more than one "subject." Thus, the "subjects" in claims 17-22 cannot be the same "subject" in claim 1, and it is unclear to a POSA who the "subjects" in claims 17-22 are, or how those "subjects" relate back to claim 1. The lack of antecedent basis for the term "subjects" renders claims 17-22 invalid under 35 U.S.C. § 112 as indefinite.

### 3. Claims 17-22 of the '539 patent Are Invalid Under 35 U.S.C. § 112 for Failing to Further Limit the Subject Matter of the Claims From Which They Depend

Pursuant to 35 U.S.C. § 112, paragraph 4, a dependent claim "shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." The Federal Circuit has held that non-compliance with 35 U.S.C. § 112, paragraph 4, renders the claim unpatentable just as non-compliance with other paragraphs of 35 U.S.C. § 112 would. Each of claims 17-22 depends from claim 1, and each recites that "subjects" experience particular TEAEs, i.e., mild or moderate headaches (claim 17), mild or moderate dizziness (claim 18), mild or moderate nausea (claim 19), mild or moderate constipation (claim 20), mild or moderate vomiting (claim 21), and mild or moderate TEAEs (claim 22). Claim 1, however, recites only "administering to a subject in need thereof a mucoadhesive bioerodable drug delivery device," and wherein the "subject" is opioid-experienced and experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects. Nothing in claim 1 mentions "subjects" or more than one "subject." Thus, claim 1 does not provide antecedent basis for the "subjects" limitations of claims 17-22. As a result, claims 17-22 are invalid under 35 U.S.C. § 112 for failing to further limit the subject matter of the claim from which they depend.

Dated: ~~August 26~~December 30, 2019

*Of Counsel*
*/s/ Charles T. Wysocki*
Dennies Varughese, Pharm. D.
Adam C. LaRock
Lauren A. Watt
Charles T. Wysocki
STERNE, KESSLER,
GOLDSTEIN&FOX P.L.L.C
1100 New York Avenue NW, Suite 600
Washington, DC 20005
(202) 371-2600
dvarughese@sternekessler.com
alarock@sternekessler.com
lwatt@sternekessler.com
cwysocki@sternekessler.com

*Attorneys for Defendants/Counterclaim Plaintiffs Chemo Research S.L. and Insud Pharma S.L.U.*

*Of Counsel*

Paul T. Meiklejohn
Geoffrey M. Godfrey
David Tseng
DORSEY & WHITNEY LLP
701 Fifth Avenue, Ste. 6100
Seattle, WA 98104
meiklejohn.paul@dorsey.com
godfrey.geoff@dorsey.com
tseng.david@dorsey.com
*Attorneys for Defendants/Counterclaim Plaintiffs IntelGenx Corp. and IntelGenx Technologies Corp.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants/Counterclaim Plaintiffs*

**Appendix A - Claim Chart of Claims 1-5 and 8-10 of U.S. Patent No. 8,147,866**

| Claim | Prior Art |
|---|---|
| 1. A method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine, the method comprising: administering buprenorphine to a subject by application of a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6; and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment upon application to the mucosal | Section III.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.

**Vasisht 1:** *See, e.g.,* **Vasisht 1** at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that

facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa."

*See also, e.g., id.* at [0010], which discloses: "In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is

created upon application to the mucosal surface, and the buprenorphine is delivered to the subject."

*See also, e.g., id.* at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes."

*See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the |

| Claim | Prior Art |
|---|---|
| surface. | present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5."

*See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.*, a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.*, the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment."

*See also, e.g., id.* at [0012], which discloses: "In yet another embodiment, the present invention is directed to mucoadhesive delivery devices suitable for direct transmucosal administration of an effective amount of buprenorphine to a subject. The mucoadhesive device generally includes buprenorphine disposed in a polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to a mucosal surface. In one embodiment, the pH is between about 4.0 and about 7.5, *e.g.*, about 6.0 or about 7.25. In another embodiment, the device further comprises at least one additional layer that facilitates unidirectional delivery of the buprenorphine to the mucosa."

*See also, e.g., id.* at [0034], which discloses: "As used herein, the term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (*e.g.*, fentanyl or buprenorphine) through the device, *e.g.*, through a polymeric diffusion environment, in substantially one direction, *e.g.*, to the mucosa of a subject." |

Page 260 of 319

| Claim | Prior Art |
|---|---|
| | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Abstract, which discloses: "The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a nonadhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components." |
| | *See also, e.g., id.* at [0131], which discloses: "Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." |
| | *See also, e.g., id.* at [0046], which discloses: "The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents . . ." |
| | *See also, e.g., id.* at [0059], which discloses: "Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities would have advantages." |
| | **Kramaric:** *See, e.g.,* **Kramaric** at 8:34-35, 47-49, which discloses: "Examples of the active substances that may be included into a pharmaceutical carrier according to the invention are as follows . . . Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid." |
| | **Volker:** *See, e.g.,* **Volker** at Summary, which discloses: "We concluded that oral administration of buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti- |

Page 261 of 319

| Claim | Prior Art |
|---|---|
| | inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis." |
| | **Moro**: *See, e.g.*, **Moro** at Abstract, which discloses: "The device of the present invention consists of a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer and one or more pharmaceuticals if desired in either or both layers. Upon application, the device adheres to the mucosal surface, providing protection to the treatment site and localized drug delivery. The 'Residence Time', the length of time the device remains on the mucosal surface before complete erosion, can be easily regulated by modifications of the backing layer." |
| | *See also, e.g., id.* at [0031], which discloses: "If the incorporated pharmaceutical agent is an analgesic narcotic it may be, for example, fentanyl, buprenorphine, codeine sulfate, levophanol, or morphine hydrochloride." |
| | *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable." |
| | *See also, e.g., id.*, which discloses: "The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination. The non-adhesive backing layer is a precast film alone or in combination with other layers." |
| | *See also, e.g., id.* at [0046], which discloses: "The residence time of the device of the present invention is dependent upon the composition of the modified backing layer and the rate of dissolution of the water-soluble polymers used. The residence time is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the |

| Claim | Prior Art |
|---|---|
| | coating solution . . . The device of the present invention will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." |
| | **Das:** *See, e.g.,* **Das** at 90, which discloses: "We hypothesize that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." |
| | **Chen:** *See, e.g.,* **Chen** at 3:30-32, which discloses: "A novel dosage unit and its method of manufacture and use is provided. In an embodiment, the dosage unit includes a water-soluble hydrocolloid, mucosal surface coat-forming film, such film including an effective dose of an active agent." |
| | **Yang:** *See, e.g.,* **Yang** at [0014], which discloses: "The present invention is directed to rapid-dissolve film products containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product is free of added plasticizers." |
| | **Chiang:** *See, e.g.,* **Chiang** at Abstract, which discloses: "The sublingual combination tablet formulation of buprenorphine and naloxone at a fixed dose ratio of 4:1 has been shown to be as effective as the tablet formulation containing only buprenorphine in treating opiate addiction." |
| | **Todd:** *See, e.g.,* **Todd** at 2:11-17, which discloses: "We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400μg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's." |

| Claim | Prior Art |
|---|---|
| | *See also, e.g., id.* at 2:21-3:4, which discloses: "According to the present invention there is provided a pharmaceutical composition for sublingual administration comprising buprenorphine or a non-toxic salt thereof dissolved in 20-30% v/v aqueous ethanol buffered to between pH 4.5 to 5.5 with 0.05 to 0.2 molar concentration of a buffering agent selected from citric acid/disodium hydrogen phosphate, sodium citrate/hydrochloric acid, lactic acid/disodium hydrogen phosphate, lactic acid/sodium lactate, sodium citrate/citric acid and sodium acetate/acetic acid, the concentration of buprenorphine being between 0.8 and 10 mg/ml of the composition." |
| | *See also, e.g., id.* at 4:7-16, which discloses: "10ml of a 10mg/ml buprenorphine solution in a pH5 mixture of a ~30% v/v aqueous ethanol: citric acid/disodium hydrogen phosphate buffer was prepared as follows: 1. The buffer was prepared by mixing 3.8ml 0.1 M citric acid (21g/l of monohydrate) and 3.2ml 0.2 M disodium hydrogen phosphate (35.6g/l of dihydrate) 2. 3.0ml 95% v/v ethanol was added to the buffer increasing the pH from ~4.6 to ~5.0. 3. 108mg buprenorphine hydrochloride was added with stirring until dissolved." |
| | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa about 8.4, decreases sharply at a pH above 6, reaching a |

| Claim | Prior Art |
|---|---|
| | functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| | **Furusawa**: *See, e.g.,* **Furusawa** at [0063], which discloses: "By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased." |
| | **Sharma**: *See, e.g.,* **Sharma** at 8:20-28, which discloses: "Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. These results indicate that the completely ionized form (pKa=8.4) of drug (pH = 5.0) has higher skin flux than the partially un-ionized form; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports." |
| | **Cassidy**: *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Mendelson**: *See, e.g.,* **Mendelson** at 7:53-55, which discloses: "Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation." |
| | **Shojaei**: *See, e.g.,* **Shojaei** at [0052], which discloses: "At physiological pH the mucus network |

