REDACTED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC., and ARIUS TWO, INC., | REDACTED - PUBLIC VERSION |
| *Plaintiffs*, | C.A. No. 19-444-CFC-CJB |
| v. |  |
| CHEMO RESEARCH S.L., INSUD PHARMA S.L.U., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., |  |
| *Defendants*. |  |

## LETTER TO THE HONORABLE CHRISTOPHER J. BURKE FROM DEFENDANTS REGARDING PLAINTIFFS' DISCOVERY DEFICIENCIES

OF COUNSEL:
Dennies Varughese, Pharm. D.
Adam C. LaRock
Josephine Kim
Charles T. Wysocki
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 New York Avenue NW, Suite 600
Washington, DC 20005
(202) 371-2600

*Attorneys for Chemo Research, S.L. and Insud Pharma S.L.U.*


Paul T. Meiklejohn
Geoffrey M. Godfrey
David Tseng
DORSEY & WHITNEY LLP
701 Fifth Avenue, Ste. 6100
Seattle, WA 98104
(206) 903-8800

*Attorneys for IntelGenx Corp., and IntelGenx Technologies Corp.*

YOUNG CONWAY STARGATT & TAYLOR, LLP
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants/Counterclaim Plaintiffs*

The Honorable Christopher J. Burke       REDACTED
March 31, 2020
Page 1

Dear Judge Burke:

The Chemo Defendants write concerning continued deficiencies in Plaintiffs' ("BDSI's") document production, discovery responses, and production of testimony in response to Rule 30(b)(6) and Rule 30(b)(1) notices. Defendants ("Chemo") address each in turn.

### A.  Corporate Testimony About the Asserted Patents (30(b)(6) Topic Nos. 1-3).

Chemo's Topics 1-3 seek testimony concerning the Asserted Patents.[1] BDSI refuses to designate a witness to testify concerning these topics. Instead, BDSI argues Chemo should be required to depose the named inventors and only then "revisit whether [Chemo] still requires any additional information" concerning the Asserted Patents. *See* Ex. 1 at 6. This is inadequate.

The named inventors are no longer employees of BDSI. By refusing to designate a corporate witness to testify about Topics 1-3, BDSI aims to avoid preparing someone for deposition that relates to relevant subject matter. Such subject matter includes the patents or the statements in declarations that BDSI submitted to the PTO during prosecution (Topic 1), such as the conception time for the alleged invention (Topic 2), or the examples, experiments, or tests disclosed in the Asserted Patents (Topic 3). Ex. 20 at 7-12. BDSI has not identified *any* witness to testify about these topics. This information relates to Chemo's invalidity case and Chemo's understanding of the infringement inquiry. Proof that simply deposing non-party inventors is inadequate is readily apparent from the deposition of Dr. Niraj Vasisht (a named inventor), who couldn't testify about important aspects of the Asserted Patents—including his own Declaration submitted during prosecution—because he could not "remember" the relevant information and was not prepared to testify. *See id.* at 2 at 134:4-139:4 *and* 124:4-23 (stating "somebody will have to go and look at the batch record and figure that out," when questioned about the backing layer). Chemo should not be limited to the memories of the inventors to get testimony as to the Asserted Patents and should not be required to expend valuable resources to depose unprepared witnesses, as BDSI suggests. Rather, BDSI must prepare a witness to testify about Topics 1-3.

### B.  The '019 Patent (RFP 9, Interrogatory 23, 30(b)(6), Topic 16-17).

BDSI refuses to provide important discovery concerning U.S. Patent No. 7,579,019 ("the '019 Patent"), even though BDSI asserts Belbuca®, and all of its products, embody the invention claimed in the '019 Patent. The '019 Patent broadly discloses a pharmaceutical carrier device for delivery of pharmaceutical compounds to mucosal surfaces. *See* Ex. 3 at Abstract. BDSI identified Belbuca as an embodiment of the '019 Patent in FDA's Orange Book. Chemo asserts that the '019 Patent serves as a blocking patent and the application for the '019 Patent serves as prior art to the Asserted Patents. *See* Ex. 4 at 141, 186-187, 230-231.

Chemo seeks the following discovery: (1) deposition transcripts from the named inventors from a related litigation, in which BDSI asserted the '019 Patent to protect Belbuca®'s sister product, Bunavail® (RFP 9); (2) the factual basis of BDSI's contention that Belbuca®

---

[1] The term "Asserted Patents" means U.S. Patent Nos. 8,147,866 ("the '866 Patent"); 9,655,843 ("the '843 Patent"); and 9,901,539 ("the '539 Patent").

The Honorable Christopher J. Burke

<span style="background-color:black;color:red">REDACTED</span>

March 31, 2020

Page 2

meets the claim limitations of the '019 Patent (Interrogatory 23); and (3) corporate testimony concerning (i) BDSI's understanding of the scope of the '019 Patent and (ii) embodiments of the '019 Patent (30(b)(6) Topics 16-17). Ex. 20 at 30-32. BDSI merely responds that the '019 Patent, which expired in January, is not asserted in this case, and, therefore, is not relevant. That is inaccurate, and not to mention insufficient to withhold discovery.  BDSI listed the '019 Patent in FDA's Orange Book for Belbuca®, telling would-be ANDA applicants that the '019 Patent protects Belbuca®. The meaning and scope of such protection would be a deterrent to filing an ANDA application and would block research and development into the subject matter until expiration of the '019 Patent—as Chemo asserts. *See* Ex. 4 at 141, 186-187, 230-231. The factual information underlying BDSI's understanding of the scope of the '019 Patent and how Belbuca® meets the limitations of the '019 Patent (as BDSI contends) inform Chemo's invalidity defenses, including its assertion that the '019 Patent is a blocking patent. This information is in BDSI's exclusive possession.[2]

C.     **Bunavail (RFP 24, 45-48, 63; Interrogatory 24; and 30(b)(6) Topics 4, 6, 13).**

BDSI improperly seeks to limit discovery to exclude discovery of Belbuca®'s sister product, Bunavail®. BDSI states that it has already produced Bunavail® documents to the extent that those documents were also related to the development of Belbuca®. But this narrow subset of documents is insufficient. The category of Bunavail® documents requested herein relate to the limitations of the '866 and '843 patents—whose relevance are separate from documents pertaining to the research and development of Belbuca®.

<span style="background-color:black;color:red">REDACTED</span>
<span style="background-color:black;color:red">REDACTED</span>
<span style="background-color:black;color:red">REDACTED</span>
<span style="background-color:black;color:red">REDACTED</span>
<span style="background-color:black;color:red">REDACTED</span>
<span style="background-color:black;color:red">REDACTED</span>

Therefore, Chemo seeks at least the following documents as to the Bunavail® (or BEMA buprenorphine/naloxone) product (for RFP 24, 45-48, and 63): (1) all documents showing the reasons for BDSI's decision to remove naloxone from the BEMA buprenorphine/naloxone product or begin developing and commercializing the Bunavail® product; (2) all documents showing the measurement, assessment, and modification of the pH of any layer of the product, including at all stages of manufacture and development contemplated or used to measure pH; (3) all documents showing the pH contemplated, tested, or used in any layer of the product and the reasons for contemplating, testing, or using each pH, (4) all documents showing the decision to buffer or stabilize the pH of any layer of the product, including the excipient(s) contemplated or

---

[2] BDSI also argues that this discovery would be privileged because it involves "analyzing the patent." Not so. BDSI publicly asserted that Belbuca® was an embodiment of the '019 Patent and Asserted Patents—years before this or any other litigation. BDSI has not articulated any basis on which to claim privilege nor documented its claim in its log. Moreover, Chemo seeks BDSI's *factual* contention of how Belbuca® embodies the '019 Patent, which is not privileged.

The Honorable Christopher J. Burke REDACTED
March 31, 2020
Page 3

used to buffer (or stabilize the pH); and (5) all documents showing whether the product provides rapid and efficient delivery of buprenorphine. *See* Ex. 7 at 31-32, 52-57, 72-73; Ex. 20 at "12-16, 25-27.

Interrogatory 24 seeks information about Bunavail®'s composition, formulation, and characteristics (i.e., pH, pharmacokinetic and side effect profiles) and how it embodies the '866 and '843 patents. Chemo has a right to assess the bounds of the claims of the Asserted Patents and understand BDSI's interpretation of the scope of the claims. Chemo specifically needs information about Bunavail® to assess the function of its components to determine how BDSI interprets the claims. To be sure, BDSI asserts that Chemo's ANDA products infringe claims requiring specific pH values for its mucoadhesive and backing layers and requiring that the product have a "buffered" environment. Understanding how BDSI assesses that its own products embody the Asserted Patents is critical to Defendants' non-infringement defenses.

Similarly, Chemo seeks corporate testimony regarding Bunavail®. Topic 4 seeks testimony regarding clinical studies and pharmacokinetic data for Bunavail®. Chemo seeks to assess the implications of changes to the quantity of buprenorphine in the composition and inclusion of other drugs, such as naloxone. REDACTED
REDACTED
REDACTED Chemo has a right to verify its contention that the pharmacokinetic properties are inherent to the BEMA platform and buprenorphine.

Lastly, Chemo seeks corporate testimony for Topic 6 (Bunavail® components) and Topic 13 (Bunavail®'s NDA and IND), both relevant to infringement and invalidity, as above.

### D. Onsolis® (RFP 24 and Interrogatory 29).

REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED

BDSI's insistence on withholding discovery as to Onsolis® is unacceptable in light of its indisputable relevance. Chemo seeks: (1) documents explaining BDSI's decision to begin

The Honorable Christopher J. Burke    <span style="color:red">REDACTED</span>
March 31, 2020
Page 4

developing and commercializing the Onsolis® product and BEMA platform; (2) all documents as to the development, preparation, testing, or analysis of Onsolis® (or the BEMA fentanyl product) described in the Asserted Patents; (3) documents showing how Onsolis® met the pharmacokinetic and dissolution properties identified in the claims of the '019 Patent; and (4) documents showing BDSI's pH testing of Onsolis®.

Interrogatory 29 seeks information regarding Onsolis®'s composition, formulation, and characteristics (i.e., pH, pharmacokinetic and side effect profiles). <span style="color:red">REDACTED</span>
<span style="color:red">REDACTED</span>
<span style="color:red">REDACTED</span>      <span style="color:red">REDACTED</span>
<span style="color:red">REDACTED</span>
<span style="color:red">REDACTED</span>
<span style="color:red">REDACTED</span>      BDSI's gamesmanship should not be permitted.

Finally, Interrogatory 29 seeks information about the Onsolis® product's pharmacokinetic and side effect profiles. As with Belbuca® and Bunavail®, BDSI listed the '019 Patent in the Orange Book for Onsolis®. Chemo seeks this information to gauge whether the properties claimed in the '539 Patent are indeed due to the purportedly novel invention disclosed in the '539 Patent or merely inherent results of incorporating an opioid into the BEMA platform. The label for Onsolis® suggests it has similar side effects as Belbuca®.

### E.    Settlement Agreements From A Related Litigation (RFP 115).

BDSI refuses to produce the settlement agreements of prior litigations involving the Asserted Patents entered into by BDSI. These documents are relevant because they (1) may form the basis for a patent misuse defense and (2) relate to the amount of damages BDSI might sustain in the event Defendants were to launch a generic version of Belbuca "at-risk" once FDA's 30-month stay expires. *See Wyeth v. Orgenus Pharma Inc.*, No. 09-cv-3235, 2010 WL 4117157 (D.N.J. Oct. 19, 2020) (Hatch-Waxman case finding that settlement agreements of prior litigation involving the asserted patents are relevant to the issues of invalidity and potential damages). These documents are also relevant to Chemo's rebuttal of BDSI's alleged secondary considerations of nonobviousness. For example, if BDSI is artificially blocking a generic entrant from the market, BDSI may artificially inflate its sales, the praise it obtains in the market, the reason it claims to satisfy a long felt but unmet need.

### F.    Endo's Termination of Its License Agreement (Interrogatory 11)

Interrogatory 11 requires BDSI to describe in detail the reasons or rationale known by BDSI for Endo's decision to terminate its license agreement for Belbuca, the Asserted Patents, and/or NDA No. 207932. *See* Ex. 13 at 7-8. Interrogatory No. 11 also requires BDSI to identify any documents relating to Endo's termination of the license agreement and any individuals involved in negotiating the terms of the termination of the agreement. *Id.* In response, BDSI

---

[3] The documents do not disclose Onsolis®'s backing layer formulation in detail, allowing witnesses to easily evade questions about the layer. *See, e.g.*, Ex. 2 at 145:7-159:14.

The Honorable Christopher J. Burke                    REDACTED
March 31, 2020
Page 5

merely quotes Endo's publicly released statement regarding the termination of the Belbuca licensing agreement and argues that if BDSI is able to locate any additional non-public information, it will supplement its response. *Id.* This is insufficient. It is impossible that BDSI is unaware of or cannot locate any non-public information as to why Endo terminated this license agreement given the extensive communications between BDSI and Endo concerning Endo's termination of the license to the Asserted Patents. Although BDSI agreed to supplement Interrogatory No. 11 on March 5, 2020 in response to Chemo's complaints of its deficiency. *See* Ex. 1 at 10. However, on the parties' March 16 meet and confer, BDSI reneged on its agreement.

BDSI is required to provide a satisfactory response to this interrogatory, which is relevant to assessing whether the Asserted Patents satisfy a long-felt but unmet need, were praised by others, or establish the Asserted Patents are nonobvious due to other secondary considerations. Indeed, Your Honor previously agreed with Chemo that BDSI must produce relevant documents concerning this very same issue. *See* D.I. 147. In spite of Your Honor's Jan. 30 Order, BDSI still has not produced a single document related to this issue and refuses to explain its eight-week delay in compliance with the Order. *See* Ex. 14 at 1-2. To the extent there are internal communications between BDSI and Endo or amongst BDSI employees regarding the subject matter of this interrogatory, BDSI should immediately produce and identify them.

### G.    Interrogatories 14-15, 17-19, and 30

For Interrogatory Nos. 14-15, 17-19, and 30, Chemo requested that BDSI identify the "persons most knowledgeable regarding the subject matter" of each interrogatory. *See* Ex. 13 at 12-15, 17-22, 31-32 BDSI refuses to identify individuals most knowledgeable on the basis that these are contention interrogatories that seek privileged information. But to the contrary, these interrogatories ask for the *factual basis* for BDSI's contention that, for example, Belbuca's backing layer indeed is "buffered to a pH of between about 4.0 and about 4.8" as required by the claims. *Id.* at 19-20 Presumably the inventors or other BDSI employee made this determination before the Asserted Patents were Orange-Book-listed for Belbuca. BDSI must identify the person most knowledgeable. Delaware courts have previously allowed contention interrogatories that seek "disclosure of each fact supporting a contention and…*each person with knowledge* of that fact." *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 844 F. Supp. 987, 990 (D. Del. Jan. 21, 1994) (emphasis added) (noting that the identification of people knowledgeable about a contention will disclose which witnesses at trial may offer evidence supporting that contention). Therefore, BDSI should immediately identify the individuals most knowledgeable regarding the subject matter of Interrogatory Nos. 14-15, 17-19, and 30.

### H.    Interrogatories 25-27

For Interrogatory No. 25, BDSI refuses to provide any information about its license agreements with QLT USA/Tolmar Therapeutics regarding Belbuca or the BEMA technology, and BDSI's reasons for entering into such agreements. *See* Ex. 13 at 27-28 REDACTED
REDACTED
REDACTED
REDACTED

The Honorable Christopher J. Burke                              REDACTED
March 31, 2020
Page 6

REDACTED
REDACTED
REDACTED
REDACTED   While it is public knowledge that BDSI has an exclusive license agreement for the BEMA Technology (*see* Ex. 15 at 5 and 11), Chemo seeks the terms and provisions in those agreements and BDSI's reasons for entering such agreements. This information may also be relevant to gauging the purported novelty of the inventions claimed in the Asserted Patents and understanding whether third-party discovery is needed.

For Interrogatory Nos. 26-27, BDSI refuses to provide information regarding third parties' role in the formulation and development process of Belbuca and/or BEMA technology and the nature and scope of those third-parties' agreements with BDSI. *See* Ex. 13 at 28-30 R REDACTED REDACTED REDACTED This requested information is relevant to understanding the state of the art at the time the Asserted Patents were filed, gauging the purported novelty of the inventions claimed in the Asserted Patents, and understanding whether third-party discovery is needed.

## I.    Mark Sirgo

BDSI should produce former CEO of BDSI, Mark Sirgo, for deposition. REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED   Delaware courts have previously allowed the deposition of executives who, like Dr. Sirgo, have unique knowledge on relevant subject matters and whose testimony cannot be obtained through less burdensome means. *See Purdue Pharma L.P. v. Amneal Pharm., LLC*, 15-1152-RGA-SRF (Del. July 25, 2018) (Ex. 21). For these reasons, BDSI should make Dr. Sirgo available for deposition.

\* \* \*

BDSI's claim that Chemo's disputes are barred without Alvogen is unavailing and insincere. *First*, any agreements between BDSI and Alvogen were made without Chemo's involvement. Chemo cannot be bound by agreements to which it was not a party. *Second*, Alvogen and Chemo are differently situated. That Alvogen does not join this letter does not diminish Chemo's arguments. *Third*, BDSI routinely omits Chemo and Alvogen from communications related to joint issues. *See* Ex. 17 at 1 (collecting instances of conduct). Despite Chemo's repeated requests to include all parties in correspondence, BDSI *again* removed Alvogen from emails discussing case scheduling just last week. *See* Ex. 18 at 1. BDSI cannot demand that defendants coordinate when it routinely initiates *ex parte* discussions on joint issues.

The Honorable Christopher J. Burke                    REDACTED ████████████
March 31, 2020
Page 7


Respectfully,

*/s/ Anne Shea Gaza*

Anne Shea Gaza (No. 4093)


cc:   Clerk of the Court (via hand delivery)
      Counsel of Record (via CM/ECF and e-mail)

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Shea Gaza, hereby certify that on March 31, 2020, I caused to be

electronically filed a true and correct copy of the foregoing sealed document with

the Clerk of the Court using CM/ECF, which will send notification of such filing to

the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Jeremy A. Tigan, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> *jblumenfeld@mnat.com*
> *jtigan@mnat.com*
>
>
> *Attorneys for BioDelivery Sciences International Inc.*
> *and Arius Two, Inc.*

I further certify that on March 31, 2020**,** I caused the foregoing sealed

document to be served via electronic mail upon the above-listed counsel and on the

following:

> Charles E. Lipsey, Esquire
> Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
> Two Freedom Square
> 11955 Freedom Drive
> Reston VA 20190
> *charles.lipsey@finnegan.com*
>
> Howard W. Levine, Esquire
> Thomas J. Sullivan, Esquire
> Michael R. Galgano, Esquire

Daniel G. Chung, Esquire
Justin J. Hasford, Esquire
 Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001
*howard.levine@finnegan.com*
*thomas.sullivan@finnegan.com*
*michael.galgano@finnegan.com*
*daniel.chung@finnegan.com*
*justin.hasford@finnegan.com*

Jennifer S. Swan, Esquire
Jeffrey D. Smyth, Esquire
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Stanford Research Park
3300 Hillview Avenue
Palo Alto, CA 94304
*jennifer.swan@finnegan.com*
*jeffrey.smyth@finnegan.com*

*Attorneys for BioDelivery Sciences International Inc.
and Arius Two, Inc.*

Dated:  March 31, 2020                       YOUNG CONAWAY STARGATT &
                                              TAYLOR, LLP

                                             */s/ Anne Shea Gaza*
                                             Anne Shea Gaza (No. 4093)
                                             Samantha G. Wilson (No. 5816)
                                             Rodney Square
                                             1000 N. King Street
                                             Wilmington, Delaware 19801
                                             *agaza@ycst.com*
                                             *swilson@ycst.com*

                                             *Attorneys for Chemo Research S.L.,
                                             Insud Pharma S.L.U., IntelGenx
                                             Corp., and IntelGenx Technologies
                                             Corp.*

2

# Exhibit 1

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
WWW.FINNEGAN.COM

**THOMAS J. SULLIVAN**
202.408.4005
thomas.sullivan@finnegan.com

March 5, 2020

YOUNG CONAWAY STARGATT & TAYLOR, LLP                    *Via Email*
Anne Shea Gaza
Samantha G. Wilson
Rodney Square
1000 North King Street
Wilmington, DE 19801

STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C
Dennies Varughese
Adam C. LaRock
Lauren A. Watt
Charles Wysocki
Josephine Kim
Sasha S. Rao
1100 New York Avenue, N.W.
Washington, D.C. 20005

DORSEY & WHITNEY LLP
Paul T. Meiklejohn
Geoffrey M. Godfrey
David Tseng
701 Fifth Avenue, Ste. 6100
Seattle, WA 98104

     Re:    *BioDelivery Sciences International, Inc., et al. v. Chemo Research S.L. et al.*, Case No. 19-cv-00444-CFC-CJB (D. Del.)

Dear Josephine:

     We write in response to your letter of February 20, 2020 ("Letter").  Initially, we note that this does not appear to be a joint letter with Alvogen.  The Court ordered the consolidation of discovery in this case, and many of the discovery requests complained of in your letter concern joint discovery requests from both Alvogen and Chemo or otherwise seek discovery that Alvogen has already agreed it will not pursue.  BDSI has informed Chemo of this issue before and, yet, Chemo insists on sending unilateral letters without apparently any consultation with Alvogen.  This is unacceptable, and if

Josephine Kim, Esq.
March 5, 2020
Page 2

necessary, BDSI will raise this issue with the Court at the appropriate time.  We address
each of your complaints in turn below.

## I.     DISCOVERY REQUESTS

### A.     Documents Concerning Bunavail®

Chemo argues that Plaintiffs have "improperly limited" the scope of its request
nos. 24, 45-48, and 63.  Letter at 1.  Plaintiffs disagree.  As discussed above, this Court
has ordered the Chemo and Alvogen Defendants to coordinate their discovery efforts.
*See* D.I. 39.  Chemo, however, has and continues to circumvent this mandate.  Alvogen
previously raised concerns regarding the production of Bunavail®-related material (*see*
D.I. 135, Ex. 5 at 1-2), but agreed to withdraw its requests after BDSI explained that any
Bunavail® studies or formulations used in the development of Belbuca® would be
produced, and that BDSI would produce the depositions of the inventors from the prior
Bunavail® litigation (*see* D.I. 135, Ex. 7 at 1).  Chemo's requests should be limited to
what Alvogen agreed was reasonable.

Further, Chemo has failed to clearly identify specific information concerning
Bunavail® that it requests.  The Court's January 30, 2020, Order (D.I. 148), noted that
"there was uncertainty between the parties about . . . what Bunavail-related documents
Defendants were actually requesting."  *See* D.I. 148 at (5).  The Court denied Chemo's
request without prejudice to allow a "more specific request."  *Id.*  Chemo has not made a
"more specific request" but has included five broad categories of documents that merely
restate its overly broad document requests and represent the same type of information
that was already at issue during the oral argument.  This is information is not "specific,"
and BDSI's position thus remains the same as previously argued before the Court.

### B.     Deposition Transcripts of Drs. Tapolsky and Osborne

Chemo contends that the transcripts and accompanying exhibits from the
depositions of Dr. Giles Tapolsky and Dr. David Osborne in *BioDelivery Sciences
International, Inc. v. Actavis Laboratories UT, Inc.*, C.A. No. 16-175 (GMS) are relevant
to the current litigation and fall within the scope of Chemo's RFP No. 9.  *See* Letter at 2.
Again, Plaintiffs disagree.  Chemo's RFP No. 9 seeks, *inter alia*, "[a]ll transcripts and
exhibits thereto of the deposition of any current or former employee of Plaintiffs."  It is
Plaintiffs' understanding that neither Dr. Tapolsky nor Dr. Osborne have ever been an
employee of either BioDelivery Sciences International, Inc. or Arius Two, Inc.  Further,
Drs. Tapolsky and Osborne are the named inventors of U.S. Patent No. 7,579,019, a
patent that is not at issue in the present litigation.  Chemo had the option to paragraph IV
the '019 patent but chose not to.  Accordingly, no alleged "nexus issues" exist.  *Id.*  And
Chemo's reliance on the '019 patent as a prior art reference does not make the inventors'
transcripts and exhibits relevant.  The inquiry about whether published versions of the
'019 patent render the patents-in-suit invalid is judged from the perspective of those of

Josephine Kim, Esq.
March 5, 2020
Page 3

ordinary skill and what the reference disclosed within its four corners—not what the inventors of the prior art themselves thought.  Further, the deposition transcripts of Drs. Tapolsky and Osborne are not relevant to Chemo's blocking patent position.

Again, Alvogen previously requested these transcripts and accompanying exhibits.  *See* D.I. 135, Ex. 5 at 2.  And again, Alvogen withdrew its request.  *See* D.I. 135, Ex. 7 at 1.  Chemo cannot continue to unilaterally dictate the scope of discovery and choose to work independently of Alvogen.

### C.    Documents Related to Onsolis®

Next, Chemo argues that "BDSI has also improperly withheld discovery related to the Onsolis product."  Letter at 2.  Initially, as raised at the prior discovery conference, Chemo never raised discovery concerning the Onsolis® product in any correspondence or during the November 13, 2019, meet and confer.  The first time Chemo raised this issue was in its letter to Judge Burke for the discovery conference.  Indeed, Chemo and the Court have acknowledged that these "documents are 'less relevant' to this case than other materials at issue."  D.I. 148 at (4) (quoting Jan. 27, 2020, Tr. at 47:24-48:3).  That is because Onsolis® involves a different active pharmaceutical ingredient, fentanyl, and falls outside the scope of any of the claims of any of the asserted patents.  Further, Chemo's argument that these documents may be relevant since the '019 patent is Orange Book-listed for Onsolis® makes no sense.

Chemo also contends that U.S. Patent No. 9,597,288 ("the '288 patent") is relevant to the current litigation involving Belbuca®.  *See* Letter at 3.  Plaintiffs disagree.  The '288 patent is limited to biodegradable films containing fentanyl and was first published on October 27, 2016.  Not only does the invention described in the '288 patent fall outside of the asserted claims, the '288 patent is not prior art to any of the patents-in-suit.  Nor has Chemo previously asserted that the '288 patent is relevant in any way to its invalidity positions.  Accordingly, Plaintiffs maintain their objections.

### D.    Settlement Agreements from Unrelated Litigations

Finally, Chemo argues that settlement agreements from previous litigations involving the patents-in-suit are relevant and should be produced by BDSI.  *Id.*  Plaintiffs disagree.  Plaintiffs note that during the January 27, 2020, Hearing, Chemo argued that the requested settlement agreements were relevant to three issues: long-felt, but unmet need, non-statutory injunctive relief sought by BDSI, and potential damages.  Jan. 27, 2020, Tr. at 44:13-45:18.  Chemo now argues that any settlement agreements are relevant

Josephine Kim, Esq.
March 5, 2020
Page 4

to a hypothetical patent misuse defense, potential damages, and general invalidity
defenses.  Letter at 3.  Chemo's shifting arguments underscore the weakness of its
argument.

Moreover, Chemo has failed to articulate why any settlement agreement related to
Belbuca® is relevant.  Chemo has provided absolutely no basis for why the settlement
agreement is relevant to an unpled hypothetical patent misuse defense.  Further, the
deadline for the parties to amend or supplement their respective pleadings in this case
was November 1, 2019.  D.I. 39 at 6.  That deadline has long passed.  Nor has Chemo
explained how any settlement agreement would be relevant to the issue of damages
should Chemo launch its ANDA Product at-risk.  Given Chemo's serious problems with
obtaining FDA approval for its product, an at-risk launch is completely hypothetical, and
Chemo does not explain how the settlement agreement would implicate the amount of
damages in any event.  Nor has Chemo explained how a settlement agreement for
Belbuca® would be relevant to its invalidity defenses where BDSI has explained it is not
relying on it.  For at least these reasons, Plaintiffs maintain their objections to producing
prior settlement agreements.

## II.   BDSI'S RESPONSES TO DEFENDANTS' 30(b)(6) NOTICE

As above, BDSI reiterates its concern that Chemo is failing to coordinate the
scope of its discovery in concert with the Alvogen Defendants as directed by the Court's
Scheduling Order (D.I. 39).  BDSI's January 13, 2020, Responses and Objections to
Defendants' Rule 30(b)(6) Notice was served on both Alvogen and Chemo.  And all
parties, BDSI, Alvogen, and Chemo, met and conferred regarding these responses and
objections on February 3, 2020.  But the February 20th Letter was sent only on behalf of
Chemo and it remains unclear whether Alvogen shares any of these concerns.  Please
explain why Chemo has chosen to exclude the Alvogen Defendants from any continued
discussion on BDSI's responses to Alvogen and Chemo's joint 30(b)(6) notice.

Nevertheless, Chemo's Letter contains several mischaracterizations regarding the
topics, and their scope, that BDSI agreed to provide corporate testimony for.  First,
Plaintiffs never agreed during the parties' meet and confer that BDSI would provide
corporate testimony on any topics.  Both BDSI and Defendants specifically agreed that
they would need to discuss the contents of the meet and confer call with their respective
clients before any agreement as to the scope of the topics was reached.  Second, Chemo's
summary of the scope of the topics proposed by BDSI is incorrect.  BDSI proposed
providing a corporate witnesses to testify concerning:

- Topic 4: this topic as it relates to only Belbuca®.

- Topic 5: subtopics (a), (b), and (c).

Josephine Kim, Esq.
March 5, 2020
Page 5

- Topic 7: as to only Belbuca®, the pH of each layer, the method(s) of measuring the pH, and the step(s) during the manufacturing process the pH is measured.

- Topic 8: as to only Belbuca®, the composition, identity, and amount of excipients in the backing layer of Belbuca®, as well as the pH of the backing layer of Belbuca®, the method(s) of measuring the pH, and the step(s) during the manufacturing process the pH is measured.

- Topic 9: as to only Belbuca®, the composition, identity, and amount of excipients in the mucoadhesive layer of Belbuca®, as well as the pH of the mucoadhesive layer of Belbuca®, the method(s) of measuring the pH, and the step(s) during the manufacturing process the pH is measured.

- Topic 10: as to only Belbuca®, the identity of the buffer system of Belbuca®, the excipients that make up the buffer system, and the rationale behind the inclusion of the buffer system in Belbuca®.

- Topic 11: as to only Belbuca®, the bioavailability, Tmax, Cmax, Cmin, AUCinf, and AUClast of Belbuca®, and the instructions for administering Belbuca described in its label or package insert.

- Topic 14: this topic as it relates to Bunavail® and Belbuca®.

- Topic 26: this topic as it relates to only Belbuca®.

- Topic 30: BDSI indicated that it would follow up whether it would provide a witness on this topic.

- Topic 33: BDSI contemplated offering to provide corporate testimony on this topic to the extent it is subsumed into only those topics agreed to by BDSI.

Concerning Topic 12, Defendants said they would consider limiting this topic to modules 3.2.S and 3.2.P.  Defendants have not followed up on this offer.

### A.    Topic Nos. 1-3

During the parties' February 3rd meet and confer, Plaintiffs expressed concern that Defendants' Topic No. 1 was overly broad, confusing, and that Defendants can seek information within the scope of these topics from the inventors of the patents in suit. Defendants are not entitled to obtain duplicative testimony.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415 (D. Del. 2010) (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents

Josephine Kim, Esq.
March 5, 2020
Page 6

concerning those topics); *Novartis Pharms. Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162
(D. Del. 2001) (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the
parties seek duplicative or cumulative information, had ample time to get the information,
or the burden outweighs the benefit . . . ."). BDSI continues to believe that the
Defendants should depose the inventors of the patents in suit and then the parties can
revisit whether they still require any additional information falling within these topics.

> **B.   Topic Nos. 16 and 17**

Defendants' Topic Nos. 16 and 17 request corporate testimony on the '019 patent.
For at least the reasons stated above, each of these categories of information are
irrelevant to the current litigation.  Moreover, Topic No. 16 is vague, ambiguous, and
improperly seeks a legal conclusion from a lay witness.  These topics also seemingly seek
discovery, including documents, beyond Chemo's more than 100 document requests.
Plaintiffs maintain their objections to these topics.

> **C.   Topic Nos. 4, 5, 6, 7, 8, 9, 10, 11, 13, and 14 as They Relate to
> Bunavail®**

To begin with, Plaintiffs note that Chemo's Letter mischaracterizes which topics
BDSI contemplated providing corporate testimony on.  Specifically, Plaintiffs have never
agreed to provide a witness to testify on any part of Defendants' Topic Nos. 6 or 13.
Moreover, BDSI did contemplate during the meet and confer call that it would provide
corporate testimony concerning Topic No. 14.

Nevertheless, Plaintiffs maintain their objections to Defendants' Topic Nos. 4-11
and 13 to the extent these topics seek corporate testimony on Bunavail® outside of
formulations used in the development of Belbuca® as discussed above.  Moreover,
Chemo's argument that Bunavail®'s side-effect profile is allegedly relevant to the claims
of the '539 patent and fall under Defendants' Topic Nos. 4 and 11 is misplaced.
Bunavail® is not indicated for opioid dependence rather than chronic pain or chronic low
back pain.  Further, BDSI offered to provide corporate testimony on the clinical trials that
formed the basis for Belbuca®'s approval, including BUP-101.  Accordingly, BDSI will
not offer corporate testimony on Defendants' Topic Nos. 4 and 11 as they relate to
Bunavail®.

 Chemo argues that it is "inappropriate" for Plaintiffs to not provide corporate
testimony on Defendants' Topic No. 6.  Letter at 7.  Plaintiffs disagree.  The scope of
Defendants' Topic No. 6 relates only to Bunavail®, a product not at issue in this suit.
Further, Chemo attempts to re-litigate claim terms, such as "buffered environment," that
were at-issue during *Markman*.  These issues have been resolved and the Court has
construed all disputed terms.  Chemo is bound by the Court's constructions.  Chemo
cannot assert new arguments regarding the scope of the terms in the asserted claims at
this late stage.

Josephine Kim, Esq.
March 5, 2020
Page 7

Chemo seeks corporate testimony on the full scope of Defendants' Topic Nos. 7, 8, and 9. Letter at 8. As stated above, it was Plaintiffs' understanding that any dispute regarding these topics was resolved during the parties' meet and confer. Nevertheless, Plaintiffs note that these topics are substantively similar to Plaintiffs' December 9, 2019, 30(b)(6) Topic Nos. 4, 6, 7 that were served on Chemo. And Plaintiffs' proposed corporate testimony on Defendants' Topic Nos. 7, 8, and 9 is identical to Chemo's objections and responses to Plaintiffs' Topic Nos. 4, 6, and 7. It is unclear how Chemo can raise a dispute regarding Plaintiffs' offers when Chemo itself has taken the same position.

For the same reasons discussed above with respect to Defendants' Topic No. 6, Plaintiffs maintain their objections to Defendants' Topic No. 10. Chemo cannot re-argue claim term scope, particularly with regard to Bunavail®, a product not in suit.

Finally, Plaintiffs maintain their objection to Defendants' Topic No. 13. Topic No. 13 is solely related to Bunavail®, and, for at least the reasons discussed above, corporate testimony on this product is inappropriate.

### D.     Topics 7-11

For at least the reasons discussed above, Plaintiffs maintain their proposal to provide corporate testimony as to portions of Defendants' Topic Nos. 7-9. Plaintiffs have sought similar testimony from Chemo and have modeled their offer off of Chemo's willingness to provide corporate testimony. But now Chemo demands more than it is willing to provide. This is unreasonable and unfair. Chemo effectively advances a standard that itself cannot or refuses to abide by.

Chemo complains that Plaintiffs have improperly refused to provide corporate testimony on part (b) of Defendants' Topic No. 10. Letter at 11. Plaintiffs disagree. During the meet and confer call, Plaintiffs offered to provide corporate testimony on the rationale behind the inclusion of the buffer system within Belbuca®. It is unclear what additional testimony Chemo seeks. Moreover, Chemo will have the opportunity to depose the named inventors of the patents-in-suit to obtain any factual knowledge these individuals possess.

Similar to Plaintiffs' responses to Defendants' Topic Nos. 7-9, Chemo complains that BDSI's contemplated corporate testimony for Topic No. 11 is insufficient. Letter at 11-12. Again, Plaintiffs seek the same corporate testimony from Chemo in Plaintiffs' Topic No. 11. And again, Plaintiffs have proposed the same corporate testimony that Chemo is willing to provide. Chemo cannot continue to argue both sides of the same issue.

Josephine Kim, Esq.
March 5, 2020
Page 8

### E.     Topic No. 12

During the parties' February 3rd meet and confer, Defendants offered to limit the scope of Topic No. 12 to certain modules and documents contained within NDA No. 207932 and IND No. 72428 such as modules 3.2.S., 3.2.P., certain clinical study summaries, and clinical study reports included in the IND and NDA.  Chemo's Letter, however, does not include this compromise.  Please advise if Defendants have withdrawn this offer.

### F.     Topic No. 29

Chemo stated in its letter: "Unless BDSI agrees that it will not object to its witnesses being questioned about documents generated at Endo that BDSI possessed and produced, please confirm that BDSI will provide corporate testimony for Topic 29." Accordingly, to avoid this dispute, Plaintiffs can agree that they will not object to their corporate and fact witnesses being questioned about documents generated at third-party Endo that were in BDSI's possession and produced by BDSI in the lawsuit.  Likewise, Plaintiffs will not object to their former employees being questioned about documents generated at third-party Endo that BDSI possessed and produced in the lawsuit so long as Defendants establish the requisite foundation, i.e., that they were generated during the witnesses' time of employment and that it was likely that the witnesses saw the document.

## III.    BDSI'S RESPONSES TO DEFENDANTS' THIRD SET OF INTERROGATORIES

As an initial matter, Plaintiffs disagree with Chemo's characterization of BDSI's responses to Defendants' Third Set of Interrogatories (Nos. 11-30).  Plaintiffs have sufficiently responded to Defendants' requests in accordance with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, and any standing orders of the Court.  Moreover, these discovery requests were served by both Chemo and Alvogen and Plaintiffs responded to these joint requests in accordance with the Court's requirement that Defendants coordinate discovery. D.I. 39.  But Chemo has again not followed the Court's order and instead chooses to pursue disputes with Plaintiffs without the involvement of Alvogen.

Plaintiffs also disagree with Chemo's characterization of the timeline preceding its Letter.  Plaintiffs first became aware of Defendants' alleged concerns with their responses in a January 24, 2020, email.  *See* Jan. 24, 2020, email from C. Wysocki to T. Sullivan.  But this email failed to provide any reason or bases for Defendants' concerns or even what those concerns were.  *Id.*  And Defendants did not provide any information concerning Plaintiffs' responses in its January 28, 2020, email.  *See* Jan. 28, 2020 email from C. Wysocki to T. Sullivan.  As Chemo notes in its Letter, Plaintiffs first became aware of Defendants' allegations during the parties' February 3rd meet and confer.  Letter at 13.  At this meet and confer, Plaintiffs asked the Defendants to provide correspondence

Josephine Kim, Esq.
March 5, 2020
Page 9

on any issues that they believe are in dispute so that BDSI can properly evaluate each issue.  Still, it took Chemo over two additional weeks to provide any correspondence.

