# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE  19899-1347

JEREMY A. TIGAN
302 351 9106
jtigan@mnat.com

Redacted - Public Version
Original Filing Date: April 7, 2020
Redacted Filing Date: April 15, 2020

The Honorable Christopher J. Burke                    *VIA ELECTRONIC FILING*
U.S. District Court for the District of Delaware
844 North King Street
Wilmington, DE 19801

   Re: *BioDelivery Scis. Int'l, Inc. v. Chemo Res., S.L. et al.,*
     C.A. No. 19-444 (CFC) (CJB)

Dear Judge Burke:

   BDSI submits this reply letter in response to Chemo's discovery dispute letter (D.I. 232). For the following reasons, Chemo's requests to compel discovery should be denied.

   Initially, the Court has consolidated discovery in the Alvogen and Chemo cases.  (D.I. 39 at 6.) Yet many of the discovery disputes Chemo has raised concern *joint* discovery requests from both Alvogen and Chemo, or otherwise seek discovery that Alvogen has already agreed it will not pursue. Alvogen did not join Chemo's discovery dispute letter or separately raise any of the same disputes with the Court.  Chemo contends that this does not "diminish [its] arguments" or prevent it from unilaterally raising discovery disputes on joint requests from the Defendants.  (D.I. 232 at 6.) Chemo is incorrect for two reasons.  First, that Alvogen has not joined this letter establishes that BDSI's positions on these discovery disputes are reasonable and that the discovery sought is not necessary for the Defendants to pursue their invalidity theories.  Second, it is unduly burdensome and prejudicial to BDSI, and contravenes the Court's directive to unify and coordinate discovery efforts, for one set of defendants (Chemo) to subject BDSI to purported discovery disputes that have already been resolved with the other set of defendants (Alvogen).  The onus to coordinate discovery efforts should be on the Defendants, not BDSI, particularly where they have served joint discovery requests.

   **Rule 30(b)(6) testimony concerning the asserted patents:**  Defendants' Rule 30(b)(6) Topics 1-3 concern the "preparation, filing, and prosecution" of the asserted patents, the "contribution(s) of each of the Named Inventors to the alleged inventions" of the asserted patents, and the "examples, experiments, and testing (including clinical testing) disclosed" in the asserted patents.  The problem with these broad topics is that BDSI is a very small company with few employees, and due to the significant amount of turnover, there is no one left at the company with actual knowledge of the development of the inventions claimed in the patents-in-suit.  The purpose of a Rule 30(b)(6) deposition is to prevent the situation where "officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are *clearly known* to persons in the organization and thereby to it."  Fed. R. Civ. P. 30(b)(6) cmt. 1970 amd. (emphasis added).  This concern is not present in this case as there are no individuals left at the company with

The Honorable Christopher J. Burke
April 7, 2020
Page 2

knowledge concerning these topics.  For this reason, BDSI informed Defendants on multiple occasions, through interrogatories, and in its response to the Notice, that the individuals with knowledge of these topics are the inventors of the patents-in-suit, Drs. Andrew Finn (former Executive Vice President of Product Development) and Niraj Vasisht (former Senior Vice President of Product Development and Chief Technology Officer), both *former employees*, who have been made available to Chemo for deposition.  Indeed, given their knowledge of the claimed inventions, BDSI arranged to make both former employees appear for their depositions voluntarily without the need for a subpoena.  Accordingly, BDSI has on numerous occasions requested that Chemo first seek information within the scope of these topics from the inventors, and then the parties can determine whether Chemo requires any additional information from a corporate witness, to the extent any such information is available.

While Dr. Finn has not yet been deposed,[1] Dr. Vasisht testified on March 12, and provided extensive testimony concerning the asserted patents (transcript attached as Ex. 1).  Dr. Vasisht testified as to the examples in the '866 and '539 patents, his declaration submitted for the '539 patent, and his and Dr. Finn's contributions to the '866 and '539 patents.  (Ex. 1 at 54:11-59:4, 67:19-86:18, 119:9-122:21.)  Very rarely during the deposition did Dr. Vasisht profess a lack of memory.  This is the very testimony sought by the Topics 1-3, and any further testimony would be plainly duplicative.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); *Novartis Pharms. Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162 (D. Del. 2001) ("The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit" (citing Fed. R. Civ. P. 26(b)(2))).  Indeed, BDSI also answered interrogatories concerning these topics as well.  (Ex. 2 at pp. 2-5, 19-22.)

To the extent Chemo did not obtain all the information it wanted from Dr. Vasisht's deposition, this is due to Chemo's own failure to ask the necessary questions despite having ample opportunity to do so.  For example, Dr, Vasisht testified that he wrote examples of the '866 patent. (Ex. 1 at 35:14-36:24.)  Chemo could have questioned Dr. Vasisht about these examples but elected not to.  Similarly, Dr. Vasisht submitted *three* declarations to the Patent Office during prosecution of the patents-in-suit.  Chemo, however, chose to not question Dr. Vasisht about any of these declarations, and Alvogen only questioned Dr. Vasisht about *one* of them, concerning the '539 patent.  Chemo did not ask any questions about the '843 patent.

Further, Chemo cites pages 134-139 of the transcript to argue that Dr. Vasisht "couldn't testify about important aspects of the Asserted Patents." (D.I. 232 at 1.)  Chemo is simply wrong. The portions of Dr. Vasisht's deposition transcript Chemo cites reflect questions Alvogen asked about his declaration submitted during the prosecution of the '539 patent. ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ (Ex. 1 at 132:2-139:4.) ████████████████████████████████████████████████████████████ (*Id.* at 137:5-13.)  That he could not remember ████████████████████████████████████████████ is hardly an "important aspect" of the patent, and certainly does not warrant Rule 30(b)(6) testimony.

---

[1] Dr. Finn was offered for deposition on January 23 and March 18.  Chemo declined to take Dr. Finn's deposition on either date.

The Honorable Christopher J. Burke
April 7, 2020
Page 3

Chemo also points to testimony at page 124, lines 4-23.  (D.I. 232 at 1.) ████████
████████████████████████████████████████████████████
████████████ (Ex. 1 at 122:13-21.) ████████████████████
████████████████████████████████████████████████████
████████████████.  Dr. Vasisht further testified extensively about the examples of the patent and
which formulations were used.  (*Id.* at 119:9-122:21.)  Moreover, for this specific information, BDSI
has in fact offered a Rule 30(b)(6) witness to testify as to the pH of the backing layer of Belbuca®
in response to Defendants' Topics 7 and 8.  (*See* D.I. 232, Ex. 1 at pp. 4-5.)

Accordingly, for all of these reasons, Chemo's request for Rule 30(b)(6) testimony on Topics
1-3 should be denied.

**Discovery related to the '019 patent:**  The '019 patent is not a patent-in-suit.  Chemo chose
to file a Paragraph III certification regarding this patent, meaning it will wait until the patent expires
to market its product.  There is no jurisdiction concerning this patent, and Chemo's requests for
sweeping discovery concerning this patent should be denied.  Chemo demands deposition transcripts
of the inventors from a prior litigation, and interrogatory responses and even Rule 30(b)(6)
deposition testimony on the scope and meaning of the claims of the '019 patent.  (D.I. 232 at 1-2.)
Chemo contends that "BDSI's understanding of the scope of the '019 Patent and how Belbuca®
meets the limitations of the '019 Patent" is relevant because Chemo asserts the '019 patent as prior
art and as a blocking patent for its invalidity defenses.  (*Id.*)  Chemo's assertions make no sense.
The inquiry about what the '019 patent discloses as a prior art reference is judged from the
perspective of those of ordinary skill—not what BDSI (the licensee of the patent) or the inventors
themselves thought.  *See Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1372 (Fed.
Cir. 2002); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007) (The question of
obviousness is "whether the combination was obvious to a person with ordinary skill in the art").
Moreover, Chemo's "blocking patent" contention is premised upon the '019 patent covering
Belbuca®, such that it would block others from experimenting.  BDSI agrees that the '019 patent
covers Belbuca®, as it is listed in the Orange Book as covering that product.  But BDSI does not
understand what other discovery Chemo needs concerning that patent.  Chemo's request for
testimony from a lay Rule 30(b)(6) witness as to BDSI's contentions as to the meaning of claims of a
patent not in suit should be rejected.  *See Medicis Pharm. Corp., et al. v. Actavis Mid Atlantic LLC*,
C.A. No. 11-409-LPS-CJB, 9/28/12 Hearing Tr. at 43:10-44:20 (D. Del. Jan. 3, 2013) (attached as
Exhibit 3).

