# EXHIBIT 1

# BANNISTER APPENDIX A

# EXHIBIT 2

# EXHIBIT 3

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2


 3
     BIODELIVERY SCIENCES,   )
 4   INTERNATIONAL, INC.,    )
     et al.,                 )
 5                           )
           Plaintiffs,       )   C.A. No. 19-444-CFC-CJB
 6                           )
     v.                      )
 7                           )
     CHEMO RESEARCH S.L.,    )
 8   et al.,                 )
                             )
 9         Defendants.       )


10


11              Tuesday, June 8, 2021
                1:00 p.m.
12


13              844 King Street
                Wilmington, Delaware
14


15
     BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
16         United States District Court Judge


17


18   APPEARANCES:


19
           MORRIS, NICHOLS, ARSHT & TUNNELL
20         BY:  JEREMY A. TIGAN, ESQ.

21                 -and-

22         DECHERT LLP
           BY:  JENNIFER S. SWAN, ESQ.
23         BY:  HOWARD W. LEVINE, ESQ.

24                 -and-
```

```
1    APPEARANCES CONTINUED:

2            FINNEGAN, HENDERSON, FARABOW,
             GARRETT & DUNNER, LLP
3            BY:  JUSTIN J. HASFORD, ESQ.
             BY:  DANIEL G. CHUNG, ESQ.
4
                         Counsel for the Plaintiffs
5

6
             YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
7            BY:  ANNE SHEA GAZA, ESQ.
             BY:  SAMANTHA WILSON
8
                     -and-
9
             STERNE, KESSLER, GOLDSTEIN & FOX
10           BY:  DENNIES VARUGHESE, ESQ.
             BY:  ADAM C. LAROCK, ESQ.
11
                     -and-
12
             DORSEY & WHITNEY
13           BY:  GEOFFREY GODFREY, ESQ.

14                       Counsel for the Defendants

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE COURT:  Good afternoon,
 2       everyone.  It's Judge Burke here.  I know our
 3       court reporter is with us, so why don't we go on
 4       the record and let me say first that we're here
 5       this afternoon by way of a teleconference in the
 6       matter of BioDelivery Sciences International,
 7       Inc., versus Chemo Research, et al.  It's civil
 8       action number 19-444-CFC-CJB here in our court.
 9       Before we go further, let me first have counsel
10       for each side who are on our call identify
11       themselves for the record.  We'll start first
12       with counsel for the plaintiffs side and we'll
13       begin there with Delaware counsel.
14                    MR. TIGAN:  Yes, Your Honor.  This
15       is Jeremy Tigan with Morris Nichols on behalf of
16       the plaintiffs.  I'm joined today by Jennifer
17       Swan and Howard Levine with the Dechert firm and
18       Ms. Swan will be presenting our argument.  I'm
19       also joined by Justin Hasford and Daniel Chung
20       from the Finnegan firm.
21                    THE COURT:  All right.  Thank you.
22       We'll do the same for counsel for the respective
23       defendants and again begin with Delaware
24       counsel.
```

```
 1                    MS. GAZA:  Thank you, Your Honor.
 2       It's Anne Gaza from Young Conaway on behalf of
 3       the defendants.  I'm joined today by my
 4       colleague, Samantha Wilson, and we are also
 5       joined by Dennies Varughese and Adam LaRock from
 6       Sterne Kessler.  We're here on behalf of the
 7       Chemo and Insud defendants.  Joining me as well
 8       is Geoff Godfrey of Dorsey & Whitney on behalf
 9       of IntelGenx.
10                    THE COURT:  All right.  Thank you.
11       Counsel, before we get started, again, by way of
12       preliminaries, I should also note that my
13       staff's made me aware that a few members of the
14       public, I think three, had requested the dial up
15       information for today's call and so we may have
16       here now or at some point in the call members of
17       the public on the line with us.  Let me just ask
18       to see now, is there anyone else on the call who
19       is a third party, a member of the public?
20                    MR. COHEN:  Yes, Your Honor.  This
21       is Michael Cohen.
22                    THE COURT:  Okay.  Mr. Cohen,
23       thank you.  Anyone else?
24                    MR. WILCOX:  Good afternoon.
```

1    documents, there are some questions we'd like to

2    ask that same witness, we didn't have those docs

3    back in February or January whenever we deposed

4    them, we'd like to depose them again, you would

5    have been just fine with that?

6              MR. VARUGHESE:  Absolutely.  We

7    offered up witnesses in May and I think April,

8    and if they said look, you know, there's some

9    new information in some e-mails, we need a

10   couple more hours with them, there's no reason

11   why we wouldn't have made them available.  When

12   we told them, hey look, in 2019 if you're going

13   to push forward with these depositions and then

14   we have to have the CRL response in order to

15   depose them again, that's inefficient, we're not

16   going to do that.  We would have tried anything

17   we could to expedite the case along and meet the

18   trial date in November and I still think we can

19   do that.

20             THE COURT:  Do you expect to

21   produce any more documents or do you feel like

22   your document production is done?

23             MR. VARUGHESE:  We believe our

24   document production is done.  And also, Your

1      Honor, we committed in our letter to not raising

2      that pH.  I think, you know, Ms. Swan was

3      speculating that that pH would change or go up.

4      We said in our letter we're not going to raise

5      the pH.  If the FDA for some reason requires us

6      to raise the pH, we're going to have to start

7      from scratch and maybe even abandon the project.

8      But our client authorized our law firm in that

9      letter to Your Honor that that pH will not go

10     above where it is now and that's really the

11     touchstone of the infringement inquiry.

12               THE COURT:  Okay.  And in your

13     letters a few times you said something like,

14     sure, yeah, the schedule in the case might have

15     to be change, I forget the word you used,

16     altered, or alteration in the schedule.  What

17     kind of alterations were you thinking about?  I

18     assume, for example, if it's true that expert

19     reports are supposed to be due in a couple days,

20     that can't happen right now, right?

21               MR. VARUGHESE:  Precisely.  And as

22     Ms. Swan said, the parties agreed to change the

23     expert dates, but, you know, sitting here today

24     on June 8th, trial is not scheduled until I

```
 1      think the first and second week in November.

 2      The parties can come up with a meaningful

 3      schedule where BDSI can take all the depositions

 4      they need of our fact witnesses and then we can

 5      go through expert reports.  Again, the issue is

 6      only non-infringement.  The key issue is pH and

 7      there is a secondary issue on the buffer.  But,

 8      you know, the CRL, I think identified 24 or 25

 9      issues.  The only issue that pertains to this

10      case was the pH specification and it wasn't even

11      a problem with the specification.  The FDA just

12      said, put the specification in there.  The

13      specification hasn't changed or the pH hasn't

14      changed from what it was when the ANDA was first

15      submitted years ago.  And so this notion that

16      Ms. Swan says our product's changed or we're

17      like to change our product, that's just not how

18      the FDA procedure works.  I think it reveals a

19      fundamental misunderstanding of the FDA process.

20                  THE COURT:  In that regard, you

21      know, I was asking about the risk in which, you

22      know, we go forward, we have a trial and then it

23      turns out the FDA does come back and ultimately

24      force your side to alter your product in a way
```

1    that ultimately changes what it is, I think you

2    mentioned that you think a CRL is -- happens so

3    often that it's not a particularly noteworthy.

4    Again, you're trying to analogize to the

5    scenario, you know, look, we have lots of

6    generics who go to trial when they haven't

7    gotten pre-approval from the FDA.  This is kind

8    of like that.  The other side is trying to say

9    no, this is nothing like that.  This is like way

10   on the other end of the spectrum in terms of the

11   unlikelihood that the generic as it currently

12   stands is actually going to make it to market in

13   its current form.  Is there anything more you

14   want to say, based on what's in the record, as

15   to how I gauge the risk that if we go forward

16   things might waste resources?

17              MR. VARUGHESE:   Absolutely.

18   Number one, let me just say, Your Honor, no one

19   can predict what the FDA is going to do.  The

20   FDA is just the regulatory agency charged with

21   making approval decisions for products.  Now,

22   Chemo and IntelGenx wouldn't invest hundreds of

23   thousands, if not millions of dollars responding

24   to the CRL, you know, with the thought that the

1      CRL wasn't going to be successful.  These are

2      highly trained scientists.  They did their best

3      to respond to the CRL to move the approval

4      process along.  So our position is we feel very

5      confident that the FDA will approve this

6      product.

7                    Separately, you said the BDSI

8      tries to analogize this to these extreme cases.

9      They cited two cases, the Forest case and the

10     Shire case.  And the facts in those cases are

11     wildly different than here.  For example, the

12     Shire case, yes, Court did stay the case, but

13     totally until the CRL response was filed.  The

14     Shire case that they cited, the Court did not

15     wait for any FDA reviews or feedback or

16     comments.  The case is stayed only until the CRL

17     response went in.  The CRL response has gone in

18     here.  The Forest case that they cite, there was

19     all kinds of shenanigans by the generic

20     defendant in that case where defendants hid the

21     ball, wouldn't produce documents or information.

22     Then they did file a CRL response and there were

23     multiple rounds of FDA objections.  None of that

24     have is attenant in this case.

```
 1    accommodate, and that way look, on the one hand,

 2    sure, would the parties, including the

 3    plaintiff, have to do the work to get ready for

 4    trial?  Yes.  But on the other hand if one of

 5    the other big concerns of plaintiffs is hey

 6    look, we might go to trial before hearing what

 7    the FDA has to say.  We think when the FDA comes

 8    back they're going to say no, we don't like this

 9    and require a bunch more changes.  Well, we'd at

10    least know that by January.  So if the trial

11    date was a little bit after that, could at least

12    account for that.  We could get rid of that, the

13    prospect of that.  How come that's not a good

14    middle ground?  Is the answer because it still

15    requires you to put in the cost and expense of

16    preparing for trial that might be obviated?

