

**WILMINGTON**
RODNEY SQUARE

**NEW YORK**
ROCKEFELLER CENTER

**Anne Shea Gaza**
P 302.571.6727
agaza@ycst.com

August 17, 2022

**VIA CM/ECF & HAND DELIVERY**

The Honorable Colm F. Connolly
United States District Court
   for the District of Delaware
844 N. King Street
Wilmington, DE 19801

**REDACTED VERSION**

Re: *BioDelivery Sciences International, et al. v. Chemo Research, S.L., et al.*,
C.A. No. 1:19-cv-444-CFC-CJB

Dear Chief Judge Connolly:

     Chemo responds to BDSI's August 15 letter (D.I. 499) to correct several glaring inaccuracies.

     *First*, BDSI purports to provide a "history" of Chemo's interactions with FDA, but BDSI omits the most salient facts. In its October 2019 Complete Response Letter ("CRL"), the FDA asked Chemo to add a pH specification to the in-process control parameters used to make Chemo's ANDA product. Ex. A at 0044792. In May 2021, Chemo submitted that pH specification to the FDA, and that pH specification is a central focus of the infringement issues in this case. Ex. B at 0058146-47.

*See* Ex. C.

(emphases added). FDA has not rejected Chemo's pH specification or raised any concerns with it. Thus, BDSI's speculation that FDA may reject Chemo's pH specification or force Chemo to amend the specification is unfounded.

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
August 17, 2022
Page 2

*Second*, BDSI notes that ▮▮▮▮ (*see* D.I. 499 at 1), but wrongly claims that ▮▮▮▮ *See id.* at 2. ▮▮▮▮ BDSI even acknowledges that Chemo ▮▮▮▮ *See* D.I. 499 at 2. Thus, ▮▮▮▮ are not a reason to delay trial.

BDSI improperly tries to extrapolate ▮▮▮▮ But, in doing so, BDSI relies on a previously stricken declaration from its expert (D.I. 465-1, Ex. 1)[1] and old stability data. Inexplicably, BDSI fails to cite, or even mention, ▮▮▮▮ although that material was produced to BDSI on July 29. ▮▮▮▮ ellingly, ▮▮▮▮ BDSI (and the expert declaration on which it relies) fails to mention any issues with ▮▮▮▮ of Chemo's ANDA product.

Rather, BDSI raises two red herrings. BDSI first relies on ▮▮▮▮ *See* D.I. 499 at 2 (citing Ex. 6). This is incorrect. FDA approval determinations are not based on ▮▮▮▮ results, but are instead based on "long-term"

---

[1] This declaration was stricken by Magistrate Judge Burke. *See* D.I. 458.

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
August 17, 2022
Page 3

(*i.e.*, room temperature and humidity) stability conditions. D.I. 468 at ¶ 10; *see also* Ex. J at 4-5. Under long-term stability conditions, ███████████████████████████████████████████████████████████████████████████████████ But, FDA requires a minimum of only 12 months of passing long-term stability data for approval, ████████████████████████ ███ D.I. 468 at ¶ 11; *see also* Ex. J. Accordingly, there is no reason to delay trial based on BDSI's speculative stability concerns.

*Third*, BDSI wrongly claims that the stability issues are "directly related" to Chemo's pH specification. But Chemo concluded, after an extensive investigation, that ██████████████████████████████████████████████████████████████████████████████████████████████████ *ee* Ex. K. The █████████████████████ is not relevant to the pH issues in this case. Even though BDSI possessed this information for more than two weeks before it submitted its letter, it chose to cherry-pick an outdated, mid-investigation hypothesis that █ ████████████████████████████████████████████████. *See* D.I. 499 at 2 (citing Ex. 7) (emphasis added). As Chemo's investigation continued, this hypothesis was not borne out. BDSI also cites to Chemo's expert reports but fails to mention that Chemo's experts' opinions are directed to █████████████████ █████████████████████████████████████████████████████. *See, e.g.,* D.I. 465-2, Ex. 11 at ¶ 49. Accordingly, BDSI has no basis to suggest that Chemo's pH specification renders the ANDA product unapprovable, or to assert that FDA action is needed before proceeding to trial.

*Fourth*, and finally, BDSI wrongly suggests—without any support—that Chemo's ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ D.I. 499 at 1. BDSI fails to explain that ████████████████████████████████████████ ████████████████████████ Moreover, █████████████████████████████ ████ ignores that FDA amended its regulations so that "there is only one opportunity for a 30-month stay" for each dosage strength. *See* 68 Fed. Reg. 36675 (codified at 21 CFR 314). Consequently, any 30-month stay in connection with Chemo's additional dosage strengths should not delay trial in this case.

\*\*\*

Young Conaway Stargatt & Taylor, LLP
The Honorable Colm F. Connolly
August 17, 2022
Page 4

    FDA approval is not a prerequisite for adjudication under the Hatch-Waxman Act. *See* D.I. 372 at ¶ 3 ("the relevant statute provides for pre-FDA approval adjudication"); *see also Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1365-67 (Fed. Cir. 2015) (noting that the Hatch-Waxman statute "evidently contemplates litigation well before such tentative approval"). And consistent with that precedent, courts routinely adjudicate infringement issues in Hatch-Waxman cases before FDA approval. *See e.g.*, *Par Pharm., Inc. v Eagle Pharms., Inc.*, C.A. No. 18-cv-0823-CFC-JLH (D. Del.) (proceeding to trial in July 2021 despite product not being approved until December 2021[2]); *In re: Brimonidine Patent Litigation*, C.A. No. 07-md-1866-GMS (D.Del) (proceeding to trial despite lack of approval for Exela's ANDA[3]). BDSI's refusal to cooperate in scheduling this case for trial is grounded in speculation and conjecture, and an attempt to avoid adjudication of Chemo's non-infringing product. Chemo anticipates ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and intends to commercially launch its generic product as soon as it can. Accordingly, Defendants respectfully request the Court schedule a teleconference to address timing for trial and related pre- and post-trial matters in light of a potential launch of the accused product as early as ▮▮▮▮▮▮▮.