Page 265 of 319

| Claim | Prior Art |
|---|---|
| | carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer." |
| | **Rademacher:** *See, e.g.,* **Rademacher** at [0027], which discloses: "The polymer matrix of a mucoadhesive administration form preferably contains one or more polymers that are water-soluble and/or capable of swelling in aqueous media. By selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour." |
| | *See also, e.g., id.* at [0015], which discloses: "Starting from the following preconsiderations, the above object has been solved by specifically adjusting the pH value in the polymer mass used for the production of film-shaped preparations, i.e., by approximating or adjusting the pH value to the physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." |
| 2. The method of claim 1, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5. | *See* claim 1 of the '866 patent, *supra.* Section III.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 3. The method of claim 1, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5. | *See* claim 1 of the '866 patent, *supra.* Section III.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 4. The method of claim 1, wherein a first quantifiable plasma concentration of buprenorphine is observed at about 45 minutes. | *See* claim 1 of the '866 patent, *supra.* Section III.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

| Claim | Prior Art |
|---|---|
| | **Vasisht I:** *See, e.g.,* **Vasisht I** at [0121], which discloses: "the delivery devices of the present invention at pH 6 appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." Table 4 sets forth "pharmacokinetic data for buprenorphine," including a first quantifiable concentration at 0.75 hours, *i.e.,* 45 minutes. |
| | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Example 40, Table 5, which discloses administering a buccal device to dogs which provides a first quantifiable blood plasma albuterol sulfate concentration above background between 30 to 60 minutes. |
| | **Bullingham I:** *See, e.g.,* **Bullingham I** at 119, Table 2, which discloses plasma levels of buprenorphine after sublingual administration, and reports that the onset of analgesia, *i.e.,* associated with a first quantifiable plasma concentration of buprenorphine, occurred between 15 and 45 minutes. |
| | *See also, e.g., id.* at 121, which discloses "Thus the sublingual route may be particularly appropriate for buprenorphine, where the slow absorption rate combines with its associative properties with the opiate receptor to provide analgesia of long duration." |
| | **Wilding:** *See, e.g.,* **Wilding** at 86, which discloses: "It will be important to tailor carefully the pharmaceutical properties of the transdermal system with the clinically required plasma levels for sustained analgesic therapy." |
| 5. The method of claim 1, wherein an effective plasma concentration of buprenorphine is maintained for at least 4 hours. | *See* claim 1 of the '866 patent, *supra.* Section III.B. of the ~~Initial~~ Amended Invalidity Contentions is incorporated herein. |
| | **Vasisht I:** *See, e.g.,* **Vasisht I** at [0121], Table 4, Figure 3, which discloses that a buprenorphine delivery device with a pH of 6 provides a $C_{max}$ of 1.05 ng/mL at 3 hours, and at 4 hours, the plasma buprenorphine concentration is slightly below 1.0 ng/mL. |
| | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Example 40, Table 5, which discloses administering a buccal device to dogs which provides a blood plasma concentration of albuterol sulfate that was maintained above background over 480 minutes, *i.e.,* for at least 4 hours. |
| 8. A mucoadhesive bioerodable drug delivery device suitable for direct | Section III.B. of the ~~Initial~~ Amended Invalidity Contentions is incorporated herein. |

| Claim | Prior Art |
|---|---|
| transmucosal administration of buprenorphine to a subject, the mucoadhesive bioerodable drug delivery device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH between about 4 and about 6; and a barrier layer comprising a polymeric barrier environment disposed adjacent to the mucoadhesive layer to provide a unidirectional gradient upon application to a mucosal surface for the rapid and efficient delivery of buprenorphine, wherein the unidirectional gradient delivers buprenorphine across the buffered polymeric diffusion environment. | **Vasisht I:** *See, e.g.,* **Vasisht I** at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa." <br><br> *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject." <br><br> *See also, e.g., id.* at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes." <br><br> *See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is |

Page 268 of 319

| Claim | Prior Art |
|-------|-----------|
| | about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5." |
| | *See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.,* a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.,* the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment." |
| | *See also, e.g., id.* at [0012], which discloses: "In yet another embodiment, the present invention is directed to mucoadhesive delivery devices suitable for direct transmucosal administration of an effective amount of buprenorphine to a subject. The mucoadhesive device generally includes buprenorphine disposed in a polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to a mucosal surface. In one embodiment, the pH is between about 4.0 and about 7.5, *e.g.,* about 6.0 or about 7.25. In another embodiment, the device further comprises at least one additional layer that facilitates unidirectional delivery of the buprenorphine to the mucosa." |
| | *See also, e.g., id.* at [0034], which discloses: "As used herein, the term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (*e.g.,* fentanyl or buprenorphine) through the device, *e.g.,* through a polymeric diffusion environment, in substantially one direction, *e.g.,* to the mucosa of a subject." |
| | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Abstract, which discloses: "The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a nonadhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, |

| Claim | Prior Art |
|---|---|
| | providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components." |
| | *See also, e.g., id.* at [0131], which discloses: "Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." |
| | *See also, e.g., id.* at [0046], which discloses: "The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents . . ." |
| | *See also, e.g., id.* at [0059], which discloses: "Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities would have advantages." |
| | **Kramaric:** *See, e.g.,* **Kramaric** at 8:34-35, 47–49, which discloses: "Examples of the active substances that may be included into a pharmaceutical carrier according to the invention are as follows . . . Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid." |
| | **Volker:** *See, e.g.,* **Volker** at Summary, which discloses: "We concluded that oral administration of buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti-inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis." |
| | **Moro:** *See, e.g.,* **Moro** at Abstract, which discloses: "The device of the present invention consists of |

Page 270 of 319

| Claim | Prior Art |
|---|---|
| | a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer and one or more pharmaceuticals if desired in either or both layers. Upon application, the device adheres to the mucosal surface, providing protection to the treatment site and localized drug delivery. The 'Residence Time', the length of time the device remains on the mucosal surface before complete erosion, can be easily regulated by modifications of the backing layer." |
| | *See also, e.g., id.* at [0031], which discloses: "If the incorporated pharmaceutical agent is an analgesic narcotic it may be, for example, fentanyl, buprenorphine, codeine sulfate, levophanol, or morphine hydrochloride." |
| | *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable." |
| | *See also, e.g., id.,* which discloses: "The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination. The non-adhesive backing layer is a precast film alone or in combination with other layers." |
| | *See also, e.g., id.,* at [0046], which discloses: "The residence time of the device of the present invention is dependent upon the composition of the modified backing layer and the rate of dissolution of the water-soluble polymers used. The residence time is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the coating solution . . . The device of the present invention will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." |

| Claim | Prior Art |
|---|---|
| | **Das:** *See, e.g.,* **Das** at 90, which discloses: "We hypothesize that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." |
| | **Chen:** *See, e.g.,* **Chen** at 3:30-32, which discloses: "A novel dosage unit and its method of manufacture and use is provided. In an embodiment, the dosage unit includes a water-soluble hydrocolloid, mucosal surface coat-forming film, such film including an effective dose of an active agent." |
| | **Yang:** *See, e.g.,* **Yang** at [0014], which discloses: "The present invention is directed to rapid-dissolve film products containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product is free of added plasticizers." |
| | **Chiang:** *See, e.g.,* **Chiang** at Abstract, which discloses: "The sublingual combination tablet formulation of buprenorphine and naloxone at a fixed dose ratio of 4:1 has been shown to be as effective as the tablet formulation containing only buprenorphine in treating opiate addiction." |
| | **Todd:** *See, e.g.,* **Todd** at 2:11-17, which discloses: "We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400μg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's."  *See also, e.g., id.* at 2:21-3:4, which discloses: "According to the present invention there is provided a pharmaceutical composition for sublingual administration comprising buprenorphine or a |

Page 272 of 319

| Claim | Prior Art |
|---|---|
|  | non-toxic salt thereof dissolved in 20-30% v/v aqueous ethanol buffered to between pH 4.5 to 5.5 with 0.05 to 0.2 molar concentration of a buffering agent selected from citric acid/disodium hydrogen phosphate, sodium citrate/hydrochloric acid, lactic acid/disodium hydrogen phosphate, lactic acid/sodium lactate, sodium citrate/citric acid and sodium acetate/acetic acid, the concentration of buprenorphine being between 0.8 and 10 mg/ml of the composition." |
|  | *See also, e.g., id.* at 4:7-16, which discloses: "10ml of a 10mg/ml buprenorphine solution in a pH5 mixture of a ~30% v/v aqueous ethanol: citric acid/disodium hydrogen phosphate buffer was prepared as follows: 1. The buffer was prepared by mixing 3.8ml 0.1 M citric acid (21g/l of monohydrate) and 3.2ml 0.2 M disodium hydrogen phosphate (35.6g/l of dihydrate). 2. 3.0ml 95% v/v ethanol was added to the buffer increasing the pH from ~4.6 to ~5.0. 3. 108mg buprenorphine hydrochloride was added with stirring until dissolved." |
|  | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
|  | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |

Page 273 of 319

| Claim | Prior Art |
|---|---|
| | **Furusawa:** *See, e.g.,* **Furusawa** at [0063], which discloses: "By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased." |
| | **Sharma:** *See, e.g.,* **Sharma** at 8:20-28, which discloses: "Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. These results indicate that the completely ionized form (pKa=8.4) of drug (pH = 5.0) has higher skin flux than the partially un-ionized form; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports." |
| | **Cassidy:** *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Mendelson:** *See, e.g.,* **Mendelson** at 7:53-55, which discloses: "Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation." |
| | **Shojaei:** *See, e.g.,* **Shojaei** at [0052], which discloses: "At physiological pH the mucus network carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer." |
| | **Rademacher:** *See, e.g.,* **Rademacher** at [0027], which discloses: "The polymer matrix of a |

| Claim | Prior Art |
|---|---|
| | mucoadhesive administration form preferably contains one or more polymers that are water-soluble and/or capable of swelling in aqueous media. By selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour." |
| | *See also, e.g., id.* at [0015], which discloses: "Starting from the following preconsiderations, the above object has been solved by specifically adjusting the pH value in the polymer mass used for the production of film-shaped preparations, i.e., by approximating or adjusting the pH value to the physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." |
| 9. The device of claim 8, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5. | *See* claims 1, 2, and 8 of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 10. The device of claim 8, wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5. | *See* claims 1, 3, and 8 of the '866 patent, *supra.* Section III.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

Appendix B - Claim Chart of Claims 1-4, 6-10, 12-16, 18-22, and 24-25 of U.S. Patent No. 9,655,843

| Claim | Prior Art |
|---|---|
| 1. A method for delivering buprenorphine to a human comprising: administering a mucoadhesive biodegradable drug delivery device for transmucosal delivery, the device comprising: a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5, and a polymeric barrier environment disposed adjacent to the mucoadhesive layer, and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface. | Section IV.B. of the ~~Initial~~ Amended Invalidity Contentions is incorporated herein.<br><br>**Vasisht 1:** *See, e.g.,* **Vasisht 1** at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that<br><br>facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa."<br><br>*See also, e.g., id.* at [0010], which discloses: "In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is<br><br>created upon application to the mucosal surface, and the buprenorphine is delivered to the subject."<br><br>*See also, e.g., id.* at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes."<br><br>*See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the |

Page 276 of 319

| Claim | Prior Art |
|---|---|
| | present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5."

*See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.*, a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.*, the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment."

*See also, e.g., id.* at [0012], which discloses: "In yet another embodiment, the present invention is directed to mucoadhesive delivery devices suitable for direct transmucosal administration of an effective amount of buprenorphine to a subject. The mucoadhesive device generally includes buprenorphine disposed in a polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to a mucosal surface. In one embodiment, the pH is between about 4.0 and about 7.5, *e.g.*, about 6.0 or about 7.25. In another embodiment, the device further comprises at least one additional layer that facilitates unidirectional delivery of the buprenorphine to the mucosa."

*See also, e.g., id.* at [0034], which discloses: "As used herein, the term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (*e.g.*, fentanyl or buprenorphine) through the device, *e.g.*, through a polymeric diffusion environment, in substantially one direction, *e.g.*, to the mucosa of a subject." |

Page 277 of 319

| Claim | Prior Art |
|---|---|
|  | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Abstract, which discloses: "The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a nonadhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components." |
|  | *See also, e.g., id.* at [0131], which discloses: "Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." |
|  | *See also, e.g., id.* at [0046], which discloses: "The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents . . ." |
|  | *See also, e.g., id.* at [0059], which discloses: "Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities would have advantages." |
|  | **Kramaric:** *See, e.g.,* **Kramaric** at 8:34-35, 47-49, which discloses: "Examples of the active substances that may be included into a pharmaceutical carrier according to the invention are as follows . . . Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid." |
|  | **Volker:** *See, e.g.,* **Volker** at Summary, which discloses: "We concluded that oral administration of buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti- |

| Claim | Prior Art |
|---|---|
| | inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis." |
| | **Moro:** *See, e.g.,* **Moro** at Abstract, which discloses: "The device of the present invention consists of a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer and one or more pharmaceuticals if desired in either or both layers. Upon application, the device adheres to the mucosal surface, providing protection to the treatment site and localized drug delivery. The 'Residence Time', the length of time the device remains on the mucosal surface before complete erosion, can be easily regulated by modifications of the backing layer." |
| | *See also, e.g., id.* at [0031], which discloses: "If the incorporated pharmaceutical agent is an analgesic narcotic it may be, for example, fentanyl, buprenorphine, codeine sulfate, levophanol, or morphine hydrochloride." |
| | *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable." |
| | *See also, e.g., id.,* which discloses: "The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination. The non-adhesive backing layer is a precast film alone or in combination with other layers." |
| | *See also, e.g., id.* at [0046], which discloses: "The residence time of the device of the present invention is dependent upon the composition of the modified backing layer and the rate of dissolution of the water-soluble polymers used. The residence time is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the |

| Claim | Prior Art |
|---|---|
| | coating solution . . . The device of the present invention will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." |
| | **Das**: *See, e.g.,* **Das** at 90, which discloses: "We hypothesize that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." |
| | **Chen**: *See, e.g.,* **Chen** at 3:30-32, which discloses: "A novel dosage unit and its method of manufacture and use is provided. In an embodiment, the dosage unit includes a water-soluble hydrocolloid, mucosal surface coat-forming film, such film including an effective dose of an active agent." |
| | **Yang**: *See, e.g.,* **Yang** at [0014], which discloses: "The present invention is directed to rapid-dissolve film products containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product is free of added plasticizers." |
| | **Chiang**: *See, e.g.,* **Chiang** at Abstract, which discloses: "The sublingual combination tablet formulation of buprenorphine and naloxone at a fixed dose ratio of 4:1 has been shown to be as effective as the tablet formulation containing only buprenorphine in treating opiate addiction." |
| | **Todd**: *See, e.g.,* **Todd** at 2:11-17, which discloses: "We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400µg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's." |

Page 280 of 319

| Claim | Prior Art |
|---|---|
| | *See also, e.g., id.* at 2:21-3:4, which discloses: "According to the present invention there is provided a pharmaceutical composition for sublingual administration comprising buprenorphine or a non-toxic salt thereof dissolved in 20-30% v/v aqueous ethanol buffered to between pH 4.5 to 5.5 with 0.05 to 0.2 molar concentration of a buffering agent selected from citric acid/disodium hydrogen phosphate, sodium citrate/hydrochloric acid, lactic acid/disodium hydrogen phosphate, lactic acid/sodium lactate, sodium citrate/citric acid and sodium acetate/acetic acid, the concentration of buprenorphine being between 0.8 and 10 mg/ml of the composition." |
| | *See also, e.g., id.* at 4:7-16, which discloses: "10ml of a 10mg/ml buprenorphine solution in a pH5 mixture of a ~30% v/v aqueous ethanol: citric acid/disodium hydrogen phosphate buffer was prepared as follows: 1. The buffer was prepared by mixing 3.8ml 0.1 M citric acid (21g/l of monohydrate) and 3.2ml 0.2 M disodium hydrogen phosphate (35.6g/l of dihydrate). 2. 3.0ml 95% v/v ethanol was added to the buffer increasing the pH from ~4.6 to ~5.0. 3. 108mg buprenorphine hydrochloride was added with stirring until dissolved." |
| | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa about 8.4, decreases sharply at a pH above 6, reaching a |

Page 281 of 319

| Claim | Prior Art |
|-------|-----------|
| | functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| | **Furusawa**: *See, e.g.,* **Furusawa** at [0063], which discloses: "By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased." |
| | **Sharma**: *See, e.g.,* **Sharma** at 8:20-28, which discloses: "Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. These results indicate that the completely ionized form (pKa=8.4) of drug (pH = 5.0) has higher skin flux than the partially un-ionized form; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports." |
| | **Cassidy**: *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Mendelson**: *See, e.g.,* **Mendelson** at 7:53-55, which discloses: "Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation." |
| | **Shojaei**: *See, e.g.,* **Shojaei** at [0052], which discloses: "At physiological pH the mucus network |

| Claim | Prior Art |
|---|---|
| | carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer." |
| | **Rademacher:** *See, e.g.,* **Rademacher** at [0027], which discloses: "The polymer matrix of a mucoadhesive administration form preferably contains one or more polymers that are water-soluble and/or capable of swelling in aqueous media. By selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour." |
| | *See also, e.g., id.* at [0015], which discloses: "Starting from the following preconsiderations, the above object has been solved by specifically adjusting the pH value in the polymer mass used for the production of film-shaped preparations, i.e., by approximating or adjusting the pH value to the physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." |
| 2. The method of claim 1, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer. | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 3. The method of claim 1, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer. | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 4. The method of claim 1, wherein the polymeric diffusion environment has a pH of between about 4 to about 6. | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 6. The method of claim 1, wherein | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is |

| Claim | Prior Art |
|---|---|
| the biodegradable drug delivery device further comprises a third layer or coating. | incorporated herein.<br><br>**Tapolsky 1:** *See, e.g.,* **Tapolsky 1** at [0014], which discloses: "In another embodiment, the pharmaceutical delivery device further comprises a third layer between the first adhesive layer and the second backing layer. The third layer is a water-erodable adhesive layer which has a surface area sufficient to encompass said first adhesive layer and contact the mucosal surface."<br><br>**Moro:** *See, e.g.,* **Moro** at [0071], which discloses: In a preferred embodiment, the method comprises application of a multi-layered pharmaceutical carrier device having a first mucoadhesive layer, a second backing layer that also acts as a support layer and a third layer that regulates the residence time of the device." |
| 7. The method of claim 1, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5. | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 8. The method of claim 1, wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6. | *See* claim 1 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 9. The method of claim 7, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer. | *See* claims 1 and 7 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 10. The method of claim 7, wherein said polymeric barrier environment comprises at least one film-forming | *See* claims 1 and 7 of the '843 patent, *supra.* Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

| Claim | Prior Art |
|---|---|
| water-erodible polymer. | |
| 12. The method of claim 7, wherein the biodegradable drug delivery device further comprises a third layer or coating. | *See* claims 1, 6, and 7 of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 13. A device for delivering buprenorphine to a human, the device comprising: a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5; and a polymeric barrier environment disposed adjacent to the mucoadhesive layer, and wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to a buccal surface of a human. | Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.<br><br>**Vasisht 1:** *See, e.g.,* **Vasisht 1** at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa."<br><br>*See also, e.g., id.* at [0010], which discloses: "In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject."<br><br>*See also, e.g., id.* at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes." |