**A.      Interrogatory No. 11**

Chemo complains that Plaintiffs' response to Defendants' Interrogatory No. 11 is "insufficient."  *Id.*  Plaintiffs disagree.  In their response, Plaintiffs quoted a public statement that encapsulates why the license agreement between non-party Endo and BDSI was terminated.  If BDSI is able to locate any additional non-public information, it will supplement its response.

**B.      Interrogatory Nos. 12-19 and 30**

Chemo complains that Plaintiffs have not fully answered Defendants' Interrogatory Nos. 12-19 and 30 by not identifying a person most knowledgeable regarding the subject matter sought by the requests.  Letter at 14.  Plaintiffs note that Defendants' Interrogatory Nos. 14-15, 17-19, and 30 seek legal conclusions, e.g., why Belbuca® falls within the scope of the claims, not requiring the identification of a lay person most knowledgeable.  BDSI agrees to supplement its responses to interrogatories 12, 13, and 16 to identify knowledgeable individuals.

**C.      Interrogatory Nos. 20, 21, and 22**

Plaintiffs disagree that their responses to Defendants' Interrogatory Nos. 20 and 21 are deficient as alleged by Chemo.  Nevertheless, and to avoid another discovery dispute, BDSI agrees to supplement its responses to Interrogatory Nos. 20 and 21.



BDSI agrees to supplement its response to address Chemo's misunderstanding.

**D.      Interrogatory Nos. 23-27 and 29**

Chemo claims that Plaintiffs' responses to Defendants' Interrogatory Nos. 23 and 24 are deficient.  *Id.* at 16-17.  Plaintiffs disagree.  Defendants' Interrogatory No. 23 seeks information regarding how Belbuca® meets the limitations of the '019 patent.  As discussed above, the '019 patent is irrelevant to the claims-at-issue.  And Defendants' Interrogatory No. 24 seeks information regarding how Bunavail® meets the limitations of the '866 and '843 patents.  This is irrelevant to any issue in the case.  Accordingly, Plaintiffs maintain their objections to Defendants' Interrogatory Nos. 23 and 24.

Josephine Kim, Esq.
March 5, 2020
Page 10

     With respect to Defendants' Interrogatory Nos. 25-27, Chemo's concerns would be addressed if it were to coordinate discovery with Alvogen.  But it has not.  Alvogen raised similar concerns regarding various license agreements.  BDSI pointed out during a meet and confer, that while this information is not relevant, the agreements are publically available and easily obtainable, including agreements licensing the '019 patent, *see e.g.*, https://assignment.uspto.gov/patent/index.html#/patent/search/resultAbstract?id=7579019 &type=patNum.  Thus, Plaintiffs maintain their objections to Defendants' Interrogatory Nos. 25-27.

     Finally, Chemo again presses for information related to Onsolis®, a product that is not at issue and contains a different active ingredient.  For at least the reasons stated above, Plaintiffs maintain their objections to Defendants' Interrogatory No. 29.

                                        Sincerely,

                                        */s/ Thomas J. Sullivan*

                                        Thomas J. Sullivan

cc: Counsel of Record (via email)

# Exhibit 2

REDACTED IN ITS ENTIRETY

# Exhibit 3



US007579019B2

(12) **United States Patent**
Tapolsky et al.

(10) **Patent No.:** **US 7,579,019 B2**
(45) **Date of Patent:** **Aug. 25, 2009**

(54) **PHARMACEUTICAL CARRIER DEVICE SUITABLE FOR DELIVERY OF PHARMACEUTICAL COMPOUNDS TO MUCOSAL SURFACES**

(75) Inventors: **Gilles H. Tapolsky**, The Woodlands, TX (US); **David W. Osborne**, The Woodlands, TX (US)

(73) Assignee: **Arius Two, Inc.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 835 days.

(21) Appl. No.: **11/069,089**

(22) Filed: **Mar. 1, 2005**

(65) **Prior Publication Data**
US 2005/0147658 A1    Jul. 7, 2005

**Related U.S. Application Data**

(60) Continuation of application No. 09/684,682, filed on Oct. 4, 2000, now abandoned, which is a division of application No. 09/069,703, filed on Apr. 29, 1998, now abandoned, which is a continuation-in-part of application No. PCT/US97/18605, filed on Oct. 16, 1997.

(51) **Int. Cl.**
*A61F 13/00*    (2006.01)
*A61K 9/14*    (2006.01)

(52) **U.S. Cl.** ...................................... **424/435**; 424/486

(58) **Field of Classification Search** ................. 424/435, 424/486
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,640,741 A | 2/1972 | Estes | |
| 3,996,934 A | 12/1976 | Zaffaroni | |
| 4,226,848 A | 10/1980 | Nagai et al. | |

| | | | |
|---|---|---|---|
| 4,250,163 A | 2/1981 | Nagai et al. | |
| 4,285,934 A | 8/1981 | Tinnell | |
| 4,286,592 A | 9/1981 | Chandrasekaram | |
| 4,292,299 A | 9/1981 | Suzuki | |
| 4,381,296 A | 4/1983 | Tinnell | |
| 4,517,173 A | 5/1985 | Kizawa et al. | |
| 4,518,721 A | 5/1985 | Dhabhar et al. | |
| 4,552,751 A | 11/1985 | Inaba et al. | |
| 4,572,832 A | 2/1986 | Kigasawa et al. | |
| 4,594,240 A | 6/1986 | Kawata et al. | |
| 4,668,232 A | 5/1987 | Cordes | |
| 4,713,243 A | 12/1987 | Schiraldi et al. | |
| 4,713,246 A | 12/1987 | Begum et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

CA    2169729    4/2001

(Continued)

OTHER PUBLICATIONS

The Merck Manual, http://www.merck.com/mmhe/sec06/ch078/ch078a.html?qt=pain&alt=sh, obtained online on Aprkl 9 2009.*

(Continued)

*Primary Examiner*—Johann R Richter
*Assistant Examiner*—Abigail Fisher
(74) *Attorney, Agent, or Firm*—McCarter & English LLP

(57) **ABSTRACT**

The present invention relates to a pharmaceutical delivery device for application of a pharmaceutical to mucosal surfaces. The device comprises an adhesive layer and a non-adhesive backing layer, and the pharmaceutical may be provided in either or both layers. Upon application, the device adheres to the mucosal surface, providing localized drug delivery and protection to the treatment site. The kinetics of erodability are easily adjusted by varying the number of layers and/or the components.

7 Claims, 1 Drawing Sheet



US 7,579,019 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,715,369 A | 12/1987 | Suzuki et al. | |
| 4,720,387 A | 1/1988 | Sakamoto et al. | |
| 4,740,365 A | 4/1988 | Yukimatsu et al. | |
| 4,755,386 A | 7/1988 | Hsiao et al. | |
| 4,764,378 A | 8/1988 | Keith et al. | |
| 4,765,983 A | 8/1988 | Takayanagi et al. | |
| 4,784,858 A | 11/1988 | Ventouras | |
| 4,857,336 A | 8/1989 | Khanna et al. | |
| 4,867,970 A | 9/1989 | Newsham et al. | |
| 4,876,092 A | 10/1989 | Mizobuchi et al. | |
| 4,889,720 A | 12/1989 | Konishi | |
| 4,894,232 A | 1/1990 | Reul et al. | |
| 4,900,552 A | 2/1990 | Sanvordeker et al. | |
| 4,900,554 A | 2/1990 | Yanagibashi et al. | |
| 4,906,463 A | 3/1990 | Cleary et al. | |
| 4,915,948 A | 4/1990 | Gallopo et al. | |
| 4,990,339 A | 2/1991 | Scholl et al. | |
| 5,047,244 A | 9/1991 | Sanvordeker et al. | |
| 5,059,189 A | 10/1991 | Cilento et al. | |
| 5,064,654 A | 11/1991 | Berner et al. | |
| 5,081,157 A | 1/1992 | Pomerantz | |
| 5,081,158 A | 1/1992 | Pomerantz | |
| 5,116,621 A | 5/1992 | Oji et al. | |
| 5,137,729 A | 8/1992 | Kuroya et al. | |
| 5,166,233 A | 11/1992 | Kuroya et al. | |
| 5,192,802 A | 3/1993 | Rencher | |
| 5,196,202 A | 3/1993 | Konishi | |
| 5,254,345 A | 10/1993 | Pogany et al. | |
| 5,254,346 A | 10/1993 | Tucker et al. | |
| 5,298,258 A | 3/1994 | Akemi et al. | |
| 5,314,915 A | 5/1994 | Rencher | |
| 5,332,576 A | 7/1994 | Mantelle | |
| 5,346,701 A | 9/1994 | Heiber et al. | |
| 5,462,749 A | 10/1995 | Rencher | |
| 5,466,465 A | 11/1995 | Royds et al. | |
| 5,505,956 A | 4/1996 | Kim et al. | |
| 5,516,523 A | 5/1996 | Heiber et al. | |
| 5,540,930 A | 7/1996 | Guy et al. | |
| 5,599,554 A * | 2/1997 | Majeti ....................... 424/448 |
| 5,603,947 A * | 2/1997 | Wong et al. ................ 424/448 |
| 5,679,714 A * | 10/1997 | Weg ........................... 514/647 |
| 5,700,478 A | 12/1997 | Biegajski et al. | |
| 5,723,143 A | 3/1998 | Jacques et al. | |
| 5,750,136 A | 5/1998 | Scholz et al. | |
| 5,780,047 A | 7/1998 | Kamiya et al. | |
| 5,800,832 A | 9/1998 | Tapolsky et al. | |
| 5,849,322 A | 12/1998 | Ebert et al. | |
| 5,853,760 A | 12/1998 | Cremer et al. | |
| 5,900,247 A | 5/1999 | Rault et al. | |
| 5,948,430 A | 9/1999 | Zerbe et al. | |
| 5,985,317 A | 11/1999 | Venkateshwaran et al. | |
| 6,159,498 A | 12/2000 | Tapolsky et al. | |
| 6,177,096 B1 | 1/2001 | Zerbe et al. | |
| 6,284,262 B1 | 9/2001 | Place | |
| 6,592,887 B2 | 7/2003 | Zerbe et al. | |
| 2005/0048102 A1 | 3/2005 | Tapolsky et al. | |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 050 480 | 4/1982 |
| EP | 0 159 604 | 10/1985 |
| EP | 0159604 A2 | 10/1985 |
| EP | 0 250 187 | 12/1987 |
| EP | 0 262 422 | 4/1988 |
| EP | 0275550 A1 | 7/1988 |
| EP | 0 381 194 | 8/1990 |
| EP | 0 654 261 A1 | 5/1995 |
| EP | 0 781 546 | 7/1997 |
| FR | 2497098 | 7/1982 |
| FR | 2582942 | 12/1986 |
| GB | 981372 | 1/1965 |
| GB | 2108841 | 5/1983 |
| JP | 56-100714 | 8/1981 |
| JP | 58-079916 | 5/1983 |
| JP | 60-116630 | 6/1985 |
| JP | 62-178513 | 2/1986 |
| JP | 61-280423 | 12/1986 |
| JP | 62-022713 | 1/1987 |
| JP | 62-056420 | 3/1987 |
| JP | 62-135417 | 6/1987 |
| JP | 63-060924 | 3/1988 |
| JP | 63-160649 | 7/1988 |
| JP | 63-310818 | 12/1988 |
| JP | 64-071812 | 3/1989 |
| JP | 64-090121 | 4/1989 |
| JP | 1-226823 | 9/1989 |
| JP | 3-246220 | 11/1991 |
| JP | 4-059723 | 2/1992 |
| JP | 9-504810 | 5/1997 |
| JP | 2001-508037 | 6/2001 |
| WO | WO-94/18925 A1 | 9/1994 |
| WO | WO-95/05416 | 2/1995 |
| WO | WO-95/05416 A2 | 2/1995 |
| WO | WO-9525544 | 9/1995 |

## OTHER PUBLICATIONS

*Webster's New World Dictionary* (1988). V. Neufeldt ed. and D.B. Guralink ed., Prentice Hall: New York 3rd. College Ed., p. 505.

* cited by examiner



FIG.1



FIG.2

US 7,579,019 B2

1

# PHARMACEUTICAL CARRIER DEVICE SUITABLE FOR DELIVERY OF PHARMACEUTICAL COMPOUNDS TO MUCOSAL SURFACES

The instant application is a continuation of U.S. patent application Ser. No. 09/684,682, filed Oct. 4, 2000, which is a divisional of U.S. patent application Ser. No. 09/069,703, filed Apr. 29, 1998 which is a continuation-in-part application of PCT/US97/18605, filed Oct. 16, 1997, which is a PCT application claiming priority from Ser. No. 08/734,519, filed Oct. 18, 1996, which applications are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to a water-erodable pharmaceutical carrier which adheres to mucosal surfaces for the localized delivery of pharmaceutical compounds and protection of the treatment site.

## BACKGROUND OF THE INVENTION

The localized treatment of body tissues, diseases, and wounds requires that the particular pharmaceutical component be maintained at the site of treatment for an effective period of time. Given the tendency of natural bodily fluids to rapidly wash away topically applied pharmaceutical components, the topical treatment of wet mucosal tissues has been problematic. In the mouth, saliva, natural replacement of the mucosal tissue, as well as, eating, drinking, and speaking movements are some of the problems that have limited the effectiveness and residence time of pharmaceutical carriers.

Bioadhesive carriers are known in the art and include gels, pastes, tablets, and films. These products, however, may lack one or several of the preferred characteristics for an efficient and commercially acceptable pharmaceutical delivery device. Some characteristics which are preferred by users of bioadhesive carriers include water-erodability; ease of handling and application to the treatment site; ease of comfort; minimal foreign body sensation; and unidirectional, specific release into the mucosal tissue. Other preferred characteristics for an effective and user-friendly product for the treatment of mucosal surfaces include the use of pharmaceutically approved components or materials; instantaneous adhesion to mucosal surface upon application; increased residence time for the protection of the affected tissue or the delivery of the pharmaceutical component; and ease of removal of the delivery device from the affected tissue or natural erosion of the delivery device at the delivery site.

Bioadhesive gels which are used for application to mucosal tissues and especially the oral cavity are known in the art. For example, U.S. Pat. No. 5,192,802 describes a bioadhesive teething gel made from a blend of sodium carboxymethyl cellulose and xanthan gum. The gel may also have potential use in the treatment of canker sores, fever blisters, and hemorrhoids. However, this type of pharmaceutical carrier has a very limited residence time, given that body fluids such as saliva quickly wash it away from the treatment site. Bioadhesive gels are also described in U.S. Pat. Nos. 5,314,915; 5,298,258; and 5,642,749. The gels described in those patents use an aqueous or oily medium and different types of bioadhesive and gelling agents.

Denture adhesive pastes are another type of bioadhesive product known in the art. However, these preparations are used primarily for their adhesive properties, to adhere dentures to the gums, rather than for the protection of tissue or for the topical delivery of is pharmaceuticals, although drugs such as local anesthetics may be used in the paste for the relief of sore gums. U.S. Pat. Nos. 4,894,232 and 4,518,721 describe denture adhesive pastes. The '721 patent describes a combination of sodium carboxymethyl cellulose and polyethylene oxide in polyethylene glycol.

Pastes have also been used as film protectants and as drug delivery systems. One such example having film forming and adhesive properties is the product commercialized under the name Orabase®-B, which is a thick gel or paste for the relief of mouth sores. Ingredients include guar gum, sodium carboxymethyl cellulose, tragacanth gum, and pectin. Even though it does provide numbing to the area of application, the film forming behavior and bioadhesion do not last. Thus, this product has a limited residence time.

Bioadhesive tablets are described in U.S. Pat. No. 4,915,948. The water-soluble bioadhesive material used in this device is a xanthan gum or a pectin combined with an adhesion enhancing material such as a polyol. Although residence time is improved with the use of bioadhesive tablets, they are not user friendly, especially when used in the oral cavity, given the unpleasant feelings associated with their solidity, bulkiness, and slow erosion time.

Bioadhesive tablets are also described in U.S. Pat. Nos. 4,226,848; 4,292,299; and 4,250,163, and are single layer or bilayer devices having an average thickness of 0.2 to 2.5 mm. The bioadhesive tablets described in these patents utilize a non-adhesive component such as cellulose ether, a bioadhesive component such as polyacrylic acid, sodium carboxymethyl cellulose, or polyvinylpyrrolidone, and a binder for tableting purposes. The cellulose derivatives may or may not be water-erodable.

The use of bandages or bioadhesive laminated films, which are thinner and flexible and therefore have a decreased foreign body sensation, is described in U.S. Pat. Nos. 3,996,934 and 4,286,592. These products are used to deliver drugs through the skin or mucous. The laminated films usually include an adhesive layer, a reservoir layer, and a backing layer. Bioadhesive devices designed to release drug through the skin at a given rate and over a period of time are usually not water soluble, and thus are not dissolved or washed away by bodily fluids.

In addition to film systems for the delivery of drug through the skin, film delivery systems for use on mucosal surfaces are also known. These types of systems, which are water-insoluble and usually in the form of laminated, extruded or composite films, are described in U.S. Pat. Nos. 4,517,173; 4,572,832; 4,713,243; 4,900,554; and 5,137,729. The '173 patent describes and claims a membrane-adhering film consisting of at least three layers, including a pharmaceutical layer, a poor water soluble layer, and an intermediate layer. The pharmaceutical layer includes the drug and a cellulose derivative selected from hydroxypropyl cellulose, methyl cellulose, and hydroxypropyl methyl cellulose. The poor water soluble layer is made by the combination of one or more cellulose derivatives with a poor water soluble fatty acid, and the intermediate layer is made of cellulose derivatives. The '832 patent relates to a soft film for buccal delivery, made by the combined use of a water soluble protein, a polyol, and a polyhydric alcohol such as cellulose and polysaccharides, and also teaches the use of coloring or flavoring agents. The '243 patent describes a single or multi-layered bioadhesive thin film made from 40-95% water soluble hydroxypropyl cellulose, 5-60% water-insoluble ethylene oxide, 0-10% water-insoluble ethyl cellulose, propyl cellulose, polyethylene, or polypropylene, and a medicament. The films are three-layered laminates and include a bioadhesive layer, a reservoir

US 7,579,019 B2

3

layer, and a non water-soluble outer protective layer. The '729 patent teaches a soft adhesive film applicable to the oral mucosa containing a systemic drug and comprising a mixture of a vinyl acetate non water-soluble homopolymer, an acrylic acid polymer, and a cellulose derivative. Finally, the '554 patent describes a device for use in the oral cavity having an adhesive layer including a mixture of an acrylic acid polymer, a water-insoluble cellulose derivative, and a pharmaceutical preparation, and a water-insoluble or sparingly soluble backing layer. The adhesive layer contains the pharmaceutical, and upon application to the mucosal surface, delivers the drug. The '554 patent also states that "it is impossible to achieve an adhesive device for application to body tissue without all three components, that is, acrylic acid polymer, water insoluble cellulose derivative and a water insoluble or sparingly soluble backing layer."

JP 56-100714 describes a preparation which comprises a coating layer and an active ingredient layer. The coating layer adheres to the mucosal membrane and is comprised of a cellulose ether or an acrylic acid polymer or salt. The active ingredient layer comprises an ointment base comprised of water-insoluble substances such as fats and oils, waxes, hydrocarbons, higher fatty acids, higher alcohols, polyhydric alcohols or glycerol esters. A surfactant and active ingredient are also present in the active ingredient layer. Thus, the active ingredient is mixed with an essentially non-water erodable substance. The previous examples of thin films to be applied in the oral cavity by adhesion onto the mucosal tissues all utilize polymers which are water-insoluble by nature or which are made water-insoluble by crosslinking, and claim a long residence time. Therefore, unfortunately, the above examples of thin films do not provide a water erodable device with good adhesive properties. Therefore, upon release of the desired amount of drug, the thin films of water insoluble polymers must be peeled off the site of application. Such peeling often removes tissue from the mucosal tissue and is painful to the patient. What is needed in the art is a water-erodable pharmaceutical delivery device which provides good adhesion and localized delivery of a pharmaceutical with minimal discomfort to the patient.

SUMMARY OF THE INVENTION

The present invention relates to a novel water-erodable pharmaceutical carrier device for application to mucosal surfaces to provide protection of and localized delivery of pharmaceutical to the site of application, surrounding tissues, and other bodily fluids such as blood or lymph, having an effective residence time, with minimal discomfort and ease of use. In one embodiment, the pharmaceutical delivery device includes a layered film disk which is water-erodable. The device comprises a layered film disk having an adhesive layer and a backing layer, both water-erodable, having the pharmaceutical in one or more of the layers.

In another embodiment, the pharmaceutical delivery device further comprises a third layer between the first adhesive layer and the second backing layer. The third layer is a water-erodable adhesive layer which has a surface area sufficient to encompass said first adhesive layer and contact the mucosal surface. In this manner, localized delivery of a pharmaceutical may be accomplished in a unidirectional manner toward the mucosal layer.

The adhesive layer(s) comprise(s) a film-forming polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethyl methyl cellulose, polyvinyl alcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, col-

4

lagen and derivatives, gelatin, albumin, polyaminoacids and derivatives, polyphosphazenes, polysaccharides and derivatives, chitin, or chitosan, alone or in combination and a bio-adhesive polymer such as polyacrylic acid, polyvinyl pyrrolidone, or sodium carboxymethyl cellulose, alone or in combination.

The non-adhesive backing layer(s) comprise(s) hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxyethylmethyl cellulose, hydroxypropylmethyl cellulose, polyvinyl alcohol, polyethylene glycol, polyethylene oxide, or ethylene oxide-propylene oxide co-polymers, alone or in combination.

In another embodiment of the invention, one or more of the layers of the device further comprise a component which acts to adjust the kinetics of the erodability and provide a convenient manner of altering the release of the pharmaceutical and the lifespan of the device. A component which acts to adjust the kinetics of the erodability is a water-based emulsion of a polylactide, polyglycolide, lactide-glycolide copolymers, poly-ϵ-caprolactone and derivatives, polyorthoesters and derivatives, polyanhydrides and derivatives, ethyl cellulose, vinyl acetate, cellulose acetate, and polyisobutylene, alone or in combination. Another component which acts to adjust the kinetics of the erodability is alkyl-glycol, propylene glycol, polyethyleneglycol, oleate, sebacate, stearate or esters of glycerol, or phthalate, alone or in combination.

In another embodiment of the invention, the number of layers of the device further may be varied to adjust the kinetics of the erodability and provide a convenient manner of altering the release of the pharmaceutical and the lifespan of the device.

In a preferred embodiment, the backing layer comprises two or more layers with different erodibility kinetics.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a three layered film disk wherein layers 2 and 3 are bioadhesive layers and layer 1 is a backing layer.

FIG. 2 is a three layered film disk wherein two of the layers are bioadhesive layers and the other layer is a backing layer. The bioadhesive layer, layer 3, which will adhere to the mucosal tissue is of smaller surface area and encompassed by the second bioadhesive layer, layer 2, to provide unidirectional delivery. Layer 1 is a backing layer.

DETAILED DESCRIPTION OF THE INVENTION

As used herein, the term "water-erodable" means that the component, device, layer, etc. erodes in water-based media such as saliva, over time. Such erosion in water may be due to factors such as dissolution, dispersion, friction, gravity, etc.

As used herein, the term "kinetics of erodability" or "erosion kinetics" refers to the timing of the release of pharmaceutical from the carrier device (release profile), as well as, the timing of the erosion of the device itself over time (lifespan or residence time of the device). As described herein, kinetics of erodability are based on factors such as type and amount of components in the device, thickness and number of layers in the device, and additives or excipients in the device. In a case in which all the components of the device are very water soluble, the kinetics of erodability will closely parallel the solubility kinetics.

In the present invention, a novel water-erodable pharmaceutical device which adheres to mucosal surfaces is provided. The present invention finds particular use in the localized treatment of body tissues, diseases, or wounds which may have moist surfaces and which are susceptible to bodily fluids, such as the mouth, the vagina, or other types of

US 7,579,019 B2

5
6

mucosal surfaces. The device carries a pharmaceutical, and upon application and adherence to the mucosal surface, offers a layer of protection and delivers the pharmaceutical to the treatment site, the surrounding tissues, and other bodily fluids. The device provides an appropriate residence time for effective drug delivery at the treatment site, given the control of erosion in aqueous solution or bodily fluids such as saliva, and the slow, natural erosion of the film concomitant or subsequent to the delivery. In one embodiment, the pharmaceutical delivery device comprises a layered film disk having an adhesive layer and a backing layer, both water-erodable, having the pharmaceutical in either or both layers.

Unlike bioadhesive gels and pastes known in the art, which have a very limited residence time, given the tendency of bodily fluids such as saliva to wash away the gel from the treatment site, the present invention offers an increased residence time because of its filmy consistency and components. A typical residence time for an aqueous gel or paste, such as Orajel®, Orabase®, or Kanka® is a few minutes. This short residence time is a consequence of a limited or poor adhesion. In a typical aqueous gel, the mucoadhesive components are either in solution, suspension, or swollen. Once applied to the mucosal surface, however, the water based gel does not instantaneously penetrate the lipophilic mucosal surface. The composition and water affinity of these gels results in a tendency to quickly mix with the saliva, rapidly pulling away the different components of the gel, and limiting the residence time. The same tendency is expected with pastes, the increase in viscosity only slightly delaying the timing. The present invention, by its solid form and its instantaneous adhesion to the mucosal surface, allows a lasting contact, a consequence of the entanglement of polymer chains and glycoproteins of the mucosal tissue which assures adhesion. Erosion kinetics in the saliva and other aqueous media are influenced by the physical state of the device. While a gel or solution will readily mix with saliva and/or other bodily fluids, a solid form of the same or similar composition, such as the film of the present invention, dissolves/erodes more slowly.

Also, unlike the bioadhesive tablets which are known in the art, the pharmaceutical device of the present invention minimizes the discomfort associated with application of a foreign substance for a period of time sufficient to provide effective drug delivery to the treatment site. Often, users of the bioadhesive tablets of the prior art experience unpleasant sensations due to their solidity, bulkiness, and slow dissolution time if erodable, especially when used in the oral cavity. Moreover, the typical thickness of bioadhesive tablets, which may or may not be water soluble, is a couple of millimeters, and because of their thickness, the preferred site of application is on the upper gingival area. This site is usually unsatisfactory for local delivery as the type of compounds to be delivered, their bioavailability, and pharmokinetics is limited. In contrast to tablets, the device of the present invention offers the advantages of an effective residence time with minimal discomfort and ease of use, and is an appropriate vehicle for the local, as well as systemic, delivery of pharmaceutical, given its thinner, flexible form.

Finally, unlike the film systems known in the art which are used to deliver pharmaceutical through the skin or mucous, the device of the present invention is made of water-erodable components and thus is bioerodable. The use of water-erodable components allows the device to erode over a period of time, with natural bodily fluids slowly dissolving or eroding away the carrier, while the pharmaceutical remains at the application site. Unlike bandages and other non-water-erodable film systems, the user of the present invention does not have to remove the device following treatment. Nor does the

user experience the sensation of the presence of a foreign object at the mucosal surface or within the body cavity, given that upon application, water absorption softens the device, and over time, the device slowly dissolves or erodes away.

The residence time of the device of the present invention depends on the erosion rate of the water erodable polymers used in the formulation and their respective concentrations. The erosion rate may be adjusted, for example, by mixing together components with different solubility characteristics or chemically different polymers, such as hydroxyethyl cellulose and hydroxypropyl cellulose; by using different molecular weight grades of the same polymer, such as mixing low and medium molecular weight hydroxyethyl cellulose; by using excipients or plasticizers of various lipophilic values or water solubility characteristics (including essentially insoluble components); by using water soluble organic and inorganic salts; by using crosslinking agents such as glyoxal with polymers such as hydroxyethyl cellulose for partial crosslinking; or by post-treatment irradiation or curing, which may alter the physical state of the film, including its crystallinity or phase transition, once obtained. These strategies might be employed alone or in combination in order to modify the erosion kinetics of the device.

Upon application, the pharmaceutical delivery device adheres to the mucosal surface and is held in place. Water absorption softens the device, thereby diminishing the foreign body sensation. As the device rests on the mucosal surface, delivery of the drug occurs. Residence times may be adjusted over a wide range depending upon the desired timing of the delivery of the chosen pharmaceutical and the desired lifespan of the carrier. Generally, however, the residence time is modulated between about a few seconds to about a few days. Preferably, the residence time for most pharmaceuticals is adjusted from about 30 minutes to about 24 hours. More preferably, the residence time is adjusted from about 1 hour to about 8 hours. In addition to providing drug delivery, once the device adheres to the mucosal surface, it also provides protection to the treatment site, acting as an erodable bandage.

In one embodiment, the present invention comprises a film disc having an adhesive layer and a non-adhesive backing layer which can be comprised of components having a similar or different hydrophilicity. The pharmaceutical component may be included in either layer, although preferably, it is included in the adhesive layer, which is closest to the treatment site and which will have a slower erosion time, given that the backing layer protects the interior, adhesive layer and will typically erode first.

The adhesive layer may comprise at least one film-forming water-erodable polymer (the "film-forming polymer") and at least one pharmacologically acceptable polymer known for its bioadhesive capabilities (the "bioadhesive polymer"). The film forming polymer may comprise hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethyl methyl cellulose, polyvinyl alcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, collagen and derivatives, gelatin, albumin, polyaminoacids and derivatives, polyphosphazenes, polysaccharides and derivatives, chitin and chitosan, alone or in combination. Preferably, the film-forming polymer comprises hydroxyethyl cellulose and hydroxypropyl cellulose. Preferably, in the case of hydroxyethyl cellulose, the average molecular weight (Mw estimated from intrinsic viscosity measurements) is in the range $10^2$ to $10^6$ and more preferably in the range $10^3$ to $10^5$, while in the case of hydroxypropyl cellulose, the average molecular weight (Mw obtained from

US 7,579,019 B2

7

size exclusion chromatography measurements) is in the range $50 \times 10^3$ to $1.5 \times 10^6$, and more preferably between $80 \times 10^3$ to $5 \times 10^5$.

The bioadhesive polymer of the adhesive layer may comprise polyacrylic acid (PAA), which may or may not be partially crosslinked, sodium carboxymethyl cellulose (NaCMC), and polyvinylpyrrolidone (PVP), or combinations thereof. These bioadhesive polymers are preferred because they have good and instantaneous mucoadhesive properties in a dry, film state. In the case of sodium carboxymethyl cellulose, typical average molecular weights comprise 50,000 to 700,000, and preferably 60,000 to 500,000, with a degree of substitution of 0.7. The substitution range varies between 0.5 and 1.5, and preferably between 0.6 and 0.9. The polyvinyl pyrrolidone can be characterized according to its average molecular weight and comprises between 5,000 and 150,000, preferably between 10,000 and 100,000. The simultaneous use of PAA with some grades of PVP may result in the precipitation of one or both components. This precipitation may not be ideal to obtain a homogenous layer and may slightly alter the overall adhesive properties of the device.

While not wishing to bound to a particular theory, it is believed that the adhesion properties of the present invention are the result of the entanglement of polymer chains and interactions with glycoproteins of the mucosal surface. The chemical nature of the bioadhesive polymers, including chain and side groups and crosslinking agents, generates interactions between the mucosal constituents and the polymer or polymers, such as physical entanglement, Van der Waals interactions, and hydrogen bonding. Given that the composition of mucosal tissues differs from one individual to another and changes naturally over time, the use of a combination of bioadhesive polymers or the use of a combination of different grades of the same polymer is preferred. The use of a combination of at least two bioadhesive polymers maximizes the adhesion capabilities of the device, although use of a single bioadhesive polymer is effective as well.

The ratio of the bioadhesive polymer to the film-forming polymer in the adhesive layer may vary, depending on the type of pharmaceutical and the amount of pharmaceutical to be used. However, the content of combined components in the adhesive layer is usually between 5 and 95% by weight, preferably between 10 and 80% by weight. In terms of weight percent of the different bioadhesive polymers PAA, NaCMC, and PVP, some examples are provided below and using the examples one skilled in the art will be able to readily adjust the percentages to obtain a pharmaceutical device having desired characteristics for a given application. Preferred combinations include PAA and NaCMC, NaCMC and PVP, or PAA and PVP, and also include the use of different grades of the same polymer.

The non adhesive backing layer may comprise a water-erodable, film-forming pharmaceutically acceptable polymer such as hydroxyethyl cellulose, hydroxypropyl cellulose, hydroxypropylmethyl cellulose, hydroxyethylmethyl cellulose, polyvinylalcohol, polyethylene glycol, polyethylene oxide, ethylene oxide-propylene oxide co-polymers, collagen and derivatives, gelatin, albumin, polyaminoacids and derivatives, polyphosphazenes, polysaccharides and derivatives, chitin and chitosan, alone or in combination. The backing layer component may or may not be crosslinked depending on the desired erosion kinetics. In one embodiment, the preferred backing layer component comprises hydroxyethyl cellulose or hydroxypropyl cellulose, and more preferably comprises hydroxyethyl cellulose. Preferably, in the case of hydroxyethyl cellulose, the average molecular weight (Mw estimated from intrinsic viscosity measurements) is in the

8

range $10^2$ to $10^6$, and more preferably in the range $10^3$ to $10^5$, while in the case of hydroxypropyl cellulose, the average molecular weight (Mw obtained from size exclusion chromatography measurements) is in the range of $50 \times 10^3$ to $1.5 \times 10^6$ and more preferably from $80 \times 10^3$ to $5 \times 10^5$.

Moreover, it has been discovered that a particularly preferable combination for the backing layer comprises hydroxypropyl cellulose and an alkylcellulose such as is methylcellulose or ethylcellulose. Such a combination comprises a film-forming amount of alkylcellulose, hydroxypropyl cellulose, and a suitable solvent. Advantageously, the characteristics of the film formed from the gel may be modified depending upon the ratio of hydroxypropyl cellulose to alkylcellulose. Such modifiable characteristics advantageously include the kinetics of erodability.

Typically, the ratio of hydroxypropyl cellulose to alkylcellulose is that necessary to form a suitable film. This ratio may vary based on the other components and the type of alkylcellulose. However, if ethylcellulose is employed then the ratio of hydroxypropyl cellulose to ethyl cellulose is usually from about 1000:1 to about 3:1, preferably from about 200:1 to about 4:1, more preferably from about 200:1 to about 8:1. Typically, as the ratio of hydroxypropyl cellulose to alkylcellulose increases, the water erodability increases, i.e., the films are more readily washed away. Thus, the ethylcellulose is a component which acts to adjust the kinetics of erodability of the device.

As described above, the erosion kinetics of one or more of the layers (adhesive layer, backing layer, or both) may be altered in many different ways in order to modify the residence time and the release profile of a drug. One way is by crosslinking or plasticizing the film-forming polymer. Crosslinking agents known in the art are appropriate for use in the invention and may include glyoxal, propylene glycol, glycerol, dihydroxy-polyethylene glycol of different sizes, butylene glycol, and combinations thereof. The amount of crosslinking agent used may vary, depending on the particular polymers and crosslinking agent but usually should not exceed 5% molar equivalent of the polymeric material, and preferably comprises 0 to 3% molar equivalent of the polymeric material.

Another way of altering the residence time and release profile is by employing a component in one or more of the layers which acts to adjust the kinetics of the erodability of the layer. While these components will vary widely depending upon the particular pharmaceutical delivery device employed, preferred components include water-based emulsions of polylactide, polyglycolide, lactide-glycolide copolymers, poly-ε-caprolactone and derivatives, polyorthoesters and derivatives, polyanhydrides and derivatives, ethyl cellulose, vinyl acetate, cellulose acetate, silicone, polyisobutylene and derivatives, alone or in combination.

It is also possible to adjust the kinetics of erodability of the devices by adding excipients which are very soluble in water such as water soluble organic and inorganic salts. Suitable such excipients may include the sodium and potassium salts of chloride, carbonate, bicarbonate, citrate, trifluoroacetate, benzoate, phosphate, fluoride, sulfate, or tartrate. The amount added will vary depending upon how much the erosion kinetics are to be altered as well as the amount and nature of the other components in the device.

Emulsifiers typically used in the water-based emulsions described above are, preferably, either obtained in situ if selected from the linoleic, palmitic, myristoleic, lauric, stearic, cetoleic or oleic acids and sodium or potassium hydroxide, or selected from the laurate, palmitate, stearate, or oleate esters of sorbitol and sorbitol anhydrides, polyoxyeth-

US 7,579,019 B2

9

ylene derivatives including monooleate, monostearate, monopalmitate, monolaurate, fatty alcohols, alkyl phenols, alyl ethers, alkyl aryl ethers, sorbitan monostearate, sorbitan monooleate and sorbitan monopalmitate.

Furthermore, in the case of the water-insoluble polymeric materials such as the polyesteraliphatic family (co-polymers of lactide-glycolide, caprolactone, etc.) the average molecular weight (Mw) is in the range $10^2$ to $10^5$ and, more preferably, $10^3$ to $10^4$, while in the case of the cellulosic family (ethyl cellulose, cellulose acetate, etc.), the average molecular weight (Mw estimated from intrinsic viscosity measurements) is in the range $10^2$ to $10^6$ and more preferably in the range $10^3$ to $10^5$.

Yet another manner of modifying the erosion kinetics of any layer, is by employing excipients which plasticize the film concomitantly. The excipient or plasticizer often improves the mechanical properties of the device and/or modifies the drug release profile or disintegation time. Suitable excipients or plasticizers modifying the erosion behavior of the layer(s) may include alkyl-glycol such as propylene glycol, polyethyleneglycols, oleate, sebacate, stearate or esters of glycerol, phthalate and others. Other suitable plasticizers include esters such as acetyl citrate, amyl oleate, myristyl acetate, butyl oleate and stearate, dibutyl sebacate, phthalate esters such as diethyl, dibutyl, and diethoxy ethyl phthalate and the like, fatty acids such as oleic and stearic acid, fatty alcohols such as cetyl, myristyl, and stearyl alcohol. Moreover, in some instances, a polymer, a pharmaceutical, or solvent residual may act as a plasticizer.

It is also possible to modify the erosion kinetics of the device of the instant invention by adjusting the thickness and number of layers. Typically, the thicker the layers, the slower the release of pharmaceutical and the longer the release profile. Correspondingly, the more layers there are, the slower the release of pharmaceutical and the longer the release profile. In a preferred embodiment, the backing layer comprises two or more layers with different erosion kinetics.

Moreover, combinations of different polymers or similar polymers with definite molecular weight characteristics may be used in order to achieve preferred film forming capabilities, mechanical properties, and kinetics of dissolution in any layer. Some combinations for use in the invention are provided in the examples below and may include ¾ of hydroxyethyl cellulose and ¼ of hydroxypropyl cellulose; ⅘ of low molecular weight hydroxyethyl cellulose and ⅕ of medium molecular weight hydroxyethyl cellulose; and ⅚ of low molecular weight hydroxyethyl cellulose and ⅙ of high molecular weight hydroxyethyl cellulose. As mentioned previously, combinations of water-erodable polymers may be employed in order to modify the erosion kinetics of the device. A particularly preferred combination includes ½ hydroxyethyl cellulose, ⅙ hydroxypropylcellulose, and ⅔ of a pseudolatex, i.e. emulsion of polymer, of lactide-glycolide copolymer.