**Discovery concerning other BDSI products not at issue:**  The Court has previously denied
Chemo's requests broadly seeking discovery on two other BDSI products not at issue in this
litigation, Bunavail® and Onsolis®.  (D.I. 148.)  Bunavail® contains naloxone in the backing layer
and is indicated for the treatment of opioid dependence.  For Bunavail®-related discovery, the Court
directed that Chemo make a "more specific request."  (*Id.*)  Chemo has not done so but instead
continues to demand five broad categories of documents that merely restate its overly broad
document requests and represent the same type of information that was already at issue during the
prior discovery conference.  On this basis alone, the Court should deny Chemo's request.  Nor has
Chemo articulated any reasoned basis why the Bunavail® discovery that BDSI has already produced
is deficient. ████████████████████████████████████████████
████████████████.  (*See, e.g.*, Ex. 4 (BEL00054021, excerpt attached); Ex. 5 (BEL00072306);

The Honorable Christopher J. Burke
April 7, 2020
Page 4

Ex. 6 (BEL000169785).)  In addition, BDSI searched for and produced documents from the prior Bunavail[®] litigation that are relevant to Belbuca[®], as well as the generic's invalidity contentions and the deposition transcripts and all accompanying exhibits of the inventors from that litigation.

Chemo argues that it is entitled to broad discovery, including interrogatory responses and Rule 30(b)(6) testimony, on Bunavail[®] because its requests "relate to the limitations of the '866 and '843 patents" and that it "has a right" to "understand BDSI's interpretation of the scope of the claims." But BDSI's Bunavail[®] product is not accused of infringement nor is it the brand product at issue. Further, the *Markman* hearing is over, and the Court has issued its claim construction order. Additional discovery regarding Bunavail[®] is not necessary or even relevant.

For BDSI's Onsolis[®] product, Chemo now claims that BDSI is withholding discovery and that it is "unacceptable in light of [Onsolis[®]'s] indisputable relevance." (D.I. 232 at 4.) Yet when the Court previously denied Chemo's requests for Onsolis[®]-related discovery, both the Court and Chemo acknowledged that such discovery is "'less relevant' to this case than other materials at issue." (D.I. 148.) That is because Onsolis[®] involves a completely different drug, fentanyl. Onsolis[®] is also not within the scope of any claims of any of the patents-in-suit, which are limited to devices and/or methods incorporating buprenorphine. ███████████████████████████████████
████████████████████████████            (*See* D.I. 127, Ex. 6 at BEL00053734.) Indeed, Onsolis[®] only became an issue late in discovery when Chemo, for the *first* time, raised any dispute about Onsolis[®] in its January 13, 2020 letter to the Court. Onsolis[®] has not, as Chemo claims, "been outstanding since August 2019." (D.I. 232 at 4.)

Further, although documents concerning Onsolis[®] have limited, if any, relevance, BDSI has produced many such documents, including documents comparing Onsolis[®]'s formulation to Belbuca[®] and Bunavail[®], a clinical trial involving Onsolis[®], and presentations. (*See, e.g.*, Ex. 6 (BEL000169785); Ex. 7 (BEL00417504); Ex. 8 (BEL00334827).) The production of such documents is more than sufficient given the limited relevance of Onsolis[®]. Further, as acknowledged by Chemo, Dr. Vasisht provided testimony concerning Onsolis[®] at his deposition. (D.I. 232 at 3.)

**Settlement agreements from other litigations:** The Court also previously denied Chemo's requests for BDSI's settlement agreements from previous litigations. (D.I. 148.) Chemo argued that the settlement agreements were relevant to long-felt need, non-statutory injunctive relief, and potential damages. (Ex. 9, 1/27/20 Hearing Tr. at 44:13-45:18.) The Court stated that it had "not yet been convinced that the agreements are relevant to the claims and defenses at issue." (D.I. 148.) Yet Chemo continues to demand the settlement agreements based on irrelevant bases—potential damages and secondary considerations. (D.I. 232 at 4.) And now, Chemo has shifted its positions to claims that the agreements are relevant to an unsubstantiated patent misuse defense. (*Id.*) Chemo's request should again be denied.

Chemo has provided no basis for why the agreements are even relevant to an unpled hypothetical patent misuse defense. Moreover, the deadline for the parties to amend or supplement their respective pleadings in this case was November 1, 2019, which has long passed. (D.I. 39 at 6.) Nor has Chemo explained how any settlement agreement would be relevant to damages. Given Chemo's serious problems with obtaining FDA approval for its product, an at-risk launch is completely hypothetical, and Chemo does not explain how any settlement agreement would inform the amount of hypothetical damages in any event. Chemo has also failed to articulate how the

The Honorable Christopher J. Burke
April 7, 2020
Page 5

settlement agreements would be relevant to secondary considerations, particularly where BDSI has explained it is not relying on them, only alleging that any secondary considerations are somehow "artificial" without any supporting basis. *See Allergan USA, Inc. v. Aurobindo Pharma Ltd.*, C.A. No. 19-1674(RGA), 1/10/20 Hearing Tr. at 7:3-10 (D. Del. Jan. 10, 2020) (attached as Exhibit 10) (explaining that settlement agreements are not relevant for Hatch-Waxman cases where damages are not at issue "unless plaintiff says that it's going to be doing secondary considerations and saying that [the settlement agreements] proves that it's non-obvious").

    **Discovery concerning Endo's decision to terminate its license agreement:**  Chemo's interrogatory number 11 seeks the reasons for *Endo's* decision to terminate the license agreement with BDSI.  These reasons have been described in detail in numerous public press releases *from Endo*, which BDSI has fully explained and pointed to in its interrogatory response.  Chemo, however, complains that this is "insufficient" because it lacks "any non-public information as to why Endo terminated this license." (D.I. 232 at 5.)  Yet, Chemo has not argued, or has any basis to argue, that the contents of Endo's press releases do not accurately describe Endo's decision to terminate or how any such "non-public information" would be different.  The interrogatory asks for BDSI's position for why Endo terminated the license agreement, and BDSI fully answered that interrogatory.

    **Discovery concerning "persons most knowledgeable":**  Chemo's interrogatory numbers 14, 15, 17-19, and 30 seek answers concerning the scope of the asserted claims and whether and how BDSI's Belbuca® product meets certain claim limitations.  These contention interrogatories seek legal conclusions for why Belbuca® falls within the scope of the claims, and requested BDSI prepare claim charts.  Further, to the extent Chemo is asking about the individuals most knowledgeable about the technical properties of Belbuca®, BDSI has identified such individuals in responses to interrogatories numbers 9, 12, and 13 (Ex. 11 at p. 20; Ex. 12 at pp. 4, 7), and Topics 7-11 of Defendants' Rule 30(b)(6) notice (D.I. 232, Ex. 1 at pp. 4-5; D.I. 232, Ex. 20 at pp. 16-24).

    **Discovery concerning other third-party agreements and relationships:**  Chemo argues that BDSI has not provided its agreement with Tolmar concerning the licensing of the '019 patent.  This is not correct.  BDSI specifically pointed Chemo to the publicly available PTO website that contains these very licenses. (D.I. 232, Ex. 1 at p. 10.)  BDSI does not understand why this is not sufficient for Chemo's purposes.  Further, Chemo seems to seek any agreement that BDSI entered into with a third party, notwithstanding any particular patent or product.  Such agreements are simply not relevant to any issue in the case.  Like Chemo, Alvogen raised similar disputes regarding various licensing agreements and third-party arrangements within the scope of Chemo's interrogatory numbers 25-27.  But, after BDSI explained the lack of relevance of this information and that such agreements are available from public sources, including BDSI's own 10-K filings, Alvogen agreed to drop the dispute.  Further, Chemo provides no explanation on its broad claims that the information would be "relevant to gauging the purported novelty" of the asserted claims and "understanding the state of the art." (D.I. 232 at 6.)  Chemo's requests should be denied.

    **Deposition of Mark Sirgo, BDSI's former CEO and current Vice Chairman:**  Mr. Sirgo is the former CEO and currently the Vice Chairman of the Board of Directors for BDSI.  Accordingly, Mr. Sirgo is an "apex witness."  Courts have applied the "apex doctrine" to ensure that depositions are used only for their intended purpose and not as a tactic to harass the opposition and inflate discovery costs.  Courts have only allowed apex witnesses to be deposed only where (1) the witness "has unique, non-repetitive first-hand knowledge of the facts at issue in the case[,] and (2)

The Honorable Christopher J. Burke
April 7, 2020
Page 6

"whether less intrusive means of discovery have been exhausted without success." *Cadence Pharm., Inc. v. Paddock Labs., Inc*., C.A. No. 11-733 (LPS), 1/3/13 Hearing Tr. at 13:5-14:9 (D. Del. Jan. 3, 2013) (attached as Exhibit 13); *Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, C.A. No. 11-1175 (RGA), 10/4/13 Hearing Tr. at 29:6-20 (D. Del. Oct. 4, 2013) (attached as Exhibit 14) (discussing the apex doctrine and holding that the proposed deponent was "high enough up in whatever organization exactly he's in so that absent some better showing that has been made so far, I'm not going to permit his deposition"); *Ford Motor Co. v. Edgewood Props.*, C.A. No. 06-1278, 2011 WL 677331, at *2 (D.N.J. Feb. 15, 2011).