17               MS. SWAN:  Yes, that's exactly

18    correct, Your Honor.  And as defendants have

19    said, they've produced all these documents

20    initially in this case.  Those related to a

21    product that was rejected by the FDA and were

22    sort of back at the drawing board again and

23    start over and we think the amendments in this

24    case are significant enough and relate directly
```

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIODELIVERY SCIENCES INTERNATIONAL, INC. and ARIUS TWO, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-444 (CFC) (CJB) |
| CHEMO RESEARCH, S.L., INSUD PHARMA S.L., INTELGENX CORP., and INTELGENX TECHNOLOGIES CORP., | ) ) ) ) | ████████████████ |
| Defendants. | ) ) | |

## **JOINT LETER TO THE HONORBALE CHRISTOPHER J. BURKE**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Jennifer S. Swan
DECHERT LLP
3000 El Camino Real
Five Palo Alto Square
Suite 650
Palo Alto, CA  94306-2112
(650) 813-4800

Howard W. Levine
DECHERT LLP
1900 K Street, NW
Washington D.C.  20006-1110
(202) 261-3300

YOUNG CONAWAY STARGATT & TAYLOR LLP
Anne Shea Gaza (#4093)
Samantha G. Wilson (#5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants*

OF COUNSEL:

Dennies Varughese, Pharm.D., Esquire
Adam C. LaRock, Esquire
Josephine J. Kim, Esquire
Tyler C. Liu, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C.  20005

*Attorneys for Defendants Chemo Research*
*S.L. and Insud Pharma S.L.U.*

Paul T. Meiklejohn, Esquire
Geoffrey M. Godfrey, Esquire
DORSEY & WHITNEY LLP

Justin J. Hasford
Daniel G. Chung
Michael R. Galgano
Daniele San Román
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
(202) 408-4000

June 15, 2021

701 Fifth Avenue, Suite 6100
Seattle, WA  98104

*Attorneys for Defendants IntelGenx Corp. and
IntelGenx Technologies Corp.*

Dear Judge Burke:

On June 8, 2021, the Court obviated the schedule and ordered the parties to submit their proposals for a revised schedule.  The parties respectfully submit their proposed modifications.

**Plaintiffs' Proposal:**

| Event | Current Date | Proposed Date |
|---|---|---|
| Close of Fact Discovery | June 8, 2021 | October 4, 2021 |
| Opening Expert Reports | June 11, 2021 | November 1, 2021 |
| Rebuttal Expert Reports | July 16, 2021 | November 29, 2021 |
| Reply Expert Reports | August 13, 2021 | December 20, 2021 |
| Conference with Court on status of Chemo's ANDA | | January 21, 2022 |
| Close of Expert Discovery | September 17, 2021 | February 12, 2022 |
| Pre-trial Order | October 15, 2021 | March 19, 2022 |
| Pre-trial Conference | November 5, 2021 | April    , 2022 |
| Trial (3-days) | November 15, 2021 | April     2022 |

Plaintiffs' schedule tracks the Court's guidance at the hearing to have a trial in this case in April 2022 or thereafter.  (*See* 6/8/2021 Tr. 49:22-24.)  This schedule is manifestly necessary to ensure BDSI a fair trial and avoid undue prejudice caused by Defendants' 17-month delay in responding to the FDA with a new amended ANDA (submitted on May 14, 2021) and Defendants' inexcusable discovery delay in producing 108,000 new pages of documents just days before the close of fact discovery in May 2021.  This date will afford Plaintiffs with the necessary time to conduct fact and expert discovery, which has effectively just started in this case given Defendants' delayed filing of its amended ANDA and late production of documents in May 2021.  It was only with the newly produced 108,000 pages of documents that Defendants produced many of the categories of documents typically produced in a Hatch-Waxman litigation (*see* 6/8/2021 Tr. 26:17-22), including numerous emails collected from their custodians that should have been produced long ago.[1]  After a hearing in October 2020, which raised this issue (10/5/2020 Tr. 13:8-20), Defendants agreed to produce such documents (D.I. 298; D.I. 305 at 1), but instead of producing them on a rolling basis,[2] they intentionally delayed doing so until May of 2021. These documents comprised 8,908 pages created in **2019**, 58,278 pages created in **2020**, 35,790 pages created in **2021**, and some 5,258 pages that are undated or created before 2019.  There is simply no reason why these 108,234 pages of documents could not have been produced before May 2021.  Defendants offered no explanation at the hearing, except for the alleged inconvenience of "shut[ting] down laptops." (6/8/2021 Tr. 27:1.)  Defendants' failure to produce the necessary documents amply supports Plaintiffs' schedule.

The most relevant documents currently in the case are those produced in May 2021, including the amended ANDA, and must be reviewed before any depositions are taken.  There

---

[1] Contrary to Defendants' assertions (6/8/2021 Tr. 30:8-33:3), the documents produced in May 2021 constitute *43%* of the total number of pages produced in this case.  The previously produced documents, mostly "lab notebooks [and] spec sheets" (*Id.*, 26:16), particularly those produced in 2019, described lab scale projects or work on Defendants' previous ANDA product and, in many cases, did not even describe the final pH that was to be used.  BDSI needed to file a motion to compel this information, which the Court granted. (D.I. 72.)

[2] *See* D.I. 193 at ¶2; D.I. 250 at 3; D.I. 261 at n.3; D.I. 273 at 1; D.I. 282 at 3.

may even be additional documents that are highly relevant that will only be discovered during deposition practice. Defendants' proposal for just one additional month of fact discovery under these circumstances is manifestly unfair and prejudicial. The schedule Plaintiffs propose here has less than four months to take fact discovery, from June 8, 2021[3] to October 4, 2021, even though the original schedule had provided BDSI with some seven months to take fact discovery from the production of Defendants' original ANDA. These four (4) months are the bare minimum amount of time Plaintiffs need to review the 108,000 pages of documents and take depositions. Plaintiffs' schedule allows it to review the documents, determine if any additional documents should have been produced, consult with technical experts, and take depositions.

Plaintiffs have noticed six (6) fact depositions (including a now former employee with relevant information) and may need to depose other individuals newly mentioned in the recent documents. Further, Plaintiffs have an outstanding 30(b)(6) notice on the contents of Defendants' ANDA, the testing of the backing and mucoadhesive layers for pH, batch records, and the characteristics and pharmacokinetic properties of Defendants' product. Defendants in 2020 stated that these depositions "need to occur after such amendment has been submitted" (which happened on May 14, 2021). (D.I. 368-1, Ex. 2, 2.)

In contrast, Defendants' proposal admittedly attempts to force the trial to occur before the FDA can even comment on Defendants' amended ANDA and product (on January 16, 2022, D.I. 368-1, Ex. 1) and to prejudice Plaintiffs by not allowing sufficient time for fact or expert discovery in order to maintain unfair "settlement leverage." (6/8/2022 Tr. 29:11-13.)    Defendants even suggest having a trial beginning on January 3, a mere two weeks before the date where the FDA has stated it will respond to Chemo's amendment. This is because there is a high likelihood that the FDA will not accept Defendants' amended product and specification, which deviates from the brand specification.[4]

---

[3] Fact discovery was extended to June 8, 2021 (D.I. 364) for the purpose of the hearing, and Defendants produced additional documents and discovery responses after May 21, 2021.

[4] The pH specification for the mucoadhesive layer of the brand (BELBUCA®) is 4.2 to 5.2 (with a target of 4.7), while the pH specification for Defendants' product in their ANDA is ▮▮▮▮▮▮. (Ex. 1 at 58147-48.) Defendants offer no explanation for this deviation, which the FDA has never seen. Defendants have now also informed the FDA that they did not measure the pH of their prior 2017 product that was used to perform the bioequivalence study. (*Id.*) Defendants have also now told the FDA that the impurity problem that resulted in the CRL is due to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 58102-103.)    During the Alvogen trial, Plaintiffs' expert testified that low pH values increased chemical reactions that degrade buprenorphine. (Ex. 2, Tr. 745:21-747:19.) Thus, the issues of impurity and pH are likely linked, and the FDA may decide Defendants need to adjust their pH. Defendants have also argued that their product is allegedly not buffered and thus does not infringe certain claims. A buffered pH is one that is "stabilized" and thus resistant to change. (*See e.g.*, D.I. 1-1, Ex. A, '866 Patent at 12:35-56.) It is difficult to imagine how the FDA will approve a product without a stable pH. Defendants argue that they will not change their pH above 3.4, but that is an acknowledgement that their specification may in fact change in ways that would impact the infringement analysis, including varying the existing pH range of ▮▮▮▮▮▮. In addition, as mentioned above, there are other non-infringement issues in the case, including, for example, whether their product is buffered.

Finally, the Court provided Defendants with every opportunity to explain how they will be prejudiced by moving the trial from November 2021 to April 2022.  Defendants could not offer any meaningful reason for why the trial needs to occur in November.  Indeed, there is no prejudice to Defendants to moving the trial.  Chemo has agreed it would stay off the market until May 2022 (D.I. 305 at 2), and the FDA will not even comment on the amended product until January 16, 2022.  Given Defendants' 17-month delay in filing their amended ANDA and *years of inexcusable delay* in providing the necessary discovery discussed above, the short adjustment of the trial date is eminently reasonable.

**Defendants' proposal**: Defendants' lead proposal in the table below is that there be no change to the current trial scheduled on the single issue of non-infringement (*i.e.*, November 15-18, 2021), but that some adjustments be made to the interim fact and expert discovery deadlines. With five months before trial is scheduled to begin, there is more than sufficient time to depose the five[5] remaining deponents and complete expert discovery related to the narrow non-infringement issues. The current schedule was agreed-to by the parties and was premised on conducting fact and expert discovery and trial on the pH specification in Chemo's CRL-response. Now that one month has passed since Chemo's response was filed with FDA and its productions completed, the case should proceed to the currently scheduled trial in November 2021, but with adjustments to the discovery deadlines.

Additionally, the parties are represented by sophisticated counsel who have a history of successfully navigating tight schedules. For example, in the two months preceding the March 2021 invalidity trial for this case, the parties largely repeated expert discovery for invalidity when circumstances required an adjustment in the expert lineup for Plaintiffs—including reissuing new expert reports and re-doing depositions—all in parallel with preparing for the invalidity trial. *See* D.I. 301; D.I. 303; D.I. 325. Accordingly, Defendants respectfully request that the Court enter a schedule to maintain the current trial date, but one that allows for interim adjustments to the fact and expert discovery deadlines.

In the alternative, if the Court determines that an adjustment to the timing of the non-infringement trial is required, then the Defendants respectfully request that the Court enter Defendants' alternative proposal, which moves trial to January 3-6, 2022 when Defendants understand Judge Connolly may have availability. Defendants' alternative proposal extends trial by approximately 45 days, which is commensurate with Chemo's extension from March 31 to May 15 to submit its CRL-response. *See, e.g.*, D.I. 340.

Plaintiffs, in contrast, seek to extend trial by five months in their continued effort to delay adjudication of Defendants' non-infringing ANDA product.[6] This is unreasonable and

---

[5] It appears that Plaintiffs' count of six remaining depositions includes an individual that Defendants have advised Plaintiffs is no longer employed by any defendant.

[6] Plaintiffs' two-pages of argument above are improper, largely rehash their arguments from last week's oral argument, and otherwise contain numerous patently incorrect and/or misleading assertions. For example, Plaintiffs wrongly imply that Defendants' recent document productions included for the first time many of the categories of documents typically produced in Hatch-Waxman cases. Plaintiffs do not identify any category of documents that were produced for the first time in May 2021; nor can they as Defendants previously produced their ANDA,

disproportionate to the 45-day extension Defendants obtained from FDA to submit their CRL-response. Nor is it justified by Defendants' document productions. That Plaintiffs sought and obtained numerous documents that are not relevant to the narrow non-infringement issues in this case (*see* D.I. 282 at 2-3) should not be justification for a months-long extension, especially when Plaintiffs have now possessed the majority of those documents for more than a month. Further, Plaintiffs do not meaningfully contest that their proposal prejudices Defendants by continuing to postpone their market entry. At bottom, Plaintiffs' schedule is, in essence, an end run around this Court's repeated denials of their motions to stay, and should be similarly rejected.

| Event | Current date | Defendants' Proposal | Defendants' Alternate Proposal |
|---|---|---|---|
| Close of fact discovery | June 8, 2021 | July 9, 2021 | July 23, 2021 |
| Opening expert reports on infringement | June 11, 2021 | July 12, 2021 | Aug. 5, 2021 |
| Rebuttal expert reports on non-infringement | July 16, 2021 | Aug. 11, 2021 | Sept. 9, 2021 |
| Reply expert reports on infringement | Aug. 13, 2021 | Sept. 3, 2021 | Oct. 7, 2021 |
| Close of expert discovery | Sept. 17, 2021 | Sept. 30, 2021 | Nov. 4, 2021 |
| Reduction of asserted claims to no more than 10 | NA | October 1, 2021 | Nov. 5, 2021 |
| Pretrial order | Oct. 15, 2021 | | Nov. 29, 2021 |

correspondence with FDA, and internal documentation and correspondence about the ANDA and the ANDA product. As another example, Plaintiffs imply that all of Defendants' prior document productions are somehow meaningless and that discovery "effectively just started" with Chemo's CRL-response. In reality, Chemo's 34,000+ page ANDA remains on file with FDA and has simply been supplemented with 4,957-pages from Chemo's CRL-response. Such a supplement hardly warrants extending trial by five months. As another example, Plaintiffs claim that they can start depositions only after reviewing all non-ANDA documents. But, as Defendants have argued previously (D.I. 282 at 2-3), the infringement inquiry in Hatch-Waxman cases is governed by the ANDA, not internal email and correspondence. *See, e.g., Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("Under § 271(e)(2)(A), a court must determine whether, if the drug were approved *based upon the ANDA*, the manufacture, use, or sale of that drug would infringe the patent in the conventional sense.") (emphasis added). As another example, Plaintiffs suggest that Defendants are trying to rush trial to avoid feedback from FDA. Contrary to the suggestion, Defendants' proposed trial dates are to accommodate the three months needed after a decision for FDA to convert tentative approval of Chemo's ANDA to final approval before (or in close proximity to) when Chemo already agreed to stay off the market in May 2022. D.I. 368 at 2. As a final example, Plaintiffs claim that FDA will reject Chemo's pH specification. This is pure speculation on Plaintiffs' part. Defendants have committed to not change the pH specification above 3.4. D.I. 368 at 3. Therefore, any adjustment to the pH specification will move it *farther away* from the claimed pH range, not closer to it.

| Pretrial conference | Nov. 5, 2021 | December 20, 2021, subject to the Court's availability |
| Trial | Nov. 15-18, 2021 | January 3-6, 2022 |

Respectfully,

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

JAT:lo
cc:     Clerk of the Court (*via CM/ECF*)
          All Counsel of Record (*via CM/ECF and email*)

# EXHIBIT 6

# EXHIBIT 7

# EXHIBIT 8

# EXHIBIT 9

# EXHIBIT 10

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4     BIODELIVERY SCIENCES          )
       INTERNATIONAL, INC. and ARIUS )
 5     TWO, INC.,                    )
                                     )
 6                    Plaintiffs,    )
                                     ) C.A. No. 19-444(CFC)(CJB)
 7     v.                            )
                                     )
 8     CHEMO RESEARCH, S.L., INSUD   )
       PHARMA S.L.U., INTELGENX CORP.,)
 9     and INTELGENX TECHNOLOGIES    )
       CORP.,                        )
10                                   )
                      Defendants.    )
11

12                               J. Caleb Boggs Courthouse
                                 844 North King Street
13                               Wilmington, Delaware

14                               Wednesday, February 2, 2022
                                 11:00 a.m.
15                               Discovery Dispute Teleconference

16

17     BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
                United States District Court Magistrate Judge

18     APPEARANCES:

19                  MORRIS NICHOLS ARSHT & TUNNELL LLP
                    BY:  JEREMY A. TIGAN, ESQUIRE
20
                          -and-
21
                    DECHERT LLP
22                  BY:  JENNIFER S. SWAN, ESQUIRE
                    BY:  HOWARD W. LEVINE, ESQUIRE
23
                                    For the Plaintiffs
24

25
```

1    APPEARANCES CONTINUED:

2              YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  ANNE SHEA GAZA, ESQUIRE
3
                        -and-
4
               STERNE KESSLER LLP
5              BY:  DENNIES VARUGHESE, ESQUIRE
               BY:  ADAM C. LaROCK, ESQUIRE
6
                        -and-
7
               DORSEY & WHITNEY LLP
8              BY:  GEOFFREY M. GODREY, ESQUIRE

9                              For the Defendants

10                   ***  PROCEEDINGS  ***

11

11:00:34  12          THE COURT:  Good morning, everyone.  This is

11:00:35  13    Judge Burke here.  Before we begin, let me just say a few

11:00:38  14    things for the record as we go on the record today.

11:00:41  15    And the first is that we're here this morning for a

11:00:44  16    discovery dispute teleconference in the matter of

11:00:47  17    BioDelivery Services International, Inc., et al vs. Chemo

11:00:52  18    Research S.L., et al. It's Civil Action Number

11:00:56  19    19-444-CFC-CJB here in our court.

11:00:59  20          Before we go further, let me just have counsel

11:01:01  21    for each side identify themselves for the record.  We'll

11:01:04  22    start first with counsel for the Plaintiffs' side, and we'll

11:01:06  23    begin there with Delaware counsel.

11:01:08  24          MR. TIGAN:  Yes.  Good morning, Your Honor.

11:01:09  25    This is Jeremy Tigan with Morris Nichols on behalf of the

11:01:12  1    Plaintiffs, and I'm joined today by Howard Levine and

11:01:15  2    Jennifer Swan, both with the Dechert firm.

11:01:19  3             THE COURT:  Okay.  Good to be with you all.

11:01:21  4             We'll do the same for counsel for Defendants'

11:01:23  5    side and, again, we'll begin with Delaware counsel.

11:01:27  6             MS. GAZA:  Good morning, Your Honor.  It's Anne

11:01:29  7    Gaza from Young Conaway on behalf of all Defendants.  I'm

11:01:32  8    joined today by my colleague, Samantha Wilson, as well as

11:01:36  9    Dennies Varughese and Adam LaRock of Sterne Kessler for the

11:01:41 10    Chemo Defendants.  And Geoff Godfrey of Dorsey & Whitney for

11:01:44 11    the Intelgenx Defendants.

11:01:46 12             And, Your Honor, at a time convenient to you, we

11:01:49 13    did want to advise that we have a housekeeping issue that

11:01:52 14    we'd like to raise before we address the substantive

11:01:55 15    arguments in the agenda.

11:01:57 16             THE COURT:  Ms. Gaza, do you want to reference

11:02:01 17    that now?

11:02:02 18             MS. GAZA:  Certainly.  I'll defer to

11:02:07 19    Mr. Varughese.

11:02:08 20             MR. VARUGHESE:  Thank you, Anne.

11:02:09 21             Good morning, Your Honor.  Dennies Varughese

11:02:11 22    from Sterne Kessler.  I'd like to just request that Your

11:02:15 23    Honor seal the proceedings today.  We received notice that a

11:02:19 24    member or multiple members of the public may be attending.

11:02:22 25    Defendants reached out to BDSI's counsel to see if we could

11:20:25  1    easier for all the parties and Your Honor, I'll say for

11:20:28  2    purposes of this hearing, we're not challenging that it's

11:20:31  3    not relevant.  We've agreed to produce it.  What we said was

11:20:34  4    it's not ripe to produce right now because we haven't -- you

11:20:36  5    know, our clients have not finalized it.  It has not been

11:20:39  6    submitted to the FDA, and the FDA hasn't even asked for it

11:20:42  7    yet.  The three and nine-month data that Ms. Swan references

11:20:44  8    were submitted to the FDA.  The twelve-month data is still

11:20:47  9    ongoing.  It hasn't been submitted.

11:20:49 10           Now, we reserve the right to object to use of

11:20:51 11    this data at trial, and that's stuff for the parties to sort

11:20:55 12    through during the pretrial process.  But for purposes of

11:20:58 13    this dispute, we're not questioning whether it's relevant or

11:21:01 14    not, but neither expert has relied on this data that is in

11:21:04 15    question, the twelve-month data.

11:21:06 16           Now, Defendants' experts have, you know, pointed

11:21:08 17    to potential differences of impurities at different pH's as

11:21:13 18    being one basis to negate doctrine of equivalents, but we

11:21:16 19    have other arguments like the all elements rule, the

11:21:21 20    doctrine of claim vitiation.  A number of arguments negate

11:21:21 21    doctrine of equivalents.