                                                                               Respectfully,

                                                                               */s/ Anne Shea Gaza*

                                                                              Anne Shea Gaza (No. 4093)

cc:  Hon. Christopher J. Burke (via Hand Delivery)
       All Counsel of Record (via E-mail)

---

[2] *See* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/211538Orig1s000ltr.pdf (FDA approval of Eagle's ANDA on December 15, 2021).

[3] *See* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021262 (showing no approved therapeutic equivalents owned by Exela).

# Exhibits A through I Redacted in Their Entirety

# Exhibit J

# Guidance for Industry
## Q1A(R2) Stability Testing of New Drug Substances and Products

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research (CDER)
Center for Biologics Evaluation and Research (CBER)

November 2003
ICH

Revision 2

*Contains Nonbinding Recommendations*

*Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Biotechnological/Biological Products*. In addition, specification for degradation products in a drug substance is discussed in ICH *Q3A Impurities in New Drug Substances*.

Stability studies should include testing of those attributes of the drug substance that are susceptible to change during storage and are likely to influence quality, safety, and/or efficacy. The testing should cover, as appropriate, the physical, chemical, biological, and microbiological attributes. Validated stability-indicating analytical procedures should be applied. Whether and to what extent replication should be performed should depend on the results from validation studies.

6. *Testing Frequency (2.1.6)*

For long-term studies, frequency of testing should be sufficient to establish the stability profile of the drug substance. For drug substances with a proposed retest period of at least 12 months, the frequency of testing at the long-term storage condition should normally be every 3 months over the first year, every 6 months over the second year, and annually thereafter through the proposed retest period.

At the accelerated storage condition, a minimum of three time points, including the initial and final time points (e.g., 0, 3, and 6 months), from a 6-month study is recommended. Where an expectation (based on development experience) exists that the results from accelerated studies are likely to approach significant change criteria, increased testing should be conducted either by adding samples at the final time point or including a fourth time point in the study design.

When testing at the intermediate storage condition is called for as a result of significant change at the accelerated storage condition, a minimum of four time points, including the initial and final time points (e.g., 0, 6, 9, 12 months), from a 12-month study is recommended.

7. *Storage Conditions (2.1.7)*

In general, a drug substance should be evaluated under storage conditions (with appropriate tolerances) that test its thermal stability and, if applicable, its sensitivity to moisture. The storage conditions and the lengths of studies chosen should be sufficient to cover storage, shipment, and subsequent use.

The long-term testing should cover a minimum of 12 months' duration on at least three primary batches at the time of submission and should be continued for a period of time sufficient to cover the proposed retest period. Additional data accumulated during the assessment period of the registration application should be submitted to the authorities if requested. Data from the accelerated storage condition and, if appropriate, from the intermediate storage condition can be used to evaluate the effect of short-term excursions outside the label storage conditions (such as might occur during shipping).

Long-term, accelerated, and, where appropriate, intermediate storage conditions for drug substances are detailed in the sections below. The general case should apply if the drug substance

*Contains Nonbinding Recommendations*

is not specifically covered by a subsequent section. Alternative storage conditions can be used if justified.

    a.    General case (2.1.7.1)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term* | 25°C ± 2°C/60% RH ± 5% RH or 30°C ± 2°C/65% RH ± 5% RH | 12 months |
| Intermediate** | 30°C ± 2°C/65% RH ± 5% RH | 6 months |
| Accelerated | 40°C ± 2°C/75% RH ± 5% RH | 6 months |

\* It is up to the applicant to decide whether long-term stability sturdies are performed at 25°C ± 2°C/60% RH ± 5% RH or 30°C ± 2°C/65% RH ± 5% RH.
\*\* If 30°C ± 2°C/65% RH ± 5% RH is the long-term condition, there is no intermediate condition.

If long-term studies are conducted at 25°C ± 2°C/60% RH ± 5% RH and *significant change* occurs at any time during 6 months' testing at the accelerated storage condition, additional testing at the intermediate storage condition should be conducted and evaluated against significant change criteria. Testing at the intermediate storage condition should include all tests, unless otherwise justified. The initial application should include a minimum of 6 months' data from a 12-month study at the intermediate storage condition.

*Significant change* for a drug substance is defined as failure to meet its specification.

    b.    Drug substances intended for storage in a refrigerator (2.1.7.2)

| Study | Storage condition | Minimum time period covered by data at submission |
|---|---|---|
| Long-term | 5°C ± 3°C | 12 months |
| Accelerated | 25°C ± 2°C/60% RH ± 5% RH | 6 months |

Data from refrigerated storage should be assessed according to the evaluation section of this guidance, except where explicitly noted below.

If significant change occurs between 3 and 6 months' testing at the accelerated storage condition, the proposed retest period should be based on the real time data available at the long-term storage condition.

If significant change occurs within the first 3 months' testing at the accelerated storage condition, a discussion should be provided to address the effect of short-term excursions outside the label storage condition (e.g., during shipping or handling). This discussion can be supported, if appropriate, by further testing on a single batch of the drug substance for a period shorter than

# Exhibit K
# Redacted in Its Entirety