Page 285 of 319

| Claim | Prior Art |
|---|---|
| | *See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5." |
| | *See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.,* a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.,* the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment." |
| | *See also, e.g., id.* at [0012], which discloses: "In yet another embodiment, the present invention is directed to mucoadhesive delivery devices suitable for direct transmucosal administration of an effective amount of buprenorphine to a subject. The mucoadhesive device generally includes buprenorphine disposed in a polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to a mucosal surface. In one embodiment, the pH is between about 4.0 and about 7.5, *e.g.,* about 6.0 or about 7.25. In another embodiment, the device further comprises at least one additional layer that facilitates unidirectional delivery of the buprenorphine to the mucosa." |
| | *See also, e.g., id.* at [0034], which discloses: "As used herein, the term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (*e.g.,* fentanyl or buprenorphine) through the device, *e.g.,* through a polymeric diffusion environment, in substantially one direction, *e.g.,* to the mucosa of a subject." |

Page 286 of 319

| Claim | Prior Art |
|---|---|
|  | **Tapolsky I:** *See, e.g.,* **Tapolsky I** at Abstract, which discloses: "The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a nonadhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components." |
|  | *See also, e.g., id.* at [0131], which discloses: "Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." |
|  | *See also, e.g., id.* at [0046], which discloses: "The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents . . ." |
|  | *See also, e.g., id.* at [0059], which discloses: "Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities would have advantages." |
|  | **Kramaric:** *See, e.g.,* **Kramaric** at 8:34-35, 47-49, which discloses: "Examples of the active substances that may be included into a pharmaceutical carrier according to the invention are as follows . . . Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid." |
|  | **Volker:** *See, e.g.,* **Volker** at Summary, which discloses: "We concluded that oral administration of |

| Claim | Prior Art |
|---|---|
| | buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti-inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis." |
| | **Moro:** *See, e.g.,* **Moro** at Abstract, which discloses: "The device of the present invention consists of a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer and one or more pharmaceuticals if desired in either or both layers. Upon application, the device adheres to the mucosal surface, providing protection to the treatment site and localized drug delivery. The 'Residence Time', the length of time the device remains on the mucosal surface before complete erosion, can be easily regulated by modifications of the backing layer." |
| | *See also, e.g., id.* at [0031], which discloses: "If the incorporated pharmaceutical agent is an analgesic narcotic it may be, for example, fentanyl, buprenorphine, codeine sulfate, levophanol, or morphine hydrochloride." |
| | *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable." |
| | *See also, e.g., id.,* which discloses: "The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination. The non-adhesive backing layer is a precast film alone or in combination with other layers." |
| | *See also, e.g., id.* at [0046], which discloses: "The residence time of the device of the present invention is dependent upon the composition of the modified backing layer and the rate of dissolution |

| Claim | Prior Art |
|---|---|
| | of the water-soluble polymers used. The residence time is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the coating solution . . . The device of the present invention will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." |
| | **Das**: *See, e.g.,* **Das** at 90, which discloses: "We hypothesize that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of drug, leading to better therapeutic efficacy and reproducibility." |
| | **Chen**: *See, e.g.,* **Chen** at 3:30-32, which discloses: "A novel dosage unit and its method of manufacture and use is provided. In an embodiment, the dosage unit includes a water-soluble hydrocolloid, mucosal surface coat-forming film, such film including an effective dose of an active agent." |
| | **Yang**: *See, e.g.,* **Yang** at [0014], which discloses: "The present invention is directed to rapid-dissolve film products containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product is free of added plasticizers." |
| | **Chiang**: *See, e.g.,* **Chiang** at Abstract, which discloses: "The sublingual combination tablet formulation of buprenorphine and naloxone at a fixed dose ratio of 4:1 has been shown to be as effective as the tablet formulation containing only buprenorphine in treating opiate addiction." |
| | **Todd**: *See, e.g.,* **Todd** at 2:11-17, which discloses: "We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate |

| Claim | Prior Art |
|---|---|
| | buffer that following administration of a 400μg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's." |
| | *See also, e.g., id.* at 2:21-3:4, which discloses: "According to the present invention there is provided a pharmaceutical composition for sublingual administration comprising buprenorphine or a non-toxic salt thereof dissolved in 20-30% v/v aqueous ethanol buffered to between pH 4.5 to 5.5 with 0.05 to 0.2 molar concentration of a buffering agent selected from citric acid/disodium hydrogen phosphate, sodium citrate/hydrochloric acid, lactic acid/disodium hydrogen phosphate, lactic acid/sodium lactate, sodium citrate/citric acid and sodium acetate/acetic acid, the concentration of buprenorphine being between 0.8 and 10 mg/ml of the composition." |
| | *See also, e.g., id.* at 4:7-16, which discloses: "10ml of a 10mg/ml buprenorphine solution in a pH5 mixture of a ~30% v/v aqueous ethanol: citric acid/disodium hydrogen phosphate buffer was prepared as follows: 1. The buffer was prepared by mixing 3.8ml 0.1 M citric acid (21g/l of monohydrate) and 3.2ml 0.2 M disodium hydrogen phosphate (35.6g/l of dihydrate). 2. 3.0ml 95% v/v ethanol was added to the buffer increasing the pH from ~4.6 to ~5.0. 3. 108mg buprenorphine hydrochloride was added with stirring until dissolved." |
| | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable |

| Claim | Prior Art |
|-------|-----------|
|       | pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
|       | **Furusawa**: *See, e.g.,* **Furusawa** at [0063], which discloses: "By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased." |
|       | **Sharma**: *See, e.g.,* **Sharma** at 8:20-28, which discloses: "Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. These results indicate that the completely ionized form (pKa=8.4) of drug (pH = 5.0) has higher skin flux than the partially un-ionized form; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports." |
|       | **Cassidy**: *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
|       | **Mendelson**: *See, e.g.,* **Mendelson** at 7:53-55, which discloses: "Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation." |

| Claim | Prior Art |
|---|---|
| 14. The device of claim 13, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer. | **Shojaei:** *See, e.g.,* **Shojaei** at [0052], which discloses: "At physiological pH the mucus network carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer." <br><br> **Rademacher:** *See, e.g.,* **Rademacher** at [0027], which discloses: "The polymer matrix of a mucoadhesive administration form preferably contains one or more polymers that are water-soluble and/or capable of swelling in aqueous media. By selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour." <br><br> *See also, e.g., id.* at [0015], which discloses: "Starting from the following preconsiderations, the above object has been solved by specifically adjusting the pH value in the polymer mass used for the production of film-shaped preparations, i.e., by approximating or adjusting the pH value to the physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." |
| 15. The device of claim 13, wherein said polymeric barrier environment comprises at least one film-forming water-erodible polymer. | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 16. The device of claim 13, wherein the polymeric diffusion environment | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

| Claim | Prior Art |
|---|---|
| has a pH of between about 4 and about 6. | |
| 18. The device of claim 13, wherein the biodegradable drug delivery device further comprises a third layer or coating. | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.<br><br>**Tapolsky 1:** *See, e.g.,* **Tapolsky 1** at [0014], which discloses: "In another embodiment, the pharmaceutical delivery device further comprises a third layer between the first adhesive layer and the second backing layer. The third layer is a water-erodable adhesive layer which has a surface area sufficient to encompass said first adhesive layer and contact the mucosal surface."<br><br>**Moro:** *See, e.g.,* **Moro** at [0071], which discloses: In a preferred embodiment, the method comprises application of a multi-layered pharmaceutical carrier device having a first mucoadhesive layer, a second backing layer that also acts as a support layer and a third layer that regulates the residence time of the device." |
| 19. The device of claim 13, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5. | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 20. The device of claim 13, wherein the polymeric diffusion environment has a pH buffered to between about 4 to about 6. | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 21. The device of claim 19, wherein the polymeric diffusion environment comprises at least one film-forming water-erodible adhesive polymer and at least one bioadhesive polymer. | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 22. The device of claim 19, wherein | *See* claim 13 of the '843 patent, *supra*. Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is |

Page 293 of 319

| Claim | Prior Art |
|---|---|
| said polymeric barrier environment comprises at least one film-forming water-erodible polymer. | incorporated herein. |
| 24. The device of claim 19, wherein the biodegradable drug delivery device further comprises a third layer or coating. | *See* claims 13, 18, and 19 of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 25. A method for treating pain, the method comprising: adhering a mucoadhesive biodegradable drug delivery device to a buccal surface of a human, the device comprising: a bioerodible mucoadhesive layer comprising a therapeutically effective amount of buprenorphine for treating pain disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5; and a polymeric barrier environment disposed adjacent to the mucoadhesive layer wherein a unidirectional diffusion gradient of buprenorphine is provided upon application to the buccal surface. | Section IV.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.