The pharmaceutical component of the present invention may comprise a single pharmaceutical or a combination of pharmaceuticals, which may be incorporated in the adhesive layer, the backing layer, or both. Pharmaceuticals which may be used, either alone or in combination, include anti-inflammatory analgesic agents, steroidal anti-inflammatory agents, antihistamines, local anesthetics, bactericides and disinfectants, vasoconstrictors, hemostatics, chemotherapeutic drugs, antibiotics, keratolytics, cauterizing agents, antiviral drugs, antirheumatics, antihypertensives, bronchodilators, anticholinergics, antimenimic compounds, hormones and macromolecules, peptides, proteins and vaccines.

10

Examples of anti-inflammatory analgesic agents include acetaminophen, methyl salicylate, monoglycol salicylate, aspirin, mefenamic acid, flufenamic acid, indomethacin, diclofenac, alclofenac, diclofenac sodium, ibuprofen, ketoprofen, naproxen, pranoprofen, fenoprofen, sulindac, fenclofenac, clidanac, flurbiprofen, fentiazac, bufexamac, piroxicam, phenylbutazone, oxyphenbutazone, clofezone, pentazocine, mepirizole, tiaramide hydrochloride, etc. Examples of steroidal anti-inflammatory agents include hydrocortisone, predonisolone, dexamethasone, triamcinolone acetonide, fluocinolone acetonide, hydrocortisone acetate, predonisolone acetate, methylpredonisolone, dexamethasone acetate, betamethasone, betamethasone valerate, flumetasone, fluorometholone, beclomethasone diproprionate, fluocinonide, etc.

Examples of antihistamines include diphenhydramine hydrochloride, diphenhydramine salicylate, diphenhydramine, chlorpheniramine hydrochloride, chlorpheniramine maleate isothipendyl hydrochloride, tripelennamine hydrochloride, promethazine hydrochloride, methdilazine hydrochloride, etc. Examples of local anesthetics include dibucaine hydrochloride, dibucaine, lidocaine hydrochloride, lidocaine, benzocaine, p-buthylaminobenzoic acid 2-(diethylamino) ethyl ester hydrochloride, procaine hydrochloride, tetracaine, tetracaine hydrochloride, chloroprocaine hydrochloride, oxyprocaine hydrochloride, mepivacaine, cocaine hydrochloride, piperocaine hydrochloride, dyclonine, dyclonine hydrochloride, etc.

Examples of bactericides and disinfectants include thimerosal, phenol, thymol, benzalkonium chloride, benzethonium chloride, chlorhexidine, povidone iode, cetylpyridinium chloride, eugenol, trimethylammonium bromide, etc. Examples of vasoconstrictors include naphazoline nitrate, tetrahydrozoline hydrochloride, oxymetazoline hydrochloride, phenylephrine hydrochloride, tramazoline hydrochloride, etc. Examples of hemostatics include thrombin, phytonadione, protamine sulfate, aminocaproic acid, tranexamic acid, carbazochrome, carbaxochrome sodium sulfanate, rutin, hesperidin, etc.

Examples of chemotherapeutic drugs include sulfamine, sulfathiazole, sulfadiazine, homosulfamine, sulfisoxazole, sulfisomidine, sulfamethizole, nitrofurazone, etc. Examples of antibiotics include penicillin, meticillin, oxacillin, cefalotin, cefalordin, erythromycin, lincomycin, tetracycline, chlortetracycline, oxytetracycline, metacycline, chloramphenicol, kanamycin, streptomycin, gentamicin, bacitracin, cycloserine, etc.

Examples of keratolytics include salicylic acid, podophyllum resin, podolifox, and cantharidin. Examples of cauterizing agents include the chloroacetic acids and silver nitrate. Examples of antiviral drugs include protease inhibitors, thymadine kinase inhibitors, sugar or glycoprotein synthesis inhibitors, structural protein synthesis inhibitors, attachment and adsorption inhibitors, and nucleoside analogues such as acyclovir, penciclovir, valacyclovir, and ganciclovir.

Examples of proteins, peptides, vaccines, genes and the like include heparin, insulin, LHRH, TRH, interferons, oligonuclides, calcitonin, and octreotide.

Other pharmaceuticals which may be employed include omeprazone, fluoxetine, ethinylestradiol, amiodipine, paroxetine, enalapril, lisinopril, leuprolide, prevastatin, lovastatin, norethindrone, risperidone, olanzapine, albuterol, hydrochlorothiazide, pseudoephridrine, warfarin, terazosin, cisapride, ipratropium, busprione, methylphenidate, levothyroxine, zolpidem, levonorgestrel, glyburide, benazepril, medroxyprogesterone, clonazepam, ondansetron, losartan, quinapril, nitroglycerin, midazolam versed, cetirizine, doxazosin, glip-

US 7,579,019 B2

11

izide, vaccine hepatitis B, salmeterol, sumatriptan, triamcinolone acetonide, goserelin, beclomethasone, granisteron, desogestrel, alprazolam, estradiol, nicotine, interferon beta 1A, cromolyn, fosinopril, digoxin, fluticasone, bisoprolol, calcitril, captorpril, butorphanol, clonidine, premarin, testosterone, sumatriptan, clotrimazole, bisacodyl, dextromethorphan, nitroglycerine In D, nafarelin, dinoprostone, nicotine, bisacodyl, goserelin, and granisetron.

The amount of active pharmaceutical (s) to be used depends on the desired treatment strength and the composition of the layers, although preferably, the pharmaceutical component comprises from about 0.001 to about 99, more preferably from about 0.003 to about 30, and most preferably from about 0.005 to about 20% by weight of the device.

Plasticizers, flavoring and coloring agents, and preservatives may also be included in the pharmaceutical delivery device of the present invention in the adhesive layer, the backing layer, or both. The amounts of each may vary depending on the drug or other components but typically these components comprise no more than 50, preferably no more than 30, most preferably no more than 15% by total weight of the device.

A permeation enhancer may be added to the device to improve absorption of the drug. Typically, such a permeation enhancer is added to the layer in which the pharmaceutical is to be contained. Suitable permeation enhancers include natural or synthetic bile salts such as sodium fusidate; glycocholate or deoxycholate; fatty acids and derivatives such as sodium laurate, oleic acid, oleyl alcohol, monoolein, and palmitoylcarnitine; chelators such as disodium EDTA, sodium citrate and sodium laurylsulfate, azone, sodium cholate, sodium 5-methoxysalicylate, sorbitan laurate, glyceryl monolaurate, octoxynonyl-9, laureth-9, polysorbates, etc.

The thickness of the device may vary, depending on the thickness of each of the layers and the number of layers. As stated above, both the thickness and amount of layers may be adjusted in order to vary the erosion kinetics. Preferably, if the device has only two layers, the thickness ranges from 0.05 mm to 3 mm, preferably from 0.1 to 1 mm, and more preferably from 0.1 to 0.5 mm. The thickness of each layer may vary from 10 to 90% of the overall thickness of the layered device, and preferably varies from 30 to 60%. Thus, the preferred thickness of each layer may vary from 0.01 mm to 0.9 mm, and more preferably from 0.03 to 0.6 mm.

While the device of the invention only requires two layers, i.e., an adhesive layer and a backing layer, it is often preferable to have additional layers. One instance in which this might be advantageous is when specific unidirectional flow of a pharmaceutical is required is toward a mucosal layer. The layered device described above provides some directional release, i.e., release will mainly be toward the mucosa and not, for instance, into the oral or vaginal cavity. However, due to the swelling characteristics of the thin film, a small amount of pharmaceutical may also be released through the sides of the device and the backing layer if all the layers are of the approximately the same surface area and are essentially on top of one another. While a preferential, but not specific, release is acceptable, and even desirable, for many pharmaceuticals, other pharmaceuticals may require unidirectional, specific release into the mucosal tissue.

An example of when unidirectional release may be desirable is when the pharmaceutical to be delivered has a specific therapeutic window or has undesirable side effects if absorbed in the gastrointestinal tract. Furthermore, some pharmaceuticals are enzymatically degraded. Therefore, a bioerodible mucoadhesive system allowing a transmucosal unidirectional delivery and protecting the drug being deliv-

12

ered from enzymes present, for instance, in the oral or vaginal cavities would have advantages.

In such instances when unidirectional release is desired, an additional layer may be placed between the first adhesive layer and the second backing layer. The third layer is a watererodable adhesive layer which has a surface area sufficient to encompass said first adhesive layer and contact the mucosal surface. The third layer may be comprised of any of the components described above for the first adhesive layer and thus may be the same or different than the first adhesive layer. FIG. **2** illustrates a disk having a third layer which encompasses the first adhesive layer.

If a bioadhesive layer is to be of a smaller surface area than the other layers then it is usually between about 5 and about 50, preferably between about 10 and about 30% smaller than the other layers.

In the aforementioned manner, localized delivery of a pharmaceutical may be accomplished in a unidirectional manner. For instance, if pharmaceutical is present in the first adhesive layer then it is prevented from being released through the sides and back of the device. If pharmaceutical is present in the backing layer, then it is prevented from entering is the mucosal layer to which the device is adhered. Likewise, if a pharmaceutical is present in the first adhesive layer and the backing layer, they are prevented from mixing.

The pharmaceutical delivery device of the present invention may be prepared by numerous methods known in the art. In one embodiment, the components are dissolved in a biocompatible solvent, preferably an aqueous medium or a combination of water and lower alkanols, to prepare a solution, a gel, or a suspension that can be used for coating. Solvents for use in the present invention may comprise water, methanol, ethanol, propanol, or low alkyl alcohols such as isopropyl alcohol, or acetone. Other suitable solvents may comprise dimethyl acetamide, N-methyl-2-pyrrolidone, dimethyl sulfoxide, ethoxydiglycoli, propylene glycol, polyethylene glycol. The final solvent content or residual solvent content in the film may be the result of either or both layers. Typically, such final solvent content is at least about 10, preferably at least about 5, more preferably at least about 1% by weight of the total device. Similarly, the final solvent content is not more than about 20, preferably not more than about 15, most preferably not more than about 10% by weight of the total device. The solvent may also be used as a plasticizer or an erosion rate-modifying agent.

Each solution is then coated onto a substrate. Eventually, one of the components might be in suspension. Each solution is casted and processed into a thin film by techniques known in the art, such as by film dipping, film coating, film casting, spin coating, or spray drying using the appropriate substrate. The thin film is then allowed to dry. If desired, the drying step can be accomplished in any type of oven in order to facilitate the process. However, as one skilled in the art will appreciate, the solvent residual, which may effect the erosion kinetics, depends on the drying procedure. The film layers may be filmed independently and then laminated together or may be filmed one on the top of the other.

The film obtained after the two layers have been laminated together or coated on top of each other may be cut, if desired, into any type of shape which is suitable for application to the mucosal tissue. Suitable shapes may include disks, ellipses, squares, rectangles, parallelpipedes, as well as, shredded, meshed, or porous films depending upon the purpose and location where the device is to be employed. Likewise, the surface area of the device of the present invention will necessarily vary depending on many factors with the major factor being where the device is to be employed. Typically, the

US 7,579,019 B2

**13**

surface area may be from about 0.1 to about 30, preferably from 0.5 to about 20 square centimeters.

Methods for treating mucosal surfaces, surrounding tissues, and bodily fluids for localized and systemic drug delivery are also provided. In one embodiment, the method comprises applying an adherent film of the invention to the treatment site in order to provide protection to the treatment site and drug delivery. The adherent film may comprise any of the layered devices provided herein. In a preferred embodiment, the method comprises application of a layered pharmaceutical carrier device having a first adhesive layer and a second non-adhesive backing layer as described above, each layer having a thickness of from 0.01 mm to 0.9 mm. The pharmaceutical or combination of pharmaceuticals may be present in the adhesive layer, the non-adhesive backing layer, or both layers.

As one skilled in the art will appreciate, when systemic delivery. e.g., transmucosal or transdermal delivery, is desired the treatment site may include any area in which the adherent film of the invention is capable of maintaining a desired level of pharmaceutical in the blood, lymph, or other bodily fluid. Typically, such treatment sites include the oral, anal, nasal, and vaginal mucosal tissue, as well as, the skin. If the skin is to be employed as the treatment site, then usually larger areas of the skin wherein movement will not disrupt the adhesion of the device, such as the upper arm or thigh, are preferred.

While the pharmaceutical carrier described in this application readily adheres to mucosal tissues, which are wet tissues by nature, it can also be used on other surfaces such as skin or wounds. The water-soluble film of the present invention will adhere to the skin if prior to application the skin is wet with an aqueous-based fluid such as water, saliva, or perspiration. The film will typically adhere to the skin until it erodes due contact with water by, for example, showering, bathing or washing. The film may also be readily removed by peeling without significant damage to tissue.

While it is in contact with the skin, the film may act as a washable, erodable bandage to protect the area where it has been applied. It is also possible to employ the film as a transdermal drug delivery system to facilitate the healing process and keep the wound or burn free of germs and debris. A significant advantage of the instant invention over conventional alternatives is that not only is the film washable, but also, perspiration helps the adhesion of the device instead of preventing or reducing it as with conventional transdermal patches.

The pharmaceutical carrier of the present invention can also be used as a wound dressing. By offering a physical, compatible, oxygen and moisture permeable, flexible barrier which can be washed away, the film can not only protect a wound but also deliver a pharmaceutical in order to promote healing, asepty, scarification, to ease the pain or to improve globally the condition of the sufferer. Some of the: examples given below are well suited for an application to the skin or a wound. As one skilled in the art will appreciate, the formulation might require incorporating a specific hydrophilic/hygroscopic excipient which would help in maintaining good adhesion on dry skin over an extended period of time. Another advantage of the present invention when utilized in this manner is that if one does not wish that the film be noticeable on the skin, then no dyes or colored substances need be used. If, on the other hand, one desires that the film be noticeable, a dye or colored substance may be employed.

The following examples are provided to illustrate pharmaceutical carrier devices, as well as, methods of making and using, pharmaceutical carrier devices of the present invention.

**14**

EXAMPLE 1

A 100 ml solution for the non-adhesive backing layer was made using 87.98% by weight water USP, 0.02% by weight FD&C red 40 dye, and 12% by weight hydroxyethyl cellulose (Mw $9\times10^4$). Using a Werner Mathis Labcoater, the substrate (Mylar 1000D or other polyester films such as 3M ScotchPak 1022) was set. 90 ml of the backing layer solution was set in front of a knife over roll with an opening of 1.5 mm. The solution was then casted and the film dried for 8-9 min. at 60° C. Following the drying step, a 0.14 mm thick reddish film was the result.

Using this procedure, the film may be easily peeled off the substrate after drying, or may be left on the substrate and rolled, to be laminated later, or for use as a substrate for the adhesive layer.

EXAMPLE 2

A 100 ml solution for the non-adhesive backing layer was made using 94.98% by weight water USP, 0.02% by weight FD&C red 40 dye, and 5% by weight hydroxypropyl cellulose. The procedure of example 1 was used, resulting in a 0.16 mm thick film.

EXAMPLE 3

A 100 ml solution for the non-adhesive backing layer was made using 84.98% by weight water USP, 0.02% by weight FD&C red 40 dye, 12% by weight hydroxyethyl cellulose, and 3% by weight hydroxypropyl cellulose. Here, the overall polymeric material was at a 15% concentration in solution. The mixture of two different types of polymeric materials modified the overall mechanical properties and erosion kinetics characteristics of the backing film. The solution was then casted on a polyester substrate and dried overnight at 90° C. The opening of the knife was set at 3 mm, resulting in a 0.3 mm thick film.

EXAMPLE 4

A 100 ml solution for the non-adhesive backing layer was made using 87.98% by weight water USP, 0.02% by weight FD&C red 40 dye, 10% by weight hydroxyethyl cellulose (Mw $9\times10^4$), and 2% by weight hydroxyethyl cellulose (Mw $7\times10^5$). Here, the mixture of two different types of hydroxyethyl cellulose modified the mechanical properties and erosion kinetics of the backing film. The solution was then cast on a polyester substrate and dried for 12 min. at 135° C. The opening of the knife was set at 3 mm, resulting in a 0.27 mm thick film.

EXAMPLE 5

A 100 ml solution for the non-adhesive backing layer was made using 87.98% by weight water USP, 0.02% by weight FD&C red 40 dye, 11.75% by weight hydroxyethyl cellulose (Mw $9\times10^4$), and 0.25% by weight hydroxyethyl cellulose (Mw $1.3\times10^6$). The procedure of Example 1 was used, resulting in a 0.14 mm thick film.

Here, the mixture of two different grades of hydroxyethyl cellulose modified the mechanical properties and erosion kinetics of the backing film. The ratio may be used to adjust the erosion pattern and residence time of the bioadhesive disk. Compared to the backing layer of Example 1, which was made of 12% by weight hydroxyethyl cellulose (Mw $9\times10^4$), and which had an erosion time of about 21 minutes (See Table

US 7,579,019 B2

15 | 16

2), the backing layer of this Example, made from a combination of two grades of hydroxyethyl cellulose, had an erosion time of about 69 minutes (See Table 2).

### EXAMPLE 6

A 100 ml solution for the non-adhesive backing layer was made using 87.98% by weight water USP, 0.02% by weight FD&C red 40 dye, 11.95% by weight hydroxyethyl cellulose (Mw $9\times10^4$), and 0.05% by weight of 40% glyoxal aqueous solution. The procedure of Example 1 was used, resulting in a 0.13 mm film.

Here, the glyoxal acted as a crosslinking agent, inducing a slow down in the erosion kinetics of the backing film. Compared to the backing layer of Example 1, which had no glyoxal and which had an erosion time of about 21 minutes (See Table 2), the backing layer of this Example, which incorporated glyoxal, had an erosion time of about 57 minutes (See Table 2).

### EXAMPLE 7

A 100 ml solution for the non-adhesive backing layer was made using 87.98% by weight water USP, 0.02% by weight FD&C red 40 dye, 11.8% by weight hydroxyethyl cellulose, 0.1% by weight of 40% glyoxal aqueous solution, and 0.1% sweet peppermint flavor. Here, as in Example 6, the glyoxal acted as a crosslinking agent, inducing a slow down in the erosion kinetics of the backing film, compared with a backing layer with no glyoxal. The sweet peppermint was added as a flavoring agent.

### EXAMPLE 8

As described in Example 1, the solutions of Examples 5, 6 and 7 were each casted on a polyester substrate. Instead of using a knife, a meier's bar was used to coat the substrate. The films were dried overnight at 90° C. The dried films were thicker, having a thickness of about 0.17 mm.

### EXAMPLE 9

The solution of Example 1 was prepared in a beaker. A microslide was then dipped quickly into the solution until it was fully immersed, removed from the solution, and left at room temperature for about 1 hour. The microslide was then dried overnight at 90° C. The resulting film was heterogeneous and had an average thickness of about 0.2 mm.

### EXAMPLE 10

A 100 ml solution for the non-adhesive backing layer was made using 84% by weight water USP, 0.02% by weight FD&C red 40 dye, 11% by weight hydroxyethyl cellulose (Mw $9\times10^4$), 1% by weight hydroxyethyl cellulose (Mw $7\times10^5$), 0.1% by weight of a 40% glyoxal aqueous solution, 3% by weight glyoxal, and 1% by weight menthol. Here, the glyoxal acted as a crosslinking agent, inducing a slow down in the erosion kinetics of the backing film. Also, the mixture of two different grades of hydroxyethyl cellulose was used to achieve slow release of the menthol. The film was coated on a polyester film as previously described.

### EXAMPLE 11

A 100 ml solution for the adhesive layer was made using 88.6% by weight water USP, 1.8% by weight hydroxyethyl cellulose, Natrosol® 99-250 L NF (Aqualon), 2.6% by weight polyacrylic acid, Noveon® AA1 USP (BF Goodrich), 4.5% sodium carboxymethyl cellulose, cellulose gum 7 LF PH (Aqualon), and 2.5% by weight dyclonine HCl. Upon mixing, a suspension was formed.

Here, dyclonine HCl may be easily substituted with any other active pharmaceutical component. However, chemical characteristics of the active pharmaceutical, such as solubility, counter ions, and melting point, might require minor modifications of the overall process, such as dissolution in a particular solvent, changing the temperature of the solution, etc. The next example illustrates one slight modification.

### EXAMPLE 12

A 100 ml solution for the adhesive layer was made using 74.6% by weight water USP, 1.8% by weight hydroxyethyl cellulose, 2.6% by weight polyacrylic acid, 4.5% sodium carboxymethyl cellulose, 2.5% by weight benzocaine, and 14% by weight ethyl alcohol. The use of benzocaine as the active pharmaceutical required that it first be dissolved in ethyl alcohol, given that benzocaine is more soluble in alcohol than water.

In the final solution, the benzocaine tends to precipitate in the form of a very fine powder. However, the film characteristics and bioadhesive properties remain intact.

### EXAMPLE 13

A 100 ml solution for the adhesive layer was made using 91% by weight water USP, 2% by weight hydroxyethyl cellulose, 2.5% by weight polyacrylic acid, and 4.5% sodium carboxymethyl cellulose. The composition of the adhesive layer may be modified and may vary according to the ranges described in Table 1 below:

TABLE 1

| Item # | % w | Material |
|---|---|---|
| 1 | 60 to 99.5 | Water USP |
| 2 | 0.05 to 5 | Hydroxyethyl cellulose |
| 3 | 0.5 to 10 | Polyacrylic acid |
| 4 | 0.0 to 15 | Sodium Carboxymethyl cellulose |
| 5 | 0 to 10 | Polyvinyl pyrrolidone |

The relative part of each components depends of the chemical compatibility of the components and the residence time to be obtained.

### EXAMPLE 14

A 100 ml solution for the adhesive layer was made using 90% by weight water USP, 1% by weight butacaine sulfate, 2% by weight hydroxyethyl cellulose, 2.5% by weight polyvinyl pyrrolidone, and 4.5% by weight sodium carboxymethyl cellulose. The solution was coated using a knife over roll on a Mylar substrate.

### EXAMPLE 15

A 100 ml solution for the adhesive layer was made. The total composition of the solution was 48.6% water, 40% ethyl alcohol, 1.8% hydroxyethyl cellulose, 2.6% polyacrylic acid, 4.5% sodium carboxymethyl cellulose, and 2.5% dyclonine HCl. Here, however, the dyclonine HCl was first solubilized in 40 ml ethyl alcohol, and then, 48.6 ml of water were added

US 7,579,019 B2

17 / 18

to the dyclonine HCl/ethyl alcohol solution, followed by the addition of the other components.

The use of ethyl alcohol as an additional solvent resulted in a suspension which was slightly more viscous than that of Example 11, which used water as the only solvent.

## EXAMPLE 16

Following the procedure of Example 12, a 100 ml solution for the adhesive layer was prepared. The solution was then coated following the procedure used in Example 1. The resulting film was 0.12 mm thick.

## EXAMPLE 17

Following the procedure of Example 12, a 100 ml solution for the adhesive layer was prepared. The solution was coated on top of a backing film prepared according to Example 1. The opening of the knife was adjusted, taking into account the thickness of the backing film. After coating, the layered film was dried at 130° C. for 15 minutes. A 0.27 mm layered film of two layers was formed.

## EXAMPLE 18

Following the procedure of Example 14, a bioadhesive film was prepared, except that the film was not fully dried. A backing film was prepared according to Example 1. The backing film was peeled off of its substrate and laminated on top of the bioadhesive film while still moist, and pressure was applied to seal the two films together. The pressure applied on the films resulted in a good interfacial adhesion. A 0.38 mm layered film of two layers was formed.

## EXAMPLE 19

Following the procedure of Example 1, several solutions for backing films were prepared according to the compositions of Table 2 below. Following film formation, ½ inch disks were die cut and set on a double-sided tape. The tape was then positioned on a micro slide. The kinetics of erosion were evaluated in water: the slide was plunged into a 100 ml beaker of water stirred at a constant speed of 50 rpm. The time for erosion was measured from the moment the disk was fully immersed in the beaker of water. Percentages (%) refer to the concentration in solution.

TABLE 2

| Composition | Weight (mg)/Thickness (mm) | Erosion Time (min.) |
|---|---|---|
| 12% HEC (Mw $9 \times 10^4$) | 17.1/0.14 | 21 |
| 10% HEC (Mw $9 \times 10^4$) and 2% HEC (Mw $7 \times 10^5$) | 16.9/0.13 | 37 |
| 9% HEC (Mw $9 \times 10^4$) and 3% HEC (Mw $7 \times 10^5$) | 17/0.14 | 75 |
| 11.75% HEC ((Mw $9 \times 10^4$) and 0.25% HEC (Mw $1.3 \times 10^6$) | 17.1/0.14 | 69 |
| 11.95% HEC ((Mw $9 \times 10^4$) and 0.05% glyoxal (40% aq. sol.) | 17.2/0.13 | 57 |
| 11.99% HEC ((Mw $9 \times 10^4$) and 0.01% propylene glycol | 17.3/0.14 | 65 |

The results demonstrate that the erosion time varies, depending on the components of the formulation, assuming a similar surface state for each sample. Although water does not mimic the exact composition of saliva, and this experiment cannot precisely replicate in vivo residence times, the experiment provides an in vitro comparison of erosion times of various compositions for use in practicing the present invention.

## EXAMPLE 20

½ inch diameter disks having a thickness of between 0.19 and 0.21 mm were administered to six healthy volunteers. The backing layer was prepared according to Example 1, and the adhesive layer was prepared according to Example 15, some containing dyclonine HCl as the active pharmaceutical component, and others containing benzocaine as a substitute. The adhesive layer was coated on top of the backing layer, forming a layered disk. The layered disk was set in the mouth, and the time for erosion was measured from the moment the disk was set in place.

Participants were asked to evaluate the disk's handling and numbing effect on a scale of 0 to 3, with 3 being very good, 2 good, 1 fair, and 0 poor. Participants also evaluated the time necessary for adhesion; the residence time; the foreign body sensation, if any, and its duration; and the erosion of the disk. Finally, participants were asked to evaluate the overall effectiveness of the disk and their overall impression, as well as which pharmaceutical component, dyclonine HCl (D) or benzocaine (B), they preferred. The results are described in Table 3 below.

TABLE 3

| No. | Handling | Adhesion | Residence Time | Foreign Body Sensation | Numbing | Dissolution | Efficiency | Overall | Pharmaceutical Pref. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3 | instant | ~1 hr | <5 min. | 3 | did not notice | + | + | B |
| 2 | 2 | instant | ~1 hr | <5 min. | 3 | did not notice | + | + | B |
| 3 | 3 | instant | ~45 min. | no | 2 | did not notice | + | + | D |
| 4 | 3 | instant | ~45 min. | no | 2 | at the end | + | − | D |
| 5 | 2 | instant | ~30 min | <5 min. | 3 | at the end | + | + | D |
| 6 | 1 | difficult | ~15 min. | <5 min. | 2 | did not notice | − | − | D |

US 7,579,019 B2

**19**                                                                                      **20**

The results demonstrate that although the handling of the disk may be difficult for first time users, the adhesion is instantaneous, there is only a minor foreign body sensation which disappears after a couple minutes upon swelling of the disk, and numbing is effective.

### EXAMPLE 21

A 1 kg preparation of a backing layer was made using 43.49% by weight of water, 43.49.% by weight of ethyl alcohol, 0.02% of FD&C red dye 40, 12% by weight of hydroxyethyl cellulose (Mw 9×104) and 1% by weight of 40% glyoxal aqueous solution. Then another 1 kg batch of the backing solution described at the example 1 was prepared. Using a Werner Mathis Labcoater, the substrate (Mylar 1000D or other polyester films such as 3M ScotchPak 1022) was set. 90 ml of the backing layer solution prepared according to example 1 was set in front of roll with an opening of 0.7 mm. The solution was than casted on the substrate and film dried for 8-9 min. at 130° C. Following the drying step, a 0.09 mm thick reddish film was the result. Then, the backing solution first described in this example was casted directly on the top of the first layer with the knife over roll technique using an opening of 0.8 mm. The resulting bilayer backing film was 0.15 mm thick.

### EXAMPLE 22

A preparation of a backing layer obtained as described in example 5 was cast using a knife over roll and dried for 8-9 min. at 130° C. Then a preparation of a backing layer using 43.49% by weight of water, 43.49.% by weight of ethyl alcohol, 0.02% of FD&C red dye 40, 12% by weight of hydroxyethyl cellulose (Mw 9×104) and 1% by weight of 40% glyoxal aqueous solution was coated directly on the top of the previous dry film (first layer was 0.05 mm thick) The resulting bilayer backing film was 0.12 mm thick.

### EXAMPLE 23

When a crosslinking agent is incorporated in the formulation, thermal curing allows to further crosslink the material either before or after the bioadhesive(s) layer(s) have been casted. Thermal curing of the films is performed by exposing the films to a time-temperature cycle. For instance, the film obtained at the end of example 22 might be exposed to 150° C. for 5 minutes, 120° C. for 10 minutes or any temperature/time which would accommodate the stability requirements of the film's components.

### EXAMPLE 24

A preparation of a backing layer obtained as described in example 5 was cast using a knife over roll and dried for 8-9 min. at 130° C. A preparation of a backing layer using 42.49% by weight of water, 42.49.% by weight of ethyl alcohol, 0.02% of FD&C red dye 40, 11% by weight of hydroxyethyl cellulose (Mw 9×104), 2% by weight of polyethylene glycol 6000 and 2% by weight of propylene glycol was coated directly on the top of the previous dry film (first layer was 0.06 mm thick) The resulting bilayer backing film was 0.12 mm thick.

### EXAMPLE 25

A preparation of a backing layer using 42.49% by weight of water, 42.49.% by weight of ethyl alcohol, 0.02% of FD&C

red dye 40, 10% by weight of hydroxyethyl cellulose (Mw 9×104), 4% by weight of hydropropylcellulose (Mw 5 105) was coated using a knife over roll technique. Then directly on the top of the previous dry film (first layer was 0.07 mm thick) a backing preparation made from 42.49% by weight of water, 42.49.% by weight of ethyl alcohol, 0.02% of FD&C red dye 40, 12% by weight of hydroxyethyl cellulose (Mw 9×104) and 3% by weight of oleic acid, was casted and dried. The resulting bilayer backing film was 0.15 mm thick.

### EXAMPLE 26

A preparation for the adhesive layer was made using 45.6% by weight water USP, 45% by weight of ethyl alcohol, 2% by weight hydroxyethyl cellulose, Natrosol® 99-250 L NF (Aqualon), 2.9% by weight polyacrylic acid, Noveon® AA1 USP (BF Goodrich), and 4.5% by weight of sodium carboxymethyl cellulose, cellulose gum 7 LF PH (Aqualon). This preparation is a bioadhesive preparation but does not contain any pharmaceutical.

### EXAMPLE 27

A 100 ml solution for the adhesive layer was made using 45.1% by weight of water USP, 45% by weight of ethyl alcohol, 1.8% by weight hydroxyethyl cellulose, Natrosol® 99-250 L NF (Aqualon), 2.6% by weight polyacrylic acid, Noveon® AA1 USP (BF Goodrich), 4.5% sodium carboxymethyl cellulose, cellulose gum 7 LF PH (Aqualon), and 1% by weight terbutaline sulfate.

### EXAMPLE 28

The film obtained following the example 25 is used as substrate for the final multilayer film of this example. The bioadhesive preparation of example 26 is directly casted on the film of example 25 and dried. Then the preparation of example 27 is cast on the top with a knife over roll system. The final four layer film is 0.240 mm. The composition of this film limits the release of terbutaline in the oral cavity but not completely as the pharmaceutical can still diffuse through the sides. In order to avoid this side diffusion, we have to changed slightly the design has previously mentioned.

### EXAMPLE 29

The film obtained following the example 25 is used as substrate for the final multilayer film of this example. The bioadhesive preparation of example 26 is directly casted on the film of example 25 and dried. A trilayer film is thus obtained, the last layer being bioadhesive but not containing any drug. Then the preparation of example 27 is coated using a mask and dried (the mask is a 0.500 mm polyester film in which ellipsoids have been die cut deposited on the trilayer laminate). This step can be repeated if necessary. The mask is then delaminated. The resulting film is tri/four layers film composed of a laminate backing layer and a laminate bioadhesive layer in which the final component includes the pharmaceutical and is of a smaller surface as shown in figure. With this system, diffusion by either the sides or the back side is limited and allows an unidirectional release of the drug into the mucosal tissues.

### EXAMPLE 30

Following the previous example but with fluocinonide instead of pilocarpine HCl, the same type of film is con-

US 7,579,019 B2

21                                                                22

structed using a screen coating technique instead of using a mask. Others techniques such as deposition of, spraying the solution or die cutting off the last layer, slot coating, or gravure coating, are satisfactory.

### EXAMPLE 31

A 200 gram (g) backing solution (or backing collodion) for coating the backing layer was made by using 84.865% by weight ethyl alcohol 190F, 0.01% by weight of FD&C Red dye 40, 13.75% by weight of hydroxypropyl cellulose, 1.25% by weight ethylcellulose and 0.125% by weight of diethyl phathalate. This solution was prepared at ambient temperature by adding the ethyl cellulose to the solution of ethyl alcohol, dye, and and diethyl phathalate. The hydroxypropyl cellulose was then added and the collodion stirred for two hours.

A two layered film was subsequently obtained using a labcoater/dryer. On a Rexam 8024 substrate, 50 mL. of the solution above was set in front of a knife-over-roll-coating device. The wet film was then dried for 6 minutes at 60° C. A second layer was directly coated on the top and the wet film was dried for an additional 6 minutes at 60° C. The final film thickness was measured to be 130 microns.

### EXAMPLE 32

A 200 g backing solution (or backing collodion) for coating the backing layer was prepared as in Example 31 except that 84.74% by weight ethyl alcohol 190F, 0.01% by weight FD&C Red dye 40, 12.5% by weight hydroxypropyl cellulose, 2.5% by weight of ethylcellulose, and 0.25% by weight diethyl phathalate was used.

A film was obtained as in Example 31 except that the film thickness was 135 microns.

### EXAMPLE 33

A 120 micron thick film was made in a similar manner as in Example 32 except that a higher molecular weight grade of ethyl cellulose was employed.

### EXAMPLE 34

A 200 g backing solution (or backing collodion) for coating the backing layer was prepared as in Example 31 except that 84.74% by weight ethyl alcohol 190F, 0.01% by weight FD&C Red dye 40, 10% by weight hydroxypropyl cellulose, 5% by weight of ethylcellulose, and 0.5% by weight diethyl phathalate was used.

A film was obtained as in Example 31 except that the film thickness was 115 microns.

### EXAMPLE 35

A 200 g backing solution (or backing collodion) for coating the backing layer was prepared as in Example 31 except

that 81.99% by weight ethyl alcohol 190F, 0.01% by weight FD&C Red dye 40 and 18% by weight hydroxypropyl cellulose was used.

A film was obtained as in Example 31 except that the film thickness was 170 microns.

### EXAMPLE 36

The disintegration time in water for the films of Examples 31 to 35 was measured by placing the films in a bath of water at 37±2° C. As the results in Table 4 show, the disintegration time varies with the ratio of hydroxypropyl cellulose to ethylcellulose.

TABLE 4

|  | Example 31 | Example 32 | Example 33 | Example 34 | Example 35 |
|---|---|---|---|---|---|
| Thickness (microns) | 130 | 135 | 120 | 115 | 170 |
| Disintegration time (min) | 20-25 | 25-30 | 35-40 | >60 | 15-20 |

### EXAMPLE 37

A gel for the backing layers was prepared which contained 79.74% water, 0.01% FD&C red dye 40, 0.05% sodium benzoate, 2.5% peppermint flavor, 13.5% hydroxyethyl cellulose, and 4.5% hydroxypropyl cellulose by weight. The gel was then made into a two layer flexible backing film of 0.17 mm in thickness by first coating a 0.8 mm thick layer of the formulation on a substrate and then drying it at 80° C. for 8 minutes. A second 0.8 mm thick layer was then coated directly on top of the first layer and dried at 80° C. for 8 minutes. A sample of the two layer film was found to disintegrate in water within 10 minutes. While not wishing to be bound to any theory, it was believed that the hydrophilic salt modified the disintegration time and the hydroxypropyl cellulose improved the tensile strength of the film.

A gel for the bioadhesive layers was prepared which contained 45.2% water USP, 45.3% ethyl alcohol, 1.6% hydroxyethyl cellulose, 0.6% hydroxypropyl cellulose, 2.8% polyacrylic acid Noveon© AA1 USP, 2.5% sodium carboxymethyl cellulose, 0.1% titanium dioxide, and 1.9% albuterol sulfate by weight. Using the gel, a first bioadhesive layer of 0.5 mm was coated directly on top of the two layer flexible backing film and dried at 60° C. for 8 minutes. A second bioadhesive layer of 0.7 mm was then coated directly on top of the first bioadhesive layer and dried at 60° C. for 20 minutes. The final film was 0.330 mm in thickness, contained 5.92% water by weight, disintegrated in water in 15±3 minutes, and contained 1.46 mg/cm$^2$ albuterol sulfate. The final film also exhibited excellent tensile strength.

### EXAMPLE 38

A gel for the backing layers was prepared which contained 42.49% water, 42.49.% ethyl alcohol, 0.02% of FD&C red dye 40, 14% hydroxyethyl cellulose (Mw $9 \times 10^4$), and 1% sweet peppermint by weight. Using the gel, a first backing layer of 0.7 mm was coated onto a substrate using a knife over roll technique. The layer was dried at 60° C. for 8 minutes. A second backing layer of 0.8 mm was then coated directly on top of the first backing layer and dried at 60° C. for 8 minutes. The final two layer film backing was 0.20 mm in thickness.

US 7,579,019 B2

**23**

A gel for the bioadhesive layers was prepared which contained 45.95% water USP, 45.95% ethyl alcohol, 1.6% hydroxyethyl cellulose Natrosol® 99-250 L NF (Aqualon), 2.2% polyacrylic acid Noveon® AA1 USP (BF Goodrich), 3.4% sodium carboxymethyl cellulose cellulose gum 7 LF PH (Aqualon), and 0.9% albuterol sulfate by weight. Using the gel, a first bioadhesive layer of 0.5 mm was coated onto the two backing layers and dried at 60° C. for 10 minutes. A second bioadhesive layer of 0.8 mm was coated onto the first bioadhesive layer and dried at 60° C. for 20 minutes. The final film was 0.260 mm thick, disintegrated in water in 20±5 minutes, contained 5.6% water by weight and about 0.71 mg/cm² of albuterol sulfate.

### EXAMPLE 39

A gel for the backing layers was prepared which contained 42.49% water, 42.49.% ethyl alcohol, 0.02% of FD&C red dye 40, 14% hydroxyethyl cellulose (Mw $9 \times 10^4$), and 1% sweet peppermint by weight. Using the gel, a first backing layer of 0.7 mm was coated onto a substrate using a knife over roll technique. The layer was dried at 60° C. for 8 minutes. A second backing layer of 0.8 mm was then coated directly on top of the first backing layer and dried at 60° C. for 8 minutes. The final two layer film backing was 0.20 mm in thickness.