Chemo has failed to make the necessary showings on either of these two factors. Mr. Sirgo does not have unique knowledge related to issues in this litigation that cannot be obtained through less burdensome discovery of BDSI, including depositions of other witnesses, interrogatories, or documents. Mr. Sirgo is *not* an inventor of any of the patents-in-suit. Nor was Mr. Sirgo listed in BDSI's Rule 26(a) disclosures or identified in any discovery responses. And contrary to Chemo's contentions, simply because others reported to Mr. Sirgo or that Mr. Sirgo was part of a BDSI technical team and provided input does not mean that only Mr. Sirgo has unique knowledge concerning development and strategy. Indeed, any general statements made by Mr. Sirgo that are typical of high-ranking corporate executives, such as internal statements on general strategy and statements regarding company values, do not imply unique, firsthand knowledge that would justify an apex deposition. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 265-66 (N.D. Cal. 2012) (granting protective order and denying motion to compel apex deposition where only basis for request was "statements of a business executive voicing [the] need to remain competitive and to plan its designs accordingly"); *Affinity Labs of Texas v. Apple, Inc.*, No. 09-4436, 2011 WL 1753982, at *14 (N.D. Ca. May 9, 2011) (explaining that "general statement[s] about patent rights" should not be used as a basis to depose a CEO). Further, that BDSI is a small company is not a reason for disregarding the apex doctrine. *Cadence*, 1/3/13 Hearing Tr. at 13:19-22 (stating "that the plaintiff may be a relatively smaller-sized company is not, in the Court's view, enough of a distinction to get out from under this apex doctrine").

Moreover, Chemo has failed to establish that less intrusive discovery is not adequate. In particular, BDSI has offered to make the inventors of the patents-in-suit, Drs. Finn and Vasisht, available for their depositions. In addition to being an inventor, Dr. Finn was the Executive Vice President of Product Development. Similarly, Dr. Vasisht was the Senior Vice President of Product Development and Chief Technology Officer. Chemo has not explained, for example, what specific information it seeks from Mr. Sirgo, why it cannot obtain such information from other witnesses, such as Dr. Finn or Dr. Vasisht, or why other forms of less intrusive discovery are not adequate.

Finally, Alvogen has also sought the deposition of Mr. Sirgo. Alvogen, however, acknowledging the apex doctrine, has agreed first to complete the depositions of BDSI's other witnesses, and at that point, revisit whether it will continue to seek a deposition of Mr. Sirgo. Chemo's discovery efforts should be consolidated with Alvogen's and follow this agreement.

For the above reasons, BDSI respectfully requests that the Court deny Chemo's requests to compel discovery.

The Honorable Christopher J. Burke
April 7, 2020
Page 7

Respectfully,

/s/ Jeremy A. Tigan

Jeremy A. Tigan (#5239)

JAT/lo

cc:     All Counsel of Record (*via* CM/ECF and E-Mail)

# EXHIBITS 1-2
# **REDACTED IN THEIR ENTIRETY**

# EXHIBIT 3

Case 1:19-cv-00449-CFC-CJB   Document 242   Filed 04/15/20   Page 10 of 33 PageID #: 27275
Case 1:11-cv-00409-LPS-CJB   Document 242   Filed 10/19/12   Page 1 of 56 PageID #: 27275

1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -
     MEDICIS PHARMACEUTICAL CORPORATION,
4    et al.,                             :    CIVIL ACTION NO.
                   Plaintiffs,           :
5                                        :
                    v.                   :
6                                        :
     ACTAVIS MID ATLANTIC LLC,           :
7                                        :    11-409-LPS-CJB
                   Defendant.            :
8                                - - -

9                         Wilmington, Delaware
                          Friday, September 28, 2012
10                        Telephone Conference

11                               - - -

12   BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S. Magistrate Judge

13   APPEARANCES:                    - - -

14
                  MORRIS NICHOLS ARSHT & TUNNELL, LLP
15                BY:  JACK B. BLUMENFELD, ESQ., and
                       JENNIFER YING, ESQ.
16
                       and
17
                  GIBSON DUNN & CRUTCHER
18                BY:  MICHAEL A. SITZMAN, ESQ., and
                       LAUREN A. EBER, ESQ.
19                     (San Francisco, California)

20                       Counsel for Plaintiffs

21
                  PROCTOR HEYMAN, LLP
22                BY:  DOMINICK T. GATTUSO, ESQ.

23                     and

24
                                 Brian P. Gaffigan
25                               Registered Merit Reporter
```

Case 1:19-cv-00449-CFC-CJB   Document 244   Filed 04/15/20   Page 11 of 33 PageID #: 2776
Case 1:21-cv-00409-LPS-CJB   Document 242   Filed 10/19/21   Page 2 of 56 PageID #: 2726

2

```
 1   APPEARANCES:  (Continued)

 2
                   ALSTON & BIRD
 3                 BY:   JOSEPH J. GLEASON, ESQ.
                         (Atlanta, Georgia)
 4
                            Counsel for Defendant
 5

 6

 7

 8

 9

10

11

12

13

14                         - oOo -

15                  P R O C E E D I N G S

16           (REPORTER'S NOTE:  The following telephone

17   conference was held in chambers, beginning at 3:01 p.m.)

18           THE COURT:  Good afternoon, everybody.  This is

19   Judge Burke.  Could the parties let me know who is on the

20   line, first for the plaintiffs?