11:21:23 22           You know, what we said to BDSI and to Your Honor

11:21:26 23    in our papers is that, you know, to avoid unnecessary

11:21:29 24    discovery disputes, Chemo has agreed to provide stability

11:21:32 25    data, even though Chemo and Intelgenx believe there's

# EXHIBIT 11

# EXHIBIT 12

# EXHIBIT 13

# Guidance for Industry
## ANDAs:  Impurities in Drug Products

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**November 2010**
**OGD**

# Guidance for Industry

## ANDAs:  Impurities in Drug Products

*Additional copies are available from:*
*Office of Communications*
*Division of Drug Information, WO 51, Room 2201*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave.*
*Silver Spring, MD  20993-0002*
*Phone: 301-796-3400; Fax: 301-847-8714*
*druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**November 2010**
**OGD**

*Contains Nonbinding Recommendations*

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... 1

II.     BACKGROUND ........................................................................................... 1

III.    LISTING OF DEGRADATION PRODUCTS AND SETTING ACCEPTANCE
        CRITERIA FOR DEGRADATION PRODUCTS IN DRUG PRODUCT
        SPECIFICATIONS.................................................................................…..2

        A.      Listing of Degradation Products…………………………………………2
        B.      Setting Acceptance Criteria for Degradation Products………………………3

IV.     QUALIFICATION OF DEGRADATION PRODUCTS……………………………4

        A.      Qualification Thresholds………………………………………………4
        B.      Qualification Procedures…………… ……………………………………5

                1.      Comparative Analytical Studies... ……………………………………… 5
                2.      Scientific Literature and Significant Metabolite……… ………………5
                3.      Toxicity Studies…………………………………… ……………… ………5

ATTACHMENT:     IDENTIFICATION AND QUALIFICATION OF DEGRADATION
PRODUCTS IN GENERIC DRUG PRODUCTS ....................................................... 6

*Contains Nonbinding Recommendations*

# Guidance for Industry
# ANDAs:  Impurities in Drug Products

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This guidance provides recommendations on what chemistry, manufacturing, and controls (CMC) information sponsors should include regarding the reporting, identification, and qualification of impurities that are classified as *degradation products* in drug products when submitting:[1,2]

- Original abbreviated new drug applications (ANDAs)

- ANDA supplements for changes that may affect the quantitative or qualitative degradation product profile

The guidance also provides recommendations for establishing acceptance criteria for degradation products (specifically, degradation products of the active ingredient or reaction products of the active ingredient with an excipient(s) and/or immediate container/closure system) in generic drug products.  The guidance will replace an existing 1998 draft guidance of the same name.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

On August 29, 2005, FDA published a revised of the draft guidance for industry titled *ANDAs: Impurities in Drug Products*, originally issued in December 1998.

---

[1] The recommendations in this guidance are limited to drug products that are manufactured from drug substances produced by chemical synthesis.

[2] See 21 CFR 314.94(a)(9)

*Contains Nonbinding Recommendations*

We are issuing this final guidance for the following reasons:

1.  To update information on listing of degradation products, setting acceptance criteria, and qualifying degradation products (thresholds and procedures) in ANDAs in conformance with the revision of the guidance for industry on *Q3B(R) Impurities in New Drug Products*.

2.  To remove those sections of the 1998 draft guidance containing recommendations that are no longer needed because they are addressed in the more recent *Q3B(R)* (see the list below).

The *Q3B(R)* was developed by the International Conference on Harmonisation (ICH) to provide guidance on impurities in drug products for new drug applications (NDAs).  However, the Agency believes that many of the recommendations provided on impurities in drug products also apply to ANDAs.  Please refer to the following specific sections in the *Q3B(R)* for these recommendations:

- Section I, Introduction
- Section II, Rationale for the Reporting and Control of Degradation Products
- Section III, Analytical Procedures
- Section IV, Reporting Degradation Products, Content of Batches
- Attachment 1, Thresholds for Degradation Products

## III. LISTING OF DEGRADATION PRODUCTS AND SETTING ACCEPTANCE CRITERIA FOR DEGRADATION PRODUCTS IN DRUG PRODUCT SPECIFICATIONS

### A. Listing of Degradation Products

We recommend that the specification for a drug product include a list of degradation products. Stability studies, chemical development studies, and routine batch analyses can be used to predict the degradation profile for the commercial product.  It is important that the list of degradation products for the drug product specification be based on degradation products found in the batch(es) manufactured by the proposed commercial process.

We recommend that you include in your submission a rationale for the inclusion or exclusion of degradation products in the drug product specification.  It is important that the rationale include a discussion of the degradation profiles observed in stability studies and any other batch(es) manufactured in support of the application.

Individual degradation products with specific acceptance criteria that are included in the specification for the drug product are referred to as "*specified degradation products*" in this guidance.  Specified degradation products can be *identified* or *unidentified.*

*Contains Nonbinding Recommendations*

We recommend that specified identified degradation products be included in the list of degradation products along with specified unidentified degradation products that are estimated to be present at a level greater than the identification threshold given in *Q3B(R)*. For degradation products known to be unusually potent or to produce toxic or unexpected pharmacological effects, we recommend that the quantitation and/or detection limit of the analytical procedures correspond to the level at which the degradation products are expected to be controlled.

For unidentified degradation products to be listed in the drug product specification, we recommend that you clearly state the procedure used and assumptions made in establishing the level of the degradation product. It is important that *specified unidentified* degradation products be referred to by an appropriate qualitative analytical descriptive label (e.g., unidentified A, unidentified with relative retention of 0.9). We recommend that you also include general acceptance criteria of not more than the identification threshold (see *Q3B(R)*, Attachment 1) for any unspecified degradation product and acceptance criteria for total degradation products.

We recommend that the drug product specification include, where applicable, a list of the following types of degradation products:

- Each specified identified degradation product
- Each specified unidentified degradation product
- Any unspecified degradation product with an acceptance criterion of not more than (≤) the figure in the identification threshold in Attachment 1, *Q3B(R)*
- Total degradation products

### B.    Setting Acceptance Criteria for Degradation Products

We recommend that the acceptance criterion be set no higher than the qualified level (see section IV, Qualification of Degradation Products). In establishing degradation product acceptance criteria, the first critical consideration is whether a degradation product is specified in the United States Pharmacopeia (USP). If there is a monograph in the USP that includes a limit for a specified identified degradation product, we recommend that the acceptance criterion be set no higher than the official compendial limit.

If the level of the degradation product is above the level specified in the USP, we recommend qualification. Then, if appropriate qualification has been achieved, an applicant may wish to petition the USP for revision of the degradation product's acceptance criterion.

If the acceptance criterion for a specified degradation product does not exist in the USP and this degradation product can be qualified by comparison to the reference listed drug (RLD), the acceptance criterion should be similar to the level observed in the RLD. In other circumstances, the acceptance criterion may need to be set lower than the qualified level to ensure drug product quality. For example, if the level of the significant metabolite impurity is too high, other quality attributes, like potency, could be seriously affected. In this case, we would recommend that the degradation product acceptance criterion be set lower than the qualified level.

We recommend that ANDA sponsors develop robust formulations and manufacturing processes that are based on sound state-of-the-art scientific and engineering principles and knowledge.

*Contains Nonbinding Recommendations*

Although routine manufacturing variations are expected, significant variation in batch-to-batch degradation product levels or an unusually high level of degradation products may indicate that the manufacturing process of the drug product is not adequately controlled or designed.

## IV.    QUALIFICATION OF DEGRADATION PRODUCTS

*Qualification* is the process of acquiring and evaluating data that establish the biological safety of an individual degradation product or a given degradation profile at the level(s) being considered. When appropriate, we recommend that applicants provide a rationale for establishing degradation product acceptance criteria that includes safety considerations.

A specified identified degradation product is considered qualified when it meets one or more of the following conditions:

- When the observed level and proposed acceptance criterion for the degradation product do not exceed the level observed in the RLD.

- When the degradation product is a significant metabolite of the drug substance.

- When the observed level and the proposed acceptance criterion for the degradation product are adequately justified by the scientific literature.

- When the observed level and proposed acceptance criterion for the degradation product do not exceed the level that has been adequately evaluated in toxicology studies.

Although quantitative structure activity relationships (QSAR) programs may be used for prediction of toxicity of an individual degradation product or a given degradation profile, the results are not generally considered conclusive for qualification purposes.

### A.    Qualification Thresholds

Recommended qualification thresholds[3] for degradation products based on the maximum daily dose of the drug are provided in *Q3B(R)*. When these qualification thresholds are exceeded, we recommend that degradation product levels be qualified. In some cases, it may be appropriate to increase or decrease the qualification threshold for qualifying degradation products. For example, when there is evidence that a degradation product in certain drug classes or therapeutic classes has previously been associated with adverse reactions in patients, it may be important to establish a lower qualification threshold. Conversely, when the concern for safety is low, a higher threshold for qualifying degradation products may be appropriate. The FDA will consider proposals for applications for alternative qualification thresholds on a case-by-case basis after considering issues such as patient population, drug class effects, and historical safety data.

---

[3] *Qualification threshold* is defined as a limit above (>) which a degradation product should be qualified.

*Contains Nonbinding Recommendations*

### B. Qualification Procedures

The decision tree in the attachment describes considerations for the qualification of degradation products when the usual qualification threshold recommended in ICH *Q3B(R)* is exceeded. In some cases, decreasing the level of the degradation product below the threshold rather than providing additional data can be the simplest course of action. Alternatively, adequate data could be available in the scientific literature to qualify the degradation product. The studies considered appropriate to qualify the degradation product will depend on a number of factors, including the patient population, daily dose, and route and duration of drug administration. Such studies can be conducted on the drug product containing the degradation product to be controlled, although studies using isolated degradation products can sometimes be appropriate. The following are descriptions of methods for qualifying degradation products.

#### 1. Comparative Analytical Studies

A degradation product present in a drug product covered by an ANDA can be qualified by comparing the analytical profiles of a generic drug product with those in an RLD using the same validated, stability-indicating analytical procedure (e.g., comparative HPLC studies). However, the profile may be compared to a different drug product with the same route of administration and similar characteristics (e.g., tablet versus capsule) if samples of the reference listed drug are unavailable or in the case of an ANDA submitted pursuant to a suitability petition. It is essential that maximum daily doses of the degradation product and routes of administration be taken into account for qualification by comparative analytical studies. The qualified threshold of a degradation product in a dosage form may not be applicable to all drug products containing that degradation product if the maximum daily doses or the routes of administration are different. We recommend that you conduct the stability studies on comparable samples (e.g., age of samples) to get a meaningful comparison of degradation profiles.

A degradation product present in the generic drug product is considered qualified if the amount of identified degradation product in the generic drug product is similar to the levels observed in the RLD.

#### 2. Scientific Literature and Significant Metabolites

If the level of the specified identified degradation product is adequately justified by the scientific literature, no further qualification is considered necessary. In addition, a degradation product that is also a significant metabolite of the drug substance is generally considered qualified.

#### 3. Toxicity Studies

Toxicity tests are the least preferred method to qualify degradation products. We recommend the tests be used only when degradation products cannot be qualified by either of the above procedures (section IV.B.1 or 2). The tests are designed to detect compounds that induce general toxic or genotoxic effects in experimental systems. If performed, such studies should be conducted on the drug product or drug substance containing the degradation products to be controlled, although studies using isolated degradation products may also be used.

*Contains Nonbinding Recommendations*

**ATTACHMENT:  IDENTIFICATION AND QUALIFICATION OF DEGRADATION PRODUCTS IN GENERIC DRUG PRODUCTS**



*Contains Nonbinding Recommendations*

## Notes on the Attachment

[a]   Lower thresholds can be appropriate if the degradation product is unusually toxic.

[b]   For example, do known safety data for this degradation product or its structural class preclude human exposure at the observed level?

[c]   A degradation product is considered qualified for ANDAs when one or more of the following conditions are met:

- When the observed level and proposed acceptance criterion for the degradation product do not exceed the level justified by the RLD.

- When the degradation product is a significant metabolite of the drug substance.

- When the observed level and the proposed acceptance criterion for the degradation product are adequately justified by the scientific literature.

- When the observed level and proposed acceptance criterion for the degradation product do not exceed the level that has been adequately evaluated in toxicity studies.

[d]   If considered desirable, a minimum screen (e.g., genotoxic potential) should be conducted.  A study to detect point mutations and one to detect chromosomal aberrations, both in vitro, are considered an appropriate minimum screen for genotoxicity.

[e]   If general toxicity studies are appropriate, one or more studies should be designed to allow comparison of unqualified to qualified material.  The study duration should be based on available relevant information and performed in the species most likely to maximize the potential for detecting the toxicity of a degradation product. On a case-by-case basis, single-dose studies can be appropriate, especially for single-dose drugs.  In general, a minimum duration of 14 days and a maximum duration of 90 days would be considered appropriate.

# EXHIBIT 14

# EXHIBIT 15

# EXHIBIT 16

# EXHIBIT 17

# Guidance for Industry
## Q3B(R2) Impurities in New Drug Products

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**August 2006[1]**
**ICH**

**Revision 3**

---

[1] ICH Q3B(R2) (Revision 2) was issued with an incorrect date of July 2006 on the title pages; however, the guidance was issued in August 2006.  Revision 3 of this guidance reflects the correct date of August 2006.  All other information remains the same.

# Guidance for Industry

# Q3B(R2) Impurities in New Drug Products

*Additional copies are available from:*

*Office of Training and Communication*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*

or

*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*http://www.fda.gov/cber/guidelines.htm.*
*(Tel) Voice Information System at 800-835-4709 or 301-827-1800*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**August 2006**
**ICH**

**Revision 3**

# TABLE OF CONTENTS

I.    INTRODUCTION (1.0) ................................................................................ 1

II.   RATIONALE FOR THE REPORTING AND CONTROL OF DEGRADATION
PRODUCTS (2.0) ........................................................................................... 2

III.  ANALYTICAL PROCEDURES (3.0) ........................................................ 3

IV.   REPORTING DEGRADATION PRODUCTS, CONTENT OF BATCHES (4.0) ........ 4

V.    LISTING OF DEGRADATION PRODUCTS IN SPECIFICATIONS (5.0) ................. 4

VI.   QUALIFICATION OF DEGRADATION PRODUCTS (6.0) ......................................... 6

GLOSSARY ................................................................................................... 1

ATTACHMENT 1 ......................................................................................... 3

ATTACHMENT 2 ......................................................................................... 5

ATTACHMENT 3 ......................................................................................... 7

*Contains Nonbinding Recommendations*

# Guidance for Industry[2]
# Q3B(R2)  Impurities in New Drug Products

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.      INTRODUCTION (1.0) [3]

This guidance provides recommendations for registration applications on the content and qualification of impurities in new drug products produced from chemically synthesized new drug substances not previously registered in a region or member state. This guidance revises the ICH guidance of the same title that was issued in May 1997 and first revised in February 2003.  The first revision clarified the 1997 guidance and included other changes.[4]  The revision also provided consistency with more recently published ICH guidances (e.g., *Q3A(R) Impurities in New Drug Substances*, *Q3C Impurities: Residual Solvents*, and *Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances*).  This second revision provides clarification to Attachment 2.[5]  This guidance complements the ICH Q3A(R) guidance, which should be consulted for basic principles along with ICH Q3C when appropriate.