**Vasisht I:** *See, e.g.,* **Vasisht I** at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa."

*See also, e.g., id.* at [0010], which discloses: "In one embodiment, the present invention is directed to methods for enhancing direct transmucosal delivery of buprenorphine to a subject. The method generally includes administering a bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: buprenorphine disposed in a mucoadhesive polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to the mucosal surface, and the buprenorphine is delivered to the subject."

*See also, e.g., id.* at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes." |

Page 294 of 319

| Claim | Prior Art |
|-------|-----------|
|  | *See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5."

*See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.,* a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.,* the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment."

*See also, e.g., id.* at [0012], which discloses: "In yet another embodiment, the present invention is directed to mucoadhesive delivery devices suitable for direct transmucosal administration of an effective amount of buprenorphine to a subject. The mucoadhesive device generally includes buprenorphine disposed in a polymeric diffusion environment; and a barrier environment disposed relative to the polymeric diffusion environment such that a unidirectional gradient is created upon application to a mucosal surface. In one embodiment, the pH is between about 4.0 and about 7.5, *e.g.,* about 6.0 or about 7.25. In another embodiment, the device further comprises at least one additional layer that facilitates unidirectional delivery of the buprenorphine to the mucosa."

*See also, e.g., id.* at [0034], which discloses: "As used herein, the term "unidirectional gradient" refers to a gradient which allows for the flux of a medicament (*e.g.,* fentanyl or buprenorphine) through the |

| Claim | Prior Art |
|---|---|
| | device, *e.g.*, through a polymeric diffusion environment, in substantially one direction, *e.g.*, to the mucosa of a subject." |
| | **Tapolsky 1:** *See, e.g.*, **Tapolsky 1** at Abstract, which discloses: "The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a nonadhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components." |
| | *See also, e.g., id.* at [0131], which discloses: "Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery." |
| | *See also, e.g., id.* at [0046], which discloses: "The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents . . ." |
| | *See also, e.g., id.* at [0059], which discloses: "Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being delivered from enzymes present, for instance, in the oral or vaginal cavities would have advantages." |
| | **Kramaric:** *See, e.g.*, **Kramaric** at 8:34-35, 47-49, which discloses: "Examples of the active substances that may be included into a pharmaceutical carrier according to the invention are as follows . . . Anti-inflammatory and analgesic agents, such as indomethacin, ketoprofen, ibuprofen, ibuproxam, ketorolac, sulindac, nabumetone, etodolac, flurbiprofen, diclofenac sodium, piroxicam, betamethasone, dexamethasone, morphine, buprenorphine, diflunisal, acetylsalicylic acid." |

Page 296 of 319

| Claim | Prior Art |
|---|---|
| | **Volker:** *See, e.g.,* **Volker** at Summary, which discloses: "We concluded that oral administration of buprenorphine is an effective method of pain management in the pathogenesis of SCW-induced arthritis in Lew/SSN rats. In this model of arthritis, oral buprenorphine has a significant anti-inflammatory effect and appears to modulate the destructive arthritic phase in joints in this animal model of arthritis." <br><br> **Moro:** *See, e.g.,* **Moro** at Abstract, which discloses: "The device of the present invention consists of a water-soluble adhesive layer, a non-adhesive, bioerodable backing layer and one or more pharmaceuticals if desired in either or both layers. Upon application, the device adheres to the mucosal surface, providing protection to the treatment site and localized drug delivery. The 'Residence Time', the length of time the device remains on the mucosal surface before complete erosion, can be easily regulated by modifications of the backing layer." <br><br> *See also, e.g., id.* at [0031], which discloses: "If the incorporated pharmaceutical agent is an analgesic narcotic it may be, for example, fentanyl, buprenorphine, codeine sulfate, levophanol, or morphine hydrochloride." <br><br> *See also, e.g., id.* at [0010], which discloses: "In one embodiment, the device comprises a mucoadhesive multi-layered film disc that is water-soluble and bioerodable." <br><br> *See also, e.g., id.,* which discloses: "The adhesive layer of the device is water soluble and the backing layer is bioerodible. The adhesive layer comprises a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, or hydroxyethylmethyl cellulose, alone or in combination, and a bioadhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination. The non-adhesive backing layer is a precast film alone or in combination with other layers." |

Page 297 of 319

| Claim | Prior Art |
|---|---|
|  | *See also, e.g., id.* at [0046], which discloses: "The residence time of the device of the present invention is dependent upon the composition of the modified backing layer and the rate of dissolution of the water-soluble polymers used. The residence time is easily controlled, from minutes to hours, by the amount of coating solution applied to the backing layer and the specific composition of the coating solution . . . The device of the present invention will maximize the unidirectional delivery of an active compound to the treatment site while minimizing the systemic delivery of the drug that results from surface erosion due to saliva or other bodily fluids." |
|  | **Das:** *See, e.g.,* **Das** at 90, which discloses: "We hypothesize that increasing the contact time with the sublingual mucosa with a mucoadhesive delivery system could improve sublingual bioavailability and result in more predictable plasma levels of the drug, leading to better therapeutic efficacy and reproducibility." |
|  | **Chen:** *See, e.g.,* **Chen** at 3:30-32, which discloses: "A novel dosage unit and its method of manufacture and use is provided. In an embodiment, the dosage unit includes a water-soluble hydrocolloid, mucosal surface coat-forming film, such film including an effective dose of an active agent." |
|  | **Yang:** *See, e.g.,* **Yang** at [0014], which discloses: "The present invention is directed to rapid-dissolve film products containing at least one water-soluble polymer including polyethylene oxide alone or in combination with a hydrophilic cellulosic polymer, wherein the film product is free of added plasticizers." |
|  | **Chiang:** *See, e.g.,* **Chiang** at Abstract, which discloses: "The sublingual combination tablet formulation of buprenorphine and naloxone at a fixed dose ratio of 4:1 has been shown to be as effective as the tablet formulation containing only buprenorphine in treating opiate addiction." |

| Claim | Prior Art |
|---|---|
| | **Todd**: *See, e.g.,* **Todd** at 2:11-17, which discloses: "We have discovered in patients that using solutions buffered at pH's 4, 5 and 6 respectively with citric acid/disodium hydrogen phosphate buffer that following administration of a 400µg/0.5ml dose of buprenorphine hydrochloride by the sublingual route that the degree of uptake of the drug was greater at the two higher pH's."<br><br>*See also, e.g., id.* at 2:21-3:4, which discloses: "According to the present invention there is provided a pharmaceutical composition for sublingual administration comprising buprenorphine or a non-toxic salt thereof dissolved in 20-30% v/v aqueous ethanol buffered to between pH 4.5 to 5.5 with 0.05 to 0.2 molar concentration of a buffering agent selected from citric acid/disodium hydrogen phosphate, sodium citrate/hydrochloric acid, lactic acid/disodium hydrogen phosphate, lactic acid/sodium lactate, sodium citrate/citric acid and sodium acetate/acetic acid, the concentration of buprenorphine being between 0.8 and 10 mg/ml of the composition."<br><br>*See also, e.g., id.* at 4:7-16, which discloses: "10ml of a 10mg/ml buprenorphine solution in a pH5 mixture of a ~30% v /v aqueous ethanol: citric acid/disodium hydrogen phosphate buffer was prepared as follows: 1. The buffer was prepared by mixing 3.8ml 0.1 M citric acid (21g/l of monohydrate) and 3.2ml 0.2 M disodium hydrogen phosphate (35.6g/l of dihydrate) 2. 3.0ml 95% v/v ethanol was added to the buffer increasing the pH from ~4.6 to ~5.0. 3. 108mg buprenorphine hydrochloride was added with stirring until dissolved."<br><br>**Hague**: *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules."<br><br>*See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion |

| Claim | Prior Art |
|---|---|
| | makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| | **Furusawa**: *See, e.g.,* **Furusawa** at [0063], which discloses: "By containing an appropriate amount of a pH-adjusting agent in the disintegrating drug layer, the transmucosal absorption efficiency of a main ingredient, a fentanyl compound, can be increased." |
| | **Sharma**: *See, e.g.,* **Sharma** at 8:20-28, which discloses: "Solubility of the base decreases exponentially as the pH increases. Buprenorphine skin flux increased as the pH was decreased to 5. These results indicate that the completely ionized form (pKa=8.4) of drug (pH = 5.0) has higher skin flux than the partially un-ionized form; therefore, further permeation studies were performed using HCl salt as a permeating species. Nevertheless, the permeability coefficients increased as the pH was raised to 8.7, which is consistent with literature reports." |
| | **Cassidy**: *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Mendelson**: *See, e.g.,* **Mendelson** at 7:53-55, which discloses: "Additionally, other pharmacologically acceptable components such as carriers, stabilizers, sugars, buffers, pH adjusters may be included in the formulation." |

| Claim | Prior Art |
|-------|-----------|
|       | **Shojaei:** *See, e.g.,* **Shojaei** at [0052], which discloses: "At physiological pH the mucus network carries a negative charge (due to the sialic acid and sulfate residues) which may play a role in mucoadhesion. At this pH mucus can form a strongly cohesive gel structure that will bind to the epithelial cell surface as a gelatinous layer."<br><br>**Rademacher:** *See, e.g.,* **Rademacher** at [0027], which discloses: "The polymer matrix of a mucoadhesive administration form preferably contains one or more polymers that are water-soluble and/or capable of swelling in aqueous media. By selecting such polymers it is possible to influence the mucoadhesive properties and the release behaviour."<br><br>*See also, e.g., id.* at [0015], which discloses: "Starting from the following preconsiderations, the above object has been solved by specifically adjusting the pH value in the polymer mass used for the production of film-shaped preparations, i.e., by approximating or adjusting the pH value to the physiological pH value of the mucous membrane to which the administration form is to be applied, so that the pH value of the polymer mass does not, or not significantly, differ, from the physiological pH value of the mucous membrane to which the administration form is to be applied." |