A suspension for the bioadhesive layers was prepared which contained 45.95% water USP, 45.95% ethyl alcohol, 1.6% hydroxyethyl cellulose Natrosol® 99-250 L NF (Aqualon), 2.2% polyacrylic acid Noveon® AA1 USP (BF Goodrich), 3.4% sodium carboxymethyl cellulose cellulose gum 7 LF PH (Aqualon), and 0.9% testosterone by weight. The testosterone is insoluble in the formulation and is added as a micronized powder which stays in suspension. The viscosity of the formulation was lowered to facilitate the coating step by adding 10% by weight of alcohol:water in a 1:1 ratio. Using the suspension, a first bioadhesive layer of 0.5 mm was coated onto the two backing layers and dried at 60° C. for 10 minutes. A second bioadhesive layer of 0.9 mm was coated onto the first bioadhesive layer and dried at 60° C. for 20 minutes. The final film was 0.310 mm thick, disintegrated in water in 20±5 minutes, contained 5.3% of water by weight and about 0.64 mg/cm² of testosterone.

### EXAMPLE 40

The films obtained via Examples 38 and 39 are die-cut in ½ inch diameter discs to be characterized and to be used for a systemic availability study in three dogs (20-25 kg spayed female bred hounds). One disc of the film to be evaluated is applied to the inside of the mouth on the buccal mucosa. A slight pressure is applied for 10 seconds. Then, the oral cavity is examined to assure adherence of the film to the mucosa and over the course of the study, to monitor the erosion of the discs. Using an indwelling jugular catheter, blood samples are collected at specific intervals. The serum is characterized by an ELISA assay in the case of albuterol sulfate and an RIA method for the testosterone study. Mucosal tissues at the end of the studies did not show any sign of irritation.

After application of ½ inch diameter discs, systemic plasma levels obtained at different intervals are given in nanograms per milliliter for the mean of the three dogs. Drug loadings are 0.9 mg albuterol sulfate per disc and 0.8 mg testosterone per disc. Results are shown in Table 5 for the albuterol sulfate and in Table 6 for the testosterone.

**24**

TABLE 5

| | (albuterol sulfate) | |
|---|---|---|
| Time (minutes) | Mean (ng/ml) | Standard deviation |
| 0 | 0.12 | 0.01 |
| 5 | 0.15 | 0.12 |
| 10 | 0.22 | 0.07 |
| 15 | 0.57 | 0.54 |
| 30 | 1.51 | 1.61 |
| 60 | 6.01 | 4.75 |
| 90 | 8.90 | 3.99 |
| 120 | 11.66 | 2.97 |
| 150 | 11.22 | 3.49 |
| 180 | 9.90 | 1.21 |
| 240 | 6.30 | 2.21 |
| 360 | 6.29 | 2.23 |
| 480 | 3.75 | 0.62 |
| 720 | 1.00 | 1.05 |

TABLE 6

| | (testosterone) | |
|---|---|---|
| Time (minutes) | Mean (ng/ml) | Standard deviation |
| 0 | 0.00 | 0 |
| 5 | 2.21 | 1.48 |
| 10 | 4.68 | 2.55 |
| 15 | 3.81 | 2.06 |
| 30 | 2.87 | 2.32 |
| 60 | 3.73 | 3.31 |
| 90 | 4.82 | 3.53 |
| 120 | 7.14 | 0.51 |
| 150 | 3.20 | 0.03 |
| 180 | 0.62 | 0.18 |
| 240 | 0.18 | 0.20 |
| 360 | 0.12 | 0.18 |
| 480 | 0.02 | 0.04 |
| 720 | 0.01 | 0.01 |

These results illustrate that systemic delivery can be achieved with the pharmaceutical carrier devices of the invention. Moreover, the pharmaceutical carrier devices of the invention yield fast onset of activity, excellent bioavailability, and sustained delivery.

The invention claimed is:

**1**. A method for the transmucosal delivery of a systemic pharmaceutical for achieving a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject, comprising:

adhering a bioerodable device to an oral mucosa surface of a subject such that there is minimal foreign body sensation; and

directionally delivering an amount of a systemic pharmaceutical from the bioerodable device to mucosal tissue of the subject such that an effective amount of the systemic pharmaceutical is delivered to the subject achieving a fast onset of activity in the subject or a desired level of the systemic pharmaceutical in the blood of the subject within about 30 minutes,

wherein the bioerodable device has a residence time of less than 1 hour or about 1 hour, and the device comprises a thin and flexible adherent and bioerodable polymeric film containing a systemic pharmaceutical, and wherein the bioerodable device comprises soluble polymers selected based on dissolution rates to achieve the desired residence time and release profile.

US 7,579,019 B2

25

**2**. The method of claim **1**, comprising adhering the bio-erodable device to a buccal mucosa surface.

**3**. The method of claim **1**, wherein the device has a residence time of less than 30 minutes or about 30 minutes.

**4**. The method of claim **1**, wherein the device has a thickness from about 0.1 mm and about 0.5 mm.

**5**. The method of claim **1**, wherein the device has a surface area of from about 0.5 to about 20 square centimeters.

26

**6**. The method of claim **1**, wherein the device further comprises a second pharmaceutical incorporated into the device.

**7**. The method of claim **1**, wherein the device instantaneously adheres to the mucosal surface upon application.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,579,019 B2                                         Page 1 of 1
APPLICATION NO.  : 11/069089
DATED                  : August 25, 2009
INVENTOR(S)       : Gilles H. Tapolsky et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1,191 days.

In the Related U.S. Application Data section, please replace

"Continuation of application No. 09/684,682, filed on Oct. 4, 2000, now abandoned, which is a division of application No. 09/069,703, filed on Apr. 29, 1998, now abandoned, which is a continuation-in-part of application no. PCT/US97/18605, filed on Oct. 16, 1997"

with

"Continuation of application No. 09/684,682, filed on Oct. 4, 2000, now abandoned, which is a division of application No. 09/069,703, filed on Apr. 29, 1998, now abandoned, which is a continuation-in-part of application no. PCT/US97/18605, filed on Oct. 16, 1997 which is a PCT application claiming priority from 08/734,519, filed on Oct. 18, 1996, now patented as 5,800,832."

Signed and Sealed this
Twenty-fourth Day of May, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC.,** | |
| **Plaintiffs,** | |
| **v.** | **C.A. No. 19-444 (CFC)** |
| **CHEMO RESEARCH, S.L., INSUD PHARMA, S.L.U, INTELGENX CORP. and INTELGENX TECHNOLOGIES CORP.** | **Confidential** |
| **Defendant.** | |

**DEFENDANTS' INITIAL INVALIDITY CONTENTIONS**

Pursuant to Paragraph 4(d) of the Court's Default Standard of Discovery and Paragraph 5 of the Scheduling Order entered in the above-captioned action (D.I. 39), Defendants Chemo Research, S.L., Insud Pharma, S.L.U, IntelGenx Corp. and IntelGenx Technologies Corp. (collectively "Defendants"), through their undersigned counsel, hereby provides the following Initial Invalidity Contentions to Plaintiffs BioDelivery Sciences International, Inc. ("BDSI") and Arius Two, Inc. (collectively, "BDSI" or "Plaintiffs"). As set forth in Plaintiffs' infringement contentions dated July 24, 2019, Plaintiffs assert infringement under 35 U.S.C. § 271(e)(2)(A) of claims 1-5 and 8-10 of U.S. Patent No. 8,147,866 ("the '866 patent"), claims 1-4, 6-10, 12-16, 18-22, 24, and 25 of U.S. Patent No. 9,655,843 ("the '843 patent"), and claims 1-7 and 9-22 of U.S. Patent No. 9,901,539 ("the '539 patent") against Defendants. Defendants contend that all of the asserted claims are invalid under at least 35 U.S.C. §§ 102, 103, and/or 112, as described

1

**(b)** **A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is negated, or at least overwhelmed, by the existence of one or more blocking patents in the buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in *Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee

140

of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

141

### 7.     Other Relevant References

One or more prior art references identified in Section I, *supra*, but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

### C.     LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS

#### 1.     The Asserted Claims of the '866 Patent are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled

##### (a)     Drug Delivery Device Having a Bioerodable Mucoadhesive Layer Comprising Buprenorphine in a Polymeric Diffusion Environment "Having a pH of Between About 4 and About 6"

The asserted claims of the '866 patent require a mucoadhesive bioerodable drug delivery device comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment is a buffered environment having a pH between about 4 and about 6 (*see* independent claims 1 and 8). The bioerodable mucoadhesive layer is a solid layer (*see* Example 1 of the '866 patent). The patentee has not shown how to prepare a solid layer having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claim. Moreover, the '866 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment having a pH between about 4.0 and about 6.0.  As a result, the '866 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

142

Example 4, included in the specification of the '843 patent, compares buprenorphine uptake from "exemplary devices of the present invention (at pH 6 and 7.25)." ('843 patent at 26:13-15.) According to Example 4, "the delivery devices of the present invention <u>at pH 6</u> appeared to provide enhanced uptake believed to be attributable to a favorable balance between drug solubility and ionization." (*Id.* at 26:17-21 (emphasis added).) Thus, the '843 patent itself characterizes that a polymeric diffusion environment having a pH of 7.25 – which is encompassed by asserted claims 1-3, 6-7, 9-10, 12-15, 18-19, 21-22, and 24-25 of the '843 patent – does not provide "enhanced uptake" of buprenorphine.  In view of the Finn Declaration and Example 4 of the '843 patent, any "unexpected results" associated with a polymeric diffusion environment having a pH between about 4 and about 6 are not associated with a polymeric diffusion environment having a pH of 7.25 (and, presumably, would not be associated with a polymeric diffusion environment having a pH between 7.25 and about 7.5).

As a result, any "unexpected results" described by the Finn Declaration are not commensurate in scope with claims 1-3, 6-7, 9-10, 12-15, 18-19, 21-22, and 24-25 of the '843 patent, and cannot establish the non-obviousness of these claims.

Moreover, in view of the minor differences between the prior art and the subject matter of the asserted claims of the '843 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to a POSA.

**(b)** **A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is negated, or at least overwhelmed, by the existence of one or more blocking patents in the

185

buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in *Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any

186

of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

### 7. Other Relevant References

One or more prior art references identified in Section III, *supra*, or Exhibit A or Exhibit B but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

C.   LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS, AND IMPROPER DEPENDENCY

   1.   The Asserted Claims of the '843 Patent are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled

       (a)   Drug Delivery Device Having a Bioerodable Mucoadhesive Layer Comprising Buprenorphine in a Polymeric Diffusion Environment Having a pH of Between About 4

The asserted claims of the '843 patent require a drug delivery device comprising a bioerodable mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment, wherein the polymeric diffusion environment has a pH between about 4 and about 7.25 (*see* independent claims 1, 13 and 25). The bioerodable mucoadhesive layer is a solid layer (*see* Example 1 of the '843 patent). The patentee has not shown how to prepare a solid layer having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claims. Moreover, the '843 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer comprising buprenorphine in a polymeric diffusion environment having a pH between about 4.0 and about 7.5. As a result, the '843 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

The specification identifies a mucoadhesive bioerodable drug delivery device having at least two layers:  a mucoadhesive layer comprising buprenorphine "and buffered to a pH of between about 4.0 and about 6.0," and a backing layer or barrier environment disposed relative to the polymeric diffusion environment. (*See, e.g*., '843 pateant at 2:60-3:60.) Example 1 of the

188

In particular, contrary to Applicant's arguments during prosecution, and as the above discussion of the prior art demonstrates:

- A POSA would have been motivated to reduce the plasma concentration of buprenorphine provided by a mucoadhesive bioerodable drug delivery device, in order to reduce side effects associated with buprenorphine (*see* Reder at Abstract; 2:63-3:7; 3:21-28),

- A POSA would have expected to reduce buprenorphine plasma concentration by buffering the pH of backing layer of the device to a certain level (*see* Zhang at 4:12-14 and 58-63, 4:64-5:1; Hague at [0053], [0057]-[0058]; Furusawa at Abstract; [0033]-[0034], [0037], [0040]-[0041], [0051], [0064], [0100], [0208]), such as to pH 4.6 in particular (*see* Crowley at [0134]), which is within the claimed range, and

- A POSA would have reasonably expected to provide effective pain management, even at a reduced plasma buprenorphine concentration of 0.185 ng/mL (*see* Reder at 23:10-17; Table 2), which is within the claimed range.

Thus, the claimed $C_{max}$ (as well as all other claimed pharmacokinetic properties) were not unexpected. On the contrary, a POSA would have predicted that a reduction in backing layer pH as claimed would have reduced buprenorphine uptake, resulting in the claimed $C_{max}$.

Moreover, in view of the minor differences between the prior art and the subject matter of the asserted claims of the '539 patent, the prior art creates such a strong case of obviousness that, even in light of evidence of secondary considerations of non-obviousness, the claimed subject matter would have been obvious to a POSA.

> **(b)    A Blocking Patent Prevents Any Nexus to the Claimed Invention Sufficient to Overcome Defendants' Obviousness Grounds**

Any objective indicia and nexus contentions with respect to the asserted claims is negated, or at least overwhelmed, by the existence of one or more blocking patents in the buprenorphine film space. Thus, even if true, any assertions of objective indicia and nexus do nothing to contradict the obviousness of any of the asserted claims.

An earlier patent is a "blocking patent" where the practice of an alleged invention

229

claimed in a later patent would infringe the earlier patent. Blocking patents were discussed by the Federal Circuit in *Merck. See Merck & Co. v. Teva Pharmaceuticals USA, Inc.,* 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, where market entry by others was blocked, the Federal Circuit ruled that the District Court erred in finding that commercial success made the asserted patent non-obvious over the prior art. *Id.* at 1377.

In a more recent case, *Acorda Therapeutics, Inc. v. Roxane Labs. Inc.*, 903 F.3d 1310 (Fed. Cir. 2018), the Federal Circuit expanded on the blocking patent jurisprudence discussed in *Merck*:

> For such reasons, it is clear that, if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent. Such a blocking patent therefore can be evidence that can discount the significance of evidence that nobody but the blocking patent's owners or licensees arrived at, developed, and marketed the invention covered by the later patent at issue in litigation.

*Id.* at 1339. The logic of discounting all objective indicia of non-obviousness in light of a blocking patent is simple. According to the Federal Circuit:

> If [a] later invention is eventually patented by an owner or licensee of [a] blocking patent, that potential deterrent effect is relevant to understanding why others had not made, developed, or marketed that 'blocked' invention and, hence, to evaluating objective indicia of the obviousness of the later patent.

*Id.* at 1377.

Here, at least one blocking patent prevented anyone but BDSI from working towards any of the claimed subject matter of the asserted patents during the entire relevant time period. One of these blocking patents, the '019 patent, issued on August 25, 2009, with claims that covered the platform by which BDSI asserts the buprenorphine film is delivered in BELBUCA®, its use

230

to achieve "a fast onset of activity in a subject or a desired level of a systemic pharmaceutical in the blood of a subject." (U.S. Patent No. 7,579,019 at Claim 1).

BDSI caused the '019 patent to be listed in the U.S. FDA Orange Book for BELBUCA®/buprenorphine hydrochloride film. Until it expires on January 22, 2020, the '019 patent prevented anyone other than BDSI from making, developing, or marketing any of the alleged inventions claimed in the asserted patents. Moreover, the specification of the '019 patent discloses the use of a bioerodible delivery device that could contain any systemic pharmaceutical, further discouraging any of BDSI's competitors from attempting to develop a pharmaceutical drug delivered via the oral mucosa.

To the extent BDSI asserts that long-felt but unmet need, failure of others, skepticism, unexpected results, praise by others, copying, and commercial success are objective indicia of non-obviousness for the asserted claims of the patents-in-suit. However, because the subject matter in each asserted claim has at all relevant times been subject to one or more blocking patents, the objective indicia of non-obviousness asserted by BDSI, both individually and collectively, do nothing to overcome the overwhelming evidence of obviousness asserted by Defendants.

### 4.    Other Relevant References

One or more prior art references identified in Section III, *supra*, or Exhibit A or Exhibit B but not specifically referred to in the discussion of anticipation or obviousness herein may be relied on to establish invalidity of the asserted claims under 35 U.S.C. §§ 102/103.

### C.    LACK OF WRITTEN DESCRIPTION, LACK OF ENABLEMENT, INDEFINITENESS

### 1.    The Asserted Claims of the '539 patent Are Invalid Under 35 U.S.C. § 112 for Lack of Written Description and Because They Are Not Enabled

(a)    **A Drug Delivery Device Having a Mucoadhesive Layer With a pH "Between About 4.0 and About 6.0," and a Backing Layer With a pH "Between About 4.0 and About 4.8"**

The asserted claims of the '539 patent require a mucoadhesive bioerodable drug delivery device comprising a mucoadhesive layer having a pH between about 4.0 and about 6.0, and a backing layer having a pH of between about 4.0 and about 4.8 (*see* independent claims 1 and 9). The bioerodable mucoadhesive layer and backing layers are solid layers (*see* Example 1 of the '539 patent). The patentee has not shown how to prepare a solid layer having a pH between about 4 and about 6 and therefore has not enabled the full scope of the claim. Moreover, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device and the asserted claims are invalid for lack of written description.

Additionally, as discussed above, the specification does not describe a drug delivery device comprising a mucoadhesive layer having a pH between about 4.0 and about 6.0, and a backing layer having a pH of between about 4.0 and about 4.8. As a result, the '539 patent does not reasonably convey to a POSA that the inventors had possession of the claimed device, and the asserted claims are invalid for lack of written description.

The specification identifies a mucoadhesive bioerodable drug delivery device having at least two layers: a mucoadhesive layer comprising buprenorphine "and buffered to a pH of between about 4.0 and about 6.0," and a backing layer "buffered to a pH of between about 4.0 and about 4.8." (*See, e.g.*, '539 patent at 2:36-41.) Example 1 of the '539 patent describes the preparation of the claimed drug delivery devices, including the preparation of the mucoadhesive and backing layers as separate blends. (*Id.* at 9:30-10:38.) With respect to the mucoadhesive layer blend, Example 1 states that "[as] the last addition step, tribasic sodium phosphate and sodium hydroxide are added to adjust the blend to a desired pH." (*Id.* at 10:4-6.) Thus, Example 1

232

# Exhibit 5

REDACTED IN ITS ENTIRETY

# Exhibit 6

REDACTED IN ITS ENTIRETY

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-444 (CFC) |
| CHEMO RESEARCH S.L., INSUD PHARMA S.L.U., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-120)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs BioDelivery Sciences International, Inc. ("BDSI") and Arius Two, Inc. (collectively, "Plaintiffs") hereby respond to Defendants Chemo Research S.L.'s, Insud Pharma S.L.U.'s, IntelGenx Corp.'s, and IntelGenx Technologies Corp.'s (collectively, "Defendants") First Set of Requests for Production of Documents and Things (Nos. 1-120) to Plaintiffs as follows:

**GENERAL OBJECTIONS**

1.      Plaintiffs object to Defendants' requests for production to the extent the Defendants seek to impose on Plaintiffs obligations beyond those of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, or any standing orders of the Court.

2.      Plaintiffs object to Defendants' requests for production to the extent they encompass materials protected by the attorney-client privilege, work-product immunity, and/or any other applicable privilege or immunity.  Documents that are not protected by attorney-client

**RESPONSE TO DOCUMENT REQUEST NO. 23:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request to the extent it is overly broad, unduly burdensome, to the extent that it seeks documents not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality agreements between Plaintiffs and third parties.  Plaintiffs object to this request as duplicative of Defendants' other requests, including at least Document Request No. 1.

Subject to their Specific and General Objections, Plaintiffs will not produce documents in response to this request.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 24:**

Documents concerning the research and development of any product allegedly covered by or described in the Patents-in-Suit, including, without limitation, all laboratory notebook entries, reports, memoranda, analyses, meeting minutes, and all test data, including preclinical and clinical testing data, animal modeling data, experimental results, and all conclusions based thereon.

**RESPONSE TO DOCUMENT REQUEST NO. 24:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or

31

immunity.  Plaintiffs object to this request to the extent it is overly broad, unduly burdensome, to the extent that it seeks documents not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the term "product" as vague and ambiguous in the context of Document Request No. 24.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.

Subject to their Specific and General Objections, Plaintiffs will produce documents responsive to this request concerning the research and development of Belbuca®, to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 25:**

Documents concerning the Patents-in-Suit, including, without limitation, all documents and communications concerning:

a. the patentability of any invention or subject matter claimed or disclosed therein, including all correspondence, memoranda, presentations, studies, prior-art searches, and the results of any prior-art searches;

b. the inventorship or any invention or subject matter claimed or disclosed therein, including all documents concerning the contribution of each named inventor to any such invention;

c. the inventive contributions of any of the named inventors to any of the claims of the Patents-in-Suit;

d. the conception and reduction to practice (whether constructive or actual) of any invention or subject matter claimed or disclosed therein, including all invention disclosures, laboratory notebook entries, reports, memoranda, analyses, and meeting minutes related thereto;

documents that are in Defendants' possession, such as the intended label for their produce and portions of their ANDA.

Subject to their Specific and General Objections, Plaintiffs will produce documents as required by Fed. R. Civ. P. 26(a)(2) at the time provided by the Rules and the Scheduling Order entered in this case.  Further, Defendants have refused to produce discovery regarding the pH of the layers of their generic ANDA product.   Accordingly, Plaintiffs will not be producing documents in response to this request.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 45:**

All documents concerning any testing, analysis, evaluation, or investigation of buprenorphine film compositions that do not possess the pH values claimed in the Patents-in-Suit.

**RESPONSE TO DOCUMENT REQUEST NO. 45:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request, which seeks "all documents," as overly broad and as seeking information that is not relevant to any party's claims or defenses because it seeks all documents and things involving different claims and defenses, *e.g.*, regarding different patents, different products, and different subject matter.  Plaintiffs further object to this request as unduly burdensome and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality

agreements between Plaintiffs and third parties.  Further, this request is vague and ambiguous regarding the temporal and subject matter scope of the documents and things requested. Plaintiffs further object to the terms "investigation" and "buprenorphine film composition" as vague and ambiguous in the context of Document Request No. 45.  Accordingly, subject to their Specific and General Objections, Plaintiffs will not produce any documents responsive to this request, unless they are produced in response to another of Defendants' document requests. Plaintiffs note that different layer pHs were tested in the research and development of Belbuca® and these documents will be produced to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 46:**

All documents concerning any testing, analysis, evaluation, or investigation of buprenorphine film compositions having a pH of about 4 to about 7.5.

**RESPONSE TO DOCUMENT REQUEST NO. 46:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request, which seeks "all documents" as overly broad and as seeking information that is not relevant to any party's claims or defenses because it seeks all documents and things involving different claims and defenses, *e.g.*, regarding different patents, different products, and different subject matter.  For example, the pH of buprenorphine film compositions, as a whole, are irrelevant to the asserted claims.  Plaintiffs further object to this

request as unduly burdensome and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality agreements between Plaintiffs and third parties.  Further, this request is vague and ambiguous regarding the temporal and subject matter scope of the documents and things requested.   Plaintiffs further object to the terms "investigation" and "buprenorphine film compositions" as vague and ambiguous in the context of Document Request No. 46.

Subject to their Specific and General Objections, Plaintiffs will produce documents responsive to this request to the extent they concern the pH of the mucoadhesive layer claimed in the Patents-in-Suit and to the extent they were part of the research and development effort to develop Belbuca®, and to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

## DOCUMENT REQUEST NO. 47:

All documents concerning any testing, analysis, evaluation, or investigation of buprenorphine film compositions having a barrier layer with a pH of about 4.0 to about 4.8.

## RESPONSE TO DOCUMENT REQUEST NO. 47:

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or

immunity.  Plaintiffs object to this request, which seeks "all documents" as overly broad and as seeking information that is not relevant to any party's claims or defenses because it seeks all documents and things involving different claims and defenses, *e.g.*, regarding different patents, different products, and different subject matter.  Plaintiffs further object to this request as unduly burdensome and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality agreements between Plaintiffs and third parties.  Further, this request is vague and ambiguous regarding the temporal and subject matter scope of the documents and things requested. Plaintiffs further object to the terms "investigation" and "buprenorphine film compositions" as vague and ambiguous in the context of Document Request No. 47.  Plaintiffs object to this request as duplicative of Defendants' other requests, including at least Document Request Nos. 46, 51, and 63.

Subject to their Specific and General Objections, Plaintiffs will produce documents related to the barrier layer of the subject matter claimed in the Patents-in-Suit, and to the extent they were part of the research and development effort to develop Belbuca®, and to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 48:**

All documents concerning any testing, analysis, evaluation, or investigation of buprenorphine film compositions having a mucoadhesive layer with a pH of about 4.0 to about 7.5.

**RESPONSE TO DOCUMENT REQUEST NO. 48:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request, which seeks "all documents" as overly broad and as seeking information that is not relevant to any party's claims or defenses because it seeks all documents and things involving different claims and defenses, *e.g.*, regarding different patents, different products, and different subject matter.  Plaintiffs further object to this request as unduly burdensome and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality agreements between Plaintiffs and third parties.  Further, this request is vague and ambiguous regarding the temporal and subject matter scope of the documents and things requested. Plaintiffs further object to the terms "investigation" and "buprenorphine film compositions" as vague and ambiguous in the context of Document Request No. 48.  Plaintiffs object to this request as duplicative of Defendants' other requests, including at least Document Request Nos. 46 and 50.

Subject to their Specific and General Objections, Plaintiffs will produce documents responsive to this request to the extent they concern the pH of the mucoadhesive layer claimed in

the Patents-in-Suit, and to the extent they were part of the research and development effort to develop Belbuca®, and to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 49:**

All documents concerning any testing, analysis, evaluation, or investigation of buprenorphine film compositions having a polymeric diffusion environment with a pH of about 4.0 to about 6.

**RESPONSE TO DOCUMENT REQUEST NO. 49:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request, which seeks "all documents" as overly broad and as seeking information that is not relevant to any party's claims or defenses because it seeks all documents and things involving different claims and defenses, *e.g.*, regarding different patents, different products, and different subject matter.  Plaintiffs further object to this request as unduly burdensome and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including, any protective orders or confidentiality agreements between Plaintiffs and third parties.  Further, this request is vague and ambiguous

Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 63:**

All documents showing the need for an buprenorphine film composition with a polymeric diffusion environment that has a pH of about 4 to about 7.5, including, but not limited to, documents showing any drawbacks or shortcomings with a polymeric diffusion environment that has a pH of about 4 to about 7.5.

**RESPONSE TO DOCUMENT REQUEST NO. 63:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this request to the extent it is overly broad, unduly burdensome, to the extent that it seeks documents not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs object to this request as duplicative of Defendants' other requests, including at least Document Request Nos. 49, 52, and 60.  Plaintiffs further object to the terms "showing the need for," "buprenorphine film composition," and "any drawbacks or shortcomings" as vague and ambiguous in the context of Document Request No. 63.

Subject to their Specific and General Objections, Plaintiffs will produce documents responsive to this request, to the extent they were part of the research and development effort to develop Belbuca® or to the extent they were incorporated in the IND or NDA for Belbuca®, or to the extent they are referred to in the prosecution histories of the Patents-in-Suit, to the extent

they are produced in response to another of Defendants' document requests, and to the extent they are not protected by the attorney-client privilege, work-product immunity, and/or any other privilege or immunity, and to the extent they exist and are located after a reasonable search of Plaintiffs' files as set forth in Plaintiffs' disclosures under paragraph 3 of the District of Delaware's Default Standard for Discovery.  As with all their responses, Plaintiffs reserve the right to supplement this response.

**DOCUMENT REQUEST NO. 64:**

Documents and things concerning reasons for customers (including, but not limited to, distributors, procurement agents, and patients) or healthcare providers and associated staff (including, but not limited to, hospitals, physicians, nurse practitioners, physician's assistants, and other healthcare professionals) to purchase or prescribe Belbuca, including, but not limited to (i) internal memoranda and presentations; (ii) distributor and customer correspondence; (iii) sales training materials; (iv) sales meeting minutes; (v) sales call reports; (vi) competitive market analyses; and (vii) customer surveys..

**RESPONSE TO DOCUMENT REQUEST NO. 64:**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this request to the extent that it seeks the production of documents or information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this request to the extent it seeks documents that are publicly available and, therefore, equally accessible to Defendants, and to the extent that it seeks documents not within Plaintiffs' possession, custody, or control.  Plaintiffs object to this request to the extent it is overly broad, unduly burdensome, to the extent that it seeks documents not relevant to any claim or defense, and not proportional to the needs of the case.  For example, the competitive market analyses and sales reports calls of Belbuca® are not related to any claim or defense in this case.  Plaintiffs do not intend to rely on commercial success as an objective indicium of nonobviousness.

# Exhibit 8

REDACTED IN ITS ENTIRETY

# Exhibit 9

REDACTED IN ITS ENTIRETY

# Exhibit 10

REDACTED IN ITS ENTIRETY

# Exhibit 11

REDACTED IN ITS ENTIRETY

# Exhibit 12

*__December 2019__*
**For Patent Cases[1]**

## SCHEDULING ORDER

This _____ day of _____, 202_, the Court having conducted an initial Rule 16(b) scheduling conference pursuant to Local Rule 16.1(b), and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.     Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within five days of the date of this Order.

2.     Joinder of Other Parties and Amendment of Pleadings.  All motions to join other parties, and to amend or supplement the pleadings, shall be filed on or before _____, 202_.

3.     Discovery.

     a.     Discovery Cut Off.  All discovery in this case shall be initiated so that it will be completed on or before _____, 202_.

     b.     Document Production.  Document production shall be substantially complete by _____, 202_.

     c.     Requests for Admission.  A maximum of ___ requests for admission are permitted for each side.

---

[1] For ANDA cases, the form should be modified as necessary by, for example, deleting paragraphs 11 and 15 and modifying paragraph 16 to reflect a three-day bench trial with trial days from 8:30 to 5:00 (10 ½ hours per side).

      d.     <u>Interrogatories</u>.  A maximum of ___ interrogatories, including contention interrogatories, are permitted for each side.

      e.     <u>Depositions</u>.

      i.     <u>Limitation on Hours for Deposition Discovery</u>.  Each side is limited to a total of __ hours of taking testimony by deposition upon oral examination.

      ii.     <u>Location of Depositions</u>.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made by order of the Court or by agreement of the parties. A defendant who becomes a cross-claimant or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

      f.     <u>Discovery Matters and Disputes Relating to Protective Orders</u>.  Should counsel find they are unable to resolve a discovery matter or a dispute relating to a protective order, the parties involved in the discovery matter or protective order dispute shall contact the Court's Case Manager to schedule an in-person conference/argument.  Unless otherwise ordered, by no later than seven business days prior to the conference/argument, any party seeking relief shall file with the Court a letter, not to exceed three pages, outlining the issues in dispute and its position on those issues.  By no later than five business days prior to the conference/argument, any party opposing the application for relief may file a letter, not to exceed three pages, outlining that party's opposition.  A party should include with its letter a proposed order with a detailed issue-by-issue ruling such that, should the Court agree with the party on a particular issue, the Court could sign the proposed order as to that issue, and the opposing party would be able to

2

understand what it needs to do, and by when, to comply with the Court's order.  Any proposed

order shall be e-mailed, in Word format, simultaneously with filing to

rga_civil@ded.uscourts.gov.

If a discovery-related motion is filed without leave of the Court, it will be denied

without prejudice to the moving party's right to bring the dispute to the Court through the

discovery matters procedures set forth in this Order.

g.      Miscellaneous Discovery Matters.

i.      The parties may, if they choose, agree to a timetable for initial

patent disclosures either as set forth in the Delaware Default Standard for Discovery or as agreed

to by the parties, and the parties should set forth any such agreement in the scheduling order.

ii.      The parties should set forth a statement identifying any other

pending or completed litigation including IPRs involving one or more of the asserted patents.

Plaintiff[2] should advise whether it expects to institute any further litigation in this or other

Districts within the next year.  Defendant should advise whether it expects to file one or more

IPRs and, if so, when.

iii.      The parties, if they think it necessary, should set times in the

schedule for reducing the number of asserted claims and asserted prior art used for anticipation

and obviousness combinations.  The usual points where the Court will consider such limits are

before claim construction and after a ruling on claim construction.

iv.      If one or more of the patents-in-suit have already been licensed or

---

[2] Plaintiff and Defendant refer to the party or parties asserting infringement and the party
or parties accused of infringement.  The parties should modify the language as necessary, for
example, in a declaratory judgment action.

the subject of a settlement agreement, either (1) Plaintiff shall provide the licenses and/or settlement agreements to Defendant no later than the time of the initial Rule 16(b) scheduling conference, or (2) if Plaintiff requires a Court Order to make such disclosures, Plaintiff shall file any necessary proposed orders no later than twenty-four hours before the initial Rule 16(b) scheduling conference.  Plaintiff shall represent in the scheduling order that it is complying or has complied with this requirement.  All parties shall be prepared to discuss at the conference what their preliminary views of damages are.

4.      Application to Court for Protective Order.  Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.  Should counsel be unable to reach an agreement on a proposed form of order, counsel must follow the provisions of Paragraph 3(f) above.

Any proposed protective order must include the following paragraph:

> Other Proceedings.  By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated as confidential pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

5.      Papers Filed Under Seal.  When filing papers under seal, counsel shall deliver to the Clerk the required number of copies as directed in paragraph 6.  A redacted version of any sealed document shall be filed electronically within seven days of the filing of the sealed

4

document.

6.     <u>Courtesy Copies</u>.  The parties shall provide to the Court two courtesy copies of all briefs and one courtesy copy of any other document filed in support of any briefs (i.e., appendices, exhibits, declarations, affidavits etc.).  This provision also applies to papers filed under seal.

7.     <u>Claim Construction Issue Identification</u>.  On or before _____, 202_, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s).  This document will not be filed with the Court.  Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be filed no later than _____, 202_.  The Joint Claim Construction Chart, in Word format shall be e-mailed simultaneously with filing to rga_civil@ded.uscourts.gov.  The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions.  A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon shall be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

8.     <u>Claim Construction Briefing</u>[3].  Plaintiff shall serve, but not file, its opening brief,

_____

[3] As each brief is written and provided to the opposing party, the individual responsible for verifying the word count will represent to the other party that it has so verified and by what means.  These verifications should not be provided to the Court unless a dispute arises about them.  Pictures, Figures copied from the patent, and other illustrations do not count against the word limit.  Plaintiff should include with its opening brief one or more representative claims with the disputed terms italicized.  Should Defendant want to add additional representative claims, Defendant may do so.  The representative claims and the agreed-upon claim constructions do not

not to exceed 5,000 words, on _____. Defendant shall serve, but not file, its answering brief,

not to exceed 7,500 words, on _____. Plaintiff shall serve, but not file, its reply brief, not to

exceed 5,000 words, on _____. Defendant shall serve, but not file its sur-reply brief, not to

exceed 2,500 words, on _____. No later than _____, the parties shall file a Joint

Claim Construction Brief. The parties shall copy and past their unfiled briefs into one brief, with

their positions on each claim term in sequential order, in substantially the form below.

## JOINT CLAIM CONSTRUCTION BRIEF

I.      Representative Claims

II.     Agreed-upon Constructions

III.    Disputed Constructions

A.      [TERM 1][4]

1.      Plaintiff's Opening Position
2.      Defendant's Answering Position
3.      Plaintiff's Reply Position
4.      Defendant's Sur-Reply Position

B.      [TERM 2]
        1.      Plaintiff's Opening Position
        2.      Defendant's Answering Position
        3.      Plaintiff's Reply Position
        4.      Defendant's Sur-Reply Position

Etc. The parties need not include any general summaries of the law relating to claim

construction. If there are any materials that would be submitted in an appendix, the parties shall

_____

count against the word limits.

[4] For each term in dispute, there should be a table or the like setting forth the term in dispute and the parties' competing constructions. The table does not count against the word limits.

6

submit them in a Joint Appendix.

9.      Hearing on Claim Construction.  Beginning at _____ a.m. on _____, 202_,

the Court will hear argument on claim construction.  Absent prior approval of the Court (which,

if it is sought, must be done so by joint letter submission no later than the date on which

answering claim construction briefs are due), the parties shall not present testimony at the

argument, and the argument shall not exceed a total of three hours.  When the Joint Claim

Construction Brief is filed, the parties shall simultaneously file a motion requesting the above-

scheduled claim construction hearing, state that the briefing is complete, and state how much

total time the parties are requesting that the Court should allow for the argument.

10.     Disclosure of Expert Testimony.

a.      Expert Reports.  For the party who has the initial burden of proof on the

subject matter, the initial Federal Rule 26(a)(2) disclosure of expert testimony is due on or before

_____, 202_.  The supplemental disclosure to contradict or rebut evidence on the same

matter identified by another party is due on or before _____, 202_.  Reply expert reports

from the party with the initial burden of proof are due on or before _____, 202_.  No other

expert reports will be permitted without either the consent of all parties or leave of the Court.

If any party believes that an expert report does not comply with the rules relating to timely

disclosure or exceeds the scope of what is permitted in that expert report, the complaining party

must notify the offending party within one week of the submission of the expert report.  The

parties are expected to promptly try to resolve any such disputes, and, when they cannot

reasonably be resolved, use the Court's Discovery Dispute Procedure or the complaint will be

waived.

7

Along with the submissions of the expert reports, the parties shall advise of the dates and times of their experts' availability for deposition. Depositions of experts shall be completed on or before _____, 202_.

        b.     Objections to Expert Testimony. To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), as incorporated in Federal Rule of Evidence 702, it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

       11.     Case Dispositive Motions. All case dispositive motions shall be served and filed on or before _____, 202_. No case dispositive motion under Rule 56 may be filed more than ten days before the above date without leave of the Court. Absent an order of the Court upon a showing of good cause, each side is limited to one forty-page opening brief, one forty-page answering brief, and one twenty-page reply brief for all of its Daubert and case dispositive motions.

       12.     Applications by Motion. Except as otherwise specified herein, any application to the Court shall be by written motion. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

       13.     Pretrial Conference. On _____, 202_, the Court will hold a Rule 16(e) final pretrial conference in Court with counsel beginning at _____ a.m. The parties shall file a joint proposed final pretrial order in compliance with Local Rule 16.3(c) no later than 5 p.m. on the fourth business day before the date of the final pretrial conference. Unless otherwise ordered by the Court, the parties shall comply with the timeframes set forth in Local Rule 16.3(d) for the

preparation of the proposed joint final pretrial order.

14.     Motions *in Limine*.  Motions *in limine* shall be separately filed, with each motion containing all the argument described below in one filing for each motion.  Any supporting documents in connection with a motion *in limine* shall be filed in one filing separate from the motion *in limine*.  Each party shall be limited to three *in limine* requests, unless otherwise permitted by the Court.  The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of three pages of argument and may be opposed by a maximum of three pages of argument, and the party making the *in limine* request may add a maximum of one additional page in reply in support of its request.  If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single three page submission (and, if the moving party, a single one page reply).  No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

15.     Jury Instructions, Voir Dire, and Special Verdict Forms.  Where a case is to be tried to a jury, pursuant to Local Rules 47.1(a)(2) and 51.1, the parties should file (i) proposed voir dire, (ii) preliminary jury instructions, (iii) final jury instructions, and (iv) special verdict forms no later than 6 p.m. on the fourth business day before the date of the final pretrial conference.   Areas of dispute shall be identified as narrowly as possible and in a manner that makes it readily apparent what the dispute is.  The parties shall submit simultaneously with filing each of the foregoing four documents in Word format to rga_civil@ded.uscourts.gov.