21           MR. BLUMENFELD:  Good afternoon, Your Honor.

22   It's Jack Blumenfeld and Jen Ying from Morris Nichols with

23   Mike Sitzman and Lauren Eber from Gibson Dunn.

24           THE COURT:  Okay.  Good afternoon to all of you.

25           MR. BLUMENFELD:  Good afternoon.
```

Case 1:19-cv-00404-CFS-CJB   Document 244   Filed 04/15/20   Page 43 of 56 PageID #: 2773
Case 1:11-cv-00409-LPS-CJB   Document 242   Filed 10/15/12   Page 43 of 56 PageID #: 2763

43

1    of the prior art previously identified by Actavis, why the

2    patents are not invalid; if the Court were to broadly

3    construe that as including not only a response to the prior

4    art but also to every secondary consideration, then we would

5    respond to that.

6         There is not an interrogatory out there in my

7    mind that says:  Please identify any secondary indicia of

8    nonobviousness and/or your basis for contending that there

9    are secondary bases.

10        THE COURT:  Okay.  I'm dealing with the issue I

11   have before me, which is whether or not Actavis should be

12   able to obtain a 30(b)(6) deponent with respect to topics 19

13   to 25.  That is the topics that really I think describe,

14   request information regarding secondary considerations.

15        I think that the plaintiffs are correct that

16   our District, in cases like the cases that they have cited

17   in their briefs, including *Reliant* and *Pharmacia* and others,

18   have identified a clear view of the Court here that so-called

19   contention depositions are not favored.

20        My sense is from reading those cases, that is for

21   Two primary reasons in the context of a 30(b)(6) deposition.

22        One is to the extent the topics in issue really

23   read more like requests for additional legal contentions as

24   opposed to underlying factual evidence regarding these issues.

25   The best way and the most appropriate way to respond to that

Case 1:19-cv-00464-CFS-CJB   Document 244   Filed 04/15/29   Page 13 of 56 PageID #: 2776
Case 1:11-cv-00409-LPS-CJB   Document 242   Filed 10/15/12   Page 44 of 56 PageID #: 2776

44

1    is by responding to contention interrogatories that ask for the

2    same thing.  And,

3              Secondly, I think it's something Mr. Sitzman

4    said, which is I think there is a general view in the

5    context of a 30(b)(6) deposition, it is particularly

6    inefficient, especially if you have the ability to propound

7    contention interrogatories, to require in this case the

8    plaintiffs to prepare a 30(b)(6) witness who may not them-

9    selves have that information in their own knowledge base to

10   testify as to these issues.

11             In light of that guidance from the case law,

12   also in light of the fact as I read the topics, I disagree

13   with Mr. Gleason, I think that they really do read more,

14   they read as give me your legal position as to these issues,

15   and they read more that way than they do as a request for

16   some targeted specific fact issue that might in some way

17   otherwise relate to secondary considerations of nonobviousness.

18             So for all those reasons, I'm going to deny

19   Actavis's request to require the plaintiffs to put forward a

20   30(b)(6) witness as to these topics.

21             Look, I don't know what form it will or won't

22   come in, but I'll tell you that some of the basis for that

23   is, as I have said, based on the idea that this information

24   is more promptly obtained via contention interrogatories.

25   Our discovery period isn't complete.  It strikes me that in

Case 1:19-cv-00464-CFS-CJB   Document 241   Filed 04/15/20   Page 44 of 36 PageID #: 2779
Case 1:11-cv-00409-LPS-CJB   Document 242   Filed 10/15/12   Page 45 of 56 PageID #: 2779

45

1    some way, shape or form, it wouldn't be inappropriate for

2    the plaintiffs to either supplement or to provide some

3    amount of this information via the response to a contention

4    interrogatory.  I think that is the impetus for this general

5    rule that we have anyway.  So I will say that.

6              That is not before me.  What is before me is the

7    request for the 30(b)(6) deponent.  I'm going to deny that

8    request.

9              Lastly, I think we have the issue of witness

10   testimony and deposition testimony that Actavis has requested.

11             Mr. Gleason, do you want to make any additional

12   brief argument with respect to that issue?

13             MR. GLEASON:  Your Honor, I think the parties

14   are fairly close on this one.

15             There are four of the seven witnesses that have

16   been deposed.  As indicated, they previously had been

17   deposed in the contract case.

18             We're happy to accept the transcripts and

19   exhibits from that case.  What we can't have is the plaintiffs

20   reserving the rights to redact whatever they want from those

21   transcripts before they produce them to us.

22             Frankly, the redaction is a little bit silly

23   because we are counsel for Actavis in the contract case, so

24   we already have those depositions in front of us, so really

25   the only person who learns anything new by the fact of these

Case 1:19-cv-00464-CFS-CJB   Document 244   Filed 04/15/29   Page 15 of 36 PageID #: 2780
Case 1:11-cv-00409-LPS-CJB   Document 242   Filed 10/15/12   Page 56 of 56 PageID #: 2782

56

1    Honor.")

2              THE COURT:  Have a great weekend.  Good-bye.

3              (Telephone conference ends at 4:29 p.m.)

4

5         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
6

7                         /s/ Brian P. Gaffigan
                           Official Court Reporter
8                           U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBITS 4-8
# **REDACTED IN THEIR ENTIRETY**

# EXHIBIT 9

1                    (PORTION UNDER SEAL)

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5

    BIODELIVERY SCIENCES            :    CIVIL ACTION
6   INTERNATIONAL, INC. And         :
    ARIUS TWO, INC.,                :
7                                   :
                                    :
8   Plaintiff/Counterclaim          :
    Defendants                      :
9                                   :
        vs.                         :
10                                  :
    CHEMO RESEARCH S.L.,INSUD       :
11  PHARMA S.L.U., INTELGENX        :
    CORP., and INTELGENX            :
12  TECHNOLOGIES CORP.,             :
                                    :
13  Defendants/Counterclaim         :
    Plaintiffs                      :    NO. 19-444-CFC-CJB
14

15                          - - -

16                          Wilmington, Delaware
                            Monday, January 27, 2020
17                          3:00 o'clock, p.m.
                            ***Telephone conference
18                          - - -

19
    BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S. MAGISTRATE
20  JUDGE

21                          - - -

22

23

24                          Valerie J. Gunning
                            Official Court Reporter
25

42

1  then I think we would be okay with that from, you know, a

2  discovery response perspective.

3       From the deposition perspective, a review of the

4  document of the Actavis case shows that the two inventors in

5  the '866 patent were deposed, and I think just on Friday,

6  perhaps in anticipation of this call, plaintiffs produced to

7  us the deposition transcript of the inventors for the '866

8  patents that took place in that Actavis case and maybe even

9  the Teva case as well.

10      But even more, there's other depositions that

11  took place in at LEAST the Actavis case that are, you know,

12  the executives and other individuals who are at BDSI at the

13  time who had knowledge and were deposed about their

14  involvement in the product development for Belbuca and

15  Bunavail, and two of the individuals, Mark Sergio (phonetic)

16  and Al Menwar (phonetic) were deposed in that Actavis case.

17  We've issued subpoenas or deposition notices for them to be

18  deposed in this case given how relevant they are based on

19  the documents that we received in this case, and come to

20  find out, they were deposed in a prior case as well.

21      So, you know, even more so, there's two other

22  people who are deposed as part of the Actavis case who are

23  inventors of a patent that we are using as prior art in this

24  case.  So, again, even though those individuals, David

25  Osborne and Guy Tipulski (phonetic) were not inventors of a

43

1  patent that's being asserted in this case, you know, their

2  testimony about what happened to and what their knowledge

3  of the prior art and of the product development and the

4  piece of prior art, their patent that we're using as prior

5  art in this case is going to be relevant to the invalidity

6  issue.

7       THE COURT:  Okay.

8       MR. LaROCK:  So from a deposition perspective, I

9  think they are all relevant.

10      THE COURT:  Okay.  And then to the extent that

11  the plaintiffs are going to say, look, with regard to what

12  is or isn't relevant with regard to one or both of these

13  litigations, at some point we had to make some agreements

14  with Alvogen because they were first.  We did.  We searched

15  for a whole bunch of stuff and we produced it and we gave

16  that same amount of stuff to these defendants.  We just

17  shouldn't have to do it again.  Like, they should basically

18  have to live with what we agreed to with Alvogen.

19      What would you say in response to that line of

20  argument?

21      MR. LaROCK:  So I was kind of surprised to hear

22  that because, you know, BDSI throughout the initial stages

23  of this case wanted to make very clear that both Alvogen and

24  the defendants in the 444 action were supposed to coordinate

25  discovery, and I think for the large portion of it, we have,

44

1  but it wasn't until receiving their response to our dispute

2  letter and after it was filed we reviewed it and understand

3  that there was an agreement with Alvogen to only produce the

4  inventor depositions.

5       So we were never a part of that agreement, and I

6  don't think that agreement would work for us given, you

7  know, the relevance of these other individuals and their

8  deposition transcripts that were part of the case, that were

9  part of the related activity.

10      THE COURT:  It looks like settlement agreements

11  might also be in dispute.  Why are settlement agreements

12  from those cases relevant to the issues at play here?

13      MR. LaROCK:  Yes.  So the settlement agreements

14  are going to be relevant to three items.  I will go through

15  each one.

16      It's going to be relevant to the long-felt need

17  argument BDSI is making in this case and the particular

18  argument about relevance has to do with, you know, BDSI is

19  keeping other products off, using settlement to keep other

20  products off of the market for a certain period of time.

21  Obviously, their product is the only one that will be on the

22  market for that period of time and so therefore it looks

23  like they're satisfying a long-felt need that's out there

24  where, you know, had the employment agreements not been in

25  place, other products may have been able to come on the

45

1  market and satisfy that need, but not Belbuca.  So that's

2  relevance number one.

3       Relevance number two is as part of their

4  complaint, BDSI is seeking non-statutory injunctive relief,

5  and so whether, and if BDSI licensing their technology goes

6  to whether they're irreparably harmed and whether they can

7  get injunctive relief setting aside any statutory remedy,

8  just getting injunctive relief generally.

9       And, three, you know, the settlement agreements

10  would go towards damages, although damages is currently not

11  at issue in this case.  Damages would be an issue if this

12  case was -- got far enough where the 30-month stay of

13  approval of the Chemo generic product passed but we didn't

14  have resolution from a decision from the Court.  You know,

15  there could be a situation where there may be an at risk

16  launch and where damages would become at play.  Now, that's

17  not -- certainly, that's many years ahead, but, you know,

18  that would be one argument about relevance.

19      THE COURT:  Okay.  And then, lastly, just to try

20  to, we've talked about Bunavail a bit.  I understand at a

21  very high level your problem at the bottom of page 2 and

22  onto page 3 of your letter, which is, you think plaintiff

23  has "limited its discovery efforts to Belbuca only,

24  unilaterally determining that discovery as to Onsolis and

25  Bunavail is not relevant or proportional.

# EXHIBIT 10

**1**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF DELAWARE

 3

 4

 5   ALLERGAN USA, INC., ALLERGAN   )
     HOLDINGS UNLIMITED COMPANY,    )
 6   ALLERGAN PHARMACEUTICALS       )
     INTERNATIONAL LIMITED and      )
 7   JANSSEN PHARMACEUTICA NV,      )
                                    )
 8                Plaintiffs,       )
                                    ) C.A. No. 19-1674(RGA)
 9        v.                        )
                                    )
10   AUROBINDO PHARMA LTD. and      )
     AUROBINDO PHARMA USA, INC.,    )
11                                  )
                  Defendants.       )
12   - - - - - - - - - - - - - - - -
13   ALLERGAN USA, INC., ALLERGAN   )
     HOLDINGS UNLIMITED COMPANY and )
14   EDEN BIODESIGN, LLC            )
                                    )
15                Plaintiffs,       )
                                    ) C.A. No. 19-1727(RGA)
16        v.                        )
                                    )
17   AUROBINDO PHARMA LTD., AUROBINDO)
     PHARMA USA, INC., ALKEM        )
18   LABORATORIES LIMITED, HETERO   )
     LABS LIMITED, HETERO USA INC., )
19   MSN PHARMACEUTICALS, INC., SUN )
     PHARMACEUTICAL INDUSTRIES      )
20   LIMITED and ZYDUS              )
     PHARMACEUTICALS (USA) INC.,    )
21                                  )
                  Defendants.       )
22
                               J. Caleb Boggs Courthouse
23                             844 North King Street
                               Wilmington, Delaware
24
                               Friday, January 10, 2020
25                             12:24 p.m.
                               Scheduling Conference
```