---

[2] This guidance was developed within the Q3B(R) Expert Working Group of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) and has been subject to consultation by the regulatory parties, in accordance with the ICH process.  This document was endorsed by the ICH Steering Committee at *Step 4* of the ICH process, June 2, 2006. At *Step 4* of the process, the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan, and the United States.

[3] Arabic numbers reflect the organizational breakdown in the document endorsed by the  ICH  Steering Committee at Step 4 of the ICH process.

[4] For example, addressing reporting, identification, and qualification thresholds; listing impurities in specifications and making a clear distinction between ICH Q3B (listing impurities) and Q6A (setting specifications); and deleting the exception to conventional rounding practice (i.e., the provision recommending no rounding up to 0.1 percent for values between 0.05 and 0.09 percent).

[5] Specifically, footnote 2 of Attachment 2 was revised to explain why the degradation product in Case 3, Example 2, does not have to be qualified.  In addition, the reporting, identification, and qualification thresholds are clearly indicated for both examples in the attachment.

*Contains Nonbinding Recommendations*

This guidance addresses only those impurities in new drug products classified as degradation products of the drug substance or reaction products of the drug substance with an excipient and/or immediate container closure system (collectively referred to as *degradation products* in this guidance). Generally, impurities present in a new drug substance need not be monitored or specified in new drug product unless they are also degradation products (see ICH Q6A guidance on specifications).

Impurities arising from excipients present in a new drug product or extracted or leached from the container closure system are not covered by this guidance. This guidance also does not apply to new drug products used during the clinical research stages of development. The following types of products are not covered in this guidance:

- Biological/biotechnological products
- Peptides
- Oligonucleotides
- Radiopharmaceuticals
- Fermentation products and semi-synthetic products derived therefrom
- Herbal products
- Crude products of animal or plant origin

Also excluded from this document are (1) extraneous contaminants that should not occur in new drug products and are more appropriately addressed as good manufacturing practice (GMP) issues, (2) polymorphic forms, and (3) enantiomeric impurities.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.     RATIONALE FOR THE REPORTING AND CONTROL OF DEGRADATION PRODUCTS (2.0)

The applicant should summarize the degradation products observed during manufacture and/or stability studies of a new drug product. This summary should be based on sound scientific appraisal of potential degradation pathways in the new drug product and impurities arising from the interaction with excipients and/or the immediate container closure system. In addition, the applicant should summarize any laboratory studies conducted to detect degradation products in the new drug product. This summary also should include test results of batches manufactured during the development process and batches representative of the proposed commercial process. A rationale should be provided for exclusion of those impurities that are not degradation products (e.g., process impurities from the drug substance and impurities arising from excipients). The impurity profiles of the batches representative of the proposed commercial process should be compared with the profiles of batches used in development, and any differences should be discussed.

*Contains Nonbinding Recommendations*

Any degradation product observed in stability studies conducted at the recommended storage condition should be identified when present at a level greater than (>) the identification thresholds given in Attachment 1.  When identification of a degradation product is infeasible, a summary of the laboratory studies demonstrating the unsuccessful efforts to identify it should be included in the registration application.

Degradation products present at a level of not more than (≤) the identification threshold generally would not need to be identified. However, analytical procedures should be developed for those degradation products that are suspected to be unusually potent, producing toxic or significant pharmacological effects at levels not more than (≤) the identification threshold. In unusual circumstances, technical factors (e.g., manufacturing capability, a low drug substance to excipient ratio, or the use of excipients that are crude products of animal or plant origin) can be considered part of the justification for selection of alternative thresholds based on manufacturing experience with the proposed commercial process.

## III.    ANALYTICAL PROCEDURES (3.0)

The registration application should include documented evidence that the analytical procedures have been validated and are suitable for the detection and quantitation of degradation products (see ICH Q2A and Q2B guidances on analytical validation).  In particular, analytical procedures should be validated to demonstrate specificity for the specified and unspecified degradation products. As appropriate, this validation should include samples stored under relevant stress conditions: light, heat, humidity, acid/base hydrolysis, and oxidation. When an analytical procedure reveals the presence of other peaks in addition to those of the degradation products (e.g., the drug substance, impurities arising from the synthesis of the drug substance, excipients and impurities arising from the excipients), these peaks should be labeled in the chromatograms and their origin(s) discussed in the validation documentation.

The quantitation limit for the analytical procedure should be not more than (≤) the reporting threshold.

Degradation product levels can be measured by a variety of techniques, including those that compare an analytical response for a degradation product to that of an appropriate reference standard or to the response of the new drug substance itself. Reference standards used in the analytical procedures for control of degradation products should be evaluated and characterized according to their intended uses. The drug substance can be used to estimate the levels of degradation products. In cases when the response factors are not close, this practice can still be used if a correction factor is applied or the degradation products are, in fact, being overestimated. Acceptance criteria and analytical procedures, used to estimate identified or unidentified degradation products, are often based on analytical assumptions (e.g., equivalent detector response). These assumptions should be discussed in the registration application.

Differences between the analytical procedures used during development and those proposed for the commercial product should also be discussed.

*Contains Nonbinding Recommendations*

## IV.    REPORTING DEGRADATION PRODUCTS, CONTENT OF BATCHES (4.0)

Analytical results should be provided in the registration application for all relevant batches of the new drug product used for clinical, safety, and stability testing, as well as batches that are representative of the proposed commercial process. Quantitative results should be presented numerically, and not in general terms such as "complies", "meets limit." Any degradation product at a level greater than (>) the reporting threshold (see Attachment 1), and total degradation products observed in the relevant batches of the new drug product, should be reported with the analytical procedures indicated.  Below 1.0 percent, the results should be reported to the number of decimal places (e.g., 0.06 percent) in the applicable reporting threshold; at and above 1.0 percent, the results should be reported to one decimal place (e.g., 1.3 percent).  Results should be rounded using conventional rules (see Attachment 2).  A tabulation (e.g., spreadsheet) of the data is recommended.  Degradation products should be designated by code number or by an appropriate descriptor (e.g., retention time).  If a higher reporting threshold is proposed, it should be fully justified. All degradation products at a level greater than (>) the reporting threshold should be summed and reported as total degradation products.

Chromatograms with peaks labeled (or equivalent data if other analytical procedures are used) from representative batches, including chromatograms from analytical procedure validation studies and from long-term and accelerated stability studies, should be provided. The applicant should ensure that complete degradation product profiles (e.g., chromatograms) of individual batches are available, if requested.

For each batch of the new drug product described in the registration application, the documentation should include:

- Batch identity, strength, and size
- Date of manufacture
- Site of manufacture
- Manufacturing process
- Immediate container closure
- Degradation product content, individual and total
- Use of batch (e.g., clinical studies, stability studies)
- Reference to analytical procedure used
- Batch number of the drug substance used in the new drug product
- Storage conditions for stability studies

## V.    LISTING OF DEGRADATION PRODUCTS IN SPECIFICATIONS (5.0)

The specification for a new drug product should include a list of degradation products expected to occur during manufacture of the commercial product and under recommended storage conditions. Stability studies, knowledge of degradation pathways, product development studies, and laboratory studies should be used to characterize the degradation profile.  The selection of

*Contains Nonbinding Recommendations*

degradation products in the new drug product specification should be based on the degradation products found in batches manufactured by the proposed commercial process. Those individual degradation products with specific acceptance criteria included in the specification for the new drug product are referred to as *specified degradation products* in this guidance. Specified degradation products can be identified or unidentified.  A rationale for the inclusion or exclusion of degradation products in the specification should be presented. This rationale should include a discussion of the degradation profiles observed in the safety and clinical development batches and in stability studies, together with a consideration of the degradation profile of batches manufactured by the proposed commercial process. Specified identified degradation products should be included along with specified unidentified degradation products estimated to be present at a level greater than (>) the identification threshold given in Attachment 1. For degradation products known to be unusually potent or to produce toxic or unexpected pharmacological effects, the quantitation or detection limit of the analytical procedures should be commensurate with the level at which the degradation products should be controlled. For unidentified degradation products, the procedure used and assumptions made in establishing the level of the degradation product should be clearly stated.  Specified unidentified degradation products should be referred to by an appropriate qualitative analytical descriptive label (e.g., *unidentified A*, *unidentified with relative retention of 0.9*). A general acceptance criterion of not more than (≤) the identification threshold (Attachment 1) for any unspecified degradation product and an acceptance criterion for total degradation products should also be included. For a given degradation product, its acceptance criterion should be established by taking into account its acceptance criterion in the drug substance (if applicable), its qualified level, its increase during stability studies, and the proposed shelf life and recommended storage conditions for the new drug product.  Furthermore, each acceptance criterion should be set no higher than the qualified level of the given degradation product.

Where there is no safety concern, degradation product acceptance criteria should be based on data generated from batches of the new drug product manufactured by the proposed commercial process, allowing sufficient latitude to deal with normal manufacturing and analytical variation and the stability characteristics of the new drug product. Although normal manufacturing variations are expected, significant variation in batch-to-batch degradation product levels can indicate that the manufacturing process of the new drug product is not adequately controlled and validated (see ICH Q6A guidance on specifications, decision tree #2, for establishing an acceptance criterion for a specified degradation product in a new drug product).
In this guidance, the use of two decimal places for thresholds (see Attachment 1) does not necessarily indicate the precision of the acceptance criteria for specified degradation products and total degradation products.

In summary, the new drug product specification should include, where applicable, the following list of degradation products:

- Each specified identified degradation product
- Each specified unidentified degradation product
- Any unspecified degradation product with an acceptance criterion of not more than (≤) the identification threshold
- Total degradation products

*Contains Nonbinding Recommendations*

# VI.    QUALIFICATION OF DEGRADATION PRODUCTS (6.0)

Qualification is the process of acquiring and evaluating data that establishes the biological safety of an individual degradation product or a given degradation profile at the levels specified. The applicant should provide a rationale for establishing degradation product acceptance criteria that includes safety considerations. The level of any degradation product present in a new drug product that has been adequately tested in safety and/or clinical studies would be considered qualified. Therefore, it is useful to include any available information on the actual content of degradation products in the relevant batches at the time of use in safety and/or clinical studies. Degradation products that are also significant metabolites present in animal and/or human studies are generally considered qualified.  Degradation products could be considered qualified at levels higher than those administered in safety studies based on a comparison between actual doses given in the safety studies and the intended dose of the new drug product. Justification of such higher levels should include consideration of factors such as: (1) the amount of degradation product administered in previous safety and/or clinical studies and found to be safe; (2) the increase in the amount of the degradation product; and (3) other safety factors, as appropriate.  If the qualification thresholds given in Attachment 1 are exceeded and data are unavailable to qualify the proposed acceptance criterion of a degradation product, additional studies to obtain such data may be appropriate (see Attachment 3).

Higher or lower thresholds for qualification of degradation products may be appropriate for some individual new drug products based on scientific rationale and level of concern, including drug class effects and clinical experience. For example, qualification can be especially important when there is evidence that such degradation products in certain new drug products or therapeutic classes have previously been associated with adverse reactions in patients. In these instances, a lower qualification threshold may be appropriate. Conversely, a higher qualification threshold may be appropriate for individual new drug products when the level of concern for safety is less than usual based on similar considerations (e.g., patient population, drug class effects, and clinical considerations).  Proposals for alternative thresholds would be considered on a case-by-case basis.

The Decision Tree for Identification and Qualification of a Degradation Product (Attachment 3) describes considerations for the qualification of degradation products when thresholds are exceeded.  In some cases, reducing the level of degradation product (e.g., use of a more protective container closure or modified storage conditions) to not more than ($\leq$) the threshold can be simpler than providing safety data.  Alternatively, adequate data could be available in the scientific literature to qualify a degradation product. If neither is the case, additional safety testing should be considered. The studies considered appropriate to qualify a degradation product will depend on a number of factors, including the patient population, daily dose, and route and duration of new drug product administration. Such studies can be conducted on the new drug product or substance containing the degradation products to be controlled, although studies using isolated degradation products can sometimes be appropriate.

*Contains Nonbinding Recommendations*

Although this guidance is not intended to apply during the clinical research stage of development, in the later stages of development, the thresholds in this guidance may be useful in evaluating new degradation products observed in new drug product batches prepared by the proposed commercial process.  Any new degradation product observed in later stages of development should be identified (see the Decision Tree for Identification and Qualification of a Degradation Product in Attachment 3) if its level is greater than (>) the identification threshold given in Attachment 1. Similarly, qualification of the degradation product should be considered if its level is greater than (>) the qualification threshold given in Attachment 1. Safety studies should provide a comparison of results of safety testing of the new drug product or drug substance containing a representative level of the degradation product with previously qualified material, although studies using the isolated degradation products can also be considered.

*Contains Nonbinding Recommendations*

## GLOSSARY

**Degradation Product:** An impurity resulting from a chemical change in the drug substance brought about during manufacture and/or storage of the new drug product by the effect of, for example, light, temperature, pH, water, or by reaction with an excipient and/or the immediate container closure system

**Degradation Profile:** A description of the degradation products observed in the drug substance or drug product

**Development Studies:** Studies conducted to scale-up, optimize, and validate the manufacturing process for a drug product

**Identification Threshold:** A limit above (>) which a degradation product should be identified

**Identified Degradation Product:** A degradation product for which a structural characterization has been achieved

**Impurity:**  Any component of the new drug product that is not the drug substance or an excipient in the drug product

**Impurity Profile:** A description of the identified and unidentified impurities present in a drug product

**New Drug Substance:**  The designated therapeutic moiety that has not been previously registered in a region or member state (also referred to as a new molecular entity or new chemical entity).  It can be a complex, simple ester, or salt of a previously approved substance.

**Qualification:**  The process of acquiring and evaluating data that establishes the biological safety of an individual degradation product or a given degradation profile at the levels specified

**Qualification Threshold:** A limit above (>) which a degradation product should be qualified

**Reporting Threshold:** A limit above (>) which a degradation product should be reported

**Specified Degradation Product:** A degradation product that is individually listed and limited with a specific acceptance criterion in the new drug product specification. A specified degradation product can be either identified or unidentified

**Unidentified Degradation Product:** A degradation product for which a structural characterization has not been achieved and that is defined solely by qualitative analytical properties (e.g., chromatographic retention time)

*Contains Nonbinding Recommendations*

**Unspecified Degradation Product:** A degradation product that is limited by a general acceptance criterion, but not individually listed with its own specific acceptance criterion, in the new drug product specification

*Contains Nonbinding Recommendations*

## ATTACHMENT 1

## THRESHOLDS FOR DEGRADATION PRODUCTS IN NEW DRUG PRODUCTS

### Reporting Thresholds

| Maximum Daily Dose[1] | Threshold[2,3] |
|---|---|
| ≤ 1 g | 0.1% |
| > 1 g | 0.05% |

### Identification Thresholds

| Maximum Daily Dose[1] | Threshold[2,3] |
|---|---|
| < 1 mg | 1.0% or 5 µg TDI, whichever is lower |
| 1 mg - 10 mg | 0.5% or 20 µg TDI, whichever is lower |
| >10 mg - 2 g | 0.2% or 2 mg TDI, whichever is lower |
| > 2 g | 0.10% |

### Qualification Thresholds

| Maximum Daily Dose[1] | Threshold[2,3] |
|---|---|
| < 10 mg | 1.0% or 50 µg TDI, whichever is lower |
| 10 mg - 100 mg | 0.5% or 200 µg TDI, whichever is lower |
| >100 mg - 2 g | 0.2% or 3 mg TDI, whichever is lower |
| > 2 g | 0.15% |

[1] The amount of drug substance administered per day
[2] Thresholds for degradation products are expressed either as a percentage of the drug substance or as total daily intake (TDI) of the degradation product.  Lower thresholds can be appropriate if the degradation product is unusually toxic.
[3] Higher thresholds should be scientifically justified.