**Appendix C - Claim Chart of Claims 1-7 and 9-22 of U.S. Patent No. 9,901,539**

| Claim | Prior Art |
|---|---|
| 1. A method of treating chronic pain, the method comprising: administering to a subject in need thereof a mucoadhesive bioerodable drug delivery device, wherein the device is administered once or twice daily, wherein the device comprises: a bioerodable mucoadhesive layer comprising about 100 µg to about 0.9 mg buprenorphine and buffered to a pH of between about 4.0 and about 6.0; and a backing layer buffered to a pH of between about 4.0 and about 4.8 and that does not include an opioid antagonist; wherein the device provides a steady-state $C_{max}$ of plasma buprenorphine concentration in a range between about 0.156 and about 0.364 ng/mL; wherein the subject is an opioid-experienced subject; and wherein the subject treated experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects. | Section V.B. of the ~~Initial~~ Amended Invalidity Contentions is incorporated herein. **Vasisht 1:** *See, e.g.,* **Vasisht 1** at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes some embodiments, chronic pain is alleviated in the subject. In other embodiments, acute pain is alleviated in the subject, hi [sic] other embodiments, the pain is breakthrough cancer pain."

*See also, e.g., id.* at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa."

*See also, e.g., id.* at [0036], which discloses: "Dosage regimens can be adjusted to provide the optimum therapeutic response. For example, several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation."

*See also, e.g., id.* at [0052], which discloses: "In another embodiment, the device comprises about 800 □ g of buprenorphine. In another embodiment the device comprises about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 □ g of buprenorphine. In another embodiment the device comprises about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 □ g of any of the medicaments described herein." |

| Claim | Prior Art |
|---|---|
| | *See also, e.g., id.* at [0032], which discloses: "As used herein, "polymeric diffusion environment" refers to an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion of the polymeric diffusion environment to a mucosal surface. The flux of a transported medicament is proportionally related to the diffusivity of the environment which can be manipulated by, *e.g.,* the pH, taking into account the ionic nature of the medicament and/or the ionic nature polymer or polymers included in the environment and."

*See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.,* when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5. In other embodiments, the pH of the device maybe about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention."

*See also, e.g., id.* at [0061], which discloses: "The pH of the mucoadhesive polymeric diffusion environment can be adjusted and/or maintained by methods including, but not limited to, the use of buffering agents, or by adjusting the composition of the device of the present invention. For example, adjustment of the components of the device of the present invention that influence pH, e.g., the amount of anti-oxidant, such as citric acid, contained in the device will adjust the pH of the device."

*See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.,* a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.,* the barrier layer may circumscribe the |

| Claim | Prior Art |
|---|---|
| | portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer disposed adjacent to the mucoadhesive polymeric diffusion environment." <br><br> *See also, e.g., id.* at [0043], which discloses: "The combination of a rapid onset with a delayed maximum concentration is particularly advantageous when treating pain, *e.g.,* relief for breakthrough cancer pain (BTP) in opioid tolerant patients with cancer, because immediate relief is provided to alleviate a flare of moderate to severe pain but persistence is also provided to alleviate subsequent flares." <br><br> *See also, e.g., id.* at [0055], which discloses: "Accordingly, in some embodiments, the devices of the present invention are not irritating to the mucosal surface on which it attaches. In some embodiments, the devices of the present invention cause little or no constipation, even when the devices include an opioid antagonist such as naloxone." <br><br> **Reder:** *See, e.g.,* **Reder** at 8:3-9, which discloses: "While chronic pain is often manageable with the use of the combination of 'mild' analgesics, and non-pharmacologic interventions, selected patients continue to experience unacceptably intense pain. Some patients with chronic pain cannot tolerate therapeutic doses of 'mild' analgesics, while others develop pain of such severity that 'strong' analgesics should be considered for subacute or chronic use." <br><br> *See also, e.g., id.* at 2:63-67, which discloses: "It is an object of the present invention to provide a method which allows for reduced plasma concentrations of buprenorphine over a prolonged time period than possible according to prior art methods, while still providing effective pain management." <br><br> *See also, e.g., id.* at 26:6-18, which discloses administering a buprenorphine transdermal patch which provides the following pharmacokinetic parameters: |

| Claim | Prior Art |
|---|---|
| | **TABLE 2** |

| | MEAN | STD. DEV. | GEOMETRIC MEAN | CV % |
|---|---|---|---|---|
| AUC (0-168 hrs) | 17740.68 | 7503.50 | 16263.88 | 42.30 |
| Cmax (pg/ml) | 184.80 | 68.84 | 171.78 | 37.25 |
| Tmax (hrs) | 110.50 | 26.48 | | 23.96 |

*See also, e.g., id.* at 9:47-52, which discloses: "In patients physically dependent on opioids, buprenorphine produces many of the subjective and objective effects of opioids; however, the drug may not be a satisfactory substitute for opioid agonists in all patients physically dependent on opioids. Tolerance to the opioid agonist activity of the drug reportedly develops rarely, if at all."

*See also, e.g., id.* at 26:56-64, which discloses: "As can be seen from the results set forth in Table 3, there was only one incident of a moderate adverse event, and no incidents of severe adverse events reported by the test subjects during the application interval. Further, turning to FIG. 2, it can be seen that the level of dizziness, nausea and sleepiness significantly decreased after day 3 of the dosage interval. Other side effects such as headache, vomiting and constipation were also low in occurrence."

**Furusawa:** *See, e.g.,* **Furusawa** at [0021], which discloses: "Recently, a transmucosal patch for a narcotic analgesic agent such as a fentanyl compound has been increasingly desired in view of ease of drug administration."

*See also, e.g., id.* at [0037], which discloses: "According to a second embodiment of the present invention, the edible oral mucosal patch comprises a non-disintegrating support layer containing a semi —synthetic water-insoluble polymer compound, a synthetic water-soluble polymer compound and a water-soluble polyhydric alcohol; and a disintegrating drug layer containing a fentanyl compound, a semi-synthetic water-soluble polymer compound, a synthetic water-soluble polymer

| Claim | Prior Art |
|---|---|
| | compound, a water-soluble polyhydric alcohol and a pH-adjusting agent." |
| | *See also, e.g., id.* at [0100], which discloses: "This is because it is not only necessary for a pH-adjusting agent added to the support layer to control the pH in the oral cavity so as to absorb a drug easily, in order for the edible oral mucosal patch formed of the disintegrating support layer and the disintegrating drug layer to exhibit its performance more satisfactorily, but also necessary to release the drug by dissolving the drug layer before the drug-absorbable condition created by the pH-adjusting agent is destroyed by secretion of saliva." |
| | **Crowley:** *See, e.g.,* **Crowley** at [0021], which discloses: "A laminate will comprise at least two layers: a bioadhesive drug reservoir layer and a backing layer. In one embodiment, the backing layer of the laminate also includes an acidic component, so as to minimize any interfacial degradation that might occur at the interface of the reservoir layer and the backing layer." |
| | *See also, e.g., id.* at [0022]-[0023], which discloses: "One embodiment of the invention provides a process for preparing a stabilized bioadhesive hot-melt extruded laminate comprising a bioadhesive hydrophilic reservoir layer comprising an alkaline labile drug . . . wet or dry granulating at least one water swellable or water soluble alkaline thermoplastic polymer, an antioxidant, at least one bioadhesive polymer, at least one acidic component, optionally one or more hydrophobic polymers, optionally one or more hydrophilic polymers, and optionally one or more other excipients to form an excipient mixture having a solution pH (when dissolved) of about 7 or less or less than the pH where the alkaline labile drug degrades . . . |
| | *See also, e.g., id.* at [134], which discloses: "Since the backing layer can be intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer . . . The results indicate decreased degradation of drug in the reservoir layer when the backing layer included an acidic component in an amount sufficient to render the solution pH of the backing film less than about 7 or less than the pH at which the alkaline labile drug degrades." |

Page 306 of 319

| Claim | Prior Art |
|---|---|
| | **Cassidy:** *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Zhang:** *See, e.g.,* **Zhang** at 4:53-5:3, which discloses: "For weak acids or weak bases, which are ionizable, there is yet another way to manipulate the solubility and dissolution rate. The weak acid or weak base can react with base or acid, respectively, to form a salt. The ionized salt forms will almost always have higher solubilities and dissolution rates than the unionized forms. In many cases, they are also more stable chemically or physically. However, the ionized forms almost always have lower partition coefficients than the unionized forms, and therefore are less well absorbed by the oral mucosal tissue. Thus, converting the weak acid or base to an ionized form in order to increase solubility compromises absorption. A common method of controlling the pH of the formulation is to use a buffer system. A buffer system consists of hydrogen ion donor(s) (acid) and conjugate hydrogen ion receiver(s) (base). An appropriate buffer system stabilizes the pH. However, optimizing the pH generally compromises the solubility and partition coefficient for oral transmucosal drug delivery." |
| | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility |

| Claim | Prior Art |
|---|---|
| | of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| | **Hague**: *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| 2. The method according to claim 1, wherein the device is administered | *See* claim 1 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