9

16.     Trial.  This matter is scheduled for a five (5) day[5] jury trial beginning at 9:30 a.m. on _____, 202_, with the subsequent trial days beginning at 9:30 a.m.  Until the case is submitted to the jury for deliberations, the jury will be excused each day at 5:00 p.m.  The trial will be timed, as counsel will be allocated a total number of hours in which to present their respective cases.

17.     ADR Process.  This matter is referred to a magistrate judge to explore the possibility of alternative dispute resolution.  This matter is referred to a magistrate judge to handle all discovery disputes including any that arise in connection with expert reports.  (The second referral is optional, and should be deleted unless all parties agree to it.)


_____
UNITED STATES DISTRICT JUDGE


_____

[5] Five days (i.e., about ten to thirteen hours per side) is the presumptive length of a patent jury trial.  If the parties think it is obvious that this will not be enough, they may put in a different length and should be prepared to explain why at the Rule 16 conference.  A final decision on the precise length of trial will not be made before the final pretrial conference.

# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 18-1395 (CFC) (CJB) |
| ALVOGEN PB RESEARCH & DEVELOPMENT LLC, ALVOGEN MALTA OPERATIONS LTD., ALVOGEN PINE BROOK LLC, ALVOGEN, INC., and ALVOGEN GROUP, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 19-444 (CFC) (CJB) |
| CHEMO RESEARCH, S.L., INSUD PHARMA S.L., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFFS PURSUANT TO RULE 33 (NOS. 11-30)**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, BioDelivery Sciences International, Inc. ("BDSI") and Arius Two, Inc. (collectively, "Plaintiffs") hereby respond to the third set of interrogatories (Nos. 11-30) served by Alvogen PB Research & Development LLC, Alvogen Malta Operations Ltd, Alvogen Pine Brook LLC, Alvogen, Inc., and Alvogen Group, Inc. (collectively, "Alvogen"), and Chemo Research S.L., Insud Pharma S.L.U., IntelGenx Corp., and IntelGenx Technologies Corp.'s (collectively, "Chemo Research") (Alvogen and Chemo Research together, "Defendants") as follows:

interrogatories be deemed an admission of relevancy, competency, materiality, or admissibility in evidence of the interrogatories or the responses thereto.

25.     Plaintiffs' responses are subject to the provisions of the Protective Orders governing these litigations.

## **RESPONSES TO INTERROGATORIES**

### **INTERROGATORY NO. 11**

Describe in detail any and all reasons or rationale known, conveyed, disclosed, or understood by Plaintiffs for Endo Pharmaceuticals, Inc.'s decision to terminate its license agreement for Belbuca, the Patents-in-Suit, and/or NDA No. 207932 between Plaintiffs and Endo Pharmaceuticals, Inc. including an identification of all documents that relate to Endo Pharmaceuticals, Inc.'s termination of the license agreement, identification of the individuals involved in negotiating the terms of the termination of the agreement and their role.

### **RESPONSE TO INTERROGATORY NO. 11**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to this interrogatory to the extent it asks Plaintiffs to provide information subject to the rights of third parties not affiliated with Plaintiffs, particularly to the extent that such disclosure is prohibited by the terms of any Protective Order or obligation of confidentiality between Plaintiffs and any third party.  Plaintiffs also object to this request to the extent that Plaintiffs lack personal knowledge regarding the subject matter of this interrogatory, and/or to the extent the requested information is not within Plaintiffs' possession, custody, or control. Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, and less expensive.  Plaintiffs object to

7

this interrogatory to the extent it calls for information that is publicly available and, therefore, equally accessible to Defendants.

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

According to Endo, "[w]hile we continue to believe Belbuca$^®$ is a differentiated asset, the product no longer aligns with Endo's U.S. Branded segment strategy and our focus on core assets…moving forward."  Endo eliminated its U.S. Branded pain sales field force in 2017.  *See* Press Release, Endo, Endo Announces Strategic Updates for Belbuca$^®$ and U.S. Branded Pain Portfolio (Dec. 8, 2019).

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 12

Describe in detail all facts concerning, referring, or relating to Plaintiffs' contention, if Plaintiffs so contend, that Belbuca contains a mucoadhesive layer and/or backing layer that has a "stabilized pH" including, but not limited to, identifying any tests evidencing the stability of the pH of the mucoadhesive layer and/or backing layer, the identity of the component or components in Belbuca causing a stabilized pH of the mucoadhesive layer and/or backing layer, the method or procedure used to test for the stability of the pH of the mucoadhesive layer and/or backing layer, the persons most knowledgeable regarding the subject matter of this interrogatory, and an identification of the documents describing the same.

legal bases for Plaintiffs' contentions are set forth in detail in Plaintiffs' response to Defendants' Interrogatory No. 30, which is incorporated by reference herein in its entirety.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 14

Describe in detail the factual basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca meets the claim limitation "a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment," including an identification of the component or components in Belbuca that meet this claim language, any differences between the bioerodible mucoadhesive layer and the polymeric diffusion environment, the persons most knowledgeable regarding the subject matter of this interrogatory, and an identification of the documents describing the same.

## RESPONSE TO INTERROGATORY NO. 14

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity. Plaintiffs also object to this interrogatory to the extent it calls for a legal conclusion. Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started. Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents.

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

Belbuca® meets the claim limitation "a bioerodible mucoadhesive layer comprising buprenorphine disposed in a polymeric diffusion environment."  The factual and legal bases for Plaintiffs' contentions are set forth in detail in Plaintiffs' response to Defendants' Interrogatory No. 30, which is incorporated by reference herein in its entirety.  Additionally, Plaintiffs identify the following nonexhaustive list of documents pursuant to Fed. R. Civ. P. 33(d), which have been previously produced in this litigation: BEL00053713; BEL00053739.  Defendants' inquiry regarding the differences between the bioerodible mucoadhesive layer and the polymeric diffusion environment is vague as the polymeric diffusion environment is contained within the bioerodible mucoadhesive layer.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**<u>INTERROGATORY NO. 15</u>**

Describe in detail the factual basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca meets the claim limitation "[a] method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine," including an identification of the comparator for determining whether the uptake of buprenorphine is "enhanced," an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

**RESPONSE TO INTERROGATORY NO. 15**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs also object to this interrogatory to the extent it calls for a legal conclusion.  Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents.

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

The phrase "[a] method for providing enhanced uptake of buprenorphine to a subject by direct transmucosal delivery of buprenorphine" is not a claim limitation, rather, it is the preamble.  The factual and legal bases for Plaintiffs' contentions are set forth in detail in

Plaintiffs' response to Defendants' Interrogatory No. 30, which is incorporated by reference herein in its entirety.  Plaintiffs further incorporate Plaintiffs' Response to Defendant Alvogen's First Set of Interrogatories (Nos. 1-2) at 22 and 24-25 and Plaintiffs Response to Defendant Chemo Research's First Set of Interrogatories (Nos. 1-2) at 20 and 28-30.   Additionally, Plaintiffs identify the following nonexhaustive list of documents pursuant to Fed. R. Civ. P. 33(d), which have been previously produced in this litigation: BEL00078783; BEL00078679.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 16**

Describe in detail any and all complaints or reports of treatment emergent adverse events (including headache, dizziness, nausea, constipation, or other treatment emergent adverse events relating to Plaintiffs' Belbuca product received by or on behalf of Plaintiffs), a description of the type of complaints or reports, the number of complaints or reports received to date, any steps Plaintiffs or any party acting on behalf of Plaintiffs took to remedy, resolve, rectify, or fix the complaint or report, and all tests, reports, studies, evaluations, or analyses regarding the complaints or reports; and the method or procedure used to gather, collect, obtain, or diagnose the complaint or report, an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

**RESPONSE TO INTERROGATORY NO. 16**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents.

## INTERROGATORY NO. 17

Describe in detail the factual basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca meets the claim limitations: "wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6," "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5," "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5," "wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5," "wherein the polymeric diffusion environment has a pH of between about 4 to about 6," and "wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5," including an identification of the component or components in Belbuca that meet these claim limitations, an identification of the testing methods or protocols used to determine if Belbuca, the mucoadhesive layer or the polymeric diffusion environment meet this limitation, the equipment and devices used to measure pH, an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

## RESPONSE TO INTERROGATORY NO. 17

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity. Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started. Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to this interrogatory to the extent it is duplicative of other discovery requests sought by Defendants, including Defendants' Requests for Documents and Things ("RFP"), including, for example, Alvogen RFP Nos. 20, 25-26, 75 and Chemo Research RFP Nos. 50-51, 53, 60-61. Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents. Plaintiffs further object to responding to allegations that Defendants have not raised or explained. For example,

Defendants have not alleged that Belbuca® does not meet the claim limitations: "wherein the polymeric diffusion environment is a buffered environment having a pH of between about 4 and about 6," "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5.5," "wherein the pH of the polymeric diffusion environment is between about 4.5 and about 5," "wherein the polymeric diffusion environment has a pH of between about 4 and about 7.5," "wherein the polymeric diffusion environment has a pH of between about 4 to about 6," and "wherein the polymeric diffusion environment has a pH buffered to between about 4 and about 7.5."

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

Subject to their Specific and General Objections, Plaintiffs identify the following nonexhaustive list of documents pursuant to Fed. R. Civ. P. 33(d), which have been previously produced in this litigation:  BEL00053729-BEL00053760;  BEL00053761-BEL00053836; BEL00078674-BEL00078794.  The factual and legal bases for Plaintiffs' contentions are set forth in detail in Plaintiffs' response to Defendants' Interrogatory No. 30, which is incorporated by reference herein in its entirety.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 18

Describe in detail the factual basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca meets the claim limitation "a backing layer buffered to a pH of between about 4.0 and about 4.8," including an identification of the component or components in Belbuca that meet this claim limitation, an identification of the testing methods or protocols used to determine if the backing layer meets this limitation, the equipment and devices used to measure pH, an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

## RESPONSE TO INTERROGATORY NO. 18

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity. Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started. Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to this interrogatory to the extent it is duplicative of other discovery requests sought by Defendants, including Defendants' Requests for Documents and Things ("RFP"), including, for example, Alvogen RFP Nos. 20, 25-26, 75 and Chemo Research RFP Nos. 50-51, 53, 60-61. Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents. Plaintiffs further object to responding to allegations that Defendants have not raised or explained. For example,

Defendants have not alleged that Belbuca® does not meet the claim limitation "a backing layer buffered to a pH of between about 4.0 and about 4.8,"

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

Subject to their Specific and General Objections, Plaintiffs identify the following nonexhaustive list of documents pursuant to Fed. R. Civ. P. 33(d), which have been previously produced in this litigation:  BEL00392017-BEL00392059; BEL00336130-BEL00336133.  The factual and legal bases for Plaintiffs' contentions are set forth in detail in Plaintiffs' response to Defendants' Interrogatory No. 30, which is incorporated by reference herein in its entirety.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 19

Describe in detail the factual basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca provides "rapid and efficient delivery of buprenorphine," including an identification of the testing methods or protocols used to determining the rapidity and efficiency of delivery of buprenorphine, an identification of any comparator for determining the rapidity and efficiency of the delivery of buprenorphine, the equipment and devices used to test for the rapidity or efficiency of the delivery of buprenorphine, an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

**RESPONSE TO INTERROGATORY NO. 19**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs also object to this interrogatory to the extent it calls for a legal conclusion.   Plaintiffs further object to this interrogatory on the ground that it is premature given that discovery in this case is ongoing and many depositions have not yet been taken.  Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.   Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents.  Plaintiffs object to this interrogatory to the extent it calls for information that is publicly available and, therefore, equally accessible to Defendants.

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

Belbuca® provides "rapid and efficient delivery of buprenorphine."  The factual and legal bases for Plaintiffs' contentions are set forth in detail in Plaintiffs' response to Defendants'

Interrogatory No. 30, which is incorporated by reference herein in its entirety; *see also* Plaintiffs' Response to Defendant Alvogen's First Set of Interrogatories (Nos. 1-2) at 26; Plaintiffs Response to Defendant Chemo Research's First Set of Interrogatories (Nos. 1-2) at 31; U.S. Patent No. 8,147,866 ("the '866 patent") at 4:32-46.  Additionally, Plaintiffs identify the following nonexhaustive list of documents pursuant to Fed. R. Civ. P. 33(d), which have been previously produced in this litigation: BEL00049897; BEL00000234.

As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 20**

Describe in detail the rationale for testing the pH of the mucoadhesive layer at the "In-Process Control" number 3 (see, e.g., BEL00047849), including an identification of the other stages in the manufacturing process contemplated for testing of the mucoadhesive layer, the reasons or rationale as to why those stages were selected or not selected, an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and documents describing the same.

**RESPONSE TO INTERROGATORY NO. 20**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this interrogatory on the ground that it is premature given that discovery in this case is ongoing and many depositions have not yet been taken.  Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.  Plaintiffs object to this interrogatory as irrelevant to any claim or defense, overly broad and unduly burdensome, and not proportional to the needs of the case.  Plaintiffs' methods for manufacturing Belbuca are not

22

No. 7,579,019.   Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.   As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 24**

Describe in detail the composition, formulation, and characteristics of Bunavail®, including the composition and pH of any mucoadhesive layer of Bunavail®, the composition and pH of any backing layer of Bunavail®, the function or functions of each component of Bunavail®, and the chemical properties of each component of Bunavail®. This response should include an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and identification of documents describing the same.

**RESPONSE TO INTERROGATORY NO. 24**

Plaintiffs incorporate their General Objections by reference.   Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.   Plaintiffs also object to this interrogatory to the extent it calls for a legal conclusion.   Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to this request as not relevant as this litigation concerns Belbuca®, not Bunavail®.  To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 25**

Describe in detail any agreements between Plaintiffs and QLP USA, Inc./Tolmar Therapeutics, Inc., regarding Belbuca®, the patents-in-suit, and/or the BEMA® technology

27

purportedly underlying Belbuca®, including all reasons for Plaintiffs' decisions to enter into or to terminate such agreements. This response should include an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and identification of documents describing the same.

## RESPONSE TO INTERROGATORY NO. 25

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this interrogatory to the extent it asks Plaintiffs to provide information subject to the rights of third parties not affiliated with Plaintiffs, particularly to the extent that such disclosure is prohibited by the terms of any Protective Order or obligation of confidentiality between Plaintiffs and any third party.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 26

Describe in detail the roles of any third party in connection with the formulation and development process for Belbuca® and/or the BEMA® technology purportedly underlying Belbuca® during the time period between 2000 and 2011, including any contributions from QLP USA, Inc./Tolmar Therapeutics, Inc., Dow Pharmaceutical Sciences, Inc., Aveva Drug Delivery Systems, Inc., 3M Drug Delivery Systems. This response should include an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and identification of documents describing the same.

## RESPONSE TO INTERROGATORY NO. 26

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client

28

privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this interrogatory to the extent it asks Plaintiffs to provide information subject to the rights of third parties not affiliated with Plaintiffs, particularly to the extent that such disclosure is prohibited by the terms of any Protective Order or obligation of confidentiality between Plaintiffs and any third party.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 27

Describe in detail the nature, scope, and duration of each of the agreements identified on BEL00354640-41, including: whether and what relation each agreement had to Belbuca®, the patents-in-suit, any embodiments of the patents-in-suit, and/or the BEMA® technology purportedly underlying Belbuca®; each party to such agreements; and all reasons for Plaintiffs' decisions to enter into or to terminate such agreements. This response should include an identification of the individuals most knowledgeable about the subject matter of this interrogatory, and identification of documents describing the same.

## RESPONSE TO INTERROGATORY NO. 27

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this interrogatory to the extent it asks Plaintiffs to provide information subject to the rights of third parties not affiliated with Plaintiffs, particularly to the extent that such disclosure is prohibited by the terms of any Protective Order or obligation of confidentiality between Plaintiffs and any third party.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense,

29

and not proportional to the needs of the case.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 28

Describe in detail Plaintiffs' document collection efforts in this case including, but not limited to, the identification of all custodians from whom Plaintiffs collected documents, the document repositories and locations searched or collected, the identity of any document repositories or locations containing potentially relevant information not searched or collected, any search terms used to locate potentially relevant electronic documents and the documents to which such search terms were applied, an identification of the relevance of each search term, and when each such collection and/or search was conducted.

## RESPONSE TO INTERROGATORY NO. 28

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory as it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this interrogatory as it calls for information not relevant to any claim or defense, is overly broad and unduly burdensome, and not proportional to the needs of the case.  The interrogatory also seeks to place obligations on Plaintiffs not set forth by the Federal Rules of Civil Procedure or the Scheduling Order in place in this case.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 29

Describe in detail the composition, formulation, and characteristics of Onsolis®, including the composition and pH of any mucoadhesive layer of Onsolis®, the composition and pH of any backing layer of Onsolis®, the function or functions of each component of Onsolis®, and the chemical properties of each component of Onsolis®. This response should include an

identification of the individuals most knowledgeable about the subject matter of this interrogatory, and identification of documents describing the same.

**RESPONSE TO INTERROGATORY NO. 29**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this interrogatory as it calls for information not relevant to any claim or defense, is overly broad and unduly burdensome, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Onsolis®.  Accordingly, pursuant to the above objections, Plaintiffs will not provide a response to this request.  As with all of their responses, Plaintiffs reserve the right to further supplement their response to this interrogatory as discovery proceeds, in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 30**

State, and describe in detail, on a claim-by claim and element-by-element basis, the factual and legal basis for Plaintiffs' contention, if Plaintiffs so contend, that Belbuca® is an embodiment of the asserted claims of the asserted patents, including whether any such claims or claim elements are present in Belbuca literally, inherently, or by equivalents; documents supporting Plaintiffs' contention that Belbuca meets each claim element, and an identification of individuals most knowledgeable about the subject matter of this interrogatory.

**RESPONSE TO INTERROGATORY NO. 30**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs also object to this interrogatory to the extent it calls for a legal conclusion.  Plaintiffs further object to this interrogatory on the ground that it is premature given that discovery in this case is ongoing and many depositions have not yet been taken.  Plaintiffs further object to this interrogatory as premature to the extent it relies on disclosure of expert opinion(s) or supporting

31

documents, and the time for expert discovery has not yet started.  Plaintiffs object to this interrogatory as overly broad and unduly burdensome to the extent that it calls for information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs also object to this interrogatory as the discovery sought can be obtained from some other course that is more convenient, less burdensome, less expensive, and the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, namely through the production of documents.

Subject to their Specific and General Objections, Plaintiffs provide the response set forth below.  Plaintiffs' response is based on information reasonably available to Plaintiffs at this time, and may require subsequent amendment, alteration or supplementation.  Consequently, Plaintiffs reserve the right to amend, alter, or supplement these responses based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction from the Court, or as a result of the Defendants' evolving invalidity theories.  *See* Fed. R. Civ. P. 8(d).

# Exhibit 14

| | |
|---|---|
| **From:** | Josephine Kim |
| **Sent:** | Thursday, March 26, 2020 10:00 PM |
| **To:** | Sullivan, Thomas; Levine, Howard; Swan, Jennifer; Hasford, Justin; Smyth, Jeffrey; Galgano, Michael; Chung, Daniel; EXT-JTigan@mnat.com; Katz, Seth |
| **Cc:** | Chemo Buprenorphine Film; 'godfrey.geoff@dorsey.com'; Gaza, Anne Shea; Wilson, Samantha |
| **Subject:** | RE: BDSI v. Chemo/IGX - BDSI and Endo licensing documents ordered on Jan 30 |

Tom,

We are surprised to learn that BDSI is citing the COVID-19 pandemic as the cause of delay in producing BDSI's Court-ordered discovery. The COVID-19 pandemic did not manifest in the United States until early March and until March 12 the parties were traveling for deposition in this case. Judge Burke ordered production of these documents and BDSI's samples on January 30. *See* D.I. 147 and 149. Is it BDSI's position that BDSI undertook *no efforts* to comply with the Court's January 30 orders in the interim between the Court's Order and BDSI's closure in mid or late March? Please be prepared to discuss these issues on the parties' next meet-and-confer.

Separately, BDSI represented that it would supplement its responses to several interrogatories in response to Chemo's February 20, 2020 Letter and, on that basis, refused to raise those disputes with the Court for resolution. We have not yet received the promised supplemental responses from Plaintiffs, nor have we received any response to our March 19 request for an ETA for this supplementation. If BDSI chooses to serve the supplement tomorrow—the last day of fact discovery—Chemo reserves the right to raise any continued deficiencies with BDSI's responses which were untimely served. Should BDSI not serve supplemental responses tomorrow, please be prepared to discuss this issue on the parties' next meet and confer.

Regards,
Josephine

---

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

---

**From:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>
**Sent:** Thursday, March 26, 2020 4:21 PM
**To:** Josephine Kim <JOSKIM@sternekessler.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Hasford, Justin <Justin.Hasford@finnegan.com>; Smyth, Jeffrey <Jeffrey.Smyth@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Katz, Seth <seth.katz@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; 'godfrey.geoff@dorsey.com' <godfrey.geoff@dorsey.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: BDSI v. Chemo/IGX - BDSI and Endo licensing documents ordered on Jan 30

Josephine, we are working on your requests.  However, BDSI is closed because of the COVID-19 crisis.  We will provide you with the requested information as soon as we are able to.

Best,
Tom

**Thomas J. Sullivan**
Attorney at Law
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4005 | fax: 202.408.4400| thomas.sullivan@finnegan.com | www.finnegan.com

# FINNEGAN

**From:** Josephine Kim <JOSKIM@sternekessler.com>
**Sent:** Monday, March 23, 2020 5:19 PM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Hasford, Justin <Justin.Hasford@finnegan.com>; Smyth, Jeffrey <Jeffrey.Smyth@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Katz, Seth <seth.katz@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; 'godfrey.geoff@dorsey.com' <godfrey.geoff@dorsey.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: BDSI v. Chemo/IGX - BDSI and Endo licensing documents ordered on Jan 30

**EXTERNAL Email:**

Counsel,

We are still waiting on BDSI's update as to documents and samples ordered by the Court on January 30. We have yet to receive (1) BDSI's documents between BDSI and Endo "concerning Belbuca and patent licensing negotiations and licensing fees relating to Belbuca" and (2) Form 222 information for the transfer of BDSI's samples, per Chemo's March 10 5:58PM ET email.

In light of the fast-approaching close of fact discovery this Friday, please promptly send us this information or let us know your availability for a meet-and-confer tomorrow afternoon to discuss these pending items.

Best,
Josephine

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

**From:** Josephine Kim
**Sent:** Thursday, March 19, 2020 12:15 PM
**To:** 'Sullivan, Thomas' <Thomas.Sullivan@finnegan.com>; 'Levine, Howard' <howard.levine@finnegan.com>; 'Swan, Jennifer' <Jennifer.Swan@finnegan.com>; 'Hasford, Justin' <Justin.Hasford@finnegan.com>; 'Smyth, Jeffrey' <Jeffrey.Smyth@finnegan.com>; 'Galgano, Michael' <Michael.Galgano@finnegan.com>; 'Chung, Daniel' <Daniel.Chung@finnegan.com>; 'EXT-JTigan@mnat.com' <JTigan@mnat.com>; 'Katz, Seth' <seth.katz@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; 'godfrey.geoff@dorsey.com'

<godfrey.geoff@dorsey.com>; 'Gaza, Anne Shea' <agaza@ycst.com>; 'Wilson, Samantha' <SWilson@ycst.com>
**Subject:** BDSI v. Chemo/IGX - BDSI and Endo licensing documents ordered on Jan 30

Counsel,

On January 30, the Court ordered BDSI to produce documents between BDSI and Endo "concerning Belbuca and patent licensing negotiations and licensing fees relating to Belbuca." D.I. 147. Chemo has not been able to locate these documents in BDSI's productions. Please direct us to where in Endo's post-January 30 productions these documents can be found. If BDSI has not yet produced these documents, please let us know **today** the date by which BDSI will produce these given that the close of fact discovery is fast approaching next week.

Regards,
Josephine



**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1100 New York Avenue, NW, Washington, DC 20005

**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 10-K

---

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2011**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission file number 001-31361**

---

# BioDelivery Sciences International, Inc.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **35-2089858** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **801 Corporate Center Drive, Suite #210 Raleigh, NC** | **27607** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Issuer's telephone number: 919-582-9050**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of exchange on which registered |
|---|---|
| Common stock, par value $.0001 | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☐

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files)   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  ☐                                                                      Accelerated filer                    ☐

Non-accelerated filer   ☐  (Do not check if a smaller reporting company)        Smaller reporting company  ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  ☐   No  ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates as of June 30, 2011 was approximately $78,773,615 based on the closing sale price of the company's common stock on such date of $3.23 per share, as reported by the NASDAQ Capital Market.

As of March 13, 2012, there were 29,577,146 shares of company common stock issued and 29,561,655 shares of company common stock outstanding.

**Table of Contents**

**BioDelivery Sciences International, Inc.**

**Annual Report on Form 10-K**

**For the fiscal year ended December 31, 2011**

**TABLE OF CONTENTS**

**Cautionary Note on Forward-Looking Statements**

| | | |
|---|---|---|
| **PART I** | | 1 |
| Item 1. | Description of Business | 1 |
| Item 1A. | Risk Factors | 26 |
| Item 1B. | Unresolved Staff Comments | 42 |
| Item 2. | Description of Property | 42 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Mine Safety Disclosure | 43 |
| **PART II** | | 44 |
| Item 5. | Market for Common Equity and Related Stockholder Matters | 44 |
| Item 6. | Selected Financial Data | 46 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 46 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 57 |
| Item 8. | Financial Statements | 57 |
| Item 9. | Changes In and Disagreements with Accountants on Accounting and Financial Disclosure | 57 |
| Item 9A. | Controls and Procedures | 57 |
| Item 9B. | Other Information | 58 |
| **PART III** | | 59 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 59 |
| Item 11. | Executive Compensation | 75 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 86 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 87 |
| Item 14. | Principal Accountant Fees and Services | 89 |
| **PART IV** | | 90 |
| Item 15. | Exhibits, Financial Statement Schedules | 90 |

Unless we have indicated otherwise, or the context otherwise requires, references in this Report to "BDSI," the "Company," "we," "us" and "our" or similar terms refer to BioDelivery Sciences International, Inc., a Delaware corporation and its consolidated subsidiaries.

**Table of Contents**

## CAUTIONARY NOTE ON FORWARD LOOKING STATEMENTS

This Annual Report on Form 10-K, including the documents referred to or incorporated by reference in this Report or statements of our management referring to our summarizing the contents of this Report, includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. We have based these forward-looking statements on our current expectations and projections about future events. Our actual results may differ materially or perhaps significantly from those discussed herein, or implied by, these forward-looking statements. Forward-looking statements are identified by words such as "believe," "expect," "anticipate," "intend," "estimate," "plan," "project" and other similar expressions. In addition, any statements that refer to expectations or other characterizations of future events or circumstances are forward-looking statements. Forward-looking statements included in this Report or our other filings with the U.S. Securities and Exchange Commission, or SEC, include, but are not necessarily limited to, those relating to:

- our plans and expectations regarding the timing and outcome of research, development, commercialization, manufacturing, marketing and distribution efforts relating to our BEMA® drug delivery technology platform and any proposed products, product candidates or marketed products, including our sole approved and marketed product, ONSOLIS®, and our partnered product candidate, BEMA® Buprenorphine;

- the domestic and international regulatory process and related laws, rules and regulations governing our technologies and our approved and proposed products and formulations, including (i) the timing, status and results of our or our commercial partners' filings with the U.S. Food and Drug Administration and its foreign equivalents, (ii) the timing, status and results of non-clinical work and clinical studies and (ii) the heavily regulated industry in which we operate our business generally;

- our ability to enter into strategic partnerships for the development, commercialization, manufacturing and distribution of our products and product candidates;

- our ability, or the ability of our commercial partners to actually develop, commercialize, manufacture or distribute our products and product candidates;

- our ability to generate commercially viable products and the market acceptance of our BEMA® technology platform and our proposed products and product candidates;

- our ability to finance our operations on acceptable terms, either through the raising of capital, the incurrence of convertible or other indebtedness or through strategic financing or commercialization partnerships;

- our expectations about the potential market sizes and market participation potential for our approved or proposed products;

- the protection and control afforded by our patents or other intellectual property, and any interest patents or other intellectual property that we license, or our or our partners' ability to enforce our rights under such owned or licensed patents or other intellectual property;

- the outcome of ongoing or potential future litigation or other claims or disputes relating to our business, technologies, products or processes;

- our expected revenues (including sales, milestone payment and royalty revenues) from our products or product candidates and any related commercial agreements of ours;

- the ability of our manufacturing partners to supply us or our commercial partners with clinical or commercial supplies of our products in a safe, timely and regulatory compliant manner and the ability of such partners to address any regulatory issues that have arisen or may in the future arise;

- our ability to retain members of our management team and our employees; and

- competition existing today or that will likely arise in the future.

Table of Contents

The foregoing does not represent an exhaustive list of matters that may be covered by the forward-looking statements contained herein or risk factors that we are faced with that may cause our actual results to differ from those anticipate in our forward-looking statements. Please see "Risk Factors" for additional risks which could adversely impact our business and financial performance. Moreover, new risks regularly emerge and it is not possible for our management to predict or articulate all risks we face, nor can we assess the impact of all risks on our business or the extent to which any risk, or combination of risks, may cause actual results to differ from those contained in any forward-looking statements. All forward-looking statements included in this Report are based on information available to us on the date of this Report. Except to the extent required by applicable laws or rules, we undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained above and throughout this Report.

**Table of Contents**

## PART I

### Item 1.   Description of Business.

### Overview

We are a specialty pharmaceutical company that is developing and commercializing, either on our own or in partnerships with third parties, new applications of proven therapeutics to address important unmet medical needs using both proven and new drug delivery technologies. We have developed and are continuing to develop pharmaceutical products aimed principally in the areas of pain management and oncology supportive care. We were incorporated in the State of Indiana in 1997 and were reincorporated as a Delaware corporation in 2002.

In formulating our products and product candidates, we utilize the novel, patent protected and proprietary *BioErodible MucoAdhesive ("BEMA®")* drug delivery technology, a small, erodible polymer film for application to the buccal mucosa (the lining inside the cheek). Our first U.S. Food and Drug Administration (which we refer to as the FDA) approved product, ONSOLIS® (fentanyl buccal soluble film), as well as our pipeline of product candidates, utilize our BEMA® technology.

We have worked with other delivery technologies in the past, and as part of our corporate growth strategy, we may seek to acquire or license additional drug delivery technologies. Should we gain access to such technologies, we would seek to formulate these technologies with proven, FDA approved therapeutics and utilize our development and commercialization experience to, either by ourselves or through commercial partnerships, navigate the resulting products through the regulatory review process and ultimately bring them to the marketplace.

Our current development strategy focuses primarily on our ability to utilize the FDA's 505(b)(2) approval process to obtain more timely and efficient approval of new formulations of previously approved, active therapeutics incorporated into our drug delivery technologies. Because the 505(b)(2) approval process is designed to address new formulations of previously approved drugs, we believe it has the potential to be more cost efficient and expeditious and have less regulatory approval risk, than other FDA approval approaches.

*ONSOLIS®*

On July 16, 2009, we announced the U.S. approval of our first product, ONSOLIS® (fentanyl buccal soluble film). ONSOLIS® is indicated for the treatment of breakthrough pain (i.e., pain that "breaks through" the effects of other medications being used to control persistent pain) in opioid tolerant patients with cancer. In May 2010, regulatory approvals were granted for Canada, and in October 2010, approval was obtained in the European Union (which we refer to herein as E.U.) through the E.U.'s Decentralized Procedure, with Germany acting as the reference member state. ONSOLIS® will be marketed in Europe under the trade-name BREAKYL™.

The FDA approval of ONSOLIS®, together with our satisfactory preparation of launch supplies of ONSOLIS®, triggered the payment to us by our commercial partner, Meda AB, a leading international specialty pharmaceutical company based in Sweden (which we refer to herein as Meda), of approval milestones aggregating $26.8 million. The first national approval of BREAKYL™ in the E.U. will result in a milestone payment of $2.5 million from Meda. A second milestone payment of $2.5 million will be realized at the time of first commercial sale in the E.U. Both of these milestones are anticipated to occur in 2012. We began receiving royalties from Meda on net sales of ONSOLIS® in the U.S. and Canada following launch and we anticipate additional royalty sales following launch in the E.U. in 2012. Our royalty revenue from this product remains below original projections due to certain regulatory conditions in the U.S., which are discussed below.

We have granted commercialization and distribution rights for ONSOLIS® on a worldwide basis (except in South Korea and Taiwan) to Meda. Meda's U.S. subsidiary, Meda Pharmaceuticals, based in Somerset, New Jersey, is a specialty pharmaceutical company that develops, markets and sells branded prescription therapeutics. Meda has an experienced, well trained and highly regarded sales force with a focus in specialty therapeutic areas including pain, allergy and central nervous system conditions. Meda has established a track record of successfully commercializing products. Meda has secured access to additional markets through acquisition of European businesses from Valeant Pharmaceuticals International, Inc., which we refer to herein as Valeant and a joint venture with Valeant covering Australia, Mexico and Canada.

1

**Table of Contents**

In 2010, we secured commercialization rights for ONSOLIS® for the remaining worldwide territories through execution of licensing agreements with Kunwha Pharmaceutical Ltd. for South Korea and TTY Biopharm Ltd. for Taiwan.

The following is a summary of the current regulatory and commercial Status of ONSOLIS®/BREAKYL™.

| Region | Partner | Regulatory Status | Commercial Status |
|---|---|---|---|
| U.S. | Meda Pharmaceuticals | Approved | Launched October 2009 |
| Canada | Meda Valeant Pharma Canada Inc. | Approved | Launched 3Q 2011 |
| E.U. | Meda | Approved | Launch anticipated in 2012 |
| Australia | Meda Valeant Pharma Canada Inc. | Filed | — |
| Taiwan | TTY Biopharm Ltd. | Filed | — |
| South Korea | Kunwha Pharmaceutical Co. Ltd. | Pre-registration | — |

Although we have generated licensing-related and other revenue to date, we have only recently begun to generate revenue from the commercial sales of an approved product — ONSOLIS® — and such revenue has been minimal to date due to multiple factors, including a highly restrictive Risk Evaluation and Mitigation Strategy (REMS) imposed by the FDA and certain manufacturing and formulation issues described below. The lack of approved REMS programs for our direct competitors resulted in an unlevel playing field, which created an unfavorable selling environment for ONSOLIS®. Furthermore, increasing pressure from payers and the availability of generic competitors have further impacted the market.

In December of 2010, Meda submitted to the FDA a new REMS program which was to provide broader access to ONSOLIS® through retail pharmacies and reduce some of the burdens placed on prescribers. This REMS program followed the guidelines provided by the FDA in November 2010, to all companies that were or would be marketing transmucosal fentanyl products, thereby providing for a level playing field. However, the FDA abandoned individual REMS programs through the creation of a consortium consisting of all manufacturers of transmucosal fentanyl products, including both us and our commercial partner Meda. The goal of the group was to develop one single REMS program covering all products in the class.

On December 29, 2011, the FDA approved a "class-wide" REMS program covering all transmucosal fentanyl products under a single risk management program. The program, which is referred to as the Transmucosal Immediate Release Fentanyl (TIRF) REMS Access Program, was designed to ensure informed risk-benefit decisions before initiating treatment with a transmucosal fentanyl product, and while patients are on treatment, to ensure appropriate use. The approved program covers all marketed transmucosal fentanyl products under a single program which will enhance patient safety while limiting the potential administrative burden on prescribers and their patients. One common program also ends the disparity in prescribing requirements for ONSOLIS® compared to similar products and provides ONSOLIS® with both retail and inpatient facility access. Healthcare professionals and patients enrolled in the prior ONSOLIS® REMS will be automatically transferred into the new TIRF REMS Program. Additionally, prescribers and patients enrolled in other individuals REMS programs will also automatically be transferred into the program. In addition to consistency in educational materials, technological advances will simplify the process of participation and verification of program participation. The full program is expected to be implemented in March 2012. At that point, it is anticipated that ONSOLIS® will be in a better position to compete on its own merits.

On March 12, 2012, we announced the postponement of the U.S. relaunch of ONSOLIS® until the product formulation can be modified to address two appearance issues raised by FDA following a recent inspection of the manufacturing facility of our North American manufacturing partner for ONSOLIS®, Aveva Drug Delivery Systems, Inc. (which we refer to herein as Aveva). Specifically, the FDA identified the formation of microscopic crystals and a slight fading of the color during the 24-month shelf life of the product. While these changes do not affect the product's underlying integrity or safety, the FDA believes that the fading of the color in particular may potentially confuse patients, necessitating a modification of the product and product specification before additional product can be manufactured and distributed. Therefore, the U.S. relaunch and additional manufacturing of ONSOLIS® has been postponed until such product appearance issues have been resolved.

2

Table of Contents

*BEMA® Buprenorphine*

Our next product, currently in development, is BEMA® Buprenorphine, a potential treatment for moderate to severe chronic pain. In December 2009, we announced that the primary efficacy endpoint was achieved in a Phase 2 clinical study evaluating the safety and efficacy of a range of doses of BEMA® Buprenorphine. Completion of this Phase 2 study led to the initiation of a Phase 3 double-blind, randomized, placebo-controlled clinical study which was initiated in the fourth quarter of 2010. On September 28, 2011, we announced the preliminary findings of our randomized, placebo-controlled, Phase 3 clinical study of BEMA® Buprenorphine for the treatment of moderate to severe chronic pain in a mixed opioid naïve and opioid experienced population. The primary endpoint of the study, overall pain intensity difference between BEMA® Buprenorphine and placebo, was not achieved. Following full analysis of the data, we concluded that we encountered a high placebo response in the opioid naïve segment of the patient population, particularly at our starting dose, which we believe accounted for the lack of statistically significant efficacy that was observed in the trial overall. This is an occurrence typical of many pain trials, and we feel this can be addressed in future studies with adjustments to our patient population, study criteria, starting dose and sample size. We believe the totality of the study results favor BEMA® Buprenorphine, including a near statistically significant difference between BEMA® Buprenorphine and placebo in the opioid experienced group of patients in the trial (p=0.067). In addition, when eliminating the group of patients that did not titrate beyond the starting dose, a statistically significant difference between BEMA® Buprenorphine and placebo (p=0.025) was identified. Neither of these subgroups was sufficiently large enough to be powered to show a statistical difference; however, the robust results in these subgroups resulted in near statistical significance in the opioid experienced patients and statistical significance in the opioid experienced patients titrating beyond the starting dose. Overall, the trial, though not successful, has provided a wealth of knowledge that will assist us in the final design of what we believe will be successful future clinical studies.

We believe that our outlook on BEMA® Buprenorphine was validated when, in January 2012, we announced the signing of a worldwide licensing and development agreement for BEMA® Buprenorphine with Endo Pharmaceuticals, Inc. (which we refer to herein as Endo) under which we granted to Endo the exclusive, worldwide rights to develop and commercialize BEMA® Buprenorphine for the treatment of chronic pain. The financial terms of our agreement with Endo include: (i) a $30 million upfront payment, which we received in January 2012; (ii) $95 million in potential milestone payments based on achievement of pre-defined intellectual property, clinical development and regulatory events; (iii) $55 million in potential sales milestones upon achievement of designated sales levels; and (iv) a tiered, mid- to upper-teen royalty on net sales of BEMA® Buprenorphine in the United States and a mid- to high-single digit royalty on net sales of BEMA® Buprenorphine outside the United States. We expect to use portions of our Endo milestone payments to fund our development obligations under the Endo agreement with respect to BEMA® Buprenorphine.