**2**

```
 1   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

 2   APPEARANCES:
 3        MORRIS NICHOLS ARSHT & TUNNELL LLP
          BY:  JEREMY A. TIGAN, ESQUIRE
 4
               -and-
 5
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
 6        BY:  PETER J. ARMENIO, ESQUIRE

 7             For the Plaintiffs

 8
     MORRIS JAMES, LLP
 9   BY:  KENNETH L. DORSNEY, ESQUIRE

10             -and-

11   KRATZ & BARRY LLP
     BY:  GEORGE J. BARRY, III, ESQUIRE
12
               For the Defendants
13             Aurobindo Pharma Ltd and
               Aurobindo Pharma USA, Inc.
14
     MORRIS JAMES, LLP
15   BY:  KENNETH L. DORSNEY, ESQUIRE

16             -and-

17   PERGAMENT & CEPEDA
     BY:  DMITRY V. SHELHOFF, ESQUIRE
18
               For the Defendants
19             Hetero Labs Limited and
               Hetero USA Inc.
20
     YOUNG CONAWAY STARGATT & TAYLOR LLP
21   BY:  PILAR G. KRAMAN, ESQUIRE

22             -and-

23   LOCKE LORD LLP
     BY:  DAVID B. ABRAMOWITZ, ESQUIRE
24
               For the Defendant
25             Zydus Pharmaceuticals (USA) Inc.
```

**3**

```
 1   APPEARANCES CONTINUED:

 2
          HEYMAN ENERIO GATTUSO & HIRZEL LLP
 3        BY:  DOMINICK T. GATTUSO, ESQUIRE

 4             -and-

 5   WINSTON & STRAWN LLP
     BY:  JOVIAL WONG, ESQUIRE
 6
               For the Defendant
 7             Sun Pharmaceutical Industries Limited

 8   PHILLIPS GOLDMAN McLAUGHLIN & HALL, P.A.
     BY:  DAVID A. BILSON, ESQUIRE
 9
               -and-
10
     KNOBBE MARTENS
11   BY:  ANDREA L. CHEEK, ESQUIRE
     BY:  ANDREW MORRELL, Ph.D.
12
               For the Defendant
13             Alkem Laboratories Limited

14   STAMOULIS & WEINBLATT LLC
     BY:  STAMATIOUS STAMOULIS, ESQUIRE
15
               -and-
16
     GOLDBERG SEGALLA
17   BY:  RICHARD JUANG, ESQUIRE

18             For the Defendants
               MSN Laboratories Private Limited and
19             MSN Pharmaceuticals, Inc.

20

21             ***  PROCEEDINGS  ***

22             THE COURT:  Good afternoon.  Please be seated.
23   Thank you for your patience.  I was in court on a different
24   matter that ran long.
25             So this is the Rule 16 for two cases which I see
```

**4**

```
 1   seem to involve five different generics which the first one
 2   is Allergan USA versus Aurobindo Pharma, Civil Action Number
 3   19-1674, and the other one is 19-1727.
 4             So why don't we just have who's here, then I
 5   have one or two questions.  I saw what you have a dispute
 6   about.  It's a good dispute to have.  I think I can resolve
 7   that.
 8             And so Mr. Tigan, there you are.
 9             MR. TIGAN:  Good afternoon, Your Honor.  I'm
10   here on behalf of all the plaintiffs in both actions, and
11   I'm joined by Mr. Armenio with Quinn Emanuel.
12             MR. ARMENIO:  Good afternoon.
13             THE COURT:  Good afternoon, Mr. Armenio.  Have I
14   seen you before?
15             MR. ARMENIO:  Including just last Thursday, we
16   had a final pretrial conference --
17             THE COURT:  Yes.
18             MR. ARMENIO:  -- in another matter.
19             THE COURT:  Yes.  Okay.  I know what you're
20   talking about.  Right.  Got it.
21             Okay.  Mr. Dorsney.
22             MR. DORSNEY:  Good afternoon, Your Honor.  I'm
23   here on behalf of two defendants, Aurobindo and Hetero, and
24   I have co-counsel on the line for Aurobindo, George Barry
25   from Kratz & Barry.  And for Hetero, Dmitry Shelhoff from
```

**5**

1  Pergament & Cepeda.  And I am from Morris James, Your Honor.

2  THE COURT:  Okay.  Well, good afternoon to

3  counsel on the line.

4  Ms. Kraman, there you are.

5  MS. KRAMAN:  Hello.  Pilar Kraman from Young

6  Conaway for Zydus Pharmaceuticals in the 19-1727 matter, and

7  with me David Abramowitz from Locke Lord.

8  MR. ABRAMOWITZ:  Good afternoon, Your Honor.

9  THE COURT:  Hi, Mr. Abramowitz.

10  Mr. Gattuso, there you are.

11  MR. GATTUSO:  Good afternoon, Your Honor.

12  Dominick Gattuso with Heyman Enerio Gattuso & Hirzel on

13  behalf of Sun.  I have with me Jovial Wong from Winston &

14  Strawn.

15  THE COURT:  Okay.  And Mr. Bilson.

16  MR. BILSON:  Good afternoon, Your Honor.  David

17  Bilson from Phillips Goldman McLaughlin & Hall for Alkem

18  Laboratories.  With me from Knobbe Martin at the conference

19  table is Andrea Cheek and back here with me is Andrew

20  Morrell.

21  THE COURT:  And Mr. Stamoulis.

22  MR. STAMOULIS:  Good afternoon, Your Honor.

23  Stam Stamoulis here on behalf of MSN, and with me on the

24  phone is Richard Juang from the Goldberg Segalla firm.

25  MR. JUANG:  Good afternoon, Your Honor.

**6**

1  THE COURT:  Okay.  And good afternoon,

2  Mr. Juang.

3  So good afternoon to all of you.  So just why do

4  we have two cases and I guess six defendants?  Is there some

5  reason?  I didn't look.  Are some of the defendants in one

6  case and some of the defendants in the other case?

7  MR. ARMENIO:  So how it's organized, Your Honor,

8  this is Peter Armenio for the plaintiffs, Aurobindo is the

9  only generic in this case to challenge the compound patents.

10  There are fundamental patents to the compound eluxadoline,

11  the active ingredient.

12  THE COURT:  So based on the paragraph 4

13  certification, that's how you divided it up?

14  MR. ARMENIO:  Correct.

15  THE COURT:  Okay.

16  MR. ARMENIO:  So -- or eluxadoline in the Orange

17  Book, there are patents on compounds.  There are patents on

18  polymorphs.  There are patents on a composition that helps

19  the product be abuse resistant because there are aspects of

20  it that may lead people to try to abuse the product.

21  So Aurobindo is the only company to certify

22  against the compound patents, the one and only, and there

23  are different plaintiffs because there's a different

24  ownership structure for the compound patents.  So for

25  example, in example Janssen Pharmaceuticals --

**7**

1  THE COURT:  Too much information.  Thank you.

2  You've answered the question.

3  Okay.  All right.  So in terms of the dispute,

4  as I understand it, my new model order talked about

5  producing settlement agreements at the initial conference,

6  and so I had in mind for that the cases where damages were

7  at issue.  And you know, unless plaintiff says that it's

8  going to be doing secondary considerations and saying that

9  licensing proves that it's non-obvious, I don't know what

10  the relevance of settlement agreements would be.

11  So in any event, but certainly I would go with

12  not including this paragraph here.  But certainly, like I

13  said, it's something that might even cause me to have to

14  revise my form.  And so as I understand it, that's in both

15  of the proposed scheduling orders.  And if you want, I can

16  just cross out the defendant's proposal because everything

17  else is agreed to; right?

18  MR. ARMENIO:  Yes, Your Honor.

19  THE COURT:  And I saw that you wanted to put off

20  figuring out how we would manage these cases until or manage

21  in terms of how long the trial would be until some date

22  which I believe was in January of 2022.  When is it?

23  MR. ARMENIO:  Yes, Your Honor.  It's in

24  Paragraph 15.  We included that and just because there were

25  14 total patents and multiple different defendants with

**8**

1  different challenges we thought it might be better, instead

2  of having a dispute now, to just bring it to Your Honor

3  closer to trial.