*Contains Nonbinding Recommendations*

**Illustration of Thresholds for Reporting, Identification, and Qualification of Degradation Products in New Drug Products as a Function of Maximum Daily Dose**

(Note: Actual threshold values should be taken from the preceding table in this attachment.)



**Expanded Scale:**



*Contains Nonbinding Recommendations*

**ATTACHMENT 2**
**ILLUSTRATION OF REPORTING DEGRADATION PRODUCT RESULTS FOR IDENTIFICATION AND QUALIFICATION IN AN APPLICATION**

The attachment is only illustrative and is not intended to serve as a template for how results on degradation products should be presented in an application file. Normally raw data are not provided.

**Example 1:  50 mg Maximum Daily Dose**

Reporting threshold: 0.1%
Identification threshold: 0.2%
Qualification threshold: 200 μg

| 'Raw' Result (%) | Reported Result (%) (Reporting Threshold = 0.1%) | Total Daily Intake (TDI) of the Degradation Product (rounded result in μg) | Action | |
|---|---|---|---|---|
| | | | Identification Threshold 0.2% exceeded? | Qualification Threshold 200 μg TDI exceeded? |
| 0.04 | Not reported | 20 | None | None |
| 0.2143 | 0.2 | 100 | None | None |
| 0.349 | 0.3[1] | 150 | Yes | None[1] |
| 0.550 | 0.6[1] | 300 | Yes | Yes[1] |

**Example 2:  1.9 gram Maximum Daily Dose**

Reporting threshold: 0.05%
Identification threshold: 2 mg
Qualification threshold: 3 mg

| 'Raw' Result (%) | Reported Result (%) (Reporting Threshold = 0.05%) | Total Daily Intake (TDI) of the Degradation Product (rounded result in mg) | Action | |
|---|---|---|---|---|
| | | | Identification Threshold 2 mg TDI exceeded? | Qualification Threshold 3 mg TDI exceeded? |
| 0.049 | Not reported | 1 | None | None |
| 0.079 | 0.08 | 2 | None | None |
| 0.183 | 0.18[1] | 3 | Yes | None[1, 2] |
| 0.192 | 0.19[1] | 4 | Yes | Yes[1] |

*Contains Nonbinding Recommendations*

**Notes on Attachment 2**

[1]  After identification, if the response factor is determined to differ significantly from the original assumptions, it can be appropriate to re-measure the actual amount of the degradation product present and re-evaluate against the qualification threshold (see Attachment 1).

[2]  To verify if a threshold is exceeded, a reported result should be evaluated against the thresholds as follows: When the threshold is described in %, the reported result rounded to the same decimal place as the threshold should be compared directly to the threshold. When the threshold is described in TDI, the reported result should be converted to TDI, rounded to the same decimal place as the threshold, and compared to the threshold (e.g., an amount of 0.18% degradation level corresponds to a TDI of 3.4 mg impurity (absolute amount), which is then rounded down to 3 mg; so the qualification threshold expressed in TDI (3 mg) is not exceeded).

*Contains Nonbinding Recommendations*

**ATTACHMENT 3**
**DECISION TREE FOR IDENTIFICATION AND QUALIFICATION OF A DEGRADATION PRODUCT**



*Contains Nonbinding Recommendations*

**Notes to Attachment 3**

[a] If considered desirable, a minimum screen (e.g., genotoxic potential), should be conducted.  A study to detect point mutations and one to detect chromosomal aberrations, both in vitro, are considered an appropriate minimum screen.

[b] If general toxicity studies are desirable, one or more studies should be designed to allow comparison of unqualified to qualified material.  The study duration should be based on available relevant information and performed in the species most likely to maximize the potential to detect the toxicity of a degradation product. On a case-by-case basis, single-dose studies can be appropriate, especially for single-dose drugs. In general, a minimum duration of 14 days and a maximum duration of 90 days would be considered appropriate.

[c] Lower thresholds can be appropriate if the degradation product is unusually toxic.

[d] For example, do known safety data for this degradation product or its structural class preclude human exposure at the concentration present?

# EXHIBIT 18

# Guidance for Industry

## Q1A(R2) Stability Testing of New Drug Substances and Products

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**November 2003**
**ICH**

**Revision 2**

# Guidance for Industry

## Q1A(R2) Stability Testing of New Drug Substances and Products

*Additional copies are available from:*

*Office of Training and Communication*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD  20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*

or

*Office of Communication, Training and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*http://www.fda.gov/cber/guidelines.htm.*
*(Tel) Voice Information System at 800-835-4709 or 301-827-1800*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**November 2003**
**ICH**

**Revision 2**

*Contains Nonbinding Recommendations*

# TABLE OF CONTENTS

**I.    INTRODUCTION (1)** .................................................................................................. **1**

   **A.    Objectives of the Guidance (1.1)** ...................................................................1

   **B.    Scope of the Guidance (1.2)** ..........................................................................2

   **C.    General Principles (1.3)** .................................................................................2

**II.    GUIDANCE (2)** ......................................................................................................... **2**

   **A.    Drug Substance (2.1)** ......................................................................................2

      *1.  General (2.1.1)* ...........................................................................................2

      *2.  Stress Testing (2.1.2)* ................................................................................3

      *3.  Selection of Batches (2.1.3)* ......................................................................3

      *4.  Container Closure System (2.1.4)* .............................................................3

      *5.  Specification (2.1.5)* ..................................................................................3

      *6.  Testing Frequency (2.1.6)* .........................................................................4

      *7.  Storage Conditions (2.1.7)* ........................................................................4

      *8.  Stability Commitment (2.1.8)* ....................................................................6

      *9.  Evaluation (2.1.9)* .....................................................................................7

   **B.    Drug Product (2.2)** .........................................................................................8

      *1.  General (2.2.1)* ...........................................................................................8

      *2.  Photostability Testing (2.2.2)* ....................................................................8

      *3.   Selection of Batches (2.2.3)* .....................................................................8

      *4.  Container Closure System (2.2.4)* .............................................................8

      *5.  Specification (2.2.5)* ..................................................................................9

      *6.  Testing Frequency (2.2.6)* .........................................................................9

      *7.  Storage Conditions (2.2.7)* ......................................................................10

      *8.  Stability Commitment (2.2.8)* ..................................................................14

      *9.  Evaluation (2.2.9)* ...................................................................................15

      *10.  Statements/Labeling (2.2.10)* ................................................................16

**GLOSSARY (3)** .................................................................................................... **17**

**REFERENCES (4)** ................................................................................................ **21**

**ATTACHMENT  List Of Revision 2 Changes** ..................................................... **22**

*Contains Nonbinding Recommendations*

# Guidance for Industry[1]

# Q1A(R2) Stability Testing of New Drug Substances and Products

---

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

---

## I.  INTRODUCTION (1) [2]

This guidance is the second revision of *Q1A Stability Testing of New Drug Substances and Products,* which was first published in September 1994 and revised in August 2001. The purpose of this revision is to harmonize the intermediate storage condition for zones I and II with the long-term condition for zones III and IV recommended in the ICH guidance *Q1F Stability Data Package for Registration Applications in Climatic Zones III and IV.* The changes made in this second revision are listed in the attachment to this guidance.

### A.  Objectives of the Guidance (1.1)

This guidance is intended to define what stability data package for a new drug substance or drug product is sufficient for a registration application within the three regions of the European Union (EU), Japan, and the United States. It does not seek to address the testing for registration in or export to other areas of the world. The guidance exemplifies the core stability data package for new drug substances and products, but leaves sufficient flexibility to encompass the variety of different practical situations that may be encountered due to specific scientific considerations and characteristics of the materials being evaluated. Alternative approaches can be used when there are scientifically justifiable reasons.

---

[1] This guidance was developed within the Expert Working Group (Quality) of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) and has been subject to consultation by the regulatory parties, in accordance with the ICH process. This document was endorsed by the ICH Steering Committee at *Step 4* of the ICH process, February 2003. At *Step 4* of the process, the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan, and the United States.

[2] Arabic numbers reflect the organizational breakdown in the document endorsed by the  ICH  Steering Committee at Step 4 of the ICH process.

*Contains Nonbinding Recommendations*

### B.      Scope of the Guidance (1.2)

The guidance addresses the information to be submitted in registration applications for new molecular entities and associated drug products.  This guidance does not currently seek to cover the information to be submitted for abbreviated or abridged applications, variations, or clinical trial applications.

Specific details of the sampling and testing for particular dosage forms in their proposed container closures are not covered in this guidance.

Further guidance on new dosage forms and on biotechnological/biological products can be found in ICH guidances *Q1C Stability Testing for New Dosage Forms* and *Q5C Quality of Biotechnological Products:  Stability Testing of Biotechnological/Biological Products*, respectively.

### C.      General Principles (1.3)

The purpose of stability testing is to provide evidence on how the quality of a drug substance or drug product varies with time under the influence of a variety of environmental factors, such as temperature, humidity, and light, and to establish a retest period for the drug substance or a shelf life for the drug product and recommended storage conditions.

The choice of test conditions defined in this guidance is based on an analysis of the effects of climatic conditions in the three regions of the EU, Japan, and the United States.  The mean kinetic temperature in any part of the world can be derived from climatic data, and the world can be divided into four climatic zones, I-IV.  This guidance addresses climatic zones I and II.  The principle has been established that stability information generated in any one of the three regions of the EU, Japan, and the United States would be mutually acceptable to the other two regions, provided the information is consistent with this guidance and the labeling is in accord with national/regional requirements.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.      GUIDANCE (2)

### A.      Drug Substance (2.1)

*1.      General (2.1.1)*

Information on the stability of the drug substance is an integral part of the systematic approach to stability evaluation.

*Contains Nonbinding Recommendations*

> 2.      *Stress Testing (2.1.2)*

Stress testing of the drug substance can help identify the likely degradation products, which can in turn help establish the degradation pathways and the intrinsic stability of the molecule and validate the stability indicating power of the analytical procedures used. The nature of the stress testing will depend on the individual drug substance and the type of drug product involved.

Stress testing is likely to be carried out on a single batch of the drug substance.  The testing should include the effect of temperatures (in 10°C increments (e.g., 50°C, 60°C) above that for accelerated testing), humidity (e.g., 75 percent relative humidity or greater) where appropriate, oxidation, and photolysis on the drug substance.  The testing should also evaluate the susceptibility of the drug substance to hydrolysis across a wide range of pH values when in solution or suspension.  Photostability testing should be an integral part of stress testing.  The standard conditions for photostability testing are described in ICH *Q1B Photostability Testing of New Drug Substances and Products*.

Examining degradation products under stress conditions is useful in establishing degradation pathways and developing and validating suitable analytical procedures.  However, such examination may not be necessary for certain degradation products if it has been demonstrated that they are not formed under accelerated or long-term storage conditions.

Results from these studies will form an integral part of the information provided to regulatory authorities.

> 3.      *Selection of Batches (2.1.3)*

Data from formal stability studies should be provided on at least three primary batches of the drug substance.  The batches should be manufactured to a minimum of pilot scale by the same synthetic route as production batches and using a method of manufacture and procedure that simulates the final process to be used for production batches.  The overall quality of the batches of drug substance placed on formal stability studies should be representative of the quality of the material to be made on a production scale.

Other supporting data can be provided.

> 4.      *Container Closure System (2.1.4)*

The stability studies should be conducted on the drug substance packaged in a container closure system that is the same as or simulates the packaging proposed for storage and distribution.

> 5.      *Specification (2.1.5)*

Specification, which is a list of tests, references to analytical procedures, and proposed acceptance criteria, is addressed in ICH *Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances* and *Q6B*

*Contains Nonbinding Recommendations*

*Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Biotechnological/Biological Products*.  In addition, specification for degradation products in a drug substance is discussed in ICH *Q3A Impurities in New Drug Substances*.

Stability studies should include testing of those attributes of the drug substance that are susceptible to change during storage and are likely to influence quality, safety, and/or efficacy. The testing should cover, as appropriate, the physical, chemical, biological, and microbiological attributes.  Validated stability-indicating analytical procedures should be applied.  Whether and to what extent replication should be performed should depend on the results from validation studies.

6.      *Testing Frequency (2.1.6)*

For long-term studies, frequency of testing should be sufficient to establish the stability profile of the drug substance.  For drug substances with a proposed retest period of at least 12 months, the frequency of testing at the long-term storage condition should normally be every 3 months over the first year, every 6 months over the second year, and annually thereafter through the proposed retest period.

At the accelerated storage condition, a minimum of three time points, including the initial and final time points (e.g., 0, 3, and 6 months), from a 6-month study is recommended.  Where an expectation (based on development experience) exists that the results from accelerated studies are likely to approach significant change criteria, increased testing should be conducted either by adding samples at the final time point or including a fourth time point in the study design.

When testing at the intermediate storage condition is called for as a result of significant change at the accelerated storage condition, a minimum of four time points, including the initial and final time points (e.g., 0, 6, 9, 12 months), from a 12-month study is recommended.

7.      *Storage Conditions (2.1.7)*

In general, a drug substance should be evaluated under storage conditions (with appropriate tolerances) that test its thermal stability and, if applicable, its sensitivity to moisture.  The storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use.

The long-term testing should cover a minimum of 12 months' duration on at least three primary batches at the time of submission and should be continued for a period of time sufficient to cover the proposed retest period.  Additional data accumulated during the assessment period of the registration application should be submitted to the authorities if requested.  Data from the accelerated storage condition and, if appropriate, from the intermediate storage condition can be used to evaluate the effect of short-term excursions outside the label storage conditions (such as might occur during shipping).

Long-term, accelerated, and, where appropriate, intermediate storage conditions for drug substances are detailed in the sections below. The general case should apply if the drug substance

*Contains Nonbinding Recommendations*

is not specifically covered by a subsequent section.  Alternative storage conditions can be used if justified.

      a.      General case (2.1.7.1)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term* | 25°C ± 2°C/60% RH ± 5% RH<br>or<br>30°C ± 2°C/65% RH ± 5% RH | 12 months |
| Intermediate** | 30°C ± 2°C/65% RH ± 5% RH | 6 months |
| Accelerated | 40°C ± 2°C/75% RH ± 5% RH | 6 months |

\* It is up to the applicant to decide whether long-term stability sturdies are performed at 25°C ± 2°C/60% RH ± 5% RH or 30°C ± 2°C/65% RH ± 5% RH.
\*\* If 30°C ± 2°C/65% RH ± 5% RH is the long-term condition, there is no intermediate condition.