Page 308 of 319

| Claim | Prior Art |
|---|---|
| once daily. | |
| 3. The method according to claim 1, wherein the chronic pain is chronic low back pain. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.<br><br>**Vasisht I:** *See, e.g.,* **Vasisht I** at [0011], which discloses: "Although commonly found in patients with cancer, breakthrough pain also occurs in patients with lower back pain, neck and shoulder pain, moderate to severe osteoarthritis, and patients with severe migraine." |
| 4. The method according to claim 1, wherein the chronic pain is moderate to severe chronic low back pain. | *See* claims 1 and 3 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 5. The method according to claim 1, wherein the subject is treated without significant constipation. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 6. The method according to claim 1, wherein the subject is treated without significant nausea. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 7. The method according to claim 1, wherein the total daily dose of buprenorphine administered to the subject is selected from the group consisting of 200 µg, 220 µg, 240 µg, 280 µg, 300 µg, 320 µg, 350 µg, 360 µg, 400 µg, 450 µg, 480 µg, 500 µg, 550 µg, 600 µg, 620 µg, 650 µg, 700 µg, 720 µg, 750 µg, 800 µg, 860 µg, 900 µg, 960 µg, 1000 µg, 1100 µg, 1200 µg, 1250 µg, 1300 µg, 1400 µg, 1500 µg, 1600 µg, and 1800 µg of buprenorphine. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 9. A method of treating a subject with | Section V.B. of the Amended Invalidity Contentions is incorporated herein. |

Page 309 of 319

| Claim | Prior Art |
|---|---|
| moderate to severe chronic low back pain, comprising: administering to the subject twice daily a mucoadhesive bioerodable drug delivery device to an oral mucosal surface of the subject, the device comprising: a bioerodable mucoadhesive layer comprising an effective amount of buprenorphine disposed in a buffered polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6; and a backing layer having a pH between about 4.0 and about 4.8 and that does not include an opioid antagonist; wherein the total daily dose of buprenorphine administered to the subject is effective for treating moderate to severe chronic low back pain; wherein the subject is an opioid-experienced subject; and wherein the subject treated experiences mild or moderate common opioid adverse effects, or no common opioid adverse effects. | **Vasisht I:** *See, e.g.,* **Vasisht I** at [0011], which discloses: "In another embodiment, the present invention is directed to methods for treating pain in a subject. The method generally includes transmucosally administering to a subject a therapeutically effective amount of buprenorphine disposed in a mucoadhesive polymeric diffusion environment such that the effective amount of the buprenorphine is delivered in less than about 30 minutes some embodiments, chronic pain is alleviated in the subject. In other embodiments, acute pain is alleviated in the subject, hi [sic] other embodiments, the pain is breakthrough cancer pain." <br><br> *See also, e.g., id.* at [0004], which discloses: "The present invention provides transmucosal devices for enhanced uptake of a medicament and methods of making and using the same. In some embodiments, the devices generally include a mucoadhesive polymeric diffusion environment that facilitates not only the absorption of the medicament across the mucosal membrane to which it is applied, but additionally, the permeability and/or motility of the medicament through the mucoadhesive polymeric diffusion environment to the mucosa." <br><br> *See also, e.g., id.* at [0036], which discloses: "Dosage regimens can be adjusted to provide the optimum therapeutic response. For example, several divided doses may be administered daily or the dose may be proportionally reduced as indicated by the exigencies of the therapeutic situation." <br><br> *See also, e.g., id.* at [0052], which discloses: "In another embodiment, the device comprises about 800 □ g of buprenorphine. In another embodiment the device comprises about 100, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, or 2000 □ g of buprenorphine. In another embodiment the device comprises about 25, 50, 75, 100, 150, 200, 300, 400, 500, 600, 700, 900, 1000, 1200, 1500, 1600 or 2000 □ g of any of the medicaments described herein." <br><br> *See also, e.g., id.* at [0032], which discloses: "As used herein, "polymeric diffusion environment" |

| Claim | Prior Art |
|---|---|
| | refers to an environment capable of allowing flux of a medicament to a mucosal surface upon creation of a gradient by adhesion of the polymeric diffusion environment to a mucosal surface. The flux of a transported medicament is proportionally related to the diffusivity of the environment which can be manipulated by, *e.g.*, the pH, taking into account the ionic nature of the medicament and/or the ionic nature polymer or polymers included in the environment and." |
| | *See also, e.g., id.* at [0060], which discloses: "In one embodiment, *e.g.*, when the medicament is buprenorphine, the pH of the mucoadhesive polymeric diffusion environment in the devices of the present invention is between about 4.0 and about 7.5. In another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 6.0. In one embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 5.5 to about 6.5, or between about 6.0 and 6.5. In yet another embodiment, the pH of the mucoadhesive polymeric diffusion environment is about 7.25. In another embodiment, the pH is between about 7.0 and 7.5, or between about 7.25 and 7.5. In other embodiments, the pH of the device maybe about 4.0, 4.5, 5.0, 5.5, 6.0, 6.5, 7.0, or 7.5, or any incremental value thereof. It is to be understood that all values and ranges between these values and ranges are meant to be encompassed by the present invention." |
| | *See also, e.g., id.* at [0061], which discloses: "The pH of the mucoadhesive polymeric diffusion environment can be adjusted and/or maintained by methods including, but not limited to, the use of buffering agents, or by adjusting the composition of the device of the present invention. For example, adjustment of the components of the device of the present invention that influence pH, *e.g.*, the amount of anti-oxidant, such as citric acid, contained in the device will adjust the pH of the device." |
| | *See also, e.g., id.* at [0074], which discloses: "The barrier environment can be, *e.g.*, a backing layer. A backing layer can be included as an additional layer disposed adjacent to the mucoadhesive polymeric diffusion environment. The layers can be coterminous, or, *e.g.*, the barrier layer may circumscribe the portion of the mucoadhesive polymeric diffusion environment that will not be in direct contact with the mucosa upon application of the device. In one embodiment, the device comprises a backing layer |

| Claim | Prior Art |
|---|---|
| | disposed adjacent to the mucoadhesive polymeric diffusion environment." |
| | *See also, e.g., id.* at [0043], which discloses: "The combination of a rapid onset with a delayed maximum concentration is particularly advantageous when treating pain, *e.g.*, relief for breakthrough cancer pain (BTP) in opioid tolerant patients with cancer, because immediate relief is provided to alleviate a flare of moderate to severe pain but persistence is also provided to alleviate subsequent flares." |
| | *See also, e.g., id.* at [0055], which discloses: "Accordingly, in some embodiments, the devices of the present invention are not irritating to the mucosal surface on which it attaches. In some embodiments, the devices of the present invention cause little or no constipation, even when the devices include an opioid antagonist such as naloxone." |
| | **Reder:** *See, e.g.,* **Reder** at 8:3-9, which discloses: "While chronic pain is often manageable with the use of the combination of 'mild' analgesics, and non-pharmacologic interventions, selected patients continue to experience unacceptably intense pain. Some patients with chronic pain cannot tolerate therapeutic doses of 'mild' analgesics, while others develop pain of such severity that 'strong' analgesics should be considered for subacute or chronic use." |
| | *See also, e.g., id.* at 2:63-67, which discloses: "It is an object of the present invention to provide a method which allows for reduced plasma concentrations of buprenorphine over a prolonged time period than possible according to prior art methods, while still providing effective pain management." |
| | *See also, e.g., id.* at 26:6-18, which discloses administering a buprenorphine transdermal patch which provides the following pharmacokinetic parameters: |

| Claim | Prior Art |
|---|---|
|  | **TABLE 2**<br><br>*See also, e.g., id.* at 9:47-52, which discloses: "In patients physically dependent on opioids, buprenorphine produces many of the subjective and objective effects of opioids; however, the drug may not be a satisfactory substitute for opioid agonists in all patients physically dependent on opioids. Tolerance to the opioid agonist activity of the drug reportedly develops rarely, if at all."<br><br>*See also, e.g., id.* at 26:56-64, which discloses: "As can be seen from the results set forth in Table 3, there was only one incident of a moderate adverse event, and no incidents of severe adverse events reported by the test subjects during the application interval. Further, turning to FIG. 2, it can be seen that the level of dizziness, nausea and sleepiness significantly decreased after day 3 of the dosage interval. Other side effects such as headache, vomiting and constipation were also low in occurrence."<br><br>**Furusawa:** *See, e.g.,* **Furusawa** at [0021], which discloses: "Recently, a transmucosal patch for a narcotic analgesic agent such as a fentanyl compound has been increasingly desired in view of ease of drug administration."<br><br>*See also, e.g., id.* at [0037], which discloses: "According to a second embodiment of the present invention, the edible oral mucosal patch comprises a non-disintegrating support layer containing a semi—synthetic water-insoluble polymer compound, a synthetic water-soluble polymer compound and a water-soluble polyhydric alcohol; and a disintegrating drug layer containing a fentanyl compound, a semi-synthetic water-soluble polymer compound, a synthetic water-soluble polymer |