One of the key intellectual property milestones under our Endo agreement was achieved when, in February 2012, the U.S. Patent and Trademark Office (or USPTO) issued a Notice of Allowance regarding one of our patent applications (No. 13/184306) which, once the patent is granted, will extend the exclusivity of the BEMA® drug delivery technology for BEMA® Buprenorphine (as well as BEMA® Buprenorphine/Naloxone, discussed below) from 2020 to 2027. As a result, we will be entitled to a milestone payment in the amount of $15 million upon the final granting of this patent and an additional milestone payment of $20 million at the time of approval of a New Drug Application (or NDA) by the FDA for BEMA® Buprenorphine for the treatment of chronic pain.

Endo is one of the premier companies in the area of pain management and has demonstrated significant achievements in the pain space, particularly with the development, launch and commercialization of a portfolio of pain therapeutics including opioids. Endo currently has approximately 650 sales representatives covering pain specialty and primary care physicians. Endo's current branded pain portfolio exceeds $2 billion in annual sales and includes products such as Opana ER, Lidoderm and Voltaren Gel. Endo has strong sales and marketing capability in pain therapeutics, and a managed care organization that has established solid formulary positioning for the company's products. We believe BEMA® Buprenorphine is an excellent fit to Endo's pain portfolio and will, if approved, add a Schedule III opioid to their branded pain franchise. BEMA® Buprenorphine would complement Endo's pain therapeutics portfolio providing the company with an opportunity to offer a "ladder" of pain products, aligned with pain severity and opioid scheduling. In particular, BEMA® Buprenorphine would potentially be aligned with the needs of pain specialists and primary care physicians who seek an alternative to Schedule II opioids for the treatment of moderate to severe chronic pain that is not adequately controlled with commonly prescribed first-line therapies (e.g., NSAIDs).

3

Table of Contents

*BEMA® Buprenorphine/Naloxone*

In addition, we believe that the widespread use of buprenorphine for the treatment of opioid dependence presents an additional commercial opportunity for the product, and we are developing a formulation of BEMA® Buprenorphine specifically for the treatment of opioid dependence. The product will combine a "high dose" of buprenorphine along with an abuse deterrent agent, naloxone. A BEMA® Buprenorphine/Naloxone product would provide us with an opportunity to compete in a rapidly growing opioid dependence market which, according to Wolters Kluwer, currently exceeds $1.4 billion in annual sales in the U.S.

Pharmacokinetic studies have demonstrated the ability of the BEMA® technology to deliver the high doses of buprenorphine necessary for the treatment of opioid dependence. In March 2011, we announced the positive outcome of a pre-Investigational New Drug (pre-IND) meeting with the FDA on the development program for BEMA® Buprenorphine/Naloxone, at which we confirmed that the 505(b)(2) regulatory pathway will be pursued for the clinical development of this product. In September 2011, we announced positive preliminary results from a study assessing the pharmacokinetics of a BEMA® Buprenorphine/Naloxone combination. The study assessed buprenorphine and naloxone absorption profiles compared to the FDA approved and currently marketed opioid dependence product, Suboxone. Results of the study demonstrated the ability of the BEMA® formulation to meet the key pharmacokinetic goal of delivering plasma concentrations of buprenorphine in the range needed to treat opioid dependence while minimizing the exposure of naloxone. In December 2011, we announced positive results of a second pharmacokinetic study and plans to meet with FDA to confirm the development plan and regulatory strategy going forward. A meeting was held with FDA in early February 2012, and following the meeting, we announced that we had reached an agreement with the FDA on the development plan for BEMA® Buprenorphine/Naloxone, which includes a pivotal pharmacokinetic study comparing BEMA® Buprenorphine/Naloxone to Suboxone in normal volunteers and a supporting safety study in opioid dependent patients. The FDA concurred with our strategy while requesting one additional, non-comparative pharmacokinetic study examining the effects of multiple films administered concurrently. A similar study was requested and completed as part of the NDA for ONSOLIS®. We plan to initiate a pivotal bioequivalence study and safety study by mid-2012. Based on current timelines, we believe we may be in a position to submit a NDA in the first half of 2013.

ONSOLIS® and our product candidates such as BEMA® Buprenorphine may also have broader indications. When presented with viable commercial opportunities for broader indications of our products, we will consider developing the product for those uses. We also continue to explore the use of the BEMA® technology with additional pharmaceutical products that may fulfill an unmet medical need.

*Additional Overview Information*

From our inception through December 31, 2011, we have recorded accumulated losses totaling approximately $95.6 million. Our historical operating losses have resulted principally from our research and development activities, including clinical trial activities for our product candidates and general and administrative expenses. Ultimately, if we secure additional approvals from the FDA and other regulatory bodies throughout the world for our product candidates, our goal will be to augment our current sources of revenue and, as applicable, deferred revenue (principally licensing fees), with sales of such products or royalties from such sales, on which we may pay royalties or other fees to our licensors and/or third-party collaborators as applicable.

We intend to finance our research and development, commercialization and distribution efforts and our working capital needs primarily through:

- commercializing ONSOLIS® and other of our candidate products;

- partnering with other pharmaceutical companies such as Meda and Endo to assist in the distribution of our products for which we would expect to receive upfront milestone and royalty payments;

- licensing and joint venture arrangements with third parties, including other pharmaceutical companies whose own proprietary pharmaceutical products may benefit from our drug delivery technologies, or where their product profile would be augmented by the inclusion of our products; and

- securing proceeds from public and private financings and other strategic transactions.

4

Table of Contents

We have based our estimates of development costs, market size estimates, peak annual sales projections and similar matters described below and elsewhere in this Report on our market research, third party reports and publicly available information which we consider reliable. However, readers are advised that the projected dates for filing and approval of our Investigational New Drug Applications (known as INDs) or New Drug Applications (known as NDAs) with the FDA or other regulatory authorities, our estimates of development costs, our projected sales and similar metrics regarding ONSOLIS®, BEMA® Buprenorphine, BEMA® Buprenorphine/Naloxone or any other product candidates discussed below and elsewhere in this Report are merely estimates and subject to many factors, many of which may be beyond our control, which will likely cause us to revise such estimates. Readers are also advised that our projected sales figures do not take into account the royalties and other payments we will need to make to our licensors and strategic partners. Our estimates are based upon our management's reasonable judgments given the information available and their previous experiences, although such estimates may not prove to be accurate.

**Our Drug Delivery Technologies**

*BEMA® Technology*

Our BioErodible MucoAdhesive (known as BEMA®) drug delivery technology consists of a small, bi-layered erodible polymer film for application to the buccal mucosa (the lining inside the cheek). BEMA® films have the capability to deliver a rapid, reliable dose of drug across the buccal mucosa for time-critical conditions such as "breakthrough" cancer pain or in situations where gastrointestinal absorption of an oral drug is not practical or reliable, such as nausea and vomiting.

We believe that the BEMA® technology permits control of two critical factors allowing for better dose-to-dose reproducibility: (i) the contact area for mucosal drug delivery, and (ii) the time the drug is in contact with that area, known as residence time. In contrast to competing transmucosal delivery systems like lozenges, buccal tablets and matrix-based delivery systems placed under the tongue or sprayed in the oral cavity, BEMA® products are designed to:

- adhere to mucosa in seconds and dissolve in minutes;

- permit absorption without patients being required to move the product around in the mouth for absorption, thus avoiding patient intervariability;

- provide a reproducible delivery rate, not susceptible to varying or intermittent contact with oral membranes; and

- dissolve completely, leaving no residual product or waste and avoiding patient removal, and the possibility for diversion or disposal of partially used product.

We currently own the BEMA® drug delivery technology. We previously licensed the BEMA® drug delivery technology on an exclusive basis from Atrix Laboratories (previously known as QLT USA, Inc., now known as TOLMAR Therapeutics, Inc., which we refer to herein as Tolmar). For a description of our previous agreements with Tolmar, see "Key Collaborative and Supply Agreements" below.

*Bioral® Technology*

We have previously engaged in development efforts with another drug delivery technology, known as the Bioral® technology, although we are not presently (and did not in 2011) dedicate any time or resources to the development of this technology or any related products. The Bioral® technology seeks to encapsulate a selected drug or therapeutic in a crystalline structure termed a "cochleate" cylinder. All of the components of the cochleate cylinder are naturally occurring substances. The Bioral® drug delivery technology was developed in collaboration with the University of Medicine and Dentistry of New Jersey, which we refer to herein as UMDNJ, and the Albany Medical College (which we refer to herein, collectively with UMDNJ, as the Universities), each of which has granted us the exclusive worldwide licenses under applicable patents.

5

Table of Contents

**ONSOLIS® and Our BEMA® Product Candidates**

The following table summarizes the status of our marketed product and our current product candidates and product concepts:

| Product/Formulation | Indication | Development Status | Commercial Status |
|---|---|---|---|
| BEMA® Fentanyl ONSOLIS®/BREAKYL™ (U.S./EU trade names) | Breakthrough cancer Pain in opioid tolerant patients | Approval: U.S. in July 2009; Canada in May 2010; E.U. in October 2010 | Partnered worldwide with Meda AB |
| BEMA® Buprenorphine | Moderate to severe chronic pain | Phase 3 results announced September 2011 | Partnered worldwide with Endo Pharmaceuticals |
| BEMA® Buprenorphine/Naloxone | Treatment of opioid dependency | Pivotal studies planned for 2012; NDA filing anticipated first half 2013 | In-house commercialization or partnership. |
| BEMA® Granisetron | Prevention of nausea and vomiting associated with cancer therapies | IND filing February 2011 | In-house commercialization for specialty indications possible; primary care rights expected to be partnered |

While continuing to work closely with Meda on ONSOLIS® (including on regulatory approvals in the E.U. and other worldwide jurisdictions (except for Taiwan where we are working with TTY and in South Korea where we are working with Kunwha)), we are presently dedicating much of our corporate resources to developing our pipeline of BEMA® products, particularly BEMA® Buprenorphine and BEMA® Buprenorphine/Naloxone. Depending on the availability of corporate resources and market opportunities, we may elect to accelerate or scale back funding for the development of other programs such as BEMA® Granisetron or other opportunities that we may identify.

*BEMA® Formulated Products and Product Candidates*

*ONSOLIS®*

Approved by the FDA in July 2009 and commercially launched in October 2009, ONSOLIS® (fentanyl buccal soluble film) is an approved treatment for the management of "breakthrough" pain (pain that "breaks through" the effects of other medications being used to control persistent pain) in patients with cancer, eighteen years of age and older, who are already receiving, and who are tolerant to, opioid therapy for their underlying persistent cancer pain. ONSOLIS® is a formulation of the narcotic fentanyl delivered through our BEMA® technology.

We have granted commercialization and distribution rights for ONSOLIS® on a worldwide basis (except in South Korea and Taiwan) to Meda. Under our agreements with Meda, we receive a double digit royalty on the net sales of ONSOLIS® and also have the potential to receive milestone payments based on achieving certain predetermined sales targets. In May 2010, ONSOLIS® was approved by the Canadian regulatory authorities. ONSOLIS® is marketed in Canada by Meda Valeant Pharma Canada, Inc., a joint venture between Meda and Valeant Canada Limited. Approval was also obtained in the E.U. in October 2010, where the product will be marketed by Meda under the tradename BREAKYL™. In May 2010, we announced a commercialization and supply agreement with Kunwha Pharmaceutical Co. Ltd., for BEMA® Fentanyl in South Korea, and in October 2010, a licensing agreement was secured with TTY Biopharm Co. Ltd., for exclusive rights to develop and commercialize the product in Taiwan. These licensing deals provide the opportunity for ONSOLIS®/BREAKYL™ to be commercialized in all regions globally.

6

# Exhibit 16

REDACTED IN ITS ENTIRETY

# Exhibit 17

| From: | Josephine Kim |
|---|---|
| Sent: | Wednesday, March 11, 2020 10:59 PM |
| To: | Sullivan, Thomas; Levine, Howard; Swan, Jennifer; Chung, Daniel; Galgano, Michael; Fletcher Price, Bonnie; Ecklund, Steve; EXT-JTigan@mnat.com; Lyons, Jeffrey J.; Hasford, Justin |
| Cc: | Chemo Buprenorphine Film; godfrey.geoff@dorsey.com; SWilson@ycst.com; agaza@ycst.com; Sklar, Steven; Bays, Gregory; Szelag, Ashlee |
| Subject: | RE: BDSI v. Chemo / IGX, 19-444-CFC-CJB |

Counsel,

BDSI's response is a transparent attempt to delay Chemo's requested meet-and-confer by a full week. The parties are just two weeks away from the close of fact discovery and have no time for such gamesmanship. We believe Magistrate Judge Burke would also be displeased by BDSI's tactics. BDSI has known about these pending discovery issues for weeks, so a meet-and-confer should come as no surprise. Please provide a date **this week** that BDSI is available to meet-and-confer.

BDSI's request that the Chemo and Alvogen defendants coordinate in discovery is disingenuous given that BDSI has repeatedly left Chemo out of discovery communications throughout fact discovery. In the past few days alone Chemo has reminded BDSI twice of such occurrences. *See* Chemo Email on March 4, 12:29PM ET (requesting BDSI provide its invalidity rog responses served only on Alvogen) and Chemo's Email on March 5, 4:00PM ET (reminding BDSI that it must include Chemo in deposition discussions with Alvogen, when it became clear that Chemo had been left out of such discussions). BDSI will also recall that in January and February, BDSI routinely ignored most if not all of Chemo's discovery-related emails and cut Chemo out of BDSI's discovery and scheduling correspondences with Alvogen. Even in your note below, BDSI addresses Alvogen-specific issues but fails to include Alvogen's counsel on the note—yet another example of BDSI not making even minimal efforts to include both defendant groups in its correspondences, while demanding that defendants coordinate.

Alvogen is welcome to join this week's meet-and-confer, but BDSI cannot delay the meet-and-confer based on Alvogen's attendance.

Regards,
Josephine

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

**From:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>
**Sent:** Wednesday, March 11, 2020 8:19 AM
**To:** Josephine Kim <JOSKIM@sternekessler.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Lyons, Jeffrey J. <jlyons@MNAT.com>;

Hasford, Justin <Justin.Hasford@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com;
SWilson@ycst.com; agaza@ycst.com
**Subject:** RE: BDSI v. Chemo / IGX, 19-444-CFC-CJB

Josephine,

Plaintiffs are not available to meet and confer today but are available either Monday or Tuesday afternoon.  Please let
us know your availability.

Moreover, if Chemo plans to discuss either BDSI's responses to Defendants' 30(b)(6) topics or Defendants' Third Set of
Interrogatories, or the deposition of Mark Sirgo, please confirm that Alvogen will be present.  These issues cannot be
raised by Chemo alone; Chemo is required to coordinate its discovery with Alvogen.

And as for Alvogen, please confirm that Alvogen will be prepared to discuss the issues raised in Mr. Hasford's emails to
Mr. Sklar concerning the depositions of Alvogen's witnesses.

Warm regards,
Tom

**Thomas J. Sullivan**
Attorney at Law
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4005 | fax: 202.408.4400| thomas.sullivan@finnegan.com | www.finnegan.com

# FINNEGAN

**From:** Josephine Kim <JOSKIM@sternekessler.com>
**Sent:** Tuesday, March 10, 2020 6:38 PM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan,
Jennifer <Jennifer.Swan@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael
<Michael.Galgano@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>; Ecklund, Steve
<steve.ecklund@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Lyons, Jeffrey J. <jlyons@MNAT.com>;
Hasford, Justin <Justin.Hasford@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com;
SWilson@ycst.com; agaza@ycst.com
**Subject:** RE: BDSI v. Chemo / IGX, 19-444-CFC-CJB

**EXTERNAL Email:**

Counsel,

Following up on my email below, please let us know when you are available for a meet-and-confer tomorrow before
2PM ET. We would also like to discuss Mark Sirgo's deposition on that call.

Thanks,
Josephine

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**

**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600    **Direct:** 202.772.8648

---

**From:** Josephine Kim
**Sent:** Monday, March 9, 2020 6:38 PM
**To:** 'Sullivan, Thomas' <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Lyons, Jeffrey J. <jlyons@MNAT.com>; Hasford, Justin <Justin.Hasford@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com; SWilson@ycst.com; agaza@ycst.com
**Subject:** RE: BDSI v. Chemo / IGX, 19-444-CFC-CJB

Counsel,

We would like to meet-and-confer regarding the discovery issues in Chemo's February 20 and BDSI's March 5 letters. Please let us know your availability on Wednesday, March 11 between 10AM-2PM ET for a call. We ask that local counsel join as well.

Thanks,
Josephine

---

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600    **Direct:** 202.772.8648

---

**From:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>
**Sent:** Thursday, March 5, 2020 6:13 PM
**To:** Josephine Kim <JOSKIM@sternekessler.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Lyons, Jeffrey J. <jlyons@MNAT.com>; Hasford, Justin <Justin.Hasford@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com; SWilson@ycst.com; agaza@ycst.com
**Subject:** RE: BDSI v. Chemo / IGX, 19-444-CFC-CJB

Counsel,

Please see the attached correspondence.

Warm regards,
Tom

**Thomas J. Sullivan**

Attorney at Law
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4005 | fax: 202.408.4400| thomas.sullivan@finnegan.com | www.finnegan.com

# FINNEGAN

**From:** Josephine Kim <JOSKIM@sternekessler.com>
**Sent:** Thursday, February 20, 2020 6:56 PM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; Fletcher Price, Bonnie <Bonnie.FletcherPrice@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; Lyons, Jeffrey J. <jlyons@MNAT.com>; Hasford, Justin <Justin.Hasford@finnegan.com>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com; SWilson@ycst.com; agaza@ycst.com
**Subject:** BDSI v. Chemo / IGX, 19-444-CFC-CJB

*EXTERNAL* Email:

Counsel,

Please see attached.

Regards,
Josephine



**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1100 New York Avenue, NW, Washington, DC 20005

**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

*Notice: The information in this electronic transmission (including any attachments) may contain confidential or legally privileged information and is intended solely for the individual(s) or entity(ies) named above. If you are not an intended recipient or an authorized agent, you are hereby notified that reading, distributing, or otherwise disseminating or copying, or taking any action based on the contents of this transmission is strictly prohibited. Any unauthorized interception of this transmission is illegal under the law. If you have received this transmission in error, please immediately notify the sender by return email and then destroy all copies of the transmission.*

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise

exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit 18

| From: | Sullivan, Thomas <Thomas.Sullivan@finnegan.com> |
|---|---|
| Sent: | Friday, March 27, 2020 3:00 PM |
| To: | Josephine Kim; Levine, Howard; Swan, Jennifer; Hasford, Justin; Chung, Daniel; Galgano, Michael; EXT-JTigan@mnat.com; EXT-JBlumenfeld@mnat.com |
| Cc: | Chemo Buprenorphine Film; godfrey.geoff@dorsey.com; tseng.david@dorsey.com; EXT- meiklejohn.pau; Gaza, Anne Shea; Wilson, Samantha |
| Subject: | RE: BDSI v. Alvogen and Chemo/IGX - Case schedule |

Hi Josephine, thank you for your email and Chemo's proposal.  We are discussing it with our client.  Is there a time next week you are available to discuss further?

Best,
Tom

**Thomas J. Sullivan**
Attorney at Law
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
202.408.4005 | fax: 202.408.4400| thomas.sullivan@finnegan.com | www.finnegan.com

# FINNEGAN

**From:** Josephine Kim <JOSKIM@sternekessler.com>
**Sent:** Friday, March 27, 2020 9:52 AM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Hasford, Justin <Justin.Hasford@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; EXT-JBlumenfeld@mnat.com <JBlumenfeld@mnat.com>; Sklar, Steven <ssklar@leydig.com>; Bays, Gregory <gbays@leydig.com>; Gattuso, D <dgattuso@hegh.law>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com; tseng.david@dorsey.com; EXT- meiklejohn.pau <meiklejohn.paul@dorsey.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: BDSI v. Alvogen and Chemo/IGX - Case schedule

*EXTERNAL* **Email:**

All,

Please send your availability for a meet-and-confer today to discuss the case schedule.

Thanks,
Josephine

**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

---

**From:** Josephine Kim <JOSKIM@sternekessler.com>
**Sent:** Thursday, March 26, 2020 4:34 PM
**To:** Sullivan, Thomas <Thomas.Sullivan@finnegan.com>; Levine, Howard <howard.levine@finnegan.com>; Swan, Jennifer <Jennifer.Swan@finnegan.com>; Hasford, Justin <Justin.Hasford@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Galgano, Michael <Michael.Galgano@finnegan.com>; EXT-JTigan@mnat.com <JTigan@mnat.com>; EXT-JBlumenfeld@mnat.com <JBlumenfeld@mnat.com>; Sklar, Steven <ssklar@leydig.com>; Bays, Gregory <gbays@leydig.com>; Gattuso, D <dgattuso@hegh.law>
**Cc:** Chemo Buprenorphine Film <ChemoBuprenorphineFilm@sternekessler.com>; godfrey.geoff@dorsey.com; tseng.david@dorsey.com; EXT- meiklejohn.pau <meiklejohn.paul@dorsey.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** BDSI v. Alvogen and Chemo/IGX - Case schedule

Counsel,

In light of the current circumstances associated with COVID-19, as well as outstanding discovery issues, Chemo proposes that the parties extend all case deadlines including the trial dates (currently scheduled for Sept 2020 and Feb 2021) by 6 months.

Please let us know your thoughts, as well as your availability for a meet-and-confer tomorrow to discuss.

Thanks,
Josephine



**Josephine Kim**
Associate
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1100 New York Avenue, NW, Washington, DC 20005

**Email:** joskim@sternekessler.com
**Direct:** 202.772.8896

**Administrative Assistant:** Claire Shin
**Main:** 202.371.2600   **Direct:** 202.772.8648

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

# Exhibit 19

## THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

| | |
|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC., and ARIUS TWO, INC., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 18-1395-CFC |
| ALVOGEN PB RESEARCH & DEVELOPMENT LLC, ALVOGEN MALTA OPERATIONS LTD., ALVOGEN PINE BROOK LLC, ALVOGEN, INC., and ALVOGEN GROUP, INC., | |
| *Defendants.* | |
| BIODELIVERY SCIENCES INTERNATIONAL, INC., and ARIUS TWO, INC., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:19-cv-444-CFC |
| CHEMO RESEARCH S.L., INSUD PHARMA S.L.U., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., | |
| *Defendants.* | |

## **DEFENDANTS' NOTICE OF RULE 30(b)(6) DEPOSITION OF PLAINTIFFS**

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Defendants Alvogen

PB Research & Development LLC, Alvogen Malta Operations, Ltd., Alvogen Pine Brook, LLC,

Alvogen, Inc., and Alvogen Group, Inc. (collectively "Alvogen"), and Defendants Chemo

Research S.L., Insud Pharma S.L.U., IntelGenx Corp., IntelGenx Technologies Corp.,

(collectively "Chemo"), by and through their undersigned attorneys, will take the testimony by

deposition upon oral examination of Plaintiffs BioDelivery Sciences International, Inc. and Arius

Two, Inc. ("Plaintiffs").  The deposition will commence at 9:00 a.m. on January 23, 2020, at the

offices of Heyman Enerio Gattuso & Hirzel LLP, 3000 Delaware Avenue, Suite 200,

Wilmington, Delaware 19801, or at such other time, date, and location mutually agreed to by the

parties.

 The deposition will take place in accordance with the Federal Rules of Civil Procedure

and the Local Rules of the United States District Court for the District of Delaware, and under

oath and before a notary public or other officer authorized to administer oaths under law.  The

deposition will be recorded by stenographic and/or audio and videographic means, and will

continue from day to day until completed.  You are invited to attend.

 PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 30(b)(6), Plaintiffs shall

designate one or more officers, directors, managing agents, or other persons who are

knowledgeable concerning each of the topics, including sub-topics, listed in Schedule A on

which examination is requested.  No later than seven days prior to the deposition date, Plaintiffs

shall designate in writing to Defendants the name and employment position of each designee

who will testify on behalf of Plaintiffs, and the topics set forth in Schedule A as to which each

designee will testify.

/s/ Dominick T. Gattuso
Dominick T. Gattuso (#3630)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, Delaware 19801
302-472-7300
dgattuso@hegh.law

*Attorney for Defendants Alvogen PB Research &*
*Development LLC, Alvogen Malta Operations*
*Ltd., Alvogen Pine Brook LLC, Alvogen, Inc., and*
*Alvogen Group, Inc.*

OF COUNSEL:
Steven H. Sklar
Gregory C. Bays
Ashlee B. Szelag
LEYDIG, VOIT & MAYER LTD.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601
312-616-5600
ssklar@leydig.com
gbays@leydig.com
aszelag@leydig.com


Dated: December 13, 2019

/s/ Samantha G. Wilson
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
YOUNG CONWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Chemo Research, S.L.*
*Insud Pharma S.L.U., IntelGenx Corp., and*
*IntelGenx Technologies Corp.*

OF COUNSEL:
Dennies Varughese, Pharm. D.
Adam C. LaRock
Lauren A. Watt
Charles Wysocki
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 New York Avenue NW, Suite 600
Washington, DC 20005
(202) 371-2600
dvarughese@sternekessler.com
alarock@sternekessler.com
lwatt@sternekessler.com
cwysocki@sternekessler.com

Paul T. Meiklejohn
Geoffrey M. Godfrey
David Tseng
DORSEY & WHITNEY LLP
701 Fifth Avenue, Ste. 6100
Seattle, WA 98104
(206) 903-8800
meiklejohn.paul@dorsey.com
godfrey.geoff@dorsey.com
tseng.david@dorsey.com

## SCHEDULE A

Definitions

1.      "Plaintiffs" shall mean Plaintiffs BioDelivery Sciences International, Inc. and Arius Two, Inc., and any current or former parent, subsidiary, affiliated or related corporation or any other related entities as well as all past and present directors, officers, employees, agents, representatives, or persons acting on behalf of any of the foregoing entities.

2.      "Endo" shall mean Endo Pharmaceuticals Inc. and any of its predecessors, subsidiaries, domestic or foreign divisions, departments, parents, affiliates, present or former officers, directors, employees, agents, representatives, entities, acting in consort, joint-venture, or partnership relationship with them, and others acting on their behalf, including but not limited to Endo International plc.

3.      "Patents-in-suit" refers collectively to U.S. Patent No. 8,147,866, issued on April 3, 2012, U.S. Patent No. 9,655,843, issued on May 23, 2017, and U.S. Patent No. 9,901,539, issued on February 27, 2018.

4.      "Asserted claims" means the claims asserted by Plaintiffs against Alvogen and/or Chemo in the above-captioned litigations.

5.      "Named Inventor" shall mean any person identified as an inventor on the face of any one of the Patents-in-suit.

6.      "FDA" shall mean the United States Food and Drug Administration, including any employees thereof.

7.      "Orange Book" means FDA's electronic publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations."

8.      "NDA" shall mean any New Drug Application filed with the FDA pursuant to 21 U.S.C. § 355(b) and held by Plaintiffs.

9.      The term "IND" means any Investigational New Drug application filed with the FDA pursuant to 21 C.F.R. § 312 and held by Plaintiffs.

10.      "Belbuca®" means the drug product referenced in NDA No. 207932

11.      "Bunavail®" means the drug product referenced in NDA No. 205637

12.      "Alvogen's ANDA Product" means the drug product described in ANDA No. No. 211594.

13.      "Chemo's ANDA Product" means the drug product described in ANDA No. 212036.

14.      "The Buprenorphine Buccal Film Lawsuits" means the following infringement suits: *BioDelivery Sciences International, Inc. v. Actavis Laboratories UT, Inc.*, C.A. No. 16-175 (GMS) (D. Del. filed March 18, 2016), *BioDelivery Sciences International, Inc. v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 16-1303 (GMS) (D. Del. filed December 22, 2016), *BioDelivery Sciences International, Inc. et al. v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 17-118 (GMS) (D. Del. filed February 3, 2017), and *BioDelivery Sciences International, Inc. et al. v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 17-282 (GMS) (D. Del. filed March 16, 2017).

15.      "Prior Art" constitutes all documentary and non-documentary sources relevant to lack of novelty under 35 U.S.C. § 102 and obviousness under 35 U.S.C. § 103 of the claims of the Patents-in-suit including but not limited to, patents, patent applications, printed publications, other documents and tangible things.

16.      "PTO" means U.S. Patent and Trademark Office.

17.     "EPO" means European Patent Office.

18.     "Document" is used in a comprehensive sense as set forth in Rule 34(a) of the Federal Rules of Civil Procedure, including without limitation, electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

19.     "Communication" shall mean any inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, notes, telegrams, advertisements, ideas, or other forms of information exchanged by any means, whether oral, electronic, or written as well as any document or electronic file recording, summarizing, storing or memorializing same.

20.     "Person" shall mean any natural person or any business, legal or governmental entity or association.

21.     "Reflecting," "concerning," "regarding," "relating to," or "referring to" means all documents or information that comprises, evidences, constitutes, describes, explicitly or implicitly refers to, was reviewed in conjunction with, or was generated as a result of the subject matter of the request, including but not limited to, all documents that reflect, record, memorialize, discuss, evaluate, consider, review, report, or relate to the subject matter of the request.

22.     "And" and "or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope, and the use of the singular form of any word includes the plural and vice versa; "any" and "all" shall mean one or more.

23.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include all others, as appropriate in context.

24.     The term "including" means including but not limited to.

## Rule 30(b)(6) Deposition Topics

1.      The preparation, filing, and prosecution of the applications relating to the Patents-in-suit and associated foreign counterpart patents and/or applications, including

   a.   the applications that led to the Patents-in-suit, as well as any co-pending and/or currently pending applications related to the Patents-in-suit;

   b.   the patent applications to which the Patents-in-suit claim priority;

   c.   all communications to or from any domestic or foreign patent office, including but not limited to the PTO and EPO;

   d.   the preparation of any declaration(s) submitted to any domestic or foreign patent office in support of the patentability of the invention(s) disclosed and/or claimed in the Patents-in-suit, including the declarations of Andrew Finn (BEL00000231-234) and Niraj Vasisht (BEL00000286-288; BEL00003132-135; and BEL00007266-268);

   e.    the factual basis for any and all statements made in any declaration(s) to any domestic or foreign patent office in support of the patentability of the inventions(s) disclosed and/or claimed in the Patents-in-suit, including the declarations of Andrew Finn (BEL00000231-234) and Niraj Vasisht (BEL00000286-288; BEL00003132-135; and BEL00007266-268);

   f.   the identity of person(s) most knowledgeable of the foregoing; and

   g.   the existence and identity of any documents, communications, or things supporting, contradicting, or otherwise relating to the foregoing.

2.      The contribution(s) of each of the Named Inventors to the alleged inventions of the Asserted claims of the Patents-in-suit, including but not limited to: (a) what each Named Inventor did to conceive of or form the invention(s) described in the Patents-in-suit, (b) what each Named Inventor did to create an embodiment or perform a process described in the Patents-in-suit, (c) the date on which any of the Named Inventors conceived of or constructed an embodiment of the invention(s) disclosed in claims of the Patents-in-suit, (d) the date on which any such embodiments or processes were shown to work, and (e) the length of time that each of the Named Inventors spent working on the subject matter described in the Patents-in-suit.

3.      The examples, experiments, and testing (including clinical testing) disclosed in the Patents-in-suit including all data, test results, figures, examples, tables, formulations, and preparations.

4.      Clinical studies of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including: (a) protocols of such clinical studies, (b) results of such clinical studies, (c) pharmacokinetic data from such clinical studies; (d) publications or other disclosures of the results of such clinical studies; and (e) disclosure of such clinical studies or results.

5.      The components of Belbuca®, including (a) the reasons for the selection of each component, (b) the function of each component, (c) the chemical and biological properties of each component, (d) the identification of any publications or other documents that the inventors relied on to obtain information about the components, and (e) the identification of any third-parties that the inventors consulted to obtain information about the components.

6.      The components of Bunavail®, including (a) the reasons for the selection of each component, (b) the function of each component, (c) the chemical and biological properties of

each component, (d) the identification of any publications or other documents that the inventors relied on to obtain information about the components, and (e) the identification of any third-parties that the inventors consulted to obtain information about the components.

7.      Testing, analysis, research, experimentation, evaluations, or investigations concerning the pH of any layer (including the mucoadhesive and backing layers), whether conducted by or on behalf of Plaintiffs, of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the current pH of both the mucoadhesive and backing layers, and whether those numbers are a range and, if so, what the range is, (b) the identity of those involved and the location of any such testing, (c) the procedures, protocols, and conditions for any testing of the pH of both the mucoadhesive and the backing layers; (d) points in the manufacturing process when the pH of either/both the mucoadhesive and the backing layers are measured; (e) the development of the current pH of the mucoadhesive and the backing layers, including any changes in pH of either layer at any time during development; (f) any decision to modify, alter, or change the pH of either layer; and (g) whether the pH of the mucoadhesive and the backing layers change from the wet blend stage to any later stage, including during the curing or casting process.

8.      The properties and characteristics of each backing layer made either in preparation for or in connection with Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) an identification of each such backing layer; (b) the chemical composition of each such backing layer, including the identity and amounts of each excipient in the backing layer and the bases for the inclusion of each excipient; (c) the measured pH of each such backing layer, whether measured in solution or otherwise; (d) the method or methods used to measure the pH of each such backing layer; (e) the

device(s) used to measure each such backing layer and the margin of error of such equipment used to measure the pH of each such backing layer; (f) the margin of error permitted by both Plaintiffs or the FDA in such pH measurements of each such backing layer; (g) any manufacturing or regulatory specification for the pH of the backing layer; (h) the target pH of each such backing layer; (i) the reasons for any difference between the target and measured pH of each such backing layer; and (j) the reasons why Plaintiffs selected a particular pH for each such backing layer.

9.     The properties and characteristics of each mucoadhesive layer made either in preparation for or in connection with Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) an identification of each such mucoadhesive layer; (b) the chemical composition of each such mucoadhesive layer, including the identity and amounts of each excipient in the mucoadhesive layer and the bases for the inclusion of each excipient; (c) the measured pH of each such mucoadhesive layer, whether measured in solution or otherwise; (d) the method or methods used to measure the pH of each such mucoadhesive layer; (e) the device(s) used to measure each such mucoadhesive layer and the margin of error of such equipment used to measure the pH of each such mucoadhesive layer; (f) the margin of error permitted by both Plaintiffs or the FDA in such pH measurements of each such mucoadhesive layer; (g) any manufacturing or regulatory specification for the pH of the mucoadhesive layer; (h) the target pH of each such mucoadhesive layer; (i) the reasons for any difference between the target and measured pH of each such mucoadhesive layer; and (j) the reasons why Plaintiffs selected a particular pH for each such mucoadhesive layer.

10.     Testing, analysis, research, experimentation, evaluations, or investigations concerning the use of any buffer, buffering agent, or buffer system in Belbuca®, Bunavail®, and

any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the reasons for the presence or absence of a buffer, buffering agent, or buffer system in each formulation or batch of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; (b) the development of the current buffer, buffering agent, or buffer system in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including any changes at any time during development; (c) the reasons why Plaintiffs selected a particular buffering agent or buffer system in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; and (d) any comparisons between formulations of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit containing a buffer, buffering agent, or buffer system and formulations that do not contain such a buffer, buffering agent, or buffer system.

11.     Testing, analysis, research, experimentation, evaluations, or investigations of the pharmacokinetic parameters associated with any transmucosal drug delivery device containing buprenorphine (for example, Tmax, Cmax, and AUC), including Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the development of the current pharmacokinetic parameters in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; and (b) the reasons why Plaintiffs selected particular pharmacokinetic parameters in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

12.     The preparation, filing, and contents of NDA No. 207932 and IND No. 72428, including experiments and clinical testing contained therein as well as supplements, amendments, administrative information, prescribing information, technical documents and

summaries thereof, pharmacology reports, toxicity reports, clinical study reports, and chemistry, manufacturing, and controls information, and communications with the FDA relating to NDA No. 207932 and IND No. 72428, and including identification of the persons responsible for preparing and communicating with the FDA concerning NDA No. 207932 and IND No. 72428.

13.    The preparation, filing, and contents of NDA No. 205637 and IND No. 110267, including experiments and clinical testing contained therein as well as supplements, amendments, administrative information, prescribing information, technical documents and summaries thereof, pharmacology reports, toxicity reports, clinical study reports, and chemistry, manufacturing, and controls information, and communications with the FDA relating to NDA No. 205637 and IND No. 110267, and including identification of the persons responsible for preparing and communicating with the FDA concerning NDA No. 205637 and IND No. 110267.

14.    The first use, first manufacture, first offer for sale, first sale, first public disclosure and first shipment of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

15.    All Prior Art, potential Prior Art, or items asserted by anyone to be Prior Art to the Patents-in-suit.

16.    Plaintiffs' knowledge, interpretation, and/or understanding of U.S. Patent No. 7,579,019 (including applications that led to U.S. Patent No. 7,579,019 and any foreign counterpart applications or patents), including the decision to list U.S. Patent No. 7,579,019 in FDA's Orange Book in connection with Bunavail® and Belbuca®.

17.    Each embodiment or product allegedly covered by or described in U.S. Patent No. 7,579,019 and any studies, experiments, analyses, investigation, or reports concerning the same.

18.     All facts that Plaintiffs contend constitute evidence of any asserted objective indicia of nonobviousness, including all facts that Plaintiffs contend constitute evidence of a nexus between any asserted objective indicia of nonobviousness and the Asserted claims in the above-captioned litigations, and including all facts Plaintiffs contend show that Belbuca is an embodiment of the Asserted claims in the above-captioned litigations.

19.     The facts Plaintiffs contend constitute objective indicia of nonobviousness that there was a long-felt but unmet need for the subject matter claimed in the Patents-in-suit, including the identification of any such long-felt but unmet need and the facts related to Belbuca® and Bunavail® allegedly satisfying such long-felt but unmet need.

20.     The facts Plaintiffs contend constitute objective indicia of nonobviousness that the prior art teaches away from the subject matter claimed in the Patents-in-suit.

21.     The facts Plaintiffs contend constitute objective indicia of nonobviousness that the subject matter claimed by the Patents-in-suit provided unexpected results compared to the closest prior art, including the identity of what Plaintiffs contend is the closest prior art.

22.     The facts Plaintiffs contend constitute objective indicia of nonobviousness of commercial success and/or acclaim, industry praise, and/or acknowledgement for Belbuca® and Bunavail® and the nexus, if any, with claims of the Patents-in-suit.

23.     The unit sales of Belbuca® and/or Bunavail® and all revenues, gross profit, and net profit from the sale of Belbuca® and/or Bunavail® from the time it was first marketed to the present.

24.     The market share, profitability, and the total amount of money spent in the course of researching, developing, and bringing Belbuca® and/or Bunavail® to market, as well as

analyses and projections relating to the market for Belbuca® and/or Bunavail® including market size, demand, competition, market participants, market share, sales, prices, and profits.