4  THE COURT:  No, I think that's a reasonable

5  thing.  Does anyone object to that?

6  MS. KRAMAN:  No.

7  THE COURT:  Well, I guess no one objects to that

8  because no one's -- okay.  So let me give you the dates that

9  I had in mind.  Actually, so in Paragraph 15, the date

10  that's here for the trial is May 2nd of 2022, and the status

11  conference date is January 7, 2022 at 9:00 a.m.

12  Does that timing work in terms of what you all

13  had in mind?

14  MR. ARMENIO:  Yes, for plaintiffs, Your Honor.

15  MR. ABRAMOWITZ:  Yes, for defendants, Your

16  Honor.

17  THE COURT:  I'm just checking.  That would be

18  the same in both.  I mean, one of the things I suppose that

19  could be decided in January of 2022 is whether the compound

20  patents and all these other patents were all going to be

21  tried at the same time or different times.  So why don't we

22  just put in May 2nd, also, in both of the orders, though

23  it's understood that's not a decision at this point as to

24  that these two are going to be tried at the same time.

25  I'm sure some of you, maybe all of you know that

9

1    I've tried various different things to keep these kinds of

2    cases from becoming overwhelmingly complex for me by

3    sometimes separating infringement, sometimes by just waiting

4    for the plaintiff to reduce the number of asserted patents,

5    sometimes by having the defendant stipulate to things, but

6    this is all a reason to like let it shake out in January of

7    2022 when we'll have a much better idea of what's going on.

8            I forget.  So probably there's some other dates.

9    Pretrial conference in Paragraph 13 would be April 15, 2022

10   at 9:00 a.m.  Claim construction hearing, I haven't looked

11   at my calendar specifically, but 9:00 a.m. on December 22nd

12   of 2020.

13           Hold on.  Let me look at my calendar.  I just

14   want to make sure that I want to have a hearing on that

15   date.

16           Off the record.

17           (Discussion held off the record.)

18           THE COURT:  All right.  Back on the record.

19           I'm not entirely sure why we picked

20   December 22nd.  So what I'd like to do is I'd like to do it

21   on December 21st rather than the 22nd.  Is that all right?

22           MS. KRAMAN:  Mm-hmm.

23           THE COURT:  At 9:00 a.m.

24           MR. ARMENIO:  Yes, for plaintiffs, Your Honor.

25           MR. ABRAMOWITZ:  Yes, for defendants.

10

1            THE COURT:  All right.  And I think that's all.

2    Is there anything else you wanted to discuss while you're

3    here?

4            MR. ARMENIO:  Not for plaintiffs, Your Honor.

5    Thank you for your time.

6            MR. ABRAMOWITZ:  Not for defendants, Your Honor.

7            THE COURT:  Okay.  Do you want me to just cross

8    things out and sign this?

9            MS. KRAMAN:  Sure.

10           MR. ABRAMOWITZ:  Yeah, that's fine.

11           MR. ARMENIO:  That would be great.

12           THE COURT:  All right.  Well, it's nice to meet

13   you all.

14           Off the record.

15           (Discussion held off the record.)

16           THE COURT:  So back on the record.  We'll be in

17   recess.  Thank you very much.

18           (Everyone said, Thank you, Your Honor.)

19           I hereby certify the foregoing is a true and

20   accurate transcript from my stenographic notes in the

21   proceeding.

22           /s/ Heather M. Triozzi

             Certified Merit and Real-Time Reporter

23           U.S. District Court

24

25

# EXHIBITS 11-12
# **REDACTED IN THEIR ENTIRETY**

# EXHIBIT 13

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CADENCE PHARMACEUTICALS,  )
INC. and SCR PHARMATOP,   )
                          )
            Plaintiffs,   )
                          )  C.A. No. 11-733 (LPS)(MPT)
v.                        )
                          )
PADDOCK LABORATORIES,     )
INC., PERRIGO COMPANY,    )
PADDOCK LABORATORIES, LLC,)
EXELA PHARMA SCIENCES,    )
LLC, EXELA PHARMSCI, INC.,)
And EXELA HOLDINGS, INC., )
                          )
            Defendants.   )

Thursday, January 3, 2013
9:00 a.m.

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE LEONARD P. STARK
         United States District Court Judge

APPEARANCES:

        MORRIS NICHOLS ARSHT & TUNNELL, LLP
        BY:  THOMAS C. GRIMM, ESQ.
        BY:  JEREMY A. TIGAN, ESQ.

              -and-

        LATHAM & WATKINS
        BY:  STEPHEN P. SWINTON, ESQ.
        BY:  DARRYL H. STEENSMA, ESQ.

              Counsel for Plaintiff
              Cadence Pharmaceuticals, Inc.

2

1    APPEARANCES CONTINUED:

2

3    MORRIS NICHOLS ARSHT & TUNNELL, LLP
     BY:  THOMAS C. GRIMM, ESQ.
4    BY:  JEREMY A. TIGAN, ESQ.

5           -and-

6    HOLLAND & KNIGHT
     BY:  CHARLES WEISS, ESQ.

7
            Counsel for Plaintiff
8           SCR Pharmatop

9

10   YOUNG CONAWAY STARGATT & TAYLOR, LLP
     BY:  ADAM W. POFF, ESQ.

11          -and-

12   WILEY REIN, LLP
     BY:  ANTHONY H. SON, ESQ.
13   BY:  MATTHEW J. DOWD, ESQ.

14          Counsel for the Defendants

15
16
17
18
19
20
21
22
23
24

3

16:59:56  1          THE COURT:  Good afternoon,
16:59:56  2   everybody.  This is Judge Stark.
16:59:56  3          Who's there, please?
16:59:56  4          MR. GRIMM:  Good afternoon, Your
16:59:56  5   Honor.  This is Tom Grimm at Morris Nichols here
16:59:56  6   in Wilmington.
16:59:56  7          I have my associate, Jeremy Tigan
16:59:56  8   with me.  We represent Cadence and SCR Pharmatop,
16:59:56  9   the two plaintiffs.
16:59:56  10         THE COURT:  Okay.
16:59:56  11         MR. GRIMM:  And on the line with me
16:59:56  12  today representing Cadence is Steve Swinton and
16:59:56  13  also Darryl Steensma from Latham & Watkins.  They
16:59:56  14  represent Cadence.
16:59:56  15         And also on the line with me is
16:59:56  16  Charles Weiss of Holland & Knight.  Mr. Weiss
16:59:56  17  represents Pharmatop.
16:59:56  18         THE COURT:  Okay.  Thanks.
16:59:56  19         MR. POFF:  Good afternoon, Your
16:59:56  20  Honor.  It's Adam Poff from Young Conaway for
16:59:56  21  Exela.  On the line with me from Wiley Rein are
16:59:56  22  Anthony Son and Matthew Dowd.
16:59:56  23         THE COURT:  Okay.  And that's
16:59:56  24  everyone; correct?

4

16:59:56  1          MR. POFF:  That's correct, Your
16:59:56  2   Honor.
16:59:56  3          THE COURT:  Okay.  Thank you.
16:59:56  4          And for the record, this is our case
16:59:56  5   of Cadence Pharmaceuticals, Inc., et al versus
16:59:56  6   Paddock Labs, Inc., et al.
16:59:56  7          Our Civil Action Number 11-733-LPS,
16:59:56  8   and we're here on discovery disputes raised by
16:59:56  9   both sides.  I want to first talk about the issue
16:59:56  10  raised by the plaintiff or plaintiffs.
16:59:56  11         The plaintiffs are seeking a
16:59:56  12  Protective Order to prevent the deposition of
16:59:56  13  Mr. Ted, I believe, it's Schroeder.  So let me
16:59:56  14  hear first from the plaintiffs, please.
16:59:56  15         MR. SWINTON:  Your Honor, this is
16:59:56  16  Steve Swinton on behalf of Cadence.  And we have
16:59:56  17  raised this issue about Mr. Schroeder's
16:59:56  18  deposition because we don't believe that there is
16:59:56  19  a justification for taking his deposition at this
16:59:56  20  stage in the case.
16:59:56  21         Mr. Schroeder is neither a scientist
16:59:56  22  or a pharmaceutical chemist.  He doesn't have any
16:59:56  23  personal knowledge of the patent law issues.
16:59:56  24  Rather, his job as CEO is to supervise and manage