If long-term studies are conducted at 25°C ± 2°C/60% RH ± 5% RH and *significant change* occurs at any time during 6 months' testing at the accelerated storage condition, additional testing at the intermediate storage condition should be conducted and evaluated against significant change criteria.  Testing at the intermediate storage condition should include all tests, unless otherwise justified.  The initial application should include a minimum of 6 months' data from a 12-month study at the intermediate storage condition.

    *Significant change* for a drug substance is defined as failure to meet its specification.

      b.      Drug substances intended for storage in a refrigerator (2.1.7.2)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term | 5°C ± 3°C | 12 months |
| Accelerated | 25°C ± 2°C/60% RH ± 5% RH | 6 months |

Data from refrigerated storage should be assessed according to the evaluation section of this guidance, except where explicitly noted below.

If significant change occurs between 3 and 6 months' testing at the accelerated storage condition, the proposed retest period should be based on the real time data available at the long-term storage condition.

If significant change occurs within the first 3 months' testing at the accelerated storage condition, a discussion should be provided to address the effect of short-term excursions outside the label storage condition (e.g., during shipping or handling).  This discussion can be supported, if appropriate, by further testing on a single batch of the drug substance for a period shorter than

*Contains Nonbinding Recommendations*

3 months but with more frequent testing than usual.  It is considered unnecessary to continue to test a drug substance through 6 months when a significant change has occurred within the first 3 months.

      c.      Drug substances intended for storage in a freezer (2.1.7.3)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term | -20°C ± 5°C | 12 months |

For drug substances intended for storage in a freezer, the retest period should be based on the real time data obtained at the long-term storage condition.  In the absence of an accelerated storage condition for drug substances intended to be stored in a freezer, testing on a single batch at an elevated temperature (e.g., 5°C ± 3°C or 25°C ± 2°C) for an appropriate time period should be conducted to address the effect of short-term excursions outside the proposed label storage condition (e.g., during shipping or handling).

      d.      Drug substances intended for storage below -20°C (2.1.7.4)

Drug substances intended for storage below -20°C should be treated on a case-by-case basis.

      *8.      Stability Commitment (2.1.8)*

When available long-term stability data on primary batches do not cover the proposed retest period granted at the time of approval, a commitment should be made to continue the stability studies postapproval to firmly establish the retest period.

Where the submission includes long-term stability data on three production batches covering the proposed retest period, a postapproval commitment is considered unnecessary.  Otherwise, one of the following commitments should be made:

- If the submission includes data from stability studies on at least three production batches, a commitment should be made to continue these studies through the proposed retest period.

- If the submission includes data from stability studies on fewer than three production batches, a commitment should be made to continue these studies through the proposed retest period and to place additional production batches, to a total of at least three, on long-term stability studies through the proposed retest period.

- If the submission does not include stability data on production batches, a commitment should be made to place the first three production batches on long-term stability studies through the proposed retest period.

*Contains Nonbinding Recommendations*

The stability protocol used for long-term studies for the stability commitment should be the same as that for the primary batches, unless otherwise scientifically justified.

       *9.        Evaluation (2.1.9)*

The purpose of the stability study is to establish, based on testing a minimum of three batches of the drug substance and evaluating the stability information (including, as appropriate, results of the physical, chemical, biological, and microbiological tests), a retest period applicable to all future batches of the drug substance manufactured under similar circumstances.  The degree of variability of individual batches affects the confidence that a future production batch will remain within specification throughout the assigned retest period.

The data may show so little degradation and so little variability that it is apparent from looking at the data that the requested retest period will be granted.  Under these circumstances, it is normally unnecessary to go through the formal statistical analysis; providing a justification for the omission should be sufficient.

An approach for analyzing the data on a quantitative attribute that is expected to change with time is to determine the time at which the 95 percent, one-sided confidence limit for the mean curve intersects the acceptance criterion.  If analysis shows that the batch-to-batch variability is small, it is advantageous to combine the data into one overall estimate. This can be done by first applying appropriate statistical tests (e.g., p values for level of significance of rejection of more than 0.25) to the slopes of the regression lines and zero time intercepts for the individual batches. If it is inappropriate to combine data from several batches, the overall retest period should be based on the minimum time a batch can be expected to remain within acceptance criteria.

The nature of any degradation relationship will determine whether the data should be transformed for linear regression analysis.  Usually the relationship can be represented by a linear, quadratic, or cubic function on an arithmetic or logarithmic scale.  Statistical methods should be employed to test the goodness of fit of the data on all batches and combined batches (where appropriate) to the assumed degradation line or curve.

Limited extrapolation of the real time data from the long-term storage condition beyond the observed range to extend the retest period can be undertaken at approval time if justified.  This justification should be based, for example, on what is known about the mechanism of degradation, the results of testing under accelerated conditions, the goodness of fit of any mathematical model, batch size, and/or existence of supporting stability data.  However, this extrapolation assumes that the same degradation relationship will continue to apply beyond the observed data.

Any evaluation should cover not only the assay, but also the levels of degradation products and other appropriate attributes.

*Contains Nonbinding Recommendations*

     *10.     Statements/Labeling (2.1.10)*

A storage statement should be established for the labeling in accordance with relevant national/regional requirements.  The statement should be based on the stability evaluation of the drug substance.  Where applicable, specific instructions should be provided, particularly for drug substances that cannot tolerate freezing.  Terms such as *ambient conditions* or *room temperature* should be avoided.

A retest period should be derived from the stability information, and a retest date should be displayed on the container label if appropriate.

     **B.     Drug Product (2.2)**

     *1.     General (2.2.1)*

The design of the formal stability studies for the drug product should be based on knowledge of the behavior and properties of the drug substance, results from stability studies on the drug substance, and experience gained from clinical formulation studies.  The likely changes on storage and the rationale for the selection of attributes to be tested in the formal stability studies should be stated.

     *2.     Photostability Testing (2.2.2)*

Photostability testing should be conducted on at least one primary batch of the drug product if appropriate. The standard conditions for photostability testing are described in ICH Q1B.

     *3.     Selection of Batches (2.2.3)*

Data from stability studies should be provided on at least three primary batches of the drug product.  The primary batches should be of the same formulation and packaged in the same container closure system as proposed for marketing.  The manufacturing process used for primary batches should simulate that to be applied to production batches and should provide product of the same quality and meeting the same specification as that intended for marketing.  Two of the three batches should be at least pilot scale batches, and the third one can be smaller if justified.  Where possible, batches of the drug product should be manufactured by using different batches of the drug substance.

Stability studies should be performed on each individual strength and container size of the drug product unless bracketing or matrixing is applied.

Other supporting data can be provided.

     *4.     Container Closure System (2.2.4)*

Stability testing should be conducted on the dosage form packaged in the container closure system proposed for marketing (including, as appropriate, any secondary packaging and

*Contains Nonbinding Recommendations*

container label).  Any available studies carried out on the drug product outside its immediate container or in other packaging materials can form a useful part of the stress testing of the dosage form or can be considered as supporting information, respectively.

>    5.    *Specification (2.2.5)*

Specification, which is a list of tests, references to analytical procedures, and proposed acceptance criteria, including the concept of different acceptance criteria for release and shelf life specifications, is addressed in ICH Q6A and Q6B.  In addition, specification for degradation products in a drug product is addressed in ICH *Q3B Impurities in New Drug Products*.

Stability studies should include testing of those attributes of the drug product that are susceptible to change during storage and are likely to influence quality, safety, and/or efficacy.  The testing should cover, as appropriate, the physical, chemical, biological, and microbiological attributes, preservative content (e.g., antioxidant, antimicrobial preservative), and functionality tests (e.g., for a dose delivery system).  Analytical procedures should be fully validated and stability indicating.  Whether and to what extent replication should be performed will depend on the results of validation studies.

Shelf life acceptance criteria should be derived from consideration of all available stability information.  It may be appropriate to have justifiable differences between the shelf life and release acceptance criteria based on the stability evaluation and the changes observed on storage.  Any differences between the release and shelf life acceptance criteria for antimicrobial preservative content should be supported by a validated correlation of chemical content and preservative effectiveness demonstrated during drug development on the product in its final formulation (except for preservative concentration) intended for marketing.  A single primary stability batch of the drug product should be tested for antimicrobial preservative effectiveness (in addition to preservative content) at the proposed shelf life for verification purposes, regardless of whether there is a difference between the release and shelf life acceptance criteria for preservative content.

>    6.    *Testing Frequency (2.2.6)*

For long-term studies, frequency of testing should be sufficient to establish the stability profile of the drug product.  For products with a proposed shelf life of at least 12 months, the frequency of testing at the long-term storage condition should normally be every 3 months over the first year, every 6 months over the second year, and annually thereafter through the proposed shelf life.

At the accelerated storage condition, a minimum of three time points, including the initial and final time points (e.g., 0, 3, and 6 months), from a 6-month study is recommended.  Where an expectation (based on development experience) exists that results from accelerated testing are likely to approach significant change criteria, increased testing should be conducted either by adding samples at the final time point or by including a fourth time point in the study design.

*Contains Nonbinding Recommendations*

When testing at the intermediate storage condition is called for as a result of significant change at the accelerated storage condition, a minimum of four time points, including the initial and final time points (e.g., 0, 6, 9, 12 months), from a 12-month study is recommended.

Reduced designs (i.e., matrixing or bracketing), where the testing frequency is reduced or certain factor combinations are not tested at all, can be applied if justified.

> 7.      *Storage Conditions (2.2.7)*

In general, a drug product should be evaluated under storage conditions (with appropriate tolerances) that test its thermal stability and, if applicable, its sensitivity to moisture or potential for solvent loss.  The storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use.

Stability testing of the drug product after constitution or dilution, if applicable, should be conducted to provide information for the labeling on the preparation, storage condition, and in-use period of the constituted or diluted product.  This testing should be performed on the constituted or diluted product through the proposed in-use period on primary batches as part of the formal stability studies at initial and final time points, and if full shelf life, long-term data will not be available before submission, at 12 months or the last time point for which data will be available.  In general, this testing need not be repeated on commitment batches.

The long-term testing should cover a minimum of 12 months' duration on at least three primary batches at the time of submission and should be continued for a period of time sufficient to cover the proposed shelf life.  Additional data accumulated during the assessment period of the registration application should be submitted to the authorities if requested.  Data from the accelerated storage condition and, if appropriate, from the intermediate storage condition can be used to evaluate the effect of short-term excursions outside the label storage conditions (such as might occur during shipping).

Long-term, accelerated, and, where appropriate, intermediate storage conditions for drug products are detailed in the sections below.  The general case should apply if the drug product is not specifically covered by a subsequent section.  Alternative storage conditions can be used if justified.

*Contains Nonbinding Recommendations*

a.    General case (2.2.7.1)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term* | 25°C ± 2°C/60% RH ± 5% RH<br>or<br>30°C ± 2°C/65% RH ± 5% RH | 12 months |
| Intermediate** | 30°C ± 2°C/65% RH ± 5% RH | 6 months |
| Accelerated | 40°C ± 2°C/75% RH ± 5% RH | 6 months |

\* It is up to the applicant to decide whether long-term stability sturdies are performed at 25°C ± 2°C/60% RH ± 5% RH or 30°C ± 2°C/65% RH ± 5% RH.
\*\* If 30°C ± 2°C/65% RH ± 5% RH is the long-term condition, there is no intermediate condition.

If long-term studies are condcuted at 25°C ± 2°C/60% RH ± 5% RH and *significant change* occurs at any time during 6 months' testing at the accelerated storage condition, additional testing at the intermediate storage condition should be conducted and evaluated against significant change criteria.  The initial application should include a minimum of 6 months' data from a 12-month study at the intermediate storage condition.

In general, *significant change* for a drug product is defined as one or more of the following (as appropriate for the dosage form):

- A 5 percent change in assay from its initial value, or failure to meet the acceptance criteria for potency when using biological or immunological procedures

- Any degradation product's exceeding its acceptance criterion

- Failure to meet the acceptance criteria for appearance, physical attributes, and functionality test (e.g., color, phase separation, resuspendibility, caking, hardness, dose delivery per actuation).  However, some changes in physical attributes (e.g., softening of suppositories, melting of creams) may be expected under accelerated conditions.

- Failure to meet the acceptance criterion for pH

- Failure to meet the acceptance criteria for dissolution for 12 dosage units

b.    Drug products packaged in impermeable containers (2.2.7.2)

Sensitivity to moisture or potential for solvent loss is not a concern for drug products packaged in impermeable containers that provide a permanent barrier to passage of moisture or solvent.  Thus, stability studies for products stored in impermeable containers can be conducted under any controlled or ambient humidity condition.

11

*Contains Nonbinding Recommendations*

      c.      Drug products packaged in semipermeable containers (2.2.7.3)

Aqueous-based products packaged in semipermeable containers should be evaluated for potential
water loss in addition to physical, chemical, biological, and microbiological stability.  This
evaluation can be carried out under conditions of low relative humidity, as discussed below.
Ultimately, it should be demonstrated that aqueous-based drug products stored in semipermeable
containers can withstand low relative humidity environments.  Other comparable approaches can
be developed and reported for nonaqueous, solvent-based products.

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term * | 25°C ± 2°C/40% RH ± 5% RH<br>or<br>30°C ± 2°C/35% RH ± 5% RH | 12 months |
| Intermediate** | 30°C ± 2°C/65% RH ± 5% RH | 6 months |
| Accelerated | 40°C ± 2°C/not more than (NMT) 25% RH | 6 months |

    * It is up to the applicant to decide whether long-term stability sturdies are performed at
    25°C ± 2°C/40% RH ± 5% RH or 30°C ± 2°C/35% RH ± 5% RH.
    ** If 30°C ± 2°C/35% RH ± 5% RH is the long-term condition, there is no intermediate
    condition.

When long-term studies are conducted at 25°C ± 2°C/40% RH ± 5% RH and significant change
other than water loss occurs during the 6 months' testing at the accelerated storage condition,
additional testing at the intermediate storage condition should be performed, as described under
the general case, to evaluate the temperature effect at 30°C.   A significant change in water loss
alone at the accelerated storage condition does not necessitate testing at the intermediate storage
condition.  However, data should be provided to demonstrate that the drug product will not have
significant water loss throughout the proposed shelf life if stored at 25°C and the reference
relative humidity of 40 percent RH.

A 5 percent loss in water from its initial value is considered a significant change for a product
packaged in a semipermeable container after an equivalent of 3 months' storage at 40°C/NMT 25
percent RH.  However, for small containers (1 mL or less) or unit-dose products, a water loss of
5 percent or more after an equivalent of 3 months' storage at 40°C/NMT 25 percent RH may be
appropriate if justified.

An alternative approach to studying at the reference relative humidity as recommended in the
table above (for either long-term or accelerated testing) is performing the stability studies under
higher relative humidity and deriving the water loss at the reference relative humidity through
calculation.  This can be achieved by experimentally determining the permeation coefficient for
the container closure system or, as shown in the example below, using the calculated ratio of
water loss rates between the two humidity conditions at the same temperature.  The permeation

*Contains Nonbinding Recommendations*

coefficient for a container closure system can be experimentally determined by using the worst case scenario (e.g., the most diluted of a series of concentrations) for the proposed drug product.