The TABLE 2 data:

| | MEAN | STD. DEV. | GEOMETRIC MEAN | CV % |
|---|---|---|---|---|
| AUC (0–168 hrs) | 17740.68 | 7503.50 | 16263.88 | 42.30 |
| Cmax (pg/ml) | 184.80 | 68.84 | 171.78 | 37.25 |
| Tmax (hrs) | 110.50 | 26.48 | | 23.96 |

| Claim | Prior Art |
|---|---|
| | compound, a water-soluble polyhydric alcohol and a pH-adjusting agent." |
| | *See also, e.g., id.* at [0100], which discloses: "This is because it is not only necessary for a pH-adjusting agent added to the support layer to control the pH in the oral cavity so as to absorb a drug easily, in order for the edible oral mucosal patch formed of the disintegrating support layer and the disintegrating drug layer to exhibit its performance more satisfactorily, but also necessary to release the drug by dissolving the drug layer before the drug-absorbable condition created by the pH-adjusting agent is destroyed by secretion of saliva." |
| | **Crowley:** *See, e.g.,* **Crowley** at [0021], which discloses: "A laminate will comprise at least two layers: a bioadhesive drug reservoir layer and a backing layer. In one embodiment, the backing layer of the laminate also includes an acidic component, so as to minimize any interfacial degradation that might occur at the interface of the reservoir layer and the backing layer." |
| | *See also, e.g., id.* at [0022]-[0023], which discloses: "One embodiment of the invention provides a process for preparing a stabilized bioadhesive hot-melt extruded laminate comprising a bioadhesive hydrophilic reservoir layer comprising an alkaline labile drug . . . wet or dry granulating at least one water swellable or water soluble alkaline thermoplastic polymer, an antioxidant, at least one bioadhesive polymer, at least one acidic component, optionally one or more hydrophobic polymers, optionally one or more hydrophilic polymers, and optionally one or more other excipients to form an excipient mixture having a solution pH (when dissolved) of about 7 or less or less than the pH where the alkaline labile drug degrades . . . |
| | *See also, e.g., id.* at [134], which discloses: "Since the backing layer can be intimate contact with the reservoir layer, its pH might impact the stability of the drug in the reservoir layer . . . The results indicate decreased degradation of drug in the reservoir layer when the backing layer included an acidic component in an amount sufficient to render the solution pH of the backing film less than about 7 or less than the pH at which the alkaline labile drug degrades." |

Page 314 of 319

| Claim | Prior Art |
|---|---|
| | **Cassidy:** *See, e.g.,* **Cassidy** at 24, which discloses: "The solubility of buprenorphine was highly pH dependent with the highest solubility seen at low pH ( 17.3 mg/ml at pH 4.2). The solubility at neutral pH was considerably lower (52 pg/ml at pH 7.3) (Fig. 1). Essentially, similar solubilities were measured in USP, phosphate, and physiological (TPS) buffers, except at pH 4.2 when the solubility was considerably lower in TPS (4.2 mg/ml)." |
| | **Zhang:** *See, e.g.,* **Zhang** at 4:53-5:3, which discloses: "For weak acids or weak bases, which are ionizable, there is yet another way to manipulate the solubility and dissolution rate. The weak acid or weak base can react with base or acid, respectively, to form a salt. The ionized salt forms will almost always have higher solubilities and dissolution rates than the unionized forms. In many cases, they are also more stable chemically or physically. However, the ionized forms almost always have lower partition coefficients than the unionized forms, and therefore are less well absorbed by the oral mucosal tissue. Thus, converting the weak acid or base to an ionized form in order to increase solubility compromises absorption. A common method of controlling the pH of the formulation is to use a buffer system. A buffer system consists of hydrogen ion donor(s) (acid) and conjugate hydrogen ion receiver(s) (base). An appropriate buffer system stabilizes the pH. However, optimizing the pH generally compromises the solubility and partition coefficient for oral transmucosal drug delivery." |
| | **Hague:** *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules."<br><br>*See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility |

| Claim | Prior Art |
|---|---|
| | of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| | **Hague**: *See, e.g.,* **Hague** at [0052], which discloses: "It is well known that most drugs are weak acids or weak bases and are present in solution in both the non-ionized and ionized forms. It has been found that the non-ionized portion of the drug is usually more lipid soluble and can more readily diffuse across the cell membrane. Ionizing a portion of the drug generally impairs its lipid solubility, and decreases the ability of the drug to penetrate the lipid membrane of the cell or to cross the cell membrane, as a result of the positive or negative charge on the ionized molecules." |
| | *See also, e.g., id.* at [0058], which discloses: "It should be remembered, however, that solubility of the ionizable pharmaceutical agents is also pH dependent. While increasing the unionized portion makes it easier for the agent to cross the cell membranes, it often decreases the solubility of the drug in aqueous solutions. For example, it is known that the aqueous solubility of fentanyl, an ionizable pharmaceutical agent having a pKa of about 8.4, decreases sharply at a pH above 6, reaching a functional low point for oral mucosal delivery at about pH 8. It has also been shown that the bioavailability of oral transmucosally delivered fentanyl drops to as little as 15% at pH 5, compared to pH 6.5, as a result of the extensive ionization of the drug at that pH. Thus, the actual bioavailability of a fentanyl preparation at a given pH depends on the combination of these two effects, state of ionization and aqueous solubility." |
| 10. The method according to claim 1, wherein said chronic pain is | *See* claim 1 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~ Amended Invalidity Contentions is incorporated herein. |

Page 316 of 319

| Claim | Prior Art |
|---|---|
| neuropathic pain. | **Vasisht I:** *See, e.g.,* **Vasisht I** at [0028], which discloses: "As used herein, the term 'chronic pain' refers to pain which persists beyond the usual recovery period for an injury or illness. Chronic pain can be constant or intermittent. Common causes of chrome pain include, but are not limited to, arthritis,<br><br>cancer, Reflex Sympathetic Dystrophy Syndrome (RSDS), repetitive stress injuries, shingles, headaches, fibromyalgia, and diabetic neuropathy." |
| 11. The method according to claim 1, wherein said chronic pain is osteoarthritic pain. | *See* claims 1 and 10 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 12. The method according to claim 1, wherein the device comprises a dose of buprenorphine selected from the group consisting of 100 µg, 110 µg, 120 µg, 140 µg, 150 µg, 160 µg, 175 µg, and 180 µg. | *See* claim 1 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 13. The method according to claim 1, wherein the total daily dose of buprenorphine administered to the subject ranges from 200 µg to about 1800 µg. | *See* claim 1 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 14. The method according to claim 1, wherein steady-state $T_{max}$ of buprenorphine is in a range between about 2.00 and about 2.90 h. | *See* claim 1 of the '539 patent, *supra.* Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein.<br><br>**Vasisht I:** *See, e.g.,* **Vasisht I** at [0121], which discloses: "As demonstrated in Table 4, the delivery devices of the present invention at pH 6 appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." |

| Claim | Prior Art |
|---|---|
| | *Table 4: Pharmacokinetic data for buprenorphine* |
| | <table><tr><td>pH</td><td>6</td><td>7.25</td></tr><tr><td>$t_{first}$ (hr)</td><td>0.75</td><td>0.75</td></tr><tr><td>$C_{first}$ (ng/mL)</td><td>0.0521</td><td>0.0845</td></tr><tr><td>$t_{max}$ (hr)</td><td>3</td><td>3</td></tr><tr><td>$C_{max}$ (ng/mL)¹</td><td>1.05</td><td>0.86</td></tr></table> |
| 15. The method according to claim 1, wherein $C_{min}$ of buprenorphine is in a range between about 0.0157 and about 0.0862 ng/mL. | *See* claims 1 and 14 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 16. The method according to claim 1, wherein steady-state ~~AUC~~sub-last$AUC_{last}$ of buprenorphine is in a range between about 0.4085 and about 5.033 h*ng/mL. | **McQuinn:** *See, e.g.,* **McQuinn** at 247, which discloses results from a clinical study in which, after applying a buccal buprenorphine device, three subjects had buprenorphine AUC values of 4622, 4769 and 3456 pg*h/mL, which correspond to values of 4.622, 4.769, and 3.456 ng*h/mL. Five subjects, who were treated with buprenorphine devices applied to the upper lips, had buprenorphine AUC values which correspond to 4.736, 4.144, 3.977, 2.657, and 4.257 ng*h/mL. |
| 17. The method according to claim 1, wherein between about 2.4-6.9% of subjects experience drug related mild or moderate headaches as a treatment emergent adverse event (TEAE). | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 18. The method according to claim 1, wherein between about 3-6.9% of subjects experience drug related mild or moderate dizziness as a TEAE. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 19. The method according to claim 1, wherein between about 2.6-27.9% of subjects experience drug related mild or moderate nausea as a TEAE. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |

| Claim | Prior Art |
|---|---|
| 20. The method according to claim 1, wherein between about 1.5-8.5% of subjects experience drug related mild or moderate constipation as a TEAE. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 21. The method according to claim 1, wherein between about 0.9-3% of subjects experience drug related mild or moderate vomiting as a TEAE. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |
| 22. The method according to claim 1, wherein between about 7.7-33.9% of subjects experience drug related mild or moderate TEAEs. | *See* claim 1 of the '539 patent, *supra*. Section V.B. of the ~~Initial~~Amended Invalidity Contentions is incorporated herein. |