25.     The marketing, promotion, advertising, and sales force activity related to Belbuca® and/or Bunavail®.

26.     Any assessment of the commercial or medical need for Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

27.     All facts that Plaintiffs contend support their claim for patent infringement, either literally or under the doctrine of equivalents, including an element-by-element comparison of each of the Asserted claims of the Patents-in-suit to Alvogen's ANDA Product.

28.     All facts that Plaintiffs contend support their claim for patent infringement, either literally or under the doctrine of equivalents, including an element-by-element comparison of each of the Asserted claims of the Patents-in-suit to Chemo's ANDA Product.

29.     All communications or agreements between Plaintiffs and Endo regarding the research, development, manufacture, marketing, and/or sale of Belbuca® and/or any other product allegedly covered by or described in the Patents-in-suit.

30.     All communications or agreements between Plaintiffs and Endo regarding the licensing of the Patents-in-suit, including the 2012 worldwide license and development agreement between BioDelivery Sciences International, Inc. and Endo, and any decisions to terminate such agreements.

31.     All communications or agreements between BioDelivery Sciences International, Inc. and Arius Two, Inc. regarding the Patents-in-suit, NDA No. 207932, IND No. 72428, Belbuca®, and any other product allegedly covered by or described in the Patents-in-suit.

32.     Any agreement with Actavis Laboratories UT, Inc., Teva Pharmaceuticals USA, Inc., and/or related entities relating to the settlement of any one of the Buprenorphine Buccal Film Lawsuits.

33.     The identity of the persons with knowledge of each of the foregoing topics.

34.     Plaintiffs' document collection efforts in the above-captioned litigation, including but not limited to: the document repositories and locations searched or collected, the identity of any document repositories or locations containing potentially relevant information not searched or collected, any search terms used to locate potentially relevant electronic documents and the documents to which such search terms were applied, and when each such collection and/or search was conducted.

# Exhibit 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 18-1395 (CFC) (CJB) |
| ALVOGEN PB RESEARCH & DEVELOPMENT LLC, ALVOGEN MALTA OPERATIONS LTD., ALVOGEN PINE BROOK LLC, ALVOGEN, INC., and ALVOGEN GROUP, INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 19-444 (CFC) (CJB) |
| CHEMO RESEARCH, S.L., INSUD PHARMA S.L.U., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' NOTICE OF DEPOSITION OF PLAINTIFFS BIODELIVERY SCIENCES INTERNATIONAL, INC. AND ARIUS TWO, INC. PURSUANT TO FED. R. CIV. P. 30(B)(6)**

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure Plaintiffs BioDelivery

Sciences International, Inc. ("BDSI") and Arius Two, Inc. (collectively, "Plaintiffs") hereby

object and respond to Topic Nos. 1-34 of Defendants Alvogen PB Research & Development

LLC, Alvogen Malta Operations Ltd, Alvogen Pine Brook LLC, Alvogen, Inc., and Alvogen

Group, Inc. (collectively, "Alvogen"), and Chemo Research S.L., Insud Pharma S.L.U., IntelGenx Corp., and IntelGenx Technologies Corp.'s (collectively, "Chemo Research") (Alvogen and Chemo Research together, "Defendants") Notice of Deposition of Plaintiffs ("Notice"), served on December 13, 2019. Plaintiffs reserve the right to raise additional objections or supplement these objections as warranted.

### GENERAL OBJECTIONS AND RESERVATIONS

The following objections apply to each of the numbered topics in Defendants' Rule 30(b)(6) Notice of Deposition:

1.     Plaintiffs incorporate by reference herein the General Objections set forth in Plaintiffs' Objections and Responses to Alvogen's First and Second Set of Requests for Production of Documents and Things (Nos. 1-121), Plaintiffs' Objections and Responses to Chemo Research's First Set of Requests for the Production of Documents and Things (Nos. 1-120), and the General Objections set forth in Plaintiffs' Objections and Responses to Defendants' First and Second Set of Interrogatories (Nos. 1-10). Any reference to General Objections in any Specific Objection below is a further incorporation of those General Objections.

2.     Plaintiffs object to the statement in the Notice that the deposition will take place "at 9:00 a.m. on January 23, 2020, at the offices of Heyman Enerio Gattuso & Hirzel LLP, 3000 Delaware Avenue, Suite 200, Wilmington, Delaware 19801." Plaintiffs will provide date(s) and location(s) for the deposition of any witnesses designated to testify pursuant to this Notice in due course.

3.     Plaintiffs object to Defendants' request that "No later than seven days prior to the deposition date, Plaintiffs shall designate in writing to Defendants the name and employment

2

position of each designee who will testify on behalf of Plaintiffs, and the topics set forth in Schedule A as to which each designee will testify" to the extent it imposes obligations on Plaintiffs that exceed those of the Federal Rules of Civil Procedure 30(b)(6) and the Local Rules of the United States District Court for the District of Delaware.

4.    Plaintiffs object to each topic to the extent it seeks discovery as to matters not known or reasonably available to Plaintiffs.

5.    Plaintiffs object to each topic to the extent it is duplicative of other discovery taken in this case, or discovery is more easily available through other less burdensome means. Seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415 (D. Del. 2010) (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis Pharms. Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162 (D. Del. 2001) (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

6.    Plaintiffs object to each topic to the extent it seeks information that is already in Defendants' possession or is readily available to Defendants, for example through public sources.

7.    Plaintiffs object to each topic to the extent it seeks discovery unrelated to the subject matter of the asserted claims of United States Patent Nos. 8,147,866 ("the '866 patent");

9,655,843 ("the '843 patent"); and 9,901,539 ("the '539 patent") or any of the parties' claims or defenses.

8.      Plaintiffs object to each topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work-product immunity, any other privilege or immunity, and/or third-party confidentiality.

9.      Plaintiffs object to each topic to the extent it imposes discovery obligations on Plaintiffs beyond those of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, or any standing orders of the Court.

10.     Plaintiffs object to each topic to the extent it seeks testimony on Plaintiffs' legal contentions. *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").

11.     Plaintiffs object to each topic as improper to the extent it seeks legal or expert conclusions or presents questions of pure law.

12.     Plaintiffs object to each topic to the extent it requires Plaintiffs to search for, inspect, or provide information not within their possession, custody, or control, including but not limited to documents that were generated by, or under the custody or control of, corporations other than Plaintiffs.  Plaintiffs further object to providing information subject to the rights of third parties without prior consent from such parties.  Plaintiffs object to each topic to the extent it requires disclosure that is prohibited by the terms of the Stipulated Protective Order with Alvogen (D.I. 32, C.A. No. 18-1395) or with Chemo Research (D.I. 40, C.A. No. 19-444) or any obligations of confidentiality between Plaintiffs and third parties.

13.     Plaintiffs object to each topic as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant or admissible evidence to the extent it seeks testimony regarding documents or information generated after July 27, 2018, the date of Alvogen's notice letter.

14.     Plaintiffs object to the breadth of these topics, as the information sought is not consistent with the "reasonable particularity" requirement of Rule 30(b)(6).  *See* Fed. R. Civ. P. 30(b)(6) (Notice "must describe with reasonable particularity the matters for examination"); *see also* 7 James Wm. Moore et al., Moore's Federal Practice ¶ 30.20.

15.     Plaintiffs object to Defendants' definition of "Plaintiffs" as overly broad, unduly burdensome, not relevant to any claim or defense, and not reasonably calculated to lead to the discovery of admissible evidence to the extent they encompass entities and/or persons beyond BioDelivery Sciences International, Inc. and Arius Two, Inc., and/or having no relevance to this action.

16.     Plaintiffs object to Defendants' requests for broad discovery, including "Bunavail®" as overly broad, unduly burdensome, not relevant to any claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and/or having no relevance to this action.

17.     Plaintiffs object to Defendants' definition of "the Buprenorphine Buccal Film Lawsuits" as overly broad, unduly burdensome, not relevant to any claim or defense, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it encompasses drug products beyond Belbuca® (buprenorphine buccal film, 75 mcg, 150 mcg, 300 mcg, 450 mcg, 600 mcg, 750 mcg, and 900 mcg), and/or having no relevance to this action. In particular, Plaintiffs object to topics directed towards *BioDelivery Sciences Int'l, Inc. et al. v. Teva Pharms. USA, Inc. et al.*, C.A. No. 17-cv-282 (DED) and *BioDelivery Sciences Int'l, Inc. et al. v. Actavis Labs. UT, Inc.*, C.A. No. 16-cv-175 (DED). These litigations concern Bunavail®, which is a different product than Belbuca®—the subject of this litigation.

18.     Plaintiffs object to Defendants' definition of "Endo" as overly broad, unduly burdensome, not relevant to any claim or defense, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it encompasses entities and/or persons beyond Endo Pharmaceuticals Inc., and/or having no relevance to this action.

19.     Plaintiffs object to Defendants' definition of "prior art" as calling for a legal conclusion.

20.     These General Objections are hereby incorporated by reference into the Specific Objections for each topic.  To the extent General Objections are cited, it is because they are believed to be particularly applicable to the specific topic and are not to be construed as a waiver

of any other General Objection applicable to information falling within the scope of the topic or as an admission of relevancy, materiality, or admissibility in evidence of any subject matter.

Plaintiffs reserve the right to raise additional objections or supplement these objections as warranted.  Plaintiffs respond to each deposition topic without conceding the relevance or materiality of any subject matter, and Plaintiffs reserve the right to object to any further discovery or to the admissibility of any matter at trial.

## SPECIFIC OBJECTIONS TO TOPICS 1-34

### TOPIC NO. 1

The preparation, filing, and prosecution of the applications relating to the Patents-in-suit and associated foreign counterpart patents and/or applications, including

   a.  the applications that led to the Patents-in-suit, as well as any co-pending and/or currently pending applications related to the Patents-in-suit;

   b.  the patent applications to which the Patents-in-suit claim priority;

   c.  all communications to or from any domestic or foreign patent office, including but not limited to the PTO and EPO;

   d.  the preparation of any declaration(s) submitted to any domestic or foreign patent office in support of the patentability of the invention(s) disclosed and/or claimed in the Patents-in-suit, including the declarations of Andrew Finn (BEL00000231-234) and Niraj Vasisht (BEL00000286-288; BEL00003132-135; and BEL00007266-268);

   e.  the factual basis for any and all statements made in any declaration(s) to any domestic or foreign patent office in support of the patentability of the invention(s) disclosed and/or claimed in the Patents-in-suit, including the declarations of Andrew Finn (BEL00000231-234) and Niraj Vasisht (BEL00000286-288; BEL00003132-135; and BEL00007266-268);

   f.  the identity of person(s) most knowledgeable of the foregoing; and

   g.  the existence and identity of any documents, communications, or things supporting, contradicting, or otherwise relating to the foregoing.

## OBJECTION TO TOPIC NO. 1

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  For example, the topic is not limited to the Patents-in-Suit, and information related to other domestic or foreign patents or applications is not relevant to the issues in the present case, and Defendants' purported need for such information is not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is publicly available from the PTO or EPO and is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 12 and 14, Alvogen's Document Request Nos. 9-11 and Interrogatory Nos. 1 and 3.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors.  The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203

F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 2

The contribution(s) of each of the Named Inventors to the alleged inventions of the Asserted claims of the Patents-in-suit, including but not limited to: (a) what each Named Inventor did to conceive of or form the invention(s) described in the Patents-in-suit, (b) what each Named Inventor did to create an embodiment or perform a process described in the Patents-in-suit, (c) the date on which any of the Named Inventors conceived of or constructed an embodiment of the invention(s) disclosed in claims of the Patents-in-suit, (d) the date on which any such embodiments or processes were shown to work, and (e) the length of time that each of the Named Inventors spent working on the subject matter described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 2

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is

9

objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning."). Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, information related to the length of time the inventors spent working on the subject matter is not relevant to the issues in the present case, and Defendants' purported need for such information is not proportional to the needs of the case. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 25 and Alvogen's Document Request Nos. 17-19. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors. The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants. Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of

10

documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 3**

The examples, experiments, and testing (including clinical testing) disclosed in the Patents-in-suit including all data, test results, figures, examples, tables, formulations, and preparations.

**OBJECTION TO TOPIC NO. 3**

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague, ambiguous and not defined to the extent it seeks "all data, test results, figures, tables, formulations, and preparations" as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for/as it plainly calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, the Patents-in-Suit present data unrelated to products, devices, or formulations containing buprenorphine as in the invention/product at issue in this litigation. Plaintiffs further object to the extent the information sought by this topic is publicly available from the PTO and is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 24, 25, 34, and 35, Alvogen's Document

Request Nos. 23-28, and Interrogatory No. 6. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors. The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants. Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 4

Clinical studies of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including: (a) protocols of such clinical studies, (b) results of such clinical studies, (c) pharmacokinetic data from such clinical studies; (d) publications or other disclosures of the results of such clinical studies; and (e) disclosure of such clinical studies or results.

## OBJECTION TO TOPIC NO. 4

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous, as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.   Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  For example, the topic is not limited to products relevant to any party's claims or defenses, e.g., different products and different subject matter, and Defendants' purported need for such information is not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is publicly available and is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 24 and 34 and Alvogen's Document Request Nos. 45-46, 73, 77, and 100.  *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors.  The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding

"duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs state that to the extent any non-privileged documents falling within the scope of this topic exist, they have been produced. Further, BDSI has made or will make the named inventors available for a deposition as fact witnesses. To the extent non-privileged information exists that falls within the scope of the topic, the inventors would be in possession of such information. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 5**

The components of Belbuca®, including (a) the reasons for the selection of each component, (b) the function of each component, (c) the chemical and biological properties of each component, (d) the identification of any publications or other documents that the inventors relied on to obtain information about the components, and (e) the identification of any third-parties that the inventors consulted to obtain information about the components.

**OBJECTION TO TOPIC NO. 5**

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs also object to this topic as unduly burdensome to the extent it seeks

14

information that is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 55 and Alvogen's Document Request Nos. 25-26, 73, and 77. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition. Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 6**

The components of Bunavail®, including (a) the reasons for the selection of each component, (b) the function of each component, (c) the chemical and biological properties of each component, (d) the identification of any publications or other documents that the inventors relied on to obtain information about the components, and (e) the identification of any third-parties that the inventors consulted to obtain information about the components.

**OBJECTION TO TOPIC NO. 6**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced.  Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 7**

Testing, analysis, research, experimentation, evaluations, or investigations concerning the pH of any layer (including the mucoadhesive and backing layers), whether conducted by or on behalf of Plaintiffs, of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the current pH of both the mucoadhesive and backing layers, and whether those numbers are a range and, if so, what the range is, (b) the identity of those involved and the location of any such testing, (c) the procedures, protocols, and conditions for any testing of the pH of both the mucoadhesive and the backing layers; (d) points in the manufacturing process when the pH of either/both the mucoadhesive and the backing layers are measured; (e) the development of the current pH of the mucoadhesive and the backing layers, including any changes in pH of either layer at any time during development; (f) any decision to modify, alter, or change the pH of either layer; and (g) whether the pH of the mucoadhesive and the backing layers change from the wet blend stage to any later stage, including during the curing or casting process.

**OBJECTION TO TOPIC NO. 7**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Bunavail®.  To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 42-48, 50-52, 54, 61, 62, and 69-70, Alvogen's Document Request Nos. 20, 25, 74-75, and 85, and Interrogatory No. 8.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

17

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 8

The properties and characteristics of each backing layer made either in preparation for or in connection with Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) an identification of each such backing layer; (b) the chemical composition of each such backing layer, including the identity and amounts of each excipient in the backing layer and the bases for the inclusion of each excipient; (c) the measured pH of each such backing layer, whether measured in solution or otherwise; (d) the method or methods used to measure the pH of each such backing layer; (e) the device(s) used to measure each such backing layer and the margin of error of such equipment used to measure the pH of each such backing layer; (f) the margin of error permitted by both Plaintiffs or the FDA in such pH measurements of each such backing layer; (g) any manufacturing or regulatory specification for the pH of the backing layer; (h) the target pH of each such backing layer; (i) the reasons for any difference between the target and measured pH of each such backing layer; and (j) the reasons why Plaintiffs selected a particular pH for each such backing layer.

## OBJECTION TO TOPIC NO. 8

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced. Plaintiffs further object to the extent the information sought by this topic is duplicative of

18

Defendants' Discovery Requests, including at least Chemo Research's Request Nos. 47, 51, 54, 61, 62, and 70, Alvogen's Document Request Nos. 20, 26, 74-75, and 85, and Interrogatory No. 8. *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses.  Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 9**

The properties and characteristics of each mucoadhesive layer made either in preparation for or in connection with Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) an identification of each such mucoadhesive layer; (b) the chemical composition of each such mucoadhesive layer, including the identity and amounts of each excipient in the mucoadhesive layer and the bases for the inclusion of each excipient; (c) the measured pH of each such mucoadhesive layer, whether

measured in solution or otherwise; (d) the method or methods used to measure the pH of each such mucoadhesive layer; (e) the device(s) used to measure each such mucoadhesive layer and the margin of error of such equipment used to measure the pH of each such mucoadhesive layer; (f) the margin of error permitted by both Plaintiffs or the FDA in such pH measurements of each such mucoadhesive layer; (g) any manufacturing or regulatory specification for the pH of the mucoadhesive layer; (h) the target pH of each such mucoadhesive layer; (i) the reasons for any difference between the target and measured pH of each such mucoadhesive layer; and (j) the reasons why Plaintiffs selected a particular pH for each such mucoadhesive layer.

## OBJECTION TO TOPIC NO. 9

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.   Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 48, 50, 52, 54, 62, and 69, Alvogen's Document Request No. 25, and Interrogatory No. 8.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.   Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii);

*see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or will make the named inventors available for a deposition as fact witnesses. Accordingly, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 10**

Testing, analysis, research, experimentation, evaluations, or investigations concerning the use of any buffer, buffering agent, or buffer system in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the reasons for the presence or absence of a buffer, buffering agent, or buffer system in each formulation or batch of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; (b) the development of the current buffer, buffering agent, or buffer system in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including any changes at any time during development; (c) the reasons why Plaintiffs selected a particular buffering agent or buffer system in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; and (d) any comparisons between formulations of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit containing a buffer, buffering agent, or buffer system and formulations that do not contain such a buffer, buffering agent, or buffer system.

**OBJECTION TO TOPIC NO. 10**

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected

21

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 49 and 53 and Alvogen's Document Request Nos. 20, 25-26, and 75.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs state that they have produced documents containing factual information concerning this topic, and BDSI has made or

will make the named inventors available for a deposition as fact witnesses.  Accordingly,

Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 11

Testing, analysis, research, experimentation, evaluations, or investigations of the pharmacokinetic parameters associated with any transmucosal drug delivery device containing buprenorphine (for example, Tmax, Cmax, and AUC), including Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit, including but not limited to: (a) the development of the current pharmacokinetic parameters in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit; and (b) the reasons why Plaintiffs selected particular pharmacokinetic parameters in Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 11

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic

as vague and ambiguous as it fails to describe with reasonable particularity the matter for

examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify

or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or

immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly

burdensome, seeks information not relevant to any claim or defense, and not proportional to the

needs of the case.  This litigation concerns Belbuca®, not Bunavail®. To the extent formulations

concerning Bunavail® were used to develop Belbuca®, these documents have been produced.

Plaintiffs also object to this topic as unduly burdensome to the extent it seeks information that is

publicly available and/or already in Defendants' possession, custody, or control.  Plaintiffs also

object to this topic to the extent that the information sought is obtainable from a source that is

more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the

same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative,

duplicative, and can be obtained from other sources that are more convenient, less burdensome,

or less expensive, and the burden or expense of the proposed discovery outweighs its likely

benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting

protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics

where party produced a substantial number of documents concerning those topics); *Novartis*, 203

F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek

duplicative or cumulative information, had ample time to get the information, or the burden

outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it

implicates disclosure of expert opinion(s) or supporting documents, and the time for expert

discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs state that they have

produced documents containing factual information concerning this topic, and BDSI has made or

will make the named inventors available for a deposition as fact witnesses.  Accordingly,

Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 12

The preparation, filing, and contents of NDA No. 207932 and IND No. 72428, including experiments and clinical testing contained therein as well as supplements, amendments, administrative information, prescribing information, technical documents and summaries thereof, pharmacology reports, toxicity reports, clinical study reports, and chemistry, manufacturing, and controls information, and communications with the FDA relating to NDA No. 207932 and IND No. 72428, and including identification of the persons responsible for preparing and communicating with the FDA concerning NDA No. 207932 and IND No. 72428.

## OBJECTION TO TOPIC NO. 12

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic

as vague and ambiguous as it fails to describe with reasonable particularity the matter for

examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify

or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or

immunity.   Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.   Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 5, 6, 56, and 88, Alvogen's Document Request Nos. 42, 44, 68, and 69, and Interrogatory No. 8.   *See* Fed. R. Civ. P. 26(b)(2)(C).   Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.   The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.   Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.   *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 13

The preparation, filing, and contents of NDA No. 205637 and IND No. 110267, including experiments and clinical testing contained therein as well as supplements, amendments, administrative information, prescribing information, technical documents and summaries thereof, pharmacology reports, toxicity reports, clinical study reports, and chemistry, manufacturing, and

25

controls information, and communications with the FDA relating to NDA No. 205637 and IND No. 110267, and including identification of the persons responsible for preparing and communicating with the FDA concerning NDA No. 205637 and IND No. 110267.

## OBJECTION TO TOPIC NO. 13

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  For example, the topic is not limited to Belbuca®, and the requested information related to Bunavail® is not relevant to the issues in the present case, and Defendants' purported need for such information is not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Alvogen's Document Request Nos. 97, 99, and 102-103. *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6)

deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 14

The first use, first manufacture, first offer for sale, first sale, first public disclosure and first shipment of Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 14

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, the topic is not limited to Belbuca®, the invention and product at issue, and Defendant's purported need for such information is not proportional to the needs of the case. Plaintiffs further object to the extent the information sought by this topic is publicly available and is duplicative of Defendants' Discovery Requests, including at least Interrogatory No. 3 and Alvogen's Document Request Nos. 43 and 98. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition. Accordingly,

seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs further object to this topic to the extent that it encompasses information not within Plaintiffs' possession, custody, or control.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 15

All Prior Art, potential Prior Art, or items asserted by anyone to be Prior Art to the Patents-in-suit.

## OBJECTION TO TOPIC NO. 15

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague, ambiguous, and not defined to the extent it seeks "potential Prior Art" as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent it seeks a legal conclusion. Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule

30(b)(6) deposition.  *See Chalumeau Power Sys.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28

("contention depositions are not fair to whomever's being asked to formulate these things");

*Medicis*, No. 1:11-cv-00409-LPS-CJB, Oral Ruling at 40-44 (denying a request to require

plaintiffs to put forward a Rule 30(b)(6) witness on contention topics related to secondary

considerations of nonobviousness); *Reliant*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 ("in

this district there is a preference that contention discovery be conducted by interrogatory even

when factual information is sought"); *Heron*, 2006 WL 3703693, at *1 ("requiring a deponent . .

. to make a legal opinion or conclusion . . . is objectionable"); *Teigel*, C.A. No. 84-48, Oral

Ruling at 14 ("[A] lay person shouldn't be required to formulate a party's contention in response

to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad,

unduly burdensome, seeks information not relevant to any claim or defense, and not proportional

to the needs of the case.  Plaintiffs further object to the extent the information sought by this

topic is publicly available from the PTO and is duplicative of Defendants' Discovery Requests,

including at least Chemo Research's Document Request Nos. 12, 13, 25, 33 and 59-62,

Alvogen's Document Request No. 12, and Interrogatory No. 1.  *See* Fed. R. Civ. P. 26(b)(2)(C).

Plaintiffs also object to this topic to the extent that the information sought is obtainable from a

source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a

review of publicly available information and/or a deposition of the named inventors.

Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is

unreasonably cumulative, duplicative, and can be obtained from other sources that are more

convenient, less burdensome, or less expensive, and the burden or expense of the proposed

discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*,

269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome"

Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs further object to this topic to the extent that it encompasses information not within Plaintiffs' possession, custody, or control.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**<u>TOPIC NO. 16</u>**

Plaintiffs' knowledge, interpretation, and/or understanding of U.S. Patent No. 7,579,019 (including applications that led to U.S. Patent No. 7,579,019 and any foreign counterpart applications or patents), including the decision to list U.S. Patent No. 7,579,019 in FDA's Orange Book in connection with Bunavail® and Belbuca®.

**<u>OBJECTION TO TOPIC NO. 16</u>**

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs further object to this topic as it is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, the topic is not limited to the Patents-in-Suit, and information related to other domestic or foreign patents or applications is not relevant to the issues in the present case, and Defendants' purported need for such information is not proportional to the needs of the case. The 7,579,019 patent is not in suit. Plaintiffs object to this topic to the extent it seeks a legal conclusion. Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition. *See Chalumeau Power Sys.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28

("contention depositions are not fair to whomever's being asked to formulate these things"); *Medicis*, No. 1:11-cv-00409-LPS-CJB, Oral Ruling at 40-44 (denying a request to require plaintiffs to put forward a Rule 30(b)(6) witness on contention topics related to secondary considerations of nonobviousness); *Reliant*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron*, 2006 WL 3703693, at *1 ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Teigel*, C.A. No. 84-48, Oral Ruling at 14 ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs further object as the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Alvogen's Document Request Nos. 86, 88-91, and 93-94.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 17

Each embodiment or product allegedly covered by or described in U.S. Patent No. 7,579,019 and any studies, experiments, analyses, investigation, or reports concerning the same.

## OBJECTION TO TOPIC NO. 17

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic as it is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  For example, the topic is not limited to the Patents-in-Suit,

and information related to other domestic or foreign patents or applications is not relevant to the issues in the present case, and Defendants' purported need for such information is not proportional to the needs of the case.  The 7,579,019 patent is not in the suit.  Plaintiffs further object as this information is duplicative of Defendants' Discovery Requests, including at least Alvogen's Document Request No. 93.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors.  The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 18**

All facts that Plaintiffs contend constitute evidence of any asserted objective indicia of nonobviousness, including all facts that Plaintiffs contend constitute evidence of a nexus between any asserted objective indicia of nonobviousness and the Asserted claims in the above-

captioned litigations, and including all facts Plaintiffs contend show that Belbuca is an embodiment of the Asserted claims in the above-captioned litigations.

## OBJECTION TO TOPIC NO. 18

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous, as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic as it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic as it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or

defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 67, Alvogen's Document Request Nos. 31, and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 19**

The facts Plaintiffs contend constitute objective indicia of nonobviousness that there was a long-felt but unmet need for the subject matter claimed in the Patents-in-suit, including the identification of any such long-felt but unmet need and the facts related to Belbuca® and Bunavail® allegedly satisfying such long-felt but unmet need.

## OBJECTION TO TOPIC NO. 19

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous, as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic as it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 ("contention depositions are not fair to whomever's being asked to formulate these things"); *Medicis*, No. 1:11-cv-00409-LPS-CJB, Oral Ruling at 40-44 (denying a request to require plaintiffs to put forward a Rule 30(b)(6) witness on contention topics related to secondary considerations of nonobviousness); *Reliant*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron*, 2006 WL 3703693, at *1 ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Teigel*, C.A. No. 84-48, Oral Ruling at 14 ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 67, Alvogen's Document Request Nos. 31, and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic

35

to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 20

The facts Plaintiffs contend constitute objective indicia of nonobviousness that the prior art teaches away from the subject matter claimed in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 20

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague, ambiguous, and not defined to the extent it seeks "indicia of nonobviousness that the prior art teaches away from the subject matter," as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the

extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 67, Alvogen's Document Request Nos. 31, and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule

30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 21**

The facts Plaintiffs contend constitute objective indicia of nonobviousness that the subject matter claimed by the Patents-in-suit provided unexpected results compared to the closest prior art, including the identity of what Plaintiffs contend is the closest prior art.

**OBJECTION TO TOPIC NO. 21**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague, ambiguous, and not defined to the extent it seeks "unexpected results compared to the closest prior art," as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent it seeks a legal conclusion.  Plaintiffs

38

further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition. *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.")  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 67, Alvogen's Document Request Nos. 31, and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less

burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 22

The facts Plaintiffs contend constitute objective indicia of nonobviousness of commercial success and/or acclaim, industry praise, and/or acknowledgement for Belbuca® and Bunavail® and the nexus, if any, with claims of the Patents-in-suit.

## OBJECTION TO TOPIC NO. 22

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4,

40

2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 67, Alvogen's Document Request Nos. 31, and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P.

41

26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 23

The unit sales of Belbuca® and/or Bunavail® and all revenues, gross profit, and net profit from the sale of Belbuca® and/or Bunavail® from the time it was first marketed to the present.

## OBJECTION TO TOPIC NO. 23

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, Plaintiffs do not intend to rely on commercial success as an objective indicium of nonobviousness. The unit sales of Belbuca® and Bunavail® and all revenues, gross profit, and net profit are not relevant to any claim or defense and not proportional to the needs of the case. This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 98 and Alvogen's Document Request Nos. 35,

49, 53, 57-59, and 62-63.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to

the extent that the information sought is obtainable from a source that is more convenient or less

burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a

lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be

obtained from other sources that are more convenient, less burdensome, or less expensive, and

the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P.

26(b)(2)(C)(i)-(iii *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding

"duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a

substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing

Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or

cumulative information, had ample time to get the information, or the burden outweighs the

benefit . . . .").

        Based on their General Objections and Specific Objections, Plaintiffs will not designate a

witness to testify on this topic.

## TOPIC NO. 24

        The market share, profitability, and the total amount of money spent in the course of
researching, developing, and bringing Belbuca® and/or Bunavail® to market, as well as analyses
and projections relating to the market for Belbuca® and/or Bunavail® including market size,
demand, competition, market participants, market share, sales, prices, and profits.

## OBJECTION TO TOPIC NO. 24

        Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic

as vague and ambiguous as it fails to describe with reasonable particularity the matter for

examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify

or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or

immunity.   Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.   For example, Plaintiffs do not intend to rely on commercial success as an objective indicium of nonobviousness and analyses and projections relating to the market is not relevant to any claim or defense and not proportional to the needs of the case.   This litigation concerns Belbuca®, not Bunavail®. To the extent formulations concerning Bunavail® were used to develop Belbuca®, these documents have been produced.   Plaintiffs also object to this topic as unduly burdensome to the extent it seeks information that is publicly available and/or already in Defendants' possession, custody, or control.   Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 64, 95, 97, and 101 and Alvogen's Document Request Nos. 47-48, 50-51, 53, 55-58, 60-61, and 63.   *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information.   Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.   *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or

cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 25

The marketing, promotion, advertising, and sales force activity related to Belbuca® and/or Bunavail®.

## OBJECTION TO TOPIC NO. 25

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. For example, Plaintiffs do not intend to rely on commercial success as an objective indicium of nonobviousness and advertising and sales force activity is not relevant to any claim or defense and not proportional to the needs of the case. Plaintiffs also object to this topic as unduly burdensome to the extent it seeks information that is publicly available and/or already in Defendants' possession, custody, or control. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 95, 96, 97, and 101 and Alvogen's Document Request Nos. 47-51, 53, and 63. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and the extensive documents produced by Plaintiffs in this action. Accordingly,

seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 26

Any assessment of the commercial or medical need for Belbuca®, Bunavail®, and any other product allegedly covered by or described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 26

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent it seeks a legal conclusion.  Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition.  *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4,

46

2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 78 and 79 and Interrogatories Nos. 1 and 4.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a

47

substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing

Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or

cumulative information, had ample time to get the information, or the burden outweighs the

benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates

disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has

not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a

witness to testify on this topic.

## TOPIC NO. 27

All facts that Plaintiffs contend support their claim for patent infringement, either literally
or under the doctrine of equivalents, including an element-by-element comparison of each of the
Asserted claims of the Patents-in-suit to Alvogen's ANDA Product.

## OBJECTION TO TOPIC NO. 27

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic

as vague and ambiguous as it fails to describe with reasonable particularity the matter for

examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify

or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected

by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or

immunity. Plaintiffs object to this topic to the extent it seeks a legal conclusion. Plaintiffs

further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that

are not the proper subject matter of a Rule 30(b)(6) deposition. *See Chalumeau Power Sys. LLC*

*v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4,

2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to

formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral

Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that

contention discovery be conducted by interrogatory even when factual information is sought"); *Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Alvogen's Document Request Nos. 39, 92, 108, and 120, and Interrogatory No. 10, and Plaintiffs' Initial Claim Charts on Infringement Pursuant to Paragraph 4(C) of the Default Standard for Discovery.   *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors. Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents

concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 28

All facts that Plaintiffs contend support their claim for patent infringement, either literally or under the doctrine of equivalents, including an element-by-element comparison of each of the Asserted claims of the Patents-in-suit to Chemo's ANDA Product.

## OBJECTION TO TOPIC NO. 28

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent it seeks a legal conclusion. Plaintiffs further object to this topic as improperly seeking testimony on Plaintiffs' legal contentions that are not the proper subject matter of a Rule 30(b)(6) deposition. *See Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 1:11-cv-01175-RGA, Oral Ruling at 27-28 (D. Del. Oct. 4, 2013) (Andrews, R.) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Reliant Pharms., Inc. v. Par Pharm. Inc.*, No. 1:06-cv-00774-JJF, Oral Ruling at 20-21 (D. Del. Mar. 7, 2008) (Farnan, J.) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought");

*Heron v. Potter*, No. 03-313-JJF, 2006 WL 3703693, at *1 (D. Del. Oct. 23, 2006) ("requiring a deponent . . . to make a legal opinion or conclusion . . . is objectionable"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 1:04-cv-00833-KAJ, Oral Ruling at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *Teigel Mfg. Co. v. Globe-Union, Inc.*, C.A. No. 84-48, Oral Ruling at 14 (D. Del. Oct. 5, 1984) (Stapleton, J.) ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning.").  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Chemo Research's Discovery Requests, including at least Document Request Nos. 12, 14, 90, 91, and 115 and Interrogatory No. 10, and Plaintiffs' Initial Claim Charts on Infringement Pursuant to Paragraph 4(C) of the Default Standard for Discovery.  *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information and/or a deposition of the named inventors. Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The

51

Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs also object to this topic as premature to the extent that it implicates disclosure of expert opinion(s) or supporting documents, and the time for expert discovery has not yet started.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 29

All communications or agreements between Plaintiffs and Endo regarding the research, development, manufacture, marketing, and/or sale of Belbuca® and/or any other product allegedly covered by or described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 29

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this request to the extent that it seeks disclosure of documents subject to third party rights, including any protective orders or confidentiality agreements between Plaintiffs and third parties.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 4 and Alvogen's Document Request Nos. 19, 35, 46, 79, and 93.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less

burdensome, or less expensive, including the extensive documents produced in this case by Plaintiffs, and the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . ."). Plaintiffs further object to this topic to the extent that it encompasses information not within Plaintiffs' possession, custody, or control.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 30

All communications or agreements between Plaintiffs and Endo regarding the licensing of the Patents-in-suit, including the 2012 worldwide license and development agreement between BioDelivery Sciences International, Inc. and Endo, and any decisions to terminate such agreements.

## OBJECTION TO TOPIC NO. 30

Plaintiffs incorporate their General Objections by reference. Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity. Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request No. 4 and Alvogen's Document Request Nos. 35-36. *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the

information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").  Plaintiffs further object to this topic to the extent that it encompasses information not within Plaintiffs' possession, custody, or control.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

## TOPIC NO. 31

All communications or agreements between BioDelivery Sciences International, Inc. and Arius Two, Inc. regarding the Patents-in-suit, NDA No. 207932, IND No. 72428, Belbuca®, and any other product allegedly covered by or described in the Patents-in-suit.

## OBJECTION TO TOPIC NO. 31

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic as it is overly broad, unduly burdensome, seeks

information not relevant to any claim or defense, and not proportional to the needs of the case. Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 5, 6, 56, and 88, Alvogen's Document Request Nos. 37, and Interrogatory No. 8.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  The burden of reviewing the documents and obtaining the information Defendants seek is substantially the same for Plaintiffs as it is for Defendants.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 32**

Any agreement with Actavis Laboratories UT, Inc., Teva Pharmaceuticals USA, Inc., and/or related entities relating to the settlement of any one of the Buprenorphine Buccal Film Lawsuits.

**OBJECTION TO TOPIC NO. 32**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs further object to this request as it seeks disclosure of documents subject to third party rights, including any protective orders or confidentiality agreements between Plaintiffs and third parties.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is publicly available and is duplicative of Defendants' Discovery Requests, including at least Chemo Research's Document Request Nos. 115 and Alvogen's Document Request Nos. 109, 115-116.  *See* Fed. R. Civ. P. 26(b)(2)(C). Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition, including a review of publicly available information.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2)) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 33**

The identity of the persons with knowledge of each of the foregoing topics.

**OBJECTION TO TOPIC NO. 33**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic to the extent it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic to the extent the topic is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.  Plaintiffs further object to the extent the information sought by this topic is duplicative of Defendants' Discovery Requests, including at least Interrogatories Nos. 3-5.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Plaintiffs also object to this topic to the extent that the information sought is obtainable from a source that is more convenient or less burdensome than a Rule 30(b)(6) deposition.  Accordingly, seeking the same information from a lay person at a Rule 30(b)(6) deposition is unreasonably cumulative, duplicative, and can be obtained from other sources that are more convenient, less burdensome, or less expensive, and the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *see also Johnson*, 269 F.R.D. at 415 (granting protective order regarding "duplicative and unduly burdensome" Rule 30(b)(6) deposition topics where party produced a substantial number of documents concerning those topics); *Novartis*, 203 F.R.D. at 162 (citing Fed. R. Civ. P. 26(b)(2))

("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit . . . .").

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

**TOPIC NO. 34**

Plaintiffs' document collection efforts in the above-captioned litigation, including but not limited to: the document repositories and locations searched or collected, the identity of any document repositories or locations containing potentially relevant information not searched or collected, any search terms used to locate potentially relevant electronic documents and the documents to which such search terms were applied, and when each such collection and/or search was conducted.

**OBJECTION TO TOPIC NO. 34**

Plaintiffs incorporate their General Objections by reference.  Plaintiffs object to this topic as vague and ambiguous as it fails to describe with reasonable particularity the matter for examination pursuant to Rule 30(b)(6), making it practically impossible for Plaintiffs to identify or prepare a witness.  Plaintiffs object to this topic as it calls for information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity.  Plaintiffs object to this topic as it is overly broad, unduly burdensome, seeks information not relevant to any claim or defense, and not proportional to the needs of the case.