9

1  with the product at issue here.  And as the Court
2  recognizes, you know, the plaintiff hasn't made
3  any argument or shown any basis to demonstrate
4  that a deposition of four hours, for example, in
5  San Diego on the issues that we've raised would
6  be burdensome to Mr. Schroeder.
7        THE COURT:  But in terms of your
8  showing, your belief that something useful would
9  come out of this deposition, is it based entirely
10  on this transcript of the call with the analyst
11  where he makes certain statements?
12        MR. DOWD:  It's based on that
13  statement where he makes specific statements with
14  respect to his belief about the value of the
15  patent, the scope of the patent.  And it's also
16  based on the press release that was released on
17  11/28, November 28th.
18        And it's related to the Settlement
19  Agreement that plaintiff or Cadence has entered
20  into with the prior defendant.  And, you know, as
21  of this date, I don't believe that we've received
22  copies of the redacted Settlement Agreements
23  which the plaintiff has agreed to produce.  This
24  is back in December, and I don't believe that

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

10

1  they've been produced yet.
2        So I think when you combine all of
3  that information and when you consider the fact
4  that they have no basis to object that the
5  deposition will be burdensome, you know, we've
6  met our need to show why Mr. Schroeder's
7  deposition is necessary.
8        THE COURT:  There's this doctrine
9  of apex officers and apex depositions, and I
10  think that doctrine would apply here.  You don't
11  address the factors that Courts have outlined as
12  being required to get such an apex deposition.
13        Do you want to address that now?
14        MR. DOWD:  Yes, Your Honor.  We're
15  aware of the apex doctrine and how it applies
16  here, given that Mr. Schroeder is the CEO of
17  Cadence.
18        But, as a first point I think in
19  this case, one thing to consider is the fact that
20  Cadence is a smaller pharmaceutical company.
21  Cadence is not involved in the manufacture of the
22  product.
23        They're more focused on the limited
24  role of licensing the product and then licensing

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

11

1  those right to a subsequent company that produces
2  it.  So, based on the information that we have,
3  it's our understanding that Mr. Schroeder is more
4  highly involved in some of the decisions and
5  activities that might preclude a deposition of a
6  CEO in a different situation in a much larger
7  company.
8        In addition, we pointed to the
9  information, the explicit statements that are
10  directly relevant to our defense of misuse.  And
11  we believe that that information satisfies our
12  need for taking his deposition.
13        MR. SWINTON:  Your Honor, this is
14  Mr. Swinton.  If I could respond, I'd be happy
15  to.
16        THE COURT:  I was just going to give
17  the opportunity to.  Go ahead.
18        MR. SWINTON:  Thank you.  Again, I
19  come back to this Court's decision in Met Life
20  and its reliance upon Upjohn, which I think is
21  the predicate, although I don't think they use
22  the term apex.  But it's certainly the basis of
23  the trial Court's position, which was affirmed by
24  the Fifth Circuit.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

12

1        Mr. Dowd did not answer the Court's
2  question.  The real issue here under apex and
3  clearly under Upjohn is we know the statements
4  they're relying upon or the generalized
5  statements.  What they have not answered for the
6  Court is:  Is there a variance between that
7  generalized statement and any of the discovery
8  that they've conducted, both in lengthy
9  depositions of the other Cadence executives and
10  in the interrogatory responses?
11        And I submit the fact that they have
12  not been able to identify or did not identify for
13  the Court any variance between Mr. Schroeder's
14  prior generalized statement and the lengthy
15  discovery is because there is none.
16        There is no unique information that
17  Mr. Schroeder has or could provide, because he
18  simply is not the person, certainly not a
19  scientist or a chemist to answer the questions
20  that they posed as the basis for the deposition.
21        THE COURT:  All right.  Thank you.
22        So with respect to plaintiff's
23  request for a Protective Order to bar this
24  deposition of, I'm not sure now if he's

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

13

1  Mr. Schroeder or Mr. Schroeder, but however you
2  pronounce his name, I'm granting the Protective
3  Order sought by the plaintiff, and I'm not
4  allowing this deposition.
5        I do believe that the doctrine that
6  has been referred to as the apex deposition
7  doctrine is applicable here.  And the defendants
8  did not address the factors that Courts have
9  required for such a deposition in the letter.
10        And those factors are really whether
11  or not the defendant can show that Mr. Schroeder
12  has unique, non-repetitive first-hand knowledge
13  of the facts at issue in the case and whether
14  less intrusive means of discovery have been
15  exhausted without success.
16        And even after hearing some
17  additional argument today, I don't believe that
18  the defendants have shown that those criteria are
19  satisfied here.  The fact that the plaintiff may
20  be a relatively smaller-sized company is not, in
21  the Court's view, enough of a distinction to get
22  out from under this apex doctrine.
23        I've reviewed the analytical, the
24  transcript for which is provided in the record

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

14

1  here as well as the press release.  And nothing
2  emerges from the statements that are attributed
3  to Mr. Schroeder there as evidencing that he has
4  any unique or direct knowledge regarding
5  secondary considerations of non-obviousness or
6  factors that could relate to the patent misuse
7  defense.  Accordingly, the Court finds good cause
8  for the Protective Order sought and that Order is
9  granted.
10        Let's turn next, then, to the issue
11  raised by Exela whereby Exela seeks to preclude
12  Mr. Weiss, who represents Pharmatop here, from
13  having access to Exela's attorneys' eyes only
14  information.  Let's hear first on this from
15  Exela, please.
16        MR. SON:  Thank you, Your Honor.
17  This is Anthony Son at Wiley Rein on behalf of
18  Exela.
19        Your Honor, the issue has arisen
20  here in this case because after the issuance or
21  the entry of the Amended Protective Order,
22  Mr. Weiss has filed and entered his appearance in
23  this case on September of last year.  And as part
24  of the discovery process, as the documents were

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

15

1  being produced, it came to light that Mr. Weiss
2  should not be receiving AEO information of Exela.
3  That all took place around November of last year.
4        Even leading up to that time and
5  prior to Mr. Weiss having made an appearance in
6  the case, he was advising SCR Pharmatop and had
7  requested access to certain confidential and
8  highly confidential information Exela had denied.
9        It was at that point in time that
10  Mr. Weiss then sought to enter an appearance in
11  the case under the belief that he could continue
12  on his role advising SCR Pharmatop as well as
13  other pharmaceutical companies and still be able
14  to receive Exela AEO information.  It is notable
15  here, Your Honor, that Mr. Weiss has not, to this
16  day and at least as of the date in November when
17  this dispute first arose, ever looked at or
18  reviewed any of the Exela AEO information.
19        At the course of the meet and confer
20  process, the issue that Exela was trying to
21  ascertain and determine for Mr. Weiss was
22  exactly:  What is his role with respect to
23  Pharmatop, and then also with respect to his
24  other pharmaceutical clients?  Is Mr. Weiss

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

16

1  purely -- and as I believe Mr. Schuler has
2  represented to the Court back in the February
3  time frame of last year when this issue was
4  before the Court on several -- a couple of
5  occasions, is he truly a trial counsel, somebody
6  involved with the litigation aspect or is he also
7  serving as somebody who would do opinion work or
8  advising his clients on other opinion or
9  licensing-type matters?
10        And there, at that time back in
11  February, Cadence and Pharmatop both affirmed
12  that they were not involved.  They were at least
13  accounted that they had made appearances in this
14  case.  They were not involved in such opinion
15  work or licensing activity.
16        But with the introduction of
17  Mr. Weiss, that kind of changed.  Mr. Weiss was
18  in the past involved with respect to the
19  prosecution or at least what attorney of record
20  was with the prosecution of the patent-in-suit.
21  We recognize that there are no continuing
22  prosecutions.
23        Mr. Weiss has mentioned that he's no
24  longer involved in that.  But that illustrates

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

37

```
 1   State of Delaware)
                     )
 2   New Castle County)

 3
               CERTIFICATE OF REPORTER
 4
 5             I, Heather M. Triozzi, Certified
     Professional Reporter, Registered Professional
 6   Reporter, and Notary Public in the State of
     Delaware, do hereby certify that the foregoing
 7   record, Pages 1 to 37 inclusive, is a true and
     accurate of the proceedings taken down on January
 8   3, 2013, in Wilmington.
               In witness whereof, this 18th day of
 9   January, 2013, in Wilmington.

10

11                     Heather M. Triozzi, CSR, RPR
                       Cert. No: 184-PS
12                     Exp: Permanent

13

14

15   DATED:  January 21, 2013
16

17

18

19

20

21

22

23

24
```

```
              Hawkins Reporting Service
     715 N. King Street - Wilmington, Delaware  19801
                    302-658-6697
```

# EXHIBIT 14

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3  CHALUMEAU POWER SYSTEMS  :
    LLC,                     : No. 1:11-cv-01175-RGA
 4       Plaintiff,          :
       v.                    :
 5                           :
    ALCATEL-LUCENT USA, INC., :
 6  et al.,                  :
         Defendants.         :
 7
 8            Friday, October 4, 2013
              3:00 p.m.
 9
              Pretrial
10            Courtroom of Judge Richard G. Andrews
11            844 King Street
              Wilmington, Delaware
12
13  BEFORE:   THE HONORABLE Richard G. Andrews,
              United States District Court Judge
14
15  APPEARANCES:
16            FARNAN LLP
              BY:  MICHAEL FARNAN, ESQ.
17
                    -and-
18
              LEE, JORGENSEN, PYLE & KEWALRAMANI, PC
19            BY:  MICHAEL LEE, ESQ.
20                 On behalf of Plaintiff
21
22
23
24
```

2