***Example of an approach for determining water loss:***

For a product in a given container closure system, container size, and fill, an appropriate approach for deriving the water loss rate at the reference relative humidity is to multiply the water loss rate measured at an alternative relative humidity at the same temperature by a water loss rate ratio shown in the table below.  A linear water loss rate at the alternative relative humidity over the storage period should be demonstrated.

For example, at a given temperature (e.g., 40°C), the calculated water loss rate during storage at NMT 25 percent RH is the water loss rate measured at 75 percent RH multiplied by 3.0, the corresponding water loss rate ratio.

| Alternative relative humidity | Reference relative humidity | Ratio of water loss rates at a given temperature |
|---|---|---|
| 60% RH | 25% RH | 1.9 |
| 60% RH | 40% RH | 1.5 |
| 65% RH | 35% RH | 1.9 |
| 75% RH | 25% RH | 3.0 |

Valid water loss rate ratios at relative humidity conditions other than those shown in the table above can also be used.

    d.      Drug products intended for storage in a refrigerator (2.2.7.4)

| Study | Storage condition | Minimum time period  covered by data at submission |
|---|---|---|
| Long-term | 5°C ± 3°C | 12 months |
| Accelerated | 25°C ± 2°C/60% RH ± 5% RH | 6 months |

If the drug product is packaged in a semipermeable container, appropriate information should be provided to assess the extent of water loss.

Data from refrigerated storage should be assessed according to the evaluation section of this guidance, except where explicitly noted below.

If significant change occurs between 3 and 6 months' testing at the accelerated storage condition, the proposed shelf life should be based on the real time data available from the long-term storage condition.

13

*Contains Nonbinding Recommendations*

If significant change occurs within the first 3 months' testing at the accelerated storage condition, a discussion should be provided to address the effect of short-term excursions outside the label storage condition (e.g., during shipment and handling).  This discussion can be supported, if appropriate, by further testing on a single batch of the drug product for a period shorter than 3 months but with more frequent testing than usual.  It is considered unnecessary to continue to test a product through 6 months when a significant change has occurred within the first 3 months.

> e. Drug products intended for storage in a freezer (2.2.7.5)

| Study | Storage condition | Minimum time period  covered by data at submission |
|-------|-------------------|----------------------------------------------------|
| Long-term | -20°C ± 5°C | 12 months |

For drug products intended for storage in a freezer, the shelf life should be based on the real time data obtained at the long-term storage condition.  In the absence of an accelerated storage condition for drug products intended to be stored in a freezer, testing on a single batch at an elevated temperature (e.g., 5°C ± 3°C or 25°C ± 2°C) for an appropriate time period should be conducted to address the effect of short-term excursions outside the proposed label storage condition.

> f. Drug products intended for storage below -20°C (2.2.7.6)

Drug products intended for storage below -20°C should be treated on a case-by-case basis.

> 8. *Stability Commitment (2.2.8)*

When available long-term stability data on primary batches do not cover the proposed shelf life granted at the time of approval, a commitment should be made to continue the stability studies postapproval to firmly establish the shelf life.

Where the submission includes long-term stability data from three production batches covering the proposed shelf life, a postapproval commitment is considered unnecessary.  Otherwise, one of the following commitments should be made:

- If the submission includes data from stability studies on at least three production batches, a commitment should be made to continue the long-term studies through the proposed shelf life and the accelerated studies for 6 months.

- If the submission includes data from stability studies on fewer than three production batches, a commitment should be made to continue the long-term studies through the proposed shelf life and the accelerated studies for 6 months, and to place additional production batches, to a total of at least three, on long-term stability studies through the proposed shelf life and on accelerated studies for 6 months.

*Contains Nonbinding Recommendations*

- If the submission does not include stability data on production batches, a commitment should be made to place the first three production batches on long-term stability studies through the proposed shelf life and on accelerated studies for 6 months.

The stability protocol used for studies on commitment batches should be the same as that for the primary batches, unless otherwise scientifically justified.

Where intermediate testing is called for by a significant change at the accelerated storage condition for the primary batches, testing on the commitment batches can be conducted at either the intermediate or the accelerated storage condition.  However, if significant change occurs at the accelerated storage condition on the commitment batches, testing at the intermediate storage condition should also be conducted.

### 9. Evaluation (2.2.9)

A systematic approach should be adopted in the presentation and evaluation of the stability information, which should include, as appropriate, results from the physical, chemical, biological, and microbiological tests, including particular attributes of the dosage form (e.g., dissolution rate for solid oral dosage forms).

The purpose of the stability study is to establish, based on testing a minimum of three batches of the drug product, a shelf life and label storage instructions applicable to all future batches of the drug product manufactured and packaged under similar circumstances.  The degree of variability of individual batches affects the confidence that a future production batch will remain within specification throughout its shelf life.

Where the data show so little degradation and so little variability that it is apparent from looking at the data that the requested shelf life will be granted, it is normally unnecessary to go through the formal statistical analysis; providing a justification for the omission should be sufficient.

An approach for analyzing data of a quantitative attribute that is expected to change with time is to determine the time at which the 95 percent one-sided confidence limit for the mean curve intersects the acceptance criterion.  If analysis shows that the batch-to-batch variability is small, it is advantageous to combine the data into one overall estimate.  This can be done by first applying appropriate statistical tests (e.g., p values for level of significance of rejection of more than 0.25) to the slopes of the regression lines and zero time intercepts for the individual batches. If it is inappropriate to combine data from several batches, the overall shelf life should be based on the minimum time a batch can be expected to remain within acceptance criteria.

The nature of the degradation relationship will determine whether the data should be transformed for linear regression analysis.  Usually the relationship can be represented by a linear, quadratic, or cubic function on an arithmetic or logarithmic scale.  Statistical methods should be employed to test the goodness of fit on all batches and combined batches (where appropriate) to the assumed degradation line or curve.

*Contains Nonbinding Recommendations*

Limited extrapolation of the real time data from the long-term storage condition beyond the observed range to extend the shelf life can be undertaken at approval time if justified.  This justification should be based, for example, on what is known about the mechanisms of degradation, the results of testing under accelerated conditions, the goodness of fit of any mathematical model, batch size, and/or existence of supporting stability data.  However, this extrapolation assumes that the same degradation relationship will continue to apply beyond the observed data.

Any evaluation should consider not only the assay but also the degradation products and other appropriate attributes.  Where appropriate, attention should be paid to reviewing the adequacy of the mass balance and different stability and degradation performance.

### 10.     *Statements/Labeling (2.2.10)*

A storage statement should be established for the labeling in accordance with relevant national/regional requirements.  The statement should be based on the stability evaluation of the drug product. Where applicable, specific instruction should be provided, particularly for drug products that cannot tolerate freezing.  Terms such as *ambient conditions* or *room temperature* should be avoided.

There should be a direct link between the label storage statement and the demonstrated stability of the drug product.  An expiration date should be displayed on the container label.

*Contains Nonbinding Recommendations*

## GLOSSARY (3)

The following definitions are provided to facilitate interpretation of the guidance.

**Accelerated testing:**  Studies designed to increase the rate of chemical degradation or physical change of a drug substance or drug product by using exaggerated storage conditions as part of the formal stability studies.  Data from these studies, in addition to long-term stability studies, can be used to assess longer term chemical effects at nonaccelerated conditions and to evaluate the effect of short-term excursions outside the label storage conditions such as might occur during shipping.  Results from accelerated testing studies are not always predictive of physical changes.

**Bracketing:**  The design of a stability schedule such that only samples on the extremes of certain design factors (e.g., strength, package size) are tested at all time points as in a full design.  The design assumes that the stability of any intermediate levels is represented by the stability of the extremes tested.  Where a range of strengths is to be tested, bracketing is applicable if the strengths are identical or very closely related in composition (e.g., for a tablet range made with different compression weights of a similar basic granulation, or a capsule range made by filling different plug fill weights of the same basic composition into different size capsule shells).  Bracketing can be applied to different container sizes or different fills in the same container closure system.

**Climatic zones:**  The four zones in the world that are distinguished by their characteristic, prevalent annual climatic conditions.  This is based on the concept described by W. Grimm (*Drugs Made in Germany*, 28:196-202, 1985 and 29:39-47, 1986).

**Commitment batches:**  Production batches of a drug substance or drug product for which the stability studies are initiated or completed postapproval through a commitment made in the registration application.

**Container closure system:**  The sum of packaging components that together contain and protect the dosage form.  This includes primary packaging components and secondary packaging components if the latter are intended to provide additional protection to the drug product.  A packaging system is equivalent to a container closure system.

**Dosage form:**  A pharmaceutical product type (e.g., tablet, capsule, solution, cream) that contains a drug substance generally, but not necessarily, in association with excipients.

**Drug product:**  The dosage form in the final immediate packaging intended for marketing.

**Drug substance:**  The unformulated drug substance that may subsequently be formulated with excipients to produce the dosage form.

**Excipient:**  Anything other than the drug substance in the dosage form.

*Contains Nonbinding Recommendations*

**Expiration date:**  The date placed on the container label of a drug product designating the time prior to which a batch of the product is expected to remain within the approved shelf life specification, if stored under defined conditions, and after which it must not be used.

**Formal stability studies:**  Long-term and accelerated (and intermediate) studies undertaken on primary and/or commitment batches according to a prescribed stability protocol to establish or confirm the retest period of a drug substance or the shelf life of a drug product.

**Impermeable containers:**  Containers that provide a permanent barrier to the passage of gases or solvents (e.g., sealed aluminum tubes for semi-solids, sealed glass ampoules for solutions).

**Intermediate testing:**  Studies conducted at 30°C/65% RH and designed to moderately increase the rate of chemical degradation or physical changes for a drug substance or drug product intended to be stored long-term at 25°C.

**Long-term testing:**  Stability studies under the recommended storage condition for the retest period or shelf life proposed (or approved) for labeling.

**Mass balance:**  The process of adding together the assay value and levels of degradation products to see how closely these add up to 100 percent of the initial value, with due consideration of the margin of analytical error.

**Matrixing:**  The design of a stability schedule such that a selected subset of the total number of possible samples for all factor combinations is tested at a specified time point.  At a subsequent time point, another subset of samples for all factor combinations is tested.  The design assumes that the stability of each subset of samples tested represents the stability of all samples at a given time point.  The differences in the samples for the same drug product should be identified as, for example, covering different batches, different strengths, different sizes of the same container closure system, and, possibly in some cases, different container closure systems.

**Mean kinetic temperature:**  A single derived temperature that, if maintained over a defined period of time, affords the same thermal challenge to a drug substance or drug product as would be experienced over a range of both higher and lower temperatures for an equivalent defined period.  The mean kinetic temperature is higher than the arithmetic mean temperature and takes into account the Arrhenius equation.

When establishing the mean kinetic temperature for a defined period, the formula of J. D. Haynes *(J. Pharm. Sci.,* 60:927-929, 1971) can be used.

**New molecular entity:**  An active pharmaceutical substance not previously contained in any drug product registered with the national or regional authority concerned.  A new salt, ester, or noncovalent bond derivative of an approved drug substance is considered a new molecular entity for the purpose of stability testing under this guidance.

**Pilot scale batch:**  A batch of a drug substance or drug product manufactured by a procedure fully representative of and simulating that to be applied to a full production scale batch.  For

*Contains Nonbinding Recommendations*

solid oral dosage forms, a pilot scale is generally, at a minimum, one-tenth that of a full production scale or 100,000 tablets or capsules, whichever is larger.

**Primary batch:**  A batch of a drug substance or drug product used in a formal stability study, from which stability data are submitted in a registration application for the purpose of establishing a retest period or shelf life, respectively.  A primary batch of a drug substance should be at least a pilot scale batch.  For a drug product, two of the three batches should be at least pilot scale batch, and the third batch can be smaller if it is representative with regard to the critical manufacturing steps.  However, a primary batch may be a production batch.

**Production batch:**  A batch of a drug substance or drug product manufactured at production scale by using production equipment in a production facility as specified in the application.

**Retest date:**  The date after which samples of the drug substance should be examined to ensure that the material is still in compliance with the specification and thus suitable for use in the manufacture of a given drug product.

**Retest period:**  The period of time during which the drug substance is expected to remain within its specification and, therefore, can be used in the manufacture of a given drug product, provided that the drug substance has been stored under the defined conditions.  After this period, a batch of drug substance destined for use in the manufacture of a drug product should be retested for compliance with the specification and then used immediately.  A batch of drug substance can be retested multiple times and a different portion of the batch used after each retest, as long as it continues to comply with the specification.  For most biotechnological/biological substances known to be labile, it is more appropriate to establish a shelf life than a retest period.  The same may be true for certain antibiotics.

**Semipermeable containers:**  Containers that allow the passage of solvent, usually water, while preventing solute loss.  The mechanism for solvent transport occurs by absorption into one container surface, diffusion through the bulk of the container material, and desorption from the other surface.  Transport is driven by a partial pressure gradient.  Examples of semipermeable containers include plastic bags and semirigid, low-density polyethylene (LDPE) pouches for large volume parenterals (LVPs), and LDPE ampoules, bottles, and vials.

**Shelf life (also referred to as expiration dating period):**  The time period during which a drug product is expected to remain within the approved shelf life specification, provided that it is stored under the conditions defined on the container label.

**Specification:**  See ICH Q6A and Q6B.

**Specification, Release:**  The combination of physical, chemical, biological, and microbiological tests and acceptance criteria that determine the suitability of a drug product at the time of its release.

*Contains Nonbinding Recommendations*

**Specification, Shelf life:**  The combination of physical, chemical, biological, and microbiological tests and acceptance criteria that determine the suitability of a drug substance throughout its retest period, or that a drug product should meet throughout its shelf life.

**Storage condition tolerances:**  The acceptable variations in temperature and relative humidity of storage facilities for formal stability studies.  The equipment should be capable of controlling the storage condition within the ranges defined in this guidance.  The actual temperature and humidity (when controlled) should be monitored during stability storage.  Short-term spikes due to opening of doors of the storage facility are accepted as unavoidable.  The effect of excursions due to equipment failure should be addressed and reported if judged to affect stability results.  Excursions that exceed the defined tolerances for more than 24 hours should be described in the study report and their effect assessed.

**Stress testing (drug substance):**  Studies undertaken to elucidate the intrinsic stability of the drug substance.  Such testing is part of the development strategy and is normally carried out under more severe conditions than those used for accelerated testing.

**Stress testing (drug product):**  Studies undertaken to assess the effect of severe conditions on the drug product.  Such studies include photostability testing (see ICH Q1B) and specific testing of certain products (e.g., metered dose inhalers, creams, emulsions, refrigerated aqueous liquid products).

**Supporting data:**  Data, other than those from formal stability studies, that support the analytical procedures, the proposed retest period or shelf life, and the label storage statements.  Such data include (1) stability data on early synthetic route batches of drug substance, small-scale batches of materials, investigational formulations not proposed for marketing, related formulations, and product presented in containers and closures other than those proposed for marketing; (2) information regarding test results on containers; and (3) other scientific rationales.