Based on their General Objections and Specific Objections, Plaintiffs will not designate a witness to testify on this topic.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
   *Attorneys for Plaintiffs*

OF COUNSEL:

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Jennifer S. Swan
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Stanford Research Park
3300 Hillview Avenue
Palo Alto, CA 94304-1203
(650) 849-6600

Howard W. Levine
Justin J. Hasford
Thomas J. Sullivan
Michael R. Galgano
Daniel G. Chung
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

January 13, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2020, copies of the foregoing were cased to be served

upon the following the following in the manner indicated:

Dominick T. Gattuso                                                 *VIA ELECTRONIC MAIL*
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
*Attorneys for Defendants Alvogen PB Research*
*Development LLC, Alvogen Pine Brook LLC, Alvogen,*
*Inc., and Alvogen Group, Inc.*

Steven H. Sklar                                                       *VIA ELECTRONIC MAIL*
Gregory C. Bays
Ashlee B. Szelag
Wallace H. Feng
David R. Van Buskirk
LEYDIG, VOIT & MAYER LTD.
Two Prudential Plaza
180 N. Stetson Ave., Suite 4900
Chicago, IL 60601
*Attorneys for Defendants Alvogen PB Research*
*Development LLC, Alvogen Pine Brook LLC, Alvogen,*
*Inc., and Alvogen Group, Inc.*

Anne Shea Gaza                                                        *VIA ELECTRONIC MAIL*
Samantha G. Wilson
YOUNG CONAWAY STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendants Chemo Research, S.L., Insud*
*Pharma S.L.U., IntelGenx Corp., and IntelGenx*
*Technologies Corp.*

Dennies Varughese, Pharm. D.                    *VIA ELECTRONIC MAIL*
Adam C. LaRock
Lauren A. Watt
Charles T. Wysocki
Josephine J. Kim
Sasha Rao
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue NW, Suite 600
Washington, DC 20005
*Attorneys for Defendants Chemo Research, S.L. and*
*Insud Pharma S.L.U.*

Paul T. Meiklejohn                              *VIA ELECTRONIC MAIL*
Geoffrey M. Godfrey
David H. Tseng
DORSEY & WHITNEY LLP
701 Fifth Avenue, Suite 6100
Seattle, WA 98104
*Attorneys for Defendants IntelGenx Corp. and*
*IntelGenx Technologies Corp.*


                                        */s/ Jeremy A. Tigan*
                                        Jeremy A. Tigan (#5239)

# EXHIBIT 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PURDUE PHARMA L.P., PURDUE PHARMACEUTICALS L.P., THE P.F. LABORATORIES, INC., RHODES TECHNOLOGIES, and GRÜNENTHAL GMBH,<br><br>        Plaintiffs,<br><br>        v.<br><br>AMNEAL PHARMACEUTICALS, LLC,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 15-1152-RGA-SRF

REDACTED - PUBLIC VERSION

## MEMORANDUM ORDER

At Wilmington this **25th** day of **July, 2018**, the court having considered the parties'

discovery dispute submissions, exhibits, and the arguments presented during the March 1, 2018

discovery dispute hearing regarding: (1) plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals

L.P., The P.F. Laboratories, Inc. (collectively, "Purdue"), Rhodes Technologies, and Grünenthal

GmbH's (collectively with Purdue, "Plaintiffs") motion to compel discovery

of defendant Amneal Pharmaceuticals, LLC ("Amneal")

and third-party Kashiv Pharma LLC ("Kashiv"); and (2) defendant Amneal's request for a

protective order quashing Plaintiffs' subpoenas on third-parties

and                                    (D.I. 193; D.I. 225; D.I. 230; D.I.

231; D.I. 232; D.I. 233; D.I. 242; D.I. 244; 3/1/18 Tr.), IT IS HEREBY ORDERED that

Plaintiffs' motion to compel the production of discovery is granted-in-part, and Amneal's request

for a protective order against Plaintiffs' subpoenas on third-parties is granted-in-part.

**1. Background.** Plaintiffs commenced this patent infringement action on December 15, 2015 against defendant Amneal for Amneal's Abbreviated New Drug Application ("ANDA") No. 203235 as amended and submitted to the United States Food and Drug Administration ("FDA") seeking approval to market a generic version of Purdue's New Drug Application ("NDA") No. 022272 for oxycodone hydrochloride extended release tablets which are sold under the trade name OxyContin® ("OxyContin"). (D.I. 1) The complaint asserts causes of action for infringement of U.S. Patent Nos. 7,674,799 ("the '799 patent"); 7,674,800 ("the '800 patent"); 7,683,072 ("the '072 patent"); 8,114,383 ("the '383 patent"); 8,309,060 ("the '060 patent"); 8,337,888 ("the '888 patent"); 8,808,741 ("the '741 patent"); 8,894,987 ("the '987 patent"); 8,894,988 ("the '988 patent"); 9,060,976 ("the '976 patent"); 9,034,376 ("the '376 patent"); and 9,073,933 ("the '933 patent").[1] (*Id.*) Plaintiffs listed the '799, '800, '072, '383, '060, '888, '741, '987, '976, and '933 patents in the FDA *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") for their OxyContin product. (*Id.* at ¶ 5) The '376 patent is not listed in the FDA's Orange Book. (D.I. 266 at ¶ 6) Plaintiffs subsequently brought three additional actions against Amneal for related, newly issued patents, and a separate action

---

[1] On April 8, 2016, the Federal Circuit affirmed the invalidity of the asserted claims of the '888 patent based on obviousness and did not reach the question of indefiniteness. (D.I. 50 at 1) As a result, the parties stipulated to dismiss all claims for infringement of the '888 patent with prejudice. (*Id.* at 2) The parties subsequently stipulated to dismiss the '799, '800, '072, and '383 patents from the instant case. (D.I. 80) The court signed the order dismissing the patents from the litigation on November 21, 2016. On November 8, 2017, the Patent Trial and Appeal Board ("PTAB") issued two final written decisions in *inter partes* review ("IPR") proceedings for the '976 patent, concluding that the '976 patent is unpatentable over the prior art. (D.I. 180 at 1) The PTAB also instituted IPR proceedings for all asserted claims of the '376 patent. (*Id.* at 2) On January 17 and February 8, 2018, the PTAB issued final written decisions invalidating the asserted claims of the '376 patent as unpatentable under the prior art. (D.I. 255 at 1-2) Most recently, in the proposed pretrial order filed on March 26, 2018, the parties identified the '987, '988, '376, '976, '933, and '060 patents as the "patents-in-suit." (D.I. 266 at ¶ 1)

2

against Kashiv. (C.A. No. 17-210-RGA; C.A. No. 17-1421-RGA; C.A. No. 18-51-RGA; C.A. No. 18-52-RGA) All actions are pending before Judge Richard G. Andrews.

**2.** The discovery dispute presently before the court concerns Plaintiffs' request to compel Amneal and Kashiv to produce discovery

. On October 17, 2017, Amneal anticipated merging with Impax, beginning in April 2018 ("the Impax Merger"). (D.I. 230, Ex. 1 at 4) Plaintiffs contend that the Impax Merger implicates a settlement agreement between Purdue and Impax that was entered into in 2013 ("the 2013 Settlement Agreement"). (*See* D.I. 182; D.I. 230)

**3.**

Rather, the parties' dispute concerns the owner of the ANDA at issue,



4. On February 3, 2017, Amneal produced a 2013

(D.I. 182, Ex. 5)

. (D.I. 213, Exs. 5, 8)

5.

that the ownership of Amneal's ANDA had allegedly been transferred to Kashiv. (D.I. 182, Exs. 2, 3; D.I. 213, Ex. 7) On September 27, 2017, Amneal produced those submissions to Plaintiffs and proposed that Kashiv be substituted as the defendant in this litigation. (*Id.*, Ex. 4) Plaintiffs



4

declined to substitute Kashiv as the defendant in this litigation, and, in response, Amneal filed a formal motion to substitute, which, as of the date of this Memorandum Order, remains pending. (D.I. 212)

**6.** On November 11, 2017, Plaintiffs requested that Judge Andrews amend the current case schedule and postpone trial in light of the Impax Merger and these outstanding ownership discovery issues. (D.I. 182)

**7.** On November 21, 2017, Judge Andrews declined to amend the schedule as requested, but permitted Plaintiffs to obtain "discovery about the ownership of the ANDA and the impact of the merger agreement" to "run in parallel with the production of expert reports." (D.I. 185)

**8.** In response to Judge Andrews' November 21, 2017 Order, on November 29, 2017, Plaintiffs served third-party discovery subpoenas on Kashiv, Dr. Nanvit Shah ("Dr. Shah"), Chirag Patel, and Chintu Patel. (D.I. 193) Also on November 29, 2017, Plaintiffs served its Third Set of Requests for the Production of Documents (D.I. 226, Ex. C) and Fifth Set of Interrogatories (D.I. 226, Ex. D) on Amneal.

**9.** Also in response to Judge Andrews' November 21, 2017 Order, Amneal produced the

"



(*Id.* at AMNOXY 0352992)

**10.** On December 29, 2017, Amneal served its responses and objections, objecting mainly

on relevancy grounds, as well as attorney-client privilege and burden. (D.I. 226 at Exs. I-K)

**11.** On February 16, 2018, Plaintiffs served third-party discovery subpoenas on

(D.I. 225)

**12.** On March 1, 2018, the court held a discovery dispute teleconference to resolve the

parties' dispute relating to discovery of ownership of the ANDA at issue and the ownership of

Amneal and Kashiv. (D.I. 229) At the conclusion of the teleconference, the court reserved

decision on the motion to compel and motion for a protective order. (3/1/18 Tr. at 38:12-15)

**13. Standard of Review.** Pursuant to Rule 26,

> [p]arties may obtain discovery regarding any nonprivileged matter that is
> relevant to any party's claim or defense and proportional to the needs of the
> case, considering the importance of the issues at stake in the action, the amount
> in controversy, the parties' relative access to relevant information, the parties'
> resources, the importance of the discovery in resolving the issues, and whether
> the burden or expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible in evidence
> to be discoverable.

Fed. R. Civ. P. 26(b)(1). A party may move for an order compelling discovery pursuant to Rule

37. Generally, a party moving to compel discovery bears the burden of demonstrating the

relevance of the requested information. *See Del. Display Grp. LLC v. Lenovo Grp. Ltd.*, 2016

WL 720977, at \*2 (D. Del. Feb. 23, 2016) (citing *Inventio AG v. ThyssenKrupp Elevator Am.*

*Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009)). However, "[t]he parties and the court have a

---

[3] Based on Plaintiffs' submissions to the court and their statements at the teleconference, it
appears that Plaintiffs agree to withdraw and "hold in abeyance" the production of documents
from                                    . (*See* D.I. 244, Ex. 1 at 2-3; 3/1/18 Tr. at 36:11-15)

collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.

**14.** Additionally, Rule 26(c) states "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed. R. Civ. P. 26(c) (*see also Ethypharm S.A. France v. Abbott*, 748 F. Supp. 2d 354, 359 (D. Del. 2010) (citations omitted). The burden of persuasion is on the party seeking the protective order. *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). "To overcome the presumption, the party seeking the protective order must show good cause by demonstrating a particular need for protection. *Id.* In *Pansy v. Borough of Stroudsburg*, the Third Circuit recognized several factors that may be considered when deciding whether good cause exists:

1) whether disclosure will violate any privacy interests;
2) whether the information is being sought for a legitimate purpose or for an improper purpose;
3) whether disclosure of the information will cause a party embarrassment;
4) whether confidentiality is being sought over information important to public health and safety;
5) whether the sharing of information among litigants will promote fairness and efficiency;
6) whether a party benefitting from the order of confidentiality is a public entity or official; and
7) whether the case involves issues important to the public.

23 F.3d 772, 787-91 (3d Cir. 1994).

**15.** "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Cipollone*, 785 F.2d at 1121. "The harm must be significant, not a mere trifle." *Id.* Furthermore, "[g]ood cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure." *Pansy*, 23

F.3d at 786. In determining whether there is good cause, courts will balance the party's need for the information against the resulting injury if disclosure is compelled. *Id.* at 787.

**16.** Moreover, "because release of information not intended by the writer to be for public consumption will almost always have some tendency to embarrass, an applicant for a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious." *Cipollone*, 785 F.2d at 1121. Therefore, to obtain a protective order, "a business will have to show with some specificity that the embarrassment resulting from dissemination of the information would cause a significant harm to its competitive and financial position." *Id.*

**17.** Rule 26(c)(1)(G) states a court can issue a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. Rule 26(c)(1)(G). The court can also grant a protective order limiting disclosure of discovery materials to protect a party from "competitive disadvantage." *Miles v. Boeing Co.*, 154 F.R.D. 112, 114 (E.D. Pa. Mar. 2, 1994) (citing *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1345 (7th Cir. 1986) (insurance provider's data on prices bid by hospitals and the calculations the insurance provider performed to decide which hospitals to include in its health care package was confidential, for fear that the hospitals could use the comparative price information to raise their prices or collude in future years.

8

## ANALYSIS

### 18. Plaintiffs' request to compel Amneal to supplement responses to

**Plaintiffs' Fifth Set of Interrogatories.** Plaintiffs request that the court compel Amneal to

supplement its responses to Plaintiffs' Fifth Set of Interrogatories to Amneal (Nos. 25-28)[4] by

providing all requested information relevant to (1) the

and (2) the valuation of ANDA No. 203235. (D.I. 244 at 2)

The parties dispute the scope

, and Plaintiffs argue that Amneal cannot withhold information based on

its unilateral interpretation of those terms. (D.I. 230 at 3)

**19.**

**20.**



alleged transfer of Amneal's ANDA to

Kashiv,

9

**21.** Amneal responds that the discovery Plaintiffs seek is neither relevant nor proportional

to the needs of Plaintiffs in their prosecution of this case. (D.I. 233 at 1) Amneal argues that

Plaintiffs "

." (*Id.*) Amneal argues that "nowhere in Judge Andrews' Order

permitting limited additional discovery did [he] authorize discovery

." (*Id.*)

**22.** Plaintiffs' request to compel Amneal to supplement its response to Plaintiffs' Fifth Set

of Interrogatories to Amneal (D.I. 226, Ex. D) is granted-in-part. Specifically, Amneal shall

supplement its response to Interrogatory No. 25 on or before **August 2, 2018.** Plaintiffs have

met their burden to show the relevance of the relationship between Dr. Shah, Kashiv, and

Amneal and its proportionality to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Plaintiffs'

request to compel Amneal to supplement its response to Interrogatory Nos. 27-28 is denied

without prejudice. Plaintiffs have argued for the need to compel additional discovery into the



, but have not presented arguments to meet

their burden in showing why it is relevant or proportional to the needs of this case for Amneal to:

*See* D.I. 230; D.I. 226, Ex. D at Inter. Nos. 26-28) The issues in the pending case involve the parties' respective allegations of infringement and invalidity. The court declines to open a collateral avenue of discovery into the financial underpinnings and organizational structure of third party entities based upon supposition

Documents concerning Kashiv's relationship to Amneal and the ANDA in issue have already been produced. No factual showing has been made that warrants digging deeper to see if anything could be unearthed to call into question the reliability of the production to date.

**23. Plaintiffs' request to compel depositions.** Plaintiffs request that the court compel Dr. Shah, Chirag Patel, Chintu Patel, and                to appear for oral depositions. (D.I. 244 at 2) Plaintiffs contend that Amneal's and Kashiv's Rule 30(b)(6) witness, Dr. Narasimhan Mani, an Amneal employee, did not have knowledge concerning "a number of critical issues about Kashiv's                future relationship with Amneal." (D.I. 230 at 2) For example, besides knowing that

(D.I. 226, Ex. S at 193:25-197:9) Dr. Mani did not know who appointed the Special Member (        *Id.* at 205:23-205:7), and did not know the criteria that the Special Member would use to appoint new board members (*Id.* at 256:9-16). Plaintiffs contend that "

11



is core to an understanding of Kashiv's relationship to Amneal

post-merger." (D.I. 230 at 4) Plaintiffs also argue that Chirag Patel, Chintu Patel, and Dr. Shah

are likely to have information that is unique and not within Amneal or Kashiv's possession.

(D.I. 230 at 4) Specifically, Plaintiffs contend that Chirag Patel is at least a contact for

(*Id.*) Moreover, Amneal represented that                                          . (*Id.*)

Therefore, Plaintiffs argue that these individuals likely have personal plans or communications

that would evidence Kashiv's present or intended                              and why

Amneal purportedly transferred the ANDA. (*Id.*)

**24.** Amneal responds that a large number of questions related to        for example,

asked at Dr. Mani's 30(b)(6) deposition were beyond the proper scope of the Amneal and/or

Kashiv deposition notices, and counsel for Amneal and Kashiv objected on that basis during the

deposition.  (D.I. 233 at 4)

                                                                        (*Id.*) As to

testimony to Kashiv's Special Member,

                                                    . (*Id.*) Therefore, according to

Amneal, any remaining questions alleged to go unanswered provide no relevant information but

serve only "to harass executives having no unique information." (*Id.*) Finally, Amneal argues

that, under the "apex doctrine," there is no basis to now depose Dr. Shah, Chirag Patel, and

Chintu Patel.[5]  (D.I. 233 at 4 n.1)  Amneal contends that deposing such senior executives would

---

[5] The "apex doctrine" is "sometimes applied to shield the deposition of a company's senior executives" to prevent the imposition of an undue burden or harassment.  *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL No. 05-1717-JJF, 2008 WL 5377979, at *3 (D. Del. Dec. 18, 2008).

12

not provide any relevant, unique, or non-duplicative evidence and serves only to harass and burden them. (*Id.*; 3/1/18 Tr. at 28:24-29:9)



**25.** Plaintiffs' motion to compel Dr. Shah and ▮▮▮▮ to appear for depositions is granted. Plaintiffs' motion to compel the ▮▮▮ and Patel depositions is denied. It is Plaintiffs' burden to demonstrate the relevance of the requested information and its proportionality to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). The court finds that Plaintiffs' request to depose Shah and ▮▮▮ to be probative on issues of ▮▮▮▮▮▮▮▮

▮▮▮▮▮ Kashiv. Amneal itself agreed at the discovery dispute teleconference ▮

▮▮▮▮▮▮▮▮▮ (3/1/18 Tr. at 25:17-22) When determining

whether the deposition of a high-ranking corporate officer is appropriate, courts in this circuit consider: "(1) whether the executive or top-level employee has personal or unique knowledge on relevant subject matters; and (2) whether the information sought can 'be obtained from lower[-]level employees or through less burdensome means, such as interrogatories.'" *In re Jevic Holding Corp.*, 526 B.R. 547, 556 (D. Del. 2014), *aff'd*, 656 F. App'x 617 (3d Cir. 2016) (citing *Ford Motor Co. v. Edgewood Properties, Inc.*, 2011 WL 677331 at \*2 (D.N.J. Feb. 15, 2011)). Plaintiffs have shown that Dr. Shah, as the sole Board Member of Kashiv, and "special member"

▮▮▮▮▮ are likely to have information that is unique on the aforesaid relevant issues. They are likely the persons with the most knowledge of ▮▮▮▮▮▮▮▮ Kashiv.

**26. Plaintiffs' request for production of documents.** Plaintiffs argue that the court should compel the production of documents ▮▮▮▮▮▮▮▮

▮▮▮▮▮. (D.I. 230 at 3) ▮▮▮▮▮▮▮▮

13



The parties dispute whether such power exists, and

Plaintiffs argue that Amneal is withholding information that could address the issue. (D.I. 203 at

3) Plaintiffs argue that they need discovery to determine

(*Id.*) As such, Plaintiffs believe they are

"entitled to documents from Amneal, including e-mail communications,

(*Id.*)

**27.** Plaintiffs contend that the discovery it seeks is necessary to determine

the relationships of

Kashiv with Chirag Patel, and Chintu Patel, as well as AE Companies – "an 'alliance' of

pharma entities formed by Chirag Patel and Chintu Patel." (D.I. 230 at 2) Plaintiffs argue that,

until January 31, 2018, AE Companies listed both Amneal and Kashiv as its members

but since then, AE Companies removed

reference to Kashiv from its website. (*Id.* at n.3) (citing D.I. 226, Ex. Q; D.I. 226, Ex. S at

350:21-351:6) Additionally, Plaintiffs contend that Amneal and Kashiv are each financed in part

by

(D.I. 230 at 2)

**28.** Amneal responds that it produced the in response to Judge

Andrews' November 21, 2017 Order, and that this agreement "lays bare the answers to the

questions Plaintiffs assert as requiring compelled discovery." (D.I. 233 at 3) The

14

(*Id.*) (citing D.I. 226, Ex. P at AMNOXY 0352991,

AMNOXY 0353019)

. (*Id.*) (citing D.I. 226, Ex. P at AMNOXY

0352972, AMNOXY 0353018) Therefore, according to Amneal,                are

irrelevant, and the question                                 has already been answered

by the                      , Amneal's interrogatory responses, and the Rule 30(b)(6)

deposition of Dr. Mani. (D.I. 233 at 3-4) Moreover, Amneal argues that Plaintiffs are seeking

highly confidential information from privately held companies or individuals that has not been

publicly disclosed in litigation or otherwise. (3/1/18 Tr. at 26:5-8) For example, Amneal argued

at the teleconference that          is "a private investment firm that made an investment in

Kashiv in 2010 based on public information;" and AE Companies is an "alliance of independent

companies that bring healthcare solutions to people worldwide." (*Id.* at 26:12-17) Amneal

contends that there has been no connection of these companies to the 2013 Settlement

Agreement, nor is there any mention of these companies in the                      . (*Id.* at

26:27-20)

**29.**     For the reasons previously stated at ¶ 22, *supra*, the court is not inclined to open a

collateral avenue of discovery not reasonably likely to yield information beyond that disclosed in

the documents produced to date and, therefore, which is not proportional to the needs of the case.

The court's order is without prejudice should new information develop.

**30. Plaintiffs' request for production of documents by Amneal.** Plaintiffs request

that the court compel Amneal to supplement its responses to Plaintiffs' third set of requests for

production of documents numbered 67-75, 77-78, 81-86, 88, 90-91, and 94 (D.I. 226, Ex. C)

including, but not limited to, the production of draft documents, e-mail communications, and a

15

log of documents withheld from production on privilege grounds. (D.I. 244 at 2) Plaintiffs'

request to compel the production of documents from Amneal is granted-in-part. The documents

are required to be produced on or before **August 2, 2018**. Given the definitions of "█████

and "███████ in the 2013 Settlement Agreement, the requested discovery as to these topics is

relevant to the case at bar. Plaintiffs have not shown, however, the need for discovery as to the

connection between Amneal and Kashiv with ████████████████████. These third-parties

are not on the board of Kashiv, nor are they listed anywhere in the ████████████████████.

(D.I. 226, Ex. P) ████████████████████████████████████████████████████

████████████████████████████████████Plaintiffs have also not shown or stated a

need for discovery as to the valuation of the ANDA. As such, Plaintiffs' motion to compel is

granted-in-part as follows:

| Topic | Request No. | Docket Item | Decision |
|---|---|---|---|
| Documents related to the █████████████ ███████ of Amneal, Kashiv, and post-merger Amneal. | Nos. 67-70 | D.I. 226, Ex. C | GRANTED |
| Documents relating ████████████████████ ANDA No. 203235 and/or the ANDA Products | Nos. 71-73 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the ███████████ between any of Kashiv, Amneal, and Impax | No. 74 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the preparation, planning, motivation, and execution of the purported transfer of Amneal's ANDA from Amneal to Kashiv | No. 75 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the valuation of ANDA No. 203235 | No. 77 | D.I. 226, Ex. C | DENIED |
| Documents relating to Amneal's allegation that ███████ with respect to Amneal's FDA submissions and Paragraph IV Notice Letters for Amneal's ANDA | No. 78 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the alleged decision to █████ ████████ | No. 81 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the reasonably anticipated ████ | No. 82 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the basis and status ██████ ████████ | No. 83 | D.I. 226, Ex. C | GRANTED |

| Documents relating to ▮ | No. 84 | D.I. 226, Ex. C | GRANTED |
|---|---|---|---|
| Documents relating to the ▮ | No. 85 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the present or future ▮ Kashiv, Dr. Shah, and/or ▮ | No. 86 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the timing of the Proposed Amneal-Impax Merger, including but not limited to Amneal's Response to Purdue's Interrogatory No. 22 | No. 88 | D.I. 226, Ex. C | GRANTED |
| Documents relating to the relationship between Amneal or Kashiv and any of ▮ | No. 90 | D.I. 226, Ex. C | DENIED |
| Documents related to the ▮ of Amneal or Kashiv by ▮ | No. 91 | D.I. 226, Ex. C | DENIED |
| Financial relationship between Kashiv and Amneal of ANDA No. 203235 and/or the ANDA Products | No. 94 | D.I. 226, Ex. C | DENIED |

**31. Plaintiffs' request for production of documents by Kashiv.** Plaintiffs request

that the court compel Kashiv to supplement its responses to document request numbers 37-45,

47, 49, 52-58, 62-63, and 66 (D.I. 193, Ex. 1) including, but not limited to, the production of

draft documents, e-mail communications, and a log of documents withheld from production on

privilege grounds. (D.I. 244 at 2)  Plaintiffs' request to compel the production of documents

from Kashiv is granted-in-part. The documents are to be produced on or before **August 2, 2018.**

In their letter submissions to Judge Andrews regarding Plaintiffs' November 17, 2017 request for

the court to allow additional discovery and amend the case schedule, the parties raised the issue

▮. (D.I. 182;

D.I. 184) Given the facts, Judge Andrews determined that should discovery may be

"appropriate," and permitted discovery into "the impact of the merger agreement" in addition to

discovery about the ownership of the ANDA. (D.I. 185)  In the submissions to the court in

17

regards to the discovery dispute at bar, Plaintiffs have again met their burden in demonstrating

the relevance and proportionality to the case

As such, Plaintiffs' motion to compel is granted-in-part

as follows:

| Topic | Request No. | Docket Item | Decision |
|---|---|---|---|
| Documents related to the ████ of Amneal, Kashiv, and post-merger Amneal, | Nos. 37-40 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the ████ ANDA No. 203235 and/or the ANDA Products | No. 41-43 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the ████ between any of Kashiv, Amneal, and Impax | No. 44 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the preparation, planning, motivation, and execution of the purported transfer of Amneal's ANDA from Amneal to Kashiv | No. 45 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the valuation of ANDA No. 203235 | No. 47 | D.I. 193, Ex. 1 | DENIED |
| Documents relating to Amneal's allegation that ████ with respect to Amneal's FDA submissions and Paragraph IV Notice Letters for Amneal's ANDA | | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the alleged decision to ████ | No. 52 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the ████ | No. 53 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the reasonably anticipated ████ | No. 54 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the basis and status ████ | No. 55 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to ████ | No. 56 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the ████ | No. 57 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the present or future ████ Kashiv, Dr. Shah, and/or ████ | No. 58 | D.I. 193, Ex. 1 | GRANTED |
| Documents relating to the relationship between Amneal or Kashiv and any of ████ | No. 62 | D.I. 193, Ex. 1 | DENIED |

18

| Documents related to of Amneal or Kashiv by | No. 63 | D.I. 193, Ex. 1 | DENIED |
|---|---|---|---|
| Financial relationship between Kashiv and Amneal of ANDA No. 203235 and/or the ANDA Products | No. 66 | D.I. 193, Ex. 1 | DENIED |

**32. Plaintiffs' subpoena *duces tecum* to Dr. Shah.** Plaintiffs request that the court

compel Dr. Shah to respond to document request numbers 1-9, 11, 14-20, 24-25, and 28 (D.I.

193, Ex. 3) including, but not limited to, the production of draft documents, e-mail

communications, and a log of documents withheld from production on privilege grounds. (D.I.

244 at 2) Plaintiffs' request to compel the production of documents from Dr. Shah in accordance

with the subpoena *duces tecum* is granted-in-part. Plaintiffs have shown that the requested

documents are relevant and proportional to the needs of the case. As such, Plaintiffs' request to

compel is granted-in-part as follows:

| Topic | Request No. | Docket Item | Decision |
|---|---|---|---|
| Documents related to the of Amneal, Kashiv, and post-merger Amneal. | Nos. 1-4 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating ANDA No. 203235 and/or the ANDA Products | No. 5-7 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the between any of Kashiv, Amneal, and Impax | No. 8 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the preparation, planning, motivation, and execution of the purported transfer of Amneal's ANDA from Amneal to Kashiv | No. 9 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to Amneal's allegation that with respect to Amneal's FDA submissions and Paragraph IV Notice Letters for Amneal's ANDA | | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the alleged decision to | No. 14 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the | No. 15 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the reasonably anticipated t | No. 16 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the basis and status | No. 17 | D.I. 193, Ex. 3 | GRANTED |

| Documents relating to █████████████████ | No. 18 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the ███████████ | No. 19 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the present or future █████ Kashiv, Dr. Shah, and/or ██████████ | No. 20 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the ████████████ ███████████ | No. 24 | D.I. 193, Ex. 3 | GRANTED |
| Documents relating to the relationship between Amneal or Kashiv and any of █████ | No. 25 | D.I. 193, Ex. 3 | DENIED |
| Financial relationship between Kashiv and Amneal of ANDA No. 203235 and/or the ANDA Products | No. 28 | D.I. 193, Ex. 3 | DENIED |

**33.     Plaintiffs' subpoena *duces tecum* to Chirag Patel and Chintu Patel.** The court

denies Plaintiffs' request that the court compel Chirag Patel and Chintu Patel to respond to

document requests in the subpoena numbered 1-9, 11, 14-20, 24-25, and 28 (D.I. 193, Exs. 4-5)

including, but not limited to, the production of draft documents, e-mail communications, and a

log of documents withheld from production on privilege grounds. (D.I. 244 at 2) Plaintiffs

allege that Chirag Patel and Chintu Patel, who are co-chairmen, co-founders, and co-CEOs of

Amneal (D.I. 184 at 3), ███████████████████████████

████████████████████████████████████████████ (D.I.

226, Ex. P at AMNOXY 0352979). (D.I. 230 at 2 n.2) █████████████████

████████████████ (D.I. 226, Ex. P at AMNOXY 0352972) █████

████████████████████████████████████████████

████████████████████ Plaintiffs' reference to a February 12, 2018 SEC

filing, wherein Impax stated that Chirag Patel and Chintu Patel beneficially own "43.875% in the aggregate of the outstanding equity securities of Kashiv" (D.I. 230, Ex. 1 at 253), and will serve on the board of directors of the new Amneal-Impax merged entity (D.I. 230, Ex. 1 at 19), is insufficient to warrant opening the door to a collateral avenue of discovery disproportional to the needs of the case. The court finds that the requested discovery is too attenuated from the instant case. As such, Plaintiffs' request to compel is denied.

**34.     Plaintiffs' subpoena *duces tecum* to** The court denies Plaintiffs' request that the court compel to respond to document requests in the subpoena numbered 1-23, 26-28, and 30 (D.I. 225, Ex. 1) including, but not limited to, the production of draft documents, e-mail communications, and a log of documents withheld from production on privilege grounds. (D.I. 244 at 2) In the February 12, 2018 SEC filing, Impax stated that Chirag Patel and Chintu Patel beneficially own "43.875% in the aggregate of the outstanding equity securities of Kashiv." (D.I. 230, Ex. 1 at 253) Plaintiffs allege that Chirag Patel and Chintu Patel, who are co-chairmen, co-founders, and co-CEOs of Amneal (D.I. 184 at 3),



(D.I. 226, Ex. P at AMNOXY 0352979). (D.I. 230 at

2 n.2)

(D.I. 226, Ex. P at AMNOXY 0352972) Plaintiffs have, therefore, not reasonably demonstrated the need for going further

. In addition, Plaintiffs' request for discovery

is overbroad. (D.I. 225, Ex. 1 at Interrogatory Nos. 1, 3) As such, Plaintiffs' request is denied.

**35.** **Plaintiffs' subpoena *duces tecum* to** ▮▮▮▮. The court denies Plaintiffs' request that the court compel ▮▮▮▮ to respond to document requests in the subpoena numbered 1-7, 9-25, 27, 32-33, and 36 (D.I. 225, Ex. 4) including, but not limited to, the production of draft documents, e-mail communications, and a log of documents withheld from production on privilege grounds. (D.I. 244 at 2) As discussed *supra*, such discovery was permitted by Judge Andrews in his November 21, 2017 Order. (D.I. 185) ("discovery about…the impact of the merger agreement may be appropriate, and, indeed Amneal acknowledges this…any such discovery can run in parallel with the production of expert reports, etc."). Plaintiffs have not shown that the requested discovery is relevant and proportional to the needs of this case ▮

▮▮▮▮. Therefore, Plaintiffs' motion to compel is denied.

**36.** **Plaintiffs' subpoena *duces tecum* to** ▮▮▮▮▮ Plaintiffs request that the court compel ▮▮▮▮ to produce documents in response to request numbers 1-11, 13, 14-20, 22-24, 27-29, and 32 (D.I. 225, Ex. 5) including, but not limited to, the production of draft documents, e-mail communications, and a log of documents withheld from production on privilege grounds. (D.I. 244 at 2) Plaintiffs' request to compel the production of documents from ▮▮▮▮ is granted-in-part. Plaintiffs have shown the need for discovery into ▮▮▮▮ role in Kashiv, for she is identified as its "Special Member," and has ▮▮▮▮

▮▮▮▮ (D.I. 233 at 2-3; D.I. 226, Ex P at AMNOXY 0352984) However, much of the duties and responsibilities of the Special Member are defined in the ▮▮▮▮

which Amneal has already provided. (D.I. 226, Ex. P) As such, Plaintiffs' request

to compel is granted-in-part as follows:

| Topic | Request No. | Docket Item | Decision |
|---|---|---|---|
| Documents related to the preparation, planning, motivation, purpose, and execution of the "Special Member Services Agreement" between ▮ and Kashiv | No. 1 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to ▮ employment and/or affiliation with any of Amneal, Kashiv, or Impax | No. 2 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to ▮ employment and/or affiliation with ▮ | No. 3 | D.I. 225, Ex. 5 | DENIED |
| Documents related to ▮ compensation as "Special Member" for Kashiv | No. 4 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to ▮ recruitment as "Special Member" for Kashiv | No. 5 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to ▮ duties and obligations as "Special Member" for Kashiv | No. 6 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to ▮ qualifications to act as "Special Member" for Kashiv | No. 7 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to ▮ communications with Dr. Shah, Chirag Patel, or Chintu Patel regarding ▮ s appointment as "Special Member" for Kashiv | No. 8 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to agendas, transcripts, and/or summary of meetings between ▮ and any of Kashiv, Amneal, or Impax | No. 9 | D.I. 225, Ex. 5 | GRANTED |
| All documents related to any meetings of current or former directors of Kashiv, including but not limited to, summaries, agendas, minutes, or resolutions concerning Kashiv, Amneal, or post-merger Amneal | No. 10 | D.I. 225, Ex. 5 | GRANTED |
| Documents related to the operation, affairs, and business of Kashiv | No. 11 | D.I. 225, Ex. 5 | GRANTED |
| Documents related ▮ | Nos. 13-14 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating ▮ | No. 15-17 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to ▮ | No. 18 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to the preparation, planning, motivation, and execution of the purported transfer of Amneal's ANDA from Amneal to Kashiv | No. 19 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to Amneal's allegation that ▮ with respect to Amneal's FDA | ▮ | D.I. 225, Ex. 5 | GRANTED |

| submissions and Paragraph IV Notice Letters for Amneal's ANDA | | | |
|---|---|---|---|
| Documents relating to the | No. 22 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to the | No. 23 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to | No. 24 | D.I. 225, Ex. 5 | GRANTED |
| Documents relating to the relationship between Kashiv and any of | No. 27 | D.I. 225, Ex. 5 | DENIED |
| Documents relating to | No. 28 | D.I. 225, Ex. 5 | DENIED |
| Documents relating to | No. 29 | D.I. 225, Ex. 5 | DENIED |
| Financial relationship between Kashiv and Amneal of ANDA No. 203235 and/or the ANDA Products | No. 32 | D.I. 225, Ex. 5 | DENIED |

**37. Amneal's motion for a protective order.** Amneal's motion for a protective order is granted-in-part. Specifically, the motion is denied as to Shah and ▇ for the reasons stated at ¶¶ 32 and 36, respectively, and is granted as to the remaining subjects of third party subpoenas.[6] The existing stipulated protective order explicitly provides for protection of third-party confidential information, which adequately protects the confidential information of Shah and ▇ (D.I. 40 at ¶ 24) ("the third-party shall have the same rights and obligations under this Protective Order as held by the Parties to this litigation").

**38. Conclusion.** For the foregoing reasons, Plaintiffs' motion to compel is granted-in-part, as outlined by this Memorandum Order. (D.I. 230) Specifically, the depositions of Dr. Shah and ▇ shall be completed on or before **August 7, 2018.** Amneal shall

---

[6] The motion for a protective order is denied with respect to ▇

24

supplement its response to Plaintiffs' Fifth Set of Interrogatories to Amneal (D.I. 226, Ex. D), as outlined by this Memorandum Order, on or before **August 2, 2018**. Amneal and Kashiv shall supplement their responses to the requests for production, as outlined in this Memorandum Order at Paragraph Nos. 30-31, on or before **August 2, 2018**. Amneal's request for a protective order is denied with respect to Dr. Shah and ████████, and is granted in all other respects. (D.I. 231) The court's ruling should not be interpreted as a broadened grant of authority to take discovery beyond the discovery ordered by Judge Andrews in the November 21, 2017 order. The discovery should be narrowly tailored to conform to the crux of the dispute ████

████████████████████████████████████████.

**39.** Given that the court has relied upon material that technically remains under seal, the court is releasing this Memorandum Order under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Memorandum Order should be redacted, the parties should jointly submit a proposed redacted version by no later than **August 1, 2018**. The court will subsequently issue a publicly available version of its Memorandum Order.

**40.** This Memorandum Order is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Memorandum Order. Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to five (5) pages each.

**41.** The parties are directed to the court's Standing Order For Objections Filed Under

Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

www.ded.uscourts.gov.

Sherry R. Fallon
United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I, Samantha G. Wilson, hereby certify that on April 15, 2020, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Jack B. Blumenfeld, Esquire
Jeremy A. Tigan, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
*jblumenfeld@mnat.com*
*jtigan@mnat.com*

*Attorneys for BioDelivery Sciences International Inc.
and Arius Two, Inc.*

I further certify that on April 15, 2020**,** I caused the foregoing document to be served via electronic mail upon the above-listed counsel and on the following:

Charles E. Lipsey, Esquire
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
*charles.lipsey@finnegan.com*

Howard W. Levine, Esquire
Thomas J. Sullivan, Esquire
Michael R. Galgano, Esquire
Daniel G. Chung, Esquire
Justin J. Hasford, Esquire
 Finnegan, Henderson, Farabow, Garrett & Dunner, LLP

901 New York Avenue, N.W.
Washington, DC 20001
*howard.levine@finnegan.com*
*thomas.sullivan@finnegan.com*
*michael.galgano@finnegan.com*
*daniel.chung@finnegan.com*
*justin.hasford@finnegan.com*

Jennifer S. Swan, Esquire
Jeffrey D. Smyth, Esquire
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
Stanford Research Park
3300 Hillview Avenue
Palo Alto, CA 94304
*jennifer.swan@finnegan.com*
*jeffrey.smyth@finnegan.com*

*Attorneys for BioDelivery Sciences International Inc.
and Arius Two, Inc.*

Dated:  April 15, 2020

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
*agaza@ycst.com*
*swilson@ycst.com*

*Attorneys for Chemo Research S.L.,
Insud Pharma S.L.U., IntelGenx
Corp., and IntelGenx Technologies
Corp.*