```
 1  APPEARANCES CONTINUED:
 2            MORRIS, NICHOLS, ARSHT & TUNNEL LLP
              BY:  JACK BLUMENFELD, ESQ.
 3
                    -and-
 4
              GOODWIN PROCTER LLP
 5            BY:  LANA SHIFERMAN, ESQ.
 6                 On behalf of Defendants
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
 1            THE COURT:  Mr. Farnan, you have
 2  Mr. Lee with you.  Were you at the claim
 3  construction?
 4            MR. LEE:  I was not.
 5            THE COURT:  So Mr. Jorgensen was
 6  there.
 7            MR. LEE:  That's correct.
 8            THE COURT:  Mr. Blumenfeld, you
 9  have Ms. Shiferman?  Is that the pronounciation?
10            MS. SHIFERMAN:  Yes, Your Honor.
11            THE COURT:  And you were at the
12  claim construction I remember.
13            MS. SHIFERMAN:  I was.
14            THE COURT:  I got thrown off a bit
15  because of the way this was scheduled, and then
16  there was a certain amount of repetition in the
17  pleadings that were filed but I didn't actually
18  realize that right away so I was busy cursing
19  that there were extra pleadings, but I got over
20  that.
21            So I have read everything.  There
22  was one thing I was kind of interested in
23  hearing from you all on.  The others seem to be
24  pretty cut and dry.  But on this interrogatory,
```

4

```
 1  whatever it is, the revenue information on these
 2  Omni switches in the 7000 and 9000 family,
 3  Mr. Lee, you're the one who is requesting the
 4  information.  What is your theory as to why you
 5  should get the sales information for these Omni
 6  switches?
 7            MR. LEE:  That's how they're sold,
 8  Your Honor.  They're sold as a family.
 9            THE COURT:  What does that mean?
10  Because I understood from what Alcatel wrote
11  that they're kind of like my family, some in
12  Delaware but some are out of state.  So, yes,
13  we're a family but we don't necessarily travel
14  together.  Or in this particular case, these
15  switches are sold independently of what gives
16  them Power over Ethernet technology.
17            MR. LEE:  The switches are
18  marketed as either having or not having PoE
19  technology.  So I downloaded this from the
20  website.  It says, with or without Power over
21  Ethernet.  The whole family is offered with or
22  without Power over Ethernet.
23            THE COURT:  So the impression I
24  got from Alcatel was that you could buy the
```

25

```
 1  identified.  But let's assume they are called
 2  Power over Ethernet Card No. 1.  I take it by
 3  what you've said about the detail that you've
 4  gotten so far, you can look and see whether they
 5  are normally sold for $300 each, but there's
 6  some percentage of them which were sold for $50
 7  each.  In other words, the underlying theory you
 8  have here is that the information you're
 9  getting, not casting any aspersions on Alcatel,
10  is not accurate.  And it seems to me that before
11  we start exploring whether that's the case, it
12  would be nice to know whether, in fact, there's
13  some objective indication that that information
14  you've gotten is not accurate.  Do either of you
15  understand?
16           MS. SHIFERMAN:  The information
17  has been pulled from the system so --
18           THE COURT:  No.  No.  I'm not
19  casting --
20           MS. SHIFERMAN:  Right.  And it can
21  be compared to the actual price list which we've
22  also produced.  So to the extent that there's a
23  question on what it is advertised or listed for
24  as compared to what the card is sold for if
```

26

```
 1  there is a discount or other change, they have
 2  the information in hand to make that comparison.
 3           THE COURT:  So you at least
 4  understood what I was suggesting.  Do you
 5  understand, Mr. Lee?
 6           MR. LEE:  Yes, I understood.
 7           THE COURT:  So a couple of things,
 8  I came in here thinking there's no way I was
 9  giving you this chassis information, but I've
10  learned something from the discussion.  But I
11  think right now it's actually premature.  I
12  think you're chasing a theory which there could
13  be factual support for but it's not there right
14  now.  And I think in the next few days when you
15  depose Mr. Vasilakis, you'll be able to explore
16  the topic from him as to whether there's a
17  factual underpinning for this.  Apparently,
18  you've been deposing some other people too.  So
19  I'm kind of inclined to think that the sale of
20  the chassis is irrelevant.  But I will be open
21  to persuasion that it is relevant.
22           On the other hand on the Alcatel
23  side of we can't produce this material, I've
24  heard Ms. Shiferman.  Is there any actual
```

27

```
 1  declaration or anything else from somebody at
 2  Alcatel that says we can't do this?
 3           MS. SHIFERMAN:  We have not gotten
 4  a declaration from an IT person.
 5           THE COURT:  Why don't you all do
 6  the deposition of Mr. Vasilakis and whatever
 7  else you have in the near future, and you can
 8  talk to each other about whether there really is
 9  something worthwhile pursuing here or not, both
10  from whether you got some addition that you're
11  getting information that's going to essentially
12  prejudice your damages calculation because of
13  bookkeeping things or whatever.  You could be
14  thinking about how if I do say that sounds
15  relevant, the question of how much would it
16  actually cost you to produce it.  Okay?
17           MS. SHIFERMAN:  Yes.
18           THE COURT:  I believe that takes
19  care of that.  According to my list of things,
20  there were three other matters on the table and
21  I will tell you what I think about them, which
22  is one of them was on the 30(b)(6) depositions
23  Topics 8 to 10, which all I have is their
24  contention deposition topics, and I think
```

28

```
 1  Mr. Blumenfeld cited Judge Stapleton.  I say
 2  Mr. Blumenfeld, maybe Ms. Shiferman.  But I'm
 3  sure Mr. Blumenfeld probably likes citing Judge
 4  Stapleton.  It's pretty hard to find anything
 5  you can cite better than Judge Stapleton.  So
 6  I'm going to quash those three topics.  And I
 7  think the only thing that actually -- off the
 8  record.
 9           (Discussion held off the record.)
10           THE COURT:  So back on the record.
11  So this issue has come up for me before and I do
12  think that contention depositions are not fair
13  to whomever's being asked to formulate these
14  things.  And I don't think changing -- I forget
15  what the exact language change you made but
16  actually that's come up before me too.
17           MR. BLUMENFELD:  Basis of fact --
18           THE COURT:  Yes.  So on Topic 7
19  which is the one about when did Alcatel first
20  know about your patent, I see that they've
21  answered it in interrogatory.  It seems to me
22  unlikely to be very productive to have some
23  corporate witness, but it also seems to me it's
24  not going to take very long so I will let you do
```

29

1  No. 7.  And I presume there is some corporate
2  witness who can be found who will know how it
3  was that Alcatel learned about the patent.
4  Presumably, the same person that provided the
5  information of the interrogatory answer.
6        Then the other thing was what the
7  deposition of Mr. Vridge(ph) and I've heard some
8  Delaware lawyers talking about the Apex Doctrine
9  before.  My impression is that basically
10 Mr. Vridge is high enough up in whatever
11 organization exactly he's in so that absent some
12 better showing that has been made so far, I'm
13 not going to permit his deposition.  I do think
14 a few days from now, I guess on Tuesday, when
15 you depose Mr. Vasilakis, if he turns out not to
16 be a fountain of knowledge, that may put things
17 in a different perspective.  But right now based
18 on the documents that have been submitted, I
19 don't think a deposition of Mr. Vridge is
20 appropriate.
21       So does that resolve everything?
22 I see you resolved between yourselves
23 Mr. Vasilakis.  So as far as I'm concerned,
24 that's great.  Is there anything else?

30

1        MS. SHIFERMAN:  No, Your Honor.
2        MR. LEE:  I think that's it, Your
3  Honor.
4        THE COURT:  All right.  So we're
5  done.  Off the record.
6        (The proceedings ended at
7  3:40 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

31

1        C E R T I F I C A T I O N
2
3        I, Taneha Carroll, Professional
   Court Reporter, certify that the foregoing is a
4  true and accurate transcript of the foregoing
5  proceeding.
6
7        I further certify that I am neither
8  attorney nor counsel for, nor related to nor
9  employed by any of the parties to the action in
10 which this proceeding was taken; further, that I am
11 not a relative or employee of any attorney or
12 counsel employed in this case, nor am I financially
13 interested in this action.
14
15
16       _____
17       Taneha Carroll
18       Professional Reporter and Notary Public
19
20
21
22
23
24