*Contains Nonbinding Recommendations*

## REFERENCES (4)[3]

*ICH Q1B Photostability Testing of New Drug Substances and Products*

*ICH Q1C Stability Testing for New Dosage Forms*

*ICH Q3A Impurities in New Drug Substances*

*ICH Q3B Impurities in New Drug Products*

*ICH Q5C Quality of Biotechnological Products:  Stability Testing of Biotechnological/Biological Products*

*ICH Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances*

*ICH Q6B Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Biotechnological/Biological Products*

---

[3] We update guidances periodically.  To make sure you have the most recent version of a guidance, check the CDER guidance page at http://www.fda.gov/cder/guidance/index.htm

*Contains Nonbinding Recommendations*

**ATTACHMENT**
**List of Revision 2 Changes**

The revisions to this *Q1A* guidance result from adoption of the ICH guidance *Q1F Stability Data Package for Registration Applications in Climatic Zones III and IV*.  The following changes were made.

1. The intermediate storage condition has been changed from 30°C ± 2°C/60% RH ± 5% RH to 30°C ± 2°C/65% RH ± 5% RH in the following sections:

    - II.A.7.a (2.1.7.1)  Drug Substance - Storage Conditions - General case
    - II.B.7.a (2.2.7.1)  Drug Product - Storage Conditions - General case
    - II.B.7.c (2.2.7.3)  Drug products packaged in semipermeable containers
    - Glossary  (3)    *Intermediate testing*

2. 30°C ± 2°C/65% RH ± 5% RH has been added as a suitable alternative long-term storage condition to 25°C ± 2°C/60% RH ± 5% in the following sections:

    - II.A.7.a (2.1.7.1)  Drug Substance - Storage Conditions - General case
    - II.B.7.a (2.2.7.1)  Drug Product - Storage Conditions - General case

3. 30°C ± 2°C/35% RH ± 5% RH has been added as a suitable alternative long-term storage condition to 25°C ± 2°C/40% RH ± 5% and the corresponding example for the ratio of water-loss rates has been included in the following section:

    - II.B.7.c (2.2.7.3)  Drug products packaged in semipermeable containers

Midstream switch of the intermediate storage condition from 30°C ± 2°C/60% RH ± 5% RH to 30°C ± 2°C/65% RH ± 5% RH can be appropriate provided that the respective storage conditions and the date of the switch are clearly documented and stated in the registration application.

It is recommended that registration applications contain data from complete studies at the intermediate storage condition 30°C ± 2°C/65% RH ± 5% RH, if applicable, by three years after the date of publication of this revised guideline in the respective ICH tripartite region.

EXHIBIT 19

**CONTAINS CONFIDENTIAL INFORMATION**

### Defendants' Position

FDA's review of Chemo's ANDA is ongoing. Chemo filed its response to FDA's Complete Response Letter ("CRL") on May 14, 2021. Soon thereafter, on May 19, 2021, FDA set "goal dates" to respond to Chemo for  *See* Ex. A at CHEMO_BEL-0067187. Chemo promptly produced this correspondence to BDSI on May 20. In September 2021, Chemo also promptly produced correspondence showing that

*See* Ex. B at CHEMO_BEL-0067196. Chemo also recently produced documentation showing that

*See* Ex. C at IGX-BUP-0187200. BDSI, however, continues to mischaracterize the status of FDA's review, and the pendency of Chemo's ANDA, in the hopes of avoiding the upcoming non-infringement trial scheduled for April 2022. There is no basis for BDSI to suggest that problems exist with the ANDA based on the fact that FDA's response is outstanding. *See* Ex. D at 35:11-16 (noting FDA's response was due in January 2022). BDSI has known since

as BDSI has suggested. As things stand now, FDA has not indicated that its review is delayed or that it will not respond to Chemo's CRL response consistent with its goal dates.

# Exhibit A

Exhibit B

Exhibit C

# Exhibit D

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   BIODELIVERY SCIENCES          )
     INTERNATIONAL, INC. and ARIUS )
 5   TWO, INC.,                    )
                                   )
 6            Plaintiffs,          )
                                   )
 7   v.                            )  C.A. No. 19-444 (CFC) (CJB)
                                   )
 8   CHEMO RESEARCH, S.L., INSUD   )
     PHARMA S.L.U., INTELGENX CORP.,)
 9   and INTELGENX TECHNOLOGIES    )
     CORP.,                        )
10                                 )
              Defendants.          )
11

12                         J. Caleb Boggs Courthouse
                           844 North King Street
13                         Wilmington, Delaware

14                         Wednesday, February 2, 2022
                           11:00 a.m.
15                         Discovery Dispute Teleconference

16

     BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
17            United States District Court Magistrate Judge

18   APPEARANCES:

19            MORRIS NICHOLS ARSHT & TUNNELL LLP
              BY:  JEREMY A. TIGAN, ESQUIRE
20
                       -and-
21
              DECHERT LLP
22            BY:  JENNIFER S. SWAN, ESQUIRE
              BY:  HOWARD W. LEVINE, ESQUIRE
23
                              For the Plaintiffs
24

25
```

2

```
 1   APPEARANCES CONTINUED:

 2        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          BY:  ANNE SHEA GAZA, ESQUIRE
 3
                    -and-
 4
          STERNE KESSLER LLP
 5        BY:  DENNIES VARUGHESE, ESQUIRE
          BY:  ADAM C. LaROCK, ESQUIRE
 6
                    -and-
 7
          DORSEY & WHITNEY LLP
 8        BY:  GEOFFREY M. GODREY, ESQUIRE

 9                    For the Defendants

10        ***  PROCEEDINGS  ***

11
12            THE COURT:  Good morning, everyone.  This is
13   Judge Burke here.  Before we begin, let me just say a few
14   things for the record as we go on the record today.
15   And the first is that we're here this morning for a
16   discovery dispute teleconference in the matter of
17   *BioDelivery Services International, Inc., et al vs. Chemo*
18   *Research S.L., et al.*  It's Civil Action Number
19   19-444-CFC-CJB here in our court.
20            Before we go further, let me just have counsel
21   for each side identify themselves for the record.  We'll
22   start first with counsel for the Plaintiffs' side, and we'll
23   begin there with Delaware counsel.
24            MR. TIGAN:  Yes.  Good morning, Your Honor.
25   This is Jeremy Tigan with Morris Nichols on behalf of the
```

3

```
 1   Plaintiffs, and I'm joined today by Howard Levine and
 2   Jennifer Swan, both with the Dechert firm.
 3            THE COURT:  Okay.  Good to be with you all.
 4            We'll do the same for counsel for Defendants'
 5   side and, again, we'll begin with Delaware counsel.
 6            MS. GAZA:  Good morning, Your Honor.  It's Anne
 7   Gaza from Young Conaway on behalf of all Defendants.  I'm
 8   joined today by my colleague, Samantha Wilson, as well as
 9   Dennies Varughese and Adam LaRock of Sterne Kessler for the
10   Chemo Defendants.  And Geoff Godfrey of Dorsey & Whitney for
11   the Intelgenx Defendants.
12            And, Your Honor, at a time convenient to you, we
13   did want to advise that we have a housekeeping issue that
14   we'd like to raise before we address the substantive
15   arguments in the agenda.
16            THE COURT:  Ms. Gaza, do you want to reference
17   that now?
18            MS. GAZA:  Certainly.  I'll defer to
19   Mr. Varughese.
20            MR. VARUGHESE:  Thank you, Anne.
21            Good morning, Your Honor.  Dennies Varughese
22   from Sterne Kessler.  I'd like to just request that Your
23   Honor seal the proceedings today.  We received notice that a
24   member or multiple members of the public may be attending.
25   Defendants reached out to BDSI's counsel to see if we could
```

4

```
 1   work out a way to bifurcate the discussion to maybe insulate
 2   some of the confidential information, but we weren't able to
 3   find a clean way to do that.  And so BDSI's counsel
 4   indicated that it would not oppose a request to seal the
 5   entire argument, if it so pleases Your Honor.
 6            THE COURT:  Okay.  It's the case that we have
 7   received actually a number of requests from members of the
 8   public to listen in on our teleconference today.  And my
 9   courtroom deputy had provided members of the public with the
10   dial-in information for the call, and they may be on the
11   call now.
12            Obviously, hearings are known to be public here
13   in the court, whether they happen in our court or whether
14   they're happening telephonically.  And so, there's a really
15   strong presumption against entirely closing or sealing off
16   any proceeding.  The strong preference would be to, as best
17   as possible, attempt to address the issues in the
18   teleconference without necessarily having to refer to
19   information that a side might seek to later redact as
20   confidential as best we can.  At times we attempt to do as
21   much of that as possible.  And then if there has to be
22   reference to confidential information to try to cabin that
23   off at some later portion of the hearing.  Obviously, that's
24   difficult with a teleconference.
25            It's also the case that teleconferences aren't
```

33

11:41:42   1   the case and or produce documents that demonstrate that.
11:41:46   2   But, otherwise, it seems like the documents are relevant and
11:41:49   3   material.  They exist, and they should be timely produced.
11:41:53   4       With regard to the second issue which is
11:41:56   5   Plaintiffs' request that I order the Defendants' side to
11:41:58   6   serve a supplemental privilege log, that request is going to
11:42:01   7   be denied.  The unlogged documents at issue here are
11:42:09   8   documents that are generated after the filing of the
11:42:12   9   complaint in this case.  And as we've noted, pursuant to the
11:42:15  10   Court's default standard, as well as the parties' earlier
11:42:18  11   agreement in the case to follow the default standard, the
11:42:22  12   Defendant wasn't required to include such documents in a
11:42:24  13   privilege log.  By the way, that portion of the default
11:42:27  14   standard is found at Paragraph 1(b)(2) of the standard.
11:42:32  15       The Plaintiffs have suggested, as we've
11:42:33  16   discussed today, that the default standard approach should
11:42:37  17   be jettisoned here because Defendants' side produced some
11:42:40  18   100,000 pages of new documents as of May of 2021.  They've
11:42:44  19   noted that that amounts to about 43 percent of the documents
11:42:46  20   in the entire case, the majority of which were dating from
11:42:52  21   2020 and 2019.  In other words, after the case was filed.
11:42:55  22       But as Defendant notes in their letter brief,
11:42:58  23   you know, that supplemental production was completed nearly
11:43:03  24   eight months ago.  The Plaintiff was aware that there would
11:43:07  25   be such a new document production for many months before

34

11:43:10   1   that.  And so, the reality is that, you know, Plaintiff, you
11:43:17   2   know, was sitting there in the middle of 2021 knowing that
11:43:20   3   they were to and then did receive the substantial amount of
11:43:24   4   these documents.  They had the documents.  They knew that
11:43:27   5   the status quo of the case was there would be no additional
11:43:30   6   privilege log for post-complaint documents.  They should
11:43:35   7   have timely requested a change to the default standard as of
11:43:41   8   mid-2021, and they didn't.  You know, nothing about the
11:43:47   9   status of the case or the arguments made by Plaintiff
11:43:51  10   suggest to me that that ask now is anything other than
11:43:56  11   untimely.
11:43:58  12       Plaintiff argues that there have been privilege
11:44:01  13   issues in the case that have been questioned.  Well, those
11:44:03  14   issues have been in the case for a long time.  It seems like
11:44:08  15   it makes it only more urgent that as of the middle part of
11:44:11  16   this year, Plaintiff was aware of this additional act of
11:44:15  17   production.  If they were going to ask Defendant to do what
11:44:17  18   is no doubt going to be some substantial amount of work to
11:44:21  19   have a new privilege log put together, they would have had
11:44:25  20   every reason to know that they should be asking for that a
11:44:28  21   long time ago.  They didn't.  The request now is untimely,
11:44:30  22   and so I conclude that the Plaintiff has waived its right to
11:44:34  23   seek any such supplemental privilege log pursuant to the
11:44:37  24   federal rules.  So, for those reasons, the motion is granted
11:44:40  25   in part and denied in part, as I described here on the call.

35

11:44:43   1       With all that said and understanding the Court's
11:44:46   2   decision, is there anything I need to clarify for either
11:44:48   3   side before we end our call today?
11:44:50   4       For Plaintiffs side, Ms. Swan?
11:44:52   5       MS. SWAN:  No, Your Honor, although I believe
11:44:56   6   that we are scheduled to also discuss Chemo's ANDA product
11:45:01   7   on this call at this time.  And it sounds like from what
11:45:07   8   Chemo's counsel said today that their product is not ready
11:45:10   9   for approval.  They haven't even submitted the stability
11:45:14  10   data.  And, you know, so we just wanted to raise the status
11:45:17  11   of Chemo's ANDA because we're about to go to trial. <mark>And I</mark>
11:45:20  12   <mark>think on our last call, the Court had indicated that, you</mark>
11:45:26  13   <mark>know, this current schedule was predicated on the FDA coming</mark>
11:45:30  14   <mark>back to Chemo, and we'd know by January about the status of</mark>
11:45:34  15   <mark>their ANDA.  It's now February and we still do not know the</mark>
11:45:38  16   <mark>status of their ANDA.</mark>
11:45:39  17       THE COURT:  Okay.  And thank you for reminding
11:45:41  18   me.  We had discussed the first status report on that, and
11:45:46  19   the Court noted that we would address it briefly on this
11:45:48  20   call.
11:45:50  21       Mr. Varughese, from Defendants' side, is there
11:45:52  22   anything Defendant wishes to add in response to Ms. Swan's
11:45:55  23   comments?
11:45:55  24       MR. VARUGHESE:  Yes, Your Honor.  I'd like to
11:45:57  25   advise the Court of some dates and some recent developments.

36

11:46:00   1   But respectfully, if it pleases the Court, may I ask to
11:46:03   2   renew my request to seal the hearing from folks in the
11:46:07   3   public?
11:46:08   4       THE COURT:  I think, as a practical matter,
11:46:11   5   Mr. Varughese, it probably will not make -- to the extent
11:46:16   6   you need to share information that would otherwise be
11:46:19   7   confidential, it sounds like you do, it's probably not going
11:46:22   8   to be practical to do that here on our teleconference.
11:46:25   9   Unlike if we were physically in court, I can't confirm that
11:46:29  10   our "virtual courtroom" has been cleared.
11:46:32  11       So, I think what I would do is I think it may be
11:46:36  12   helpful for me to direct the parties to provide me with a
11:46:39  13   short joint status report with regard to this issue where
11:46:48  14   the parties can tell me whatever they wish to tell me about
11:46:51  15   the current state of affairs and Plaintiffs' concerns to
11:46:52  16   Defendants' responses.  And then to the extent that I feel
11:46:55  17   that I either need to set up an additional call or request
11:46:55  18   that if there's a request for relief that it be made in
11:47:00  19   writing, I can do so.
11:47:00  20       So, I'd be contemplating maybe a joint letter of
11:47:03  21   no more than, say, three single-spaced pages that the
11:47:06  22   parties might provide within a week.  That's just off the
11:47:09  23   top of my head.  But you all, I know you've got other issues
11:47:12  24   and things you're dealing with in the case.
11:47:14  25       Is that workable for you on Plaintiffs' side,